# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

———————————————————————— x
                                              :
BRIAN HUNTER,                                 :
                                              :
      Plaintiff,                              :     07 Civ. 1307 (RJL)
                                              :
          v.                          :
                                              :
                                              :
                                              :
                                              :
FEDERAL ENERGY REGULATORY                     :
COMMISSION,                                   :
                                              :
                                              :
                                              :
                                              :
      Defendant.                              :
———————————————————————— x


**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A <u>PRELIMINARY INJUNCTION AND DECLARATORY RELIEF</u>**

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...................................................................................1

**ARGUMENT** ..........................................................................................................1

**I.**   **This Court Has The Power To Determine Whether FERC Is Acting Outside Its Jurisdiction**...................................................................................1

    A.   Plaintiff Is Challenging A Final Determination By FERC Of Its Jurisdiction, Not The Merits Of FERC's Underlying Allegations...............2

    B.   The *Ultra Vires* Doctrine Permits Judicial Review Apart From Whether Agency   Action Is Final For Purposes Of The Administrative Procedure Act ............................................................3

    C.   FERC's Assertion of Jurisdiction Is A Final Agency Action As That Concept Is Used In The Administrative Procedure Act.....................3

    D.   The Controversy Is Ripe For Adjudication ................................................4

    E.   Hunter Is Not Required To Seek Review In The Court Of Appeals............7

**II.**   **Hunter Is Likely to Prevail On The Merits**.................................................8

    A.   FERC Does Not Have Jurisdiction to Pursue An Anti-Manipulation Enforcement Action Against Natural Persons ............................................8

    B.   FERC Does Not Have Jurisdiction to Pursue An Anti-Manipulation Enforcement   Action  Against Those Who Are Alleged Solely To Have Traded Natural Gas *Futures* ............................................14

    C.   FERC's Interpretation of "In Connection With" Does Not Extend Its Jurisdiction To Natural Gas Futures Contracts .....................................18

**III.**   **The Balance of Equities Favors An Injunction** .........................................21

    A.   Hunter Has And Will Continue To Suffer Irreparable Harm....................21

    B.   An Injunction Will Not Harm FERC .......................................................25

**CONCLUSION**.....................................................................................................26

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ................................................................4, 6

*Am Agric. Movement, Inc. v. Bd. of Trade of City of Chicago,* 977 F.2d 1147 (7th Cir. 1992) ................................................................................................................................16

*American Dental Association v. Shalala*, 3 F.3d 445 (D.C. Cir. 1993) ...........................................12

*ARCO v. Dept. of Energy*, 769 F.2d 771 (D.C.Cir. 1985)................................................................5, 6

*Athlone Industries v. Consumer Products Safety Commissioner*, 707 F.2d 1485 (D.C. Cir. 1983)................................................................................................................................5, 6

*Bonneville Power Admin. v. F.E.R.C.*, 422 F.3d 908 (9th Cir. 2005) .............................................20

*Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52 (D.D.C. 2004) ....................................................................................................3, 4, 8, 23, 25

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C.Cir. 1996).........................3

*Chemical Bank v. Arthur Anderson & Co.* 726 F.2d 930 (2d Cir. 1984)..........................................19

*Chevron v. Natural Resources Defense Council,* 467 U.S. 837 (1984) ..............................................9

*Chicago Mercantile Exch. v. SEC,* 883 F.2d 537 (7th Cir. 1989)....................................................18

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986) ...........................................................3, 6

*City of Tucson, Ariz. v. C.I.R.*, 820 F.2d 1283  (D.C. Cir. 1987) ....................................................10

*Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004) ..............................................................................................................................23, 25

*District of Columbia v. Eastern Trans-Waste of Maryland, Inc.*, 758 A.2d 1 (D.C. 2000) ..............22

*Federal Trade Commission v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980) ..................................6

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ............................................................................3

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2002)................................................................15

*Harmon v. Brucker*, 355 U.S.579 (1958) ........................................................................................3

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F.Supp.2d 27 (D.D.C. 2002).................23

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001) ..........................................................................8

*Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)..........................................9

*Ontario Public Service Employees v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004) ..............19

*Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996) ..........................................25

*Rand v Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986) .......................................................19

*SEC v. Hopper*, 2006 WL 778640 (S.D. Tex. March 24, 2006) .......................................................17

*Smith v. United States*, 508 U.S. 223 (1993)..................................................................................10

*State of California ex. Rel Water Resources Control Bd. v. FERC*, 966 F.2d 1541 (9th Cir. 1992) ........................................................................................................4

*United States v Reliant Energy Services Inc.*, 420 F.Supp.2d 1043 (N.D. Cal. 2006)......16

*United States v. Akintobi*, 159 F.3d 401 (9th Cir. 1998) ...............................................10

*United States v. Cabrini Medical Ctr.*, 639 F.2d 908 (2d Cir. 1981) ...............................6

*Wolverine Power Co. v. FERC*, 963 F.2d 446 (D.C. Cir. 1992) .....................................13

## Statutes and Rules

15 U.S.C. § 717 .......................................................................7, 10, 11, 12, 13, 15, 18

16 U.S.C. § 823 ...............................................................................................13

16 U.S.C. § 825 ...............................................................................................12

16 U.S.C. §§ 812-813 .......................................................................................15

16 U.S.C. §§ 813 .............................................................................................15

18 C.F.R. § 1c1.1 (2006) ...................................................................................10

5 U.S.C. §§ 551 ...............................................................................................3

7 U.S.C. § 2 ...............................................................................................16, 17

## Other Authorities

120 Cong. Rec. 34,736 (Oct. 9, 1974)................................................................17

*Black's Law Dictionary* (6th Ed. 1990)...............................................................11

H. Conf. Rep. No. 93-1383, 93rd Cong., 2d Sess. (1974)....................................17

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976)..........................................................16

Sen. Rep. No. 93-1131, 93rd Cong., 2d Sess., 54 (1974) .....................................17

*Webster's 3rd International Dictionary* (1993). ..................................................11

## PRELIMINARY STATEMENT

Plaintiff Brian Hunter ("Hunter"), by and through his attorneys, Kobre & Kim LLP, respectfully submits this memorandum of law in support of his motion for an injunction and declaratory judgment that the Federal Energy Regulatory Commission ("FERC") lacks the statutory authority to pursue its pending enforcement action against Hunter. In pursuing its current enforcement action against Hunter, the FERC is acting outside the statute that empowered it. The enabling statute only authorized the FERC to bring enforcement actions in the wholesale physical gas markets, not futures markets, and against entities, not natural persons such as Hunter. FERC's lawless enforcement action is a significant force in the disintegration of Hunter's business, and Hunter respectfully petitions this Court to compel the FERC to obey the law.

While the FERC argues that it serves the public good for the agency to pursue the type of enforcement action that is at issue here, this Court should send a clear message that the proper remedy for the FERC is to ask Congress to amend the statute and if appropriate to grant such authority to the FERC, not to pursue a *ultra vires* enforcement action.

