UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRIAN HUNTER, | : | |
| Plaintiff, | : | 07 Civ. 1307 (RJL) |
| v. | : | |
| | : | **SUPPLEMENTAL DECLARATION OF BRIAN HUNTER IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND <u>DECLARATORY RELIEF</u>** |
| FEDERAL ENERGY REGULATORY COMMISSION, | : | |
| Defendant. | : | |

### SUPPLEMENTAL DECLARATION OF BRIAN HUNTER IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DECLARATORY RELIEF

I, Brian Hunter, declare as follows:

<u>Overview</u>

1. I am the plaintiff in the above-captioned action.

2. On July 23, 2007, I filed a complaint seeking declaratory relief as well as a temporary restraining order ("TRO") and a preliminary injunction enjoining the Federal Energy Regulatory Commission ("FERC") from pursuing an *ultra vires* enforcement action against me. In support of my complaint, I made a declaration, dated July 23, 2007, in which I described the irreparable harm that FERC's enforcement action would cause me.

1

3. Since the filing of my complaint and declaration, and after the Court denied my request for a TRO, FERC initiated the enforcement action by issuing an Order to Show Cause and Notice of Proposed Penalties ("OSC") on July 26, 2007.

4. I now make this supplemental declaration to describe for the Court how the FERC's pursuit of its enforcement action through its OSC has caused me specific, identifiable, concrete and irreparable harm, how the continued existence of the FERC enforcement action will cause additional irreparable harm.

<u>Solengo Capital Advisors, ULC Is An Operating Business With Valuable Assets Even Apart From Investments In The Solengo Managed Funds</u>

5. As described more fully in my July 23 declaration, I currently serve as President of Solengo Capital Advisors, ULC, a company registered under the laws of the Province of Alberta, Canada ("Alberta"). I maintain a 60% ownership stake in Solengo Capital Advisors.

6. Solengo Capital Advisors is an ongoing business that has been and continues to be actively engaged in several activities, including: (a) recruiting and retaining a unique team of investment professionals in a highly competitive labor market; (b) building and maintaining office space and administrative infrastructure in two different countries; (c) managing a variety of business affairs, including ongoing legal matters, financing efforts, and investment research projects, among others; and (d) researching, building and maintaining highly valuable proprietary trading systems, strategies, and intellectual property associated with commodity derivatives trading. In addition, Solengo Capital Advisors is currently poised to execute its principal business strategy of providing investment advisory services to private investment funds for select qualified investors (the "Solengo Managed Funds"). As explained

2

further below, Solengo Capital Advisors was working toward being able to accept investors into Solengo Managed Funds before the FERC's OSC. The FERC's OSC has continued to damage Solengo Capital Advisors significantly and the company is now on the brink of complete disintegration.

7. Solengo Capital Advisors currently has 11 employees, and maintains offices in Calgary, Alberta and indirectly leases desk space in Greenwich, Connecticut. These offices are used for Solengo Capital Advisors' ongoing activities in human resources, financing, legal affairs, technical research into and development of trading strategies and investment opportunities, and other business areas, and are filled with furniture, computers, and other equipment that are being used every day.

8. Several other persons and I have spent significant time, money, and energy in establishing and operating Solengo Capital Advisors. Solengo Capital Advisors' employees and I have spent the past six months working full-time for Solengo Capital Advisors: leasing office space, designing proprietary trading strategies and systems, addressing questions from prospective investors, working to obtain relevant approvals and registrations, recruiting and retaining employees, developing and documenting a sophisticated legal structure, and negotiating critical business relationships. I have invested the bulk of the funds required by Solengo Capital Advisors up to this point, which has exceeded US $1.7 million, and spent an enormous amount of my time building Solengo to its present state.

9. These efforts are more than just aspirations or ideas; there is a real company there with employees, equipment, intellectual property, research, and other valuable assets. Solengo Capital Advisors now owns significant physical and intellectual property,

         including proprietary trading and risk management software and hardware and complex quantitative and qualitative trading strategies designed by Solengo Capital Advisors' portfolio managers and operations team (including risk managers) and commodity derivatives trading experts.

10. Solengo Capital Advisors' principals and portfolio managers all have advanced quantitative educational backgrounds and a high level of trading experience. Although Solengo Capital Advisors has many assets – physical and intangible – one of its most important assets is the team of highly qualified investment professionals that has been recruited, assembled, and retained at great expense. We have employees recruited from New York City, London, Connecticut, and Canada. These professionals have now worked together for several months researching investment opportunities and refining trading strategies that are to be executed as a team – an asset that, although intangible, is as valuable as any precious physical good.

