UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIAN HUNTER,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )   Civil Case No. 07-1307 (RJL)
                                       )
FEDERAL ENERGY REGULATORY              )
COMMISSION,                            )        FILED
                                       )
        Defendant.                     )        DEC 1 0 2007
                                                NANCY MAYER WHITTINGTON, CLERK
                                                    U.S. DISTRICT COURT

MEMORANDUM OPINION
(December 10, 2007) [#4]

Plaintiff, Brian Hunter ("Hunter") filed a motion on July 23, 2007, seeking a temporary restraining order[1] and a preliminary injunction to enjoin the Federal Energy Regulatory Commission ("FERC") from exercising its enforcement jurisdiction over him. On September 7, 2007, plaintiff and FERC jointly requested this Court to refrain from ruling on plaintiff's motion for several weeks to allow FERC and the Commodity Futures Trading Commission ("CFTC") to have discussions which may resolve some or all of the issues relevant to their enforcement action. (Hr'g Tr. 1:14-20, Sept. 7, 2007.) On September 24, 2007, both sides informed the Court that they had not resolved any of the material issues in this case, and therefore requested it to go forward and rule on this matter. (Hr'g Tr. 1:23-2:1, Sept. 24, 2007.)

---

[1] The Court denied plaintiff's motion for a temporary restraining order during the hearing on July 24, 2007, and set a hearing for the preliminary injunction on August 7, 2007.

After careful consideration of the arguments presented to the Court, and the supplemental memoranda filed by both the plaintiff and defendant, the Court DENIES plaintiff's motion for a preliminary injunction.

## BACKGROUND

In 2005, Congress amended the Natural Gas Act ("NGA") and the Federal Power Act ("FPA") through the enactment of the Energy Policy Act, Pub. L. No. 109-58, 119 Stat. 594, §§ 315 and 1283 (2005) ("EPAct"). In so doing, Congress provided FERC with the authority to issue regulations prohibiting:

> [A]ny entity, directly or indirectly, to use or employ in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers.

15 U.S.C. § 717c-1 (NGA anti-manipulation provision); *see also* 16 U.S.C. § 824v (FPA anti-manipulation provision). In 2006, FERC enacted its anti-manipulation rule after a period of notice and comment. *See* Prohibition of Energy Market Manipulation, 18 C.F.R. § 1c.1, issued in Order No. 670, 114 FERC 61,047 (Jan. 19, 2006). The scope of FERC's authority under the EPAct and its regulations are at the heart of this challenge to FERC's authority. How so?

From June 2004 through September 2006, Hunter was a natural gas trader and portfolio manager at Amaranth, a hedge fund based in Greenwich, Connecticut.[2] (Hunter

---

[2] From June 2004 through October 2005, Hunter was employed by Amaranth Advisors LLC. (Hunter Decl. ¶ 1.) From October 2005 until September 2006, Hunter was employed by

2

Decl. ¶¶ 1-2.) In that capacity, he traded, *inter alia*, natural gas futures on the New York Mercantile Exchange ("NYMEX"). (Hunter Decl. ¶ 10.) According to the defendant, Hunter "purportedly made Amaranth roughly $1 billion from natural gas trading in 2005 (for which he received $75-100 million in compensation)." (Def. FERC's Mem. of Points & Authorities in Opp'n to Pl.'s Mot. for Prelim. Inj. at 2-3 (citing Ann Davis, *How Giant Bets on Natural Gas Sank Brash Hedge-Fund Trader*, Wall St. J., Sept. 19, 2006, at A1).) In 2006, however, trading on natural gas prices supposedly resulted in Amaranth losing $6 billion and being forced to liquidate the fund. (*Id.*)

In June 2006, FERC launched a non-public investigation into Amaranth's trading practices, which they conducted in close cooperation with the CFTC. (FERC Order to Show Cause and Notice of Proposed Penalties, *Amaranth Advisors, LLC*, IN07-26-000, 120 FERC ¶ 61,085 (July 26, 2007) at ¶ 53 (hereinafter "OSC").) This investigation was prompted by the FERC's staff noticing certain anomalies in the price of the NYMEX Natural Gas Futures Contract for May delivery. (*See* OSC ¶ 52.) Indeed, during the course of the CFTC's investigation into Amaranth's and Hunter's trading practices, Hunter was subpoenaed to testify on-the-record (*i.e.*, a deposition). Hunter was also subpoenaed to provide on-the-record testimony to the Securities and Exchange Commission ("SEC"). Indeed, FERC representatives were present for both of these depositions. (Hunter Decl. ¶¶ 7-8.) Ultimately, FERC concluded that there was a substantial basis to believe that Amaranth and Hunter manipulated the NYMEX NG

---

Amaranth Advisors (Calgary) ULC. (Hunter Decl. ¶ 2.) The Court will collectively refer to these entities as "Amaranth."