## ARGUMENT

### I. This Court Has The Power To Determine Whether FERC Is Acting Outside Its Jurisdiction

This Court has the power to review FERC's assertion of jurisdiction to pursue an enforcement action against natural persons who allegedly manipulated natural gas futures. FERC's assertion of its purported authority to do so is a final agency action. FERC has definitively and repeatedly claimed it has this authority,[1] and its action against Hunter is premised upon it.[2] Whether FERC's assertion of its

---

1 For example, on May 16, 2007, FERC issued a formal order of investigation, asserting its jurisdiction under the Natural Gas Act ("NGA") to investigate whether any entities manipulated the price of NYMEX Natural Gas Futures Contracts in such a way as to affect Commission-jurisdictional natural gas transactions. On July 20, 2007, FERC provided notice of its intent to issue an Order to Show Cause and Notice of Proposed Penalties (the "OSC") against Plaintiff, purportedly pursuant to FERC's enforcement powers under the Energy Policy Act of 2005 (the "EPAct"). *See* Declaration of Justin V. Shur in Support of Plaintiff's Motion for a Preliminary Injunction and Declaratory Relief; s*ee also* Supplemental Declaration of Justin V. Shur in Further Support of Plaintiff's Motion for a Preliminary Injunction and Declaratory Relief at

authority is correct presents a purely legal question that does not require any fact-finding nor an adjudication of the merits of the underlying allegations. As such, the issue whether FERC's action is *ultra vires* is a ripe controversy that this Court can resolve.

A. Plaintiff Is Challenging A Final Determination By FERC Of Its Jurisdiction, Not The Merits Of FERC's Underlying Allegations

FERC attempts to evade judicial review by mischaracterizing Hunter's challenge as an attack on the merits of FERC's allegations against him.[3] FERC presents a straw man to distract the Court from the legal issue before it. *Hunter is not now challenging the merits of FERC's enforcement action*. Hunter is not asking the Court to opine on whether Plaintiff should be found liable for the allegations against him by FERC or to make any factual findings regarding the accuracy of FERC's allegations. Rather, Hunter is challenging FERC's final and unequivocal determination that it has the statutory authority to pursue an enforcement action against a natural person who is only alleged to have traded natural gas futures contracts. Plaintiff's Complaint seeks an injunction and a declaratory judgment that FERC's very assertion of jurisdiction over Hunter—a *natural person* who even FERC agrees traded *only* natural gas *futures* (rather than physical gas)—is *ultra vires*. (Plaintiff's Complaint at ¶¶ 55-63, Plaintiff's Prayer for Relief on Count 1, at ¶ 1.) Clearly, FERC has reached a final determination on the question of its jurisdiction, and it is that determination that Hunter is challenging. As discussed further herein, Hunter's challenge presents a pure legal issue—an issue that the agency has definitely already decided in its favor.

---

¶¶ 3-6 (citing examples of FERC Commissioner Joseph T. Kelliher making public statements confirming the FERC's view that it has enforcement authority over natural persons who trade natural gas futures).

2 *See, e.g.*, OSC at ¶¶ 3, 44, 48; *see also* Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction (hereafter "FERC Mem.") at 7, 12-13, 17, 18.

3 *See* FERC Mem. at 10 n.5 ("In this action, Plaintiff is challenging the merits of FERC's actions…" (emphasis added)); *Id.* at 10 ("Instead, Plaintiff asserts that the relevant anti-manipulation provision of the [EPAct] does not *apply to his conduct* and therefore, the enforcement action is improper. Plaintiff may respond to the OSC with facts that may *bear on the issue whether he violated FERC's regulations*." (emphasis added); *Id.* at 9.

B.     The *Ultra Vires* Doctrine Permits Judicial Review Apart From Whether Agency

Action Is Final For Purposes Of The Administrative Procedure Act

In addition to mischaracterizing Hunter's application as a challenge to the merits of the FERC

administrative enforcement action, FERC attempts to shield itself from judicial scrutiny by invoking

the Administrative Procedure Act ("APA").  However, as a threshold matter, the APA is inapplicable

to Hunter's challenge because Hunter is relying on the inherent authority of a court to review federal

officials' *ultra vires* acts, an authority that is conferred on Article III Judges by 28 U.S.C. § 1331, and

which is a source of jurisdiction that is separate and distinct from the APA.[4]

C.     FERC's Assertion of Jurisdiction Is A Final Agency Action As That Concept Is Used In

The Administrative Procedure Act

Even under the APA, however, FERC's assertion of jurisdiction in bringing this enforcement

action constitutes a final "agency action," which for reasons described herein, is sufficiently "final" to

be warrant review by this Court.[5]

FERC's unequivocal assertion of jurisdiction over this matter is "final" even if, as FERC

asserts, the APA applies to this application (as explained herein, courts have held that the APA's

limitations do not apply where an agency is found to be acting *ultra vires*).  To determine whether an

agency action is "final," the Court need only look to "whether the agency has completed its decision-

making process, and whether the result of that process is one that will directly affect the parties."

*Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 59 (D.D.C. 2004)

(Leon, J.) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (holding that a Court may

review—prior to the conclusion of ongoing administrative proceedings alleging wrongdoing by

---

[4] *See Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1327 (D.C.Cir. 1996) (reviewing regulations implementing an executive order even though suit would not qualify under the APA, reasoning that "generally, judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers" (quoting *Harmon v. Brucker*, 355 U.S.579, 581-82 (1958) and citing several Supreme Court and D.C. Circuit cases holding that federal courts have jurisdiction under section 1331 to review whether an agency exceeded its delegated authority and that nothing in the APA repealed the grant of authority to review of *ultra vires* actions).)

[5] *See* 5 U.S.C. §§ 551(4), 551(13) (defining "agency action" to include "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy…"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) ("The term `agency action' encompasses an agency's interpretation of law.")

plaintiff—defendant-agency's decision to follow an allegedly improper administrative decision-making procedure that affected the plaintiff's interests, where the plaintiff was "not seeking to review the merits of either of the ongoing administrative proceedings.")

By this well-established definition, FERC's assertion of jurisdiction is a final act subject to judicial scrutiny.   FERC has clearly decided that it has jurisdiction to enforce against natural persons who allegedly affected physical gas markets solely by virtue of their trading activity in natural gas *futures* rather than physical gas.  Hunter is directly affected by such decision because for him, FERC's assertion of jurisdiction is not a matter of academic curiosity.  FERC has instituted an enforcement action against Hunter for such alleged acts, and Hunter is therefore a party who is "directly affect[ed]." *Id.*

D.    The Controversy Is Ripe For Adjudication

FERC's assertion of jurisdiction, as an *ultra vires* act reviewable under Section 1331 or as "final agency action" reviewable under the APA, constitutes a final determination that is ripe.   In determining ripeness, courts consider "both the fitness of the issue for judicial review and the hardship to the parties of withholding consideration."   *Brendsel*, 339 F. Supp. 2d at 59 (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) (abrogated by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980)).  With respect to fitness, courts consider: (1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes "final agency action"; (3) whether the challenged agency action has or will have a direct and immediate impact upon the petitioners; and (4) whether resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency.  *Abbott Laboratories,* 387 U.S. at 149. Indeed, "[i]t is difficult to postulate an issue more proper for judicial decision than that of the statutory authority of an administrative agency."  *State of California ex. Rel Water Resources Control Bd. v. FERC*, 966 F.2d 1541, 1562 (9th Cir. 1992) (finding agency's determination of authority ripe for judicial review).