11. I will first describe these professionals' backgrounds then detail the enormous difficulty of assembling and keeping together such a group of people – a task that would be difficult if not impossible replicate because once this team disperses, there would be numerous obstacles to reassembling them.

12. Of Solengo Capital Advisors' two principal portfolio managers, one holds a Bachelor's degree in Commerce, with distinction, from the University of Calgary, and the other holds a Bachelor's of Science degree in Finance and Management Information Systems from Kansas State University. Collectively, both have approximately 20 years of experience and have traded energy derivatives for industry leaders, including Citadel Investment Group and TransCanada Energy. Their trading

leverages their knowledge of the intricacies of the North American natural gas market, with a focus on location-based price differentials.

13. Solengo Capital Advisors' Chief Operating Officer has also spent over 10 years in the energy derivatives industry, most recently at TD Securities, where he was a Vice President and Director. He has also been employed by a number of other leading firms, including Shell Canada and Sempra Energy Trading. He holds a Bachelor's of Commerce degree in Finance and is a Chartered Financial Analyst ("CFA"). He is also a past president of the Calgary CFA society.

14. Solengo Capital Advisors' Head of Systems Engineering has over 20 years of experience in software engineering. He has developed proprietary software systems for a number of large companies, including Morgan Stanley, Lehman Brothers, and HBO. He holds a Bachelor's of Science degree in Mathematics from Mercy College.

15. Solengo Capital Advisors also employs a Quantitative Analyst, who has done significant post-graduate work, an individual in charge of Information Technology with over 10 years of experience in the field, a Director of Tax and Accounting, who holds a Master's degree in tax law, a Director of Operations and a Director of Marketing.

16. Recruiting and retaining such highly qualified professionals has required hundreds of hours of work and more than US $300,000 in recruitment expenses and incentives. If the team – which has spent the past several months working together on various investment research and other business projects – were to disperse, it would be virtually impossible to reassemble them. In the financial services industry, it is common for highly qualified individuals to be restricted from switching employers by

        non-compete and non-solicitation covenants, and it would be impossible to reacquire these individuals from their subsequent employers after their departure from Solengo Capital Advisors if the firm were to disintegrate.

17. Over the past six months, Solengo Capital Advisors and, in particular, our Head of Systems Engineering, has developed a number of proprietary trading and risk management systems. Because of the complex nature of the trading that is the focus of Solengo Capital Advisors, these systems may not be purchased "off-the-shelf," and therefore have been developed from the ground up by Solengo Capital Advisors to suit the specific needs of commodity derivatives trading by the specific individuals at Solengo Capital Advisors.

18. Solengo Capital Advisors' proprietary risk management systems include the capacity to perform a number of complex, scenario-based "stress" tests, which evaluate the resiliency of a given portfolio to various types of potential market events.

19. Solengo Capital Advisors' proprietary trading systems are able to collect and analyze large-volume market data, a critical function that will allow Solengo Capital Advisors' traders and risk management personnel to ultimately be able to value Solengo Capital Advisors' trading positions in real-time.

20. These proprietary trading systems and strategies have required at least several hundred hours of effort by highly qualified professionals, and cost more than US $600,000 thus far to design and implement. If Solengo Capital Advisors were to disintegrate, these unique systems would lose their primary value.

21. As explained in greater detail below, the FERC enforcement action is a significant ongoing force in the disintegration of Solengo Capital Advisors, and the valuable assets it possesses.

The FERC Enforcement Action Is A Significant Force
That Is Destroying Solengo Capital Advisors Regardless Of The CFTC Action

22. On Wednesday, July 25, 2007, the Commodity Futures Trading Commission ("CFTC"), filed an enforcement action against me and other defendants in the Southern District of New York. The CFTC enforcement action charges *attempted*, not actual, manipulation.

23. On Thursday, July 26, 2007, FERC issued the OSC and has been pursuing an enforcement action against me.

24. As anticipated in my prior declaration, the FERC's pursuit of its enforcement action has paralyzed Solengo Capital Advisors' business.

25. In stark contrast to the CFTC enforcement action, which charges only attempted manipulation that did not cause any damages, FERC's OSC charges me with *perfected* manipulation and seeks to order *US $30 million* in civil penalties against me. FERC's enforcement action therefore raises the specter of a significant judgment against me and the strong possibility of follow-on civil litigation by private parties, making it immensely difficult if not impossible for Solengo Capital Advisors (because of my majority ownership stake) to obtain financing and lines of credit and creating a major disincentive for potential business partners to work with me.