3

Futures Contract price on three occurrences in 2006, thereby impacting the price of a "substantial volume" of natural gas transactions regulated by FERC. (*See* OSC ¶¶ 5-6.)

Not surprisingly, perhaps, Hunter left Amaranth just after FERC commenced its investigation and started a new business venture: Solengo Capital Advisors, ULC ("Solengo Capital Advisors" or "SCA"). Solengo Capital Advisors is "a fledgling company that intends to provide professional investment advisory services to potential clients that are private investment funds." (Compl. ¶ 44.) It has the principal business strategy of serving as an investment advisor to private investment funds, namely for the Solengo Managed Funds ("SMF"). (Hunter Decl. ¶ 4; Hunter Supp. Decl. ¶ 6). Hunter, who is the president of SCA, maintains a 60% ownership interest in the company, which maintains offices in Calgary, Alberta and "desk space" in Greenwich, Connecticut. (Hunter Supp. Decl. ¶¶ 5, 7.) SCA has eleven employees, some of whom have worked on creating proprietary risk management systems for use by SCA. (*Id.* ¶¶ 17-20.)

In order for SCA to serve as investment advisor to the Solengo Managed Funds, it must first register as an investment advisor in Alberta, Canada. (Hunter Decl. ¶ 17.) According to Hunter, however, Solengo Managed Funds cannot accept funds until it registers in the Cayman Islands. It cannot register there, however, until individuals have committed to serve as directors to SMF. (*Id.* ¶¶ 17-19). FERC's investigation, Hunter contends, is, in effect, frustrating his ability to recruit individuals to serve in that capacity. (Hunter Supp. Decl. ¶ 38.)

Accordingly, on May 16, 2007, when FERC issued a Formal Non-Public Order of Investigation announcing its intention to investigate, *inter alia*, "potential market

4

manipulation that may have occurred in connection with Commission-jurisdictional natural gas transactions, including but not limited to, manipulation of the settlement price of the prompt-month NYMEX Natural Gas Futures Contract," Hunter challenged its authority to bring an enforcement action by filing submissions with FERC's Division of Investigation. (Shur Decl. ¶ 8.) When Hunter finally received a letter dated July 19, 2007, from FERC informing him that it intended to issue an Order to Show Cause, which makes preliminary findings that Hunter and Amaranth violated FERC's Anti-Manipulation Rule, 18 C.F.R. § 1c.1, Hunter filed this suit on July 23, 2007, *ex parte*, challenging FERC's jurisdiction and authority to issue an Order to Show Cause.

Thereafter, on July 25, 2007, the CFTC filed a civil enforcement action, based on substantially similar allegations as those included in FERC's OSC, in the United States District Court for the Southern District of New York against Hunter and his former employer, Amaranth, alleging violations of the Commodity Exchange Act. *See United States Commodity Futures Trading Commission v. Amaranth Advisors, LLC*, Civil No. 07-6682 (S.D.N.Y. filed July 25, 2007). By the next day, when FERC issued its Order to Show Cause and Notice of Proposed Penalties ("OSC"), two of Solengo Managed Funds directors had resigned after Hunter informed them of the pending CFTC investigation and likely FERC OSC. (Hunter Supp. Decl. ¶¶ 32-38.)

Additionally, two traders left Solengo Capital Advisors, informing Hunter that if the FERC action was discontinued and Solengo obtained the necessary registrations, they would return. (Hunter Supp. Decl. ¶ 45.) Hunter contends that if additional skilled employees leave, he will be unable to re-hire them due to non-compete and non-

solicitation agreements with their future employers. (Hunter Supp. Decl. ¶ 16.) Hunter thus seeks an injunction enjoining FERC from proceeding with an enforcement action against him, in addition to a declaratory judgment that the FERC's assertion of jurisdiction conflicts with the Energy Policy Act of 2005 and the Commodity Exchange Act.