4

First, FERC's asserted authority to bring enforcement actions against natural persons concerning transactions exclusively in natural gas futures contracts (not wholesale natural gas) is a matter of statutory interpretation, and does not turn on the merits of the factual allegations against Hunter. Despite FERC's obvious attempt to include complicated factual recitations in its memorandum of law (perhaps in the hope that the Court will be tempted to send the matter to the agency for determination), there is no factual dispute before the Court. That is, it is *undisputed* that Hunter is a natural person, and it is *undisputed* that according to the OSC, Hunter is not alleged to have traded physical natural gas.[6] These are the only two premises necessary for the Court to resolve the legal issue before it.

Indeed, courts routinely find an agency's final determination as to its jurisdiction to be a purely legal issue that is ripe for review. As the D.C. Circuit stated in *ARCO v. Dept. of Energy*, 769 F.2d 771 (D.C. Cir. 1985):

> The question whether the Department of Energy has statutory authority to adjudicate price-control controversies and to impose discovery sanctions clearly meets this test…We have no need for a particularized factual record to assist us in deciding the only issue presented: the scope of the Department's statutory powers in the two foregoing respects. Questions of statutory interpretation are the day-to-day business of the courts.

*ARCO*, 769 F.2d at 783 (holding that challenge to Department of Energy's authority to levy a discovery sanction in the course of an administrative adjudication was immediately ripe); s*ee also Athlone Industries v. Consumer Products Safety Commissioner*, 707 F.2d 1485, 1489 (D.C. Cir. 1983) ("We note first that the scope of the Commission's statutory authority is strictly a legal issue. No factual development or application of agency expertise will aid the court's decision. Nor will a decision by the court invade the field of agency expertise or discretion. '[W]here the only ... dispute relates to the meaning of the statutory term ... [the controversy] presents issues on which courts, and not [administrators] are relatively more expert.'"); *United States v. Cabrini Medical Ctr.*, 639 F.2d

---

[6] As explained further herein, an examination of the relevant FERC enabling statutes reveals that FERC is not statutorily authorized to pursue an anti-manipulation enforcement proceeding against natural persons (as opposed to companies) or against those who only traded natural gas futures contracts rather than physical gas.

908, 910 (2d Cir. 1981) (holding that Rehabilitation Act did not confer jurisdiction upon agency to investigate hospital and determining that it was proper to reach this decision before agency had completed its investigation, as it was a purely legal question of statutory jurisdiction, stating, "We see no point in permitting the Government to institute an investigation with its attendant inconvenience, expense, and annoyance if there is and can be no authority for undertaking it.") (Abrogated on other grounds).  Thus, Plaintiff's challenge clearly satisfies the first factor for "fitness."

Second, the challenged agency action is also sufficiently "final" to be appropriate for judicial scrutiny.  The Supreme Court has held that "finality" must be determined in a "flexible" and "pragmatic" way.  *Abbott Laboratories,* 387 U.S. at 149-50 (1967); *Ciba-Geigy Corp.* 801 F.2d at 435.  Not only has FERC repeatedly pronounced its determination of jurisdiction in rejecting Hunter's previous objection to jurisdiction, FERC's enforcement action is necessarily premised upon that purported authority.  *See, e.g.*, *Athlone*, 707 F.2d at 1489 ("By filing a complaint in the present case, the Commission, for all practical purposes, made a final determination that such proceedings were within its statutory jurisdiction"); *ARCO*, 769 F.2d at 783 (stating that by subjecting ARCO to adjudicatory proceedings, the Department of Energy has made a final determination that such proceedings are within its statutory jurisdiction).[7]

Third, the challenged action will have a direct and immediate impact on Hunter.  Apart from the irreparable harm from FERC's action detailed in Hunter's declarations, FERC's enforcement action has a direct and immediate impact on Hunter as it requires him now to utilize counsel and gather evidence in order to respond to FERC's allegations or risk losing some $30 million in penalties that FERC has preliminarily determined against him.

---

[7]  *Compare Federal Trade Commission v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980) (holding that court did not have jurisdiction to review whether the agency had "reason to believe" there was a violation when it filed its complaint, as required by statute, because at that time the agency had yet to make a definitive determination as to whether there had in fact been a violation).  Here, unlike *Standard Oil*, the agency has reached a definitive determination that it has the jurisdiction to bring this enforcement action, whether or not it ultimately concludes that Plaintiff violated the relevant anti-manipulation provisions.

Fourth, resolution by this Court will foster efficient administration by FERC by providing certainty with respect to its jurisdiction—a necessary pre-requisite to its initiation of this enforcement action. This case is an important one to many constituents. It is an important case for FERC because it is the very first enforcement action under FERC's new anti-manipulation rule. It is also the first enforcement action brought against a natural person who traded only natural gas futures contracts. Resolving the question of FERC's jurisdiction will provide much-needed certainty not only for the agency, but also the many thousands of participants in the futures market who are now plagued by uncertainty as to whether they are regulated solely by the CFTC (as had been the belief until recent weeks) or whether their actions are now subject to some unarticulated standards of FERC.

E.     Hunter Is Not Required To Seek Review In The Court Of Appeals

FERC baldly asserts that Section 19(b) of the NGA dictates that Hunter's arguments must be directed to the U.S. Court of Appeals after FERC administrative litigation has run its course. *See* FERC Mem. at 18. FERC's claim is that it can bring lawless enforcement actions against persons outside the scope of its statute, yet no Article III judge can stop it until after its administrative enforcement action had concluded and any irreparable harm had already been inflicted on such persons. FERC's outlandish view of its own immunity from judicial scrutiny is not supported by the law. FERC's citation to Section 19(b) of the NGA is wholly misplaced. Section 19(b) explicitly applies only to "[a]ny party to a proceeding under this chapter *aggrieved by an order* issued by the Commission *in such proceeding*." 15 U.S.C. § 717(r). However, Hunter is not seeking review of an "order" issued in a FERC proceeding, and as stated previously, is not challenging the merits of the underlying allegations in the OSC or otherwise seeking to appeal some order issued by FERC in such proceedings.[8] Hunter is seeking review of FERC's determination that it has jurisdiction to bring an anti-manipulation case against a natural person for allegedly improper natural gas futures trading—a

---

[8] The APA defines "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. 511(6) (emphasis added)

determination that exists independent of the OSC or the merits of the underlying enforcement proceeding against Hunter. *See, e.g.*, *Brendsel*, 339 F. Supp. 2d 52 at 59 (holding that plaintiff was not required to seek review in the Court of Appeals under a statute that similarly provided that a party to a proceeding may obtain review of a "final order" issued by the agency in the Court of Appeals, stating that plaintiff "is not seeking to review the merits of either of the ongoing administrative proceedings").

## II.    Hunter Is Likely to Prevail On The Merits

### A. FERC Does Not Have Jurisdiction to Pursue An Anti-Manipulation Enforcement Action Against Natural Persons

FERC repeatedly claims that it has the power to pursue the enforcement action here because Congress authorized it to bring an anti-manipulation case against *any entity*. *See* FERC Mem. at 12-13. FERC asserts that the EPAct, which amended the Natural Gas Act ("NGA"), granted it broad authority to prevent market manipulation affecting sales and transportation of natural gas within its jurisdiction. However, an examination of the relevant statute reveals that FERC has no power to pursue an enforcement action against Hunter, a *natural person* who is alleged to have traded natural gas *futures* only (rather than physical natural gas).