26. As described further below, the response to the FERC enforcement action from various parties that are critical to Solengo Capital Advisors' business has been very

different from their response to the CFTC action. These parties have provided clear indications that they view the FERC's OSC as a significantly greater threat to their involvement with Solengo Capital Advisors than the CFTC enforcement action, largely because of the extent of the civil penalties sought against me.

27. I have personally served as the guarantor for certain surety bonds and insurance policies necessary for Solengo Capital Advisors' business. I believe these surety bonds and insurance policies for Solengo Capital Advisors are now unobtainable because of the enforcement action by FERC and its threat of US $30 million in civil penalties.

28. Additionally, because the OSC alleges a *perfected* manipulation scheme, both the qualified investors who have expressed interest in investing in the Solengo Managed Funds and my business partners are concerned about additional private litigation stemming from the OSC.

29. Because the CFTC has alleged only *attempted* manipulation (as opposed to *perfected* manipulation), I believe that the CFTC's enforcement action poses no material risk from follow-on civil actions to Solengo Capital Advisors' business activities, since by definition, attempted manipulation did not lead to any actual damages to others.

30. In contrast, because the FERC OSC is based on a theory of perfected manipulation, the risk of adverse private litigation arising from the FERC enforcement action is very high.

31. Clearly, the CFTC action presents an unfortunate and difficult situation for me and I do not mean to suggest to the Court that it does not present problems for me and Solengo Capital Advisors. However, the FERC action is clearly a significant

additional factor that is causing (and contributing to causing) ongoing harm to me and Solengo Capital Advisors.

Resignation of Outside Directors

32. The Solengo Managed Funds (which are private investment funds for qualified investors) must obtain registration with the Cayman Islands Monetary Authority in order to accept funds from any investors. Solengo Capital Advisors intends to execute a contract with the Solengo Managed Funds by which it will receive management and performance fees in exchange for advisory services. As is customary in the industry, some of these fees would be independent of trading performance while other fees would be tied to trading performance.

33. Under the laws of the Cayman Islands, without the services of directors, the Solengo Managed Funds cannot be registered and cannot accept investor funds.

34. Solengo Capital Advisors' business, therefore, depends on the agreement of directors to serve the Solengo Managed Funds in that capacity.

35. Prior to last week, the Solengo Managed Funds had two directors. On July 25, both of these directors resigned. Their resignations came within a couple of hours of my having communicated to them that the FERC would be filing an OSC against me.

36. On either July 23 or July 24, I had communicated to the directors that the CFTC would very likely be filing an enforcement action against me (which it ultimately did on July 25). I explained to the directors that the CFTC would only be charging attempted manipulation and that, as a result, follow-on civil litigation was unlikely. Then, on July 24, the Court denied my request for a temporary restraining order against the FERC. The next day, on July 25, in the early afternoon, I called one of the

9

two directors and left a detailed message. (The two directors work together, so it was effectively a message to both of them.) In the message, I explained that the FERC would be issuing an OSC against me, that it would charge actual manipulation, that it would be seeking a very heavy fine, and that the FERC procedures for deciding the OSC was something I wanted to discuss with them. Within a couple of hours, both directors faxed over their resignation letters.

37. Given that the directors resigned immediately following my explaining the FERC situation to them (whereas they had not done so even after learning about the impending CFTC action), I believe that the resignation was primarily the result of the FERC action.

38. Since the resignation of the Fund directors, no new directors have agreed to serve in their place and I do not anticipate being able to find replacements. As a result, the Solengo Managed Funds will not be able to obtain the registration necessary to begin accepting funds from investors. I believe that if an end were put to the FERC action, Solengo Managed Funds would be able to obtain directors.

39. Solengo Capital Advisors' third-party administrator for its investment operations also requires that the Solengo Managed Funds engage the services of directors. As set out above, the Solengo Managed Funds' directors have resigned and new directors will be unwilling serve. Consequently, Solengo Capital Advisors is unable to obtain income from advising on investments to be held by the Solengo Managed Funds, since the Solengo Managed Funds cannot operate without directors.