## ANALYSIS

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The four factors which courts in this Circuit consider when determining whether a plaintiff is entitled to injunctive relief are whether: (1) there is a substantial likelihood that the plaintiff will succeed on the merits of its claims; (2) the plaintiff would suffer irreparable injury if the defendants are not enjoined; (3) an injunction would not substantially injure other interested parties; and (4) the public interest favors issuing an injunction. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

The four factors are balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747). However, "[i]f the plaintiff makes a particularly weak showing on one factor . . . the other factors may not be enough to compensate." *Dodd v. Fleming*, 223 F. Supp. 2d 15, 19 (D.D.C. 2002) (citations omitted). Indeed, "if a party makes no showing

of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." *CityFed Fin. Corp.*, 58 F.3d at 747.

For the following reasons, Hunter has failed to meet this heavy burden in this case.

### A.   *Hunter Has Not Shown Irreparable Harm*

To obtain injunctive relief, Hunter must demonstrate that he will otherwise suffer irreparable harm. Our Circuit Court has set a high standard for irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). While not easily defined, certain factors aid in determining whether the requirement of irreparable harm has been met. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

First, the "injury must be both certain and great; it must be actual and not theoretical." The moving party must show that the harm has occurred and is likely to occur again, or is likely to occur in the future, and that "[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. Second, mere economic loss does not, in and of itself, constitute irreparable harm. Recoverable monetary loss may constitute irreparable harm in some cases, but only where the loss threatens the very existence of the movant's business. *Wis. Gas Co.*, 758 F.2d at 674; *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1, 4 n.4 (D.D.C. 1978) (finding irreparable harm where majority of business for the past twenty years was GSA contracts, the termination of which would put the movant out of business). Third, the movant must also show that "the alleged harm will *directly result* from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674

7

(emphasis added). Thus, where the threat is to the very existence of the plaintiff's business, it must still occur as a *direct result* of the action the movant seeks to enjoin. *See id.*; *Power Mobility Coalition v. Leavitt*, 2005 WL 3312962, *11 (D.D.C. Dec. 7, 2005).

Accordingly, even if Hunter need not prove that FERC's action is the sole cause of his harm to prevail on his motion for a preliminary injunction, he must still demonstrate that enjoining FERC's enforcement action will alleviate the threat of irreparable harm to him and his business.[3] *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Pension Benefit Guar. Corp.*, 372 F. Supp. 2d 91, 101 (D.D.C. 2005) (finding no irreparable injury because, among other reasons, unclear whether enjoining the termination of a pension plan would prevent employees from quitting, given that the uncertainty with the pension plan would continue as long as there were other avenues for terminating the plan and that it was unclear granting an injunction would curtail the alleged injury). For the following reasons, Hunter has not done so here!

Hunter's contention, in essence, that enjoining FERC's action, even while the CFTC's action remains pending, will alleviate the multiple harms threatening his fledgling enterprise (*i.e.*, employee departures, withdrawal of prospective investors, and inability to register due to a lack of directors for SMF) does not withstand scrutiny. How so?

First, Hunter's attempt to parse the fallout between the CFTC action and FERC enforcement action lacks the specificity necessary to demonstrate a direct causation

---

[3] The cases Hunter cites to support his argument that the destruction of his business constitutes irreparable harm are inapposite. Unlike here, in those cases the links between the threat to the business and the harm sought to be enjoined were less tenuous.

between FERC's action and their resignation. (Hunter Supp. Decl. ¶ 35.) Indeed, Hunter does not even state that the directors attributed their resignations to the FERC action. (*Cf.* Hunter Supp. Decl. ¶ 38 ("I *believe* that the resignation was primarily the result of the FERC action.") (emphasis added).)

Moreover, Hunter's "belief" that the directors resigned primarily because of the FERC Order to Show Cause is particularly insufficient where Hunter had to inform the outside directors within a three-day period of not only the potential FERC action, but a potential CFTC enforcement action in the Southern District of New York. This Court cannot, and will not, speculate as to the exact reasons for each director's resignation.