#### i. FERC Cannot Confer Greater Authority On Itself Than What The Statute Permits

It is well-established that an agency cannot confer on itself greater powers through the promulgation of a rule (such as Order 670) than granted to it by Congress. FERC has "no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress. It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (citation omitted) (vacating EPA's decision to administer a federal permit program in lands whose Indian country status was considered to be "in question" because such authority was not

explicitly delegated to EPA by statute).  Where FERC "lacks authority under the [NGA]…its action is plainly contrary to law, and cannot stand."  *Id*.

To determine whether FERC's action is contrary to law, the Court looks first to the enabling statute, in this case, the NGA, amended by the EPAct.  To assess the "validity of an agency's interpretation of a statute" the Court must ask "whether Congress has directly spoken to the precise question at issue.  If so, the court, as well as the agency must give effect to the unambiguously expressed intent of Congress."  *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1069 (D.C. Cir. 1998) (enjoining FDA regulation which was unenforceable because it was inconsistent with the plain language of the applicable statute); *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842-843 (1984) ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

Although FERC complains that restricting its averted enforcement powers would cause it inconvenience and harm, *see* FERC Mem. at 24-26, and claims that the CFTC currently is friendly to the scope of FERC's self-described authority and has said nice things about FERC, *see* FERC Mem. at 17-18, these complaints cannot confer upon FERC authority that Congress did not grant under the NGA.  The mutually congratulatory and self-serving press conferences of FERC and the CFTC are unavailing on the question of FERC's jurisdiction.  Whether the EPAct conferred power on FERC to enforce its anti-manipulation provisions against a natural person did not trade physical natural gas, is a pure question of law for this Court to resolve.  As explained below, the EPAct did not confer on FERC the power it assumes here.

ii.  The NGA Limits FERC's Anti-Manipulation Authority to Any "Entity," Which

Does *Not* Include Natural Persons

FERC asserts that it has jurisdiction to bring an administrative enforcement action against

Hunter, a natural person, because in FERC's opinion the phrase "any entity" in the EPAct should

include natural persons as well as companies, and cites its own Order as the legal authority:

> Order 670 also states that the statutory phrase "any entity" (which is repeated in the Anti-Manipulation Rule) covers not just companies that have traditionally been subject to FERC jurisdiction (such as natural gas pipeline companies or public utilities), but also to include any company or firm, *and natural persons as well* who "intend to affect, or have acted recklessly to affect, a jurisdictional transaction."  FERC Mem. 12. (emphasis added).

However, by its plain terms, the anti-manipulation provisions of the NGA as introduced by the EPAct

proscribes only manipulation of FERC jurisdictional transactions by "any entity" and does not include

the "and natural persons" phrase that FERC has appropriated for itself.  The statute provides:

> It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas…subject to the jurisdiction of the [FERC], any manipulative or deceptive device or contrivance.

*See* 15 U.S.C. § 717c-1.  FERC's Rule 1c.1 merely parrots the language of the statute.  *See* 18 C.F.R. §

1c1.1 (2006).  The anti-manipulation provision does not subject any "natural person" to an

enforcement action for violation of the anti-manipulation provisions.  Although FERC argues that

"entity" includes natural persons, a review of the NGA proves otherwise.

The NGA does not explicitly define "entities," but the plain meaning of the word and basic

rules of statutory construction would exclude human beings.  Courts must "attribute to non-technical

statutory words their 'known and ordinary signification.'"  *City of Tucson, Ariz. v. C.I.R.*, 820 F.2d

1283, 1288-89 (D.C. Cir. 1987).  When a term lacks a statutory definition, the court will normally

construe the term in accord with its ordinary meaning.  *Smith v. United States*, 508 U.S. 223, 228

(1993).  This canon of construction begins by examining the term's dictionary definition.  *See United

States v. Akintobi*, 159 F.3d 401, 403 (9th Cir. 1998) (using a dictionary to construe the term "proceeds"

in the federal money laundering statute).  *Black's Law Dictionary* defines the term "legal entity" as a

"entity, *other than a natural person*…that can function legally, sue or be sued, and make decisions through agents as in the case of corporations." *Black's Law Dictionary* (6th Ed. 1990). *Webster's* does not define "entity" to include individuals, but instead states that an entity is an "organization (as a business or governmental unit) that has an identity separate from those of its members." *Webster's 3rd International Dictionary* (1993).

The absence of "natural persons" in the NGA's anti-manipulation provision is significant because when the NGA wishes to refer to human beings, it makes such reference clear. The NGA has several provisions that are applicable to both human beings and companies (*see, e.g.,* 15 U.S.C. § 717g-(a) (imposing burden of proof on any "person" making, authorizing, or requiring certain accounting entries questioned by FERC); 15 U.S.C. § 717m-(d) (permitting judicial compulsion of testimony and document production in cases of contumacy by any "person")); various provisions of the NGA are not aimed at "entities" but rather at "persons" (*see, e.g.,* 15 U.S.C. § 717b (providing that no "person" shall import or export natural gas without FERC's express permission)); and the NGA explicitly defines the term "person" as including both "an individual or a corporation." 15 U.S.C. § 717a-(1). The NGA uses the term "persons" (meant to include both human beings and companies) in various places to describe provisions applicable to both natural persons and organizations, but notably does <u>not</u> use such term when describing the anti-manipulation provision and the market transparency rules. Nothing prevented Congress from including the term "natural person" or "person" (as opposed to "entity") in the anti-manipulation provision for FERC. *See, e.g.,* 15 U.S.C. § 717g-(a) (imposing requirements on any "person making, authorizing, or requiring" certain record-keeping entries); 15 U.S.C. § 717m-(d) (providing FERC with subpoena and testimony-taking powers over any applicable "person"). Instead, here Congress spoke directly to the precise question at issue, and used the term "entity."

The only other reference to the word "entity" in the NGA supports the view that, as used in the statute, the term "entity" refers only to companies or organizations rather than individuals. In 15

U.S.C. § 717t-2(3)(B), which concerns natural gas market transparency rules providing for the publication of certain price and volume information, the statute provides that FERC may "rely on entities other than the [FERC] to receive information." In this context, the statute is obviously referring to organizations that obtain and aggregate information, rather than individuals. No natural person could possibly aggregate and publish the sum total of massive market information submitted pursuant to the statute.

The EPAct's amendments to the Federal Power Act ("FPA") support the argument that the NGA's anti-manipulation provision does not encompass natural persons. The EPAct also amended the FPA to provide FERC with enforcement authority in wholesale electricity markets. The FPA, like the NGA, distinguishes between "entity" and "person," consistently using the former to refer to groups or organizations, *see, e.g.,* 16 U.S.C. § 825d-(c)(1) and (2) (using "person" to denote an officer, director, partner, or other representative of an "entity," and describing an "entity" as comprising various types of "company, firm, or organization"), and clearly indicating when provisions are applicable to both natural persons and companies. *See, e.g.,* 16 U.S.C. § 825s-4 (particularizing "any State, municipality, corporation, association, firm, district, or individual").