<u>Draining Away Of Solengo Capital Advisors' Resources</u>

40. The threat to Solengo Capital Advisors posed by the FERC's enforcement action represents more than just harm to the Solengo Managed Funds' ability to proceed to accepting investments. FERC's enforcement action imperils Solengo Capital Advisors' existence as a viable business entity. With the initiation of FERC's enforcement action, the resignation of the outside directors of the Solengo Managed Funds, and the resulting inability of Solengo Capital Advisors to begin trading as planned, the unique expertise acquired by and the substantial commitments made to Solengo Capital Advisors have begun to drain away, causing irreparable and continuing harm. The continuation of the enforcement action begun by the OSC is therefore substantially likely to destroy Solengo Capital Advisors.

41. The individuals whom Solengo Capital Advisors employs and has recruited are in extremely high demand, due to the limited supply of people with the specialized skills required. Because of the localized nature of natural gas derivatives trading, in order to execute their trading, these individuals must have acquired expertise in the intricacies of the supply and demand of North American natural gas at specific delivery points around the continent, including the ability to analyze the weather patterns that are a primary driver of natural gas derivatives prices.

42. They must also be fluent in the complex mathematical calculations that underlie trading in commodity derivatives. These calculations are critical for evaluating returns from investments based on expected price volatilities over long-term time horizons.

43. These types of individuals are concerned specifically about the FERC enforcement action and are not simply going to wait for Solengo's highly precarious future to be resolved, but will seek other employment opportunities, and have already informed me as such.

44. Each lost trader represents a significant blow to Solengo Capital Advisors' assets. This threat is not speculative. Last week, two individuals who had previously committed to serve as portfolio managers at Solengo withdrew their commitment.

45. The events surrounding their withdrawal are as follows: I had been keeping these traders abreast of my legal situation and had explained to them the significance of the FERC action, explaining that, as a result of the directors of the Solengo Managed Funds having resigned, it was now very unlikely that the Funds would be able to obtain registration (and therefore could not accept investments). I also explained to the portfolio managers that, as described further below, I had learned that the Alberta Securities Commission ("ASC") was unlikely to permit Solengo Capital Advisors to register as an investment advisor under the laws of Alberta if I were to remain in the ownership structure. (As explained below, the ASC had cited the FERC action as a primary concern.) I told the traders that they could stay at Solengo Capital Advisors, but explained that the Fund would likely not be up and running if I remained involved. The two traders responded that they did not want to work at Solengo without my involvement and so they decided to go elsewhere and forego their commitment to Solengo. The traders also told me that if the FERC action were to be discontinued and Solengo could obtain its necessary registrations, they would come back to Solengo.

46. One of these individuals has over 12 years of experience trading certain types of natural gas derivative products and holds a Master's Degree in Business Administration. The other individual has over 20 years of experience trading other types of commodity derivatives.

47. The loss of the unique trading talents of these individuals, have caused irreparable harm to Solengo Capital Advisors, as Solengo Capital Advisors will not be able to find an adequate replacement for their skills.

48. I believe it is highly certain that many other such individuals with unique skills will withdraw their employment commitments as a result of the pendency of FERC's enforcement action against me. The loss of such highly talented employees to Solengo Capital Advisors is irreparable, both because of the small number of such potential employees within the market place and the unique nature of their skills. Thus, the threat of further irreparable harm to Solengo Capital Advisors from the FERC's enforcement action is ongoing.

49. Additionally, as mentioned above, it is standard practice in the financial services industry, including the commodity derivatives trading industry, for traders to sign non-compete and non-solicitation agreements.

50. As a result, Solengo will not simply be able to replace these lost employees and lost recruits, since, their talents and expertise will be legally bound to another employer for a fixed period of time.

### Loss Of Potential Investors

51. As with all other investment firms of its type, Solengo Capital Advisors and the Solengo Managed Funds must await the approval of regulatory authorities prior to

soliciting and accepting specific investments from qualified investors. During the period prior to such approval, however, potential investors often express an intent to invest in the investment company in question; when the investment firm in question obtains all necessary approvals, these potential investors submit investments and become actual investors.

52. Prior to the initiation of the FERC's action, a total of approximately 25 qualified investors had expressed intent to invest approximately US $800 million in planned investments into the Solengo Managed Funds. As is the case with investment firms who become registered, these expressions of interest in the Solengo Managed Funds – which are of significant value to an investment advisory firm with an arrangement to advise such funds, such as Solengo Capital Advisors – would ordinarily become investments as soon as the law permitted.

53. Although obviously there is no guarantee that a potential investor who has expressed an intent to invest would actually invest (in the same way that for any trading firm there is no guarantee that any existing investor will continue to invest with the firm in the future), such expressions of interest from investors are valuable to the firm.