As to the departure of SCA's employees, and the impact on its "intellectual property," Hunter's allegation of irreparable harm is equally speculative and similarly doomed. His contention that the traders would return if the FERC action is discontinued is conditioned on SCA obtaining the necessary registrations. (Hunter Supp. Decl. ¶ 45.) Obtaining those registrations, however, depends upon his recruiting directors who are willing to serve in that fiduciary capacity while the CFTC investigation is still ongoing. Since the directors who resigned have not indicated to date that they would return if the CFTC investigation continued even after FERC's action was discontinued, the traders' departures are of no value in establishing irreparable harm at this time.[4] Similarly, the return of prospective investors who cited the FERC's action as the primary reason not to

---

[4] Hunter also fears the departure of other skilled employees and asserts this represents ongoing and future harm. Given an injunction would not definitively prevent FERC from maintaining its action, it is unclear that an injunction at this time would prevent future departures. (*Cf.* Prelim. Inj. Hr'g Tr. 18:8-16 ("FERC is maintaining its enforcement action and the uncertainty created by that . . . such that people are leaving and have told Mr. Hunter they intend to leave *as long as* the FERC maintains its action." (emphasis added)).)

invest in Solengo Managed Funds (Hunter Supp. Decl. ¶ 54), is equally speculative since Solengo Managed Funds, without directors, would not be able to accept investments even if the FERC action were terminated.[5] Thus, enjoining FERC at this juncture, without conclusively reaching the merits, will not necessarily provide Hunter with the relief he seeks. Simply stated, the threat that a FERC action poses to his business, such as it is, will not be removed until this Court makes its final adjudication on the merits in this case.

Finally, while destruction of a plaintiff's business reputation can constitute irreparable harm, Hunter's allegations in this regard suffer from the same flaws as his allegations regarding Solengo. As discussed above, it is not possible from the record before this Court to determine whether enjoining FERC will halt in any way the damage to Hunter's reputation since the CFTC complaint is based on similar allegations. Moreover, the Court is not in a position to determine the extent to which, if any, Hunter's business reputation has actually been harmed by the fact that multiple investigations have been launched by regulatory agencies. The Court will not speculate as to the degree to which his "reputation" has been lessened in the eyes of the investing public to date. Thus, in light of the record set forth by plaintiff, the Court is unable to find the necessary

---

[5] Hunter's lost business opportunity involving a land transaction in Alberta is also too speculative. Hunter cannot establish that his business partners would allow him to participate absent the FERC action. (Hunter Supp. Decl. ¶ 63 ("If the FERC were to be enjoined from pursuing its enforcement action, I believe these partners would be willing to proceed with the transaction.").) Additionally, even though the participants in Hunter's prospective business transaction involving the self-storage business cite their withdrawal as due to the penalties associated with the FERC action (Hunter Supp. Decl. ¶ 64), this is a mere economic injury and therefore not irreparable. Furthermore, Hunter's "belief," without more, that the surety bonds and insurance polices are no longer obtainable due to concern about litigation associated with the FERC action (Hunter Supp. Decl. ¶ 27-28) is insufficient for injunctive relief. *Power Mobility Coalition v. Leavitt*, 2005 WL 3312962, *11 (D.D.C. Dec. 7, 2005) (insufficient to show actual and imminent harm where declaration only "anticipates" possible harm will occur).

irreparable harm to warrant a preliminary injunction.

**B.      *Hunter Has Not Established A Substantial Likelihood of Success on the Merits***

A preliminary injunction is additionally unwarranted in this case because it is unlikely that Hunter will succeed on the merits. Indeed, Hunter has not even demonstrated that this Court has the necessary jurisdiction in this matter. How so?

Hunter argues that the Court should hear this issue now, as opposed to after a final determination on the OSC. He relies on a series of cases in which courts reviewed the statutory authority of an agency to undertake the challenged actions prior to a final order. *See, e.g., Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986); *Atlantic Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771 (D.C. Cir. 1985) ("*ARCO*"); *Athlone Industries, Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485 (D.C. Cir. 1983). FERC, by contrast, argues the issuance of an OSC is not a final agency action because FERC has not yet imposed any obligation, denied any right, or fixed some legal relationship. *See, e.g., FTC v. Standard Oil Co.*, 449 U.S. 232, 240-41 (1980) (issuing complaint not final agency action because represents start of process); *Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21, 27-28 (D.D.C. 2005) (issuing notice of violation ("NOV") not final agency action since it is not a final decision on liability). The Court agrees with FERC.