In *American Dental Association v. Shalala*, 3 F.3d 445, 446 (D.C. Cir. 1993), the court considered whether the term "entity" included "individual persons" where the applicable statute did not define the term "entity." The court found that, just as in the NGA and the EPAct, although the statute "does not define 'entity,'…the term as used in the [Healthcare Quality Improvement] Act refers uniformly to groups and organizations." *Id.* at 446. In addition, the Court found, that, like the EPAct and the NGA, the statute in other provisions explicitly included human beings by using the word "person" rather than "entity," which the court held "would be nonsensical if 'entity' already encompassed 'person.' Thus, all of the textual evidence points in one direction: Congress did not intend the term "entity to encompass individual[s]." *Id.* at 447. In the same way, the NGA already uses the term "person" which includes human beings, in several places, *see, e.g.,* 15 U.S.C. 717f-(a)

("person or municipality"), but notably refers only to "entity" when articulating the anti-manipulation rule.  As the *American Dental Association* court observed, it would be nonsensical for the NGA to use "entity" in addition to the term "person" if the term already encompassed the definition of "person."

In an analogous case, FERC attempted to expand the classes of potential defendants under its power by reading into the statute phrases that were not there.  In *Wolverine Power Co. v. FERC*, 963 F.2d 446 (D.C. Cir. 1992), FERC attempted to levy a fine against Wolverine, an unlicensed utility even though the FPA confers on FERC the authority to levy civil penalties only on a "licensee, permittee or exemptee."  16 U.S.C. § 823(b)-(c).  FERC asserted in its proposed rulemaking that it would interpret these provisions of the statute to include those who engage in "conduct requiring a license."  *Wolverine Power Co.*, 963 F.2d at 448.  FERC cited policy reasons claiming it would be in the public interest for FERC to be able to enforce against "persons" who committed acts that would require a license, even though the statute said "licensee, permittee, or exemptee" and not "others who engage in conduct requiring a license."  *Id.* at 451-52.  The Court disagreed and held that the statutory language limiting FERC's civil penalty authority to a "licensee, permittee or exemptee" did *not* authorize the imposition of a civil penalty on those who simply engage in conduct requiring a license.  The Court noted that the FPA used the term "person" in other places, which included an "unlicensed individual or entity," and concluded that Congress "did not intend the expansive reading by FERC."  *Id.* at 450.  The Court stated:

> That Congress chose to use the term "person" in sections 314 and 316 and "licensee" in section 315 and also differentiated the two in the definitional section of the FPA...not only manifests a general distinction between the two terms but also demonstrates that Congress knew how to draft an enforcement provision applicable to a "licensee" but not a "person."  *Id.* at 451.

Similarly, in the NGA, Congress used both "person" (which includes human beings) and "entities" (which FERC wishfully interprets to include human beings).  As in *Wolverine Power Co.*, Congress obviously knew how to draft an enforcement provision applicable to natural persons, but

13

chose to limit the anti-manipulation provision to "entity."  FERC's attempt to appropriate jurisdiction over natural persons cannot create words where there are none in the statute.

B.      FERC Does Not Have Jurisdiction to Pursue An Anti-Manipulation Enforcement Action Against Those Who Are Alleged Solely To Have Traded Natural Gas *Futures*

In addition to lacking jurisdiction over natural persons, FERC lacks jurisdiction to pursue the enforcement action at issue because Congress did not authorize FERC to pursue anti-manipulation enforcement actions against those who solely traded natural gas *futures* and did not trade physical natural gas.

i.      Neither The NGA Nor The EPAct Grants Such Jurisdiction To FERC

As a threshold matter, FERC's enabling statutes do not grant FERC the ability to regulate trading in natural gas *futures* contracts.  The NGA and the FPA granted FERC enforcement jurisdiction over natural gas companies, the transport and sale of natural gas for ultimate distribution to the public, the regulation of utilities, and the sale and transmission of electricity.  15 U.S.C. §§ 717(a) and (b); 16 U.S.C. §§ 812-813.  The regulatory authority granted to FERC is limited to wholesale energy markets—the market for physical natural gas. Indeed, to avoid doubt about the scope of FERC's jurisdiction, Congress stated in the EPAct that "[n]othing in this Section may be construed to limit or affect the *exclusive* jurisdiction of the [CFTC] under the [CEA]."  15 U.S.C. § 717t-2(c)(2).[9]

Prior to the recent, sensationalistic publicity that made Amaranth and Plaintiff tempting targets for enforcement, FERC itself also believed that its jurisdiction extended only to wholesale physical gas transactions.  In its often-cited Order 670 interpreting its anti-manipulation rule, FERC stated that the purpose of the rule was to "deter or punish fraud in *wholesale* energy markets" and that the rule "does not, and is not intended to, expand the types of transactions subject to [FERC's] jurisdiction under the…NGA…" and that its "jurisdiction is limited to *certain wholesale transactions* that remain within

---

[9] In the *Memorandum of Understanding Between FERC and CFTC Regarding Information Sharing*, (October 12, 2005), ("MOU"), FERC specifically acknowledged that the CFTC has "***exclusive*** jurisdiction with respect to…transactions involving contracts of sale of a commodity for future delivery, including…natural gas"  (emphasis added).

the ambit of the NGA, [the Natural Gas Policy Act of 1978], and FPA." *See* Order 670 at ¶¶ 5, 16, 22 (emphases added). FERC even admitted that if Congress intended to expand the transactions under FERC's traditional jurisdiction via the EPAct, "it would have done so explicitly." *Id*. at ¶ 20.

ii.    The Commodity Exchange Act Granted Exclusive Jurisdiction Over Natural Gas Futures Contracts To The CFTC

Congress granted to the CFTC the *exclusive* authority to regulate all transactions involving futures contracts. When it adopted the Commodity Exchange Act ("CEA"), Congress specifically explained that the CFTC has "exclusive jurisdiction…with respect to accounts, agreements…and transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A) (2007). Congress intended the CEA to pre-empt any other federal or state authority regulating commodities futures trading. *See* Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 18 (1976) (describing the legislative history of the CEA and noting that "it is clear that the conferees intended the CFTC to be the sole regulatory authority for the futures industry"); *See FTC v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2002) ("[A]ll of the categories delineated…describe business deals that involve the buying and selling of futures, which comports with Congress's goal of conferring the CFTC with sole regulatory authority over futures contracts, markets or other exchanges").

FERC seeks to turn the careful regulatory structure governing natural gas futures contracts, on its head. Although FERC is correct when it states that the CEA does not "divest FERC or other federal regulators of their authority to pursue their traditional regulatory functions," FERC Mem. 16, that observation is irrelevant here, because FERC has conceded that its "traditional regulatory functions" are limited to wholesale energy transactions. *See* Order 670 at ¶¶ 5, 16, 20, 22. FERC also claims that the CEA does not "interfere or conflict with the new regulatory functions given to FERC in EPAct 2005." FERC Mem. 16. FERC has also conceded that EPAct did not enlarge FERC's traditional subject matter jurisdiction. *See* Order 670 at ¶¶ 5, 16, 20, 22. Both FERC's "traditional" and "new"

regulatory functions, therefore, are still limited to wholesale energy transactions, and do not include transactions in natural gas futures contracts.

FERC's reliance on the CEA (7 U.S.C. §2(a)(1)(A)) to support its claim of jurisdiction is misplaced.  FERC notes that the CEA does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States…or…restrict…such other authorities from carrying out their duties and responsibilities in accordance with such laws."  However, as set out above, Congress did not delegate any jurisdiction over natural gas futures contracts to FERC under the NGA.  Instead, Congress specifically mandated that the goal of the CFTC's exclusive jurisdiction over the futures markets was to "avoid unnecessary, overlapping and duplicative regulation." 120 Cong. Rec. 34,736 (Oct. 9, 1974).  As the Seventh Circuit noted, the goal of the CEA was to bring the futures markets "under a uniform set of regulations."  *Am Agric. Movement, Inc. v. Bd. of Trade of City of Chicago,* 977 F.2d 1147, 1155-57 (7th Cir. 1992) (rev'd in part on other grounds by *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918 (7th Cir., 1995).  Moreover, "the clarifying amendments make clear that (a) the [CFTC's] jurisdiction over futures contract markets or other exchanges is exclusive and includes the regulation of commodity accounts, commodity trading agreements, and commodity options; (b) *the [CFTC's] jurisdiction, where applicable, supersedes State as well as Federal agencies...*"  Sen. Rep. No. 93-1131, 93rd Cong., 2d Sess., 54 (1974) (emphasis added).  Stated alternatively, "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act…would preempt the field insofar as futures regulation is concerned."  H. Conf. Rep. No. 93-1383, 93rd Cong., 2d Sess. (1974).

FERC's resort to *United States v. Reliant Energy Services Inc*., 420 F.Supp.2d 1043 (N.D. Cal. 2006) is misconceived.  *Reliant Energy* deals only with the interpretation of the CEA, not with the NGA.  Reliant Energy ("Reliant") was charged by the CFTC with market manipulation under section 9(a)(2) of the CEA.  Reliant, unlike Amaranth, owned and operated physical plants that were both the motive and the means for part of its alleged scheme, which involved the direct manipulation of spot

markets and a direct artificial depression of available physical supply.  Reliant argued that the CEA regulates "only" futures markets, and that, "the CEA…is not applicable to wholesale electricity markets, which are regulated exclusively by FERC." *Id.* at 1061. The Court found that the CEA explicitly granted authority to the CFTC to bring enforcement charges concerning *both* commodities and futures contracts because §9(a)(2) "makes it a crime for any person to manipulate or attempt to manipulate the *price of any commodity in interstate commerce, or for future delivery*." *Id.* at 1062.  As set forth in *Reliant*, the CFTC's jurisdiction is broader than FERC's: unlike FERC, the CFTC has exclusive jurisdiction over futures as well as jurisdiction over physical commodities in some cases (hence not the name the "Commodities *and* Futures" Trading Commission).  FERC, however, has non-exclusive jurisdiction over wholesale energy only.  In considering exactly the anti-manipulation provisions that FERC relies on here, the court stated that "the recent amendments to the FPA" (by the EPAct being discussed here) do not "reveal an intent to keep electricity wholesalers outside of the reach of the CEA's anti-manipulation provisions." *Id.* at 1064.  It may be unpleasant for FERC, but futures trading falls exclusively within the jurisdiction of the CFTC and there is no reciprocal grant of statutory authority to FERC because the NGA *did not expand the Commission's traditional NGA and FPA subject matter jurisdiction*…"  Order 670 at ¶20 (emphasis added).  Indeed, such an extension of FERC's jurisdiction would render the CFTC's "exclusive" jurisdiction meaningless.  In contrast to the exclusive grant of authority over futures contracts plus the explicit right to regulate manipulation of the underlying commodity to the CFTC in the CEA, Congress pointed out in the NGA that "[n]othing in this Section may be construed to limit or affect the *exclusive* jurisdiction of the [CFTC] under the [CEA]."  *See* 15 U.S.C. § 717t-2(c)(2).[10]

---

[10] In addition, FERC's reliance on *SEC v. Hopper*, 2006 WL 778640 (S.D. Tex. March 24, 2006), is inapposite.  Unlike FERC, in *Hopper*, the SEC did not attempt to sanction the defendants in *Hopper* for price manipulation subject to the jurisdiction of the CFTC or of FERC.  Rather, in *Hopper*, the SEC's allegations concerned knowing misrepresentations to investors about the company's true "trading volumes and revenues." *Id.* at *12.  Because the financial reporting of wash sales is independent of those sales' alleged effect on prices, the accountants' alleged fraud on in *Hopper* was separate and distinct from any traders' alleged fraud on futures or physical markets.  It was the foregoing misrepresentations to investors, rather than artificial market prices for futures or for electricity, that were found to be potentially "in connection with" the sale of a security under Rule 10b-5.  *Ibid.*

Where, as here, the jurisdiction of the CFTC is exclusive and the jurisdiction of FERC is not, the latter is precluded from regulating activity in the area of alleged overlap. In *Chicago Mercantile Exch. v. SEC,* 883 F.2d 537 (7th Cir. 1989), the Seventh Circuit dealt with the claimed intersection between the CFTC and SEC's jurisdictions. The court found that even where a financial instrument is both a futures contract and a security—and thus apparently subject to the jurisdiction of both the CFTC and the SEC—the CFTC is "the sole regulator" because of the exclusivity provision of 7 U.S.C. § 2(a)(ii), which has no parallel in the enabling statute for the SEC. *Id.* at 539. *Chicago Mercantile Exch. v. SEC* is exactly on point. FERC does not cite *any* authority, much less any language in the NGA, purporting to grant it *exclusive* jurisdiction over the transactions governed by § 315 of the EPAct. By contrast, as FERC has conceded, the CFTC has "*exclusive* jurisdiction" over NYMEX futures settlements. *See* FERC Mem. 15. FERC's argument contradicts the straightforward conclusion that in cases involving the CFTC's exclusive jurisdiction over NYMEX, "[j]urisdiction never overlaps." *Chicago Mercantile Exch.,* 883 F.2d at 539. Indeed, FERC's assertion of jurisdiction over futures contracts would make the "exclusive" purview of the CFTC meaningless, and should be rejected outright by the Court, as a matter of law.

C.    FERC's Interpretation of "In Connection With" Does Not Extend Its Jurisdiction To Natural Gas Futures Contracts

To assert its self-described "complementary" jurisdiction with the CFTC, FERC claims that Section 717c-1's "in connection with" language grants it jurisdiction over any futures manipulation that "affects physical natural gas markets." FERC Mem. 13-14. It is undisputed that FERC is alleging that Plaintiff only traded natural gas futures, not that he was taking delivery of physical gas. Accepting *arguendo* FERC's allegations regarding Hunter's supposed manipulative scheme, FERC's theory of jurisdiction is that such manipulation of natural gas futures settlement prices had an "effect" on the price of physical gas transactions. In support of this proposition, FERC advances several complicated theories as to how natural gas futures trading could "affect" the price of physical gas transactions. *See*

18

FERC Mem. at 14-15. It is not necessary, however, for this Court to examine whether natural gas futures transactions "affect" the price of natural gas or the merits of FERC's specific allegations as to the effect of Hunter's trading of natural gas futures. The question before this Court is a simple question of law: does FERC have jurisdiction to pursue an anti-manipulation action against those whose sole alleged activity is trading natural gas futures, on the theory that futures trading is "in connection with the purchase or sale of natural gas" if such trading "affected" the price of physical natural gas? As explained below, the answer is a clear no.

The anti-manipulation provision at issue was modeled after section 10(b) of the Securities Exchange Act, *see* FERC Mem. at 12, and thus securities law regarding the meaning of "in connection with" in the Securities Exchange Act is valid precedent. In *Ontario Public Service Employees v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004)), the Second Circuit dismissed an action brought under Section 10(b) of the Exchange Act, and held that plaintiffs did not have standing to sue where the company whose stock they purchased was negatively impacted by the material misstatement of another company; because the anti-manipulation regulations under 10(b) reach purchases and sales of securities, not conduct that merely "*affected*" the price of companies' securities.

Contrary to FERC's claim that a penny-for-penny *effect* in the price of physical basis transactions from futures trading is sufficient for jurisdiction over natural gas futures trading, FERC Mem. 14, courts have found that even a catastrophic effect over the price of the object being regulated is insufficient to meet the "in connection with" requirement, when it is caused by non-jurisdictional conduct. In *Rand v. Anaconda-Ericsson, Inc*., 794 F.2d 843, 848 (2d Cir. 1986), the Second Circuit held that a false press release which had a catastrophic effect on the price of a security without being connected to purchases and sales of securities was not "in connection with" a jurisdictional transaction to constitute securities fraud under 10(b)(5); s*ee also Chemical Bank v. Arthur Anderson & Co.* 726 F.2d 930, 943 n.24 (2d Cir. 1984) (where a corporation misrepresented its financial status to a commercial lender when it pledged the securities of a subsidiary as collateral for a loan, and the bank

would not have made the loan without the representation, such "but for" causation was insufficient to confer Securities Exchange Act jurisdiction because the misrepresentations were "merely an incident in a transaction not otherwise involving the purchase or sale of securities"). Similarly, FERC's claim that natural gas prices are "affected" by the price of natural gas futures contracts is insufficient to extend its anti-manipulation enforcement authority over Plaintiff where there is no allegation that Plaintiff ever transacted in physical gas. Thus, a mere "effect" on a jurisdictional transaction is insufficient to render natural gas futures subject to FERC jurisdiction.

In *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005) ("*BPA*"), FERC engaged in the kind of end-run around its delegated authority that it is now attempting against Plaintiff, and was ultimately criticized and enjoined by the Court for doing so. In *BPA*, FERC tried to order refunds from non-public utilities, although the statute explicitly limited FERC's jurisdiction to order refunds form "public utilities" only. *Id.* at 918. Nevertheless, much like in this case, FERC attempted to counter the clear language of the FPA to include non-public utilities in its jurisdiction "by shifting analysis away from the identity of the sellers and focusing instead on the nature of their transactions and the markets and the tariffs under which these transactions were conducted." *Id.* at 919. FERC improperly asserted its jurisdiction over non-public utilities by arguing that sales by the non-public utilities "*involved wholesale sales of electric energy in interstate commerce…within FERC's jurisdiction.*" *Id.* (emphasis added). The court concluded that FERC's attempt to shoehorn non-public utilities into its jurisdiction by pointing to its general jurisdiction over wholesale sales of electric energy was improper, and "contravened the more specific provisions…that limit FERC's authority over government entities…and limit FERC's authority to 'public utilities.'" *Id.* at 920.

Here, FERC's opposition papers rely on precisely the argument that was rejected in *BPA*: FERC claims that while it "is not authorized to regulate all commodities trading behavior…the new NGA section…does give the FERC authority to enforce against any entity, if the manipulative trading…affects physical natural gas markets, which are unquestionably within FERC's jurisdiction."

FERC Mem. 12-13. As set out in *BPA*, FERC's assertion of jurisdiction over Plaintiff's trading in natural gas futures by pointing to its general jurisdiction over natural gas is improper. It contradicts the specific and "clear dictates of the statute," *Id.* at 920, and is an impermissible effort by executive branch officials to "restructure the scope of FERC's statutory authority." *Id.* at 926.

### III.    The Balance of Equities Favors An Injunction

#### A.    Hunter Has And Will Continue To Suffer Irreparable Harm

FERC's ongoing enforcement action threatens the very existence of Hunter's business, Solengo Capital Advisors ULC ("Solengo Capital Advisors"). As detailed in Hunter's Declaration and Supplemental Declaration, Solengo Capital Advisors is not just a business concept or a shell company. It is an actual, up-and-running business with 11 employees, offices in two countries, and substantial tangible assets, proprietary trading systems, and valuable intellectual property and intangible assets. Solengo Capital Advisors has already been engaged in various investment research and development activities that are of significant value, and was well on its way to managing private investment funds for select qualified investors (the "Solengo Managed Funds").

FERC's ongoing enforcement action has been a significant factor in causing ongoing harm to Solengo Capital Advisors and to Hunter, as described in detail in Hunter's Supplemental Declaration. In summary, citing in particular FERC's ongoing action, several professionals have left Solengo Capital Advisors, and several others have expressed similar intentions. These are highly-qualified professional traders whose unique talents and expertise cannot be replicated; as a result, the very value of the intellectual property and proprietary trading strategies and systems that Solengo Capital Advisors has spent the last several months developing is threatened with extinguishment. Moreover, Solengo Managed Fund's directors have now all resigned, shortly after being informed of the FERC action and the significant penalties that FERC seeks. Without directors, the Solengo Managed Funds essentially cannot function as they cannot be registered under the laws of the Cayman Islands. However, no new directors have agreed to replace the directors who have resigned. Furthermore, a

substantial number of prospective investors have lost interest in Solengo Managed Funds, again citing the ongoing FERC action. Since the filing of the OSC, the amount of money prospective investors have expressed an interest in investing has dropped from approximately US $800 million to approximately US $100 million.

Thus, Hunter will continue to suffer two types of harm if FERC is not enjoined: (a) Solengo Capital Advisors ULC will almost certainly disintegrate, such that Hunter faces the complete destruction of a business which has substantial assets and intellectual property, and which took a significant amount of money and effort to build; and (b) Solengo Managed Funds—the investment vehicle to which numerous investors had indicated interest in investing—will be unable to formally accept investments and will therefore be destroyed.[11]

These harms justify a preliminary injunction for at least three reasons. <u>First</u>, in the case of Solengo Capital Advisors, Plaintiff faces the complete destruction of his business, which alone warrants an injunction. *See District of Columbia v. Eastern Trans-Waste of Maryland, Inc.*, 758 A.2d 1, 15 (D.C. 2000) (affirming preliminary injunction and finding irreparable harm where economic loss "threaten[ed] the very existence of movant's business") (quotations omitted). <u>Second</u>, a preliminary injunction is justified because, with respect to either losses associated with Solengo Capital Advisors or Solengo Managed Fund, Hunter will likely be unable to recover money even if he ultimately prevails: If Hunter sues FERC, FERC will undoubtedly raise the defense of sovereign immunity under the Eleventh Amendment; to our knowledge, no relevant waiver of sovereign immunity would permit Hunter to sue for money damages, and no claim would exist under the Federal Tort Claims Act. As this Court has recognized, preliminary injunctions are warranted when the economic loss is

---

[11] As detailed in Plaintiff's Supplemental Declaration, Plaintiff also faces harm from damage to other business interests as a direct result of FERC's action.

unrecoverable. *See Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56, 65-66 (D.D.C. 2004) (Leon, J.); *accord. Brendsel*, 339 F. Supp. 2d at 66-67.[12]

*Third*, a preliminary injunction is appropriate because, even if recoverable, the damages stemming from Plaintiff's lost income, while clearly of *value*, would be very difficult to quantify to precise numbers.  This Court has recognized the appropriateness of preliminary injunctions in such situations.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F.Supp.2d 27, 34 (D.D.C. 2002) (Leon, J.) (in redressing the loss to Merrill Lynch of six former financial advisors in violation of their employment agreements, noting that damages could not be easily determined as "it is impossible to calculate the investments that would have flowed from the customers' accounts" and the "loss of confidential customer information and the loss of customer goodwill and trust…is a concrete harm that cannot be compensated with money damages").

In an attempt to paint the controversy as moot and therefore escape judicial scrutiny, FERC has mischaracterized Hunter's application as an attempt to stop the issuance of the OSC only.  *See* FERC Mem. at 20.  But this position is contradicted by the very relief that is requested in Plaintiff's Complaint.[13]  FERC also mischaracterizes the harm complained of by Hunter as essentially damage to "reputation," FERC Mem. 21, 23-24, rather than the very existence of the *ultra vires* FERC enforcement proceeding itself.  However, as explained in greater detail below and as is clear from the

---

[12] For example, in *Clarke*, this Court granted a preliminary injunction enjoining an agency from directing Freddie Mac to withhold assets and funds to which Clarke was presently entitled under his agreements with Freddie Mac.  Clarke asserted that, without the injunction, he would suffer irreparable injury because "he is not currently able to exercise restricted stock and stock options granted to him, and profits that would be reaped as a result of such exercise will be unrecoverable." *Clarke*, 355 F. Supp. 2d at 65.  Although the harm alleged was fundamentally economic and measurable in money, this Court recognized those profits as irreparable harm because Clarke would likely be unable to recover them.  With respect to the government agency, the Court noted that sovereign immunity would likely prohibit such a suit.  *See also Brendsel*, 339 F. Supp. 2d at 67 (suffering monetary damages as a result of improper government action qualifies as "irreparable injury" since government officials are likely immune from damages actions under a variety of statutory legal protections).

[13] In the Complaint, Hunter requests that the Court issue a declaratory judgment and grant relief with respect to not only the issuance of the OSC (which was obviously the most imminent aspect of FERC's conduct as of the TRO hearing) but also FERC's pursuit of its enforcement action and the very assertion of jurisdiction over this matter by FERC.  *See* Complaint at ¶¶ 12-13, 15.

Complaint itself, Hunter is seeking to enjoin FERC from *pursuing* its enforcement action, which is continuing to damage Hunter, not to keep FERC enforcement action a "secret" from the public.[14]

Finally, FERC states that the harm to Solengo Capital Advisors may be caused by other events, such as the CFTC action, other civil litigation and "bad publicity," which it notes Hunter has received in the past. FERC Mem. 21, 23-24. However, for reasons explained in Plaintiff's Supplemental Declaration, the harm that has occurred since FERC's OSC is a discrete, substantial, additional negative factor: the professionals, directors and investors that have now left or withdrawn interest had all approached Solengo with full knowledge of the publicity falling out of the collapse of Amaranth in 2006 and the existence of related civil litigation against Hunter. In addition, the professional, directors, prospective investors and other third parties who have or are threatening to depart have done so after learning of, or after making reference to, the FERC action, with its charge of *actual* manipulation and significant penalties.

In any case, however, even if these other events (such as the CFTC action or civil litigation) may contribute to the difficulties that Solengo Capital Advisors and Solengo Managed Funds are currently experiencing, that does not mean that FERC's action is *not* causing Plaintiff any harm and that FERC should just be permitted to proceed *ultra vires*. The legal standard for preliminary injunction is whether the plaintiff will suffer irreparable harm as a result of the defendant's actions if the injunction is not issued. The plaintiff is not required to prove that the defendant's action is the *sole* source of harm. Such a requirement would lead to the absurd result that a government agency could freely victimize a vulnerable party without fear of being enjoined, so long as that party was also being tormented by other government agencies. If the conduct is unlawful and harming the plaintiff, it should be enjoined, and whatever other problems the plaintiff may encounter as a result of lawful

---

[14] The Court should reject FERC's attempt to characterize Hunter's application as a complaint about FERC enforcement action becoming public (FERC argues, therefore, that the matter is moot). Obviously, in operating a regulated entity such as Solengo Capital Advisors ULC, Hunter would be obligated to inform potential investors, regulators, vendors, and others regarding the existence of FERC's enforcement action, whether it was public or not. As stated herein, Hunter is seeking to enjoin FERC from continuing with its enforcement action, not asking the Court to keep the matter a "secret" or complaining generally about harm to his reputation.

conduct by others is beyond the scope of what needs to be addressed by the Court.   Indeed, courts will enjoin a defendant from violating a plaintiff's rights even if other factors are also causing plaintiff's harm.  *See, e.g.*, *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996) (in patent suit, granting preliminary injunction and holding that the fact that there may be other infringers in the marketplace does not negate the statutory presumption of irreparable harm, stating "evidence that Westmark was not the principal or the sole cause of Polymer's lost sales does not provide legal support for the finding that Westmark rebutted the presumption of irreparable harm").

      B.    An Injunction Will Not Harm FERC

FERC argues that an injunction will cause "harm to FERC's enforcement program."  FERC does not—and cannot—explain how a temporary delay in its administrative litigation process for this case would "harm" its "enforcement program."  There is no reason to believe that witnesses or documents would become unavailable, nor is FERC seeking to stop some ongoing conduct by Hunter; all the conduct mentioned in the OSC is from 2006.  In any event, FERC assumes that its enforcement program is acting within the confines of its statutory jurisdiction in the first place.  To the contrary, the public interest weighs heavily in favor of Hunter.  As this Court has recognized, the public has a substantial interest in insuring that that the government agencies stay within the limits of its authority. *See Clarke*, 355 F. Supp. 2d at 65-66; *accord. Brendsel*, 339 F. Supp. 2d at 66-67.

## CONCLUSION

The Court should issue a preliminary injunction against the FERC's pursuing its enforcement action, and proceed to a declaratory judgment and permanent injunction hearing.

Dated: August 3, 2007
      New York, New York

Respectfully submitted,

KOBRE & KIM LLP

By: /s/ Michael S. Kim
    Michael S. Kim
    Natalie Holme Elsberg
    Leif T. Simonson
    Kobre & Kim LLP
    800 Third Avenue
    New York, New York 10022
    Telephone:    212.488.1200
    Facsimile:    212.488.1220

    Justin V. Shur (973855)
    Kobre & Kim LLP
    1050 Connecticut Avenue N.W.
    Washington, D.C. 20036
    Telephone:    202.664.1900
    Facsimile:    202.664.1920

    *Attorneys for Plaintiff Brian Hunter*