54. Since the issuance of the OSC, the expressions of qualified investor interest in the Solengo Managed Funds have decreased from over US $800 million to less than US $100 million just in the past several days.

55. Slightly more than half of the investors who had expressed an interest in investments in the Solengo Managed Funds have contacted Solengo Capital Advisors to indicate that they are no longer interested in investing. I believe that the vast majority of

investors who have not changed their intent yet will do so if the FERC's enforcement action is allowed to continue.

56. Significantly, a number of prospective investors have cited the *FERC's* enforcement action (as opposed to CFTC's action) as a primary reason for their decision to contact us concerning the fact they are no longer interested in investments in the Solengo Managed Funds, largely because of the amount of civil penalties sought by FERC and because of the nature of the allegations presented – namely, actual manipulation that allegedly damaged the markets significantly as opposed to attempted manipulation that did not have any effect on the markets.

57. The expressions of qualified investor interest in the Solengo Managed Funds have been made by sophisticated, knowledgeable investors. In putting forward these expressions of interest, these investors possessed full knowledge of the damage to my personal reputation suffered as a result of the publicity associated with the dissolution of Amaranth Advisors LLC ("Amaranth") and the filing of a related action by a former investor in funds advised by Amaranth, the San Diego County Employees Retirement Fund, which names me as a defendant. In addition, the hearings at the United States Senate which the FERC references, in which certain statements criticizing my trading activities were made public, are well known to these potential investors who nevertheless stated that they intend to invest in the Solengo Managed Funds. Those events occurred well before they made and maintained their expressions of intent to invest. (Further, to my knowledge I am not currently a defendant in the action captioned *Gracey v. Amaranth Advisors et al.*, 07 Civ. 6377 as the FERC incorrectly claims in its memorandum of law.)

58. After the issuance of the OSC approximately one week ago, Solengo Capital Advisors has not received any new inquiries or expressions of intent to invest from potential investors.

<u>Additional Harm</u>

59. The damage suffered by Solengo Capital Advisors from the FERC's enforcement action is ongoing.

60. Since last week, Solengo Capital Advisors has already required an additional capital injection of at least US $500,000 to US $1 million, which I will be making from my personal funds, and will more than likely require additional capital injections based on continued delays.

61. Additionally, since FERC informed me and my attorneys of its intent to issue the OSC and pursue an enforcement action against me, the Alberta Securities Commission ("ASC") contacted Solengo Capital Advisors for an update on the status of the enforcement actions against me. The ASC provided indications that it is unlikely permit Solengo Capital Advisors to register as a commodities investment advisor under the laws of Alberta if I remain in the ownership structure. The ASC indicated that a primary concern in this regard was the FERC's enforcement action.

62. As a result of the foregoing, I have considered stepping down from my position as president of Solengo. Despite the prior damage to my reputation discussed above, I have only contemplated doing so as a result of the extremely damaging consequences to Solengo Capital Advisors of the FERC's enforcement action.

### Additional Harm to Other Business Interests

63. Prior to the issuance of the OSC, I had been involved in a land transaction in Alberta. My business partners in this deal informed me on July 29, 2007 that they have determined that they can no longer agree to my participation in the deal, because of the perceived risk to their own finances primarily due to the large nature of the civil penalties sought by FERC against me personally if I were to become a co-owner of an asset with them and the FERC were to eventually levy against my share of the asset. If the FERC were to be enjoined from pursuing its enforcement action, I believe these partners would be willing to proceed with the transaction.

64. Finally, I have also been involved in a prospective business transaction in the "self-storage" business in the Calgary area. Based on the issuance of the OSC and the FERC's enforcement action, my business partners in this transaction informed me on July 27, 2007 that I could no longer participate in the transaction, because of the perceived risk to their own finances due to the large nature of the penalties sought by FERC against me personally. If the FERC were to be enjoined from pursuing its enforcement action, these partners would be willing to proceed with the transaction, assuming it still exists at the time of the injunction is issued.

65. Since the FERC's pursuing its enforcement action against me is causing me to completely lose these transactions at the outset, it is difficult if not impossible for me to value precisely the money damages for losing the ability to participate in these transactions. However, it is clear that losing the ability to participate in an attractive business transaction for which I have devoted a large amount of time and effort is a significant harm. If the FERC is permitted to proceed with its enforcement action, no

matter the outcome, I fully expect that these particular partners in these transactions will have found other partners and consummated these transactions without me.

66. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge and belief.

*Brian Hunter*

Dated: Calgary, Alberta, Canada
August 3, 2007