Hunter's efforts to cast his action as a purely legal jurisdictional question akin to the ones in *Ciba-Geigy*, *Athlone* and *ARCO* is to no avail. As pointed out in *Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Commission*, 324 F.3d 726,

11

733-35 (D.C. Cir. 2003), in cases where courts determine the scope of an agency's authority *prior* to a final agency decision, the interim agency decision had already imposed an obligation or fixed a legal right or it concerned a purely legal issue on which the agency's determination was irrelevant. *See, e.g.*, *Ciba-Geigy*, 801 F.2d at 431-37 (agency had articulated a definitive unequivocal position and expected the plaintiff to alter its conduct to conform with that position, the court found judicial review warranted at that juncture); *Athlone*, 707 F.2d at 1489 (authority of agency to assess civil penalties heard where dispute was solely construction of statutory term, agency had conclusively determined it had jurisdiction to assess the penalties, and a similarly-situated party had already obtained an injunction before a different court); *ARCO*, 769 F.2d at 782-84 (hearing challenge where plaintiff faced with prospect of complying with mandated discovery orders). Here, Hunter does not find himself in that situation. He does not, for example, have to pay any fines or comply with any orders. *Cf. Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279-80 (D.C. Cir. 2005) (finding final agency action in the issuing of new permits had legal consequences by authorizing certain activities for some permit-seekers who need to either delay completion of the project and participate in the new permit procedures or modify their projects to stay within the permit procedures). The OSC represents the first step of a formal process designed to determine whether Hunter actually violated any FERC regulations. Much like the NOV discussed in the *Royster-Clark Agribusiness* case, Hunter will have a full opportunity to respond to FERC's initial findings. Simply stated, the issuance of an OSC

does not have any binding legal effect on Hunter's ability to operate his business on a day-to-day basis. Accordingly, the Court concludes that the issuance of this OSC is not a final agency action that warrants judicial review at this time.[6]

### C.   *Injunction Is Not in the Public Interest*

Given the public's interest in conserving judicial resources and the harm that issuing an injunction would cause to FERC's enforcement authority, the Court finds that the public interest would not be served by issuing an injunction at this time. Indeed, although this Court has recognized the public's interest in insuring an agency's compliance with its statutory authority in a very different situation, no similar abdication of statutory authority has occurred by FERC in this case. *Cf. Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 63 (D.D.C. 2004) (clear from

---

[6] Even assuming *arguendo* the issue of judicial review is ripe, plaintiff has failed to demonstrate that FERC's action is sufficiently outside its statutory authority (*i.e.*, *ultra vires*) to be likely to succeed on the merits. Indeed, judicial review due to an alleged *ultra vires* action is only appropriate when an agency patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute. *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal quotations and citations omitted) (relying on *Leedom v. Kyne*, 358 U.S. 184 (1958)). Simply stated, Hunter cannot demonstrate that FERC's OSC is the "brazen defiance" of its statutory authority required to constitute an "*ultra vires*" act that warrants judicial review at this time. *See, e.g., Philip Morris, Inc. v. Block*, 755 F.2d 368, 369-70 (4th Cir. 1985); *see also Qwest Corp. v. FCC*, 482 F.3d 471, 476 (D.C. Cir. 2007). This is particularly true when Congress, in adopting the EPAct in 2005, expanded FERC's enforcement authority to reach *any* entity, that directly or indirectly, engages in manipulative practices, *in connection with*, natural gas transportation and sales.

Furthermore, as FERC appropriately argues, any challenge to the OSC is properly made in the courts of appeals pursuant to § 19(b) of the NGA, which provides for review of FERC's orders in a court of appeals. (Def.'s Opp'n at 18-19.) Indeed, in *Commodity Futures Trading Commission v. Amaranth Advisors, LLC*, Civil No. 07-6682 (S.D.N.Y. Nov. 1, 2007) (Order), Judge Chin recently rejected a similar jurisdictional argument raised by Hunter's co-defendant (*i.e.*, Amaranth) in a challenge to the FERC's authority in the context of the CFTC enforcement action in the Southern District of New York. Judge Chin concluded, among other things, that to the extent Amaranth seeks to challenge FERC's jurisdiction, that challenge should be brought in the circuit court, not district court. *Id.* at 15.

the plain language of the statute that OFHEO was acting in conflict with a statutory directive).

## CONCLUSION

Thus, for all of the above reasons, the Court DENIES plaintiff's Motion for Preliminary Injunction. An appropriate Order will issue with this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge
