**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

```
————————————————————————x
                                    :
                                    :
BRIAN HUNTER,                       :
                                    :
    Plaintiff,                      :        07 Civ. 1307 (RJL)
                                    :
    v.                              :
                                    :
FEDERAL ENERGY REGULATORY           :
COMMISSION,                         :
                                    :
    Defendant.                      :
                                    :
————————————————————————x
```

**<u>DECLARATION OF JUSTIN V. SHUR IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE COMPLAINT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR DECLARATORY JUDGMENT</u>**

I, Justin V. Shur, declare as follows:

1. I am an attorney admitted to practice law in the District of Columbia and before the United States District Court for the District of Columbia.  I am an attorney at Kobre & Kim LLP and represent Brian Hunter in this action.

2. I submit this declaration in order to provide a chronology for the Court regarding the public statements made by the Federal  Energy Regulatory Commission ("FERC") that reflect its determination that it has jurisdiction to regulate trading by individuals in the natural gas futures markets.  These statements were made both before and after the issuance of FERC's Order to Show Cause and Notice of Proposed Penalties, 120 FERC ¶ 61,085, issued on July 26, 2006 ("OSC").

*Statements Made Prior To The Issuance of the OSC*

3. Attached hereto as Exhibit A is a true and correct copy of the Memorandum of Understanding ("MOU") between FERC and the Commodity Futures Trading Commission ("CFTC") Regarding Information Sharing And Treatment of Proprietary Trading And Other Information, made effective on October 12, 2005.  In relevant part, the MOU specifically acknowledges that the CFTC has "***exclusive*** jurisdiction with respect to…transactions involving contracts of sale of a commodity for future delivery, including…natural gas." (emphasis added).

4. Attached hereto as Exhibit B is a true and correct copy of FERC's Order 670, 114 FERC ¶ 61,047, issued on January 19, 2006 ("Order 670").  Order 670 laid out the text of 18 C.F.R. § 1c.1, FERC's "Anti-Manipulation Rule," which makes it "unlawful for any entity directory or indirectly, in connection with the purchase or sale of natural gas…to

use or employ any device, scheme, or artifice to defraud." FERC has relied on Order 670 in arguing that it has jurisdiction over Hunter.

5.  Attached hereto as Exhibit C is a copy of a publicly available letter dated February 21, 2007, from FERC Chairman Joseph T. Kelliher to the Honorable Jeff Bingaman, Chairman of the Committee on Energy and Natural Resources of the United States Senate. In relevant part, the letter states, "[FERC] interpret[s] the anti-manipulation language of [the Energy Policy Act of 2005] as allowing the [FERC] to sanction market manipulation in financial transactions of natural gas that affect jurisdictional sales, or physical sales….As a consequence, [FERC] staff has reviewed trading into the last half hour final settlement period for NYMEX Futures since Fall of 2004."

6.  Several months later, on May 16, 2007, FERC issued a Formal Non-Public Order of Investigation ("Formal Order"), under Docket Number IN07-26-00. The FERC's investigation was directed, in part, at Brian Hunter. The text of the Formal Order reads substantially as follows:

   1)  "In spring 2006, the Division of Energy Market Oversight of the Office of Enforcement observed anomalous price and trading patterns on termination day for prompt-month NYMEX Natural Gas Futures Contract, which directly sets or is used as a reference price to set the price for a substantial volume of Commission-jurisdictional natural gas transactions. The Division of Investigation of the Office of Enforcement ('Investigations') ordered a preliminary non-public investigation and has obtained evidence that multiple entities, either acting alone or in concert with others, may have manipulated the settlement price for this contract for multiple contract months. This formal, non-public investigation will address whether any of these entities, or any others subsequently identified by Investigations, has manipulated Commission-jurisdictional natural gas transactions via manipulation of the settlement price of the prompt-month NYMEX Natural Gas Futures Contract.

   2)  Pursuant to Natural Gas Act ('NGA') Sections 4A, 10, 14, and 16, 15 USC §§ 717c-1, 717i, 717m and 717o (2000) (all as amended by the Energy Policy Act of 2005), and Part 1b of the Commission's Regulations, 18 CFR Pt. 1b (2006), the Commission authorizes Investigations with the assistance from other Commission offices as appropriate to conduct a non-public, formal

investigation with subpoena authority, regarding potential market manipulation that may have occurred in connection with Commission-jurisdictional natural gas transactions, including but not limited to, manipulation of the settlement price of the prompt-month NYMEX Natural Gas Futures Contract.  The non-public, formal investigation shall be limited to obtaining information of whether violations of any provision of the NGA, as amended, or any rules, regulations, or orders promulgated thereunder, have occurred with any Commission-jurisdictional natural gas sales."

7.  Attached hereto as Exhibit D is a true and correct copy of a letter, received July 20, 2007, in which the FERC provided notice of its intent to issue the OSC against Hunter pursuant to FERC's enforcement powers under the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat.594 (2005), 315 and 1283, and Order 670.

8.  Attached hereto as Exhibit E is a true and correct copy of the OSC itself.  In relevant part, the OSC states:

> In Order No. 670, we interpreted the statutory phrase "any entity" (which is repeated in the Rule) to cover not just companies that have traditionally been subject to Commission jurisdiction (such as natural gas pipeline companies or public utilities), but also to include any company or firm, and natural persons as well who, "intended to affect, or have acted recklessly to affect, a jurisdictional transaction."  Thus, while the Commission is not authorized to regulate all commodities trading behavior by any person or company, the Anti-Manipulation Rule prohibits manipulation of the physical and financial natural gas markets by any entity if the manipulative trading, whether intentionally or recklessly, also affects Commission-jurisdictional transactions, such as physical basis transactions and transactions based off indices calculated using physical basis transactions that are not "first sales."

9.  Attached hereto as Exhibit F is a true and correct copy of a press release issued by FERC regarding the OSC on July 26, 2007.  In relevant part, Chairman Kelliher stated, "Congress granted FERC the authority to prevent manipulation to protect both consumers and the integrity of these markets on which our economy depends…Bad actors in the industry must recognize that manipulation, even in increasingly complex energy markets, can be detected. And when it is proven, they will be punished severely."

*Subsequent to the Issuance of the OSC*

10. Attached hereto as Exhibit G is a true and correct copy of a publicly available interview transcript retrieved from the Internet site http://www.eenews.net/tv/transcript/654 at 1:45 p.m. on August 3, 2007, entitled "FERC's Kelliher discusses Amaranth, Energy Transfer Partners market manipulation cases." (OnPoint, 7/31/07.) In relevant part, Chairman Kelliher stated, "What we're doing is we're acting to sanction manipulation of futures that affected FERC jurisdictional transactions."

11. Attached hereto as Exhibit H is a true and correct copy of a filing, dated September 28, 2007, in the United States District Court for the Southern District of New York by FERC in the case captioned *U.S. Commodity Futures Trading Commission v. Amaranth Advisors L.L.C., et al.*, 07 Civ. 6682 (DC). In relevant part, FERC stated in that brief:

> "Congress granted FERC broad authority to police market manipulation by 'any entity' who engages in conduct that is in 'in connection with' any jurisdictional transaction. This grant of authority was modeled on similar authority given to the SEC, which authority has been interpreted very broadly. Finally, if this were not enough, Congress recognized that this new grant of authority would require extensive cooperation between the CFTC and FERC, precisely because of the close interplay between financial and physical markets for natural gas and electricity."

12. Attached hereto as Exhibit I is a true and correct copy of a filing, dated September 28, 2007, in the case captioned *U.S. Commodity Futures Trading Commission v. Amaranth Advisors L.L.C., et al.*, 07 Civ. 6682 (DC) by the CFTC. In relevant part, the CFTC stated in that brief that "the plain language of Section 2(a)(I)(A) vests the CFTC with sole power and authority among federal regulatory agencies to adjudicate the lawfulness of futures trading on designated contract markets such as the NYMEX."

13. Attached hereto as Exhibit J is a true and correct copy of the FERC's Order Denying Rehearing, issued on November 30, 2007 directed as to Amaranth Advisors LLC,

Matthew Donohue, and others ("Order Denying Rehearing"). Brian Hunter is not a party to such order. In the Order Denying Rehearing, FERC indicated that "in a future order" it would "address issues raised in rehearing requests by other Respondents, such as the authority to assess civil penalties, the construction of the term 'any entity' as to individuals, or the liability of such Respondents."

14. FERC has not yet done so, as reflected in Exhibit K, a FERC Order Granting Rehearing For Further Consideration, dated September 26, 2007.

15. Attached hereto as Exhibit L is a true and correct copy of the testimony of FERC Chairman Kelliher before the House Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, provided on December 12, 2007. In relevant part, Chairman Kelliher stated that FERC "stand[s] by [its] position that Amaranth's activities fall within [its] jurisdiction insofar as they affected physical sales of natural gas" and indicated that the reference in the Natural Gas Act to "any entity" showed "Congress's intent to capture not only natural gas companies historically subject to FERC jurisdiction under the Natural Gas Act, *but also anyone else that engages in prohibited behavior that affect jurisdictional physical sales*." (emphasis added.)

16. Attached hereto as Exhibit M is a true and correct copy of a filing, dated October 3, 2007, in the United States District Court for the Southern District of New York in the case captioned *U.S. Commodity Futures Trading Commission v. Amaranth Advisors L.L.C., et al.*, 07 Civ. 6682 (DC) by *Amici Curiae* Futures Group Futures Industry Association, Inc., Managed Funds Association, Inc., New York Mercantile Exchange, Inc., Chicago Mercantile Exchange Group, Inc., International Swaps and Derivates Association, Inc.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

_____
Justin V. Shur

Dated: Washington, D.C.
          January 7, 2008

MEMORANDUM OF UNDERSTANDING

BETWEEN

THE FEDERAL ENERGY REGULATORY COMMISSION (FERC)

AND

THE COMMODITY FUTURES TRADING COMMISSION (CFTC)

REGARDING INFORMATION SHARING AND

TREATMENT OF PROPRIETARY TRADING AND OTHER INFORMATION

## Definitions

**"Aggregate data"** shall mean data utilized in a format that does not separately disclose the business transactions or market positions of any person, trade secrets, and/or names of customers.

**"CEA"** shall mean the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

**"FPA"** shall mean the Federal Power Act, 16 U.S.C. § 791a, *et seq.*

**"Futures and options trading data"** shall mean data and information regarding commodity futures or options transactions as described in section 2(a)(1)(A) of the CEA, 7 U.S.C. § 2(a)(1)(A).

**"MOU"** shall mean this Memorandum of Understanding.

**"NGA"** shall mean the Natural Gas Act, 15 U.S.C. § 717, *et seq.*

**"NGPA"** shall mean the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, *et seq.*

**"Other information"** shall mean non-public enforcement and regulatory materials other than futures and options trading data.

**"Parties"** shall mean the FERC and the CFTC.

**Preamble**

WHEREAS, sections 316 and 1281 of the Energy Policy Act of 2005 direct that, within 180 days of its enactment on August 8, 2005, the FERC and the CFTC shall conclude a memorandum of understanding to ensure that information requests to markets within the respective jurisdiction of each agency are properly coordinated to minimize duplicative information requests, and to address the treatment of proprietary trading information;

WHEREAS, the CFTC has exclusive jurisdiction with respect to accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery, including, but not limited to, natural gas, electricity, or any other energy product, traded or executed on or subject to the rules of a designated contract market, registered derivatives transaction execution facility, or any other board of trade, exchange, or market as described in section 2(a)(1)(A) of the CEA, 7 U.S.C. § 2(a)(1)(A);

WHEREAS, the FERC has exclusive jurisdiction over, among other things, the transportation of natural gas in interstate commerce and certain sales in interstate commerce of natural gas for resale as set forth in section 1 of the NGA, 15 U.S.C. § 717, and section 601(a) of the NGPA, 15 U.S.C. § 3431(a); certain other transportation and sales of natural gas authorized pursuant to section 311 of the NGPA, 15 U.S.C. § 3371; and the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce by public utilities, as described in section 201 of the FPA, 16 U.S.C. § 824;

WHEREAS, section 8(e) of the CEA, 7 U.S.C. § 12(e), permits but does not require the CFTC, upon the request of any department or agency of the government of the United States acting within the scope of its jurisdiction, to furnish to such department or agency any information in the possession of the CFTC obtained in connection with the administration of the CEA;

WHEREAS, section 8(e) of the CEA requires that any information so furnished by the CFTC to any federal department or agency not be disclosed by such department or agency except in an action or proceeding under the laws of the United States to which it, the CFTC, or the United States is a party;

WHEREAS, the CFTC engages in administrative and enforcement activities in accordance with the CEA of organized exchanges, registered entities, trading facilities, brokers, and persons engaged in activities subject to the CEA and rules and regulations of the CFTC;

WHEREAS, section 407(a) of the Department of Energy Organization Act (DOE Organization Act), 42 U.S.C. § 7177(a), requires each federal agency to provide to the FERC, upon request, such existing information in the possession of the agency as the FERC determines is necessary to carry out its responsibilities under the DOE Organization Act;

WHEREAS, the FERC engages in the administrative and enforcement activities identified in Appendix A pursuant to its statutory authority, as contemplated by section 8(e) of the CEA; and

WHEREAS, the CFTC and the FERC may from time to time engage in oversight or investigations of activity affecting both CFTC-jurisdictional and FERC-jurisdictional markets;

NOW, THEREFORE, this MOU is entered into by and between the Parties.

The Parties agree to the following:

Information requests by the FERC

1.      The FERC shall direct in writing to the CFTC any and all requests for futures and options trading data or other information from a designated contract market, a registered derivatives transaction execution facility, or any other board of trade, exchange, or market.  The CFTC shall promptly obtain this data and furnish it to the FERC under the conditions set forth in this MOU.

2.      Any futures and options trading data or other information furnished pursuant to this MOU by the CFTC to the FERC shall be kept confidential and non-public, and shall not be disclosed or made available by the FERC to any other person except in an action or proceeding under the laws of the United States to which the FERC, the CFTC, or the United States is a party in accordance with section 8(e) of the CEA.  The FERC may disclose to other persons futures and options trading data or other information the CFTC furnishes under this MOU only in an administrative or enforcement proceeding listed in Appendix A.

Information requests by the CFTC

3.      In the event the CFTC seeks data or information which may be in the possession of the FERC, the CFTC shall direct in writing a request for such information to the FERC.  If the information is in the possession of the FERC, the FERC shall furnish it to the CFTC under the conditions set forth in this MOU.  If the information is not in the possession of the FERC, the FERC will so inform the CFTC promptly.

4.      Any data or information obtained by the FERC pursuant to the confidentiality provisions of 18 C.F.R. Part 1b or any other FERC confidentiality regulation, and furnished pursuant to this MOU by the FERC to the CFTC, shall be kept confidential and non-public, and shall not be disclosed or made available by the CFTC to any other person except in an action or proceeding under the laws of the United States to which the CFTC or the United States is a party.

Information requests, general provisions

5.      The Parties will confer on coordinating procedures relating to the disclosure of information so as to conform to third-party notice requirements of their respective regulations.

6.      The Parties agree to avoid duplicative information requests to the extent possible, and to coordinate on a regular basis oversight, investigative, and enforcement activities of mutual interest.  To facilitate this coordination, the respective oversight and enforcement staffs of the FERC and CFTC are authorized to share information concerning ongoing oversight,

investigative, and enforcement activities to determine whether and when they have a mutual interest in matters.

7.    The Parties agree that this MOU does not in any way interfere with, proscribe, or adversely affect the ability or authority of the FERC or the CFTC to obtain any information directly from entities subject to their powers to obtain information.

<u>Treatment of proprietary information</u>

8.    Aggregate data furnished or derived from data furnished pursuant to this MOU by the FERC to the CFTC or by the CFTC to the FERC may be disclosed or made available by the recipient agency and are not subject to the restrictions in paragraphs 2 and 4.

9.    The disclosure or publication by the FERC of any report, history, evaluation, narrative, analysis, or other document to any person outside the FERC, whether that person is within or without the federal government, that contains futures and options trading data or other information provided by the CFTC to the FERC pursuant to this MOU may not be made without the prior written consent of the CFTC, except as permitted by paragraph 2 herein.  The disclosure or publication by the CFTC of any report, history, evaluation, narrative, analysis, or other document to any person outside the CFTC, whether that person is within or without the federal government, that contains confidential or non-public information provided by the FERC to the CFTC pursuant to this MOU may not be made without the prior written consent of the FERC, except as permitted by paragraph 4 herein.  Requests for written consent may be made in accord with paragraph 11.  This limitation does not apply to disclosure or publication of aggregate data only, or to the disclosure or publication of information received by other means.

10.    Except as permitted by section 8(e) of the CEA, and unless prohibited by federal law, the FERC shall promptly notify the CFTC in writing in accord with paragraph 11 of the receipt of any request or demand of the FERC for the disclosure of futures and options trading data or other information that has been furnished by the CFTC to the FERC pursuant to this MOU.  The CFTC shall unless prohibited by federal law promptly notify the FERC in writing of the receipt of any request or demand of the CFTC for the disclosure of confidential or non-public data or information that has been furnished by the FERC to the CFTC pursuant to this MOU.  This includes, but is not limited to, an informal request, a subpoena, a court order, or a request pursuant to the Freedom of Information Act (FOIA).   In responding to any such request other than a FOIA request, the FERC and the CFTC each shall assert all legal exemptions and privileges on the other's behalf that may reasonably be requested to be asserted.  The FERC shall refer any FOIA request to the CFTC for disposition by the CFTC, and the CFTC shall refer any FOIA request to the FERC for disposition by the FERC.

<u>Implementation</u>

11.    The FERC designates its General Counsel and his or her designees as its point(s) of contact for requesting or providing any data or information or notifications as required by this MOU.  The CFTC designates its Director of the Division of Enforcement and his or her

designees as its point(s) of contact for requesting or providing any data or information or notifications as required by this MOU.

12.     The disclosure of any of the futures and options trading data or other information to the FERC, or the subsequent disclosure of futures and options data or other information by the FERC pursuant to the terms of this MOU, and the disclosure of any confidential or non-public data or information to the CFTC, or subsequent disclosure of confidential or non-public data or information by the CFTC pursuant to the terms of this MOU, does not constitute a waiver with regard to any confidentiality or privilege of undisclosed data or information.  In addition, this MOU does not create any right enforceable against the FERC or the CFTC or any of their members, officials, or employees.

13.     The Parties agree that no further authorizations are necessary for their respective staffs to undertake an information request; exchange of data or information; exchange of oversight, investigation, and enforcement interests; discussion among staff of mutual interests; or otherwise to conduct activities as described by this MOU.  All such information requests and exchanges shall be initiated by a written request.

14.     This MOU shall become effective as of the date of its signing, and may be revised or modified only upon the written agreement of the Parties, or as required by changes in relevant laws.

Agreed to this  12th  day of  ___October___, 2005

__Reuben Jeffrey III__
Reuben Jeffery III, Chairman
Commodity Futures Trading Commission

__Joseph T. Kelliher__
Joseph T. Kelliher, Chairman
Federal Energy Regulatory Commission

APPENDIX A

FERC ADMINISTRATIVE AND ENFORCEMENT ACTIONS

1.      Any FERC action filed in a U.S. District Court to enjoin violations of, or to enforce compliance with, any provision of law or any rule or order issued thereunder pursuant to:  section 314 of the Federal Power Act (FPA), 16 U.S.C. § 825m (2000); section 20 of the Natural Gas Act (NGA), 15 U.S.C. § 717s; section 504(b)(1) of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3413(b)(1); or comparable statutory authority under any other law administered by FERC, including the Energy Policy Act of 2005.

2.      Any FERC action filed in a U.S. District Court to affirm an assessment of a civil penalty or to recover the amount of such a penalty pursuant to:  FPA section 31, 16 U.S.C. § 823b; NGPA section 504(b)(6); or comparable statutory authority under any other law administered by FERC, including the Energy Policy Act of 2005.

3.      Any action in any court in which FERC is a defendant, intervener, plaintiff, or other party.

4.      Any level of judicial appeal of an order issued in an action described in items 1, 2, or 3 above.

5.      Any administrative proceeding or matter filed with or initiated by FERC in which (a) the compliance of an entity with any provision of the FPA, NGA, NGPA, any other law administered by FERC, or any rule or order issued thereunder is at issue, and (b) FERC staff participates, that may result in the issuance of an order, including but not limited to matters under FPA § 206, NGA § 5, and non-public matters under 18 C.F.R. Part 1b.

6.      Any level of judicial appeal of an order FERC issues in an administrative proceeding described in item 5 above.

114 FERC 61,047
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

18 CFR Part 1c

(Docket No. RM06-3-000; Order No. 670)

Prohibition of Energy Market Manipulation

(Issued January 19, 2006)

AGENCY:  Federal Energy Regulatory Commission.

ACTION:  Final Rule.

SUMMARY:  In this Final Rule, pursuant to Title III, Subtitle B, and Title XII, Subtitle

G of the Energy Policy Act of 2005, the Federal Energy Regulatory Commission

(Commission) is amending its regulations to implement new section 4A of the Natural

Gas Act and new section 222 of the Federal Power Act, prohibiting the employment of

manipulative or deceptive devices or contrivances.

EFFECTIVE DATE: This Final Rule will become effective [insert date of publication in

the **FEDERAL REGISTER**].

FOR FURTHER INFORMATION CONTACT:

Mark Higgins
Office of Market Oversight and Investigations
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426
(202) 502-8273
Mark.Higgins@ferc.gov

Docket No. RM06-3-000                                                    -2-

Frank Karabetsos
Office of General Counsel
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426
(202) 502-8133
Frank.Karabetsos@ferc.gov


SUPPLEMENTARY INFORMATION:

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Prohibition of Energy Market Manipulation            Docket No. RM06-3-000

ORDER NO. 670

FINAL RULE

(Issued January 19, 2006)

I.  INTRODUCTION ................................................................................................ 1.

II.  BACKGROUND  ............................................................................................... 6.

III.  DISCUSSION .................................................................................................. 8.
    A.  Scope of Application of Regulations ............................................................. 9.
        1.  Comments ................................................................................................ 9.
        2.  Commission Determination ..................................................................... 16.
    B.  General Applicability of Securities Law Concepts  ..................................... 26.
        1.  Comments ............................................................................................... 26.
        2.  Commission Determination ..................................................................... 30.
    C.  Disclosure ..................................................................................................... 33.
        1.  Duty of Disclosure ................................................................................. 34.
            a.  Comments ......................................................................................... 34.
            b.  Commission Determination .............................................................. 35.
        2.  Sections 1c.1(a)(2) and 1c.2(a)(2) and Omissions of Material Fact ........ 38.
            a.  Comments ......................................................................................... 38.
            b.  Commission Determination .............................................................. 41.
    D.  Sections 1c.1(a)(3) and 1c.2(a)(3) and Intent .............................................. 43.
        1.  Comments ............................................................................................... 43.
        2.  Commission Determination ..................................................................... 45.
    E.  Elements of a Manipulation Claim  ............................................................. 46.
        1.  Comments ............................................................................................... 46.
        2.  Commission Determination ..................................................................... 48.
    F.  Interplay with Market Behavior Rules ......................................................... 55.
        1.  Comments ............................................................................................... 55.
        2.  Commission Determination ..................................................................... 58.
    G.  Statute of Limitations ................................................................................... 61.

Docket No. RM06-3-000                                                    ii

    1. Comments .................................................................................... 61.
    2. Commission Determination ......................................................... 62.
  H. Safe Harbors and Affirmative Defenses .......................................... 64.
    1. Comments .................................................................................... 64.
    2. Commission Determination ......................................................... 66.
  I. Procedures for Handling Manipulation Claims ................................. 68.
    1. Comments .................................................................................... 68.
    2. Commission Determination ......................................................... 70.
  J. Miscellaneous Issues ........................................................................ 75.
    1. Use of "Entity" in place of "Person" in sections 1c.1(a)(3) and 1c.2(a)(3) ........ 75.
      a. Comments ............................................................................. 75.
      b. Commission Determination .................................................. 76.
    2. Impact of New Regulations on the Policy Statement on Natural Gas and Electric Price Indices ........................................................ 77.
      a. Comments ............................................................................. 77.
      b. Commission Determination .................................................. 78.
    3. Special Pleading ......................................................................... 79.
      a. Comments ............................................................................. 79.
      b. Commission Determination .................................................. 80.

IV. REGULATORY FLEXIBILITY ACT CERTIFICATION ..................... 81.

V. INFORMATION COLLECTION STATEMENT ................................... 83.

VI. ENVIRONMENTAL STATEMENT .................................................... 84.

VII. DOCUMENT AVAILABILITY ......................................................... 85.

VIII. EFFECTIVE DATE AND CONGRESSIONAL NOTIFICATION ..................... 88.

TABLE OF CONTENTS

REGULATORY TEXT

APPENDIX: Parties Filing Initial and Reply Comments and Acronyms

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
Nora Mead Brownell, and Suedeen G. Kelly.

Prohibition of Energy Market Manipulation                    Docket No. RM06-3-000

ORDER NO. 670

FINAL RULE

(Issued January 19, 2006)

I.  **Introduction**

1.      On October 20, 2005, the Commission issued a Notice of Proposed Rulemaking

(NOPR) to prohibit energy market manipulation.[1]  Pursuant to section 4A of the Natural

Gas Act (NGA)[2] and section 222 of the Federal Power Act (FPA),[3] as added to the

statutes by the Energy Policy Act of 2005 (EPAct 2005),[4] the Commission proposed to

add a Part 159 under Subchapter E and a Part 47 under Subchapter B to Title 18 of the

Code of Federal Regulations.  Under the proposed regulations, it would be unlawful for

---

[1] Prohibition of Energy Market Manipulation, 113 FERC ¶ 61,067 (2005).

[2] 15 U.S.C. 717 et al. (2000).

[3] 16 U.S.C. 791a et al. (2000).

[4] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005), 315 and 1283, respectively.

Docket No. RM06-3-000                                                                            2

any entity, directly or indirectly, in connection with the purchase or sale of natural gas or

the purchase or sale of transportation services subject to the jurisdiction of the

Commission, or in connection with the purchase or sale of electric energy or the purchase

or sale of transmission services subject to the jurisdiction of the Commission, (1) to use

or employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of

a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business that operates or would operate as

a fraud or deceit upon any person.

2.        In the NOPR, the Commission stated that sections 315 and 1283 of EPAct 2005

"apply to the conduct of 'any entity,' not just jurisdictional market-based rate sellers,

natural gas pipelines, or holders of blanket certificate authority," and "includes not only

regulated utilities but also governmental utilities and other market participants."[5]

Furthermore, we stated in the NOPR that sections 1c.1(a)(1)-(3) and 1c.2(a)(1)-(3) of the

proposed regulations were patterned after the Securities and Exchange Commission's

(SEC) Rule 10b-5,[6] and were "intended to be interpreted consistent with analogous SEC

precedent that is appropriate under the circumstances."[7]  Sections 1c.1(b) and 1c.2(b) of

---

[5] NOPR at P 9.

[6] 17 CFR 240.10b-5 (2005).

[7] NOPR at P 10.  As explained in P 5, supra, the regulations proposed to be placed

(continued)

Docket No. RM06-3-000                                                        3

the proposed regulations stated that nothing in these provisions should be construed to

create a private right of action.  The Commission further noted, however, that sections

1c.1(b) and 1c.2(b) were not intended to take away any other right that may otherwise

exist.

3.      Thirty parties filed comments and nine parties filed reply comments.[8]  In response

to the comments, and as discussed more fully below, the Commission, among other

things: clarifies the scope of application of the Final Rule; addresses comments pertaining

to disclosure and sections 1c.1(a)(2)-(3) and 1c.2(a)(2)-(3) of the Final Rule; discusses

the elements of a violation of the Final Rule; notes the relationship of the Final Rule to

the Market Behavior Rules[9]; and deals with a number of implementation issues, such as

the applicable statute of limitations, affirmative defenses and safe harbor provisions, and

procedural matters.

---

in new sections 159.1 and 47.1 will be new sections 1c.1 and 1c.2, respectively.

[8] Entities filing intervening and reply comments are listed in the Appendix to this
Final Rule.  The abbreviations for such commenters are noted in the Appendix.  The
Commission has accepted and considered all comments filed, including late-filed
comments.

[9] Investigation of Terms and Conditions of Public Utility Market-Based Rate
Authorizations, 105 FERC ¶ 61,218 (2003), reh'g denied, 107 FERC ¶ 61,175 (2004);
Order No. 644, Amendment to Blanket Sales Certificates, 68 FR 66323 (2003), FERC
Stats. & Regs. ¶ 31,153 (2003), reh'g denied, 107 FERC ¶ 61,174 (2004).  The Market
Behavior Rules are currently on appeal.  Cinergy Marketing & Trading, L.P. v. FERC,
Nos. 04-1168 et al. (D.C. Cir., appeal filed April 28, 2004).

Docket No. RM06-3-000                                                    4

4.      For the most part, the Commission finds it unnecessary to change the wording of

the proposed regulatory text, except in one respect: substituting "entity" for "person" in

sections 1c.1(a)(3) and 1c.2(a)(3) of the Final Rule.  However, we do provide certain

clarifications requested by several commenters.  In addition, we find that some of the

recommendations made by commenters are more appropriately addressed in the

proceeding initiated in Docket No. RM06-5-000, proposing to repeal the codes of

conduct for unbundled sales service and for persons holding blanket marketing

certificates, and in Docket No. EL06-16-000, proposing to repeal the Market Behavior

Rules, which are currently included in all public utility sellers' market-based rate tariffs

and authorizations.[10]

5.      Without a rule prohibiting manipulative or deceptive conduct, the language of

EPAct 2005 sections 315 and 1283 does not, by itself, make any particular act unlawful.

As a result, this Final Rule serves as the implementing provision designed to prohibit

manipulation and fraud in the markets the Commission is charged with regulating.  The

Final Rule is not intended to regulate negligent practices or corporate mismanagement,

but rather to deter or punish fraud in wholesale energy markets.  In addition, to ease

references to the Final Rule, we have determined to place the new regulations in a new

---

[10] Amendments to Codes of Conduct for Unbundled Sales Service and for Persons
Holding Blanket Marketing Certificates, 70 FR 72090 (2005), 113 FERC ¶ 61,189
(2005); Investigation of Terms and Conditions of Public Utility Market-Based Rate
Authorizations, 70 FR 71484 (2005), 113 FERC ¶ 61,190 (2005).

Docket No. RM06-3-000                                                                     5

Part 1c of the Commission's general regulations, rather than separately in new Parts 159

and 47 as proposed in the NOPR.  The regulatory text of proposed sections 159.1 and

47.1 as identified herein will be new sections 1c.1 and 1c.2, respectively.

## II. **Background**

6.      On August 8, 2005, EPAct 2005 became law.  Sections 315 and 1283 of EPAct

2005, amending the NGA and the FPA, respectively, are virtually identical, and prohibit

the use or employment of manipulative or deceptive devices or contrivances in

connection with the purchase or sale of natural gas, electric energy, or transportation or

transmission services subject to the jurisdiction of the Commission.  These anti-

manipulation sections of EPAct 2005 closely track the prohibited conduct language in

section 10(b) of the Securities Exchange Act of 1934,[11] and specifically dictate that the

terms "manipulative or deceptive device or contrivance" are to be used "as those terms

are used in section 10(b) of the Securities Exchange Act of 1934."

7.      The SEC adopted Rule 10b-5,[12] which implemented section 10(b) of the Exchange

Act.  Since their promulgation, a significant body of legal precedent concerning section

10(b) of the Exchange Act and Rule 10b-5 has developed.  Consistent with the mandate

that certain aspects of the Commission's new authority be exercised in a manner

consistent with section 10(b) of the Exchange Act, consistent with Congress' modeling

---

[11] Securities Exchange Act of 1934, 15 U.S.C. 78j(b) (2000) (Exchange Act).

[12] 17 CFR 240.10b-5 (2005).

Docket No. RM06-3-000                                                        6

sections 315 and 1283 of EPAct 2005 on section 10(b) of the Exchange Act, and as

proposed in the NOPR, the Commission has modeled the Final Rule on Rule 10b-5.  This

approach will benefit entities subject to the new rule because there is a substantial body

of precedent applying the comparable language of Rule 10b-5.  In the course of

responding to various comments, we will discuss the appropriate application of analogous

securities law precedent that will inform the interpretation of the Final Rule in the context

of the NGA and FPA.

## III.    **Discussion**

8.      The 30 initial comments and nine reply comments on the NOPR are from a diverse

group of industry stakeholders.  Overwhelmingly, commenters are supportive of our

efforts to implement well-developed, clear and fair rules aimed at eliminating the

potential for fraud in wholesale energy transactions.  The comments identify a number of

issues: (1) the scope of application of the Final Rule; (2) the usefulness of securities law

precedents to the energy industry; (3) the disclosure implications of the Final Rule; (4)

the elements that comprise a violation of the Final Rule; (5) how the Final Rule will

interact with the Market Behavior Rules; and (6) a variety of procedural matters,

including the appropriate statute of limitations to apply to the Final Rule.  These issues

and others that were raised in comments are addressed in the sections that follow.

### A.  **Scope of Application of Regulations**

#### 1.  **Comments**

9.      Several commenters express views on the appropriate scope of the proposed anti-

Docket No. RM06-3-000                                                                 7

manipulation regulations.[13]  Commenters ask the Commission to clarify the meaning of

"any entity" and "subject to the jurisdiction of the Commission" as these statutory terms

apply to the proposed regulations.  For example, the Midwest ISO supports broad

application of the proposed regulations to any entity as opposed to "limiting the

application of the regulations to FERC jurisdictional parties."[14]  Likewise, NASUCA

reads the proposed regulations as applying to all entities, "not just jurisdictional market-

based rate sellers, natural gas pipelines, or holders of blanket certificate authority."[15]

AGA asks the Commission to clarify that "any entity" means that the proposed

regulations extend beyond Order No. 644 regulation of jurisdictional market-based rate

sellers, natural gas pipelines, or holders of blanket certificate authority.  This is

necessary, AGA asserts, to ensure the rules will have the "intended effective impact on

the market place for natural gas sales."[16]

10.    Two commenters specifically address whether the proposed regulations apply to

"first sales"[17] of natural gas.  APGA, noting that first sales represent a substantial part of

---

[13] See, e.g., AGA at 4-5; APGA at 10; APPA at 3-4; AOPL at 2; BP at 1-2; Cinergy at 8; EEI at 25-26; Indicated Market Participants at 8; Midwest ISO at 4; NARUC Reply at 3-5; SCANA at 3; SUEZ at 6-11.

[14] Midwest ISO at 4.

[15] NASUCA at 3.

[16] AGA at 4.

[17] "First sales" are certain wholesale sales of natural gas removed from the Commission's jurisdiction by the Natural Gas Policy Act of 1978 (NGPA) and the

(continued)

Docket No. RM06-3-000                                                    8

the wholesale natural gas market, argues that the phrase "subject to the jurisdiction of the

Commission" in NGA section 4A must be read to apply only to "the purchase or sale of

transportation services" and not to the preceding clause "purchase or sale of natural

gas."[18] SUEZ, however, argues that "subject to the jurisdiction of the Commission"

applies to purchases and sales as well as to transportation services. SUEZ maintains that

"any entity" does not include entities engaged in non-jurisdictional transactions such as

first sales, sales of LNG, or retail sales, but is intended only to bring certain governmental

entities otherwise excluded from FPA jurisdiction under the umbrella of the proposed

regulations.[19]

11.     APPA and NARUC also urge the Commission to construe the phrase "subject to

the Commission's jurisdiction" to modify both the purchase or sale of electric energy and

the purchase or sale of transmission services. By doing so, APPA and NARUC argue,

the Commission will make clear the regulation does not apply to retail sales or purchases

---

Wellhead Decontrol Act of 1989. Accordingly, the only sales of natural gas that the
Commission currently has jurisdiction to regulate are sales for resale of domestic gas by
pipelines, local distribution companies (LDCs), or their affiliates so long as they do not
produce the gas that they sell, and sales for resale of natural gas previously purchased and
sold by an interstate pipeline, LDC or retail customer. See San Diego Gas and Electric
Company, 101 FERC ¶ 61,161 at P 10 (2002); Reporting of Natural Gas Sales to the
California Market, 96 FERC   61,119 at 61,463, reh'g denied, 97 FERC ¶ 61,029 (2001).

    [18] APGA at 3-10.

    [19] SUEZ at 10, referring to FPA section 201(f) entities.

Docket No. RM06-3-000                                                                                    9

and thus will avoid overlap with state and local jurisdiction.[20]  In reply comments, Cinergy argues that regardless of the parsing of the statutory language, the manipulation authority falls within the existing scope of the FPA and NGA, and that nothing in the scope of these statutes suggests that retail sales are in any way subject to the Commission's authority.[21]  Likewise, EEI argues that the FPA is limited to wholesale markets, and that matters subject to state regulation are excluded from the reach of the Commission.[22]

12.    NGSA asserts that EPAct 2005 does not open the door to regulation of non-jurisdictional sales even if they are subject to the anti-manipulation rules.  NGSA acknowledges that the statutory provisions expand the Commission's authority to prevent market manipulation, but cautions that nothing in the statute grants the Commission any rate or certificate jurisdiction over deregulated first sales of natural gas.[23]

13.    Other commenters address the meaning of "any entity" in the context of FPA sections 201(f) and 211A.  PG&E argues that it is crucial that the Commission's authority to prohibit manipulation extend to all entities involved in the market.  Noting the specific reference to entities described in FPA section 201(f), PG&E states that the proposed

---

[20] APPA at 4; NARUC Reply at 3-5.

[21] Cinergy Reply at 2-4.

[22] EEI Reply at 6.

[23] NGSA at 3.

Docket No. RM06-3-000                                                          10

regulations should apply to all municipalities and other governmental agencies.[24]  EEI

also states that the proposed regulations must reach entities described in FPA section

201(f), including unregulated transmitting utilities under FPA section 211A.  This is so,

EEI argues, because the authority to require comparable open access transmission under

FPA section 211A makes all transmission service provided by FPA section 201(f) entities

subject to the jurisdiction of the Commission and thus subject to the proposed anti-

manipulation rules.[25]  APPA responds that under section 211A(c) certain entities are not

subject to the transmission service requirements (those selling less than 4,000,000 MWhs

per year, or that do not own facilities necessary to operate an interconnected transmission

system, or that meet other criteria that the Commission may adopt in the future).  These

entities, APPA argues, are not subject to the jurisdiction of the Commission and thus not

subject to the proposed regulations.[26]  NRECA goes further, asserting that while FPA

section 201(f) governmental entities are "potentially" subject to the proposed anti-

manipulation regulations, the regulations can only apply to transactions that are otherwise

subject to the Commission's jurisdiction.  Thus, NRECA argues that neither party to a

retail sale, to transmission service in intrastate commerce, or to a sale of electricity or

---

[24] PG&E at 6.

[25] EEI at 25.

[26] APPA Reply at 5-6.

Docket No. RM06-3-000                                                                11

transmission service by a FPA section 201(f) entity are subject to the proposed

regulations.[27]

14.       AOPL seeks clarification that "subject to the jurisdiction of the Commission" does

not mean the Commission would subject oil pipelines to claims of market manipulation

in connection with transportation and transmission services subject to the Commission's

jurisdiction under the Interstate Commerce Act (ICA).[28]

15.       Finally, Cinergy asks that the text of the proposed regulations be modified to make

explicit that the regulations pertain only to market manipulation, noting that SEC Rule

10b-5 applies to a wide range of activities beyond market manipulation.[29]

## 2. **Commission Determination**

16.       As an initial matter, this Final Rule does not, and is not intended to, expand the

types of transactions subject to the Commission's jurisdiction under the FPA, NGA,

NGPA, or ICA.  As now explained, however, the new regulations do apply to "any

entity" as that is the scope of the Final Rule as directed by sections 315 and 1283 of

EPAct 2005.  If any entity engages in manipulation and the conduct is found to be "in

connection with" a jurisdictional transaction, the entity is subject to the Commission's

anti-manipulation authority.  Absent such nexus to a jurisdictional transaction, however,

---

[27] NRECA Reply at 2-5.

[28] AOPL at 1-3.

[29] Cinergy at 8.

Docket No. RM06-3-000                                                        12

fraud and manipulation in a non-jurisdictional transaction (such as a first or retail sale) is

not subject to the new regulations.

17.      NGA section 4A and FPA section 222 make it unlawful for "any entity" to use a

manipulative or deceptive device or contrivance "in connection with" the purchase or sale

of natural gas or electric energy or the purchase or sale of transportation or transmission

services "subject to the jurisdiction of the Commission."[30]  The answer to the scope of

---

[30] The text of EPAct 2005 section 315, adding section 4A to the NGA, is:

It shall be unlawful for any entity, directly or indirectly, to use or employ, in
connection with the purchase or sale of natural gas or the purchase or sale of
transportation services subject to the jurisdiction of the Commission, any manipulative or
deceptive device or contrivance (as those terms are used in section 10(b) of the Securities
Exchange Act of 1934 (15 U.S.C. 78j(b))) in contravention of such rules and regulations
as the Commission may prescribe as necessary in the public interest or for the protection
of natural gas ratepayers. Nothing in this section shall be construed to create a private right
of action.

The corresponding text of EPAct 2005 section 1283, adding section 222 to the
FPA, is:

(a) IN GENERAL.—It shall be unlawful for any entity (including an entity described
in section 201(f)), directly or indirectly, to use or employ, in connection with the
purchase or sale of electric energy or the purchase or sale of transmission services subject
to the jurisdiction of the Commission, any manipulative or deceptive device or
contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of
1934 (15 U.S.C. 78j(b))), in contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in the public interest or for the
protection of electric ratepayers.

(b)  NO PRIVATE RIGHT OF ACTION.—Nothing in this section shall be construed to
create a private right of action.

Docket No. RM06-3-000                                                    13

application of the Final Rule lies in a reasonable reading of these terms in relation to each

other.

18.     "Any entity" is a deliberately inclusive term.  Congress could have used the

existing defined terms in the NGA and FPA of "person," "natural-gas company," or

"electric utility," but instead chose to use a broader term without providing a specific

definition. [31]  Thus, the Commission interprets "any entity" to include any person or form

of organization, regardless of its legal status, function or activities.[32]

19.     The second aspect of the analysis focuses on the transaction involved.  A

transaction under NGA section 4A is "the purchase or sale of natural gas or the purchase

or sale of transportation services subject to the jurisdiction of the Commission."  A

transaction under FPA section 222 is "the purchase or sale of electric energy or the

purchase or sale of transmission services subject to the jurisdiction of the Commission."

The critical issue is whether the limiting phrase of "subject to the jurisdiction of the

Commission" applies to both preceding phrases, that is, (1) the purchase or sale of the

energy commodity and (2) transportation services or transmission services, or just to the

---

[31] See NGA sections 2(1) and 2(6); FPA sections 3(4) and 3(22).  Congress did note that entities described in FPA section 201(f) are included in the meaning of entity. See FPA section 222(a).

[32] Because many entities that are engaged in wholesale natural gas or electricity transactions or in interstate transportation or transmission services, engage in both jurisdictional and non-jurisdictional transactions, it is not enough to say, as SUEZ suggests, that entities engaging in non-jurisdictional transactions are not covered.

Docket No. RM06-3-000                                                           14

transportation or transmission services.  APGA argues that the "rule of the last

antecedent" means that it should only modify the last phrase, that is, transportation

services or transmission services.  But in the absence of definitive punctuation or other

clearer expression of intent to limit the jurisdiction requirement only to transportation or

transmission, the Commission must look for the meaning which is the most reasonable

under the circumstances.[33]

20.     The Commission concludes that the phrase "subject to the jurisdiction of the

Commission" should be read as modifying both preceding phrases, that is, "the purchase

or sale" as well as "transportation services" (NGA) and "transmission services" (FPA).

Had Congress intended to expand the Commission's jurisdiction so significantly as to

give it anti-manipulation authority over such transactions as first sales of imported natural

gas, intrastate sales of electric energy, retail sales of electric energy or energy sales by

governmental entities, we believe it would have done so explicitly. [34]  Further, in light of

---

[33]  APGA at 4 (citing 2a N. Singer, Sutherland on Statutory Construction § 47:33 at
369 (6th rev. ed. 2000) and Barnhart v. Thomas, 540 U.S. 20, 26 (1993)).  The general
rule is that a qualifying phrase will normally apply to the provision or clause immediately
preceding it.  However, "where the sense of the entire act requires that a qualifying word
or phrase apply to several preceding . . . sections, the word or phrase will not be restricted
to its immediate antecedent."  Sutherland § 47:33 at 372.  The case referred to by APGA
also notes that the rule is "not an absolute" and "can assuredly be overcome by other
indicia of meaning."  Barnhart v. Thomas, 540 U.S. at 26.

[34]  Transactions not subject to the Commission's jurisdiction include first sales,
sales of imported natural gas, sales of imported LNG, sales and transportation by NGA
section 1(b)-(d) entities (i.e., activities including production and gathering, local
distribution, "Hinshaw" pipelines, and vehicular natural gas), or by NGA section 7(f)

(continued)

Docket No. RM06-3-000                                                    15

the close link between transportation or transmission services and natural gas and electric

commodity sales, we do not believe that Congress would have expanded the

Commission's authority to cover all natural gas and electric commodity sales but not all

gas transportation and electric transmission.  Accordingly, we conclude that the most

reasonable interpretation is that Congress did not expand the Commission's traditional

NGA and FPA subject matter jurisdiction in sections 315 or 1283 of EPAct, but rather

gave the Commission broad jurisdiction over the entities that engage in certain conduct

affecting our subject matter jurisdiction.

21.    Third, the phrase "in connection with" must be given meaning.  APGA says that

interpreting "subject to the jurisdiction of the Commission" as applying to sales

effectively would exclude producers and marketers from the reach of the Final Rule as

these are the dominant sellers of natural gas in wholesale markets.  APGA argues this

interpretation implies that enactment of NGA section 4A serves no purpose, as it does not

increase the Commission's reach beyond the rules already promulgated by Order No.

644.[35]  This is not the case, however.  As discussed below, any entity may be subject to

---

companies, retail sales of electric energy, sales of electric energy in intrastate commerce,
sales of electric energy by governmental entities and certain electric power cooperatives,
and certain interstate transmission by governmental entities.

    [35] APGA at 6-8.  APGA also points to EPAct 2005 section 318, which adds a new
section (d) to NGA section 20.  Section 20(d) authorizes the Commission to seek a court
order barring an individual found to have engaged in manipulation from future energy
transactions; there is a similar new provision in FPA section 314(d).  Here, APGA
argues, Congress used subparts to separate sales from transportation service, and applied

(continued)

Docket No. RM06-3-000                                                          16

the Final Rule if its fraudulent or manipulative conduct is "in connection with" a

purchase or sale of natural gas, electric energy, transportation service, or transmission

service that is subject to the Commission's jurisdiction.[36]  Thus, the third aspect of the

analysis is to consider whether the fraud is "in connection with" a jurisdictional

transaction.

22.      Section 10(b)'s "in connection with" requirement has been construed broadly by

the Supreme Court to encompass many circumstances where securities transactions

"coincide" with the overall scheme to defraud.[37]  However, the Supreme Court was

---

the "subject to the jurisdiction of the Commission" only to the latter.  This is not
dispositive.  First, this is a separate section of the statute.  Second, the use of subparts
does not conclusively mean that "subject to the jurisdiction of the Commission" cannot
also modify the first subpart.  Third, the reading APGA urges still presents the
troublesome prospect that parties could assert that the anti-manipulation authority now
applies to retail sales or other transactions otherwise expressly excluded from the
Commission's jurisdiction.

[36] AEP urges that the Final Rule identify the modalities through which an entity is
prohibited from manipulating a market, noting that SEC Rule 10b-5 specifies that fraud
or manipulation must involve the "use of any means or instrumentality of interstate
commerce or of the mails, of any facility of any national securities exchange."  AEP at 2.
This is not necessary, as manipulation must be in connection with jurisdictional
transactions which, by definitions in NGA section 1(b) and FPA section 201(b), are in
interstate commerce.

[37] SEC v. Zandford, 535 U.S. 813, 825 (2002) ("[T]he SEC complaint describes a
fraudulent scheme in which the securities transaction and breaches of fiduciary duty
coincide.  Those breaches were therefore 'in connection with' securities sales within the
meaning of [section] 10(b).").  See also  Superintendent of Insurance v. Bankers Life &
Casualty Co., 404 U.S. 6, 12-13 (1971) (previously the Supreme Court had stated that the
requirement was met when there was an "injury as a result of deceptive practices
touching [the] sale of securities"); Head v. Head, 759 F.2d 1172, 1175 (4th Cir. 1985)
(continued)

careful to state that section 10(b) "must not be construed so broadly as to convert every

common law fraud that happens to involve securities into a violation" of section 10(b)

and Rule 10b-5.[38]  Guided by this precedent, the Commission views the "in connection

with" element in the energy context as encompassing situations in which there is a nexus

between the fraudulent conduct of an entity and a jurisdictional transaction.  We note

that, unlike the SEC, which has broad jurisdiction over securities transactions, our

jurisdiction is limited to certain wholesale transactions that remain within the ambit of the

NGA, NGPA, and FPA.  At the same time, energy markets are made up of both

jurisdictional and non-jurisdictional transactions.  We do not intend to construe the Final

Rule so broadly as to convert every common-law fraud that happens to touch a

jurisdictional transaction into a violation of the Final Rule.  Rather, in committing fraud,

the entity must have intended to affect, or have acted recklessly to affect, a jurisdictional

transaction.[39]  For example, any entity engaging in a non-jurisdictional transaction

through a Commission-regulated RTO/ISO market, that acts with intent or with

recklessness to affect the single price auction clearing price (which sets the price of both

non-jurisdictional and jurisdictional transactions), would be engaging in fraudulent

---

(the nexus must be more than a de minimis "touch," yet is applied flexibly where there is
fraud affecting securities transactions).

[38] SEC v. Zandford, 535 U.S. at 820.

[39] See PP 52-53 infra for a discussion of the intent required for a violation of the
Final Rule.

Docket No. RM06-3-000                                                    18

conduct in connection with a jurisdictional transaction and, therefore, would be in

violation of the Final Rule.

23.     Turning to the comments that address the applicability of the proposed regulations

to FPA sections 201(f) and 211A,[40] here too the focus must be on the transaction and the

entity's conduct to determine whether a violation of the Final Rule occurred.  Again, the

Commission emphasizes that if <u>any</u> entity engages in fraudulent conduct and that conduct

is in connection with a jurisdictional transaction, then the Final Rule is applicable to that

entity.  It is, therefore, not necessary for the Commission to determine in this context how

sections 201(f) and 211A are to be applied generally.[41]

24.     With respect to the request by AOPL for clarification on whether "subject to the

jurisdiction of the Commission" would cause oil pipelines to be subject to claims of

market manipulation in connection with transportation services subject to the

Commission's jurisdiction under the ICA, the Commission points out that EPAct 2005

did not amend the ICA to include anti-manipulation provisions, and therefore we do not

---

[40] <u>See, e.g.</u>, APPA Reply at 5-6; EEI at 25; PG&E at 6; NRECA Reply at 2-5.

[41] Section 211A permits the Commission to issue regulations to implement the
provisions of FPA section 211A.  At this time, the Commission has not proposed such
regulations, but has included this issue in the Notice of Inquiry issued in <u>Preventing
Undue Discrimination and Preference in Transmission Service</u>, 70 FR 55796 (2005),
FERC Stats. & Regs. ¶ 35,553 (2005).   Full delineation of the scope of FPA section
211A should be developed through that proceeding, not in the context of the anti-
manipulation regulations.

Docket No. RM06-3-000                                                    19

read the authority granted under the NGA and FPA to proscribe and penalize fraud or

deceit as applying to oil pipeline transportation under the ICA.

25.    As to Cinergy's request that the text of the Final Rule be modified to make explicit

that the regulations apply only to market manipulation, we decline to do so.  Cinergy's

request would unduly narrow the broad authority Congress granted in EPAct 2005.  The

language of EPAct 2005 sections 315 and 1283 is modeled after section 10(b) of the

Exchange Act, which has been interpreted as a broad anti-fraud "catch-all clause."[42]  SEC

Rule 10b-5, on which the Final Rule is patterned, does not expressly limit itself to

manipulation, but uses terms such as "device, scheme, or artifice to defraud" and "fraud

or deceit."[43]  We will retain similar language in our Final Rule, which will permit the

Commission to police all forms of fraud and manipulation that affect natural gas and

electric energy transactions and activities the Commission is charged with protecting.

## B.  General Applicability of Securities Law Concepts

### 1.  Comments

26.    Commenters are divided as to whether we should model the proposed anti-

---

[42] See Aaron v. SEC, 446 U.S. 680, 690 (1980); see also Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 6-7 (1985) (describing section 10(b) as a "general prohibition of practices . . . artificially affecting market activity in order to mislead investors . . . ."); Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151-53 (1972) (noting that the repeated use of the word "any" in section 10(b) and SEC Rule 10b-5 denotes a congressional intent to have the provisions apply to a wide range of practices).

[43] 17 CFR 240.10b-5 (2005).  SEC Rule 10b-5 is titled "Employment of manipulative and deceptive devices."

Docket No. RM06-3-000                                                          20

manipulation regulations after SEC Rule 10b-5.  Ameren, Cinergy, EPSA, Indicated

Market Participants, EEI, LG&E, NGSA, PNM and Xcel argue that adoption of a rule

patterned on SEC Rule 10b-5 is problematic because the securities model is one of

disclosure, designed in large part to protect novice investors by eliminating disparities in

access to information, whereas the purpose of the FPA and NGA is to ensure "just and

reasonable" rates in wholesale energy markets.  Many of the commenters also argue that

the participants in energy markets are largely sophisticated, and unlike less-sophisticated

participants in the securities markets, do not need the protections of a disclosure regime.[44]

27.     AGA comments that it is unclear how the SEC's model of disclosure will apply to

natural gas market transactions, and ISDA and PNM argue that the Commission should

refrain from a wholesale adoption of SEC case law as such an action would create

uncertainty as to the duties, standards and obligations owed by market participants

because of the different regulatory frameworks for energy and securities markets.[45]

EPSA, PG&E and SUEZ call for further study and tailoring of Rule 10b-5 to the energy

industry because of the differences between the operations of the securities markets and

---

[44] Ameren at 3-4; Cinergy at 6-7; EPSA at 5-8; Indicated Market Participants at 10-13; EEI at 6-8; LG&E at 3-7; NGSA at 4-5; PNM Reply at 4-5; Xcel at 3-6.

[45] AGA at 4; ISDA at 3-5; PNM Reply at 4-6.  But not everyone dismisses the importance of the regulations to sophisticated parties.  APPA shares SCE's observation that the degree of "protection" implied by relative levels of counterparty sophistication must not be overstated, noting that even sophisticated market participants may need protection against market manipulations.  APPA Reply at 3-4; SCE at 3-4.

Docket No. RM06-3-000                                                           21

the energy markets.[46] FirstEnergy argues that the rules proposed in the NOPR are vague

and overly broad.[47]

28.      On the other hand, APGA, NARUC, NASCUA, NJBPU, and the States support

the Commission's decision to model the proposed regulations on SEC Rule 10b-5.[48]

APPA, NARUC and NJBPU argue that Rule 10b-5 case law will provide useful guidance

as the Commission develops its own body of precedent to follow.[49]  TDUS argues that

the Commission's proposed rule prohibiting market manipulation plainly implements, in

a straightforward manner, the express intent of EPAct 2005.[50]  TDUS finds the arguments

of Ameren and Xcel unpersuasive because parties as sophisticated as they purport to be

ought to have no problem complying with a straightforward prohibition against making

fraudulent representations in their transactions.[51]  TDUS also argues that the level of

sophistication of the parties to a bilateral negotiation is irrelevant because the

---

[46] EPSA at 11; PG&E at 12; SUEZ at 14.

[47] FirstEnergy at 4-6.

[48] APGA at 4-5; NARUC at 4-5; NASCUA at 2-3; NJBPU at 2-3; States at 2. APGA, NARUC, and the States argue that modeling the Final Rule on SEC Rule 10b-5 is consistent with the express congressional dictates of EPAct 2005.

[49] APPA Reply at 1-2; NARUC at 5; NJPBU at 3.

[50] TDUS at 2-3.

[51] Id. at 3.

Docket No. RM06-3-000                                                    22

Commission's anti-manipulation rules are not to protect the contracting parties from each

other, but to protect the consumers who rely on the market for their energy supplies.[52]

29.    APPA and INGAA support the Commission's reliance on section 10(b) of the

Exchange Act and SEC Rule 10b-5, and the case law interpreting the statute and rule, as

providing guidance to the Commission in administering its new EPAct 2005 anti-

manipulation authority.[53]    APPA and INGAA also recommend that the Commission

take into account pertinent differences between the regulatory regimes of the Exchange

Act and the NGA and NGPA, and depart from securities law precedent when industry

structure and common sense so dictate.[54]

## 2. **Commission Determination**

30.    As a general matter, the Commission does not believe that modeling the Final

Rule on SEC Rule 10b-5 is problematic or will create uncertainty.  This is not to say that

commenters did not raise valid concerns about how securities precedent will be applied in

the energy industry context.  We intend to adapt analogous securities precedents as

appropriate to specific facts, circumstances, and situations that arise in the energy

industry.  This is consistent with Congress' modeling of EPAct 2005 sections 315 and

1283 on section 10(b) of the Exchange Act and explicit references to section 10(b) in

---

[52] Id. at 3-4.

[53] APPA Reply at 1-3; INGAA at 7.

[54] APPA Reply at 1; INGAA at 5.

Docket No. RM06-3-000                                                          23

EPAct 2005 sections 315 and 1283, and will provide a level of substantial certainty with

respect to how the regulations will operate that the Commission is not typically able to

provide where a preexisting body of law and precedent is not readily available. The

Commission likewise finds that modeling the Final Rule on SEC Rule 10b-5 provides

clarity to affected parties similar to the clarity provided by Congress. Thus, the

Commission rejects FirstEnergy's argument that the proposed regulations are vague and

overly broad. As previously stated, the Final Rule is modeled on SEC Rule 10b-5, which

is not vague or overly broad.[55]

31.     The Commission rejects EPSA's, PG&E's and SUEZ's calls for further study and

tailoring of Rule 10b-5 to the industry the Commission regulates. Further study and

tailoring would not improve the Final Rule or industry understanding of its scope and

applicability. While the Commission generally agrees with commenters that a wholesale

overlay of the securities laws onto energy markets is overly simplistic, we also believe it

would be illogical to simply ignore decades of useful guidance that securities law

precedent can offer, especially considering that Congress deliberately modeled EPAct

2005 sections 315 and 1283 on section 10(b) of the Exchange Act. Therefore, the

Commission intends to recognize, on a case-by-case basis, that the roles of the

Commission and the SEC are not identical in determining whether it is appropriate to

_____

[55] See, e.g., United States v. Persky, 520 F.2d 283 (2d Cir. 1975); accord Todd & Co. v. SEC, 557 F.2d 1008, 1013 (3d Cir. 1977).

Docket No. RM06-3-000                                                    24

adopt securities precedents to specific energy industry facts, circumstances, or

situations.[56]

32.     The Commission recognizes that the SEC does not have a duty to assure that the

price of a security is just and reasonable, and that our duty is not to protect purchasers

through a regime of disclosure.  Despite these differences in mission, however, wholesale

natural gas and power markets, like securities markets, are susceptible to fraud and

market manipulation, regardless of the level of sophistication of the market participants.

Therefore, it is appropriate to model the Final Rule on SEC Rule 10b-5 in an effort to

prevent (and where appropriate remedy) fraud and manipulation affecting the markets the

Commission is entrusted to protect, while providing a level of certainty to market

participants that is beyond that which the Commission would be otherwise required to

provide.  However, as discussed below, we provide several of the clarifications requested

by the commenters to address the differences between the SEC's regulation of securities

markets and our regulation of markets for natural gas and electricity.

## C.  **Disclosure**

33.     Several commenters expressed concern over what they consider to be disclosure

implications of the proposed regulations.[57]  In particular, commenters focused on two

---

[56] For example, as explained in paragraph 36 <u>supra</u>, the Commission is not
adopting the disclosure regime of the SEC, and as explained in paragraphs 52-53 <u>infra</u>,
the element of scienter will apply in the Final Rule just as it applies to SEC Rule 10b-5.

[57] <u>See, e.g.</u>, Ameren at 4-6; AGA at 4; AEP at 2; Cinergy at 8-9; Indicated Market
(continued)

Docket No. RM06-3-000                                                          25

disclosure-related areas: whether the proposed anti-manipulation regulations create a new

duty of disclosure; and whether sections 1c.1(a)(2) and 1c.2(a)(2), and particularly the

references to "omissions of material fact," impose an undue burden on bilateral, arm's-

length negotiations.

     1. **Duty of Disclosure**

       a. **Comments**

34.   Commenters' view is that the proposed regulations should not create an

affirmative duty to disclose strategic or proprietary information not otherwise required

under the FPA, NGA, or Commission orders, rules, or regulations.[58]  Ameren argues that

there is no evidence in EPAct 2005 that Congress intended to impose a general obligation

of disclosure in the energy markets.[59]  Ameren and LG&E provide examples of a

company purchasing power as a result of a forced outage, and question whether, under

the regulations, a party would have to disclose information detrimental to its bargaining

position.[60]  AEP expresses similar concern that the regulations should not require

companies to disclose trade secrets, sensitive information, or forward looking information

---

Participants at 10-13, 23-28; EEI at 14-16; EPSA at 5-11; FirstEnergy at 10-13; ISDA at
3-8; INGAA at 5-7, 10; LG&E at 9; NGSA at 2, 5-6; PG&E at 7; Progress at 2-4; SCE at
3-4; SUEZ at 12-14; Xcel at 2, 4-6.

[58] See, e.g., Ameren at 4; EEI at 16; Indicated Market Participants at 27.

[59] Ameren at 4.

[60] Id. at 5; LG&E at 8.

Docket No. RM06-3-000                                                    26

developed by the company.[61]  AEP argues that the proposed rules be clarified to

encompass only those instances where there is an affirmative duty to disclose, such as a

Commission-imposed disclosure or reporting requirement.[62]  EPSA and Progress argue

that the regulations should be clarified so as not to result in broad disclosure obligations

that would be incompatible with the arm's-length transactions that the Commission

oversees.[63]  Similarly, INGAA and EEI argue that the regulations should be revised to

delete or limit any affirmative obligation to disclose information to a counterparty, or to

educate another party in bilateral negotiations.[64]  In support of its argument, INGAA cites

SEC Regulation D, which exempts certain securities offerings from the registration and

disclosure requirements of the securities laws because the investors in such offerings are

sophisticated.[65]  NGSA also states that the Commission should clarify that it does not

intend to incorporate by reference the disclosure obligations applicable to issuers of

securities.[66]

---

[61] AEP at 2.

[62] Id. at 3.

[63] EPSA at 1; Progress at 2-4.

[64] INGAA at 7; EEI at 16.  See also ISDA Supplemental Reply at 2.

[65] INGAA at 5.

[66] NGSA at 2, 5-6.

Docket No. RM06-3-000                                                          27

### b. **Commission Determination**

35.     The Commission declines to modify the proposed regulations in this Final Rule.

To avoid uncertainty, however, we clarify that the Final Rule creates no new affirmative

duty of disclosure.  Commenters are mistaken to the extent they believe section 10(b) of

the Exchange Act or SEC Rule 10b-5 imposes an independent affirmative obligation to

disclose.   Well-settled case law interpreting section 10(b) and Rule 10b-5 makes clear

that section 10(b) and Rule 10b-5 do not, by themselves, create an affirmative duty to

disclose absent a relationship of trust and confidence (i.e., a fiduciary relationship) or

some other duty imposed elsewhere in the securities laws.[67]  Therefore, in the arm's-

length, bilateral negotiations that are typical in wholesale energy markets, absent some

tariff requirement or Commission directive mandating disclosure, the Final Rule imposes

no new affirmative duty of disclosure.

36.     As there is no new affirmative duty of disclosure under the Final Rule,

commenters' concern over the disclosure implications of the proposed regulations is

---

[67] See Basic Inc. v. Levinson, 485 U.S. 224, 239, n.17 (1988) ("Silence, absent a
duty to disclose, is not misleading under Rule 10b-5.") citing Chiarella v. United States,
445 U.S. 222, 234 (1980) (". . . a duty to disclose under [section] 10 (b) does not arise
from the mere possession of nonpublic market information.  [T]he duty to disclose arises
when [there exists] a relationship of trust and confidence. . . ."); see also Gross v. Summa
Four, 93 F.3d 987, 992 (1st Cir. 1996) (citing Chiarella, the court holds that "[b]y itself. .
. Rule 10b-5[] does not create an affirmative duty of disclosure.  Indeed, a corporation
does not commit securities fraud merely by failing to disclose all nonpublic material
information in its possession."); accord Castellano v. Young & Rubicam, Inc., 257 F.3d
171, 179 (2d Cir. 2002); Ackerman v. Schwartz, 947 F.2d 841, 848 (7th Cir. 1991).

misplaced.  The Final Rule operates within the regulatory framework of the FPA and

NGA; the Commission is not adopting the disclosure provisions of the securities laws[68]

or the purpose of the securities laws, which is "to protect investors by promoting full

disclosure of information thought necessary to informed investment decisions."[69]  Rather,

the Final Rule, like section 10(b) of the Exchange Act and SEC Rule 10b-5, is an anti-

fraud provision, not a disclosure provision.[70]  Nothing in the Final Rule requires

disclosure of sensitive information that would only function to weaken an entity's

bargaining position in arm's-length, bilateral negotiations.   Absent a tariff requirement or

Commission directive mandating disclosure, there is no violation of the Final Rule

simply because an entity chooses not to disclose all non-public information in its

possession.[71]

37.       Similarly, the Commission clarifies that nothing in the Final Rule changes the

Commission's precedent on contract law.  Private contracts are fundamental to the

---

[68] See, e.g., 15 U.S.C. 78m (2000).

[69] SEC v. Ralston Purina Co., 346 U.S. 119, 123-5 (1953).

[70] See, e.g., International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 565 n.18 (1979) (distinguishing between the disclosure and antifraud provisions of the securities laws, the court states that a waiver from disclosure requirements because an investor is sophisticated does "not provide shelter from the criminal anti-fraud protection of Rule 10b-5 or other civil anti-fraud provisions); Sonnenfeld v. City of Denver, 100 F.3d 744, 746 n.1 (10th Cir. 1996) (noting that securities exempted from regulatory burdens are still subject to civil fraud causes of action).

[71] See supra note 67.

functioning of the energy industry, and the Commission expects parties to continue to

rely on the contracts they enter into.  The Commission expects parties to continue to

resolve most contract disputes, including those based on claims of fraud in the

inducement, without the involvement of the Commission, relying on state and federal

courts to apply contract law as appropriate.

### 2. <u>Sections 1c.1(a)(2) and 1c.2(a)(2) and Omissions of Material Fact</u>

#### a. <u>Comments</u>

38.    Commenters are divided as to whether the Commission should modify or delete

sections 1c.1(a)(2) and 1c.2(a)(2) of the Final Rule, particularly with regard to sections

1c.1(a)(2) and 1c.2(a)(2)'s references to omissions.[72]  Ameren, Cinergy, and Indicated

Market Participants argue that sections 1c.1(a)(2) and 1c.2(a)(2) should not be adopted

because the definition of market manipulation should not include any general duty to

disclose.[73]  More specifically, EEI and EPSA argue that reference in sections 1c.1(a)(2)

and 1c.2(a)(2) to "omissions of material fact" should be deleted as it would require

market participants to disclose sensitive information that would not otherwise be

exchanged among wholesale energy market participants engaged in bilateral negotiations,

---

[72] Sections 1c.1(a)(2) and 1c.2(a)(2) read: "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

[73] Ameren at 6; Cinergy at 8; Indicated Market Participants at 28.

Docket No. RM06-3-000                                                        30

which could result in harm to the market participant's bargaining position.[74] EEI also

argues that sections 1c.1(a)(2) and 1c.2(a)(2) should be modified to incorporate a

knowledge and intent standard.[75]

39.    FirstEnergy argues that sections 1c.1(a)(2) and 1c.2(a)(2) are overly broad, and

unnecessary to protect electric ratepayers because participants in wholesale power sales

transactions are sophisticated and have the ability to evaluate the veracity of any

information that may be conveyed by other participants.[76] Indicated Market Participants

argue that since the disclosure concepts of the securities laws are not generally applicable

to electric and gas markets, sections 1c.1(a)(2) and 1c.2(a)(2) should be deleted.[77]

Likewise, Xcel argues that there is no need to require SEC-like disclosure in wholesale

energy markets, and it argues that the Commission should modify or delete sections

1c.1(a)(2) and 1c.2(a)(2).[78] While not asking for a change in the regulations, INGAA

requests that we clarify that "mere puffery" is not actionable under the regulations.[79]

40.    On the other hand, APGA, PNM and TDUS support the inclusion of sections

---

[74] EEI at 16; EPSA at 8.

[75] EEI at 16.

[76] FirstEnergy at 11.

[77] Indicated Market Participants at 27-28.

[78] Xcel at 2, 4-6.

[79] INGAA at 9.

1c.1(a)(2) and 1c.2(a)(2) without modification.[80]  APGA urges the Commission to reject

calls for the deletion or modification of sections 1c.1(a)(2) and 1c.2(a)(2) because the

vast bulk of natural gas sales are not negotiated by sophisticated market participants, but

are determined by price indices that rely on full and accurate reporting.[81]  PNM supports

the inclusion of sections 1c.1(a)(2) and 1c.2(a)(2) noting that there may be rare instances

where an omission of material fact amounts to market manipulation, but also notes that

the Commission should make clear that the sections create no new duty of disclosure.[82]

### b.  Commission Determination

41.     The Commission rejects proposals to modify or delete sections 1c.1(a)(2) and

1c.2(a)(2) of the regulations.  As just discussed, the Final Rule does not create an

affirmative duty to disclose beyond any existing requirements.  It is important to note,

however, that where an entity voluntarily provides information or where the entity is

required by a tariff or a Commission statute, order, rule or regulation to provide

information, and the entity then misrepresents or omits a material fact such that the

information provided is materially misleading, there can be a violation of the Final Rule

---

[80] APGA at 5; PNM at 9; TDUS at 3-4.

[81] APGA at 5.

[82] PNM at 9.  As discussed above in paragraph 28, TDUS argues that no dilution or alteration of the proposed rules is warranted, regardless of the sophistication of the parties to a transaction.  TDUS at 3-4.

Docket No. RM06-3-000                                                              32

if all of the other elements of a violation are present.[83]  This does not mean, however, that

a material misrepresentation or omission that affects only negotiations between two

sophisticated parties will necessarily result in an enforcement action by the Commission.

Instead, the Commission will decide whether to pursue enforcement action in such a

situation on a case-by-case basis, with due consideration of whether such material

misrepresentations or omissions occur in or have an effect on jurisdictional transactions.

Absent such an effect, as we noted earlier, we generally will not apply the Final Rule to

bilateral contract negotiations.

42.    With respect to other comments related to the application of specific securities law

precedent, as discussed earlier, the Commission intends, on a case-by-case basis, to be

guided by analogous securities law precedent that is appropriate under the specific facts,

circumstances, and situations in the energy industry.  For example, even if some duty to

provide information exists, the Commission agrees with INGAA that "mere puffery" is

not violation of sections 1c.1(a)(2) and 1c.2(a)(2).[84]

---

[83] These include the requisite scienter, discussed infra, and the conduct being in
connection with a jurisdictional purchase or sale or jurisdictional transportation or
transmission, discussed supra.

[84] See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3rd Cir. 1999) (noting
that general expressions of optimism for the future are immaterial and not actionable);
Eisenstadt v. Centel Corp., 113 F.3d 738, 745 (7th Cir. 1997) ("Everybody knows that
someone trying to sell something is going to look and talk on the bright side. You don't
sell a product by bad-mouthing it.  And everybody knows that auctions can be
disappointing.") (emphasis in original); Raab v. General Physics Corp., 4 F.3d 286, 287
(4th Cir. 1996) (holding that predictions of future business prospects were not specific
(continued)

Docket No. RM06-3-000                                                      33

### D. Sections 1c.1(a)(3) and 1c.2(a)(3) and Intent

#### 1. Comments

43.    Some commenters suggested the Commission delete sections 1c.1(a)(3) and

1c.2(a)(3) of the proposed regulations or revise them explicitly to include the element of

intent.  For example, Ameren argues that sections 1c.1(a)(3) and 1c.2(a)(3) are

unnecessary in light of sections 1c.1(a)(1) and 1c.2(a)(1).[85]  EEI argues that sections

1c.1(a)(3) and 1c.2(a)(3) should be deleted because the "operates as a fraud" language

could prohibit any deceptive act regardless of whether scienter is present.[86]

Alternatively, EEI and FirstEnergy suggest that sections 1c.1(a)(3) and 1c.2(a)(3) be

revised.  EEI urges that sections 1c.1(a)(3) and 1c.2(a)(3) include elements of knowledge

and intent; FirstEnergy also asks that the phrase "or would operate" be removed so it

would be clear that actions not intended to defraud from being subject to the

regulations.[87]

---

guarantees necessary to make them material within the meaning of section 10b); see also
In re Northern Telecom Ltd. Securities Litig., 116 F. Supp. 2d 446, 466 (S.D.N.Y 2000)
(stating that under section 10b and Rule 10b-5, actionable statements must be sufficiently
"concrete" or "specific" to be material, as opposed to "single, vague statement[s] that are
essentially mere puffery").

[85] Ameren at 6-7.

[86] EEI at 13-14.

[87] Id. 14; FirstEnergy at 15.

44.    In contrast, TDUS argues that the Commission should reject attempts to modify or delete sections 1c.1(a)(3) and 1c.2(a)(3) noting that SEC Rule 10b-5 has remained intact since 1951, and no court or SEC action has resulted in any change to Rule 10b-5.[88] APGA also opposes modification or deletion of sections 1c.1(a)(3) and 1c.2(a)(3), arguing that intent is already an element of a violation of the proposed regulations, and any elimination of sections 1c.1(a)(3) and 1c.2(a)(3) could create uncertainty by distinguishing the Final Rule from SEC Rule 10b-5 so as to render analogous securities law precedent inapplicable.[89]

### 2.  **Commission Determination**

45.    The Commission rejects proposals to modify or delete sections 1c.1(a)(3) and 1c.2(a)(3) beyond the substitution of "entity" in place of "person" as discussed below in paragraph 76.  Sections 1c.1(a)(3) and 1c.2(a)(3) are necessary; and as discussed below, there can be no violation of the Final Rule, or any of its sections, absent a showing of the requisite scienter.  SEC Rule 10b-5 has an analogous section that has remained unchanged since it was adopted in 1942, and there is abundant securities law precedent that highlights the ongoing relevance of that section.[90]  Therefore, as the Final Rule is

---

[88] TDUS Reply at 8-9.

[89] APGA Reply at 5.

[90] One measure of the paragraph's importance is the frequency of use.  There are numerous cases citing the "operate as a fraud" language of SEC Rule 10b-5, which suggest that it is not nugatory as EEI argues in its comments.  See, e.g., SEC v. Zandford,

(continued)

Docket No. RM06-3-000                                                    35

modeled on SEC Rule 10b-5 and the Commission intends to be guided, on a case-by-case

basis, by analogous securities law precedent that is appropriate under the facts,

circumstances, and situations presented in the energy industry, it is prudent to retain

sections 1c.1(a)(3) and 1c.2(a)(3) without modification.

### E.  Elements of a Manipulation Claim

### 1.  Comments

46.     Several commenters asked the Commission to clarify the elements of manipulation

under the Final Rule.[91]  INGAA recommends that the Commission explicitly reference

the essential elements of the SEC's Rule 10b-5 cause of action that have been developed

in the case law and provide greater guidance as to their application in the context of the

natural gas markets.[92]  Specifically, INGAA argues the Commission should clarify the

definition of materiality, the requirement of scienter, the requirement of deception, the

existence of a pre-existing duty to speak in a nondisclosure case, the absence of liability

for mere puffery and other limitations.[93]  Indicated Market Participants and NGSA state

that the Commission should set forth the following as elements of a manipulation claim:

---

535 U.S. at 819; SEC v. George, 426 F.3d 786, 792 (2005).

[91] See, e.g., Ameren at 6-7; AEP at 3; Cinergy at 7-8; Indicated Market
Participants at 9-10, 18; EEI at 12-14; FirstEnergy at 7-10; INGAA at 7-11; LG&E at 3;
NGSA at 2, 5-8; NiSource at 3, 5-8; Progress at 2-3; SCE at 4.

[92] INGAA at 7-8.

[93] Id. at 11.

Docket No. RM06-3-000                                                             36

misrepresentation or omission of a material fact; scienter, causation, reliance, and

damages.[94]

47.    EEI seeks clarification that fraud is a required element of the Final Rule and its

sections.[95] AEP and EEI suggest that the Commission should explicitly identify the

intent standard based on the scienter standard used in section 10(b), which is satisfied by

a showing of recklessness.[96] EEI seeks clarification that liability under the market

manipulation rule requires a showing of "extreme recklessness" or "egregious

disregard."[97]   Progress believes that the Final Rule should be revised to exclude

"indirectly" from sections 1c.1(a) and 1c.2(a), and if the Commission is unwilling to do

so, it should explicitly incorporate an intent standard.[98] In contrast, TDUS argues that the

Commission should not modify the regulations to incorporate a specific standard of intent

into the Final Rule.[99]

    **2.  Commission Determination**

48.    The Commission generally agrees that clarification of the elements of a violation

---

[94] Indicated Market Participants at 18; NGSA at 2, 5-7.

[95] EEI at 4.

[96] Id. at 12; AEP at 3.

[97] EEI at 12.

[98] Progress at 2-3.

[99] TDUS at 5.

Docket No. RM06-3-000                                                                    37

under the Final Rule would reduce regulatory uncertainty and thereby assure greater

compliance.  It is unnecessary, however, to modify the text of the Final Rule.  Rather, we

will clarify the general requirements of a violation, guided by applicable securities law

precedent, specifically the precedent setting out the elements the SEC must prove when it

brings an enforcement action, as INGAA noted in its comments.[100]  In enforcement

actions under Rule 10b-5, the SEC must show that the defendant: (1) made a material

misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; and (3) in connection with the purchase or sale of

securities.[101]  The SEC does not need to show reliance, loss causation or damages

because "the Commission's duty is to enforce the remedial and preventive terms of the

statute in the public interest, and not merely to police those whose plain violations have

already caused demonstrable loss or injury."[102]

---

[100] INGAA at 10-11.  See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 308
(2d Cir. 1999) (setting out the elements of an enforcement action under SEC Rule 10b-5).
We reject the comments of Indicated Market Participants and NGSA, which set forth the
elements of a private right of action under section 10(b) and Rule 10b-5.  While cases
arising in the context of private litigation may be instructive on certain points, the
elements needed for a private right of action are not the same as those required for
administrative enforcement applicable here.

[101] SEC v. Monarch Funding Corp., 192 F.3d at 308.

[102] See, e.g., SEC v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 491 (S.D.N.Y.
2002) quoting Berko v. SEC, 316 F.2d 137, 143 (2d Cir. 1963) citing SEC v. North
American Research & Dev. Corp., 424 F.2d 63, 84 (2d Cir. 1970) (reliance not an
element of a Rule 10b-5 claim in the context of an SEC proceeding).  Similarly, in a
criminal prosecution for securities fraud, the government need not demonstrate specific
(continued)

Docket No. RM06-3-000                                                                 38

49.     These elements offer useful guidance as to how the Commission will apply the

Final Rule.  The Commission will act in cases where an entity: (1) uses a fraudulent

device, scheme or artifice, or makes a material misrepresentation or a material omission

as to which there is a duty to speak under a Commission-filed tariff, Commission order,

rule or regulation, or engages in any act, practice, or course of business that operates or

would operate as a  fraud or deceit upon any entity; (2) with the requisite scienter; (3) in

connection with the purchase or sale of natural gas or electric energy or transportation of

natural gas or transmission of electric energy subject to the jurisdiction of the

Commission.  In the paragraphs that follow, the Commission offers clarification on each

element.

50.     The Final Rule prohibits the use or employment of any device, scheme, or artifice

to defraud.  The Commission defines fraud generally, that is, to include any action,

transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-

---

reliance by the investor in a securities fraud prosecution. See <u>United States v. Ashdown</u>,
509 F.2d 793, 799 (5th Cir. 1975).  However, the government must show "impact of the
scheme on the investor." <u>See</u> <u>United States v. Schaefer</u>, 299 F.2d 625, 629 (7th Cir.
1962).  While reliance, loss causation and damages are not necessary for a violation of
the Final Rule, these elements will inform the Commission's assessment of any
disgorgement or civil penalties that may be appropriate under the circumstances.

Docket No. RM06-3-000                                                         39

functioning market.[103]  Fraud is a question of fact that is to be determined by all the

circumstances of a case.

51.     If there is a duty to disclose under a Commission-filed tariff or Commission

directive, material misrepresentations and, under certain conditions, material omissions,

may violate the Final Rule.   Guided by securities law precedent, the Commission finds

that a fact is material if there is a substantial likelihood that a reasonable market

participant would consider it in making its decision to transact because the material fact

significantly altered the total mix of information available.[104]  Of course, not every fact

about a transaction is material and, therefore, the materiality of a misrepresented or

omitted fact will be determined on a case-by-case basis.[105]

52.     The Commission rejects as unnecessary commenters' requests to incorporate a

specific intent standard into the Final Rule.   Congress directed that the terms

"manipulative or deceptive device or contrivance" as they appear in sections 1283 and

---

[103]  See e.g., Dennis v. United States, 384 U.S. 855, 861 (1966) (noting that fraud within the meaning of a statute need not be confined to the common law definition of fraud: any false statement, misrepresentation or deceit).

[104]  TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) sets forth the "total mix" or "substantial likelihood" test of materiality: a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.  Accord Basic, Inc. v. Levinson, 485 U.S. 224, 231-2 (1988).

[105]  Based on securities law precedent, the relevant time period for determining materiality is at the time of the statement or omission, and not in hindsight.  See Ganino v. Citizens Utils. Co., 228 F.3d 154, 165 (2d Cir. 2000).

Docket No. RM06-3-000                                                          40

315 of EPAct 2005 be interpreted in accordance with section 10(b) of the Exchange Act.

According to the Supreme Court, "[t]he words 'manipulative or deceptive' used in

conjunction with 'device or contrivance' strongly suggest that § 10 (b) was intended to

proscribe knowing or intentional misconduct . . . conduct designed to deceive or defraud

investors by controlling or artificially affecting the price of securities."[106]  Based on the

foregoing, any violation of the Final Rule requires a showing of scienter.[107]

53.     Commenters sought clarification on whether recklessness satisfies the scienter

element.  The Supreme Court has not addressed whether recklessness satisfies the

scienter requirement it read into section 10(b),[108] but the Courts of Appeals that have

---

[106] Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976) (Hochfelder); accord Aaron v. SEC, 446 U.S. 680, 690 (1980) (Aaron).

[107] See Aaron, 446 U.S. at 690, 705 (stating that the words "manipulative," "device," and "contrivance" whether given "their commonly accepted meaning or read as terms of art" clearly refers to "knowing or intentional misconduct." In addition, the Court said that "Section 10(b) is described as a catchall provision, but what it catches must be fraud."); Hochfelder, 425 U.S. at 199 (noting that the words "manipulative," "device," and "contrivance" are "terms that make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence").  Despite section 10(b)'s use of the disjunctive "or" in "manipulative or deceptive device or contrivance," the Supreme Court has concluded that both require "misrepresentation."

[108] Hochfelder, 425 U.S. at 194 n.12 ("In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under [section] 10(b) and Rule 10b-5.").  Although the scienter requirement was first read into section 10(b) in the context of a private right of action, in Aaron the Supreme Court decided that a showing of scienter is also required in SEC civil enforcement actions arising under section 10(b).  Aaron, 446 U.S. at 695.

Docket No. RM06-3-000                                                                                    41

addressed the issue agree that recklessness satisfies the section 10(b) scienter

requirement.[109]  Similarly, the Commission concludes that recklessness satisfies the

scienter element of the Final Rule.

54.     For our discussion of the "in connection with" requirement, see paragraphs 21 and

22, supra.

   **F.  Interplay with Market Behavior Rules**

      **1.  Comments**

55.     Several commenters raise concerns over the interplay between the proposed

regulations and the Market Behavior Rules.[110]  Some commenters advocate that the

---

[109] Courts of appeal are in general agreement that that recklessness in some form satisfies the scienter requirement of SEC Rule 10b-5.  For example, motive and opportunity to commit fraud or conscious behavior sufficient to raise a strong inference of recklessness is sufficient in the Second, Third, and Eighth Circuits.  See, e.g., Florida State Board of Administration v. Green Tree Fin. Corp., 270 F.3d 645 (8th Cir. 2001); Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000); In re Advanta Corp. Securities Litig., 180 F.3d 525 (3d Cir. 1999).  The First, Fifth, Sixth, Tenth and Eleventh Circuits apply a "severely reckless" or action with "conscious disregard" of the problem or risk standard.  See, e.g., Nathenson v. Zonagen, Inc., 267 F.3d 400 (5th Cir. 2001); City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245 (10th Cir. 2001); Grebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999); In re Comshare, Inc. Securities Litig., 183 F.3d 543 (6th Cir. 1999); Bryant v. Avardo Brands, Inc., 187 F.3d 1271 (11th Cir. 1999).  In the Ninth Circuit, a plaintiff must plead "in great detail facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." See, e.g., In re Silicon Graphics Securities Litig., 183 F.3d 970 (9th Cir. 1999) (adopting the definition of recklessness as it appears in Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir. 1977), cert. denied, 434 U.S. 875 (1977)).

[110] See, e.g., Ameren at 8-9; AGA at 5; Cinergy at 5, 9; EEI at 17-19; LG&E at 9; NARUC at 6; NASUCA at 4-5 (arguing for an expansion of the Market Behavior Rules to reach all market participants); PG&E at 4, 12-13; APPA Reply at 5; PNM Reply at 7-
                                                                                    (continued)

Docket No. RM06-3-000                                                    42

Commission retain Market Behavior Rules, either as they are currently written or with modification.[111]  Several industry commenters request deletion of the foreseeability standard and "legitimate business purpose" criteria of Market Behavior Rule 2, and incorporation of the scienter standard of the proposed regulations.  Certain commenters also find the specific prohibitions of Market Behavior Rules 2(a) (wash trades), 2(b) (false information), 2(c) (artificial congestion/relief), and 2(d) (collusion) useful because those rules offer guidance and specificity about the prohibition of certain defined transactions.

56.    APPA argues that the Commission should deal with the future of the Market Behavior Rules in the Commission's separate FPA 206 proceeding and not as part of this proceeding.[112]  PNM, in contrast, contends that adopting rules based on SEC Rule 10b-5 will be confusing, and instead urges the Commission to amend the existing Market

---

8; EEI Reply at 4-6.

[111] We note that, as a result of the timing of the comment due date in this proceeding, these comments were filed the same day as the Commission issued its orders proposing repeal of the Market Behavior Rules.  See Amendments to Codes of Conduct for Unbundled Sales Service and for Persons Holding Blanket Marketing Certificates, 113 FERC ¶ 61,189 (2005); Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations, 113 FERC ¶ 61,190 (2005).

[112] APPA Reply at 5.

Docket No. RM06-3-000                                                          43

Behavior Rules to incorporate the terms of EPAct 2005 sections 315 and 1283, and not

adopt the proposed regulations.[113]

57.    EEI urges the Commission to retain the time limits and specific acts set forth in

the Market Behavior Rules, and to state that compliance with the behavior rules

guidelines constitutes compliance with the new rules.[114]  Similarly, EEI argues that

whatever the interaction between the Market Behavior Rules and the Final Rule, the

Commission should clarify that there will be no "double jeopardy."[115]

## 2.  <u>Commission Determination</u>

58.    Both Market Behavior Rules 2 and 3[116] and this Final Rule prohibit fraud and

manipulative conduct.  The Market Behavior Rules are still in effect, although the

Commission has indicated in the Market Behavior Rules proceeding (Docket Nos. EL06-

16-000 and RM06-5-000) that the Market Behavior Rules may be revised or repealed

after the anti-manipulation regulations are made effective.[117]  If they are repealed, the

---

[113] PNM Reply at 7-8.

[114] EEI Reply at 4-6.

[115] EEI at 21.

[116] The following analysis with regard to the Market Behavior Rules also applies to sections 284.288(a) and 284.403(a) of the Commission's codes of conduct with respect to certain sales of natural gas.  18 CFR 284.288(a) and 284.403(a) (2005).

[117] <u>See</u> <u>Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations</u>, 70 FR 71484 (2005), 113 FERC ¶ 61,190 at P 13 (2005); <u>Amendments to Codes of Conduct for Unbundled Sales Service and for Persons Holding Blanket Marketing Certificates</u>, 70 FR 72090 (2005), 113 FERC ¶ 61,189 at P 11 (2005).

Docket No. RM06-3-000                                                    44

Commission intends to have a smooth transition from the Market Behavior Rules to the

Final Rule on manipulation, and there will be no gap in our prohibition of manipulation

as we complete the transition.

59.    As stated in the NOPR, the Commission will not seek duplicative sanctions for the

same conduct in the event that conduct violates both the Market Behavior Rules and this

Final Rule.[118]  With respect to the specific prohibitions of Market Behavior Rule 2 (wash

trades, transactions predicated on submitting false information, transactions creating and

relieving artificial congestion, and collusion for the purpose of market manipulation),

these are examples of prohibited manipulation, all of which are manipulative or deceptive

devices or contrivances, and are therefore prohibited activities under this Final Rule,

subject to punitive and remedial action.[119]  Further, as discussed further below, the

specific provision set forth in the Market Behavior Rules for actions taken in conformity

with the Commission-approved market rules adopted by an ISO or RTO identify

behaviors that are presumptively not fraudulent and hence would not be violations of this

Final Rule.

60.    The issue of applying the time limits set forth in the Market Behavior Rules to this

Final Rule will be dealt with below.

---

[118] See Prohibition of Energy Market Manipulation, 113 FERC ¶ 61,067 at P 15 (2005).

[119] See 113 FERC ¶ 61,190 at P 18 (2005); 113 FERC ¶ 61,189 at P 15 (2005).

Docket No. RM06-3-000                                                          45

### G. <u>Statute of Limitations</u>

#### 1. <u>Comments</u>

61.     Some commenters urged the Commission to adopt an explicit statute of limitations

period for the proposed rules.[120]  For example, NiSource cites the Sarbanes-Oxley Act in

support of its argument that the Commission require actions under the Final Rule be

commenced within two years of discovery of a violation, but in no event more than five

years after occurrence of a violation.[121]    AEP cites a private rights of action under SEC

Rule 10b-5 in support of its argument for three year limitations period, and EEI argues

the Commission should follow the five-year statute of limitations contained in 28 U.S.C.

2462 and adopt the 90-day provision of the Market Behavior Rules to require that an

action must be filed within 90 days after the end of the calendar quarter in which the

alleged violation of the Final Rule occurred or, if later, 90 days after the complainant

knew or should have known that the alleged violation of the Final Rule occurred.[122]

#### 2. <u>Commission Determination</u>

62.     There is no explicit statute of limitations set forth in NGA section 4A or in FPA

section 222, and no statute of limitations of general applicability appears in the NGA or

FPA.  The Commission declines to designate a statute of limitations or otherwise adopt

---

[120] <u>See, e.g.</u>, AEP at 3; EEI at 19-21; NGSA at 2, 5, 8; NiSource at 9.

[121] NiSource at 3.

[122] AEP at 3; EEI at 19-20.

Docket No. RM06-3-000                                                                                  46

an arbitrary time limitation on complaints or enforcement actions that may arise under

NGA section 4A and FPA section 222.  We note, however, that when a statutory

provision under which civil penalties may be imposed lacks its own statute of limitations,

the general statute of limitations for collection of civil penalties, 28 U.S.C. 2462,

applies.[123]  Section 2462 in 28 U.S.C. imposes a five-year limitations period on any

"action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture,

pecuniary or otherwise."[124]

63.     The Commission, therefore, rejects AEP's call for a three-year limitations period

because that period applies only in the context of private rights of action under the

securities laws, not to SEC enforcement actions.  For the same reason, we reject

NiSource's argument that a limitations period under the Sarbanes-Oxley Act should

apply to actions we may bring under our enforcement authority, and EEI's request that

the Commission apply to the Final Rule the 90-day action limitation of the existing

Market Behavior Rules.  We will exercise prosecutorial discretion in determining

whether to pursue an alleged violation based on all the facts presented, including the time

elapsed since the violation is alleged to have occurred, and will adhere to the five-year

statute of limitations where we seek civil penalties.

---

[123] See, e.g., United States v. Godbout-Bandal, 232 F.3d 637, 639 (8th Cir. 2000).

[124] 28 U.S.C. 2462 (2000).  The five-year limitation runs "from the date the claim
first accrued."  Id.  We intend that any administrative action for violation of the Final
Rule be commenced within five years of the date of the fraudulent or deceptive conduct.

Docket No. RM06-3-000                                                                                      47

### H. __Safe Harbors and Affirmative Defenses__

#### 1. __Comments__

64.      Several commenters suggest that the Commission make explicit in the language of proposed regulations certain safe harbors.  For example, they argue that the following should be deemed acceptable behavior: actions or transactions taken at the direction of an RTO or ISO (similar to the affirmative defense in Market Behavior Rule 2), compliance with Midwest ISO's market monitoring program, actions or transactions with a "legitimate business purpose," and legitimate hedging activity.[125]

65.      Some commenters urge the Commission to provide specific examples of what would or would not constitute market manipulation.[126]  NiSource argues that aiding and abetting, as opposed to primary violations, and actions taken pursuant to Commission-approved tariffs, state law, and Supreme Court precedent, as well as minor errors, would not violate the proposed rules.[127]  Furthermore, some commenters request a mechanism

---

[125] See, e.g., AEP at 2; AGA at 5-6 (advocating a safe harbor for "inadvertent" errors); Ameren at 7; DTE at 2-4; INGAA at 11; LG&E at 3; NGSA at 2, 5, 8-9 (seeking clarification that the proposed regulations do not modify or supersede the Commission's policy statement on price reporting or the related safe harbor provisions of that policy); NiSource at 7; and SCANA at 3-4.

[126] See, e.g., SCANA at 3-5 (arguing for an explicit safe harbor for hedging transactions, and that any violation of the "shipper must have title" rule is a per se violation); NiSource at 7; and Indicated Market Participants at 20-22 (requesting specific guidance, including a non-exclusive list, of what would and would not be considered manipulative conduct, to aid in internal training and compliance programs).

[127] NiSource at 6-9.

Docket No. RM06-3-000                                                      48

for obtaining guidance on whether proposed conduct violates the anti-manipulation rules

through a procedure similar to the SEC's No-Action Letter process.[128]

### 2. **Commission Determination**

66.      The Commission will address issues relating to the Market Behavior Rules, and

the affirmative defenses or safe harbors therein, in the FPA section 206 proceeding and

NGA NOPR related to the Market Behavior Rules in Docket Nos. EL06-16-000 and

RM06-5-000.  As noted in that proceeding, it is the Commission's intent to have a

smooth transition to the new anti-manipulation regulations but not to leave gaps between

the adoption of the Final Rule and any repeal or revision of the Market Behavior Rules.

67.      In all events, however, it is not necessary to change the wording of the Final Rule.

The availability of safe harbor presumptions of compliance and affirmative defenses will

be the same as is currently the case under the Market Behavior Rules.  Thus, if a market

participant undertakes an action or transaction that is explicitly contemplated in

Commission-approved rules and regulations, we will presume that the market participant

is not in violation of the Final Rule.  If a market participant undertakes an action or

transaction at the direction of an ISO or RTO that is not approved by the Commission,

the market participant can assert this as a defense for the action taken.

---

[128] See, e.g., First Energy at 15-16; INGAA at 11.

Docket No. RM06-3-000                                                      49

## I.  **Procedures for Handling Manipulation Claims**

### 1.  **Comments**

68.    Some commenters seek clarification on how claims of market manipulation will be processed by the Commission.  PG&E asks for procedures that will permit involvement of affected market participants in manipulation complaints, including intervention and full participation by affected parties, and availability of all remedies, including disgorgement or returning consumers to the condition they would have been in, absent manipulation.  Doing so, PG&E asserts, would provide due process for those damaged by manipulation and would assure that the Commission considers all relevant factors in resolving the complaint.[129]  Cinergy, on the other hand, states that it expects that complaints would be filed pursuant to NGA section 5 or FPA section 206, and that the Commission should incorporate in the Final Rule procedural requirements for filing complaints.  Cinergy also seeks clarification on whether the Commission intends to apply the proposed regulations retroactively in any manner.[130]  At the same time, however, Cinergy also argues that the Commission should explicitly urge parties first to take concerns and potential complaints to the Office of Market Oversight and Investigations Enforcement Hotline (Hotline).  This, Cinergy explains, would permit entities accused of manipulation to present facts and evidence without suffering the potential harm within

---

[129] PG&E at 14-15.

[130] Cinergy at 10.

Docket No. RM06-3-000                                                          50

industry and the investment community that could result from an accusation of

manipulation, and could lead to faster settlement resolutions of manipulation claims.[131]

69.      EEI and INGAA also urge the Commission to address the formal process and

procedures to be used in resolving manipulation complaints, including the burden of

proof.[132]  INGAA and ISDA suggest the Commission adopt a "Wells submission"[133]

process like that of the SEC in which an entity is given, at the end of an investigation,

notice of the proposed charges and enforcement action that staff intends to recommend to

the SEC, and an opportunity to submit a written statement and materials to refute staff's

recommendation.[134]

### 2. Commission Determination

70.      Congress enacted the statutory prohibitions on market manipulation as separate

sections of the NGA and FPA, giving the Commission anti-manipulation authority that is

independent of other provisions of the NGA and FPA, including NGA section 5 and FPA

section 206.  Accordingly, the Commission rejects Cinergy's suggestion that complaints

alleging manipulation necessarily would rely on NGA section 5 or FPA section 206.[135]

---

[131] Id. at 10-12.

[132] EEI at 19-21; INGAA at 13.

[133] The "Wells submission" process is set forth in SEC regulations, 17 CFR
202.5(c) (2005).

[134] INGAA at 12; ISDA Reply at 5.

[135] Even if a complaint were to involve NGA section 5 or FPA section 206 in some
                                                                          (continued)

Docket No. RM06-3-000                                                          51

As to the procedures to be followed when a complaint alleging manipulation is filed, the

Commission will process the filing under the procedures currently set forth in Rule 206

of the Rules of Practice and Procedure.[136]  The Commission rejects as unnecessary EEI's,

INGAA's, and Cinergy's suggestions that we incorporate procedures into the Final Rule.

The requirements for filing complaints are set out in Rule 206, and the process for

handling complaints, including the allocation of the burden of proof, is well-defined

through Commission case law.  There is no need for a special or separate set of

procedures for complaints arising from our new anti-manipulation authority.

71.     Cinergy states that the industry needs to understand if there is to be any retroactive

application of the Final Rule.  The regulations adopted herein will become effective upon

publication in the <u>Federal Register</u>.  There can be no violation of the Final Rule until it is

effective.  The Market Behavior Rules, however, have been in effect since December

2003, and will remain in effect pending the outcome of the separate Docket Nos. EL06-

16-000 and RM06-5-000 proceedings.

72.     To the extent Cinergy suggests that no retroactive remedies should be used, the

Commission reiterates that a complaint that alleges market manipulation will proceed

---

manner, that does not mean that the Commission would be limited only to prospective
remedies, as Cinergy seems to suggest.  Certain violations are susceptible of remedies
from the time the violation occurred.  <u>See, e.g.</u>, <u>Consolidated Gas Transmission Corp.</u>,
771 F.2d 1536 (D.C. Cir. 1985) (retroactive remedy available under NGA section 16).

        [136] 18 CFR 385.206 (2005).

Docket No. RM06-3-000                                                    52

under NGA section 4A or FPA section 222, utilizing the procedural rules and

mechanisms generally applicable to NGA and FPA proceedings. We reject any

suggestion that the Commission cannot remedy manipulative conduct after it has

occurred, such as by ordering the disgorgement of profits and/or imposing a civil penalty.

Congress did not limit the Commission's jurisdiction under NGA section 4A or FPA

section 222 to prospective conduct and associated remedies only. How the Commission

addresses market manipulation will depend on the facts presented, but we have

significant discretion to shape equitable remedies that achieve the purpose of Congress'

enactment of anti-manipulation provisions.[137] In devising a remedy, the Commission will

exercise discretion to arrive at an appropriate remedy[138] and will explore all equitable

considerations and practical consequences of our action pursuant to our statutory

delegation.[139]

---

[137] "[T]he Commission has broad authority to fashion equitable remedies in a variety of settings." Columbia Gas Transmission Corp. v. FERC, 750 F.2d 105, 109 (D.C. Cir. 1984) and cases cited therein. The courts have noted that "the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily . . . to the fashioning of policies, remedies, and sanctions . . . to arrive at maximum effectuation of Congressional objectives." Niagara Mohawk Corp. v. FPC, 379 F.2d 153, 159 (D.C. Cir. 1967).

[138] Gulf Oil Corp. v. FPC, 536 F.2d 588 (3rd Cir. 1977), cert. denied, 434 U.S. 1062 (1978), reh'g denied, 435 U.S. 981 (1978).

[139] FPC v. Tennessee Gas Transmission Co., 371 U.S. 145 (1962); Continental Oil Co. v. FPC, 378 F.2d 510 (5th Cir. 1967).

73.   The Commission also declines to accept Cinergy's suggestion that we explicitly urge parties first to bring concerns and potential complaints to the Hotline.[140]  Aggrieved entities should be free to choose the approach best suited to their circumstances, and if an entity so chooses, the Hotline (or other informal contact with the Commission's staff) is available for such matters.

74.   Turning to INGAA's suggestion that the Commission adopt what is referred to as a "Wells submission" to permit entities under investigation to submit material to refute staff findings and recommendations prior to Commission action, we find that no new process need be adopted here.  The Commission already has a regulation in place that provides a company under investigation with an opportunity to present its views,[141] and staff's existing practice is to present the company's views to the Commission as part of any report or recommendation made by staff following an investigation.

**J.  Miscellaneous Issues**

**1.  Use of "Entity" in place of "Person" in sections 1c.1(a)(3) and 1c.2(a)(3)**

**a.  Comments**

75.   Two commenters express concern with the use of "person" in proposed sections 47.1(a)(3) and 159.1(a)(3) and urge the Commission to substitute "entity" for "person."[142]

---

[140] See 18 CFR 1b.21 (2005).

[141] See 18 CFR 1b.18 (2005).

[142] See APGA at 10-11; APPA at 2-4.

Docket No. RM06-3-000                                                          54

Specifically, APPA points out that under proposed section 47.1(a)(3), it is unlawful "to engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any <u>person</u>" (emphasis added) and that the definition of "person" under the FPA excludes municipalities. Thus, according to APPA, an entity that practices a "fraud or deceit" on a municipality could argue that proposed section 47.1(a)(3) does not apply because the victim is not a "person" under the FPA.[143] APGA makes a similar argument with respect to proposed section 159.1(a)(3).[144]

### b.  Commission Determination

76.      The Commission agrees with these commenters. It would be unfair and unintended to prohibit fraudulent or manipulative behavior by any entity, including municipalities, but then not cover fraud or deceit when it is perpetrated against a municipality. Accordingly, the Commission will substitute the word "entity" for "person" in sections 1c.1(a)(3) and 1c.2(a)(3) of the Final Rule.[145]

### 2.  Impact of New Regulations on the Policy Statement on Natural Gas and Electric Price Indices

### a.  Comments

77.      NGSA requests that the Commission clarify that the new regulations do not

---

[143] APPA at 2-3.

[144] APGA at 10.

[145] As noted, the Final Rule will appear in 18 CFR 1c.1 and 1c.2 of the Commission's Rules of General Applicability, and the language change will be in 18 CFR 1c.1(a)(3) and 1c.2(a)(3).

Docket No. RM06-3-000                                                                    55

modify or supersede the Commission's Policy Statement on Natural Gas and Electric

Price Indices.[146]

### b. **Commission Determination**

78.      The Commission clarifies that the new regulations are not intended to modify or

supersede the Commission's Policy Statement on Natural Gas and Electric Price Indices.

That Policy Statement provided guidance on how market participants should report price

transaction information to price index developers, and stated that if the Policy Statement

guidelines are followed, participants would not be penalized for inadvertent errors.  We

continue to encourage market participants to contribute to price formation and to utilize

the guidelines of the Policy Statement when reporting pricing information.  We also note

that if an inadvertent error occurs, it would not involve the scienter needed for application

of the Final Rule.

### 3. **Special Pleading**

### a. **Comments**

79.      AEP argues that the Commission should discourage general allegations of fraud

by requiring parties that bring an action under the proposed rule to plead with "sufficient

particularity" by addressing eight items.[147]  Other commenters, however, argue that the

---

[146] NGSA at 8-9.  See Policy Statement on Natural Gas and Electric Price Indices, 104 FERC ¶ 61,121 (2003) (explaining the conditions under which the Commission will give industry participants safe harbor protection for good faith reporting of transactions data to entities that develop price indices).

[147] AEP at 3-4.  The eight items are: (1) what identifiable acts or omissions

(continued)

Docket No. RM06-3-000                                                                56

Commission should not adopt special pleading requirements beyond its notice provisions

and existing complaint procedures.[148]

### b. **Commission Determination**

80.    Commenters' concerns regarding special pleading requirements are clearly

covered by Rule 206 of the Commission's Rules of Practice and Procedure, which

contains detailed requirements as to the specificity required by parties filing complaints

with the Commission.  For instance, under Rule 206(b)(1)-(2), a complaint must "clearly

identify the action or inaction which is alleged to violate applicable statutory or

regulatory requirements," and must "explain how the action violates statutory or

regulatory requirements."[149]  Similarly, in Order No. 663, the Commission sets forth the

---

occurred, what representations were made and why they were not accurate but constituted
a scheme or device to defraud; (2) when and where each act occurred; (3) who
participated, that is, how each entity is related to the case; (4) what specific documents
contained what specific misrepresentations or material omissions; (5) how a party relied
on the other party's actions; (6) whether the necessary element of scienter was present;
(7) when the purchase, sale, or transmission of electric energy or natural gas occurred;
and (8) what the offending party gained as a result of the fraud.

[148] See, e.g., TDUS Reply at 9.

[149] See Wisconsin Department of Natural Resources v. Wisconsin River Power
Company, 101 FERC ¶ 61,108 at P 5 (2002) (rejecting complaint).  See also Union
Electric Company, d/b/a AmerenUE, 93 FERC ¶ 61,158 at 61,529 (2000) (denying a
request for a hearing, citing Rule 206(b)(1), (2), and (8), and stating that "[t]he
Commission's rules require a complaint not only to identify clearly the action that is
alleged to violate applicable statutory standards or regulatory requirements, but to explain
how the action violates those standards or requirements, and to include all documents in
the complainant's possession that support the facts in the complaint").

Docket No. RM06-3-000                                                        57

requirement that issues must be listed with specificity in a separate section entitled

"Statement of Issues."[150]

## IV.    Regulatory Flexibility Act Certification

81.    The Regulatory Flexibility Act of 1980[151] generally requires a description and

analysis of Final Rule that will have significant economic impact on a substantial

number of small entities.[152]   The Commission is not required to make such analyses if a

rule would not have such an effect.

82.    The Commission concludes that this Final Rule would not have such an impact on

small entities.   This Final Rule prohibits all entities, including small entities, from

employing manipulative or deceptive devices or contrivances in connection with energy

markets subject to the Commission's jurisdiction, and therefore may cause entities,

including potentially small entities, to increase costs in order to comply.   This

---

[150] See Revision of Rules of Practice and Procedure Regarding Issue Identification, 70 FR 55723 (2005), FERC Stats. & Regs. ¶ 31,193 (2005).

[151] 5 U.S.C. 601-612 (2000).

[152] The RFA definition of "small entity" refers to the definition provided in the Small Business Act, which defines a "small business concern" as a business which is independently owned and operated and which is not dominant in its field of operation. 15 U.S.C. 632 (2000).  The Small Business Size Standards component of the North American Industry Classification System defines a small electric utility as one that, including its affiliates, is primarily engaged in the generation, transmission, and/or distribution of electric energy for sale and whose total electric output for the preceding fiscal years did not exceed 4 million MWh.  13 CFR 121.201 (Section 22, Utilities, North American Industry Classification System, NAICS) (2004).

Docket No. RM06-3-000                                                          58

prohibition, however, will improve market transparency to the economic benefit of all

entities, including small entities.  Therefore, the Commission certifies that this Final Rule

will not have a significant economic impact on a substantial number of small entities.

Therefore, no regulatory flexibility analysis is required.

## V.    **Information Collection Statement**

83.    This Final Rule implements the existing requirements as set forth in sections 315

and 1283 of EPAct 2005 and does not include new information requirements under the

provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.).

## VI.    **Environmental Statement**

84.    The Commission is required to prepare an Environmental Assessment or an

Environmental Impact Statement for any action that may have a significant adverse effect

on the human environment.[153]  The Commission has categorically excluded certain

actions from this requirement as not having a significant effect on the human

environment.  Included in the exclusion are rules that are clarifying, corrective, or

procedural or that do not substantially change the effect of the regulations being

amended.[154]  Thus, we affirm the finding we made in the NOPR that this Final Rule is

procedural in nature and therefore falls under this exception; consequently, no

environmental consideration would be necessary.

---

[153] Regulations Implementing the National Environmental Policy Act, Order No. 486, 52 FR 47897 (1987), FERC Stats. & Regs. ¶ 30,783 (1987).

[154] 18 CFR 380.4(a)(2)(ii) (2005).

Docket No. RM06-3-000                                                                 59

## VII.  <u>Document Availability</u>

85.     In addition to publishing the full text of this document in the <u>Federal Register</u>, the

Commission provides all interested persons an opportunity to view and/or print the

contents of this document via the Internet through the Commission's Home Page

(http://www.ferc.gov) and in the Commission's Public Reference Room during normal

business hours (8:30 a.m. to 5:00 p.m. Eastern time) at 888 First Street, N.E., Room 2A,

Washington, D.C. 20426.

86.     From the Commission's Home Page on the Internet, this information is available

in the eLibrary.  The full text of this document is available on eLibrary both in PDF and

Microsoft Word format for viewing, printing, and/or downloading.  To access this

document in eLibrary, type the docket number excluding the last three digits of this

document in the docket number field.

87.     User assistance is available for eLibrary and the Commission's website during

normal business hours.  For assistance, please contact Online Support at 1-866-208-3676

(toll free) or 202-502-6652 (e-mail at FERCOnlineSupport@FERC.gov), or the Public

Reference Room at 202-502-8371, TTY 202-502-8659 (e-mail at

public.referenceroom@ferc.gov).

## VIII.  <u>Effective Date and Congressional Notification</u>

88.     This Final Rule will take effect upon publication in the <u>Federal Register</u>.  The

Commission has determined, with the concurrence of the Administrator of the Office of

Information and Regulatory Affairs of the Office of Management and Budget, that this

Docket No. RM06-3-000                                                          60

rule is not a major rule within the meaning of section 251 of the Small Business

Regulatory Enforcement Fairness Act of 1996.[155]  The Commission will submit the Final

Rule to both houses of Congress and the Government Accountability Office.[156]

89.    A non-major rule goes into effect "as otherwise provided by law after submission

to Congress."[157]  The effective date may be sooner if the agency "for good cause" finds

that "notice and public procedure thereon are impracticable, unnecessary, or contrary to

the public interest."[158]  The Administrative Procedure Act (APA)[159] requires rulemakings

to be published in the Federal Register.  The APA generally mandates that publication or

service of a substantive rule not be made less than 30 days before its effective date.  This

waiting period is not required, however, if the agency finds "good cause" for waiving the

30 day waiting period.[160]

90.    The Commission finds that "good cause" exists that makes further notice and

public procedure impracticable, unnecessary, or contrary to the public interest.  The

Commission has balanced the necessity for immediate implementation of this Final Rule

---

[155] 5 U.S.C. 804(2) (2000).

[156] 5 U.S.C. 801(a)(1)(A) (2000).

[157] 5 U.S.C. 801(a)(4) (2000).

[158] 5 U.S.C. 808(2) (2000).

[159] 5 U.S.C. 551, et seq. (2000).

[160] 5 U.S.C. 553(d)(3) (2000).

Docket No. RM06-3-000                                                          61

against the principles of fundamental fairness which require that all affected persons be

afforded reasonable time to prepare for the effective date of this ruling.  The Commission

is of the view that the persistent high energy prices in the wake of severe damage to the

United States energy infrastructure from the hurricanes of 2005, together with the

potential for severe price events in the event of cold winter weather during the winter

months of 2006, may present opportunities for energy price manipulation.  It would be

contrary to the public interest to delay regulations that implement Congressional intent to

prohibit manipulation in energy markets.  Immediate adoption of the Final Rule will

protect natural gas and electricity markets from manipulative conduct.  Moreover, the

public has had an opportunity to comment on the proposed rules, and the Final Rule

being adopted is substantively the same as the rule that was proposed.  Finally, the

conduct proscribed by the Final Rule is similar to the conduct already proscribed by the

Market Behavior Rules.  Market participants should not have difficulty preparing to

comply with a rule that bars manipulation in energy markets, particularly since many

such participants are currently subject to the existing Market Behavior Rule provisions

prohibiting manipulation.  This Final Rule, therefore, will be made effective upon

publication in the <u>Federal</u> <u>Register</u>.

Docket No. RM06-3-000                                                    62

<u>List of subjects in 18 CFR Part 1c</u>

Electric utilities

Natural gas

By the Commission.

( S E A L )


                    Magalie R. Salas,
                      Secretary.

Docket No. RM06-3-000                                                           63

In consideration of the foregoing, under the authority of EPAct 2005, the

Commission amends Chapter I, Title 18, <u>Code of Federal Regulations</u>, as follows:

1.      Part 1c is added to read as follows:

## PART 1c - - PROHIBITION OF ENERGY MARKET MANIPULATION

**Sec.**
**1c.1   Prohibition of natural gas market manipulation.**
**1c.2   Prohibition of electric energy market manipulation.**

Authority: 15 U.S.C. 717-717z; 16 U.S.C. 791-825r, 2601-2645; 42 U.S.C. 7101-7352; .

## § 1c.1   Prohibition of natural gas market manipulation.

(a) It shall be unlawful for any entity, directly or indirectly, in connection with the

purchase or sale of natural gas or the purchase or sale of transportation services subject to

the jurisdiction of the Commission,

(1) To use or employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading, or

(3) To engage in any act, practice, or course of business that operates or would

operate as a fraud or deceit upon any entity.

(b) Nothing in this section shall be construed to create a private right of action.

## § 1c.2   Prohibition of electric energy market manipulation.

(a) It shall be unlawful for any entity, directly or indirectly, in connection with the

Docket No. RM06-3-000                                              64

purchase or sale of electric energy or the purchase or sale of transmission services subject

to the jurisdiction of the Commission,

   (1) To use or employ any device, scheme, or artifice to defraud,

   (2) To make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading, or

   (3) To engage in any act, practice, or course of business that operates or would

operate as a fraud or deceit upon any entity.

   (b) Nothing in this section shall be construed to create a private right of action.

Note: The following Appendix will not be published in the Code of Federal Regulations.

# APPENDIX

## List of Parties Filing Comments and Reply Comments and Acronyms

Ameren Services Co. (Ameren)

American Electric Power Service Corporation (AEP)

American Gas Association (AGA)

American Public Gas Association (APGA) * *

American Public Power Association (APPA) * *

Association of Oil Pipelines (AOPL)

BP Energy Co. (BP)

Cinergy Services, Inc. (Cinergy) * *

Constellation Energy Group, Inc., DTE Energy Company and Sempra Energy (Indicated Market Participants)

DTE Energy Company (DTE)

Edison Electric Institute (EEI) * *

Electric Power Supply Association (EPSA)

FirstEnergy Service Co. (FirstEnergy)

International Swaps and Derivatives Association, Inc. (ISDA) * *

Interstate Natural Gas Association of America (INGAA)

LG&E Energy LLC (LG&E)

Midwest Independent Transmission System Operator, Inc. (Midwest ISO)

Missouri Public Service Commission

National Association of Regulatory Utility Commissioners (NARUC) * *

Docket No. RM06-3-000                                                    2

National Association of State Utility Consumer Advocates (NASUCA)

National Rural Electric Cooperative Association (NRECA)*

Natural Gas Supply Association (NGSA)

New Jersey Board of Public Utilities (NJBPU)

NiSource, Inc. (NiSource)

Pacific Gas and Electric Co. (PG&E)

PNM Resources, Inc. (PNM) *

Progress Energy Inc. (Progress)

SCANA Energy Marketing, Inc. (SCANA)

Southern California Edison Company (SCE)

States of Illinois, Iowa, Minnesota, Missouri and Wisconsin (States)

SUEZ Energy North America, Inc. (SUEZ)

Transmission Dependent Utility Systems (TDUS)*

Xcel Energy Services Inc. (Xcel)


*       Entities filing reply comments only

* *     Entities filing reply comments in addition to initial comments

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, DC 20426

OFFICE OF THE CHAIRMAN

February 21, 2007

The Honorable Jeff Bingaman
Chairman
Committee on Energy and Natural Resources
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

I am writing in response to your February 6, 2007 letter relating to the Federal
Energy Regulatory Commission's efforts to implement its expanded enforcement
authority under the Energy Policy Act of 2005 (EPAct 2005). I agree with you that the
evolution of complex and inter-related markets for financial and physical energy
commodities has elevated the importance of the Commission's role, and I am pleased to
share with you information on many initiatives and actions that the Commission has
taken under EPAct 2005, which was enacted in large part because of your efforts. I am
also pleased to have the opportunity to respond to your specific questions, to the extent I
can do so publicly, as the Chairman, individual Commissioners, and Commission staff
are bound by certain legal constraints to ensure the confidentiality of the existence and
the nature of ongoing investigations. Any infraction of those rules, of course, would be a
violation of law and a very serious matter.

In general, your letter seeks information about how the Commission has
discharged the regulatory, oversight, and enforcement authorities that were greatly
expanded by EPAct 2005. EPAct 2005 amended Part II of the Federal Power Act (FPA),
the Natural Gas Act (NGA), and the Natural Gas Policy Act of 1978 (NGPA), and gave
the Commission the authority to assess civil penalties of up to $1 million per day per
violation for violations of rules, regulations, and orders issued under these laws.[1]

---

[1] Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 1284(e), 314 (b) (1) (B), and
314(b) (2), 119 Stat. 594 at 950 and 691 (2005), respectively. Under FPA Part II, the
Commission can assess a penalty "of not more than $1,000,000 for each day that such
violation continues." FPA section 316A (b). Under the NGA, the Commission can
assess a penalty "of not more than $1,000,000 per day per violation for as long as the
violation continues." NGA section 22(a). Under the NGPA, the Commission can assess
a penalty "of not more than $1,000,000" and "each day of violation shall constitute a
separate violation." NGPA section 504(b) (6) (A) and (C). There was no change to the

I have long thought the Commission needed stronger enforcement authority. The basic enforcement tool available to a regulatory body is the ability to impose civil penalties. We largely lacked that necessary tool before EPAct 2005. I began to argue in favor of expanding the Commission's enforcement authority nearly ten years ago, when I was majority counsel to the House Energy and Commerce Committee. When I was an advisor to former Secretary of Energy Spencer Abraham, I argued in favor of granting the Commission increased civil penalty authority. As the Commission Chairman, I argued in favor of retaining the penalty provisions during consideration of EPAct 2005. It was a matter of great personal satisfaction to exercise this authority last month, when the Commission imposed civil penalties for the first time under our new penalty authority.

EPAct 2005 also authorized the Commission to issue regulations prohibiting manipulation in wholesale electric and natural gas markets.[2] I want to take the opportunity to commend you for your leadership in granting the Commission this anti-manipulation authority. I have long believed that the lack of an express prohibition of market manipulation was a tragic flaw in federal electricity and natural gas law. I urged Congress to establish such a prohibition, grant us discretion to define market manipulation, and also grant us civil penalty authority comparable to other economic regulatory bodies.[3] You agreed, and thanks in large part to your efforts Congress gave us the tools we needed. I have no doubt that without your leadership the anti-manipulation provisions of EPAct 2005 would not have become law.

EPAct 2005 permanently changed the Commission. It represented the largest grant of regulatory power to the agency since the New Deal. It also turned us into an enforcement agency for the first time. We are dedicated to being a premier enforcement agency. I believe the Commission has a good record implementing our new EPAct 2005 responsibilities, particularly our enforcement authorities.

I promised that if Congress gave the Commission the tools we needed, we would use them – and we have. Upon enactment of EPAct 2005, the Commission acted promptly to implement its new enforcement authority. We have launched a number of new investigations, and expanded the scope of our investigations. Let me review the major actions we have taken to implement our new enforcement authority since implementation of EPAct 2005.

---

Commission's existing FPA Part I civil penalty authority, under which the Commission can assess civil penalties of up to $11,000 "for each day that such violation or failure or refusal continues." FPA section 31(c), as adjusted for inflation by 18 C.F.R. § 385.1602 (2006).

   [2] EPAct §§ 315, 1283 (*codified as* 15 U.S.C. § 717c-1, 16 U.S.C. § 824v).

   [3] Joseph T. Kelliher, *Market Manipulation, Market Power, and the Authority of the Federal Energy Regulatory Commission*, 26 Energy L.J. 1, 30 (2005).

- In October 2005, the Commission issued the *Policy Statement on Enforcement,* describing the factors the Commission will consider when assessing civil penalties or developing remedies for violations of the statutes, orders, rules, and regulations the Commission administers. [4] This Policy Statement was modeled on the practices of other enforcement agencies, such as the U.S. Department of Justice, the Securities and Exchange Commission (SEC), and the Commodity Futures Trading Commission (CFTC). In the Policy Statement, we laid out a goal of firm but fair enforcement of the statutes committed to us by Congress. Our goal is compliance, and in the Policy Statement we proposed to use our penalty authority to encourage compliance. Our experience to date shows the Policy Statement has been successful in encouraging compliance. One measure of that success is the number of self reports we have received since issuance of the Policy Statement, which exceeds 40. Our subsequent enforcement actions have been guided by and consistent with the Policy Statement.

- In October 2005, the Commission issued a notice of proposed rulemaking to implement the anti-manipulation authority granted by Congress in EPAct 2005. [5] Consistent with the direction of Congress in EPAct 2005, this proposed rule was modeled closely on SEC anti-manipulation rules.

- In October 2005, the Commission also entered into the *Memorandum of Understanding between the Federal Energy Regulatory Commission and the Commodity Futures Trading Commission Regarding Information Sharing and Treatment of Proprietary Trading and Other Information* (MOU), which established the framework for ongoing coordination and sharing of information between the Commission and the CFTC with respect to markets of mutual interest, including natural gas related financial markets. I note that EPAct 2005 directed the two agencies to enter into an MOU within 180 days of enactment. The agencies accelerated the MOU and concluded it much sooner, in 65 days. We did so because we recognized the importance of close coordination between the two agencies in the wake of hurricanes Katrina and Rita, given resulting high prices and volatility.

- In November 2005, the Commission issued an *Interpretive Order Regarding No-Action Letter Process* clarifying that section 388.104(a) of its regulations may be used to obtain informal staff advice regarding certain matters, including the new

---

[4] *Enforcement of Statutes, Orders, Rules, and Regulations,* 113 FERC ¶ 61,068 (2005).

[5] Notice of Proposed Rulemaking, *Prohibition of Energy Market Manipulation,* 70 Fed. Reg. 61,930 (October 27, 2005), FERC Stats. & Regs. ¶ 32,591 (2005).

proscriptions on energy market manipulation under EPAct 2005.[6]

- In January 2006, the Commission adopted Order No. 670, the Commission's new anti-manipulation rule, which prohibits energy market manipulation by any entity in connection with a Commission-jurisdictional transaction.[7] Recognizing the importance of preventing manipulation of natural gas markets during a period of high prices, the Commission invoked the emergency provisions of the Administrative Procedure Act and made the anti-manipulation rule effective immediately.

- In December 2006, the Commission issued the *Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties*, setting forth the specific procedures required under the FPA, NGA, and NGPA when assessing a civil penalty.[8] While the Commission continues to encourage settlement, we cannot assume that all investigations that find wrongdoing will result in settlement. We must be prepared to litigate. The Statement of Administrative Policy details how we would assess civil penalties if we resort to administrative litigation.

  With the groundwork for enforcement laid, the Commission exercised for the first time its new civil penalty authority in January 2007, assessing a total of $22.5 million in civil penalties on five companies for various violations of their tariffs or other regulatory obligations.

Against this backdrop of broad-reaching developments, I will address your more specific questions. Before doing so, however, I would like to describe the legal restrictions with respect to disclosing non-public information, laws which govern the Commission, and apply equally to the Chairman, individual Commissioners, and the Commission staff. Indeed, the same or comparable laws and rules apply to other federal enforcement agencies, including the CFTC, the U.S. Department of Justice, and the SEC.

The Commission's processes relevant to your questions are governed in most respects by the investigations provisions of 18 C.F.R. Part 1b. Accordingly, the Commission may conduct an investigation relating to any matter subject to its jurisdiction.[9] Investigations may be "formal" or "preliminary," and "public" or "non-

---

[6] *Interpretive Order Regarding No-Action Letter Process,* 113 FERC ¶ 61,174 (2005), *modified,* 117 FERC ¶ 61,069 (2006).
[7] *Prohibition of Energy Market Manipulation,* Order No. 670, 71 Fed. Reg. 4244 (January 26, 2006), FERC Stats. & Regs. ¶ 31,202, *order denying reh'g,* 114 FERC ¶ 61,300 (2006).
[8] *Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties,* 117 FERC ¶ 61,317 (2006).
[9] 18 C.F.R. § 1b.3 (2006).

public."[10]  The Commission may, by order, in its discretion initiate an investigation.[11] The initiation may be based on its own information or in response to a request from a member of the public or the staff.[12]  The Commission's staff is also authorized to initiate "preliminary" (non-formal) investigations at its discretion.[13]  All information and documents obtained during an investigation and the investigative proceeding are treated as non-public.  This means that neither staff nor the Chairman nor an individual Commissioner may reveal the existence of the investigation or related information except to the extent the Commission directs or authorizes the public disclosure.[14]  Only the Commission can order a "formal" investigation, which results in subpoena authority being vested in investigating officers[15] as opposed to preliminary investigations where no process issues.[16]   In practice, almost all investigations are initiated by staff and are both preliminary and non-public.  Finally, in general, whether in the context of an investigation or otherwise, the nature and time of any proposed action by the Commission are confidential and may not be divulged to anyone outside the Commission.[17]

        The non-public treatment of these matters is critical to the accomplishment of the Commission's mission, especially the enforcement role that has become one of the Commission's priorities, as Congress intended under EPAct 2005.  Many of the investigations undertaken by the Commission deal with issues and markets that are vital to the nation's economy and could be disrupted by a disclosure that the Commission is investigating players or phenomena in those markets.  Where wrongdoing has clearly occurred, such disruption might be an unavoidable consequence of necessary public action by the Commission.  But, by their very nature, investigations begin based on incomplete information.  Frequently, indeed in most instances, the Commission staff through discovery determines that what was at first glance suspicious or anomalous is in fact legitimate and legal.  An announcement of the investigation of such matters might lead to unnecessary and adverse consequences in the markets, such as driving participants out of otherwise legitimate, competitive, and economically beneficial markets or transactions.  In addition, companies are more willing to provide information and cooperate with an investigation when they have a reasonable expectation that the information they provide (which is usually proprietary trade data) and the existence of the investigation will not be made public.  There are limits to such expectations (because ultimately some information will come out as part of the process if there has been wrongdoing), but before culpability can be determined, an investigation is typically

---

[10] 18 C.F.R. § 1b.4 (2006).
[11] 18 C.F.R. § 1b.5 (2006).
[12] 18 C.F.R. §§ 1b.8 and 1b.6 (2006).
[13] 18 C.F.R. § 1b.6 (2006).
[14] 18 C.F.R. § 1b.9 (2006).
[15] 18 C.F.R. § 1b.5 (2006).
[16] 18 C.F.R. § 1b.6 (2006).
[17] 18 C.F.R. § 3c.2 (b) (2006).

6

required and some level of company cooperation is important to the efficient utilization of Commission resources in the prosecution of those investigations. At the end of an investigation, the Commission generally pursues a settlement with companies that have violated Commission rules, orders, or tariffs. We do so in order to expand the reach of our enforcement resources, and enable staff to conduct a greater number of investigations. Public disclosure of the existence of an investigation would certainly impede settlements, and may make settlement impossible.

The Commission frequently relies on information from third party witnesses who do not wish it to become known publicly that they were the source. Finally, intra-agency communications pertaining to investigations almost always involve at least three privileges that are vital to the Commission's ability to perform its work: the attorney-client communication privilege, the work product doctrine (because litigation is always a potential outcome), and the deliberative process privilege. Failure to keep non-public these communications poses the danger of waiving or violating those privileges.

The importance of these principles is embraced by a number of statutory and regulatory protections such as: (a) exemptions to the Government in the Sunshine Act, (permitting the Commission to hold "Closed Meetings" when discussing sensitive law enforcement and litigation related matters)[18]; (b) exemptions to the Freedom of Information Act, (exempting from disclosure records pertaining to confidential trade data, privileged material, and records pertaining to law enforcement activities)[19]; (c) the Commission's investigations regulations, (discussed above)[20]; and (d) the Commission's regulations pertaining to the confidentiality of its decision making process, (described above)[21]. These principles and restrictions are fundamental to our work. The Chairman and every Commissioner and Commission staff member involved in these activities are repeatedly made aware of their importance by way of annual ethics training required of all Commission employees. Violations of these requirements are also ethical violations.

As I stated earlier, an unauthorized disclosure of the existence of a nonpublic investigation would be a violation of the law and a very serious matter. It would damage the integrity of the investigative process. An unauthorized disclosure would allow the subjects of an investigation to attack the integrity of the investigation. In some circumstances, an improper disclosure could make it difficult or impossible for the Commission to ultimately prosecute parties who are found to have engaged in market manipulation or otherwise violated Commission rules, tariffs, or orders. Companies who might have been required to pay substantial civil penalties may escape payment altogether.

---

[18] 5 U.S.C. § 552 (2000).
[19] 5 U.S.C. §§ 552(b) (4), (5), and (7) (2000).
[20] 18 C.F.R. Part 1b (2006).
[21] 18 C.F.R § 3c.2 (2006).

The responses below are set against the backdrop of these legal restrictions.

## Question 1

The Energy Policy Act of 2005 broadened the scope of the Commission's authority to review transactions in financial markets related to natural gas. This is particularly important, given that indices derived from the trading of NYMEX gas futures contracts are included in many supply agreements entered into between producers and local distribution companies (LDCs), the costs of which are ultimately passed along to end-use consumers. Please describe the Commission's efforts to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading, the last half-hour of which forms the basis of the index used in many producer/LDC supply contracts.

## Response

EPAct 2005 did not broaden the Commission's jurisdiction over the financial sales of natural gas that take place on designated contract markets such as the New York Mercantile Exchange (NYMEX). Those markets remain under the exclusive jurisdiction of the CFTC.[22] The MOU entered into between the Commission and CFTC recognizes CFTC jurisdiction:

> [T]he CFTC has exclusive jurisdiction with respect to accounts, agreements and transactions involving contracts of sale of a commodity for future delivery, including, but not limited to, natural gas, electricity, or any other energy product, traded or executed on or subject to the rules of a designated contract market, registered derivatives transaction execution facility, or any other board of trade, exchange, or market as described in section 2(a)(1)(A) of the CEA, 7 U.S.C. § 2(a)(1)(A).

However, EPAct 2005 did grant the Commission authority to prohibit market manipulation "in connection with" the purchase or sale of natural gas subject to the jurisdiction of the Commission.[23] We interpret the anti-manipulation language of EPAct 2005 as allowing the Commission to sanction market manipulation in financial

---

[22] 7 U.S.C. § 2(a) (1) (A) (2000). It appears to be clear Congressional intent to maintain the respective jurisdictions of the Commission and the CFTC. The jurisdictional balance was clear before enactment of EPAct 2005, there is no grant of authority to the Commission over financial sales of natural gas in the new laws, and some provisions of EPAct 2005 reflect a conscious decision by Congress to preserve the respective jurisdictions. EPAct 2005 § 316.

[23] EPAct 2005 § 315.

8

transactions of natural gas that affect jurisdictional sales, or physical sales.  In brief, the CFTC has exclusive jurisdiction over futures, the Commission has exclusive jurisdiction over interstate natural gas transportation and certain natural gas sales, and where matters relate to both markets, both agencies have jurisdiction.  Therefore, as a general matter, Commission staff does not monitor trading of NYMEX Natural Gas Futures Contracts (NYMEX Futures) looking across *all* trading activities for *any* potential misbehavior or structural flaws.  We monitor trading for trading activities that may affect jurisdictional sales, or physical sales.

Certain physical markets for natural gas that fall under the Commission's jurisdiction make use of prices that are derived, in part, from final settlement prices of NYMEX Futures.   In particular, transactions that make use of NYMEX Futures settlement prices include "physical basis" transactions.  In physical basis transactions, the price for the next month's delivery is set directly by taking the NYMEX Futures settlement price and adding or subtracting a fixed amount to take account of a variety of other considerations, mainly the value of gas at the location of the delivery as compared to delivery at the Henry Hub in Louisiana.

Physical basis transactions conform to the standards of "fixed price" deals that are used in the construction of monthly indices by publishers such as *Platts* and *Natural Gas Intelligence*, and by the IntercontinentalExchange (ICE).  The proportion of physical basis transactions used in these indices varies by location, with Eastern and Gulf Coast indices predominantly made up of physical basis transactions, the Midcontinent indices containing a mix of physical basis and fixed price transactions, and those in the West not using physical basis at all.

As a result, indices in these Eastern and Gulf Coast areas are closely, even mathematically, related to the NYMEX Futures final settlement prices.  The index prices are related to, but not the same as, the NYMEX Futures settlement prices because the fixed amounts added or subtracted from the settlement price change the final price level of the physical basis contract.  And, not all prices reported to the indices are physical basis – in some cases, index prices are also based on fixed-price bilateral transactions that do not rely on NYMEX Futures prices.  However, in general, changes in the next-month NYMEX Futures price as it enters its settlement period are very influential in these monthly indices.

As a consequence, Commission staff has reviewed trading into the last half hour final settlement period for NYMEX Futures since Fall of 2004.  In particular, since early 2006, Commission staff follows, in real time, trading in the NYMEX Futures contract and trading in the ICE swap designed to settle against the NYMEX Futures settlement

price.[24] Subsequent to final settlement, Commission staff collects and documents the "tick trading" in these periods, and reports to the Chairman and the Commissioners when changes into and during this final period appear significant.

## Question 2

Pursuant to provisions of EPACT, FERC and the Commodity Futures Trading Commission (CFTC) in October 2005 jointly entered into a Memorandum of Understanding regarding information sharing, which has presumably enhanced the capabilities of FERC's market monitoring unit. In general, when a potential anomaly in financial natural gas markets is detected by FERC's monitoring unit:

a. What is the process by which the full complement of Commissioners is notified?
b. What is the process by which the Commissioners decide whether to institute a more comprehensive investigation?
c. What is the process by which the Commissioners determine whether to contact the CFTC?
d. What is the process by which the Commissioners determine whether to contact state regulators or make public the existence of an anomaly or investigation?
e. Does written guidance exist regarding these policies?

## Response

As an initial matter, it would be helpful to provide some additional background on the MOU. Pursuant to that agreement, the CFTC staff and the Commission's Office of Enforcement staff are in regular contact with respect to matters of mutual interest and concern through meetings and teleconferences.[25] One reason for the MOU was to ease sharing of information between the two agencies. Before the MOU, the Commission had to authorize each information exchange. Under the MOU, information sharing occurs continually at the staff level without any need of Commission authorization. That improves the ability of both agencies to detect market manipulation. Both staffs routinely advise each other of investigations pertaining to their agencies' respective jurisdictions, and also typically work together to investigate and resolve matters where appropriate. These communications occur at the staff level on almost a weekly basis and the Chairmen and Commissioners of each agency are kept informed by their respective staffs. In

---

[24] In September 2006, NYMEX began supporting simultaneous trading at its Exchange and electronically through GLOBEX through the settlement period. Thus, Commission staff follows trading in real time through each of these two NYMEX trading mechanisms, both of which contribute to the calculation of the settlement.

[25] MOU ¶¶ 5, 6.

addition, the CFTC Chairman and I confer as necessary or appropriate.  Written guidance exists regarding the process on contact with the CFTC, namely the MOU.

The principal objective of the MOU was to carry out Congress's directive in EPAct 2005 to ensure that "information requests to markets within the respective jurisdictions of each agency are properly coordinated to minimize duplicative information requests and to address the treatment of proprietary trading information."[26]  Accordingly, the MOU requires the Commission to proceed through the CFTC to obtain data from any designated contract markets.[27]  And, notwithstanding this sharing of information between the agencies, the staffs of each agency are bound to maintain the important restrictions in place at each agency as to the further dissemination of non-public information.[28]

Your other questions primarily relate to Commission processes.  Indeed, these processes pertain to Commission oversight of *any* of the markets or aspects of the markets over which the Commission has jurisdiction (electric, natural gas, hydropower, oil).  In this regard, the Office of Enforcement Division of Energy Market Oversight (DEMO) conducts a daily meeting at 11 a.m. where staff, mainly from DEMO but also from other Commission program offices, discusses current market conditions and identifies issues that require further review.  Individual Commissioners and their personal staffs, of course, are also invited to attend these meetings, as long as there are no more than two Commissioners present at the same time.  When staff detects market anomalies, they notify the Chairman and Commissioners through a variety of methods (reports, e-mails, meetings).  In addition, DEMO staff is available to brief the Commission, the Chairman, individual Commissioners, or their staffs upon request and frequently do so.

Sometimes, an anomaly identified by DEMO may warrant an investigation.  At this time, the Office of Enforcement Division of Investigations pursues the matter, according to the processes and restrictions discussed above at pages 4-6.  In short, the Commission staff is authorized to open an investigation on their own initiative.  The Commission may also order the initiation of an investigation.  In practice, most investigations are initiated by staff.  The origins of investigations initiated by staff vary.  As indicated above, sometimes an investigation is initiated when staff observes market anomalies.  Other Office of Enforcement investigations are initiated based on a referral by a Commission program office, a complaint, a hotline call, a tip by an informant, a self report, or a referral by a market monitor, among other ways.

Individual Commissioners are notified of the opening of staff-initiated investigations through a variety of methods (reports, e-mails, meetings) and staff is available to brief individual Commissioners or their staffs as requested and frequently do

---

[26] EPAct 2005 §§ 316, 1281.
[27] MOU at ¶ 1.
[28] MOU at ¶¶ 2, 4.

so.  In addition, the Commission periodically convenes "Closed Meetings" where staff briefs the full Commission in a non-public forum on the progress of investigations that may pertain to suspected market anomalies (as well as possible violations of the Commission's statutes, rules, regulations, and orders).  These meetings are closed to the public pursuant to the Government in the Sunshine Act, referenced above on page 6.

As to discussing investigations outside of the Commission (other than with the CFTC under the MOU), neither staff nor the Chairman or an individual Commissioner may make public or otherwise disclose an investigation.[29]  An unauthorized disclosure is a violation of the law and a serious ethical violation.  However, the Commission staff does regularly interact with the staff of state regulators as to general market activities as described in greater detail below in the response to Question 4.  The controlling written guidance on most of these matters is contained in the Commission's regulations at 18 C.F.R. Part 1b and 18 C.F.R. § 3c.2 (b), and also the MOU.  In addition, of course, the Commission staff is prohibited from engaging in any off-the-record communication about an issue in a contested on-the-record proceeding.[30]

**Question 3**

Last fall's collapse of the Amaranth hedge fund—with its very large positions in financial natural gas markets—has led to heightened concerns about market transparency and potential consumer impacts of speculative trading on the prices being paid for natural gas. In 2006, were there any times FERC's market monitoring or enforcement staff detected and brought to your attention potentially anomalous market behavior related to gas futures contract trading, including end of month trading, which may affect the accuracy or representative nature of NYMEX indices used in LDC supply contracts?  If so:

a. Please identify the days and months in which the suspected anomalies occurred.
b. Please describe any subsequent discussions or correspondence between you or your staff, and your counterparts at the CFTC.
c. Please describe any subsequent discussions or correspondence between you or your staff and any members of the industry or financial communities.
d. Please describe any subsequent discussions or correspondence between you or your staff and any state regulators.
e. At any point or in any forum, did the Commission consider notifying the public or state regulators, given potential impacts for the end-use natural gas consumers?

**Response**

---

[29] 18 C.F.R. § 1b.9 (2006).
[30] 18 C.F.R. § 385.2201 (2006).

DEMO staff began reviewing NYMEX Futures settlement closes in Fall of 2004. Starting in April 2006, DEMO staff has monitored in real time trading patterns into the last half hour of NYMEX Futures settlement closes and has regularly reported such patterns to the Commission. Staff also discussed the concept of physical basis and its role linking the NYMEX Futures settlement close with monthly indices in a September 26, 2006 public workshop on the transparency of natural gas and electric energy prices. The material was shared with individual Commissioners and their staffs, who were invited to the workshop. Staff also included a comprehensive analysis of many of the market fundamentals and relationships pertaining to NYMEX Futures and physical natural gas markets in Section 7 of its 2006 *State of the Markets Report,* which is available at www.ferc.gov/oversight. In that discussion, and as discussed more fully below in response to Question 4, staff addressed the increase in the last decade of trading volume and open interest in NYMEX Futures, the relationship between trading in NYMEX Futures and physical basis transactions and indices, and the relative degree of transparency of these markets. With respect to other aspects of Question 3 that may implicate the existence or nature of an ongoing nonpublic investigation, as indicated above, I am unable to comment publicly pursuant to, *inter alia,* 18 C.F.R. Part 1b.

**Question 4**

In its September 2006 report, the GAO identified a number of categories of information FERC should consider providing to states and the public in a more timely fashion. In addition to the recent release of the new market oversight website, is the Commission contemplating the development of additional policies to implement these recommendations?

**Response**

In its September 2006 report titled *Roles of Federal and State Regulators in Overseeing Prices,* the GAO noted that the Commission has taken many steps to improve the understanding of the Commission's role in overseeing the market and deterring market manipulation. GAO complimented how the Commission had implemented its expanded EPAct 2005 authority.[31] The report also discussed the substantial efforts the Commission has made in the past to inform state regulators about our oversight activities regarding gas markets.[32] GAO recognized that disclosure of information can damage the integrity of market manipulation investigations and impede enforcement efforts.[33]

---

[31] *Roles of Federal and State Regulators in Overseeing Prices* at 14 (U.S. Gov't Accountability Off., September 2006) ("FERC has made substantial progress implementing the additional authorities related to natural gas provided to it in EPAct 2005").

[32] *Id.* at 19.

[33] *Id.* at 22 ("We agree that disclosure of information that is specific or detailed

The report provided recommendations that the Commission could consider to further improve our market oversight and deterrence of market manipulation by providing stakeholders, particularly state regulators, information regarding: (1) how staff analyzes natural gas markets and identifies anomalies or unusual behavior, (2) the types of unusual market behavior that warrant further investigation, and (3) investigations under way. My letter to the GAO with respect to the report generally concurred in its conclusions and findings. I also pointed out that the Commission continues to work toward instilling greater overall confidence in the natural gas market by developing vigilant market oversight to ensure that commodity prices are competitive and free from manipulation.

Shortly after the GAO report was released, I asked to meet with the National Association of Regulatory Utility Commissioners' Gas Committee at its Annual Convention. Commissioner Donald L. Mason from Ohio, Chairman of the Gas Committee, graciously granted my request. I met with the Gas Committee, accompanied by Susan J. Court, Director of the Office of Enforcement. At that meeting, I reviewed the Commission's new enforcement role under EPAct 2005, how we have implemented our new authorities, and how we conduct oversight of gas markets. I also discussed how we conduct investigations, and the remedies available in the event we find there have been violations of our rules, orders, and tariffs. I had a good discussion with Chairman Mason and Committee members, and will continue to work with them.

The Commission has made, or is in the process of making, several changes to the way market oversight efforts are conducted. First, as you noted, the Commission released its new market oversight web pages at www.ferc.gov/oversight in January. The web site allows Commission staff to share more information about natural gas markets faster than in the past and with a wider set of interested stakeholders. The web pages were inaugurated with five regularly updated slides relating to NYMEX trading, two of which focus explicitly on the relationship between Henry Hub physical (or "cash") and futures trading.

The Commission also recently posted on its website the staff's *2006 State of the Markets* report, mentioned also in response to Question 3. In coordination with the new web pages, the *State of the Markets* report is an up-to-date assessment of major issues in the electric and natural gas markets. The *2006 State of the Markets* report includes detailed discussions of trading in financial and futures markets and the relationship to physical markets, including a discussion of physical basis as a link between NYMEX Futures and monthly gas indices. The regular update of web pages permits the staff to present this kind of market assessment far sooner than was possible in the past (when

---

could provide would-be market manipulators with information about FERC's sources and methods of operations.").

*State of the Market* reports were published months into the next year and, being in book form, could not be updated with new data).

Further, DEMO staff has been for some months conducting conference calls with interested state regulatory staffs to discuss electric and gas market observations on a regional basis.   Staff is in the process of reorganizing its monthly conference calls in order to improve regional coverage, extend participation more broadly, and make use of information now available through the web pages.  There have been frequent meetings with state staff, predominantly in New England and the West, often involving discussion of natural gas price trends and relationships with NYMEX Futures trading.

As a final matter, in response to Question 4, in coordination with the meeting of the National Association of Regulatory Utility Commissioners this week here in Washington, D.C., DEMO staff has begun promoting a more intensive program of working with state regulatory staff members, inviting as many as three at a time to spend a week working closely with market oversight staff both in their daily market monitoring efforts and on a natural gas or electricity research topic of interest to them in their regulatory efforts.  It is my hope that this coordination will better inform state regulators about our oversight and investigation activities.

I hope this information is useful to the Committee in its evaluation of these important matters.  If I can be of any further assistance with this or any other Commission matter, please let me know.

Sincerely,

Joseph T. Kelliher
Chairman

FEDERAL ENERGY REGULATORY COMMISSION
Office of Enforcement, Division of Investigations
Washington, D.C. 20426



July 19, 2007

Non-Public

<u>Via Overnight Delivery</u>
Mr. Brian Hunter
25138 Escartment Ridge View
Calgary, Alberta 23Z 307
Canada

> Re: ***Natural Gas Market Manipulation*, IN07-26-000 (Amaranth
> Advisors L.L.C. and other Entities); Release of Information**

Dear Mr. Hunter:

You are hereby notified that the Federal Energy Regulatory Commission
(Commission) has voted to release some or all of the information contained in the
material identified in the attachment, which was submitted by you and obtained by
Commission staff in connection with the above-referenced non-public investigation. The
release will take the form of citation to, analysis of, or in some cases quotation of the
materials, or information contained in the materials. The release will occur in a public
Commission "Order to Show Cause and Notice of Proposed Penalties" (Order). The
release is required in order for the Commission to issue the Order because it forms part of
the basis and authority for the matters the Commission is considering.

The Order may be made publicly available no sooner than five (5) calendar days
from the date of this letter (July 26, 2007). If you have any questions regarding this
matter, please contact Justin Shellaway at (202) 502-6573.

Sincerely,

Robert E. Pease
Director
Division of Investigations
Office of Enforcement

cc:    Michael Kim, Esq.
       Stephen Senderowitz, Esq.
       David Mollón, Esq.
       Stephen Obie, Esq.
       Scott Pomfret, Esq.

| DEPOSITION PAGE | DOCUMENT DECRIPTION | DOC DATE |
|---|---|---|
| 50-51 | Hunter Depo | 15-Jun-07 |
| 18 | Hunter Depo | 17-Nov-06 |
| 52-53 | Hunter Depo | 16-Nov-06 |
| 21-22 | Hunter Depo | 16-Nov-06 |
| 21, 24 | Hunter Depo | 16-Nov-06 |
| 51-52 | Hunter Depo | 15-Jun-07 |
| 169 | Hunter Depo | 15-Jun-07 |



**120 FERC ¶ 61,085**
**UNITED STATES OF AMERICA**
**FEDERAL ENERGY REGULATORY COMMISSION**

Before Commissioners:  Joseph T. Kelliher, Chairman;
                       Suedeen G. Kelly, Marc Spitzer,
                       Philip D. Moeller, and Jon Wellinghoff.

| | |
|---|---|
| Amaranth Advisors L.L.C. | Docket No.  IN07-26-000 |
| Amaranth LLC | |
| Amaranth Management Limited Partnership | |
| Amaranth International Limited | |
| Amaranth Partners LLC | |
| Amaranth Capital Partners LLC | |
| Amaranth Group Inc. | |
| Amaranth Advisors (Calgary) ULC | |
| Brian Hunter | |
| Matthew Donohoe | |

ORDER TO SHOW CAUSE AND NOTICE OF PROPOSED PENALTIES

(Issued July 26, 2007)

Docket No. IN07-26-000

## TABLE OF CONTENTS

I.  BACKGROUND                                                                    4

    A.  The Relevant Markets                                             4
        1.  The NG Futures Contract                                  5
            a.  Trading in the NG Futures Contract              5
            b.  NG Futures Contract Settlement Price             7
        2.  NG Futures Contract Settlement Price Effects on Derivatives    8
        3.  NG Futures Contract Settlement Price Effects on Prices in
            Commission-Jurisdictional Transactions                  11
    B.  The Respondents                                                 15
        1.  The Amaranth Entities                                    15
        2.  The Traders                                              16
        3.  The Trading Operation                                    17
    C.  Trading in the March, April, and May 2006 NG Futures Contract   19

II.  THE NATURE AND SCOPE OF THE VIOLATIONS                                       23
    A.  Commission Jurisdiction and the Anti-Manipulation Rule         23
    B.  Staff's Investigation                                           29
    C.  Amaranth's Manipulation of the March, April, and May 2006 NG
        Futures Contracts on February 24, March 29, and April 26, 2006   31
        1.  Trading on February 24, 2006: *"Bit of An*
            *Experiment Mainly"*                                     34
            a.  The Instant Messages                           34
            b.  Trade and Position Data                        42
        2.  Trading on March 29, 2006: *A Second Try*               49
        3.  Trading on April 26, 2006: *The "Last Eight Minutes"*  53
        4.  Trading in Summer 2006                                  61
    D.  Amaranth's Trading "In Connection With" Commission-
        Jurisdictional Transactions                                  61
    E.  *Scienter*                                                     63

III.  NOTICE OF PROPOSED PENALTIES                                               65
    A.  The Timing and Magnitude of the Violations                     65
    B.  Civil Penalties: Factor Analysis and Monetary Assessment       66
        1.  Amaranth Entities                                       67
            a.  Seriousness Factors                            68
                i.  Harm                                      68
                ii.  Willfulness                              68
                iii.  Senior Management Involvement           69

Docket No. IN07-26-000

|  |  | iv. | Financial Impact | 73 |
|  |  | b. | Mitigation Factors | 73 |
|  | 2. | Traders Hunter and Donohoe |  | 73 |
| C. | Disgorgement |  |  | 74 |
| IV. | CONCLUSION AND ORDER |  |  | 75 |

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
Suedeen G. Kelly, Marc Spitzer,
Philip D. Moeller, and Jon Wellinghoff.

Amaranth Advisors L.L.C.                                    Docket No.  IN07-26-000
Amaranth LLC
Amaranth Management Limited Partnership
Amaranth International Limited
Amaranth Partners LLC
Amaranth Capital Partners LLC
Amaranth Group Inc.
Amaranth Advisors (Calgary) ULC
Brian Hunter
Matthew Donohoe

ORDER TO SHOW CAUSE AND NOTICE OF PROPOSED PENALTIES

(Issued July 26, 2007)

1.    Pursuant to section 385.209(a)(2) of the Commission's regulations[1] and the
Commission's *Statement of Administrative Policy Regarding the Process for Assessing
Civil Penalties*,[2] the Commission directs the above-captioned firms (collectively, the
Amaranth Entities) and former Amaranth Entities' employees Brian Hunter and Matthew
Donohoe (collectively, along with the Amaranth Entities, the Respondents) to show cause
why they have not violated section 1c.1 of our regulations,[3] which prohibits the
manipulation of natural gas prices.  We further direct the Respondents to show cause why
they should not be assessed civil penalties for, and required to disgorge unjust profits plus

---

[1] 18 C.F.R. § 385.209(a)(2) (2006).

[2] *See Statement of Administrative Policy Regarding the Process for Assessing
Civil Penalties*, 117 FERC ¶ 61,317, at P 7 (2006).

[3] 18 C.F.R. §1c.1 (2006) (Anti-Manipulation Rule).

Docket No. IN07-26-000                                                  - 2 -

interest from, these violations of almost $300,000,000 (in total). We direct the
Respondents to file with the Commission such answers within 30 days of the date of this
order.

2.      This case concerns the important nexus between the wholesale interstate natural
gas markets subject to our jurisdiction and the New York Mercantile Exchange
(NYMEX) Natural Gas Futures Contract (the NG Futures Contract).  In recent years,
many market participants in the physical natural gas markets have used the NG Futures
Contract as a significant benchmark for prices in physical natural gas.  In this case,
manipulation of Commission-jurisdictional prices resulted from manipulation of the NG
Futures Contract.

3.      In the wake of the manipulation of prices in western energy markets during 2000-
01, Congress expanded our anti-manipulation authority with the enactment of the Energy
Policy Act of 2005 (EPAct 2005).[4]   It empowered us to prohibit manipulation, not only
by direct participants in the physical natural gas (or wholesale electric) markets, but also
where, as here, "any entity" commits manipulation directly or indirectly, in connection
with jurisdictional transactions.[5]   Moreover, recognizing the increasing importance of
deterring misconduct to protect the competitiveness of energy markets, Congress
substantially increased through EPAct 2005 the remedies available to us to punish and
deter violations of Commission regulations, orders, rules or policies, including increased
civil penalties of up to $1,000,000 per violation, per day.[6]

4.      This case presents evidence of serious wrongdoing in violation of the new anti-
manipulation proscriptions.  The Respondents received multiple opportunities to present
evidence and argument prior to the issuance of this order, both orally and in writing.  The
Commission is nevertheless preliminarily of the view that Respondents violated the
Commission's regulation as set forth in this order.  The Respondents are now provided
with another chance to respond.[7]   Should any such responses fail to address fully the case

---

[4] EPAct 2005, Pub. L. No. 109-58, § 315 (2005) (codified at 15 U.S.C. 717c-1).

[5] *Id.*

[6] EPAct 2005, Pub. L. No. 109-58, § 314(b) (2005) (codified at 15 U.S.C. 717t-1).

[7] Under the applicable rule, 18 C.F.R. § 385.213(c) (2006), Respondents must file
answers that provide a clear and concise statement regarding any disputed factual issues
and any law upon which they rely.  Respondents must also, to the extent practicable,
admit or deny, specifically and in detail, each material allegation of this order and set
forth every defense relied upon.  Upon receipt of Respondents' answers, the Commission
                                                                    (continued)

presented here, the matter will present an appropriate occasion for the first exercise of our expanded substantive regulatory authority, as well as a substantial exercise of our expanded remedial authority.

5.      In this case, we preliminarily conclude that the Respondents manipulated the price of Commission-jurisdictional transactions by trading in the NG Futures Contract on February 24, March 29, and April 26, 2006, which trading was designed to produce, and in fact produced, artificial "settlement prices" (discussed more fully below) for these contracts.  The evidence of the manipulation is strikingly clear.  As discussed in detail *infra*, the Respondents manipulated the final, or "settlement," price of the NG Futures Contract on the above dates by selling an extraordinary amount of these contracts during the last thirty minutes of trading before these futures contracts expired.  Respondents did so with the purpose and effect of driving down the settlement price.  Considered in isolation, this trading would be economically irrational because by driving down the settlement price, Amaranth made less on the sales of these contracts.  However, Amaranth had previously taken positions several times *larger* in various financial derivatives whose value *increased* as a direct result of the decrease in the settlement price of the NG Futures Contract.  Thus, for every dollar lost on its sales of the NG Futures Contract, it would gain several dollars on its derivative financial positions.  The motive for Amaranth's manipulative scheme thus supplied, Respondent Hunter (Amaranth's head energy trader) observed that he just needed the NG Futures Contract settlement price to "get smashed on settle" as he put it in one of many "instant messages" or IMs revealed in staff's investigation.[8]

6.      Moreover, Amaranth and its traders Hunter and Donohoe intentionally manipulated the settlement price of the NG Futures Contract knowing that the NG Futures Contract settlement price is explicitly used to price a substantial volume of Commission-jurisdictional natural gas transactions (namely, "physical basis" transactions, described below, and the various monthly indices that are calculated using physical basis transactions).  As Amaranth has acknowledged,  the "public relies on [the settlement price of the NG Futures Contract] as a key price benchmark for physical and financial contracts involving natural gas" and that the manipulation of this price can harm

---

has many options as to how to proceed.  It may issue an order on the merits, request briefs or set specified issues for a trial-type hearing, with full discovery, before an administrative law judge (ALJ), request a recommendation or report from an ALJ, or provide for any other process that would justly and efficiently resolve the matter.

[8] AALLC_REG0684186 (Instant Message from Hunter to Amaranth trader Matthew Calhoun, February 24, 2006).

Docket No. IN07-26-000                                                          - 4 -

"all natural gas market participants, including consumers whose cost of natural gas most certainly [is] tied" to the settlement price.[9]  Accordingly, the Respondents intentionally or recklessly manipulated prices in connection with Commission-jurisdictional transactions, and thus violated the Commission's Anti-Manipulation Rule.

7.    Amaranth's manipulative scheme began, as Hunter stated in another IM, as "a bit of an expiriment [sic]"[10] devised by Hunter on or before February 23, 2006, the day before the first manipulation occurred.  The February 24 "experiment" was repeated and refined on March 29 and April 26.  Ultimately, and notoriously, Amaranth experienced massive trading losses in the fall of 2006 and ceased investment operations.  While related to Amaranth's overall natural gas portfolio, that failure is not directly tied to the manipulations and, as discussed more fully *infra*, this matter was initiated by Commission staff on a non-public basis well before those losses and collapse.

8.    By granting the Commission enhanced civil penalty and anti-manipulation authority in EPAct 2005, Congress gave us a clear mandate to punish such gaming of the energy markets that are subject to our jurisdiction, particularly where, as here, the manipulation harmed all market participants.  Based on all the facts and circumstances, including the serious nature of the violations and the absence of any material mitigating factors, we preliminarily conclude that it would be appropriate to order severe civil penalties of $200,000,000 in the case of the Amaranth Entities, $30,000,000 in the case of Hunter, and $2,000,000 in the case of Donohoe, as well as disgorgement of substantial unjust profits from the Amaranth Entities of over $59,000,000 plus interest.

I.    **BACKGROUND**

    A.    **The Relevant Markets**

9.    The manipulation in this case involves three distinct but interrelated markets:  (1) the NG Futures Contract market, which contracts are traded exclusively on NYMEX; (2) a variety of "derivative" financial products, most of which are termed "swaps" (some traded on NYMEX, some "over the counter" (*e.g.*, on Intercontinental Exchange, Inc. (ICE)), and all of which derive their value based on the "settlement price" of the NG Futures Contract for a given month; and (3) Commission-jurisdictional wholesale natural

---

[9] AMARANTH_REG_054783-84 (Letter from Amaranth to NYMEX, August 30, 2006).

[10] AALLC_REG0684227 (Instant Message from Hunter to "gloverb", February 24, 2006).  Hereinafter, "expiriment" will generally be correctly spelled as "experiment."

gas sales, namely, wholesale natural gas sales in interstate commerce that are not "first sales" within the meaning of the Natural Gas Policy Act of 1978 (NGPA).[11] The first market affects the second and third inasmuch as the NG Futures Contract settlement price determines, in whole or in part, the value of the derivatives and the price of a substantial volume of Commission-jurisdictional wholesale natural gas sales.

### 1.    The NG Futures Contract

10.    The NG Futures Contract is a contract for the future delivery of 10,000 MMBtu of natural gas over the course of the contract month to the buyer's interconnection on the Sabine Pipe Line Co.'s Henry Hub in Louisiana.[12] The NG Futures Contract market provides important benefits to the physical natural gas markets. Highly liquid trading of the NG Futures Contract is driven by sophisticated participants who study the fundamentals that affect future natural gas prices such as weather, storage, injections, withdrawals, production and the like. Tens of thousands of prompt-month contracts are traded on a daily basis, with trading volume increasing as the time to maturity decreases. As a result, many market participants view NG Futures Contract pricing as a reliable price signal for the purpose of transacting or planning for natural gas sales. The market also allows physical natural gas market participants to hedge against risks of future price volatility on their fixed contract obligations.

### a.    Trading in the NG Futures Contract

11.    During the relevant time period (early 2006), the NG Futures Contract was principally traded in an "open outcry" market on the NYMEX trading floor located in the financial district in New York, New York. It is an open and continuous auction by NYMEX members who are acting on behalf of their customers, the brokerage companies they represent, or themselves.[13] It is referred to as "open outcry" because, instead of a

---

[11] 15 U.S.C. § 3431(a) (2000).

[12] *See* NYMEX Exchange Rulebook §§ 220.05, 220.10-12 ("Natural Gas Futures Contract"), *available at* http://www.nymex.com/rule_main.aspx?pg=33.

[13] The following description of NYMEX floor trading is based largely on the summary provided on the NYMEX website: http://www.nymex.com/how_exchang_works.aspx. Electronic trading on the NYMEX is currently eclipsing trading in the open outcry pit; in January 2007, NYMEX volume on the CME Globex electronic trading platform for the first quarter 2007 was 597,000 contracts per day, while the NYMEX floor-traded average daily volume was 330,000 contracts per day. NYMEX, *NYMEX Reports Record First Quarter 2007 Volume of*

(continued)

single auctioneer selling an item, every member on the floor can shout out bids (*i.e.*, prices at which they are willing to buy a contract) or offers (*i.e.*, the prices at which they wish to sell a contract), in what may appear to be a somewhat chaotic and disorganized process. At some times, there may be one hundred or more traders on the floor or "pit," yelling and gesturing all at the same time as they struggle to find counterparties and fulfill their client's orders.

12.      In fact, the seemingly chaotic NYMEX "pit" is an efficient market clearing environment. The NYMEX floor traders, normally wearing jackets with distinctive colors to identify themselves or the brokerage company for which they work, stand in the trading rings or pits on the trading floor, which are arranged like little amphitheaters with wide steps descending to the center. Brokers' phone clerks, who are outside the trading pit area, take orders from customers and typically record those orders on small slips of paper, noting the volume of the order, the terms requested and any other information pertinent to the execution of the order. Another broker employee may physically deliver the orders to the floor traders in the ring, or the orders may be verbally transmitted to the floor broker. Floor traders who wish to accept a bid or offer do so by shouting at and gesturing (using well known pit gestures) to the trader making the bid or offer. Experienced traders can detect in real time the status and direction of pricing and volumes by visually and audibly monitoring the trading behavior of other brokers in the ring. Importantly, for purposes of this case, and as discussed more fully below, when a floor broker with a large order to sell begins to offer to sell contracts serially and in rapid succession, and other brokers quickly accept or "lift" the offers, experienced brokers who may have orders to buy will perceive the intentions of the large seller. Rather than bidding at prevailing prices and having sellers "hit" their bids, they will wait for the large seller to offer at a lower price and then "lift" those offers at such lower prices. In such a manner, the large seller can (intentionally or unintentionally) move the prevailing prices in the ring in a downward direction.

13.      When a trade is executed, each selling broker must record each transaction on a card about the size of an index card which shows the commodity, quantity, delivery month, price, broker's badge name and badge name of the buyer. The pit card must be tossed (physically) into the center of the trading ring within one minute of the completion of a transaction. A NYMEX employee sits in the center of the trading ring, collects and time-stamps the cards, and the data on the card is then entered into a NYMEX central

---

*1.512 Million Contracts Per Day, Up 40 Percent From 2006 Period; Record March Volume Averaged 1.372 Million Contracts Per Day* (Apr. 3, 2007), http://investor.nymex.com/releasedetail.cfm?ReleaseID=236556.

computer system. In addition, most brokers will record the essential terms of the execution on the same slips of paper their firms created with respect to the client orders.

### b.    NG Futures Contract Settlement Price

14.    The NG Futures Contract "settlement price" is the volume-weighted average price of trades made during the 30-minute "settlement period," which is the last 30 minutes of trading on the termination day for the "prompt-month" contract. The "prompt-month" is the next calendar month. The "termination day" for the NG Futures Contract is the third-to-last business day of the month preceding the prompt month, and the settlement period occurs from 2:00 p.m. to 2:30 p.m. on the termination day (except when the NYMEX is operating on a holiday schedule). So, for example, for August 2007, the prompt-month contract is the September 2007 NG Futures Contract. The last business day for August 2007 is Friday, August 31, so the settlement period for the September 2007 NG Futures Contract will take place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.

15.    A few futures market participants hold their positions to the end of the settlement period for the prompt-month contract, and thus are obligated to "go to delivery." That is to say, the "futures" contract for the prompt month becomes a present contractual obligation for the purchase and sale of the physical gas. Longs must take delivery and shorts must make delivery of 10,000 MMBtu per contract over the course of the contract month, at the buyer's interconnection on the Sabine Pipe Line Co.'s Henry Hub in Louisiana.[14] As noted above, the price for the gas that goes to delivery is the settlement price of the NG Futures Contract.[15] However, it should be noted that the vast majority of NG Futures Contracts do not in fact go to delivery. For the contract months in question, the height of open interest[16] during the life of the contracts was 103,552 for the March

---

[14] *See* NYMEX Exchange Rulebook §§ 220.10-12, *available at* http://www.nymex.com/rule_main.aspx?pg=33.

[15] *See* NYMEX Exchange Rulebook § 220.11(D), *available at* http://www.nymex.com/rule_main.aspx?pg=33.

[16] "Open Interest" is the total number of futures contracts long or short in a delivery month or market that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery. CFTC Glossary, http://www.cftc.gov/opa/glossary/opaglossary_o.htm. Thus, as the clock is winding down during the settlement period, the open interest (both in terms of the total number of contracts and the number of counterparties) is rapidly decreasing, so that a given number of contracts will represent an increasing share of the outstanding prompt-month contracts.

Docket No. IN07-26-000                                                          - 8 -

Contract, 82,372 for the April Contract, and 109,265 for the May Contract,[17] while only the following number of contracts went to delivery: 1,697 for March (1.6 percent of largest open interest), 1,230 for April (1.5 percent of largest open interest), and 1,748 for May (1.6 percent of largest open interest).[18]

16.     Most market participants prefer to *avoid* trading during the settlement period.  As the time to termination is winding down, price risk and volatility may increase, while market liquidity and the remaining open interest are decreasing.  Most market participants liquidate or "roll" (meaning that they transfer their position into later contract months) their open long or short positions in the prompt-month NG Futures Contract well before the settlement period.  A small number of floor brokers known as "locals"[19] trade on their own account.   For locals, these price and liquidation risks are less prominent because they trade in the ring on their own information (as opposed to clients who may be calling in orders).  They can perceive the market movements in real time and trade, in the moment, on these market movements, buying and selling in the closing minutes to earn profits here and there on individual trades – and providing liquidity as the contract proceeds to termination.[20]  As will be seen *infra*, however, some locals also act as brokers for large institutional clients.

## 2.     NG Futures Contract Settlement Price Effects on Derivatives

17.     The NG Futures Contract final settlement price sets, in whole or in part, the settlement price for a wide range of natural gas derivatives, including financially-settled natural gas futures "swaps" and "basis swaps."[21]  Certain "options" can also settle on the final NG Futures Contract settlement price.

---

[17] NYMEX NG Futures Contract trade data, *available at* FutureSource, NGH06, NGJ06, NGK06, http://www.esignal.com/futuresource.

[18] NYMEX_00031 (NYMEX NG Futures Contract data).

[19] *See* NYMEX Frequently Asked Questions, http://www.nymex.com/faq.aspx.

[20] *See, e.g.* Bolling Dep. 34:18-23 (June 29, 2007).

[21] A "basis swap" is a derivative instrument whose value is based on the difference between the settlement price of the NG Futures Contract for a given contract month and that of the monthly "index" at a specified location for that same month. *See, e.g.*, NYMEX Exchange Rulebook § 521.02 ("NYMEX Transco Zone 6 Basis Swap (Platts IFERC) Contract"):

(continued)

18.    A natural gas futures "swap" (swap) is a purely financial instrument that operates much like the NG Futures Contract except that, rather than becoming a physical delivery or purchase obligation, it settles financially at the termination of the NG Futures Contract at the NG Futures Contract's final settlement price.  Financial swaps do not entail physical delivery risk.  The buyer in a swap transaction for a given contract month agrees to pay the seller a "fixed price," *i.e.*, a specific amount determined at the time when the transaction occurs.  The seller pays the buyer a "floating price,"[22] which will be the actual final settlement price for the NG Futures Contract and which is not known at the time of the swap transaction.  Thus, buyers and sellers hope to profit based on the relation between the price paid at the time of the transaction and the ultimate settlement price of the NG Futures Contract: the buyer of the swap profits if the floating price (*i.e.*, the actual final NG Futures Contract settlement price) is higher than the fixed price at which the swap is trading at the time that the transaction takes place; the seller profits if the floating price is lower than the fixed price.

---

> The Floating Price for each contract month will be equal to the Platts Inside FERC's Gas Market Report ('Platts IFERC') Transco Zone 6 Index ('Index') published in the table titled 'Market Center Spot-Gas Prices' in the first regular issue of the contract month minus the NYMEX (Henry Hub) Natural Gas Futures contract final settlement price for the corresponding contract month.

*available at* http://www.nymex.com/rule_main.aspx?pg=90.  As discussed in more detail below, a monthly index price is normally calculated based on the volume-weighted average price of fixed-price and/or physical basis transactions executed during "bid week," which is the last five business days of the month.

[22] *See, e.g.*, NYMEX Exchange Rulebook § 508.02 ("Henry Hub Swap Futures Contract") ("The Floating Price [*i.e.*, the final settlement price of the swap] for each contract month will be equal to the NYMEX (Henry Hub) Natural Gas Futures contract final settlement price for the corresponding contract month on the last trading day for that contract month."), *available at* http://www.nymex.com/rule_main.aspx?pg=77. Similarly, for the ICE natural gas swap, the floating price is "the monthly last settlement price for natural gas futures as made public by the New York Mercantile Exchange (NYMEX) for the month of production."  ICE, Product Details for Natural Gas Swap, Fixed for NYMEX LD1, *available at* https://www.theice.com/ productguide/productDetails.do?productId=53&productTypeId=1093&display=.

Docket No. IN07-26-000                                                      - 10 -

19.     A natural gas futures "option" is a contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of futures for a particular contract month at a specific price within a specified period of time, regardless of the futures market price. If an option is exercised, or "assigned," a futures position is established.  Like all futures, a future created from an option can be liquidated by making an offsetting purchase or sale, or can go to delivery.  An option can be either a "call" or a "put."  The buyer of a natural gas futures "call" option traded on NYMEX has the right, but not the obligation, on the expiration day[23] to purchase one NG Futures Contract at the "strike price," which is a price specified at the time the option is written.[24]  Conversely, the seller (or "writer") of the call has the obligation to sell one NG Futures Contract at the strike price to the buyer of the call, in the event the option is exercised.  Similarly, the buyer of a "put" option has the right, but not the obligation, on the expiration day to sell one NG Futures Contract at the strike price, while the writer (seller) of the put has an obligation to buy one NG Futures Contract at the strike price from the buyer upon exercise.  In either case, the buyer of the put or call makes an initial payment to the writer of the put or call, referred to as the option premium.  Traders can also buy and sell options on purely financial contracts, such as swaps.  As with the other natural gas derivatives described above, the price of the NG Futures Contract has a direct relationship to the value of options.  The NG Futures Contract is a basic component that determines the value of the options.  While options on prompt-month futures and other derivatives expire on the day before termination day, trading during the settlement period on termination day continues to affect the value of options on future-month instruments.  Trading during the last two minutes on the termination day is particularly important, as options continue to trade at prices in relation to the price of the expiring NG Futures Contract.  As discussed more fully below, options and other derivatives are given a non-final settlement price based on trading during these two minutes, which determines the options' marked-to-market[25] value for that day.

---

[23] There are various option expiration days, depending on the terms of the particular option instrument in question.  This discussion will be limited to the NYMEX natural gas option, which expires the day before the termination day for the NG Futures Contract for that month, *i.e.*, the fourth-to-last business day of the month.

[24] There will normally be a range of strike prices for each put and call of a given contract month, separated by $0.25 or $0.50 intervals.  For example, an August call with a strike price of $5 would be identified as simply the August $5 call.

[25] Marked-to-market values represent the gains or losses in each contract position resulting from changes in the price of the futures or option contracts at the end of each

(continued)

### 3.    NG Futures Contract Settlement Price Effects on Prices in Commission-Jurisdictional Transactions

20.    Importantly, from the perspective of our jurisdiction, the NG Futures Contract settlement price determines the price of a substantial proportion of Commission-jurisdictional transactions, most directly, "physical basis" transactions.  A physical basis transaction is a contract for delivery of natural gas at some location in the wholesale natural gas delivery system that spans the nation.  The price of a physical basis transaction is the NG Futures Contract settlement price for a given month, plus or minus a fixed amount representing the expected "basis" (or differential for delivery at the delivery location versus Henry Hub) at the time of the transaction.[26]  Consequently, any manipulation of the NG Futures Contract settlement price will inevitably result in a penny-for-penny change in the prices used in physical basis transactions.

21.    A second, and larger, category of Commission-jurisdictional transactions that rely to a great degree on the NG Futures Contract are "index" transactions.  Monthly price indices are compiled and published by several trade press entities (*e.g.*, Platts or NGI) who obtain information provided on a voluntary basis by market participants about trades occurring at various physical natural gas trading locations.[27]  Monthly indices are normally calculated based on the volume-weighted average price of fixed-price and/or physical basis transactions executed at such locations during "bid week," which is the last five business days of the month.  As such, the NG Futures Contract settlement price is included in the calculation of indices for locations where bid week physical basis trades are reported to publishers.

22.    Figure 1 below shows that high percentages of bid week transactions at index points in the East, Mid-Continent, and producing regions along the Gulf coast are physical basis transactions.  Consequently, monthly indices at these locations are set primarily by physical basis transactions that explicitly use the NG Futures Contract

---

trading session.  *See* CFTC Glossary,
http://www.cftc.gov/opa/glossary/opaglossary_m.htm.

   [26]  So for example, if gas for delivery to Transco Zone 6 (*i.e.*, New York) during August 2007 is expected to be $1 greater than gas delivered to Henry Hub for that month, a physical basis trade for the prompt month would be the settlement price of the August 2007 NG Futures Contract settlement price, plus one dollar.

   [27] *See generally Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121 (2003), *clarification granted*, 105 FERC ¶ 61,282 (2003).

Docket No. IN07-26-000                                          - 12 -

settlement price as a reference price.  If the NG Futures Contract settlement price is rendered artificial due to manipulation, this artificial price element will be directly transmitted into index prices to the extent that they are calculated using physical basis transactions.

**Figure 1: Use of Physical Basis in Natural Gas Price Indices at Major Trading Points, 2006**[28]



23.    The price indices that rely heavily on physical basis transactions, in turn, are widely used in bilateral natural gas markets as a price term.  According to a report prepared by the American Gas Association (AGA), a trade group for natural gas local distribution companies (LDCs), "it is clear that first-of-the-month index pricing [*i.e.*,

---

[28] FERC, *2006 State of the Markets Report* at 50 (2007), *available at* http://www.ferc.gov/market-oversight/st-mkt-ovr/st-mkt-ovr.asp.

Docket No. IN07-26-000                                                                      - 13 -

monthly indices] dominates the market for long- and mid-term supply agreements." This report surveyed 30 LDCs and made the following findings: (i) for long-term gas purchases (one year or more), 20 of 22 responding companies used monthly indices, with 13 of those companies using monthly indices for 51 to 100 percent of their long-term purchases; (ii) for mid-term purchases (more than one month, less than one year), 24 of 29 respondents used monthly indices, with 15 of those companies using monthly indices for 51 to 100 percent of their purchases; (iii) for short-term purchases (less than one month), 19 of the respondents used monthly indices; and (iv) 26 of 29 respondents used monthly indices to buy gas for storage injection, with 11 of those companies using monthly indices for 76 to 100 percent of their storage gas.[29] The AGA report further found that several of these LDCs used the NYMEX price itself for supply agreements: (i) four of the 22 respondents to this question used NYMEX for long-term supply agreements; (ii) seven of the 29 respondents used NYMEX for mid-term supply agreements, with three of these using it for 76 to 100 percent of their purchases; (iii) seven of the 29 respondents used NYMEX for short-term pricing (less than one month), with five of these using it for 51 to 100 percent of their purchases; and (iv) three of the 29 respondents used NYMEX to buy gas for storage injection.[30]

24.    In addition to market participants relying on the NG Futures Contract settlement price, or on indices that substantially report prices based on the settlement price, regulators at the state level sometimes look to index or settlement price-based purchases of natural gas by LDCs in evaluating whether such purchases were prudent. Accordingly, LDCs naturally have increasingly come to rely on such prices in satisfying themselves that their purchases will pass regulatory scrutiny.

25.    Jurisdictional sellers of natural gas are not required to report their sales to the Commission. While we have issued a Notice of Proposed Rulemaking to require future annual reporting of aggregate physical natural gas sales,[31] pursuant to the transparency provisions of EPAct 2005,[32] we cannot, nor need we, determine at this time the precise

---

[29] AGA, *LDC Supply Portfolio Management During the 2005-2006 Winter Heating Season* at 3-5, 11 (2006).

[30] *Id.* at 11-14, 17.

[31] Notice of Proposed Rulemaking, *Transparency Provisions of Section 23 of the Natural Gas Act; Transparency Provisions of the Energy Policy Act of 2005*, 72 Fed. Reg. 31,217 (June 6, 2007), FERC Stats. & Regs. ¶ 32,614 (2007).

[32] EPAct 2005 § 316 (codified at 15 U.S.C. § 717t-2).

volume or proportion of total "jurisdictional" gas transactions that are priced using physical basis or that are sold at index prices determined, in whole or in part, by physical basis trades.   We have a variety of indications that the volume is substantial.  For example, as discussed at our October 13, 2006 Technical Conference on Price Transparency, numerous blanket market certificate sellers have notified the Commission that they report their sales to indices, including sellers like BP, ConocoPhillips, Sempra, Coral, and Chevron.  Given the proportion of the index transactions that are physical basis, it stands to reason that these jurisdictional sellers are selling a large proportion of physical basis.  In addition, monthly wholesale physical gas transactions executed on ICE during 2006 indicate that there were over 747 Bcf of wholesale physical basis transactions during this period.  The following volumes of physical basis trades were executed on ICE at major Eastern, Mid-Continent, and Gulf Coast trading hubs: Columbia Gas TCO Pool (Appalachia) – 92.8 Bcf; TETCO-M3 (Eastern Texas) – 76.7 Bcf; Dominion South (Mid-Atlantic) – 76.1 Bcf; Transco Z6 (New York) – 52.9 Bcf; Centerpoint-East (Mid-Continent) – 39.4 Bcf.[33]

26.    As noted, an additional category of Commission-jurisdictional transactions whose price is determined by the NG Futures Contract settlement price are those NG Futures Contracts that "go to delivery."  During the months of interest, blanket certificate holders such as BP, Louis Dreyfus, UBS, Merrill Lynch, and ConocoPhillips each sold natural gas by taking NG Futures Contracts short through expiration in one or more of the months for a total of over 2,000 contracts for approximately 20 Bcf of physical gas that went to delivery.[34]

27.    The natural gas sold as a result of the aforementioned processes represents substantial wholesale sales for resale in interstate commerce that are not first sales. Consequently, they are subject to the Commission's jurisdiction, and manipulation of the NG Futures Contract Settlement price will necessarily change the price in these transactions by corresponding amounts.

---

[33] ICE, End of Day Reports – OTC (natural gas firm physical basis swaps), *available at* https://www.theice.com/eod_valuation.jhtml.

[34]  NYMEX_00029 (NYMEX open interest, trade, and delivery data).

Docket No. IN07-26-000                                                      - 15 -

    **B.**    **The Respondents**

        **1.**    **The Amaranth Entities**

28.    The Amaranth Entities collectively comprise what is commonly referred to as a "hedge fund." On paper, they consist of a complex array of interrelated LLCs, LLPs, and corporations,[35] organized for the purpose of pooling and investing funds of investors. They include "Amaranth Advisors L.L.C.," which is the "Advisor" to a number of "Funds," which in turn hold the capital contributed by investors, as discussed more fully *infra*.

29.    The principal "Fund" is Amaranth LLC, a Cayman Islands company. Amaranth LLC is a multi-strategy trading fund advised by Amaranth Advisors L.L.C. and its affiliates. Amaranth LLC serves as a "master fund" in a "master-feeder" fund structure. Investors invest directly into three feeder funds (Amaranth International Limited, Amaranth Partners LLC, and Amaranth Capital Partners LLC), which invest substantially all of their capital in Amaranth LLC.[36] Amaranth LLC then invests its funds on a global basis in a host of trading vehicles. Amaranth LLC currently possesses substantial assets related to the operation of the Amaranth Entities.

30.    Amaranth Group Inc. is a Delaware S corporation owned 100 percent by Amaranth LLC CEO Nicholas Maounis (Maounis). As of May 1, 2006, Amaranth Group Inc. owned one percent and served as general partner of Amaranth Management Limited Partnership, a Delaware holding entity, which entity in turn owned 78 percent of Amaranth Advisors L.L.C. Amaranth Group Inc. employed all the natural gas traders, including Brian Hunter, Matthew Donohoe, as well as the executives such as the President and Chief Investment Officer (CIO) Maounis, Chief Risk Officer (CRO) Robert Jones, and Chief Compliance Officer (CCO) Michael Carrieri. Amaranth Group Inc. is a service provider to the Amaranth Funds.

31.    Amaranth International Limited is a Bermuda company. Amaranth International Limited serves as an off-shore "feeder fund" for non-United States and tax-exempt investors, in the "master-feeder" fund structure. Investors invest directly into Amaranth International Limited, which invests substantially all of its capital in Amaranth LLC.

---

[35] AMARANTH_REG000049-61 (thirteen pages of Amaranth Organizational Charts).

[36] AALLC_REG0343320 (Amaranth LLC Financial Profile, January 2006).

32.     Amaranth Partners LLC and Amaranth Capital Partners LLC are Delaware Limited Liability Companies.  They both serve as a domestic "feeder fund" for United States taxable investors, in the "master-feeder" fund structure.  Investors invest directly into these entities, which then invest substantially all of their capital in Amaranth LLC.

33.     Amaranth Advisors (Calgary) ULC is a Nova Scotia, Canada company, registered with the Alberta Securities Commission, that Amaranth established as an energy advisor entity to allow Hunter and his team to move their trading operation from Greenwich, Connecticut to Calgary, Alberta (as discussed more fully *infra*).  Hunter was the President, though most of the other officers were based in Greenwich, as were the other Amaranth employees assigned to perform support functions for the Calgary trading operation.  Amaranth Advisors (Calgary) ULC is an indirect subsidiary of Amaranth Advisors L.L.C.

34.     At the close of 2005, the Amaranth Entities employed over 600 people in Amaranth's Greenwich, Connecticut headquarters and seven other offices worldwide and controlled in excess of $8 billion in assets.  In September 2006, Amaranth experienced significant losses from its natural gas positions that ultimately resulted in the pending and well-publicized dissolution of the firm.[37]  Although Amaranth trading operations ceased in 2006, at present the assets of the Amaranth Entities exceed $600,000,000.[38]

###     2.     The Traders

35.     Brian Hunter, a Canadian citizen, was the head natural gas trader at Amaranth, stationed in a Calgary, Alberta office during the period in which the manipulative trading occurred.  After holding various energy trading positions at TransCanada and Deutsche Bank, he joined Amaranth as an energy trader in 2004 in Greenwich and became a Portfolio Manager for Energy Trading in 2005.  At about the time he joined Amaranth, it seems to have become generally known that he had left Deutsche Bank on unfavorable terms, including being taken off of the trading desk.[39]  His troubles with Deutsche Bank

---

[37] We note, in passing, that we have found no evidence indicating these fall 2006 losses were connected to Respondents' manipulative trading in the NG Futures Contract in early 2006 and also that staff's monitoring activities and investigation that resulted in this order began well before Amaranth's losses and the publicity, Congressional interest, and private litigation that ensued.

[38] Letter from Maounis to Amaranth Investors (Mar. 29, 2007).

[39] *See* Ann Davis, *How Giant Bets on Natural Gas Sank Brash Hedge-Fund Trader*, WALL ST. J., Sept. 19, 2006, at A1, *available at*

                                                                    (continued)

eventually erupted publicly with the filing of a lawsuit against the firm blaming alleged performance problems on faulty Deutsche Bank systems and management. He left Amaranth sometime in late 2006 after the losses discussed above.

36.    Matthew Donohoe was Hunter's "execution trader" at Amaranth. According to Donohoe, Hunter would "direct macro strategy, and [Donohoe] would implement it via trading."[40]  As such, Donohoe would place the orders with NYMEX floor brokers or execute trades with counterparties on behalf of Hunter's trading book. He also left Amaranth after the fall 2006 losses.

### 3.    The Trading Operation

37.    Hunter was hired in 2004 by Maounis and Harpreet "Harry" Arora, a former Enron trader who had established Amaranth's energy and commodities trading desk. Hunter apparently grew to dislike reporting to Arora and to resent the way Hunter was compensated by Amaranth.[41]  During the summer of 2005, Hunter threatened to leave Amaranth and went so far as to sign a contract with another firm.[42]  In order to retain Hunter, Maounis allowed Hunter to manage a trading book separate from Arora's, focused on natural gas futures and derivatives.[43]  Maounis also eventually promoted Hunter to Vice President reporting directly to Maounis, made Hunter "co-head" with Arora of commodities trading at Amaranth, and enhanced Hunter's "desk participation" (*i.e.*, his share of his trading desks profits) from 7.5 percent to 15 percent.[44]  Hunter

---

http://online.wsj.com/article_email/SB115861715980366723-lMyQjAxMDE2NTE4OTYxMTk3Wj.html; *see also* Maounis Dep. 54:9-55:16 (Nov. 20, 2006 late afternoon session); Hunter Dep. 52:9-53:2 (Nov. 16, 2006).

[40] Donohoe Dep. 17:21-18:2 (Mar. 14, 2007 morning session).

[41] Maounis Dep. 14:2-15:3 (Nov. 20, 2006 morning session).

[42] Hunter Dep. 21:5-22:3 (Nov. 16, 2006); Maounis Dep. 26:6-27:20 (Nov. 20, 2006 late afternoon session).

[43] Hunter Dep. 21:5-10, 24:9-22 (Nov. 16, 2006); Maounis Dep. 15:13-16 (Nov. 20, 2006 morning session).

[44] Maounis Dep. 28:4-7 (Nov. 20, 2006 late afternoon session); Arora Dep. 16:21-25 (Nov. 14, 2006 morning session), 33:18-20 (Nov. 14, 2006 afternoon session); A_CFTC000052; *see also* AMARANTH_REG003387-3402 (Letter from Amaranth to Hunter, dated June 1, 2005, summarizing his compensation package).

made roughly $1 billion for Amaranth in 2005, largely from trading around the periods
when Hurricanes Katrina and Rita sent natural gas prices soaring, and received total
compensation of roughly $100 million.[45]  Subsequently, Amaranth allowed Hunter to
increase the size of his natural gas positions (so that Amaranth allocated well over *half* of
its risk capital to its energy book by the Summer of 2006).[46]

38.    On August 23, 2005, shortly after Amaranth allowed Hunter to split his book from
Arora's, Amaranth submitted an application to NYMEX for an exemption from
NYMEX's position limits for trading in the NG Futures Contract and the Henry Hub
Swap Contract (or NN Contract).[47]  Specifically, Amaranth requested that its position
limits be raised from 1,000 NG Futures Contract equivalents to 3,000 NG Futures
Contract equivalents.  In its request, Amaranth emphasized the high priority that it placed
on risk management and that it had "assigned a risk manager to sit among its energy
traders."[48]  On September 16, 2005, NYMEX substantially granted Amaranth's
exemption request.[49]  This exemption, in part, positioned Hunter for the extensive trading
in the settlement period that was to come.

39.    In late 2005, Amaranth allowed Hunter to move his trading desk to Calgary, his
hometown.[50]  At first, Hunter was alone in Calgary, though eventually, four other
Amaranth natural gas traders migrated there from Greenwich over the course of the
Spring and Summer of 2006 (specifically, Matthew Donohoe, Matthew Calhoun, Shane
Lee, and Brad Basarowich).  Notably absent in Calgary were Amaranth senior

---

[45] Maounis Dep. 27:21-24 (Nov. 20, 2006 late afternoon session); Ann Davis, *How
Giant Bets on Natural Gas Sank Brash Hedge-Fund Trader*, WALL ST. J., Sept. 19, 2006,
at A1, *available at* http://online.wsj.com/article_email/SB115861715980366723-
lMyQjAxMDE2NTE4OTYxMTk3Wj.html.

[46] *See, e.g.*, AALLC_REG0767207-28, AALLC_REG0605202,
AALLC_REG0550756, AALLC_REG0609346, AALLC_REG0611335 (series of
documents Amaranth provided to investors outlining the percentage of risk capital
allocated by strategy).

[47] A_CFTC000051-56.

[48] A_CFTC000052-53.

[49] A_CFTC000057.

[50] Maounis Dep. 15:7-17:11 (Nov. 20, 2006 morning session).

Docket No. IN07-26-000                                                - 19 -

management, risk management, or compliance personnel,[51] contrary to the
aforementioned representations Amaranth made to the NYMEX to obtain position limit
exemptions.

40.    By early 2006, Hunter was in his ascendancy within Amaranth and by March
2006, Arora had left Amaranth to work at another hedge fund.  It is clear that Arora and
Hunter had different views on trading, in particular, trading NG Futures during the
settlement period.  As do most participants in the NG Futures market, Arora sought to
exit his position in the expiring "prompt-month" NG Futures as early as possible to avoid
the risks of trading in the settlement.[52]  Indeed, Amaranth did not trade large volumes of
prompt-month contracts on the settlement day until after Hunter had been made a Co-
Portfolio Manager for commodities trading.  In the months leading up to Arora's
departure, Arora expressed concerns to Amaranth CRO Jones and Maounis about
Hunter's natural gas trading.[53]  But, Hunter's energy trading book had been "an
enormous source of profitability in 2005."[54]  Moreover, energy trading accounted for 98
percent of Amaranth's 2005 profits, primarily from natural gas derivatives.[55]  Thus it
appears Amaranth senior management took a rather hands off approach to overseeing
Hunter's trading operation (at least until May 2006).  As we will discuss in more detail
*infra*, Amaranth senior management's handling of the trading operation factors
significantly into our overall view of this matter.

### C.    Trading in the March, April, and May 2006 NG Futures Contract

41.    There are three NG Futures Contracts and their respective settlement days in 2006
– February 24, March 29, and April 26 – that are the subject of this order.  The specific
manipulative trading activity by Amaranth will be detailed further *infra*, but here it is

[51] Maounis Dep. 17:22-21:5 (Nov. 20, 2006 morning session).

[52] Arora Dep. 19:20-20:9 (Nov. 14, 2006, afternoon session).

[53] Jones Dep. 38:15-41:4 (Nov. 13, 2006 morning session); Arora Dep. 25:4-29:4
(Nov. 14, 2006 morning session).

[54] Jones Dep. 71:17-20 (Nov. 13, 2006 morning session).

[55] STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, COMMITTEE ON
HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS, 110TH CONG., EXCESSIVE
SPECULATION IN THE NATURAL GAS MARKET at 58 (2007) (quoting JPMorganChase, CP
Leveraged Funds Due Diligence, Annual Review 2005, JPM-PS1 0007051).

Docket No. IN07-26-000                                                      - 20 -

useful to review the price evolution of these contracts over the course of the termination days.  The price points during the three trading days and other relevant information are presented in three figures below.

**Figure 2: NYMEX Trading on March 2006 Contract Termination, February 24, 2006**[56]



---

[56] NYMEX_00003 (NYMEX NG Futures Contract trade data).

Docket No. IN07-26-000                                              - 21 -

**Figure 3: NYMEX Trading on April 2006 Contract Termination, March 29, 2006**[57]



**57** NYMEX_00004 (NYMEX NG Futures Contract trade data).

Docket No. IN07-26-000                                                    - 22 -

**Figure 4: NYMEX Trading on May 2006 Contract Termination, April 26, 2006**[58]



42.    As these graphs show, there were significant alterations in the trajectory of the prices starting more or less at the start of the settlement period (although the direction and consistency of that change was not always the same).  The coincidence of the shift in trajectory with the start of the settlement period and the departure of the settlement period prices from the rest-of-day trading is especially stark for the March contract, for which prices were in the range of $7.28 to $7.55 during the day (and closer to $7.50 in the hours prior to settlement), but then dropped dramatically in the first five minutes of the settlement.  The contract settled at just over $7.11.  In addition, the trading in the May contract seems anomalous: a sharp increase in prices at the start of the settlement period was followed by a marked decline.

43.    An even more telling view of the activity is the running weighted average of prices which reveals how the volume of each sale combined with the price paid affected what would ultimately become the 30-minute weighted average.  For example, Figure 5 below shows for the March 2006 contract (to the left of the vertical red line) the running

---

[58] NYMEX_00001 (NYMEX NG Futures Contract trade data).

Docket No. IN07-26-000                                              - 23 -

weighted average of prices during the settlement day up to the settlement period.  To the
right of the red line is a running weighted average of sales in the settlement period.   Had
a settlement price been calculated based on selling up to the settlement period, the
settlement price would have been about $7.42, but instead the contract settled at $7.112.

**Figure 5:  March Contract Volume-Weighted Average Price on February 24**[59]



## II.    The Nature and Scope of the Violations

### A.    Commission Jurisdiction and the Anti-Manipulation Rule

44.    The Commission's Anti-Manipulation Rule, section 1c.1 of the Commission's
regulations, implements section 315 of EPAct 2005,[60] and prohibits:

---

[59] NYMEX_00003 (NYMEX NG Futures Contract trade data).

any entity, directly or indirectly, in connection with the purchase or sale of natural gas . . . subject to the jurisdiction of the Commission . . . [from using] . . . any device, scheme, or artifice to defraud [or from engaging in] any act, practice, or course of business that operates or would operate as a fraud or deceit . . . on any person.[61]

In adopting this rule, we issued Order No. 670 and therein clarified the following elements of a manipulation claim: "an entity: (1) . . . engages in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite *scienter*; (3) in connection with the purchase or sale of natural gas  . . . subject to the jurisdiction of the Commission."[62]  This case presents the first exercise of this new anti-manipulation authority.  Accordingly, commentary about some of its elements, as relevant to the facts of this case, is appropriate.

45.    The Anti-Manipulation Rule is an intentionally broad proscription against all kinds of deception, manipulation, deceit and fraud.[63]   In Order No. 670, we explained that fraud is defined generally to include "any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market."[64]  The body of precedent interpreting SEC Rule 10b-5 and section 10(b) of the Exchange Act upon which some of the elements of Rule 1c.1 were modeled makes plain that Rule 1c.1 covers manipulative conduct implemented, as here, by means other than material misrepresentations or omissions.  The Supreme Court has defined market manipulation under Rule 10b-5 as conduct "designed to deceive or defraud investors by *controlling or artificially affecting* the price of securities"[65] or practices that "artificially affect market

---

[60] EPAct 2005 § 315 (2005) (codified at 15 U.S.C. 717c-1).

[61] 18 C.F.R. § 1c.1 (2006).

[62] *Prohibition of Energy Market Manipulation*, Order No. 670, 71 Fed. Reg. 4244 (Jan. 26, 2006), FERC Stats. & Regs. ¶ 31,202, at P 49 (2006) (Order No. 670).

[63] Order No. 670, FERC Stats. & Regs. ¶ 31,202 at P 50.

[64] *Id.* (citing *Dennis v. United States*, 384 U.S. 855, 861 (1966) (noting that fraud within the meaning of a statute need not be confined to the common law definition of fraud: any false statement, misrepresentation or deceit)).

[65] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (emphasis added).

Docket No. IN07-26-000                                              - 25 -

activity."[66]  In particular, practices such as attempting to or actually "marking the close," by which a manipulator seeks to alter normal market operations by sales targeted at the close of exchange trading, are prohibited.[67]  Just as in the securities markets, energy market participants may be deceived or defrauded where one market participant trades with the intent to artificially affect the price of a physical or financial energy product and has the ability to do so, due to its relative size in the market or through explicit or tacit coordination with other traders.  In the presence of such manipulative trading, the price is no longer set solely by the legitimate forces of supply and demand.

46.    With respect to the "subject to the jurisdiction of the Commission" element, Section 1(b) of the NGA grants the Commission jurisdiction over "the sale in interstate commerce of natural gas for resale."[68]  The NGPA[69] and the Wellhead Decontrol Act of 1989[70] exclude from the Commission's NGA jurisdiction all "first sales,"[71] which are all sales from the producer to the consumer, unless and until the gas is purchased by an interstate pipeline, intrastate pipeline, or local distribution company or an affiliate thereof.[72]

47.    As noted *supra*, trading in the NG Futures Contract sets the settlement price for physical gas that "goes to delivery" and also determines the price for physical basis transactions which account for the vast majority of bid week transactions in the East, Upper Midwest and Gulf Coast market centers.  These physical basis transactions during bid week, in turn, determine the monthly index prices for these locations and thereby the

---

[66] *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

[67] *See In re Kocherhans*, No. 3-8611, 52 S.E.C. 528, 530, 1995 SEC LEXIS 3308, at *6 (Dec. 6, 1995) (defining manipulation through "marking the close" as "the practice of attempting to influence the closing price of a stock by executing purchase or sale orders at or near the close of the market"); *SEC v. Schiffer*, Fed. Sec. L. Rep. (CCH) P90,247, 1998 U.S. Dist. LEXIS 8579, at *26 & n.26 (Jun. 11, 1998) (finding *prima facie* showing of manipulation through marking the close).

[68] 15 U.S.C. § 717(b) (2000).

[69] 15 U.S.C. §§ 3301 *et seq.* (2000).

[70] Pub. L. No. 101-60, 103 Stat. 157 (1989).

[71] Commodity Exchange Act, 15 U.S.C. § 3431(a) (2000) (CEA).

[72] 15 U.S.C. § 3301(21)(A) (2000).

Docket No. IN07-26-000                                                - 26 -

prices for the larger volume of sales based on the index price.  A substantial proportion of the foregoing are Commission-jurisdictional sales for resale in interstate commerce and not first sales.

48.     We do not have jurisdiction directly to regulate trading in the NG Futures Contract that does not affect our jurisdictional markets; that is the province of the Commodity Futures Trading Commission (CFTC).  However, the law makes plain that the jurisdiction of the two agencies is to be complementary.[73]  Where the two regulatory regimes overlap, courts have concluded that Congress intended that both should be given effect.  For example, in *United States v. Reliant Energy*,[74] the court concluded that the Commission's exclusive jurisdiction under the FPA to regulate the transmission and sale at wholesale of electricity in interstate commerce did not preempt the CFTC's anti-manipulation jurisdiction to pursue criminal charges for manipulation of electricity prices during California's energy crisis in summer 2000.[75]  Indeed, Congress directed in EPAct 2005 that the two Commissions execute a Memorandum of Understanding (MOU) to establish, among other things, provisions ensuring that investigations pertaining to markets within the respective jurisdiction of each agency are properly coordinated to minimize duplicative information requests, provide for adequate protection of proprietary trading information, and the like.[76]  On October 12, 2005, the Commission and the CFTC

---

[73] CEA, 7 U.S.C. § 2(a)(1)(A) (2000) (providing that CFTC "exclusive" jurisdiction is not to be read to interfere with separate jurisdiction granted to other federal agencies).

[74] 420 F. Supp. 2d 1043 (N.D. Cal. 2006); *see also SEC v. Hopper*, 2006 U.S. Dist LEXIS 17772, Fed. Sec. L. Rep. (CCH) P93,878 (S.D. Tex. 2006) (court rejected defendants' argument that SEC could not sanction energy trader for "round-trip" trading because such energy trading fell within exclusive jurisdiction of the Commission and the CFTC because the transactions were fraudulent and deceptive within the meaning of Rule 10b-5).

[75] *Reliant Energy*, 420 F. Supp. 2d at 1045 (*quoting United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("[I]t is a cardinal principle of construction that … when there are two acts upon the same subject, the rule is to give effect to both" and "Congressional intent behind one federal statute should not be thwarted by the application of another federal statute if it is possible to give effect to both laws.")).

[76] EPAct 2005 §§ 316, 1281 (codified at 15 U.S.C. §§ 717t-2(c)(1) (2005) and 16 U.S.C. §824t(c)(1) (2005)).

Docket No. IN07-26-000                                        - 27 -

entered into the MOU[77] and pursuant to its provisions, as discussed more fully *infra*, the staffs of the two agencies have worked closely together for more than a year to coordinate discovery and the proceedings in this case.   In short, CFTC has jurisdiction over trading on its regulated exchanges, we have jurisdiction over certain types of natural gas and electric markets, and where these markets are interconnected, both agencies have jurisdiction to prohibit market manipulation.

49.      In Order No. 670, we interpreted the statutory phrase "any entity" (which is repeated in the Rule) to cover not just companies that have traditionally been subject to Commission jurisdiction (such as natural gas pipeline companies or public utilities), but also to include any company or firm, and natural persons as well[78] who, "intended to affect, or have acted recklessly to affect, a jurisdictional transaction."[79]   Thus, while the Commission is not authorized to regulate all commodities trading behavior by any person or company, the Anti-Manipulation Rule prohibits manipulation of the physical and financial natural gas markets by any entity if the manipulative trading, whether intentionally or recklessly, also affects Commission-jurisdictional transactions, such as physical basis transactions and transactions based off indices calculated using physical basis transactions that are not "first sales."

50.      With respect to the *scienter* requirement, in Order No. 670 we stated that for the Anti-Manipulation Rule to apply "the entity must have intended to affect, or have acted recklessly to affect, a jurisdictional transaction."[80]   With respect to the "in connection with" requirement, Rule 1c.1 applies where there is a "nexus" between the manipulative conduct and the jurisdictional transaction.[81]   Given that the application of these elements to any case will almost always be particularly fact-bound, we will discuss the contours of these elements in greater detail *infra*, in the context of the facts of this particular case.

---

[77] *See* Memorandum of Understanding Between the Federal Energy Regulatory Commission (FERC) and the Commodity Futures Trading Commission (CFTC) Regarding Information Sharing and Treatment of Proprietary Trading and Other Information, executed October 12, 2005.

[78] Order No. 670, FERC Stats. & Regs. ¶ 31,202 at P 2, 18.

[79] *Id.* at P 22.

[80] *Id.* (emphasis added).

[81] *See id.* at P 16.

51.     The direction in which the manipulative conduct moves the price is immaterial to its legality.  Courts routinely find that a downward manipulation violates section 10(b) of the Exchange Act and SEC Rule 10b-5.[82]  In such cases, the conduct is manipulative because it "creat[es] a false impression of supply and demand . . . "[83]  Courts have emphasized that defendants' "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact."[84]  Similarly, courts and the CFTC have condemned downward manipulations under the CEA.[85]  The downward manipulation that occurred in *Avista* is of particular relevance to the instant case.  There, the CFTC found that Avista Energy engaged in a manipulative scheme to drive down the settlement price of NYMEX electricity futures contracts to increase the value of its positions in over-the-counter (OTC) derivative contracts.[86]  The academic literature takes a similar view, making no distinction between the harms resulting from upward or downward manipulations.  These harms may include: deadweight losses due to distortions in consumption, production, storage, and transportation, as well as a reduction in hedging effectiveness, and a decline in market

---

[82] *See, e.g.*, *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474 (S.D.N.Y. 2002); *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006); *HealthExtras, Inc. v. SG Cowen Secs. Corp.*, 2004 U.S. Dist. LEXIS 698  (S.D.N.Y., Jan. 20, 2004), *United States v. Regan*, 937 F.2d 823 (2d Cir. 1991); *Nanopierce Tech. v. Southridge Capital Mgmt.*, *LLC*, 2002 U.S. Dist. LEXIS 24,049 (S.D.N.Y. Oct. 10, 2002) (*Nanopierce*); *SEC v. Parnes,* 2001 U.S. Dist. LEXIS 21722 (S.D.N.Y. Dec. 26, 2001).

[83] *Nanopierce*, 2002 U.S. Dist. LEXIS 24,049, at *30.

[84] *See, e.g., United States v. Charnay*, 537 F.2d 341, 351 (9th Cir. 1976).

[85] *See, e.g.*, *Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1984) (condemning under the Sherman Act and the Commodity Exchange Act a conspiracy by potato processors to artificially reduce the price of potato futures contracts); *In re Avista Energy, Inc.*, CFTC Docket No. 01-21, 2001 CFTC LEXIS 107 (Aug. 21, 2001) (*Avista*); *see also In re Anthony J. Diplacido*, Comm. Fut. L. Rep. (CCH) ¶ 29,866 (Sept. 14, 2004); *In re Taylor*, Comm. Fut. L. Rep. (CCH) ¶ 29,594 (Sept. 30, 2003).

[86] *Avista*, 2001 CFTC LEXIS 107, at *5-*6.

liquidity.[87]  In sum, whenever manipulation results in markets that function other than on the basics of supply and demand, harm to the market participants results.

## B.    Staff's Investigation

52.    Staff of the Office of Enforcement's Division of Energy Market Oversight (DEMO) includes advisors and analysts who have prior experience in the relevant markets, including actual open outcry trading in futures contract pits, as well as transactions in the wholesale physical natural gas markets.  DEMO has routinely reviewed NG Futures Contract settlement prices in recent years.  During trading for the last half hour of the May 2006 NG Futures Contract on April 26, 2006, DEMO staff observed in real time the sharp rise in price followed by the sharp decline during the last half-hour of trading, which resulted in a 10-cent increase in the settlement price for the May NG Futures Contract compared to where the contract had traded for most the day prior to termination.  DEMO then reviewed and conducted a comprehensive comparative analysis of data on prior settlements going back several years.  DEMO advised the Commission of its observations and referred the matter to staff of the Office of Enforcement's Division of Investigations (Investigations).

53.    On May 2, 2006, Investigations requested from the CFTC, under the Commission's MOU with the CFTC (adopted pursuant to the requirements of EPAct 2005[88]), data necessary to identify the entities with the largest positions and trading volume in the May NG Futures Contract.  The data showed that Amaranth was, by far, the largest seller in that termination.  Subsequently, staff sought a broader data set and, after further analysis, on June 30, 2006, under the authority delegated to the Director of Enforcement or her designee,[89] the Director of Investigations initiated a non-public, preliminary investigation under Part 1b of the Commission's regulations into suspicious trading in NG Futures Contracts during settlement periods.  Staff obtained further data from the NYMEX and the Amaranth Entities were identified as having engaged in seemingly suspicious trading in several contract months in early 2006.  Over the ensuing months, Investigations obtained from the Respondents (as well as others) trade and position data, memoranda, reports, e-mails, IMs, and tape recorded telephone

---

[87] Stephen Craig Pirrong, *Manipulation of Cash-Settled Futures Contracts*, 74 J. BUS. 221 (2001).

[88] EPAct 2005 § 316 (2005) (codified at 15 U.S.C. 717t-2(c)(1)).

[89] 18 C.F.R. § 375.314 (2006).

conversations, as well as the sworn testimony of over fifteen witnesses including all of the identified principals of the Amaranth Entities and each of the individual Respondents.

54.     Staff also retained the services of an outside consulting expert Dr. Wincenti (Vince) Kaminski who conducted econometric analyses and a general review of the record which provided an independent review of staff's analysis and, ultimately, gave him a strong basis to conclude that manipulation occurred (see further discussion *infra*).[90] Based on his academic credentials and professional experience, Dr. Kaminski is a useful and credible source for an opinion on these matters.  Dr. Kaminski worked with staff in the following areas: (1) general characterization of the relevant markets; (2) independent (blind) validation of staff's screening for and selection of investigation targets based on trading behavior; (3) review and characterization of the complete Amaranth portfolio, as to possible motives, conduct, intent and benefit from the suspect trading activity; (4) review of the evidence and testimony gathered, and (5) understanding the dynamics of trading in the NYMEX pit during the settlement period and how the behavior of one or a small group of traders can influence the rest of the market.  He also conducted market share, concentration, multiple regression, and other econometric analyses in order to assess Amaranth's ability to impact, and estimate its actual impact on, the settlement price.

55.     Staff's investigation was heavily coordinated with an investigation opened subsequently by the CFTC, the exclusive direct regulator of the NYMEX.  As contemplated by the MOU, the staffs of the two agencies regularly coordinated their discovery efforts including participating jointly in depositions, sharing documentary evidence and conferring jointly with both inside and outside experts.  Staff also coordinated with the Securities and Exchange Commission and other government agencies who have examined various regulatory aspects of Amaranth's activities. Coordination of this sort of case is, we believe, what Congress intended given the increasing interrelationship between the physical and financial energy markets.  CFTC has exclusive jurisdiction over the operation of exchanges such as NYMEX, we have

---

[90] Dr. Kaminski is a world renowned expert in the field of energy trading and applied mathematics and economics.  His more recent publications include ENERGY MODELING: ADVANCES IN THE MANAGEMENT OF UNCERTAINTY (2005) and MANAGING ENERGY PRICE RISK: THE NEW CHALLENGES AND SOLUTIONS (2004).  He is currently on the faculty of the business school at Rice University.  Prior to that, he spent a career in various energy trading operations leading sophisticated quantitative analysis teams, and he recently was consulted by a Congressional committee as to the functioning of the natural gas markets and testified before the Senate Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations on June 25, 2007.

Docket No. IN07-26-000                                    - 31 -

exclusive jurisdiction over the physical wholesale gas markets described above, and both
agencies have jurisdiction where, as here, the manipulations are connected to both
markets.

56.    Each of the Respondents, prior to the issuance of this Order, was notified of
Staff's conclusions that form the basis for this Order and were given multiple
opportunities to address those conclusions, in writing and otherwise.

### C.    Amaranth's Manipulation of the March, April, and May 2006 NG Futures Contracts on February 24, March 29, and April 26, 2006

57.    We preliminarily find that Amaranth's head natural gas trader, Hunter, along with
his execution trader, Donohoe, manipulated the settlement price of the NG Futures
Contract for the March 2006, April 2006, and May 2006 contracts, by holding the
Amaranth Entities' NG Futures Contract positions open until the beginning of the
settlement periods on February 24, March 29, and April 26, 2006, then liquidating the
positions by selling during the settlement period.  The traders sought to influence the
settlement price in order to benefit their positions in financially-settled swaps and
options.

58.    Before embarking on the discussion of Amaranth's trading, it is important to
emphasize that the Commission does not consider high volume trading during the
settlement period alone to be illegal or manipulative.  Nor is it illegal to possess a large
share of trading activity, to engage in speculation, or to wrongly predict the direction of
markets.  However, where a firm uses some combination of market power and trading
activity, against economic interest in one sector, in order to benefit its position in a
related financial instrument by artificially moving the price, the firm likely crosses the
line into the realm of manipulation.  Our preliminary conclusion here is based on all of
the facts and circumstances of the case, including, as discussed more fully below: the fact
that Amaranth traded in a manner that had the effect of driving down the NG Futures
Contract settlement price; its aggregate natural gas position in the prompt month and
prompt next; the manner and timing of the building of these positions in the days leading
up to the settlement periods; and, contemporaneous documents in which Hunter and
Donohoe outlined their plan to trade in the settlement period and the strong
circumstantial evidence as to motive and intent that can be drawn from the sequence,
pinpoint timing, and language of these documents.[91]

---

[91] *See* Order No. 670, FERC Stats. & Regs. ¶ 31,202 at P 50 ("Fraud is a question
of fact that is to be determined by all the circumstances of a case."); *Herman & MacLean
v. Huddleston*, 459 U.S. 375, 391 n.30 (1983) ("The Court of Appeals also noted that the
(continued)

Docket No. IN07-26-000                                                    - 32 -

59.    Nevertheless, high-volume trading during the settlement period is one factor (among many) that lead us to conclude that Amaranth had a manipulative intent for trading during the settlement periods identified above.  Most traders normally try to avoid trading in large volumes during this period due to a number of risks.  First, liquidity (*i.e.*, the amount of "open interest") is diminishing rapidly as most traders close out their positions well in advance of the termination day, and in particular the final thirty minutes.  There are only a limited number of futures market participants that are also active in the physical markets and thus have the ability to make or take physical delivery.  For a purely financial player (such as Amaranth), the risks of failing to close out the position are thus magnified, when compared with those faced by physical players.

60.    Moreover, errors in monitoring the position in the prompt-month NG Futures Contract can result in unwanted physical delivery obligations, so traders want to be "out" well before the close to allow time for confirmation and reconciliation of trade capture systems so that any errors can be corrected if necessary before the close of trading.[92]  The spread between bids and offers (*i.e.*, difference between the price sellers are asking for and the price that buyers are willing to pay at a given moment) as well as the spreads (*i.e.*, difference) between the prompt-month NG Futures Contract and a later-month NG Futures Contract or related instruments such as swaps or an "exchange of futures for

---

proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence.  If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof.  In any event, we have noted elsewhere that circumstantial evidence can be more than sufficient."); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 463 & n. 24 (1976) (stating that a showing of market manipulation "may be by circumstantial as well as direct evidence, and the purchases themselves may be considered").

[92] In fact, in the Autumn of 2005 Amaranth made a significant error of this sort, which obligated it to take delivery of 100 to 200 contracts.  After this costly error, Amaranth required all traders to transfer their position in the prompt-month NG Futures Contract to a single trader (Donohoe) during the days immediately preceding the settlement day, and Donohoe was responsible for exiting these positions.  Hunter Dep. 51:15-52:10 (June 15, 2007); Donohoe Dep. 44:17-47:13 (Mar. 14, 2007 morning session); Arora Dep. 29:19-30:24 (Nov. 14, 2006 afternoon session); Carrieri Dep. 31:9-32:7 (May 15, 2007).  As will be discussed below, this concentration of the prompt-month NG Futures Contract position in the hands of one trader on the termination day facilitated the manipulation.

Docket No. IN07-26-000                                                          - 33 -

swaps" (EFS) can be substantial and highly volatile during the settlement period.  As
Arora testified:

> [A]s you get closer expect more volatility and liquidity is usually more
> difficult.  Or things get more volatile and the liquidity profiles change.  You
> have lesser time. . . . As I mentioned to you, that is taking your contract too
> -- taking your position  . . . which you do not intend to take or make
> delivery too close out there and be exposed to the last minute changes to
> spreads.[93]

61.      Concentrated buying or selling in the settlement period could move prices up or
down, respectively, either as a result of:  (i) the sheer volume of contracts traded,
conferring a transitory, but nevertheless meaningful "market power;" (ii) unilateral
manipulative floor trading practices (*e.g.*, instructing or positioning the floor broker to
signal to other floor brokers the plan so as to boost the market-moving effect); or (iii)
explicit or tacit collusion (*e.g.*, with other traders who recognize the manipulator's intent
and want to help him move the market with tag-along benefits to their own positions).  In
any case, for such a strategy to have a significant impact on the settlement price, which is
a volume-weighted average, a would-be manipulator would have to account for, or
propagate, a significant portion of the trading volume during some portion of the
settlement period and the market would have to be fairly concentrated for some portion of
the settlement period.

62.      If trading in the NG Futures Contract were considered in isolation, the above
manipulative strategy would typically be self-defeating.  Concentrated selling of the NG
Futures Contract to liquidate a long position (or buying to liquidate a short position)
would normally reduce the value received, so that the overall payoff would always be
less than that from a non-manipulative, price-taking strategy.  However, such a strategy
could be profitable to a trader who has set up its portfolio with *opposing* swap or physical
positions that are much greater in scale (highly leveraged) than the NG Futures Contract
position so as to benefit from these otherwise adverse movements in the NG Futures
Contract.  We preliminarily find that this is the calculation and strategy the Respondents
employed.

---

[93] Arora Dep. 44:16-19, 45:21-24 (Nov. 14, 2006 afternoon session); *see also* Lee
Dep. 57:23-58:12 (Mar. 21, 2007 morning session) (discussing heightened volatility and
other dangers of trading during close); Bolling Dep. 76:4-24 (June 29, 2007) (same).

Docket No. IN07-26-000                                                    - 34 -

## 1.    Trading on February 24, 2006: *"Bit of An Experiment Mainly"*

63.    The evidence of Amaranth's manipulation is clearest with respect to its trading on February 24, 2006, relating to the settlement of the March 2006 NG Futures Contract. Notably, this was the first time that the firm traded more than a few hundred contracts in any settlement day and the first time it traded a large number of contracts in the 30-minute settlement period.  At roughly 10:00 a.m. on that day, Amaranth's Greenwich headquarters advised Hunter and Donohoe in an e-mail that they were short (1,729) futures contracts and to make sure that Amaranth is "flat by the end of the day today."[94] In other words, Greenwich gave the unremarkable reminder to Calgary that the position should go to zero so as to avoid taking delivery.  But Hunter and Donohoe had plans to do much more before going "flat by the end of the day."

### a.    The Instant Messages

64.    In this case, our inquiry is aided by the fact that Hunter and Donohoe were physically separated by half a continent in February 2006.  Hunter was in Calgary, and Donohoe was in Greenwich.  They chose to use instant messaging technology to communicate and effectuate their trading.  Buried in the millions of bytes of instant message texts uncovered by staff are the clear signals of their manipulative scheme.  In particular, in a series of instant messages from a 24-hour period in late February 2006 with other Amaranth traders (such as Donohoe and Calhoun) and traders at other firms (such as one Bart Glover of National Trading LLC with the IM handle "gloverb"), Hunter laid out his plan to manipulate the settlement price for the March NG Futures Contract by selling over 3,000 contracts "MoC" (market on close).  "Market on Close" means to sell during the settlement period, or as one definition puts it "[a]n order to buy or sell at the end of the trading session at a price within the closing range of prices."[95]

65.    The first hints of this strategy are contained in two instant message conversations between Hunter and Donohoe on February 23, the day before the termination day.  First,

---

[94] AALLC_REG0672597 (February 24, 2006 E-mail from Michael Malach to Hunter and Donohoe, among others).

[95] CFTC Glossary, http://www.cftc.gov/opa/glossary/opaglossary_m.htm; *see also* definition used by Man Financial, one of the leading brokers at NYMEX, http://www.mandirect.com/Trading-Tools/order_entry.cfm (stating that a "Market on Close" order is "an instruction to fill the order, at market, but only in the closing range").

Docket No. IN07-26-000                                                           - 35 -

at 2:58 p.m., Hunter tells Donohoe "ok – end of day tomorrow still stands."[96]  The
meaning of this cryptic comment is apparently clarified at 3:39 p.m., when Hunter
instructs Donohoe to "make sure we have lots of futures to sell MoC tomorrow."[97]
Hunter thus instructed Donohoe to buy a large number of March NG Futures Contracts
before the close the next day so that Amaranth would have "lots" of NG Futures
Contracts to sell MoC, that is, during the close.  At the time Hunter made the statement,
Amaranth had a short position of (1,729) March NG Futures Contracts.[98]  Therefore,
Amaranth would have had to buy only 1,729 March NG Futures Contracts if its objective
was merely to go "flat by the end of the day today."  But, if it wanted to have "lots" of
futures *to sell MoC*, it would have to buy *additional* contracts to build a long position.
That is what it did.  In fact, Amaranth bought in excess of 4,800 March NG Futures
Contracts the next day, taking its position from short, past "flat" and then to long
sometime around noon.

66.     In a series of instant message exchanges during the mid-day of February 24,
Donohoe gave Hunter periodic updates on his position in the March NG Futures
Contract, and Hunter provided further detailed instructions on the implementation of their
strategy.  For example, in an instant message conversation beginning at 11:02 a.m. EST,
Donohoe informed Hunter that he had already liquidated the short position of (1,729)
March NG Futures Contracts and was by that point up to a long position of 2,111.
Hunter then instructed Donohoe to further build his position to be long at least 3,000
contracts.[99]  By 12:22 p.m., Donohoe had already achieved this goal, reaching a position

---

    [96] AALLC_REG0684033.  Given that the Hunter and Donohoe were in Calgary
and Greenwich, respectively, and that this is the first mention of trading for the "end of
the day tomorrow" in the instant messages, it appears that Hunter first laid out his
strategy to Donohoe in a previous telephone conversation.  Amaranth claims that it did
not record any of its telephone lines, so we do not have any record of any telephone
conversations laying out their plan.

    [97]  AALLC_REG0684056 (February 23, 2006 Instant Message between Hunter
and Donohoe).

    [98]  AMARANTH_REG091722_pos0223.xls (Amaranth end of day position report
for February 23, 2006); AALLC_REG0672597 (February 24, 2006 E-mail from Michael
Malach to Hunter and Donohoe, among others).

    [99] AALLC_REG0704803.

    Donohoe: 11:02:52  i'm long 2111 fut
    Hunter:    11:03:20  already?

                                                                          (continued)

Docket No. IN07-26-000                                                      - 36 -

of long "3111 fut," *i.e.*, March NG Futures Contracts.  Donohoe then asked whether he should get more but Hunter told Donohoe that "that should be enough."[100]  Donohoe agreed not to trade any more March NG Futures Contracts until the settlement period, so that he could carry out Hunter's previous instruction that all of these contracts were to be sold in the close.[101]

67.     In the meantime, Hunter let Donohoe know he was "telling vinnie."[102]  This is a reference to Hunter contacting Amaranth's primary NYMEX floor brokerage firm, ALX Energy, Inc. (ALX), and specifically Vincent Rufa, one of ALX's phone clerks.[103]  Under all the circumstances, a fair inference is that Hunter called Rufa in order to advise him of Amaranth's intentions so that when it came time to execute the trades, the broker would have considered, in advance, how to execute the order so as to maximize the intended effect.[104]  We note that because Rufa had a strong professional and personal relationship

---

Donohoe: 11:03:43  vitol sold 2000
Hunter:    11:04:12  maybe get to 3000
Donohoe: 11:04:17  I can easily get 2000 or mor

[100] AALLC_REG0684197.

[101] *Id.*

Donohoe: 12:22:03 3111 fut
Hunter:    12:26:17  that should be enough
Hunter:    12:26:23  getting them easy?
Donohoe: 12:26:35  yeah … last 1500 on h/j roll
Donohoe: 12:26:42  vitol gave me 2000
Hunter :   12:32:20  telling Vinnie
Donohoe: 12:32:52  ok no more futures will be traded

[102] *Id.*

[103] Rufa also traded for his own account and acted as a broker during the relevant time period.  Rufa Dep. 19:19-23, 21:23-22:4 (Mar. 7, 2007).

[104] This inference is further justified by Rufa's testimony indicating that he owed a certain loyalty to Amaranth – that he communicated conditions in the pit directly to either Hunter or Donohoe, and that he did so all day long.  Rufa Dep. 28:10-29:14, 51:2-12 (Mar. 7, 2007).  Said Rufa, "I would make sure the clients got information I thought they needed."  Rufa Dep. 22:5-7.  Rufa has also passed on critical market intelligence to market participants in the past, such as the identity of a buyer or seller.  Hunter Dep. at 169:3-21 (June 15, 2007).

with Amaranth and its traders, and because of subsequent events, as discussed more fully
*infra*, it is reasonable to conclude that Amaranth armed Rufa with the knowledge that
Amaranth intended to drive down prices in the close.[105]

68.    It appears that ALX's resulting selling activity, in one manner or another,
disseminated to the pit that Amaranth would be a large seller.  During the settlement
period, an ALX floor broker, James DeLucia, known in the pit as Jim X, traded on
Amaranth's behalf.  Another trader, Eric T.Bolling stood only five feet away from
DeLucia in the pit.[106]  Of the trades that DeLucia executed on behalf of Amaranth during
the close, approximately 26 percent went to Bolling, more than any other trader
transacted with Amaranth.[107]   Bolling was thus an eyewitness to the Amaranth selling
and recalled in vivid detail the events of that settlement.  He testified that the March
contract close on February 24 involved a "dramatic sell off . . . [that was] probably more
emphatic [than a typical close because of] the speed at which it dropped, 50 cents."[108]

69.    Bolling was able to trade profitably in rapid fire fashion because of what Bolling
called "massive"[109] selling by DeLucia, suggesting that, at the very least, DeLucia did not
achieve best execution.  Bolling testified that it was clear to him that DeLucia had a lot of
size to move, and he was more concerned with executing trades than with obtaining good
prices.  Bolling further testified that the pit, himself included, knew that Amaranth traded
through ALX.[110]   Armed with the right information a floor broker can use pit behavior,
some of which is virtually undetectable, to reveal – even unwittingly – to other floor
brokers how he intends to trade.[111]   Traders watch the pit to see how it is reacting and
moving; as Bolling testified, "That is the way a pit trader should trade  . . . . You look for

---

[105] Amaranth was ALX's largest customer, and Rufa traveled to Calgary and
socialized with Amaranth employees on multiple occasions.  Rufa Dep. 42:23-47:2,
48:23-49:3 (Mar. 7, 2007).

[106] DeLucia Dep. 96:4-97:11 (May 17, 2007).

[107] NYMEX_00003 (NYMEX NG Futures Contract trade data).

[108] Bolling Dep. 168:3-5, 169:13-16 (June 29, 2007).

[109] *Id.* at 212:12-17.

[110] *Id.* at 54:22-23.

[111] There are many ways a broker can communicate whether he is a big buyer or
seller.  For example, a floor trader can make trades with an apparent indifference to price.

volume, you look for flow, you want to see activity, you want to see traders or orders that have big volume or they are aggressive"[112] and "you have to adjust your trading according to the direction of the market, the direction of the order flow"[113] and "[t]hat is part of the nuance of being a pit trader is to be able to read people, read where they are, not just order brokers, but locals, too."[114]  Moreover, a single trader can move the market by "continually adding to the trade.  In other words, when you get filled, do it again, do it again, do it again, and there are orders like that.  There are people who just come back and come back and come back."[115]  As discussed more fully *infra*, Bolling confirmed this is what Amaranth's broker did and that the selling indeed moved the market.

70.    Additional evidence of *Amaranth's* intent, further paints the picture of a plan to drive down the settlement price.   As the Amaranth traders waited for the settlement, Hunter traded messages with Matthew Calhoun, another Amaranth natural gas trader, in which Hunter boasts he "just need[s] ***H to get smashed on settle*** … then day is done."[116]  The letter "H" is the market nomenclature for the March NG Futures Contract.  In another message at 1:31 p.m., Hunter outlined his plans to Glover:

> Hunter: We have 4000 to sell MoC  . . . ***shhhh***
> Glover: unless you are huge bearish . . . why the f would yo [sic] do that
> Hunter:  ***bit of an expirment [sic] mainly***
> Glover: what the f . .. ***that is huge***[117]

71.    Donohoe carried out Hunter's instructions by placing a series of six orders to ALX from 2:00 p.m. to 2:28 p.m., in which he directs ALX to sell a total of 3,111 NG Futures Contracts.[118]  Technically, Donohoe did not place an "MoC" order, but instead placed a

---

[112] Bolling Dep. 48:16-25 (June 29, 2007).

[113] *Id.* at 80:7-9.

[114] *Id.* at 90:20-22.

[115] *Id.* at 128:11-14.

[116] AALLC_REG0684186 (emphasis added).

[117] AALLC_REG0684227 (emphasis added).  In an earlier instant message, Hunter tells gloverb at 11:13 a.m. that "its us and john [Arnold of rival trading house Centaurus]… we are long …futures … for MoC … decent size."  AALLC_REG0684152.

[118] ALX006-011.  Each of the first five was for 500 March NG Futures Contracts, with the last at 2:28 p.m. for 611 March NG Futures Contracts.

series of "Market Orders" in the close.[119]  An MoC order would have directed the broker
to sell the contract in the closing range but would have left the timing of the sales to the
discretion of the broker in order to get the best price, so long as the sales occurred in the
closing range.  A "market order" is an order to buy or sell a futures contract immediately
at whatever price is obtainable at the time it is entered in the pit.[120]  On all the floor
trading tickets created in the pit by ALX when Amaranth phoned in its orders, the price
column is left blank, indicating that Hunter was indifferent to the price received for these
contracts, as long as they sold.[121]  Importantly, the first trade tickets, time stamped at
1:59 p.m., indicate an order to sell 500 contracts, which represents by far the largest sell
in the opening minutes of the close.  And, the notes on the ticket pertaining to executions
in the pit known as "fills" show relatively higher priced transactions occurring rapidly in
small lot sizes accompanied by the rapid drop in prevailing prices as seen in Figure 2
above.  Once the prevailing market price dropped from around \$7.40 at 2:00 p.m. to
about \$7.10 sometime around 2:08 p.m., Amaranth fills show rapid and larger size fills at
the lower prices.  This activity strongly supports the profile of a large seller signaling to
the pit the intention to be a large seller and inducing buyers to hold off on aggressive
bidding, waiting instead for progressively lower offers (and thus lower prices for their
buys).

72.    Bolling specifically recalled,

> Jim X [ALX's DeLucia] was a big seller in March [the March contract] . . .
> . I mean, just hitting any substantial bid that was there, hitting a bid, if you
> showed him a bid he would hit it.  He clearly had a lot of contracts to sell . .
> . . he is hitting me every time I open my mouth, and I am the biggest local
> in the ring.[122]

Nor was Bolling the only trader reacting to ALX:

> A: [A]ll eyes were on Jim X because he had a lot to sell.  He had a lot of
> contracts to sell, and if you put a big bid up he would hit it.

---

[119] *Id.*

[120] CFTC Glossary, http://www.cftc.gov/opa/glossary/opaglossary_m.htm.

[121] ALX006-011.

[122] Bolling Dep. 172:18-22, 175:22-23 (June 29, 2007).

Docket No. IN07-26-000                                                                - 40 -

Q: Aside from you, who else was watching Jim X?

A:  I think the whole pit was . . . . [H]e was willing to hit any bid that was  . . . any size bid in the ring, boom, sold, boom."[123]

* * *

Q  . . . . Did it seem to you that he was more interested in price or volume?

A: Volume.[124]

* * *

A: Remember, it is a close and most of the smaller market makers are going to back off because they don't want to get hit by a freight train . . . .

Q: You would describe Jim X's selling as a freight train?

A: On a close, on a very active close in March, with March-April being such an active spread, I would say that if he kept hitting 100's that would be a freight train, yes.

Q: Did he keep hitting 100's?

A: He hit me on it a bunch of times.[125]

* * *

He was a massive seller.[126]

---

[123] *Id.* at 178:18-179:6.

[124] *Id.* at 180:25-181:2.

[125] *Id.* at 209:19-210:6.

[126] *Id.* at 212:17.

Docket No. IN07-26-000                                                - 41 -

73.    In response to Amaranth's "freight train" of a broker, the pit reacted to move the market lower.  Bolling further testified:

> Q:  And in the first instance you would expect that the price would go lower if he were truly bailing?
>
> A: Yes.
>
> Q: And would everyone else who is prepared to feed on the bad –
>
> A: Now you are barking up the right tree.
>
> . . .
>
> Q: -- prepared to feed on the fallen corpse, would they run ahead of this to help the market go lower?
>
> A: Absolutely.[127]
>
> *   *   *
>
> A: If all of a sudden he is selling a big piece of March on the close, for me as a trader, the flag goes up and says, hey, maybe this is the beginning of him saying, no mas, and he is throwing the position in, at which point all of his upstairs buddies, who are either on the other side of the trade or looking to make a buck off it, guarantee started selling.  I mean that is what happened.[128]

74.    Bolling was a prominent force in the pit that other traders followed or watched for direction.[129]  By arming Bolling and other significant locals with knowledge and the opportunity to trade Amaranth contracts virtually risk free, DeLucia further magnified the effect of Amaranth's trading activity.  Such a signal would have allowed the other floor brokers to position themselves to respond to the selling broker in such a way that could

---

[127] *Id.* at 193:1-11.

[128] *Id.* at 193:24-194:5.

[129] DeLucia Dep. 77:13-78:13 (May 17, 2007); Bolling Dep. 90:23-91:4 (June 29, 2007).

Docket No. IN07-26-000                                                          - 42 -

have benefited them (for their own or client accounts) as well as maximize the intended
market effect of the selling broker's trades.

75.    As the settlement period progressed, at 2:15 p.m. Hunter and Donohoe began
engaging in a bit of celebratory instant messaging:

>    Hunter:   today came together quite nicely . . . We'll hit the rest near the end of
>    this

Around 2:30 p.m., as the settlement period ended:

>    Donohoe: h [March NG Futures Contract] will settle lower . . . and h/j [March
>    April spread] wider . . .nice  . . .
>    Hunter:  I am flexing here
>    Donohoe:  looking preety bang on . . . . lol  . . . rrrrrrrrrrrrrrrrrrr
>    Hunter:   hahahahaha
>    Donohoe:  2nd best … sept/oct last year still the best[130]

This last reference indicates Donohoe's expectation that the day would be their second
best ever – the best still being the hurricane-related trading from the fall of 2005.  Unlike
in Autumn 2005, however, there were no major disruptions to the supply and demand
sides of the physical gas markets – as occurred in the wake of Hurricanes Katrina and
Rita – that would explain the trading profits that Amaranth earned on February 24.

### b.  Trade and Position Data

76.    Forensic evaluation of Amaranth's trade data confirms the intentions and conduct
suggested by the IMs.  Amaranth entered the day with a short position of (1,729) March
NG Futures Contracts.[131]  Amaranth bought between 4,800 and 4,900 contracts prior to
the close on February 24.  Amaranth began selling at roughly 2:00 p.m., which is the
beginning of the settlement period, and sold 3,111 contracts in the settlement period.
Amaranth was the largest seller in the close and its selling represented at times between
forty and fifty percent of all sales in the opening minutes of the close.  The following
Figure 6 shows the trades throughout the day, with the blue bars representing buys (to a

---

[130] AALLC_REG0704932.

[131] AMARANTH_REG091722_pos0223.xls (Amaranth end of day position report
for February 23, 2006); AALLC_REG0672597 (February 24, 2006 E-mail from Michael
Malach to Hunter and Donohoe, among others).

Docket No. IN07-26-000                                      - 43 -

long position) and the red bars representing sales in each minute (all of which occurred in the settlement period).  The second graph in Figure 7 illustrates Amaranth's net positions. The reversal of position before the settlement, the size of the long position, and the timing of the liquidation by sales immediately after the start of the settlement period, all evidence an intent to take the position substantially long before going flat in the settlement period.

**Figure 6: February 24ᵗʰ Amaranth Trading Before and in the Close For the March 2006 Contract**[132]



---

[132] NYMEX_00003  (NYMEX NG Futures Contract trade data).

Docket No. IN07-26-000                                          - 44 -

**Figure 7:  Amaranth March 2006 Termination Day February 24, 2006:
Intraday NYMEX Natural Gas Position**[133]



77.    Amaranth had ample motive to drive down the NG Futures settlement price.
Amaranth's position in the derivative March swaps was short (13,167.5) futures contract
equivalents.[134]  The value of this position increased proportionate to the decline in the
March NG Futures Contract settlement price.  In addition, Amaranth maintained short
positions in the "prompt-next" or April NG Futures Contract.  The prompt-next month

---

**133** NYMEX_00003 (NYMEX NG Futures Contract trade data).

**134** In reference to financially-settled swaps, the terms "contracts" and "futures
contract equivalents" will be used interchangeably here, and refer to the size of the NG
Futures Contract, which is 10,000 MMBtus/month.  However, the various types of
natural gas swap contracts (*e.g.*, Clearport or NN Contract, ICE swaps, bilateral swaps,
*etc*.) vary in size, so the positions in these various instruments have all been converted
into "futures contract equivalents."

NG Futures Contract trades in the same pit, at the same time, as the prompt-month (expiring) contract.  Because the two contracts are similar as to their fundamentals, the trading in the prompt-month contract tends to affect the trading in the prompt-next NG Futures Contract as well.  So, manipulation of the prompt-month NG Futures Contract sales has an effect on the sales of the prompt-next contract.  At the end of the settlement day, the prompt-next NG Futures Contract is also assigned a "settlement price," as are all NG Futures contracts for subsequent months and derivative contracts such as swaps and options.  Each settlement price is based on only the last two minutes of sales, and is not a final settlement price, because those NG Futures Contracts have not yet terminated.[135] These settlement prices establish the relative value of each contract versus the prompt month contract, and are the basis for determining marked-to-market values for these instruments.

78.     Accordingly, if the artificial lowering of the prompt-month NG Futures Contract settlement price was effectuated significantly through sales in those final two minutes, or resulted in artificially lower prices in those last two minutes (because of the momentum of trading in the first twenty-eight minutes), the settlement price of the prompt-next month would also be artificially lowered.  Consequently, any short position in the prompt-next contract would also be benefited.  On February 24, Amaranth held a short position of (16,613.25) contracts in the prompt-next month, *i.e.*, the April NG Futures Contracts and swaps.  Thus, trading on February 24 benefited Amaranth's positions in its net short position (*i.e.*, including both the NG Futures Contract and swaps) in both the March and April contract months.

79.     Dr. Kaminski concludes that Amaranth manipulated the market for the March contract (and in the other months addressed in this order).   In addition to reviewing the overall record, from an econometric perspective, he demonstrated a very high degree of correlation between large trader transactions in the settlement period and price movements.  For example, he evaluated share and concentration using standard techniques such as the Herfindahl-Hirschman Index (HHI) along with price trends in order to correlate concentration with price effects.  He showed that relatively higher HHIs on the buy side of the market correlate very strongly (*i.e.*, have a high r-squared) to a statistically significant degree with upward movement in prices and a similarly high correlation between relatively higher levels of concentration HHIs on the sell side and

---

[135] On days other than a settlement day, every NG Futures Contract, including the prompt-month contract, is assigned a two-minute settlement price at the end of the trading day.

downward movement in prices.[136]  In other words, large traders have a statistically significant ability to artificially move the market price during the settlement period.  In addition, he analyzed the degree of persistence of effect on the market Amaranth's large selling in real time during and over the course of the thirty minutes settlement period using, for example, auto-regressive integrated moving average techniques in order to assess the degree of impact on the resulting settlement price.[137]

80.    Amaranth profited by roughly $27,300,000 (at least) from its manipulation of the March NG Futures Contract settlement price.[138]  This figure is necessarily an estimate. Given the complexity of the market involved, the importance of the psychology of the trading pit, which is not susceptible to precise modeling, and limits to the precision of the available data (as to time stamps, for example) it is impossible to determine precisely what the settlement price would have been absent Amaranth's manipulative selling.  Nor is there one single method for estimating such impact.  But reasonable estimates are derivable. Dr. Kaminski has evaluated several methods for estimating the price impact of Amaranth's trading, including varying degrees of conservatism.  We require nothing more for our determination of such matters as market impact and disgorgement, once wrongdoing is determined.

81.    Amaranth's net short position in the March NG Futures Contract and March swaps of (10,056.5) contracts would have benefited by slightly more than $1 million per penny decrease in the settlement price of the March NG Futures Contract.  Prior to the beginning of the settlement period on February 24, the NG Futures Contract had been

---

[136] Here the typical relationships between HHIs and prices are reversed because of the need for most parties to exit in order to avoid the delivery obligation.  Normally concentration and share in a buyer side would raise concerns that the buyer would be able to command lower prices; here however the combined effect of the delivery risk and the fact that some participants can take delivery creates the proverbial "musical chairs" phenomenon.

[137] For reasons discussed more fully below, he advises that this technique is probably not appropriate for evaluation of the May contract due to the unique profile of Amaranth's selling in that settlement.

[138] Amaranth's profits from its manipulation are calculated based on its net position in the NG Futures Contract and swaps.  Therefore, any potential losses that Amaranth may have suffered on its NG Futures Contract are already accounted for, as they would be offset by the profits on an equal volume of swaps (*i.e.*, an equal number of futures contract equivalents of swaps).

trading at around $7.40, but the prices declined sharply during the settlement period and the March NG Futures Contract settled at $7.112.[139] Dr. Kaminski estimates that Amaranth's manipulation was directly responsible for a portion of that drop. The most conservative estimate is $.09, a mid-range is $.12 and the least conservative (but still reasonable) estimate is $.29. Thus, as to the March NG Futures Contract and March swaps, Amaranth's estimated gain from its manipulation is the product of the $1 million per penny change and between $.09 and $.29, for a realized gain of between $9,000,000 and $29,000,000.[140] In addition, Amaranth had a net short position of (16,613.25) April NG Futures Contract and swaps, which would have benefited by roughly $1.661 million per penny decrease in the April NG Futures Contract settlement price for the day. Amaranth's trading on February 24 caused the April NG Futures Contract to settle an estimated between $.11 and $.36 lower for the day, resulting in a marked-to-market gain between $18,300,000 and $60,000,000.

82.    According to Amaranth's contemporaneous records, the total one-day net trading profits for Hunter's group ("Calgary Energy") on February 24 were $45,350,447.[141]

---

[139] Our analysis is based on two sets of NYMEX data: (1) the complete set of trades recorded by the NYMEX on the settlement day; and (2) the set of trades that NYMEX used to calculate the settlement price. There are some differences between these sets based on NYMEX administrative practices. For example, some trades whose time-stamps in the first data set indicate that they occurred during the settlement period (i.e., that are time-stamped from 2:00 p.m. to 2:30 p.m.) were not included in the settlement calculation because of various defects in the trades subsequently determined by NYMEX in arriving at the settlement price and reflected in the "Validation Codes" in the second set of data. Other trades appear to have been modified between the recording and inclusion in the settlement, in particular, where NYMEX corrected apparently erroneous time stamps. Finally, a few trades used to calculate the settlement price are not in the set of trades that occurred on the settlement day. These issues affect a small percentage of the total trades, and the settlement prices calculated using the two sets of data are nearly identical (i.e., within a fraction of a penny). The data differences do not change our fundamental analysis or conclusions.

[140] In addition to these amounts, Amaranth may have had marked-to-market gains for other contract months or in other prompt-month or later instruments such as basis swaps or options, which are not included here.

[141] AALLC_REG0692140-45 (Amaranth E-mail of February 27, 2006). According to this e-mail, Hunter's books had daily profits on February 24 of roughly $15 million each in his "SKEW2" and "WINTERVOLSPREAD2" strategies, which included large positions in the March NG Futures Contract and March swaps. Moreover, the cover
(continued)

Thus, these gains were offset in the daily Profit and Loss by losses elsewhere in this complicated book.[142]  However, the greatest gains show up in the portions of the book where the short March and April swap positions were held.  More generally, the gains on the day are more than three times the average daily gains the book had enjoyed up to that point, year-to-date.

83.    For a variety of reasons, it appears that a proportion of trades that are originally reported to have occurred in the settlement periods were routinely not actually used by NYMEX in calculating the settlement price.  Indeed a number of Amaranth's trades actually ended up not being included in NYMEX's calculation of the March contract settlement price, based on NYMEX's administrative practices pertaining to said calculation.[143]  This fact does not detract from our finding of manipulation primarily

---

e-mail to which this P&L statement was attached states that the Calgary Energy group gained on *the week* $198 million "on short Mar-Jul 06 positions as prices *decreased* by an average of $0.05," (emphasis added) though it is possible that this weekly amount includes gains from previous days.  Analysis of the raw data provided by Amaranth, which includes only trades related to natural gas, shows daily profits for February 24 of about $49 million, with about $17 million in the SKEW2 strategy and $10 million in the WINTERVOLSPREAD2 strategy (with the difference from overall P&L's likely attributable to non-gas related portions of these strategies).  AMARANTH_REG091722_pos0223.xls, AMARANTH_REG091723_pos0224.xls (Amaranth end of day position reports for February 23 and 24, 2006).

[142] For example, Amaranth's Profit and Loss (P&L) statement reflects the full effect of the drop in price during the settlement period, not just the portion of the volume-weighted average price that Amaranth's trades constituted, as well as profits and losses from trades that were unrelated to the manipulation.  However, the downward movement of subsequent contract months was generally beneficial to Amaranth's book because it had a net short position in the March 2006 through November 2006 NG Futures Contracts.  Moreover, the impact of changes in the prompt-month contract on other contract months generally decreases as the time to the contract's maturity increases.  For example, a decrease in the price March 2006 NG Futures Contract would result in a larger decrease in the price of the April 2006 NG Futures Contract than it would for the March 2007 NG Futures Contract.

[143] According to the data provided by the NYMEX, it appears that for the March 2006 NG Futures Contract termination, between 51 and 59 percent of Amaranth's trades time stamped between 2:00 p.m. and 2:30 p.m. are included in the settlement.  For the April 2006 contract termination, approximately 92 percent of Amaranth's trades time stamped between 2:00 p.m. and 2:30 p.m. are included in the settlement.  For the May

(continued)

Docket No. IN07-26-000                                                                     - 49 -

because the most trenchant effect on the settlement price is not from the inclusion of
Amaranth's progressively lower priced sales in the after-the-fact *calculation*, but instead
from the impact, *in real time*, of Amaranth's sales on the entire pit trading environment
as discussed above.  The simple point is that Amaranth went into the pit with its large and
obvious sales orders, with the intent to lower the settlement price, the entire pit reacted to
that dynamic resulting in overall lower priced trading.  Whether each of those Amaranth
trades was included in the settlement calculated some hours later does not detract from
the market-wide impact that occurred between 2:00 and 2:30 – and which created the
universe of trades from which the settlement was calculated.  Moreover, the exclusion of
some trades did not materially affect the final settlement price.  A calculation of a
volume-weighted average price using all trades occurring in the thirty minutes yields a
virtually identical price as the published price.

84.     Based on the evidence described above, and in the absence of any credible
alternative explanation or justification for this trading behavior, we preliminarily find that
Amaranth manipulated the settlement price of the March 2006 NG Futures Contract, in
violation of the Anti-Manipulation Rule.

### 2.        Trading on March 29, 2006: *A Second Try*

85.     After the success of the "experiment" in the February 24 trading for the March
Contract, Hunter and Donohoe apparently decided to repeat this strategy for the April
Contract on March 29.  As on February 24, Amaranth held a large long position in the
April NG Futures Contract prior to the settlement period, and proceeded to sell it "MoC"
during the close.  Amaranth's trade data, which are summarized in Figure 8 below, again
provide strong evidence that Donohoe and Hunter employed a nearly identical trading
strategy as that used for the previous month.

---

2006 contract termination, it appears that as much as 64 percent of Amaranth's trades
time stamped between 2:00 p.m. and 2:30 p.m. are included in the settlement.

Docket No. IN07-26-000                                              - 50 -

**Figure 8: Amaranth's Trading in the Settlement Period for the April 2006 Contract[144]**



86.   On March 29, Amaranth entered the day with a long position of 1,603 April NG Futures Contracts.[145]   In three separate orders, Amaranth directed ALX to sell 303 April

---

[144] NYMEX_00004 (NYMEX NG Futures Contract trade data).

[145] AMARANTH_REG091745_pos0328.xls (Amaranth end of day position report for March 28, 2006); AALLC_REG0672343 (E-mail at 10:10 a.m. on March 29 from Malach to Calgary Energy traders, among others, in which he request that they "[p]lease make sure that we are flat today with the below contracts, NGJ6.  We agree with JPMU with Long 1603.").  This is further confirmed by Donohoe's contemporaneous statements, *e.g.*, when he reported at 3:54 p.m. on March 29 to Malach, a compliance officer, that he had sold 1,603 futures that day to flatten his position. AALLC_REG0701583.

Docket No. IN07-26-000                                      - 51 -

NG Futures Contract prior to the close between 12:41 p.m. and 1:50 p.m.[146]  At 2:00 p.m. and 2:03 p.m. Amaranth placed further orders for ALX to sell 100 April NG Futures Contracts and 1,200 April NG Futures Contracts "MOC."[147]  Once again, Delucia/Jim X of ALX was the selling broker in the trading ring.

87.    During the week prior, Amaranth built its aggregate April swap position from being short roughly (9,500) futures contract equivalents at the end of the day on March 21 to short (17,884) futures contract equivalents at the end of the day on March 29.[148] Thus, although the amount of NG Futures Contract selling was *less* than the selling in the March contract, the amount of short swap contracts that stood to benefit from a lowered NG Futures Contract prices was *much greater*.

88.    Amaranth profited by roughly $11,200,000 (at least) from its manipulation of the April NG Futures Contract on March 29.  On March 29, the April NG Futures Contract was trading between about $7.26 and $7.32 in the half hour before and at $7.34 at 2:00 p.m., and then prices dropped right at the beginning of the settlement to about $7.15. From 2:00 p.m. to 2:30 p.m., the April NG Futures Contract traded in the range of $7.15 to $7.37 and settled at $7.233.  Using the same methods applied to trading in the March NG Futures Contract, Dr. Kaminski estimates that Amaranth's trading caused the settlement price of the April NG Futures Contract to decrease by somewhere between $.04 and $.09 from where it would have settled without Amaranth's trading.  Amaranth's April NG Futures Contract and April swap positions realized gains of $1.788 million per penny decrease in the settlement price of the April NG Futures Contract, for a total profit of between $7,200,000 and $16,000,000.  In addition, Amaranth had a net short position of (19,639.5) contracts in the May NG Futures Contract and swaps, whose value increased by about $1.964 million per penny decrease in the May NG Futures Contract settlement price for that day.  Amaranth's trading caused the May NG Futures Contract to settle lower by between $.02 and $.13 for a marked-to-market gain of between $4,000,000 and $25,500,000.

---

[146] ALX047-49.

[147] ALX045-46.

[148] AMARANTH_REG091740_pos0321.xls, AMARANTH_REG091746_pos0329.xls (Amaranth end of day position reports for March 21 and 29, 2006).  As before, Amaranth's other positions that may have benefited from a decline in the settlement price of the April NG Futures Contract are not included here.

89.    Once again, Amaranth's trading patterns and the evolution of its positions in the
April NG Futures Contract and April swaps evidence intent to artificially reduce the
settlement price of the April NG Futures Contract.  While Amaranth reversed its NG
futures position from short to long on March 23 it maintained a short swap position
through the end of the day on March 29 that significantly exceeded the long futures
position, which demonstrates that its true aggregate position was net short.  Amaranth
held on to the majority of its long NG Futures Contract position until the beginning of the
settlement, when it sold 1,300 contracts, including a single 1,200 contract MoC order.
The intent and effect of such trading was to drive down the settlement price.

90.    There are virtually no contemporaneous documents for this March 29 trading (as
compared to those relating to February 24).  In February, Hunter was trading alone in
Calgary and thus needed to work through Donohoe in Greenwich.  This created more of a
"virtual paper trail" than exists for March, by which point Hunter had Donohoe and most
of the rest of Hunter's team working in Calgary in a single trading room about the size of
a large conference room.  They were sitting right next to each other, and it is reasonable
to conclude that the instant messages between the two became largely unnecessary.[149]  In
addition, it is conceivable that the traders, by then perhaps more fully comprehending the
significance of their activities, determined that it might be prudent to stop any further
recording of their thoughts and intentions in real-time.

91.    Based on the evidence described above, and in the absence of any credible
alternative explanation or justification for this trading behavior, we preliminarily find that
Amaranth manipulated the settlement price of the April 2006 NG Futures Contract, in
violation of the Anti-Manipulation Rule.

---

[149] Hunter testified that he was on vacation in the Maldives during the settlement
for the April contract, had no involvement with this close and no idea why Donohoe
would have traded as described above.  Hunter Dep. 50:15-51:14 (June 15, 2007). We
have no reason to doubt that he was traveling.  However, we find the notion that he
neither was in contact with Donohoe nor had left instructions about the trading to be
highly dubious, given the events of the preceding month, the importance of closing out
the futures position to avoid delivery, and Donohoe's lack of authority to trade for a book
on his own.  Moreover, Hunter and Donohoe were in communication on March 29
regarding Hunter's book and other matters.  AALLC_REG0700464 (Mar. 29, 2006, 4:13
a.m. E-mail from Donohoe to Hunter with the subject line "Call me asap" and stating,
"Your book. Is fine.  Your attn is needed elsewhere immediAtely [sic] unfortunatly
[sic]."); *see also* AALLC_REG0680310 (chain of March 26, 2006 E-mails between
Donohoe and Hunter).

### 3.    Trading on April 26, 2006: *The "Last Eight Minutes"*

92.    On April 26, 2006, the settlement day for the May NG Futures Contract, Hunter and Donohoe tried for a third time their new strategy, which had been so successful during the previous two months, but this time with a refinement likely (as discussed more fully below) directed also at the "prompt-next" spread value.  As it turns out, Amaranth was not as successful in driving down the settlement price as before.  However, the trade and position data and a few documents which capture communications between Calgary traders and managers in Greenwich and one taped telephone call between Donohoe in Calgary and brokers on the NYMEX trading floor in New York, again strongly indicate the manipulative intent and conduct.

93.    Amaranth began April 26 with a long position of 3,044 May NG Futures Contracts.[150]  In instant messages between Hunter and David Chasman, an energy risk manager in Greenwich, which took place seven minutes into the start of the settlement period, Hunter explained that Hunter is still "waiting to sell" his May NG Futures Contracts.[151]

94.    In fact, Donohoe placed orders with three separate brokers (TFS, Gotham, and ALX) to sell these 3,044 contracts, in a highly orchestrated fashion starting at 2:22 p.m.  Order tickets and audio recordings show that he instructed two of the three to wait until the last eight minutes to sell, *i.e.*, to begin at 2:22 p.m.  The phrase "last 8 minutes" is written on the order tickets for Gotham and TFS,[152] while the order ticket for ALX – for 2000 May NG Futures Contract – is time stamped at 2:22 p.m.[153]  Also, a taped telephone line at Gotham captured Donohoe and brokers at Gotham, as follows:

> Barry:        Gotham, Dave
>
> Donohoe:   TJ

---

[150] AMARANTH_REG091765_pos0425.xls (Amaranth end of day position report for April 25, 2006); AMARANTH_REG_054788-90 (August 15, 2006 Letter from Amaranth to NYMEX regarding Amaranth's trading on April 26, 2006).

[151] A_CFTC032878 (Hunter at 2:02 p.m.); A_CFTC032910 (Calhoun at 2:07 p.m.).

[152] NX-USSEN-001548 (TFS ticket for 500 May NG Futures Contract MOC); NX-USSEN-001584 (Gotham ticket for 544 May NG Futures Contract).

[153] NX-USSEN-001350 (ALX order ticket for 2,000 May NG Futures Contract).

Docket No. IN07-26-000                                                      - 54 -

[ . . . pit noise in background . . . .]

T.J.:            Gotham T

Donohoe:         Hey

        [ . . .pit noise in background . . . ]

T.J.             Hey, Matty what's up?

Donohoe:         In the last eight minutes . . .

T.J.:            Yes?

Donohoe:         I need you to sell five hundred and forty four Mays

T.J.:            In the last eight minutes sell 544 Mays

Donohoe:         Yes

T.J.:            You got it, my friend[154]

95.    The time and volume of Amaranth's actual sales during the settlement period on
April 26 are illustrated below in Figure 9 below.

---

[154] *See* NX-CFTC-7 (CD) NICESC_WAVF7 (audio file).

**Figure 9: Amaranth's Trading in the Settlement Period for the May 2006 Contract[155]**



96.    As the evidence above shows, and Figure 9 demonstrates, Amaranth not only waited to sell in the settlement period, but waited to sell in the *final minutes* of the settlement period.  There is no legitimate explanation or business justification for this trading behavior.  While a savvy trader with only a prompt-month position including futures might legitimately wait until late in the settlement period in hopes of selling at a higher price, this is not the position that Amaranth held.  Amaranth's actual net position was short (aggregated swaps and futures), and this position was significantly larger than its stand-alone prompt-month long futures position.  Amaranth's net swap position's value would have been negatively impacted by a rising market that would have ostensibly benefited a stand-alone long position in futures.  It is possible that this "last 8 minutes" approach was calculated to maximize the downward effect on prices owing to vanishing liquidity towards the end of the settlement period.  The advantage to Amaranth would be that, given the increasingly "empty" pit in terms of remaining contract buyers, those

_____

[155] NYMEX_00001 (NYMEX NG Futures Contract trade data).

buyers would be able to purchase at even lower prices in order to allow the counterparty to "exit" before delivery, and new buyers would have an incentive to take contracts to delivery by buying at low and advantageous prices.[156]  This activity would lower the settlement price and increase the value of Amaranth's short swaps, which would liquidate with the termination of the futures contract.  A second advantage was the extraordinary effect on the "last two minutes" of trading that impacted the settlement of the prompt-next (June) contract positions.  Amaranth held an aggregated net short prompt-next (June) position between futures and swaps, as well as a long put position.  Both of these positions substantially benefited by the lower settlement of the prompt-next contract that day.  As discussed more fully below, Amaranth reported a profit in prompt-next positions of over $20,000,000.

97.    As Figure 10 below shows, Amaranth began the month of April with a large short position in the May NG Futures Contract (which Amaranth gradually rolled forward to other summer contract months) and a smaller long position in May swaps.  But, on April 21, Amaranth reversed its positions in both, first going flat, then, between April 21 and 26, built a long position of 3,044 May NG Futures Contracts and a short position of roughly (12,000) May swaps by the beginning of the day on April 26.  On April 26, Amaranth built its short May swap position even further to (22,378) futures contract equivalents.

---

[156] *See* Bolling Dep. 215:16-216:3 (June 29, 2007) (describing "catching the pit with less liquidity" in final minutes of trading).

Docket No. IN07-26-000                                           - 57 -

**Figure 10: Amaranth April 2006 Daily Positions:
May NG Futures Contract vs. May Swaps**[157]



98.     Amaranth made over $20,500,000 million (at least) from its manipulation on April 26. At 2:00 p.m. on April 26, the May NG Futures Contract was trading at about $7.12, and then traded in the range of $7.00 to $7.30.  Notably, this profit was significantly less than it might otherwise have been because Amaranth's selling at the end of the settlement period was preceded by a fairly pronounced *increase* in prices.  In this respect, the manipulative trading was only able to make the contract settle "less high" rather than

---

[157] AMARANTH_REG091749_pos0403.xls-
AMARANTH_REG091766_pos0426.xls (Amaranth end of day position reports for April 3 through April 26, 2006).

Docket No. IN07-26-000                                                      - 58 -

"lower." But, that fact is not inconsistent with a manipulation – not every manipulation need be as successful as the manipulator might have hoped in order to be actionable.[158]

99.      Amaranth's trading caused the settlement price of the May NG Futures Contract to decrease by an estimate of $.03. The task of estimating Amaranth's impact is greatly simplified by the distinct profile of its selling in the May contract as compared to the March and April contracts and Dr. Kaminski assigns a higher degree of confidence to this single estimate of $.03. Based on its net short position of (19,334) futures contract equivalents in May swaps, Amaranth would have benefited by $1.933 million dollars per penny decrease in the NG Futures Contract settlement price, so that it realized a profit from its manipulation of $5,800,000 on its net short position in the May NG Futures Contract and swaps. Amaranth also had a net short position of (13,380.75) June NG Futures Contract and swaps, whose value increased by $1.338 million per penny decrease in the settlement price of the June NG Futures Contract. Amaranth's trading on April 26 caused this price to decrease by an estimated $.06, for a total marked-to-market gain of $8,000,000.

100.     For May, there appears also to have been an options-related element to the Amaranth trading in the settlement. For the March and April NG Futures Contract termination days, Amaranth did not establish or reduce options positions in any significant way. However, Amaranth established significant options positions in the final two days of trading for the May NG Futures Contract, which benefited significantly from Amaranth's manipulation of that contract. Between April 24 and April 26, Amaranth executed a straightforward series of options trades, all of which would benefit from lower prices and a declining market. On April 25, 2006, the second-to-last trading day for the May NG Futures Contract, also known as the penultimate day, Amaranth bought 6,600 June $7.25 puts, 5,150 June $7.00 puts and 120 July $7 puts. Amaranth did not trade any other NG Futures options that day. On April 26, the termination day for the May NG Futures Contract, Amaranth bought 3,000 $6.75 June puts and 180 July $7 puts. Again, Amaranth did not trade any other NG Futures options.

101.     Sales during the last minutes of the May NG Futures Contract termination day on April 26 caused prices on that contract to fall. In response to that fall in prices, prices

----

[158] *See Markowski v. SEC*, 274 F.3d 525, 529 (D.C. Cir. 2001) (finding that overall financial losses resulting from a failed scheme do not prevent a finding of intent to manipulate). The defendants in *Markowski* attempted to prevent a drop in the price of a particular security so as to maintain customer interest in their investment firm and sustain confidence in the firm's other securities, attempting thus to prevent potential additional losses. *Id.*

also fell in the last two minutes of trading of the June and July contracts, as the market maintained the "spread," or difference in price, among these three contracts. The June and July contracts settled lower on April 26, and Amaranth profited significantly. Amaranth reported its resulting June option position profit as approximately $20,600,000, and applying the methodology used above as to the June swap positions, the benefit to Amaranth was at least $6,700,000. These profits were derived from the decline in prices of the June and July contracts that resulted from trading of the May NG Futures Contract in the last two minutes of the settlement day, selling that was virtually dominated by Amaranth.

102.    We note that Amaranth's daily profit and loss statement for April 26 states that Calgary Energy gained $37 million on its short Summer positions for the day, as prices decreased by an average of $0.15. The grand total for Calgary Energy on the day was $41,601,586.[159]   As noted, these net gains probably include gains and losses unrelated to the manipulation, but also provide circumstantial evidence that complements our forensic (and necessarily imprecise) analysis.

103.    In a letter dated August 15, 2006, Amaranth provided an explanation of its trading on April 26 in response to an inquiry from the NYMEX dated August 2, 2006.[160]   The response was written and approved by Hunter and several other Amaranth executives, and signed by CRO Carrieri. But Amaranth's August 15 letter raises more questions than it answers and is in some respects contradicted by the contemporaneous evidence. First, Amaranth's letter provides misleading information as to its position with respect to May swaps. It acknowledges that "by April 26" (a careful avoidance of describing what happened "on April 26") it had built a short position of roughly (13,000) May swaps, and thus had a net short position in both the May NG Futures Contract and May swaps of (10,000). However, it failed to reveal that it sold an *additional* 10,000 May swaps *that day*, so that its actual net position (which stood to gain from any manipulation) was short (19,334) contracts.

---

[159] AALLC_REG0693426-32 (including a roughly $31 million gain on the WINTERVOLSPREAD2, which included substantial May positions). Staff's analysis of the data provided by Amaranth, which includes only trades related to natural gas, shows a daily profit of roughly $49 million for April 26 including about $30 million on the WINTERVOLSPREAD2. AMARANTH_REG091765_pos0425.xls, AMARANTH_REG091766_pos0426.xls (Amaranth end of day position reports for April 25 and 26, 2006).

[160] AMARANTH_REG_054788-90 (Amaranth's response, dated August 15, 2006).

Docket No. IN07-26-000                                          - 60 -

104.    Amaranth also claimed falsely, that its trading of the May NG Futures Contract that day was related to its desire to reduce its overall Summer-Winter spread position, and that it was forced to trade the NG Futures Contract when it did (*i.e.*, roughly 3,000 contracts in the final three minutes) because of its inability to sell the desired amount of Winter contracts.[161]    Amaranth's explanations that the trading in the May Contract was linked to its attempts to sell Winter contract months during the close, that Hunter would expect there to be much liquidity in the Winter months, or that he would wait until the settlement period to try to find this liquidity are difficult to accept.    As another Amaranth trader testified:

> Well, during the May settlement most of the world or by world I mean the market is concerned with May trading only, or very – things that are linked to May, like a May-June spread or May-July spread.  There are not a lot of people willing to go trade Winters or say 2008 gas during that half-hour period.[162]

 In fact, Amaranth's position in the expiring May NG Futures Contract was an outright position (not a spread), that was completely independent of its position in other months. Further, Amaranth added to any purported need to "sell winters" with the (10,000) additional short summers about which it omitted to tell NYMEX.  More generally, Amaranth had any number of alternative methods to reduce its summer/winter spread, including simply rolling forward into June any May positions that could not be offset with sales of winters.[163]   None of those other options would have involved selling NG Futures in the settlement period, and most of them would have involved less price and execution risk.

---

[161] *Id.* at 2.

[162] Lee Dep. 88:11-17 (Mar. 21, 2007 morning session).

[163] To "roll" out of a position simply means that the trader moves his position in a given contract month to a later month.  For example, if a trader had a long position in the May NG Futures Contract, he would roll out of it by selling out his position in the May NG Futures Contract and simultaneously buying an equal number of June NG Futures Contracts.  The result is that he would have zero May NG Futures Contracts and a long position in the June NG Futures Contract.  If the trader had a short position, he would buy May NG Futures Contracts and sell an equal number of June NG Futures Contracts, so that he eliminates his position in May and has a short position in the June NG Futures Contract.

Docket No. IN07-26-000                                                        - 61 -

105.    Aside from demonstrably inaccurate data and suspect explanations, we note that
Amaranth frames its letter in terms of:  "Here's one way you might employ this strategy,"
rather than stating what it in fact did.  In the end, we believe that the August 15 letter
represents an attempt by Amaranth to conceal from or falsely rationalize to the NYMEX
its trading strategy on April 26.

106.    As with the trading in the March and April NG Futures Contract, absent any
credible alternative explanation or justification for this trading behavior, we preliminarily
find that Amaranth manipulated the settlement price of the May 2006 NG Futures
Contract, in violation of the Anti-Manipulation Rule.

### 4.    Trading in Summer 2006

107.    Hunter and Donohoe appear not to have attempted to manipulate the settlement
price of June, July, or August NG Futures Contract.  While the reasons behind this
change in strategy are not entirely clear, it appears that, due to forces unrelated to these
violations, Hunter's natural gas portfolio suffered significant losses in the range of $1
billion during the month of May, and Amaranth was forced to liquidate assets to have
sufficient cash on hand to meet prospective margin calls.[164]  As such, Hunter was short
on capital and time for such endeavors, and under significant pressure from both
Amaranth's senior management and its risk managers (who themselves were responding
to pressure from Amaranth's investors) to reduce risk in Amaranth's natural gas
positions.[165]  In any event, by May 2006, the Calgary traders were under actual
supervision of Amaranth management for the first time in half a year.  Maounis testified
that he directed the Calgary team to return to Greenwich for days at a time, on a regular
basis, starting in June and through September, in part, to separate them from homes and
families in order to motivate them to address the May losses.[166]

### D.    Amaranth's Trading "In Connection With" Commission-Jurisdictional Transactions

108.    Amaranth's manipulation of the NG Futures Contract settlement price was "in
connection with" Commission-jurisdictional transactions.  First, the settlement price

---

[164] Maounis Dep. 136:18-137:9 (Nov. 20, 2006 morning session).

[165] *See, e.g.*, Jones Dep. 79:9-81:9, 131:24-138:10 (Nov. 13, 2006 morning
session); Maounis Dep. 22:20-29:19 (Nov. 20, 2006 morning session).

[166] *See* Maounis Dep. 21:15-22:19, 141:22-142:6 (Nov. 20, 2006 morning session).

Docket No. IN07-26-000                                                                 - 62 -

directly sets the price for any contracts that ultimately go to delivery at Henry Hub. Second, the settlement price is directly incorporated into the price for physical basis transactions. As noted above, physical basis transactions have two legs: one leg set by the NG Futures Contract settlement price and a leg consisting of a fixed amount that is added or subtracted from the settlement price, which represents the expected basis at that location. Finally, a number of LDCs use the NYMEX price itself for supply agreements.

109. In addition, as noted, physical basis transactions make up all or a substantial majority of the bid week monthly transactions at trading points in the East, Mid-Continent, and the Gulf Coast, which are used to calculate the monthly price indices at these points. These indices are relied on by consumers, producers, marketers, and state regulators in pricing monthly wholesale transactions, a substantial volume of which are Commission-jurisdictional. Moreover, the effect of any manipulation of the NG Futures Contract settlement price on Commission-jurisdictional transactions is self-executing because the parties to these transactions select the NG Futures Contract settlement price in advance as a price benchmark and as a basis of the bargain.

110. The Anti-Manipulation Rule applies whether or not the manipulator's principal or exclusive purpose is the manipulation of physical natural gas sales. In Order No. 670, we stated that "we do not intend to construe the Final Rule so broadly as to convert every common law fraud that *happens to touch* a jurisdictional transaction into a violation of" the Anti-Manipulation Rule.[167] However, such a transaction would be covered if "in committing fraud, the entity . . . intended to affect, or have acted recklessly to affect, a jurisdictional transaction."[168] We noted that the "in connection with" language is drawn from similar language of Rule 10b-5 which has been very liberally construed.[169] Accordingly, the Anti-Manipulation Rule applies where there is a "nexus" between the manipulative conduct and the jurisdictional transaction.[170] Under the analogous Rule 10b-5 precedent, the alleged manipulator need not be a party to the jurisdictional

---

[167] Order No. 670, FERC Stats. & Regs. ¶ 31,202 at P 22 (emphasis added).

[168] *Id.*

[169] *Id.*

[170] *See id.* at P 16 (stating where there is no "nexus" between the conduct and a jurisdictional transaction, fraud and manipulation in a non-jurisdictional transaction is not subject to the Anti-Manipulation Rule).

transaction,[171] nor must the connection be overwhelmingly direct.[172]  Finally, we have also noted that a determination of manipulation, in general, is "a question of fact that is to be determined by all the circumstances of a case."[173]  Given the facts discussed above, the manipulative conduct at issue here is more than sufficient to meet the generalized "in connection with" requirement.

### E.    *Scienter*

111.    The evidence summarized above indicates that both Hunter and Donohoe traded with the intent to manipulate the settlement price of the March, April, and May 2006 NG Contracts.  The settlement price directly sets the price of any futures contracts that go to delivery.  Thus, Amaranth's conduct amounts to the intentional manipulation of the price for that jurisdictional gas.[174]  This is so even if the *object* of the manipulation was simply

---

[171] This fact is apparent from a textual reading of the Anti-Manipulation Rule, which prohibits "any entity" from engaging in manipulation "in connection with" a jurisdictional transaction (not "engaged in" or "a party to" a such transaction).  Moreover, cases under the Securities Exchange Act of 1934, 15 U.S.C. § 78(b) (2000) (Exchange Act), generally demonstrate that one can violate Rule 10b-5 (which implements Section 10(b) of the Exchange Act) without being a purchaser or seller.  *See, e.g.*, *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) (permitting shareholder suit for damages under 10b-5 where company made misleading statements that affected its own stock).  Section 10(b) also does not require deception of an identifiable purchaser or seller, only deception "in connection with the purchase or sale of any security," in keeping with the Exchange Act's goal of ensuring honest markets.  *See United States v. O'Hagan*, 521 U.S. 642, 658 (1997).

[172] The Anti-Manipulation Rule prohibits an entity from "directly or indirectly" committing fraud.  The Supreme Court construes the "in connection with" language of the SEC regulatory scheme on which the Anti-Manipulation Rule is modeled flexibly, not technically and restrictively, in order to accomplish the scheme's remedial purposes.  *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citations omitted); *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12 (1971).

[173] Order No. 670, FERC Stats. & Regs. ¶ 31,202 at P 50.

[174] *See* NYMEX Exchange Rulebook § 220.11(D) ("Natural Gas Futures Contract – Delivery Procedure"):

(D) SETTLEMENT PRICE

The last settlement price shall be the basis for delivery.

(continued)

to benefit swap or other derivative positions. Although this amount of physical gas is relatively small compared to the overall market and Amaranth did not take any contracts to delivery, the intent link is strong.

112.    Importantly, Amaranth and its traders also knew that the NG Futures Contract settlement price affected or determined prices for physical gas and that manipulation of this price would harm all market participants. In a letter to the NYMEX, Amaranth stated that "the public relies on [the NG Futures Contract settlement price] as a *key price benchmark* for physical and financial contracts involving natural gas" (emphasis added).[175] Similarly, Amaranth traders and risk managers acknowledged the close relationship between the futures and physical markets and the importance of the NG Futures Contract as a price benchmark for substantial volumes of physical natural gas.[176] Amaranth and its traders certainly were eminently aware of the effect of the NG Futures Contract settlement price in setting the price of physical gas from their knowledge of market fundamentals and from their experience basis swap trading.[177] At the very least, Hunter and Donohoe were reckless with respect to the impact of their manipulation of the NG Futures Contract settlement price on prices in Commission-jurisdictional transactions. An entity may engage in reckless conduct through willful blindness or

---

http://www.nymex.com/rule_main.aspx?pg=33#220.11.

[175] AMARANTH_REG_054783-84 (August 30, 2006 Letter to the NYMEX from Amaranth's Michael Carrieri).

[176] *See, e.g.*, Donohoe Dep. 78:15-82:15 (Mar. 14, 2007 mid-afternoon session); Calhoun Dep. 57:24-61:17 (Mar. 20, 2007 mid-afternoon session); Jones Dep. 38:14-39:14 (Nov. 13, 2006 late afternoon session); Lee Dep. 31:23-37:16 (Mar. 21, 2007 mid-afternoon session); Hunter Dep. 18:3-23 (Nov. 17, 2006). As Amaranth trader Lee explained:

> [A]nything that references the NYMEX natural gas price theoretically is linked … [A]n eastern [physical] basis contract, let's say Transco Zone Six New York, it references the settlement contract price. So theoretically whatever that settle is, that's the price New Yorkers are going to pay for the price of gas, so yes.

Lee Dep. 66:10-23 (Mar. 21, 2007 mid-afternoon session).

[177] Calhoun Dep. 15:24-16:7, 42:11-43:21 (Mar. 20, 2007, morning session); *see also* Basarowich Dep. 26:18-23, 34:21-35:2 (Mar. 28, 2007, morning session); Lee Dep. 12:13-15:24, 35:8-37:16 (Mar. 21, 2007 mid-afternoon session).

Docket No. IN07-26-000                                                           - 65 -

ignorance of the effect of its actions.  In the context of the SEC's Rule 10b-5 on which
the Anti-Manipulation Rule was modeled, recklessness may be found if there is a danger
"so obvious that the actor must have been aware of the danger."[178]  That test is amply
satisfied here.

## III.    NOTICE OF PROPOSED PENALTIES

113.    The remedies available for these violations include civil penalties and
disgorgement of profits.[179]  We discuss each in turn, after first assessing the timing and
magnitude of the violations.

### A.    The Timing and Magnitude of the Violations

114.    We have authority to impose a civil penalty of up to $1 million per violation, per
day for any violations of a provision of the NGA or a Commission rule or order
implementing one of those provisions that occurred or continued on or after August 8,
2005.  Rule 1c.1 became effective January 26, 2006, and Amaranth's manipulative
trading began about a month later and continued through late April, and is thus covered,
temporally, by the Rule.

115.    Neither EPAct 2005 nor our civil penalty regulation prescribes a formula for how
a "violation" will be characterized or "counted" for purposes of assessing civil penalties.
This is for good reason.  The nature, timing, and numerosity of violation(s) will depend
on the facts and circumstances of each case.  And, as courts have noted, the means of
manipulation "are limited only by the ingenuity of man."[180]

116.    In this case, Amaranth entered orders resulting in 219 separate, multi-contract
executions of orders reported as "fills" in open outcry pit trading in order to sell its

---

[178]  *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000); *see also SEC v.
Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) *quoting Sunstrand Corp. v. Sun Chem.
Corp.*, 553 F.2d 1033, 1045 (7th Cir.) (recklessness is met where a company "wantonly
ignored" readily available evidence of the unfairness of a proposed acquisition and
therefore failed to disclose certain facts).

[179]  EPAct 2005 § 314(b) (2005) (codified at 15 U.S.C. 717t-1).

[180]  *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

futures in the three settlement periods.[181]  Each of these executions of orders involved varying numbers of futures contracts (ranging from as few as 10 to as many as 300). Each of these orders involved a different price and an independent transaction between floor brokers on behalf of customers or themselves.

117.   The executions of orders were the essential acts that moved the settlement price. Amaranth's orders indicate its priority was to liquidate the futures position as quickly as possible, no matter how low the prevailing market price became, rather than to achieve sales at as high a price as possible, or to trade throughout the settlement period in an effort to match the settlement price.  In addition, the evidence shows Amaranth armed its floor broker with information on its intent, and that either the floor broker used floor trading techniques with its orders to signal to others in the ring so as to maximize the effect of the overall Amaranth sales, or the market recognized that significant selling was occurring and responded, creating significant downward price effects.

118.   On the facts of this case, it is appropriate to find that each of the 219 floor transactions, or "fills," was a separate violation and accordingly the maximum available civil penalty for all of these violations is $219,000,000.

## B.     Civil Penalties:  Factor Analysis and Monetary Assessment

119.   Not all cases merit maximum civil penalties.  In determining the appropriate size of a civil penalty for a given violation, we were mandated by Congress to consider the seriousness of a violation and the remedial actions, if any, taken by a violator in response to a violation.[182]  These factors were more specifically described in our *Enforcement Policy Statement*.[183]  We apply those factors to the facts of every case in order to arrive at an appropriate civil penalty amount.

120.   The seriousness factors are:  (1) What harm was caused by a violation? (2) Was a violation the result of manipulation, deceit, or artifice? (3) Was the action willful, reckless, or deliberately indifferent to the results? (4) Was it part of a broader scheme? (5) Is it a repeat offense or does the company have a history of violations?  (6) Was the

---

[181] NYMEX_00001, NYMEX_00003-04 (NYMEX NG Futures Contract trade data).

[182] EPAct 2005 § 314(b) (2005) (codified at 15 U.S.C. 717t-1(c)).

[183] *Enforcement of Statutes, Orders, Rules, and Regulations,* 113 FERC ¶ 61,068 (2005) (*Enforcement Policy Statement*).

wrongdoing related to actions by senior management? (7) How did the wrongdoing come to light? (8) What effect would potential penalties have on the financial viability of the company?  The remedial action factors are: (1) internal compliance, (2) self-reporting, and (3) cooperation.  We analyze these factors by two groupings of Respondents:  the Amaranth Entities and the individual traders.

## 1.    Amaranth Entities

121.    The Amaranth Entities are punishable for the actions of their employees, officers, and agents.[184]   Hunter and Donohoe fall into several of those categories.  Moreover, all of the technically, legally distinct Amaranth organizations are in practice a tightly knitted association-in-fact, which operated as a single entity under the direction of Maounis and his fellow executives.  The "Advisor" entity that employed the traders, and the traders themselves, under the Advisory Agreement between Amaranth LLC and Amaranth Advisors L.L.C., are (or were) broadly empowered agents of the Fund entities.[185]   Thus, under all the circumstances, it is appropriate to assess only one civil penalty against the Amaranth Entities, collectively.

---

[184] We routinely sanction a company for the actions of its employees.  *See, e.g.*, *In re PacifiCorp*, 118 FERC ¶ 61,026 (2007); *In re SCANA Corp.*, 118 FERC ¶ 61,028 (2007), *In re Entergy Servs., Inc.*, 118 FERC ¶ 61,027 (2007); *In re NorthWestern Corp.*, 118 FERC ¶ 61,029 (2007); *In re NRG Energy, Inc.*, 118 FERC ¶ 61,025 (2007).  It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously punishable for acts of their agents or employees in the scope of their authority or employment.  *See In re Raymond James Fin. Servs, Inc.*, 2005 SEC LEXIS 2368, at *170 (Sept. 15, 2005) (in fraud action, holding that law of agency and doctrine of *respondeat superior* are available to find firm liable for actor's illegal actions); *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1431 (3d Cir. 1994) (recounting how "agency doctrine, including the theory of apparent authority, has long been a part of the federal system" and stating "a corporation can only act through its agents, and therefore only can be bound through application of agency principles"); *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 567 (1982) ("The apparent authority rule has long been the settled rule in the federal system.").

[185] AMARANTH_REG049258-59 (Advisory Agreement between Amaranth Advisors LLC and Amaranth LLC dated December 31, 2003).

Docket No. IN07-26-000                                                    - 68 -

### a.    Seriousness Factors

122.    Almost all of the seriousness factors favor a very high penalty as to the Amaranth Entities.  In general, this is a *serious* case.  It involves the Anti-Manipulation Rule, one of the most important elements fulfilling the Commission's mandate to ensure fair and competitive markets.  The only factor favoring the Amaranth Entities of which the Commission is aware is the absence of prior similar behavior.  We discuss the remaining factors more particularly below.

### i.    Harm

123.    The harm to the market was significant.  Consumers are harmed when prices are set by manipulation.  The harm to consumers from an upward manipulation is immediate.  Harm from downward manipulation is more long term.  The manipulation also diluted the price discovery and hedging functions that these markets are supposed to provide.  These functions depend on pricing based on fundamentals and valid predictions about future values, and are perverted by manipulative schemes designed to create prices unconnected to such fundamentals.  Producers who sold natural gas pursuant to physical delivery obligations tied to the NG Futures Contract, or indirectly based on the NG Futures Contract as a price benchmark, were paid significantly less than the market price for their gas.  The pecuniary interests of state governments and the federal government were also affected given that these governments sell rights to produce natural gas from public lands based on royalties tied to the NYMEX settlement price.  Policing market behavior is about protecting the interest of *all* participants, sellers and consumers alike.  In order to attract the supply and investment in production and infrastructure on which the natural gas markets rely, the prices sellers obtain for their product must be based on a fair and well-functioning market.  Amaranth's manipulation harmed these interests significantly.

### ii.    Willfulness

124.    The manipulation was the result of intentional and deceitful conduct.  It was willful as to the futures settlement price that sets the price of physical gas sold on delivery from the NG Futures Contract and (at least) reckless as to the secondary physical market impact such as physical basis.  We find especially troubling the evidence from the IMs that shows the traders knew their conduct was suspect (*e.g.*, Hunter telling Glover "shhhh")[186] and that the subsequent explanations for the trading are at best disingenuous and arguably false.

---

[186] AALLC_REG0684227 (Instant Message from Hunter to "gloverb," February 24, 2006).

### iii.    Senior Management Involvement

125.    Hunter was a Vice-President of Amaranth at the time of the offenses and the more senior managers Maounis, Carrieri, and Jones created the conditions that permitted the violations (or may have actually known of them).  The wrongdoing was discovered only as a result of Commission inquiry (not as a result of management's discovery or correction).  The failure of Amaranth's senior management to supervise and prevent manipulative trading by traders Hunter and Donohoe is a particularly significant factor in our determination of the amount of civil penalties.  In particular, Hunter's trading and related activities raised a number of "red flags" that must have put Jones, Carrieri, and Maounis on notice that Hunter was likely engaged in manipulation, or at the very least, highly improper conduct.  These executives either actually knew of Hunter's manipulative trading or willfully blinded themselves to the numerous warning signs.[187]  Because of the importance of this factor to our determination in this case, we discuss it in detail.

126.    As noted, Hunter was hired in 2004 with the executives' awareness of the allegations that he had engaged in risky behavior at Deutsche Bank.[188]  To keep him at Amaranth in 2005, the executives elevated him in status and importance and moved him out from under Arora's direct supervision.[189]

127.    When Amaranth sought the hedge exemption shortly thereafter, Amaranth represented to NYMEX in August 2005, that the "Chief Risk Officer [Jones] ha[d]

---

[187] We note that the Anti-Manipulation Rule may be applied to sanction misconduct by senior management who are responsible for supervising traders and who intentionally or recklessly permit manipulative conduct to occur.  Indeed, we have given serious consideration to seeking civil penalties against the Amaranth executives personally.  We exercise prosecutorial discretion in this case not to seek penalties from the executives personally, in no small measure because the largest investors in the Funds were insiders and employees, and these executives were among the largest holders in that category.  Maounis Dep. 27:9-14 (Nov. 20, 2006 morning session).  Thus, these executives will pay a significant price due to the payment of the civil penalty by the Amaranth Entities.  We observe that future cases involving executive management failures to rein in violations by employees may not present this unique element.

[188] *See supra* P 35; *see also* Arora Dep. 76:3-21 (Nov. 14, 2006 afternoon session).

[189] AMARANTH_REG003387-93 (June 1, 2005 Letter setting forth Hunter's compensation package); *see also* Arora Dep. 16:21-25 (Nov. 14, 2006 morning session).

assigned a risk manager "to sit among the energy traders to facilitate close monitoring of price risk within the book as well as market conditions."[190]  But in October 2005, Amaranth allowed Hunter to move his trading desk to Calgary and did not assign risk management or compliance personnel to sit with the Calgary natural gas traders.  As noted, Amaranth increased Hunter's percentage of profits due for his trading, thus creating further incentive to earn extraordinary profits from the manipulation. Subsequently, Amaranth allowed Hunter to increase the size of his natural gas positions such that Amaranth allocated well over *half* of its capital to its energy book by the Summer of 2006, thus increasing the Funds' dependence on Hunter,[191] while Amaranth was stating to its investors that it intended to reduce its energy exposure.[192]  Before he left, Arora expressed to Jones and Maounis concerns about Hunter.[193]

128.    Managers in Greenwich failed to construct their IT systems such that they could directly look at computer screens that reported the trading and position data in real time of the trading going on in Calgary.[194]  Jones appears to have experienced rather poor

---

[190] A_CFTC000051-56 (Amaranth Letter to NYMEX dated August 23, 2005 at 2). Chasman, Amaranth's head risk manager for energy trading, recognized the need to have risk management personnel "on the ground" in Calgary, but Amaranth had still not assigned anyone to the task by September 2006, nearly a year after Hunter first relocated to Calgary.  Chasman Dep. 116:5-116:20 (Nov. 28, 2006 morning session).

[191] *See, e.g.*, AALLC_REG0767207-28, AALLC_REG0605202, AALLC_REG0550756, AALLC_REG0609346, AALLC_REG611335 (series of documents Amaranth provided to investors outlining the percentage of risk capital allocated by strategy, *e.g.*, energy, long/short equity, merger arbitrage, US/international convertible arbitrage, for the period from January 2004 through June 2006.  In early 2005, Amaranth devoted less than 20 percent to energy, growing to roughly 30 percent by late summer 2005, then 35 percent or more in early 2006, then finally shooting up to 50 percent in May 2006 and 56 percent in June 2006, the last month for which this report was prepared.).

[192] Maounis Dep. 100:25-101:23 (Nov. 20, 2006 morning session); Jones Dep. 131:19-134:13 (Nov. 13, 2006 morning session).

[193] Jones Dep. 38:15-41:4 (Nov. 13, 2006 morning session); Arora Dep. 25:4-29:15 (Nov. 14, 2006 morning session); Maounis Dep. 12:8-13:4 (Nov. 20, 2006 morning session).

[194] Maounis Dep. 36:7-21 (Nov. 20, 2006 morning session).

Docket No. IN07-26-000                                              - 71 -

communications with Hunter[195] and could only view intra-day activity when he "sat on the trading desks" which he never did in Calgary.[196]  As to Maounis, Hunter's direct supervisor, though he could have reviewed the computerized reports of actual trading activity himself in real time, he "never looked at the screens" in Calgary, Greenwich or anywhere else apparently.[197]  In fact, Maounis and Jones visited Calgary once, and not to supervise or even observe the trading operation, but instead to attend the July 2006 "Stampedes" event and attend dinners and events with investors and other market participants.[198]

129.    In mid-March (just a few weeks after the first manipulative trading occurred), NYMEX sent Amaranth a violation letter for violating the very same NG Futures Contract hedge exemption (on February 23, 2006 – the day just prior to the first settlement of interest here).[199]  This highlighted (or should have) for Amaranth's senior management that they needed to evaluate Hunter's activity and perhaps exercise some measure of control, yet the manipulative trading continued in March and April, perhaps

---

[195] Indeed, there was some tension between Jones and Hunter in that Jones was frustrated by the difficulties in reaching the traders in Calgary to obtain information necessary to monitor their positions and risk profile.  Jones Dep. 124:20-130:14 (Nov. 13, 2006 morning session); AALLC_REG0011580 (April 24, 2006 E-mail in which Jones tells Hunter "[y]ou need to have someone on the desk by 8:30 EST. every day.  Ideally someone who has a qualified opinion on your portfolio or who can quickly contact someone who has."  Jones re-sent the identical e-mail to Hunter each day at roughly the same time for the rest of that week until April 28, apparently to emphasize his frustration with Hunter's group).  Unfortunately, any improvement in communications seems not to have occurred until after the manipulative conduct presented here.

[196] Jones Dep. 121:4-18 (Nov. 13, 2006 morning session).

[197] Maounis Dep. 36:22-25 (Nov. 20, 2006 morning session).

[198] Maounis Dep. 45:13-49:4 (Nov. 20, 2006 late afternoon session).

[199] AMARANTH_REG_054785 (Letter from NYMEX to Amaranth regarding Violation of Exchange Rule 9.28, March 13, 2006); *see* NYMEX Exchange Rulebook § 9.28, *available at* http://www.nymex.com/rule_main.aspx?pg=8#9.28.  The letter referred to Amaranth's open commitment in the March 2006 NG Futures Contract, and stated that at the end of the day on February 23, 2006, Amaranth had exceeded its prompt month hedge exemption position limit of 2,500 contracts by 1,146 contracts (*i.e.*, almost 46 percent).  AMARANTH_REG_054785.

Docket No. IN07-26-000                                            - 72 -

because Hunter's natural gas trading book was an "enormous source of profitability for the fund in the beginning of [2006]."[200]

130.    Amaranth senior management also participated in drafting and/or approving misleading statements in its August 15, 2006 letter to the NYMEX regarding its natural gas trading on April 26 in the May NG Futures Contract.  A second NYMEX/Amaranth exchange from later in August 2006 shows just how far these executives were willing to let Hunter trade at his discretion with minimal supervision.  After several hedge exemption violations *and* a NYMEX investigation opened against Amaranth for NG Futures Contract settlement trading, when the executives' control and oversight over Hunter should have been at its zenith, at the end of August 2006 as the settlement period approached, Hunter again violated the NYMEX's position limits – this time exceeding the standard limit by almost 9,000 combined futures and futures-equivalent contracts.[201] The NYMEX took the unusual step of contacting Amaranth the morning of the settlement day and instructing Amaranth to liquidate that position in an orderly fashion over the course of the day and not to carry any large positions into the settlement.[202]

131.    In reviewing this record of management behavior through the winter and late spring of 2006, we are struck by the contrasting approach in May 2006 when Hunter's book lost Amaranth over $1 billion, but the firm was still a going concern, Maounis started recalling Hunter and team physically to Greenwich on a routine basis for days at a time, all through the summer of 2006.[203]  So, when the executives really wanted to control Hunter, they made him come to Greenwich, but when the "enormous source of profitability" was rolling, management was content to leave Hunter to his devices more than half a continent away.  This record is deeply troubling and weighs heavily in our determination that the Amaranth Entities should be severely penalized for the behavior of Hunter and Donohoe.

---

[200] Jones Dep. 71:17-19 (Nov. 13, 2006 morning session).

[201] AMARANTH_REG091856_pos0828.xls (Amaranth end of day position report for August 28, 2006, showing short position of (6,721) September NG Futures contracts and short (4,760) NN futures at Henry Hub for the September contract).

[202] *See* AMARANTH_REG_054783-74 (August 30, 2006 Letter from Amaranth's Carrieri to NYMEX, referencing the fact that Amaranth had been instructed by NYMEX not to trade large orders during the settlement period on August 29).

[203] Maounis Dep. 21:15-23:14 (Nov. 20, 2006 morning session).

### iv.    Financial Impact

132.    Evaluation of the financial viability of the company as a factor seems neutral, as the firm is dissolving.  There are sufficient assets left in the Amaranth Entities to satisfy maximum penalties.

### b.    Mitigation Factors

133.    The mitigation factors do not much alter the case for a high penalty.  The company did not self report.  The compliance and risk management program was weak. Cooperation with staff investigation has been acceptable (as it should be in all cases) but not exemplary so as to merit consideration in setting the penalty amount.

134.    On balance, the penalty factors support a nearly maximum civil penalty.  A civil penalty against the Amaranth Entities of $200,000,000 is appropriate.

### 2.    Traders Hunter and Donohoe

135.    As to these two individuals, virtually all of the seriousness and mitigation factors weigh in the same way for a high penalty as they do with respect to the Amaranth Entities.  Indeed, because they personally and directly engaged in the manipulation, the traders' level of culpability is higher.  Hunter's cooperation has, of late, gone from acceptable to unacceptable, including a refusal voluntarily to complete his testimony.[204] On the other hand, the traders have *much less* of an ability to pay, though they were highly compensated and do have significant resources.  Hunter still has a substantial net worth after having purportedly earned $75 to $100 million in 2005, as well as seven- or eight-figure compensation in previous years.

136.    Donohoe presents a similar case to Hunter, but has a much lower net worth and stood to earn much less from the illegal behavior (based on industry standards for an execution trader, likely only one to two percent of profits compared to fifteen percent as

---

[204] Although the details are unnecessary to recount here, Hunter failed to appear for an agreed upon second deposition by staff and subsequently refused voluntarily to give further sworn testimony, agreeing only to be interviewed not under oath.  Under different circumstances, staff might have subpoenaed him and proceeded with enforcement of that subpoena in United States District Court.  However, on the facts of the case, in particular the vast body of inculpatory evidence already gathered, as well as a deposition Hunter subsequently gave to the CFTC a transcript of which staff obtained, this step was unnecessary.

Docket No. IN07-26-000                                              - 74 -

to Hunter). Moreover, he was more of an instrumentality (though knowingly so) of the manipulation as opposed to Hunter, the mastermind.

137.   There are strong enforcement and deterrence policy bases for setting the civil penalties for individual traders at a high level. The traders in this industry have historically been capable of easily recovering from disastrous performance or misconduct by simply moving to, or starting up, another trading operation. Even after spectacular failures, a trader can attract capital to start new trading activities or a new fund. Currently, Hunter is reported to be developing a new hedge fund of his own called Solengo, which (should it be permitted to register with appropriate regulatory authorities) is also expected to trade in financial energy products. Donohoe is currently employed by Bank of Nova Scotia and is involved in energy trading for that firm. Under the circumstances, the Commission sends here a clear message that manipulation will have severe personal consequences for individual traders in order to deter them and others from violative behavior.

138.   Based on the foregoing factors, in particular the relative proportion of profits the traders stood to gain as compared to the Amaranth Entities, we find that civil penalties of $30,000,000 for Hunter and $2,000,000 for Donohoe are appropriate.

### C.    Disgorgement

139.   Unlike civil penalties, we do not approach the assessment and ordering of disgorgement of unjust profits as a discretionary matter.[205] Except in rare circumstances not present here, any unjust profits earned from the violations must be disgorged in their entirety. As noted, as a result of its manipulation, Amaranth profited by a total of *at least* $59,000,000 and perhaps as much as $168,000,000 on these three settlement days as a direct result of the manipulation. At a minimum the most conservative of these numbers, $59,000,000 plus interest calculated at the rates published by the Commission for natural gas refund purposes should be disgorged.

---

[205] *Enforcement Policy Statement*, 113 FERC ¶ 61,068 at PP 19, 23, 25 (2005) ("[A]t a minimum a company involved in wrongdoing must disgorge any unjust profits resulting from the wrongdoing.").

## IV.    CONCLUSION AND ORDER

140.    In 2000 and 2001, when Enron traders manipulated western energy markets, they referred to their schemes as "experiments."[206]  Their conduct bespoke an attitude that markets served as their private laboratories where they were free to tinker with prices and supply in order to test responses and to make extraordinary profits.  Their "experiments" gave little care to the harmful impact of such behaviors on the functioning of the markets or harm to other market participants and the public at large.  Congress passed the salient provisions of EPAct 2005 in direct response to those behaviors and charged us with the obligation to detect, investigate, punish, and deter such manipulations.  As Hunter's "bit of an experiment" illustrates, even after the legal aftermath of Enron, the enactment of EPAct 2005, and the promulgation of Commission rules, there are still those who need to recognize that manipulation, even in complex markets, can be detected and, when proven, will be punished severely.

The Commission orders:

(A)    The Respondents, within 30 days of the date of this order, to file answers in accordance with 18 C.F.R. § 385.213 (2006) showing cause why they should not be found to have violated section 1c.1 of the Commission's regulations by trading in the March, April, and May 2006 NG Futures Contract on February 24, March 29, and April 26, 2006.

(B)    The Respondents, within 30 days of the date of this order, to file answers in accordance with 18 C.F.R. § 385.213 (2006) showing cause why their violations of section 1c.1 of the Commission's regulations should not warrant the assessment of civil penalties of $200,000,000 in the case of the Amaranth Entities, $30,000,000 in the case of Hunter, and $2,000,000 in the case of Donohoe and an order to disgorge unjust profits of $59,000,000 plus interest as described in the body of this order.

---

[206] *See* FERC Trial Staff, March 1, 2005, Initial Tape Testimony Filing, Docket No. EL03-180, at 8 (Enron audio files of telephone calls relevant to the "Get Shorty" scheme, entered as Exhibit No. S-123, File ID 158610, File Name 23-20000918-8363259-8411931.mp3); *see generally Final Report on Price Manipulation in Western Markets*, Docket No. PA02-2-000, at VI-3, VII-13, IX-12 (March 26, 2003), *available at* http://www.ferc.gov/industries/electric/indus-act/wec.asp#skipnavsub (follow "Part 2" hyperlink).

Docket No. IN07-26-000                                          - 76 -

(C)     In any answer, Respondents to address any matter, legal, factual or procedural, that they would urge in the Commission's consideration of this matter.

By the Commission.

( S E A L )

Kimberly D. Bose,
Secretary.

## FEDERAL ENERGY REGULATORY COMMISSION

**NEWS**

July 26, 2007

Docket Nos. IN07-26-000, IN06-3-002

**NEWS MEDIA CONTACT**

Mary O'Driscoll - 202.502.8680

## Commission Takes Preliminary Action in Two Major Market Manipulation Cases

The Federal Energy Regulatory Commission for the first time used its new enforcement authority to prosecute market manipulation today when it issued show cause orders that made preliminary findings of market manipulation and proposed civil penalties totaling $458 million in two investigations involving traders' unlawful actions in natural gas markets.

The Commission's actions, which come under both the anti-manipulation authority of the Energy Policy Act of 2005 and its former market manipulation rule, are a signal that FERC will not tolerate manipulation of energy markets.

"Congress granted FERC the authority to prevent manipulation to protect both consumers and the integrity of these markets on which our economy depends," Commission Chairman Joseph T. Kelliher said. "Bad actors in the industry must recognize that manipulation, even in increasingly complex energy markets, can be detected. And when it is proven, they will be punished severely."

The first case, brought under the Commission's new anti-manipulation rule, involves the Greenwich, Conn.-based hedge fund Amaranth LLC and traders Brian Hunter and Matthew Donohoe. The Commission voted unanimously to give Amaranth and the traders 30 days to show why they should not be assessed civil penalties and disgorge profits totaling $291 million for manipulating the price of Commission-jurisdictional transactions by trading in the NYMEX Natural Gas Futures Contract in February, March and April 2006.

In the second case, the Commission voted unanimously to give Energy Transfer Partners, LP (ETP), a Texas-based owner of pipeline assets and a natural gas trading affiliate, 30 days to show that it did not violate the Commission's former market behavior rule by manipulating the wholesale natural gas market at Houston Ship Channel on certain dates in 2003, 2004 and 2005. The Commission is proposing more than $167 million in total penalties and disgorgement of unjust profits.

"These cases are serious. It is alarming to read and hear the instant message and voice recording evidence of improper actions, some of which were authorized by senior managers. The Commission is right to propose close to the maximum in penalties for actions that harmed millions of consumers and the natural gas markets they depend on for their energy needs," Kelliher said.

"For these two companies, failure to refute these findings will confirm that their actions harmed many wholesale market participants, creating losses that ultimately hurt natural gas customers across the country," Kelliher added.

FERC's actions today are related to similar actions by the Commodity Futures Trading Commission for violations of its statutes. The two federal agencies cooperated in the two investigations through their

(more)





Memorandum of Understanding, though their individual actions fall under separate statutes.

"I also want to praise the Commodity Futures Trading Commission for being a strong partner in coordinating investigations regarding market manipulation," Kelliher said. "There is a relationship between physical gas sales and gas futures, and coordination between the two agencies is necessary to effectively police market manipulation."

**Amaranth LLC**

This case involves manipulation of the final, or "settlement," price of the NYMEX Natural Gas Futures Contract on February 24, March 29 and April 26, 2006, by selling an extraordinary amount of these contracts during the last 30 minutes of trading before these future contracts expired, with the purpose and effect of driving down the settlement price.

Investigators in the Commission's Office of Enforcement found that Amaranth had previously taken positions in various financial derivatives that were several times larger, and whose values increased, as a direct result of the fall in the settlement price of the natural gas futures contract. Thus, for every dollar lost on its sales of the futures contracts, Amaranth would gain several dollars on its derivative financial positions.

The Commission's investigation found that Amaranth and its traders Hunter and Donohoe intentionally manipulated the settlement price of the futures contract. That settlement price is explicitly used to determine the price for a substantial volume of FERC-jurisdictional physical natural gas transactions.

Evidence uncovered by the investigation includes instant messages (IM) written by traders. According to one such IM, the scheme began as "a bit of an expiriment (sic)" devised by Hunter on or before Feb. 23, 2006, the day before the first manipulation occurred. The Feb. 24 "experiment" was then repeated and refined on March 29 and April 26.

These market manipulation violations took place well before Amaranth's notorious demise in the fall of 2006, when it experienced massive trading losses and ceased trading operations. Amaranth's collapse was not related to these manipulations. This investigation was initiated in Summer 2006 by Commission staff, well before those losses and collapse.

Based on the facts and circumstances and the absence of any material mitigating factors, the Commission is recommending penalties of $200 million for Amaranth, $30 million for Hunter and $2 million for Donohoe. The Commission also proposes that Amaranth disgorge more than $59 million in unjust profits, plus interest.

**ETP, LP**

This case, which came to the Commission's attention through its enforcement hotline, involves manipulation of wholesale natural gas markets at Houston Ship Channel and Waha, Texas, trading hubs on various dates from December 2003 through December 2005.

The Commission's investigation found that ETP violated FERC's Market Behavior Rule, the anti-

(more)





manipulation rule then in effect, when it artificially lowered the price for prompt month gas at the Houston Ship Channel to the benefit of its physical and financial positions. By lowering the price, ETP suppressed the *Inside FERC* Houston Ship Channel index, published by Platts, on which the pricing of many physical natural gas contracts and financial derivatives are based.

The investigation also found that ETP suppressed the price of daily gas at Waha, and violated the Natural Gas Policy Act (NGPA) by unduly preferring affiliated shippers and unduly discriminating against non-affiliated shippers on its Oasis Pipeline for interstate gas transportation system from Waha, in West Texas, to Katy, near Houston.

The investigation uncovered voice recordings that show senior managers at ETP were aware of the situation and directed the company's manipulative strategy to suppress fixed-price gas at the Houston Ship Channel.

In one such recording from Sept. 26, 2005, Marshall McCrea, the company officer in charge of trading at the hub, told at least one trader that "as long as we sell as much as we can sell, it ought to push Ship down." The phrase "push Ship down" means to suppress the price at the Houston Ship Channel, which would lower the price of ETP's physical gas purchases and widen the price spread between that market and the Henry Hub, thereby increasing the value of its financial derivative positions.

The Commission is proposing to assess ETP civil penalties totaling $97.5 million, and total disgorgement of $69.9 million in unjust profits.

For market manipulation, FERC proposes that ETP pay $82 million in civil penalties – the maximum $79 million for the manipulations at the Houston Ship Channel, and $3 million for the manipulations at Waha and Permian. The Commission also is proposing disgorgement of $69.9 million, plus interest, in unjust profits. This includes $67.6 million for manipulation in the Houston Ship Channel and $2.2 million for manipulation at Waha and Permian.

The Commission also is proposing to revoke ETP's blanket certificate to sell natural gas for one year, beginning 120 days from today. This means that ETP would have to get Commission approval for all jurisdictional sales of natural gas.

For the Oasis Pipeline NGPA violations, the Commission proposes that ETP pay $15.5 million in civil penalties for undue discrimination and undue preference, and $500,000 for failure to file an amended operating statement. The Commission also is proposing the company disgorge $267,122, plus interest, in unjust profits.

Both companies' manipulative actions sought to lower the price of natural gas for the profit of their physical and/or financial derivative positions. Over the long run that can be as destructive to consumers and markets as prices that have been manipulated to rise.

"Manipulation designed to lower prices is as offensive as manipulation that raises prices," Kelliher said. "In any form, market manipulation undermines the integrity of markets by driving away legitimate participants.

(more)





When it raises prices, manipulation harms consumers immediately and in ways that are easy to understand. Manipulation that lowers prices also hurts consumers, over a longer period and more indirectly."

And while today's actions propose serious sanctions against market manipulation, Kelliher said it is important to note that FERC is not opposed to legitimate risk-taking and trading.

"Trading and risk taking are vital parts of energy markets, and benefit consumers," he said. "The core element of manipulation is fraud – fraud on consumers and fraud on the market.  Manipulation is deception, period. It is not legitimate trading, risk-taking and speculation."

More information on the FERC orders can be found at www.ferc.gov. The CFTC orders can be found at http://www.cftc.gov/opa/opaenf2007.htm.

(30)

R07-47

---

- [About E&E](#)
- [Start a Trial](#)
- [Contact Us](#)

- [E&E Daily](#)
- [Greenwire](#)
- [E&ENews PM](#)
-
- [E&ETV](#)
- [Land Letter](#)
- [Special Reports](#)
- [E&E Publishing](#)







[<< Back to E&ETV index page.](#) Search: [Enter keyword] [go!]

# Energy Markets: FERC's Kelliher discusses Amaranth, Energy Transfer Partners market manipulation cases (OnPoint, 07/31/2007)

Advertisement



**About this video**



For the first time since the Federal Energy Regulatory Commission was granted market manipulation authority in the Energy Policy Act of 2005, FERC has used this authority to bring charges against two companies -- Amaranth Advisors and Energy Transfer Partners -- for illegally manipulating energy markets. During today's OnPoint, FERC Chairman Joseph Kelliher discusses the two cases and the effect, he believes, the actions of these companies had on markets. Kelliher explains the significance of using this authority for the first time and discusses how he hopes these cases will affect the decisions of other companies.

 watch video  email video

## Transcript

**Monica Trauzzi:** Welcome to OnPoint. I'm Monica Trauzzi. Joining me today is Chairman Joseph Kelliher of the Federal Energy Regulatory Commission. Chairman, thanks for coming on the show.

**FERC Chairman Joseph Kelliher:** Sure, thanks for having me.

**Monica Trauzzi:** Chairman, last week FERC filed charges in two separate market manipulation cases. The first was against Amaranth Advisors and two of its energy traders for a total of $291 million in penalties for illegally manipulating natural gas markets. Explain what happened here and why you decided to bring these charges against Amaranth.

**Joseph Kelliher:** Sure. And then talk about the other case afterwards?

**Monica Trauzzi:** Then we'll talk about, yeah, the second case.

**Joseph Kelliher:** Well, Amaranth, we actually acted against their nine different Amaranth entities, but one of them is Amaranth Advisors. In this case, this investigation began in May of 2006. FERC commission staff saw certain anomalies in trading of monthly futures prices at NYMEX. Commission staff very closely monitor both power and gas markets and they looked for anomalies. If they see anomalies, price movements that can't be explained by market fundamentals, they have the authority to initiate investigations. They began an investigation in May of 2006 on their own motion. They have the authority to do that if they see something suspicious. So over the course of time they began to investigate what happened in that month. They started looking at another period. They started looking at Amaranth. They started collecting evidence. And last week we acted to reveal the results of our investigation. We made public our investigation. So, from our point of view, the investigation phase has really been concluded and now we're beginning administrative litigation or prosecution of some kind. Now, we issued show cause orders that make preliminary findings, lay out the fact that we've uncovered so far, and it gives the objects or the targets of the investigation an opportunity to respond. They can dispute or facts. They can introduce new facts. They can suggest different conclusions should be drawn. So we're making preliminary findings, but our investigation I think is complete. And now the parties will get due process. They'll have an opportunity to respond in 30 days.

**Monica Trauzzi:** What was the most conclusive evidence that you found?

**Joseph Kelliher:** Well, a lot of the instant messages are strongly suggestive of intent, but the parties ...

**Monica Trauzzi:** And these were instant messages between the two energy traders?

**Joseph Kelliher:** From Mr. Hunter and Mr. Donahoe, who's trading on his behalf, Mr. Donahoe, on his behalf. And these instant messages are suggestive of intent, but they have an opportunity to offer a different explanation on what does "smash the settle" mean? We think that it suggests a desire to affect a sudden and precipitous collapse in price, but there may be alternate explanations. And we'll hear from Mr. Hunter. We'll hear from Amaranth.

**Monica Trauzzi:** So what impact do you believe their actions have on markets?

**Joseph Kelliher:** We think there was a very significant effect on markets, in both cases, both Amaranth and ...

**Monica Trauzzi:** We'll get to that in a second.

**Joseph Kelliher:** ... the Energy Transfer Partners investigation. We believe, based on preliminary findings of the investigation that there were schemes to mitigate prices downward in order to benefit positions that both Amaranth and Energy transfer Partners held in other natural gas products, physical products, financial products, futures. That they were, in both cases, manipulating prices downward in one product in order to increase the spread and increase their profits elsewhere.

**Monica Trauzzi:** This is the first time that FERC has used its market manipulation authority that was granted to it in the Energy Policy Act of 2005. How significant is this?

**Joseph Kelliher:** I think it's very significant because if you look back at the California power crisis, 2000-2001, the California Western power crisis, there's a lot of criticism of FERC for not acting more quickly to prevent market manipulation. But actually, in 2000-2001 I think it's fair to argue that FERC didn't have the right tools to prevent market manipulation. That was one of the changes that Congress made in the Energy Policy Act of 2005. They gave us express authority to prohibit, they established an express prohibition of market manipulation, gave the commission authority to define exactly what that means over time. We can change the definition and also to impose civil penalties of $1 million per day per violation. And so the Congress gave us the right tools. Congress and FERC both learned the lesson of the California Western power crisis and now we're acting. We have the right tools and we're acting to use them.

**Monica Trauzzi:** Brian Hunter, one of the two traders being charged is currently trying to start up his own hedge fund in Canada. And his lawyers say that the action that FERC is taking against him is not only going to damage him personally, but also professionally as he tries to start up his hedge fund. They argue that FERC does not have jurisdiction over the futures markets or exchanges. Is that a valid claim?

**Joseph Kelliher:** No.

**Monica Trauzzi:** Are you overstepping your boundaries here?

**Joseph Kelliher:** No, we're not, because the argument that we are somehow acting to regulate futures is a false argument. We are not proposing to regulate futures. I would think our sister agency, the Commodity Futures Trading Commission, would have an opinion on that. They are acting in concert with us. What we're doing is we're acting to sanction manipulation of futures that affected FERC jurisdictional transactions. Natural gas is a fungible commodity. It's interchangeable, but it's sold in, as many different products. There are really three broad product categories; physical wholesale gas, where FERC has jurisdiction, there's financial products, and there's also futures products. And those are areas of CFTC jurisdiction. You can clearly see manipulation of one kind of natural gas product in order to affect a profit somewhere else. Now, if someone seeking to manipulate natural gas markets can move across product lines confident that the two agencies will never work in concert, then that's a huge opportunity for manipulation. We in

CFTC want to block that. We think the law is clear, based on securities precedent. The law that we're overseeing, at least with respect to Amaranth, is securities law lifted out of the Securities Exchange Act 1934, put in both the Natural Gas Act and the Federal Power Act. So there is precedent in this area of manipulating one kind of product to benefit a position in another product. And we do have legal authority.

**Monica Trauzzi:** The second case which you mentioned is against Energy Transfer Partners, ETP. They're a natural gas transporter. The commission has proposed $167 million in fines and returned profits. Why were these charges brought against ETP?

**Joseph Kelliher:** Well, this is a case, Amaranth investigation began with commission staff seeing an anomaly in the market, in natural gas markets. In the case of Energy Transfer Partners it began with a competitor calling the commission hotline and basically providing a tip. And this tip we received in October 2005, so it was in the wake of the hurricanes. And we started looking at Energy Transfer Partners practices, initially looking at September 28, 2005. On that single day our investigation suggests that they earned $40 million in profits by manipulating prices of certain FERC jurisdictional physical gas sales downward in order to benefit positions in financial products, as well as other FERC jurisdictional physical products. Again, it's a preliminary finding of the investigation. But we found actually that we believe the practice occurred not just in one month, in the wake of the hurricanes, not just two months in the wake of the hurricanes, but it occurred over a nine-month period between December 2003 and December 2005. So we think it wasn't an isolated incident, but it was part of a continuing practice.

**Monica Trauzzi:** And ETP says here that their business transactions during the time in question were actually lawful and that no regulations were violated. They say that they were faced with market uncertainty after Katrina and that FERC is ignoring the fact that market conditions were difficult during that time. Is that a valid charge?

**Joseph Kelliher:** Well, they have an opportunity to respond. Within 30 days they have an opportunity to respond and to dispute our facts, our interpretation of the facts, and offer alternative theories. But I think it's worth noting that we believe that the manipulative practice didn't just occur immediately on the heels of the hurricanes, but actually occurred two years before. There were not hurricanes in December of 2003 or in certain months of 2004. We do think this is a practice that began well before the hurricanes and it continued into the wake of the hurricanes, but we will hear the response.

**Monica Trauzzi:** So what's the message that you're trying to send to your two other companies?

**Joseph Kelliher:** Well, first of all, that we're closely monitoring markets, both natural gas markets and power markets, and we have the expertise to do that. The Amaranth investigation is significant in that it began with commission staff noticing certain anomalies and then digging deeper. They have the authority to do that on their own initiative. They don't need my approval to begin that kind of an informal investigation. Sometimes they find, after a little bit more investigation, that there is a good reason to explain the price movements. The investigation ends. But in other cases if they can't find a legitimate explanation for price movements they keep on digging and in some cases they might find manipulation. What's significant in the Amaranth case is in both cases we require disgorgement of profits or an estimate of their profits. But in Amaranth we proposed penalties that are four times the profits. So it isn't just a question, if you're engaging in market manipulation and the commission fines you, it isn't just a question of surrendering your ill-gotten gains, but perhaps four times as much in penalties on top of that.

**Monica Trauzzi:** All right, so the two companies have 30 days to respond ...

**Joseph Kelliher:** Yes.

**Monica Trauzzi:** ... to the charges?

**Joseph Kelliher:** Yes.

**Monica Trauzzi:** And we'll be keeping an eye on that.

**Joseph Kelliher:** Yes.

**Monica Trauzzi:** Thanks for coming on the show.

**Joseph Kelliher:** Thank you very much.

**Monica Trauzzi:** This is OnPoint. I'm Monica Trauzzi. Thanks for watching.

*[End of Audio]*

Advertisement

Return to the top of the page.

About E&E  Start a Trial  Get E-mail Alerts  Advertise  Staff Directory  Special Reports  RSS



    

The Premier Information Source for Professionals Who Track Environmental and Energy Policy.

© 1996-2007 E&E Publishing, LLC  Privacy Policy  Site Map

P. Todd Mullins
Leslie B. Bellas
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC  20426
(202) 502-8594

Attorneys for the Federal Energy Regulatory Commission

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – –

|  |  |  |
|---|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **07 Civ. 6682 (DC)** |
| | : | |
| **AMARANTH ADVISORS L.L.C.,** | : | **ECF Case** |
| **AMARANTH ADVISORS (CALGARY) ULC,** | : | |
| **and BRIAN HUNTER,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

– – – – – – – – – – – – – – – – – – – –  :

**THE FEDERAL ENERGY REGULATORY COMMISSION'S**
**OPPOSITION TO DEFENDANTS' MOTION FOR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT. ................................................................1

II.  BACKGROUND .................................................................................4

    A.  Parties Relevant to This Action ................................................4

        1.  The Federal Energy Regulatory Commission ...................4

        2.  Commodity Futures Trading Commission. .......................5

        3.  Defendants . .........................................................................5

    B.  The Relevant Markets .................................................................5

        1.  The Financial Markets . .....................................................6

        2.  The Physical Markets . ......................................................7

    C.  Recent Legislative and Regulatory Developments ...................9

        1.  Energy Policy Act of 2005 . ..............................................9

        2.  FERC's Anti-Manipulation Rule. ...................................10

    D.  Agency Investigations ..............................................................11

        1.  FERC's Administrative Investigation and the OSC's Preliminary Findings. ..........................................................11

        2.  CFTC's Investigation and Litigation. .............................15

    E.  Related Litigation and Agency Action. ....................................17

        1.  Related Litigation Against Amaranth. .............................17

        2.  Litigation Related to FERC's Order to Show Cause: *Hunter v. FERC*. .......17

III.  ARGUMENT. ...................................................................................18

    A.  Jurisdiction to Review FERC's Order Lies Exclusively With the Court of Appeals ..........................................................19

    B.  FERC's Enforcement Action Will Not Irreparably Harm Amaranth, but a Stay Will Harm FERC and the Public Interest ................................................23

        1.  Litigation Costs From Dual Actions are Not Irreparable Harm . ...................24

**Page**

        2.     Claim or Issue Preclusion is Not Harmful ..........................................25

        3.     FERC and the Public Will be Harmed by a Stay ...............................28

    C.   Amaranth is Unlikely to Prevail on the Merits .......................................29

        1.     FERC Has Statutory Authority to Prohibit Market Manipulation that Affects Its Jurisdictional Energy Markets .................................29

        2.     Manipulation of Natural Gas Markets Is Not Within the CFTC's "Exclusive" Jurisdiction ..............................................................34

        3.     The CEA Preserves FERC's Authority ..............................................36

        4.     The Doctrine of Primary Jurisdiction Does Not Apply ....................37

IV.   CONCLUSION ..............................................................................................38

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aaron v. SEC*, 446 U.S. 680 (1980). ................................................................................... 10, 31

*Altamont Gas Transmission Co v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996). .......................... 30

*Am. Elec. Power,* 103 F.E.R.C. ¶ 61,089 (2003). ................................................................. 27

*Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13 (2d Cir. 1987) .................................... 23

*Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005). ...................................... 30

*Borey v. National Union Fire Ins. Co.*, 934 F.2d 30 (2d Cir. 1991). .................................... 23

*Bristol-Meyers Co. v. FTC*, 738 F.2d 554 (2d Cir. 1984). .................................................... 27

*Burrows v. U.S.*, No. 93-1795, 1993 US. Dist. LEXIS 8229 (S.D.N.Y. June 16, 1993). ..................... 22

*CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005) ................................................ 34

*CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006) ........................................................ 35

*CFTC v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1485 (10th Cir. 1983) .................. 28

*CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007). ........................................................ 35

*Cherokee Nation of Oklahoma v. U.S.*, 124 F.3d 1413 (Fed. Cir. 1997) .............................. 29

*Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) .................................... 36, 37

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958) ............................................ 19

*Conoco, Inc. v. FERC*, 90 F.3d 536 (D.C Cir. 1996), cert. denied, 519 U.S. 1142 (1997) ................. 30

*Consolidated Natural Gas Corp. v. FERC*, 611 F.2d 951 (4th Cir. 1979) ............................ 20

*Ellis v. Tribune Television Co.*, 443 F.3d 71 (2d Cir. 2006) ................................................. 38

*Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93 (2d Cir. 1986) ........................... 24

*Energy Dev. Corp. v. St. Martin*, No. 98-3395, 2005 U.S. Dist. LEXIS 994

  (E.D. La. Jan. 24, 2005) ...................................................................................................... 25

*FTC v. Cement Inst.*, 333 U.S. 683 (1948) ........................................................................... 27

*FTC v. Roberts*, 276 F.3d 583 (D.D.C. 2001) ........................................................... 34, 35, 36

*FTC v. Standard Oil Co.*, 449 U.S. 232 (1980) .................................................................... 24

*FTC v. Texaco, Inc.*, 555 F.2d 862 (D.C. Cir. 1977) (en banc). .............................................. 3

*Fulton Cogeneration Ass'n. v. Niagara Mohawk Power Corp.*, 84 F.3d 91 (2d Cir. 1996). ..............38

**Page**

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988) ....................................... 23, 29

*Haustechnik v. U.S.*, 34 Fed. Cl. 740 (1996). .................................................................... 38

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir. 2005) ......................... 26

*Hydrocarbon Trading and Transp. Co. v. Exxon Corp.*, 89 F.R.D. 650 (S.D.N.Y. 1981)................... 38

*In re Coral Energy Res., L.P.*, 110 F.E.R.C. ¶ 61,205 (2005) ................................................ 27

*In re Coral Energy Res., L.P.*, Comm. Fut. L. Rep. (CCH) ¶ 29,815 (CFTC July 28, 2004) .............. 27

*In re FCC*, 217 F.3d 125 (2d Cir. 2000). ........................................................................... 20

*Landis v. North Am. Co.*, 299 U.S. 248 (1936).............................................................. 21, 23

*Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir. 1983)............................................. 23

*M.G. Davis & Co. v. Cohen*, 369 F.2d 360, 363 (2d Cir. 1966) .......................................... 21

*Myers v. Bethlehem Corp.*, 303 U.S. 41 (1938) .............................................................. 21

*New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346 (3d Cir. 1964) ....... 26

*Northern States Power Co. v. FERC*, 176 F.3d 1090 (8th Cir. 1999) ..................................... 30

*Northrop Corp. v. U.S.*, 27 Fed. Cl. 795 (1993) ............................................................. 38

*Parklane Hosiery Co., Inc., v. Shore*, 439 U.S. 322 (1979)................................................ 25

*Peck v. U.S.*, 522 F. Supp. 245 (S.D.N.Y. 1981) ............................................................ 26

*Perkins v. Endicott Johnson Corp.*, 128 F.2d 208, 213 (2d Cir. 1942) ................................. 21

*Pub. Util. Comm'n of Ohio  v. United Fuel Gas Co.*, 317 U.S. 456 (1943). .......................... 22

*Renegotiation Bd. v. Bannercraft Co.*, 415 U.S. 1 (1973) ................................................. 24

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49 (1975). ................................................... 23

*Southern Natural Gas Co. v. FERC*, 877 F.2d 1066 (D.C. Cir. 1989). ................................ 21

*SEC v. Hopper*, No. 04-1054, 2006 U.S. Dist LEXIS 17772 (S.D. Tex. Mar. 24, 2006) .................. 35

*SEC v. Zandford*, 535 U.S. 813 (2002) ........................................................................ 31

*Shepard Indus., Inc. v. 135 E. 57th St., L.L.C.*, No. 97-8447, 1999 U.S. Dist. LEXIS 14431
    (S.D.N.Y. Sept. 17, 1999)................................................................................... 23

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971) ................................ 31

*Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, (D.C. Cir.1984). .......................... 20

*The Times Mirror Co. v. FTC*, No.78-3422, 1979 U.S. Dist. LEXIS 11738
    (C.D. Cal. June 13, 1979) ................................................................... 20, 23, 33

**Page**

*Touche, Ross & Co. v. SEC*, 76 Civ. 4489, 1978 U.S. Dist. LEXIS 17974
(S.D.N.Y. May 3, 1978).................................................................................................. 33

*U.S. Commodity Futures Trading Comm'n v. Am. Elec. Power Co., Inc.*,
No. C2-03-891 (Sept. 30, 2003).................................................................................... 27

*U.S. v. RCA*, 358 U.S. 334 (1959).......................................................................... 26, 28

*U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043 (N.D. Cal. 2006) ........................... 27, 35

*U.S. v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429 (7th Cir. 1991)......................... 25

*U.S. v. Valencia*, No. 03-204, 2003 U.S. Dist. LEXIS 15264 (S.D. Tex. Aug. 25, 2003) ................... 35

*U.S. v. Western Pac. R.R.*, 352 U.S. 59 (1956) ............................................................ 37

*Warner-Lambert Co. v. FTC*, 361 F. Supp. 948 (D.D.C. 1973). ...................................... 27

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d 1996)................................. 23

*Williams Natural Gas Co. v. The City of Oklahoma*, 890 F.2d 255 (10th Cir. 1989) .............. 19, 20

*Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330 (D.C. Cir. 2006) .................. 19, 21

*Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981) ..................................................... 22


**Statutes**

Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2000)........................................... *passim*

Energy Policy Act of 2005, P.L. No. 109-58, 119 Stat. 594 (2005).............................. *passim*

Federal Power Act, 16 U.S.C. § 824 *et seq.* (2000), as amended by
Energy Policy Act of 2005, P.L. No. 109-58, 119 Stat. 594, § 1283 (2005)............................ 30, 35

Natural Gas Act, 15 U.S.C. § 717 (2000). ...................................................................... *passim*

Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 (2000)............................................. 4, 10

Securities Exchange Act, 15 U.S.C. 78j(b) (2000), ..................................................... 10, 31

Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989) ........................ 4

**Page**

**Regulations**

17 C.F.R. § 240.10b-5 (2005). ........................................................................................ 10, 30, 31, 35

18 C.F.R. § 1b.19 (2007) ........................................................................................................... 13

18 C.F.R. § 1c.1 (2007)................................................................................................... 10, 13, 32


**Other Authorities**

A. Horwich, *Warnings to the Unwary: Multi-Jurisdictional Federal Enforcement*

    *of Manipulation and Deception in the Energy Markets After the Energy Policy Act of 2005*,

    27 ENERGY LAW J. No.2, 363, 364 (2006) ....................................................................... 32

Black's Law Dictionary (7th Ed. 1999)................................................................................... 35

C. Wright & A. Miller, Federal Practice and Procedure § 2948, (1973). ............................... 23

Natural Gas Futures Contract, NYMEX EXCHANGE RULEBOOK,

    http://www.nymex.com/rule_main.aspx?pg=33#220.05 (last visited Sept. 14, 2007). ..................... 6

*Policy Statement on Enforcement*, 113 FERC ¶ 61,068 (2005)........................................... 14

*Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121 (2003),

    clarification granted, 105 FERC ¶ 61,282 (2003) ............................................................. 7

*Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244 (Jan. 26, 2006)........................ *passim*

STAFF REPORT OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, COMM. ON

    HOMELAND SEC. AND GOVERNMENTAL AFFAIRS, 110th Cong., *Excessive Speculation in the*

    *Natural Gas Market* (2007). ........................................................................................... 6

U.S. GOV'T ACCOUNTING OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN

    OVERSEEING PRICES  (2006). .................................................................................... 9, 32

## I.     PRELIMINARY STATEMENT

The thrust of Amaranth's Motion for Preliminary Injunction is the assertion that the Federal Energy Regulatory Commission ("FERC") is exceeding its jurisdiction and, therefore, FERC should be enjoined from proceeding with its enforcement action.  However, judicial review of a FERC order such as the Order to Show Cause ("OSC") at issue here is committed, by statute, to the exclusive jurisdiction of the Courts of Appeals.  On that basis alone the Motion can, and must, be denied.  Notably, that very jurisdictional question is already pending and ripe for decision before the United States District Court for the District of Columbia (Leon, J.) in a related effort by Defendant Hunter to stop the OSC.  This Court ought in comity to defer its ruling to that court and *both* courts must recognize that this issue cannot be adjudicated in the district courts.

Amaranth also cannot demonstrate it will suffer irreparable harm or that it is likely to succeed on the merits.  Amaranth's claim of harm amounts to legal fees, which alone are not cognizable as "irreparable harm."  Moreover, from a practical standpoint, there is no judicial or administrative economy to be gained by staying FERC's administrative action pending the litigation of the Commodity Futures Trading Commission's ("CFTC") claims here.  Actually, staying FERC's OSC presents the prospect of greater expenditure of party, agency and judicial resources.  Moreover, FERC's action will not "interfere" with this Court's adjudication of the claims by the CFTC.  The staying of a federal agency's important enforcement proceeding by a federal court, merely because of the presence of related claims and parties before the court, would be an extraordinary act.  And it would be unprecedented, for Amaranth has cited not a *single case* where a federal court has done so.

During the court conference on August 16, 2007, the Court asked why two government agencies are pursuing enforcement action against some of the same parties for related conduct for seemingly similar relief.  FERC responds in detail below to this question and summarizes that response here.

1

First, this case does not involve the same parties, the same legal standards, or the same remedies that are at issue in FERC's OSC. This action concerns only three parties, whereas FERC's OSC concerns those three parties as well as six other entities relevant to the allegedly manipulative conduct. This action concerns only an allegation of *attempted* manipulation under the Commodity Exchange Act ("CEA"), whereas the OSC concerns an allegation of *actual* manipulation under the Natural Gas Act ("NGA"). This action charges alleged misrepresentations to the New York Mercantile Exchange ("NYMEX") as a violation, whereas the OSC contains no such allegation. This action seeks primarily injunctive relief, whereas the OSC seeks primarily monetary relief. This action does not seek the disgorgement of profits, whereas the OSC seeks disgorgement of $59 million in unjust profits to be disbursed to market participants who were harmed.

Second, the two cases concern impacts on two different markets. This action concerns financial markets regulated by the CFTC. FERC's OSC concerns the manipulation of financial markets only to the extent that such action directly harmed FERC-jurisdictional physical markets. As Amaranth itself conceded, the "public relies on the [NYMEX] settlement price" as a "key price benchmark for physical . . . contracts involving natural gas."[1] Amaranth's alleged manipulation of financial markets skewed the price of FERC-jurisdictional transactions, affecting millions of consumers across the United States. That is why trade organizations representing millions of natural gas and electric consumers filed briefs *amicus curiae* in this action. FERC has the expertise and jurisdictional mandate to protect these consumers. Amaranth's claim, if accepted, would remove that protection.

Third, Amaranth complains that the CFTC and FERC investigated the same conduct, but there is nothing surprising nor unlawful in two federal agencies pursuing enforcement actions under

---

[1] Letter from Michael Carrieri, Compliance Director of Amaranth, to Anthony Densieski, Senior Director, Market Surveillance, NYMEX (Aug. 30, 2006) (attached as Exhibit 1).

2

two different statutory schemes where the same underlying conduct violates both statutes. *See* discussion *infra* fns 64-67.[2]  In these cases, the courts routinely held such actions permissible because a defendant that violated two statutory schemes cannot reasonably argue that violating one insulates it from liability for violating the other.  If the law were otherwise, it would reward unlawful behavior, rather than discouraging it, and encourage contests between federal agencies to file their actions first, rather than encouraging agency cooperation.

Fourth, in addition to the fact that overlapping enforcement actions are commonplace, they were specifically contemplated by Congress when it enacted the Energy Policy Act of 2005 ("EPAct 2005").  EPAct 2005 granted FERC broad new authority to police market manipulation and impose civil penalties for the manipulation of natural gas and electric markets.  This new authority was granted in the wake of the scandals involving Enron and the crisis that engulfed western energy markets in 2000-2001.  Relevant here, EPAct 2005 did not limit FERC's jurisdiction to manipulation by entities traditionally regulated by FERC, nor did it limit FERC's jurisdiction to manipulative conduct solely concerning physical markets.  Rather, Congress granted FERC broad authority to police market manipulation by "any entity" who engages in conduct that is in "in connection with" any jurisdictional transaction.  This grant of authority was modeled on similar authority given to the SEC, which authority has been interpreted very broadly.  Finally, if this were not enough, Congress recognized that this new grant of authority would require extensive cooperation between the CFTC and FERC, precisely because of the close interplay between financial and physical markets for natural gas and electricity.  Congress therefore mandated that the two agencies enter into a Memorandum of Understanding ("MOU") to facilitate coordination of their enforcement actions.

---

[2] *See FTC v. Texaco, Inc.*, 555 F.2d 862, 881 (D.C. Cir. 1977) (en banc) (noting "an era of overlapping agency jurisdiction under different statutory mandates.")  For example, the FDA and the FTC simultaneously pursue cases for wrongful medical product claims.  The SEC and the FCC simultaneously pursue cases of improper conduct by communications companies. *See* discussion *infra* at pp. 26-28.

The CFTC and FERC did so promptly. The fruits of that cooperation are evident in the enforcement actions that give rise to both this action and the OSC. Those actions were closely coordinated for more than one year and announced the same week, with both agencies supporting each other's actions in public statements accompanying the announcements.

Far from a case of an agency veering off its congressionally-mandated course, which Amaranth would casually invite the Court to stay, the Amaranth OSC is the first time that FERC is implementing an important regulatory program that should go forward. For all these reasons, as well as those discussed *infra*, the motion is without merit and should be denied.

## II.    BACKGROUND

### A.    Parties Relevant to This Action

#### 1.    The Federal Energy Regulatory Commission

FERC is an independent agency that regulates the rates, terms, and conditions of interstate transmission of natural gas, oil, and electricity by certain entities. In 1938, Congress recognized that regulation of the transportation and sale of natural gas in interstate commerce is necessary in the public interest.[3] Section 1(b) of the NGA grants FERC jurisdiction over "the sale of natural gas for re-sale" to ensure that rates and charges pertaining to the transportation or sale of natural gas subject to the jurisdiction of the Commission shall be "just and reasonable."[4] The Commission was given broad power "to prescribe, issue, make, amend, and rescind such orders, rules, and regulations" as

---

[3] 15 U.S.C. § 717 (2000).

[4] 15 U.S.C. §§ 717(b) and 717c(a) (2000). The Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301(21)(A) (2000), and the Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989), exclude from FERC's jurisdiction all "first sales," which are sales from the producer to the consumer, unless the gas is purchased by an interstate or intrastate pipeline, or local distribution company, or an affiliate thereof.

necessary to carry out its statutory obligations.[5]  Prior to 2005, however, FERC's reach was limited to actual sellers of natural gas and conduct that formed a part of the actual sales transaction.

In 2005, Congress expanded FERC's jurisdiction to reach *any* entity that, directly or indirectly, engages in manipulative practices *in connection with* those natural gas transportations and sales that have been historically within FERC's jurisdiction.  *See* discussion *infra* at pp 30-34.

### 2.       The Commodity Futures Trading Commission

Plaintiff CFTC is an independent federal regulatory agency that is responsible for administering and enforcing the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, and implementing regulations.  The CEA provides that the CFTC has exclusive jurisdiction to regulate accounts, agreements, and transactions involving futures contracts traded on designated contract markets and other registered entities.  *See* discussion *infra* at 35-37.

### 3.       Defendants

Defendant Amaranth Advisors L.L.C., and its subsidiary Amaranth Advisors ("Calgary") ULC, are investment advisors in what is commonly referred to as a "hedge fund" (known in the market as "Amaranth").  Prior to its cessation of trading in September 2006, Amaranth traded significantly in energy products.  Defendant Brian Hunter was a natural gas trader and portfolio manager at Amaranth from June 2004 until Amaranth's collapse in September 2006.

### B.       The Relevant Markets

Natural gas is among the most important energy sources in the United States.  It is used to heat homes, generate electricity, and power manufacturing operations.  As a recent Congressional report observed, "[n]atural gas prices are determined through the interaction of the two major types of markets for natural gas:  the cash, or physical, market, which involves the purchase and sale of physical quantities of natural gas; and the financial markets, which involve the purchase and sale of

---

[5] 15 U.S.C. § 717o.

financial instruments whose prices are linked to the price of natural gas in the physical market."[6]

The OSC alleges that Amaranth and others gamed the financial natural gas markets that directly set

prices in physical markets to the detriment of all market participants.

### 1. The Financial Markets

Natural gas financial markets focus on the purchase and sale of financial instruments whose

price is linked to the price of natural gas on the physical market.  There are several financial markets

for energy commodities including "futures exchanges" (or a commodity exchange) such as the

NYMEX.

Amaranth traded in Natural Gas Futures Contracts ("NG Futures Contracts") on the

NYMEX.  NG Futures Contracts are standardized contracts that specify the terms under which a

buyer will accept and a seller will deliver a specified quantity of natural gas at a specified place and

over a specified month up to seventy-two months into the future.[7]  "Speculators" buy and sell NG

Futures Contracts to profit from the change in price over time, while "hedgers" use the futures

market to lock in the price of a future purchase or sale.  All participants look to the futures market

for information about trends in supply, demand, and price of natural gas.  The NG Futures Contract

is not purely a financial instrument, however.  Some futures contract traders take their contracts "to

delivery," meaning they hold the contracts into the contract month during which the contract

becomes a contract for actual delivery and purchase of 10,000 MMbtus of natural gas over the

contract month at the Henry Hub delivery point in Erath, Louisiana.  The price of that *physical* gas

---

[6] STAFF REPORT OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, COMM. ON HOMELAND SEC. AND GOVERNMENTAL AFFAIRS, 110TH CONG., EXCESSIVE SPECULATION IN THE NATURAL GAS MARKET at 23 (2007) (attached as Exhibit 2).

[7] Specifically, a NG Futures Contract is a contract for the future delivery of 10,000 MMBtus of natural gas over the course of the contract month to the buyer's interconnection on the Henry Hub in Louisiana.  *See* Natural Gas Futures Contract, NYMEX EXCHANGE RULEBOOK §§ 220.05, 220.10-12, http://www.nymex.com/rule_main.aspx?pg=33#220.05 (last visited Sept. 14, 2007).

transaction is the "settlement price" of the NG Futures Contract.[8]  There are also a variety of

"derivative" financial products, most of which are termed "swaps," that derive their value based on

the settlement price of the NG Futures Contract for a given month.  In addition, the NG Futures

Contract settlement price determines, in whole or in part, the price of a substantial volume of

additional physical natural gas sales.

> ## 2. The Physical Markets

The wholesale physical natural gas markets include a variety of types of contracts and selling

arrangements.  One major monthly sales tool is a product called a "physical basis" contract.

Physical basis contracts use the NG Futures Contract settlement price for a given month as the base

price, plus or minus a fixed amount representing the expected price differential for delivery at the

delivery location versus the Henry Hub in Louisiana (where the NYMEX NG Futures Contract calls

for delivery).  Particularly in the Northeast, Midwest and Gulf of Mexico producing regions, trillions

of cubic feet of natural gas were priced during 2006 using this method, which is mathematically tied

to the NG Futures Contract settlement price.[9]

To determine the prevailing price for natural gas at a given location, physical buyers and

sellers often look to benchmarks, such as a published price "index" at a similar location, or a

specified differential to a published price index in the event the gas is to be delivered at a different

location.[10]  To compile monthly "indices" at various physical natural gas trading locations,

---

[8] The "settlement price" is the volume-weighted average price of trades made during the 30-minute "settlement period," which is the last 30 minutes of trading on the termination day for the next calendar month contract.

[9] Order to Show Cause, 120 FERC ¶ 61,085 at ¶ 25 (July 26, 2007) (citing data available from the IntercontinentalExchange ("ICE")) (attached as Exhibit 3).

[10] *See generally Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121 (2003), *clarification granted*, 105 FERC ¶ 61,282 (2003) (attached as Exhibit 4 and Exhibit 4a).

publishers of natural gas industry newsletters (*e.g.,* Platts or NGI) conduct price surveys of market participants.  Those surveys capture a significant amount of the physical basis transactions.  Figure 1 shows the high percentages of physical basis transactions that make up index prices.

**Figure 1: Use of Physical Basis Contracts in Natural Gas Price Indices at Major Trading Points, 2006**[11]



Consequently, if the NG Futures Contract settlement price is affected due to manipulation, this effect will be directly and substantially transmitted into index prices.  In turn, this index pricing "dominates the market for long- and mid-term supply agreements" by such purchasers as Local Distribution Companies who sell natural gas to consumers to heat homes and fuel kitchens or electric utility companies who use natural gas to generate electricity for the Nation's grid.[12]

In sum, manipulation of the NG Futures Contract settlement price has a direct and substantial effect on the prices used for huge quantities of physical natural gas – the type of "connection with"

---

[11] FERC, 2006 STATE OF THE MARKETS REPORT 50 (2007), http://www.ferc.gov/market-oversight/st-mkt-ovr/st-mkt-ovr.asp (last visited Sept. 14, 2007).

[12] OSC at ¶ 23 (Exhibit 3) (citing FERC *State of the Market Report* and survey prepared by American Gas Association).

the physical natural gas markets that the new anti-manipulation provisions from EPAct 2005 were designed to redress.

    **C.**      **Recent Legislative and Regulatory Developments**

          **1.**        **Energy Policy Act of 2005**

EPAct 2005 empowered FERC to prohibit manipulation, not only by direct participants in the physical natural gas (or wholesale electric) markets, but also where, as here, "any entity" commits manipulation directly *or indirectly*, in *connection with* jurisdictional transactions.[13] Congress expanded FERC's authority under the NGA over natural gas markets to "police natural gas markets, punish manipulation, and impose greater penalties for other types of violations."[14] Congress also substantially increased through EPAct 2005 the remedies available to FERC to punish and deter such violations, including increased civil penalties of up to $1,000,000 per violation, per day.[15] This is the highest available penalty amount in the federal government and many times larger than penalties that can be sought by the CFTC.

As a consequence of expanding FERC's authority over energy markets, Congress recognized FERC would need to work with the CFTC because of areas of mutual jurisdictional interest. Thus, EPAct 2005 required FERC and the CFTC to enter into a MOU[16] because "the CFTC and the FERC

---

[13] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 549 § 315 (2005) (codified at 15 U.S.C. 717c-1). Thus, the conduct need not be "in" a jurisdictional transaction. Rather, transactions in financial markets that intentionally or recklessly affect Commission-jurisdictional markets are within FERC's mandate under EPAct 2005. *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244 (Jan. 26, 2006).

[14] U.S. GOV'T ACCOUNTING OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN OVERSEEING PRICES 2 (2006) (citing EPAct 2005) (attached as Exhibit 5).

[15] EPAct 2005 § 314(b) (codified at 15 U.S.C. § 717t-1).

[16] *Id.* § 316(c)(1).

may from time to time engage in oversight or investigations of activity affecting both CFTC-jurisdictional and FERC jurisdictional markets."[17]

## 2.    FERC's Anti-Manipulation Rule

FERC adopted Rule 1c.1, "The Anti-Manipulation Rule," to implement its anti-manipulation authority.[18]  This new rule was adopted through "Order No. 670."  *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244 (Jan. 26, 2006) (herein "Order No. 670").  The Anti-Manipulation Rule is based largely on the Securities and Exchange Commission's 10b-5 regulation and prohibits all kinds of deception, manipulation, deceit, and fraud.[19]  Tracking the breadth of EPAct 2005, the reach of Order No. 670 and Rule 1c.1 are likewise broad because they prohibit *any* entity from engaging in manipulation that is "in connection with" a jurisdictional transaction.[20]

---

[17] MOU at 2-3 (attached as Exhibit 6).  The MOU notes that FERC has exclusive jurisdiction over the transportation and certain sales in interstate commerce of natural gas, while the CFTC has exclusive jurisdiction over the accounts, agreements, and transactions involving contracts for sale of a commodity for future delivery.  *Id.* at 2.  Yet, the MOU acknowledges that the oversight and investigations of these two Commissions may affect both CFTC-jurisdictional and FERC-jurisdictional markets.

[18] 18 C.F.R. § 1c.1 (2007).

[19] Order No. 670, 71 Fed. Reg. 4,244, 4,249 at ¶¶ 25 (quoting *Aaron v. SEC*, 446 U.S. 680, 690 (1980)), 49-50 (Jan. 26, 2006).  *See also* 18 C.F.R. § 1c.1.  Consistent with the mandate that certain aspects of the FERC's new authority be exercised in a manner consistent with section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and consistent with Congress' modeling of EPAct 2005 section 315 (new NGA section 4A) and 1283 (new FPA section 222) on section 10(b) of the Securities Exchange Act, FERC modeled the Anti-Manipulation Rule on SEC Rule 10b-5.  Order No. 670, 71 Fed. Reg. 4,244, 4,246 at ¶ 7; *see also Exchange Act*, 15 U.S.C. § 78j(b) (2000); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2005).

[20] Order No. 670, 71 Fed. Reg. 4,244, 4246-9 at ¶¶ 2, 16, 18, 22.  Commission-jurisdictional sales are wholesale natural gas sales in interstate commerce that are not sales from the producer to the consumer, unless and until gas is purchased by an interstate or intrastate pipeline, or local distribution company within the meaning of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3431(a)(1)(A) (2000).

D.    **Agency Investigations**

1.    **FERC's Administrative Investigation and the OSC's Preliminary Findings**

In April 2006, FERC's market oversight staff observed, in real-time, anomalies in the price on the NYMEX of NG Futures Contracts for May 2006 Delivery during the 30 minute settlement period for that contract.[21]  After review of comparative data on prior settlements, the matter was referred to FERC investigators.[22]  On May 2, 2006, FERC informed the CFTC of FERC's observations and requested and received trade data from the NYMEX pursuant to the MOU.[23]  In June 2006, FERC instituted a non-public investigation of Amaranth, subsequently working throughout in close cooperation with the CFTC.[24]  Following a year-long investigation, FERC staff concluded there was a substantial basis to believe that Amaranth and others manipulated the NYMEX NG Futures Contract price on February 24, March 29, and April 26, 2006 that had corresponding direct and substantial effects on the physical markets.[25]

In the meantime, Congress followed up its enactment of EPAct 2005 with related oversight. For example, while FERC's non-public investigation of the Amaranth entities proceeded, Senator Jeff Bingaman, Chairman of the Senate Committee on Energy and Natural Resources, sent FERC Chairman Kelliher a letter: (a) noting "the evolution of complex and inter-related markets for financial and physical energy commodities has elevated the importance of the Federal Energy Regulatory Commission's . . . role," (b) inquiring about FERC's efforts "to police the [natural gas]

---

[21] OSC (Exhibit 3) at ¶¶ 55, 61.

[22] *Id*. at ¶ 53.

[23] *Id.*

[24] *Id.*

[25] *Id.* at ¶ 57.

market," in particular "efforts [by FERC] to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading" and, (c) querying how FERC was working with the CFTC.[26]  FERC's February 21, 2007 response explained that where matters relate to both futures markets and interstate natural gas transportation and certain sales, both the CFTC and FERC have jurisdiction.[27]  FERC described its routine monitoring of NG Futures Contract trading, but, because FERC's investigations are non-public, FERC could not disclose at that time the Amaranth investigation or other investigations.[28]  Senator Bingaman likewise sent a letter to the CFTC asking the same sorts of questions to which the CFTC replied in part, that indeed in recent years NG futures Contract "settlement prices have taken on a new role, as other entities independently have determined to rely on these prices to price various cash market transactions . . ."[29]  The CFTC also noted that the MOU was facilitating regular contacts between the enforcement staffs of the CFTC and FERC on "matters of mutual interest."[30]

---

[26] *See* Letter from Senator Bingaman, Chairman, Committee on Energy and Natural Resources, to Joseph Kelliher, Chairman, FERC (Feb. 6, 2007) (attached as Exhibit 7).

[27] Letter from Joseph Kelliher, Chairman, FERC, to Senator Bingaman, Chairman, Committee on Energy and Natural Resources (Feb. 21, 2007) (attached as Exhibit 8).

[28] *Id.* at 11-12.

[29] *See* Letter from Senator Bingaman, Chairman, Committee on Energy and Natural Resources, to Reuben Jeffrey III, Chairman, CFTC at 1-2 (Feb. 6, 2007) (attached as Exhibit 9).  In response, the CFTC explained that the MOU between the CFTC and the FERC is "a formal agreement by the [CFTC] and FERC to coordinate, on a regular basis, with respect to activities of mutual interest."  *See* Letter from Reuben Jeffrey III, Chairman, CFTC to Senator Bingaman, Chairman, Committee on Energy and Natural Resources at 5 (Feb. 22, 2007) (attached as Exhibit 10).  Thus, FERC and CFTC staff remain in regular contact to share information on oversight and ongoing investigations of mutual interest.  MOU (Exhibit 6) at 9.

[30] Letter of Jeffrey to Senator Bingaman at 7 (Feb. 22, 2007) (Exhibit 10).

Following its year-long investigation, and after providing Amaranth an opportunity to explain why an enforcement proceeding should not commence,[31] on July 19, 2007, FERC Commissioners voted unanimously to issue the OSC.  In coordination with the CFTC, and to maximize the efficacy of both enforcement efforts, FERC issued to Amaranth the OSC on July 26, 2007, one day following the CFTC's complaint in this action.  The OSC preliminarily concluded that the Amaranth Entities and former Amaranth employees Brian Hunter and Matthew Donahoe violated FERC's Anti-Manipulation Rule 1c.1 by *manipulating the price of Commission jurisdictional transactions* on three specific dates by trading on February 24, March 29 and April 26, 2006.  By selling an extraordinary amount of NG Futures Contracts during the last 30 minutes of trading before the contracts expired, the Amaranth traders appear to have manipulated (in this case driving down) the settlement price of NG Futures Contracts.  As Amaranth had taken positions several times larger in various financial "swaps" and other derivatives whose value increased as a direct result of the decrease in the settlement price of the NG Futures Contracts, Amaranth would have gained on its financial positions.

If Amaranth's conduct drove down the NG Futures settlement price, it had a significant impact on physical markets given the role of the NG Futures settlement price in physical market price formation and affected a substantial volume of FERC jurisdictional natural gas transactions.  As Amaranth itself stated to the NYMEX, the "public relies on the settlement price" as a "key price benchmark for physical and financial contracts involving natural gas."[32]  The CEO of the NYMEX,

---

[31] Pursuant to 18 C.F.R. § 1b.19, staff informed Amaranth that a recommendation may be made about whether to commence an enforcement action and invited Amaranth to submit a statement explaining Amaranth's position regarding FERC's investigation and basis for bringing an enforcement action.  In response, Amaranth and others filed with staff lengthy submissions to the Commission arguing issues of fact, law, and policy.

[32] Letter from Carrieri to Densieski (Exhibit 1) at 1.  For example, during the three months of interest in FERC's action, blanket certificate holders who sell natural gas subject to FERC's jurisdiction, such as BP, Louis Dreyfus, UBS, Merrill Lynch, and ConocoPhillips sold natural gas by

himself a former CFTC Commissioner, Dr. James Newsome, also observed that the NG Futures

settlement price is "widely used as a national benchmark price."[33] As a result, producers and other

natural gas market participants may have been paid an artificially lower price for their natural gas.[34]

In addition, the pecuniary interests of state and federal governments may have been harmed when

natural gas from public lands was sold for royalties that are also tied to the NYMEX settlement

price.

      The OSC does not, as Amaranth contends, seek "damages" or injunctive relief.  Instead,

FERC seeks more than $200 million in civil penalties to redress harm to the *physical* gas markets,

not the NG Futures market.  Thus, the civil penalties will punish the Amaranth Entities and the

traders for the impact of their manipulative conduct on Commission-jurisdictional transactions and

for preventing sellers from obtaining a price for their product that is fair and based on a well-

functioning market.   In addition, FERC proposed recovery, through disgorgement, at least $59

million in unjust profits and, to the extent possible, will distribute those disgorged funds to those

who were harmed as a result of Amaranth's conduct.[35]

---

taking 2,000 NG Futures Contracts through expiration in one or more of the months for approximately 20 billion cubic feet ("Bcf") of physical gas that went to delivery.  OSC (Exhibit 3) at ¶ 26.  These are the prices Amaranth is accused of manipulating.  *Id.*  It is therefore somewhat puzzling that, citing the entire OSC, Amaranth claims no physical transactions were "mentioned by FERC."  Memorandum of Law in Support of the Motion of Amaranth for Preliminary Injunction (hereinafter "Amaranth Memo.") (Docket Entry #5) at 5.

[33] Dr. James Newsome, "Testimony before the Senate Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, Excessive Gas Speculation on Natural Gas Market" (July 9, 2007) (attached as Exhibit 11).

[34] OSC (Exhibit 3) at ¶¶ 20-27, 108-110.

[35] *Policy Statement on Enforcement,* 113 FERC ¶ 61,068, at ¶¶ 19, 23, 25 (2005) (attached as Exhibit 12) ("[A]t a minimum a company involved in wrongdoing must disgorge any unjust profits resulting from the wrongdoing.")

Amaranth has been granted nearly three months to respond to the OSC.[36]  After any such response, FERC may request further briefing, set issues for a trial-type proceeding, with full discovery before an administrative law judge ("ALJ"), request a recommendation or report from an ALJ, issue an order on the merits, or provide any other process that would justly and efficiently resolve the matter.[37]  Only at the culmination of such processes will FERC issue a final order that is appealable directly to the Court of Appeals.

## 2.    CFTC's Investigation and Litigation

As discussed above, FERC contacted the CFTC on May 2, 2006, requesting trade data for the May NG Futures Contract.  The CFTC opened its investigation after being notified by FERC of the anomaly in the May settlement period and after FERC's investigation began.  Subsequently, pursuant to the MOU, FERC and the CFTC coordinated their investigations of Amaranth's conduct.

On July 25, 2007, the CFTC filed the instant action alleging that Amaranth and others attempted to manipulate NG Futures Contracts settlement prices on two specific dates (as opposed to three dates alleged in the OSC) in violation of the Commodity Exchange Act.[38]  In announcing their respective enforcement actions, the Chairmen of the two agencies praised each agency's cooperative investigative efforts.[39]  Unlike FERC's OSC, which made a preliminary finding of *actual* manipulation that impacted the natural gas markets, the CFTC complaint is narrower, in that it alleges only that Amaranth *attempted* to manipulate the price of NG Futures Contracts (Count 1).

---

[36] Amaranth sought, and was granted, extensions of time to respond to the OSC.  As of this writing, responses are due to be filed on October 19, 2007.

[37] OSC (Exhibit 3) at ¶ 2-3 n.7.

[38] *CFTC v. Amaranth Advisors, LLC*, No. 07 Civ. 6682, at 16-17 (S.D.N.Y. July 25, 2007) (Docket Entry No. 1).

[39] *See* http://www.cftc.gov/newsroom/enforcementpressreleases/2007/pr5359-07.html (CFTC statement), and http://www.ferc.gov/news/statements-speeches/kelliher/2007/07-26-07-kelliher.asp (Statement by FERC Chairman Kelliher).

The CFTC makes a claim for making misrepresentations to the NYMEX (Count 2), whereas FERC does not allege such a violation.  The CFTC did not sue all parties against whom the OSC issued.  And, unlike the FERC OSC, which does not seek to bar the defendants from futures trading, the majority of relief sought by the CFTC is injunctive in nature.  The CFTC also seeks civil penalties, but in an amount not to exceed $130,000 or triple the monetary gain for each violation of the CEA.[40]  Table 1 summarizes the differences between these two enforcement actions.

**Table 1:  Comparison of FERC OSC and CFTC Complaint**

| ELEMENT OF THE ACTION | FERC OSC | CFTC COMPLAINT |
|---|---|---|
| **Plaintiffs:** | None | CFTC |
| **Defendants/Respondents:** | Amaranth Advisors L.L.C. Amaranth LLC Amaranth Management Limited Partnership Amaranth International Limited Amaranth Partners LLC Amaranth Capital Partners LLC Amaranth Group Inc. Amaranth Advisors (Calgary) ULC Brian Hunter Matthew Donohoe | Amaranth Advisors L.L.C. Amaranth Advisors (Calgary) ULC Brian Hunter |
| **Basis for Jurisdiction:** | NGA (as amended by EPAct) Section 4A, 15 U.S.C. § 717c-1 | Sections 6c and 9(a) of the CEA |
| **Claims Alleged:** | Manipulation of Commission-jurisdictional transactions by trading in the NG Futures Contracts on three days.  OSC at ¶ 5. | Count I:  *attempted* manipulation of the price of NG Futures on two days in violation of Section 6c, 6d, and 9(a)(2) of the CEA;  Count II:  misrepresentations to the NYMEX in violation of Section 9(a)(4) of the CEA. |

---

[40] *Id.* at 20.

| Relief Sought: | **Disgorgement** of at least $59 Million in unjust profits<br><br>**Civil penalties** of over $230 million | **Injunctive relief** enjoining defendants from, inter alia:  violating the CEA, . . . trading on any registered entity or trading for any commodity interest account; or engaging in business activities related to commodity interest trading.<br><br>**Civil Penalties**  of up to $130,000 per violation<br><br>**Costs and fees** |
|---|---|---|

Given these differences, FERC will need to proceed administratively irrespective of the outcome of the CFTC case (*see* further discussion at pp. 29-30).

### E.     Related Litigation and Agency Action

#### 1.     Related Litigation Against Amaranth

Within the last several months, the Amaranth entities were named as defendants in three separate lawsuits filed by an Amaranth investor and putative class members representing market participants claiming investor fraud and market manipulation.[41]  In addition, the United States Securities and Exchange Commission, as well as other agencies, also opened inquiries into Amaranth's activities.[42]

#### 2.     Litigation Related to FERC's Order to Show Cause: *Hunter v. FERC*

On July 23, 2007, Brian Hunter, who is also a defendant in this action, filed in the United States District Court for the District of Columbia an *ex parte* application for a temporary restraining order ("TRO") and preliminary injunction to prohibit FERC from initiating the OSC action against

---

[41] *See San Diego County Employees Ret. Ass'n. v. Maounis et al.*, No. 07 Civ. 2618 (S.D.N.Y. Mar. 29, 2007) (attached as Exhibit 13); *Gracey v. Amaranth Advisors, LLC*, No. 07 Civ. 6377 (S.D.N.Y. July 12, 2007) (attached as Exhibit 14); *Special v. Amaranth Advisors, L.L.C.*, No. 07 Civ. 7181 (S.D.N.Y. Aug. 10, 2007) (attached as Exhibit 15).

[42] *See, e.g.,* OSC (Exhibit 3) at ¶ 55.

Hunter.[43]  The bases for Hunter's motion are virtually identical to the arguments raised in

Amaranth's *ex parte* motion here, namely that the CFTC, not FERC, has exclusive jurisdiction

because Amaranth traded only in the NYMEX futures market, and that FERC's enforcement action

would irreparably harm Hunter.  Hunter's motion for a TRO was immediately denied, but the parties

await the court's ruling on Hunter's motion for a preliminary injunction.[44]

## III.    ARGUMENT

As Hunter argued in *Hunter v. FERC*, Amaranth argues here that the CFTC has exclusive

jurisdiction over anything relating to futures markets and, therefore, FERC lacks jurisdiction to

pursue its enforcement action.  Like Hunter, Amaranth also asks this Court to: (1) review FERC's

Order to Show Cause, (2) determine that FERC's preliminary findings pertain exclusively to NG

Futures Contracts traded exclusively on the NYMEX; (3) ignore express statutory authority and

conclude that the CFTC is the *only* agency authorized to prevent and punish manipulation of natural

gas markets; and (4) prevent FERC from carrying out its express statutory mandate to protect energy

markets.

To resolve the motion, this Court must review FERC's OSC.  Thus, like Hunter, Amaranth is

trying an end-run around the statutory requirement that judicial review of a FERC order be had *only*

in the Court of Appeals and only upon final agency action.  As did Hunter, Amaranth raises its

unfounded legal argument at the wrong time and in the wrong court.

---

[43] A copy of Hunter's Motion and Memorandum in Support is attached as Exhibit 16.

[44] Judge Leon heard oral argument on Hunter's Motion on August 7, 2007.  *See Hunter v. FERC*, No. 1:07 Civ. 01307 (D.C. Cir. 2007), Excerpts of Transcript of Preliminary Injunction Hearing Before Judge Richard J. Leon, August 7, 2007 at 43:25-44:3 (attached as Exhibit 18).  On September 7, 2007, as here, the parties jointly sought, and were granted, a temporary cessation of the proceedings in *Hunter v. FERC*.  However, during a September 24, 2007 status conference, the parties requested that Judge Leon proceed with his ruling and Judge Leon advised the parties he expects to rule in October 2007.

A.    **Jurisdiction to Review FERC's Order Lies Exclusively With the Court of Appeals**

Amaranth's motion must fail because this Court lacks jurisdiction to review FERC's OSC.

15 U.S.C. § 717r(b) (2005); *Williams Natural Gas Co. v. The City of Oklahoma*, 890 F.2d 255, 262-

63, and 262 n. 8 (10th Cir. 1989) (under 19(b) of the NGA, judicial review of a FERC order is

exclusive within the court of appeals and a collateral trial court challenge to a FERC order could not

be entertained); *see also Williston Basin Interstate Pipeline Co. v. FERC,* 475 F.3d 330, 334 (D.C.

Cir. 2006) (Section 19(b) of the NGA provides that a party aggrieved by a FERC order and seeking

review must first apply for a rehearing of a FERC order, then upon application of rehearing, must

file for any review in the appropriate court of appeals).  While Amaranth styles its motion as a

motion for preliminary injunction that seeks merely to "stay" FERC's enforcement action, to grant

Amaranth's Motion, this Court must find that Amaranth is irreparably harmed by FERC's OSC and

ensuing administrative action *and* that there is a substantial likelihood that Amaranth will prevail in

its claim that FERC's OSC and administrative action exceed FERC's jurisdiction.  Resolution of

these arguments self-evidently requires review of FERC's Order.[45]  But, that review is committed

exclusively to the Court of Appeals.

"It can hardly be doubted that Congress, acting within its constitutional powers, may

prescribe the procedures and conditions under which, and the court in which, judicial review of

administrative orders may be had."[46]  In Section 19(b) of the NGA, Congress provides that the

---

[45] Amaranth's claim that it "is not asking the court to determine whether FERC has jurisdiction to proceed with its enforcement action" (Amaranth's Memo. at 4 n. 6) is, to say the least, confusing given its prayer (on the same page of the brief) that the court "stay FERC's proceeding . . . [because] the FERC is acting beyond the scope of its statutory authority" and the seventeen out of thirty pages of Amaranth's Memo. which argue against FERC's jurisdiction.  *Id.*

[46] *City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 336 (1958).

exclusive avenue for judicial review of FERC orders (which the OSC unquestionably is) is in the

Court of Appeals.  The statute provides in pertinent part:

> Any party to a proceeding under this Act [15 USCS §§ 717 et seq.]
> aggrieved by an order issued by the Commission in such proceeding may
> obtain a review of such order in the [circuit] court of appeals of the United
> States for any circuit wherein the natural-gas company to which the order
> relates is located or has its principal place of business, or in the United
> States Court of Appeals for the District of Columbia, by filing in such court,
> within sixty days after the order of the Commission upon the application for
> rehearing, a written petition praying that the order of the Commission be
> modified or set aside in whole or in part.[47]

While the request before this Court involves a FERC order initiating an administrative

proceeding rather than concluding one after consideration of rehearing petitions, it nevertheless

involves review of a FERC order that in turn can be had only in a court of appeals.  "Where statute

commits review of agency action to the Court of Appeals, any suit seeking relief that might affect

the Circuit Court's *future* jurisdiction is subject to the exclusive review of the Court of Appeals."

(emphasis added).[48]  Importantly, in *Williams*, the Court observed that the prohibited collateral

attack, as here, "ultimately challenges FERC's determination of its own jurisdiction" but those

arguments must be raised on appeal from the FERC order.   890 F.2d at 269.  A very similar case

was presented in *Consolidated Natural Gas Corp. v. FERC*, 611 F.2d 951 (4th Cir. 1979).  In

*Consolidated*, the natural gas company filed a district court action seeking to restrain a FERC Order

to Show Cause proceeding.  In vacating the district court judge's grant of the injunction, the Court of

---

[47] 15 U.S.C. § 717r(b) (2005).

[48] *In re FCC*, 217 F.3d 125, 141 n. 10 (2d Cir. 2000) (quoting *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 78-9 (D.C. Cir.1984)).  *See also The Times Mirror Co. v. FTC*, No.78-3422, 1979 U.S. Dist. LEXIS 11738 (C.D. Cal. June 13, 1979) (attached as Exhibit 17) (court denied The Times Mirror's motion for preliminary injunction to enjoin the FTC's administrative action on the ground that the FTC lacked subject matter jurisdiction because the FTC administrative proceedings should be exhausted, The Times Mirror would have ample opportunity to present its position to the agency, and any final decision by the FTC would be subject to review by the Court of Appeals).

Appeals held that Section 19(b) of the Natural Gas Act "vests *exclusive* jurisdiction to review all decisions of the Commission in the circuit court of appeals." *Id.* at 957 (emphasis added) (citations omitted). Thus, the "district court was without jurisdiction to interfere with the Commission's proceedings through the issuance of an injunction." *Id.* at 958. Moreover, the court noted that *even the Court of Appeals* could not ordinarily review procedural or preliminary FERC Orders before administrative remedies had been exhausted and "even more so the district court may not review such orders." *Id.* at 957.[49]

Importantly, the above-referenced NGA provision also makes clear, and the cases state, that as a prerequisite to Court of Appeals review, an aggrieved party should first seek a rehearing by the Commission.[50] Notwithstanding its attempt to stay the FERC proceeding through an order in this Court, Amaranth recently requested rehearing at the Commission of the OSC.[51] Clearly, Defendants know that the appropriate course is to seek review of FERC's Order in the Court of Appeals and they are laying the groundwork at FERC to pursue that course. Defendants should not be permitted to shop in this forum for the relief they seek – and can only seek -- elsewhere.[52]

---

[49] *See also Perkins v. Endicott Johnson Corp.*, 128 F.2d 208, 213 (2d Cir. 1942) ("federal courts will not entertain a suit by a respondent in an administrative proceeding to enjoin the proceeding on allegations that the administrative agency is without 'jurisdiction' and that to allow the proceeding to continue in such circumstances will put the respondent to needless expense." (citing *Myers v. Bethlehem Corp.*, 303 U.S. 41 (1938)). *Accord M.G. Davis & Co. v. Cohen*, 369 F.2d 360, 363 (2d Cir. 1966) (injunction denied where plaintiff had not shown that the SEC "so grossly exceeded its power as to have, in effect, flouted the will of Congress.").

[50] *Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330, 334 (D.C. Cir. 2006); *Southern Natural Gas Co. v. FERC*, 877 F.2d 1066, 1072 (D.C. Cir. 1989) (Section 19(b) of the NGA requires a person aggrieved by a FERC order to first petition the Commission for rehearing before petitioning the Court of Appeals for review).

[51] Request of Amaranth Advisors L.L.C. *et al*. for Expedited Rehearing to Terminate Show Cause Order for Lack of Subject Matter Jurisdiction, Docket No. IN07-26-000 (Aug. 27, 2007).

[52] Amaranth's reliance on *Landis v. North Am. Co.*, 299 U.S. 248 (1936) to support its claim that this Court has inherent authority to stay FERC's administrative proceeding is inapposite. Amaranth Memo. at 28. *Landis* involved 47 cases in 13 judicial districts, each making the same

In a related vein, Amaranth's co-defendant Hunter, sought in *Hunter v. FERC* a review of

FERC's administrative action arguing to Judge Leon that the CFTC, not FERC, has jurisdiction.[53]

As here, FERC argued in *Hunter v. FERC* that under § 19(b) of the NGA, the district court lacked

jurisdiction to review FERC's OSC.  Hunter's motion in *Hunter v. FERC* is fully briefed and argued

and the parties await a decision by that court.  Setting aside whether *Hunter v. FERC* represents yet

additional peddling of these arguments by Amaranth's co-defendant (who is also represented by

Amaranth's counsel in the case at bar),[54] the doctrine of comity urges this Court to defer its ruling

until the United States District Court for the District of Columbia, under its prevailing practice,

issues a decision in *Hunter v. FERC* that may inform this Court of the legal and factual bases for any

ruling on an injunction.[55]

---

challenge to a single statute and the resolution of a single test case would settle the rule of law with
respect to the other cases.  The instant case will not settle the rule of law because, as discussed
above, the CFTC is proceeding under the CEA and FERC is proceeding under the NGA.
Amaranth's reliance on *Pub. Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 468
(1943), is also misplaced.  Amaranth Memo. at 28.  In *Public Utility Comm'n*, the Supreme Court
upheld an injunction against the state public utilities commission because the statute conferred to the
Federal Power Commission (the predecessor of FERC) the exclusive authority to set natural gas
rates.  In this case, Amaranth is trying to *prevent* FERC from exercising the anti-manipulation
authority conferred by the EPAct.  Therefore, a stay in this case would clearly frustrate the will of
Congress.

[53] *See* fn 44 *supra*.

[54] Though not appearing here as "counsel of record" for Hunter, Amaranth's counsel
Winston & Strawn represents Hunter in his "corporate capacity" with respect to the FERC matter.
In vociferously opposing an extension of the briefing schedule here (an extension to which it
subsequently agreed), Winston & Strawn proclaimed in its September 5, 2007 letter to the Court that
FERC was "clearly forum shopping."  Though it is an intriguing notion that FERC, which neither
initiated the *Hunter v. FERC* case nor involved itself in *this* case, is a "forum shopper," FERC will
leave to the Court's own conclusions the matter of whether and which litigants are shopping, where,
and for what.

[55] *See Zambrana v. Califano,* 651 F.2d 842, 844 (2d Cir. 1981) (relying on principles of
comity and judicial economy, the court affirmed dismissal of action where plaintiffs had a remedy in
another court with jurisdiction over the claims); *Burrows v. U.S.*, No. 93-1795, 1993 U.S. Dist.
LEXIS 8229, at \*8-9 (S.D.N.Y. June 16, 1993) (attached as Exhibit 19) (principles of comity
required court to defer to Eastern District of New York to resolve identical claims.)

**B.     FERC's  Enforcement Action Will Not Irreparably Harm Amaranth, But a Stay Will Harm FERC and the Public Interest**

Amaranth is not entitled to a preliminary injunction without a showing of irreparable injury.[56]  Amaranth "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which [it] prays will work damage to someone else."[57]  Amaranth's claimed "harm" (aside from contradictory assertions about "collateral" effects discussed below) really boils down to speculative assertions by Amaranth's CEO that Amaranth will incur greater legal fees and costs from coordinated, simultaneous proceedings than it would incur if the CFTC case and OSC were adjudicated *seriatim*.  Such speculative claims are insufficient to sustain its burden here.[58]

---

[56] *See*, *e.g.*, *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) (to obtain a preliminary injunction, the moving party must demonstrate "(a) irreparable harm *and* (b) either (1) likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.") (internal quotations omitted); s*ee also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 56 (1975); *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996); *Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.") (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973) (footnote omitted)).

[57] *Landis*, 299 U.S. at 255.

[58] *See Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991) (a motion for preliminary injunction should be denied if the harm alleged is remote, speculative, or merely possible); *Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (court affirmed denial of preliminary injunction because, in part, plaintiff produced only conclusory evidence of its president); *Shepard Indus., Inc. v. 135 E. 57th St., LLC*, No. 97-8447, 1999 U.S. Dist. LEXIS 14431, at *24 (S.D.N.Y. Sept. 17, 1999) (attached as Exhibit 20) (conclusory allegations of damage to goodwill and reputation are insufficient bases to find irreparable harm); *The Times Mirror Co. v. FTC*, No. 78-3422,  1979 U.S. Dist. LEXIS 11738, at *6 (C.D. Cal. June 13, 1979) (Exhibit 17) (neither litigation expenses nor waste of government resources amount to irreparable harm).

1.    **Litigation Costs From Dual Actions Are Not Irreparable Harm**

Amaranth's main contention -- that a stay is necessary to avoid defense effort and litigation costs[59] -- does not meet the standard of "irreparable harm" that warrants the extraordinary relief of delaying FERC's administrative action.  *See FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (noting that the burden, expense, and disruption of defending an enforcement action are part of the social burden of living under government and, therefore, are not considered irreparable harm).[60]  In fact, allowing FERC's action to proceed is more likely to result in *more* judicial economy – not less. The CFTC and FERC can continue their joint efforts by coordinating requests for documents and conducting joint depositions, thereby reducing the discovery and resource burdens on Amaranth.  If Amaranth pursues third party discovery, there is no reason that such discovery cannot proceed in both this court and at FERC, as appropriate.  Moreover, given the complexity of the issues and the technical expertise needed, the parties would benefit by simultaneously developing expert analysis and testimony that encompasses all relevant issues, not just those in a single case.  Finally, Amaranth is currently facing litigation and investigation from many quarters such as multiple individual and class cases, as well as the attentions of yet additional regulators.  Stopping FERC's OSC will not stop these other activities and Amaranth does not and cannot specify what the additional marginal expense is of defending the FERC action.  So, it is speculative at best how a stay will result in cost savings.

_____

[59] Declaration of Nicholas Maounis (Docket Entry # 4) at ¶¶ 9-10 (attached to Amaranth Memo.).

[60] *See also Renegotiation Bd. v. Bannercraft Co.*, 415 U.S. 1, 24 (1973) ("mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury); *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93, 100 (2d Cir. 1986) (monetary cost of arbitration is not irreparable harm, nor is the pendency of the same issues before the NLRB a basis for staying the arbitration) (citations omitted).

##        2.        Claim or Issue Preclusion is Not Harmful

Amaranth vaguely claims that it (or this Court's jurisdiction) could be "harmed" because of the potential "collateral" effects on the CFTC case at bar from rulings by FERC on the OSC. These claims are unwarranted. First, Amaranth conflates the concepts of "res judicata" and "collateral estoppel" -- the former is inapplicable here and the latter is of minimal relevance. Second, Amaranth's argument is internally inconsistent. On the one hand, Amaranth contends that allowing both cases to proceed could result in *inconsistent* decisions because of the "two agencies diametrically opposed conclusions," yet on the other hand (and in the same sentence) Amaranth claims it will be harmed if FERC's action has a collateral effect that would result in *consistent* decisions because the "agencies seek to punish Amaranth Advisors for the exact same conduct." Amaranth Memo. (Docket Entry # 5) at 8, 9. Neither predicate is accurate and Amaranth's "either/or" argument is unsustainable as a matter of logic. The doctrine of collateral estoppel is intended to ensure consistency of judicial decisions and there is nothing inherently harmful or problematic if resolution of one claim would have some effect on the second action.[61] The cases cited by Amaranth to support its contention that the potential for inconsistent decisions constitutes irreparable harm either support FERC's position or are not on point.[62] If the time comes for a determination by this Court on the merits, a preclusive ruling either will exist (which will spare the Court the need to re-litigate the matter) or it will not exist (and will therefore present no prospect of

---

[61] *See Parklane Hosiery Co., Inc., v. Shore*, 439 U.S. 322, 326 (1979) (offensive collateral estoppel protects litigants from the burden of relitigating an identical issue and promoting judicial economy by preventing needless litigation, and district courts are given discretion to determine when it should be applied).

[62] In *U.S. v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 438 (7th Cir. 1991), the court *agreed* "that the prospect of inconsistent state and federal court judgments did not constitute irreparable harm to the REA," and, therefore did not grant a preliminary injunction. The irreparable harm found in *Energy Dev. Corp. v. St. Martin*, No. 98-3395, 2005 U.S. Dist. LEXIS 994 (E.D. La. Jan. 24, 2005) (attached as Exhibit 21), rested on the fact that conflicting state and federal judgments would cloud title to mineral rights.

double effort).  Application of well-developed preclusive doctrines that are applied in related cases

by courts on a regular basis is not "harmful."  Amaranth may not like the results of such future (and

as yet unknown) "collateral" effects but that does not make them "harmful."

Moreover, Amaranth's posited collateral effects are largely illusory.[63]  FERC has no

authority to enforce the provisions of the CEA, and the CFTC cannot adjudicate in this Court issues

arising under the NGA.  There are some similarities in the cases but also several substantial

differences.  The statutes (CEA v. NGA), causes of action (attempted v. actual manipulation),

burden of proof (specific intent to create an artificial price v. reckless disregard), and remedies

sought (injunctive relief and some civil penalties v. disgorgement of unjust profits and civil

penalties) differ.[64]  There is no "unforgiving" prospect of *res judicata* (Amaranth Memo. at 25)

because the cases are not the same.  Neither the CFTC nor FERC could be precluded in either case,

because the agencies are not parties in the other's cases.  In sum, Amaranth has not articulated how

or to what extent either action would have a preclusive effect on the other, even if such effects were

somehow deemed "harmful."

---

[63] The most egregious claim by Amaranth is that the CFTC "found . . . that the evidence does not support a claim that prices of natural gas futures were artificial."  Amaranth Memo. at 2.  The CFTC made no such allegations, let alone a "finding."  The most that can be said is that the CFTC has made (for now) a prosecutorial decision to charge a lesser offense of "attempted manipulation" as opposed to manipulation.

[64] *See U.S. v. RCA*, 358 U.S. 334, 346 (1959) (there can be no collateral estoppel or *res judicata* arising out of the separate district court and administrative proceedings, pursuant to the Sherman Act and Federal Communications Act, respectively, because the court had no power to decide the Federal Communications Act issues and the FCC had no power to decide antitrust questions); *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 377 (3d Cir. 2005) (no risk of inconsistent judgments where cases are based on different facts or law); *Peck v. U.S.*, 522 F. Supp. 245, 247 (S.D.N.Y. 1981) (motion for stay *denied* because resolution of the instant action will have "very little, if any, impact on the outcome" of the other court's proceeding);  *see also New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346, 353 (3d Cir. 1964) (the Department of Justice could not be estopped by any determination made in the FCC proceeding because the FCC did not have authority to decide the antitrust issue there presented).

Amaranth's overarching suggestion that there is something inherently wrong with two enforcement actions ignores modern regulatory norms. There is ample judicial precedent to support dual enforcement actions by separate government agencies such as FERC and the CFTC.[65] In fact, FERC and the CFTC previously acted under their respective statutory authorities to simultaneously address misconduct in the energy markets.[66] The related CFTC and FERC actions do not require Amaranth to pay two civil penalties for the same violation. The CFTC seeks civil penalties for violating the CEA, while FERC's civil penalty claim rests on violations of the NGA. Because the CEA and the NGA authorize civil penalties for *each* violation, Amaranth is subject to civil penalties for violations under *both* laws.[67] Moreover, FERC seeks disgorgement of profits – a remedy the CFTC does not seek – and a means by which those who were harmed by the misconduct can obtain at least some redress.

---

[65] *FTC v. Cement Inst.*, 333 U.S. 683 (1948) (two or more agencies may proceed simultaneously against the same parties and the same conduct); *Bristol-Meyers Co. v. FTC*, 738 F.2d 554, 559-60 (2d Cir. 1984) (concurrent Federal Trade Commission/Food and Drug Administration jurisdiction approved); *Warner-Lambert Co. v. FTC*, 361 F. Supp. 948, 952-53 D.D.C. 1973) (court upheld concurrent enforcement action by the FDA and FTC, even though they involved the same parties or issues, because the statutory remedies of the two agencies are cumulative and not mutually exclusive).

[66] As part of its investigation of the western energy markets, FERC initiated an enforcement action against American Electric Power ("AEP") for providing false data to trade press entities that published natural gas price indexes. *Am. Elec. Power Co.*, 103 F.E.R.C. ¶ 61,089 (2003). The CFTC also filed suit against AEP for the same conduct, alleging deliberate reporting of false natural gas trading information to firms that compile natural gas price indexes. *U.S. Commodity Futures Trading Comm'n v. Am. Elec. Power Co.*, No. C2-03-891 (Sept. 30, 2003) (attached as Exhibit 22). AEP entered into a settlement agreement with the U.S. Department of Justice, under which AEP agreed to pay an additional $30 million criminal penalty to resolve an investigation into the entity's false reporting of natural gas trades. Similarly, both FERC and the CFTC addressed misconduct by Coral Energy Res., L.P. Both actions involved allegations that Coral provided false data concerning natural gas transactions. *See In re Coral Energy Res., L.P.*, 110 F.E.R.C. ¶ 61,205 at 12-14 (2005); *In re Coral Energy Res., L.P.*, Comm. Fut. L. Rep. (CCH) ¶ 29,815 (CFTC July 28, 2004).

[67] *See U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043, 1064 (N.D. Cal. 2006) (where two federal laws cover the same conduct, both may be applied because "congressional intent behind one federal statute should not be thwarted by the application of another federal statute").

### 3.     FERC and the Public Will Be Harmed by a Stay

Staying FERC's proceeding will be harmful to FERC's enforcement program and the public. First, FERC is the federal agency responsible for regulating the wholesale, interstate physical natural gas market.  Unlike the CFTC, which oversees trading on products such as pork bellies, metals and lumber, FERC's sole focus is energy.  FERC has exclusive jurisdiction over, among other things, "the transportation of natural gas in interstate commerce, to the sale in interstate commerce, or to the sale in interstate commerce for resale."[68]  FERC, not the CFTC, has the enforcement focus to ensure that natural gas prices in those jurisdictional markets are competitive and fair.[69]  A stay that prevents FERC from pursuing its action will frustrate those efforts.

Second, staying FERC's enforcement action will have little practical benefit to the parties, this Court or the public.  Because FERC's OSC is different and broader than the CFTC complaint, the FERC action will need to go forward regardless of how the CFTC claims are resolved.[70]  Thus, staying the OSC is a pointless act that merely delays the vindication of the public's interests. Moreover, delaying FERC's administrative action until the instant litigation is resolved could result in a delay of several years.  During that time, Amaranth's assets and evidence could disappear. Amaranth's papers admit that it is disbursing its assets to investors, thereby reducing the assets

---

[68] 15 U.S.C. § 717.

[69] *See RCA*, 358 U.S. at 346 (agency that performs ratemaking activities has strong interest in maintaining its enforcement actions).

[70] If the CFTC proceeds first with its action and prevails, the FERC will still need to pursue its administrative action with the potential for discovery and a trial-type proceeding to resolve the NGA claims against all respondents because those issues and many respondents are not before this Court.  If the CFTC loses, for example, for failure to meet the intent requirement under its law, the FERC action will nonetheless proceed because the standard of proof for manipulation under NGA is "reckless disregard."  *See CFTC v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1485 (10th Cir. 1983) (court denied stay of investor lawsuits because the receiver and the individual investors were asserting different claims and, therefore a stay would delay, but not obviate the need for the investor lawsuits, and resolution of the receiver's claims will not narrow the issues in and promote settlement of the investors' lawsuits).

available to pay any disgorgement of unjust profits – a remedy the CFTC does not seek.[71]  FERC also faces the well known risks of loss of evidence and fading memories.[72]  As contrasted with the illusory and unspecified harms Amaranth claims, the harm to FERC and the public from a stay is substantial and indisputable.

### C.    Amaranth is Unlikely to Prevail on the Merits

In addition to establishing irreparable harm, Amaranth must also demonstrate that it is likely to prevail on the merits or that it raises sufficiently serious questions going to the merits to make them a fair ground for litigation "and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[73]  Amaranth's assertions about the relative jurisdictions of FERC and the CFTC do not sustain this weighty burden.

### 1.    FERC Has Statutory Authority to Prohibit Market Manipulation that Affects Its Jurisdictional Energy Markets

Amaranth's argument that it is not subject to FERC's jurisdiction because it never traded in "physical gas" is off the mark.  FERC is pursuing enforcement against Amaranth because evidence uncovered during FERC's investigation suggests that Amaranth's alleged manipulation of the NG Futures Contract settlement price was "in connection with" *Commission-jurisdictional transactions*. This is precisely the type of manipulation Congress decreed FERC should police under EPAct 2005.

---

[71] *See* Amaranth Memo. at 27 and the attached Declaration of Nicholas Maounis (Docket Entry # 4) at ¶ 10.  Amaranth claims that FERC's action will "harm" Amaranth because monies that could otherwise be used to re-pay investors would instead be used to cover expenses to defend FERC's enforcement action.  This is beside the point.  Every time a corporate actor is fined or must defend itself against regulatory action, its investors or shareholders theoretically pay the cost of litigation and judgment.

[72] *See Cherokee Nation of Oklahoma v. U.S.*, 124 F.3d 1413, 1418 (Fed. Cir. 1997) (trial court decision to stay resolution of claims impaired plaintiffs ability to litigate their case because, "with the passage of time, memories will fade, litigation costs will balloon, and resolve will dwindle.").

[73] *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) (internal quotations omitted).

Amaranth does not dispute FERC's authority to make all rules necessary to ensure that the markets for natural gas are competitive and free of manipulation.  Nor does Amaranth dispute that in response to the western energy crisis, Congress gave FERC broad authority to prevent any entity from engaging in market manipulation in connection with jurisdictional sales (as defined by the NGA and NGPA) and transportation of natural gas in interstate commerce.[74]  Amaranth simply argues that its conduct should not be covered by these provisions.

The language of the statute, however, particularly the use of the terms "any entity," "directly or indirectly" and "in connection with [jurisdictional transactions]," shows that Congress intended to cover the very type of conduct at issue here.  By using the term "any entity," Congress intentionally added to the types of companies and individuals FERC could reach, including those not otherwise jurisdictional to FERC.  Use of the phrase "directly or indirectly" shows Congress intended this provision to apply to more than the conduct of the physical sale itself and more than just the direct seller of the physical commodity.   Similarly, use of the phrase "in connection with" supports the interpretation that Congress intended to cover a broad range of conduct that could significantly affect FERC-jurisdictional rates and services; in particular, the phrase "in connection with" is modeled after the "in connection with" language of section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b) (2000), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2006).  Those provisions have been construed as broad anti-fraud "catch-all clauses" to cover a wide range of fraudulent, deceptive

---

[74] *See* EPAct 2005, 15 U.S.C. § 717c-1.  A parallel provision was added to the Federal Power Act.  Federal Power Act, 16 U.S.C. § 824v(a) (2000) (as amended by EPAct 2005 § 1283).  Thus, Amaranth's reliance on *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996), *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 914-23 (9th Cir. 2005), *Northern States Power Co. v. FERC*, 176 F.3d 1090, 1096 (8th Cir. 1999) and *Conoco, Inc. v. FERC,* 90 F.3d 536, 552-53 (D.C Cir. 1996), are inapposite.  Not only were all three cases brought in the Court of Appeals – the appropriate forum for deciding questions of the Commission's jurisdiction – but none of the three cases addressed the Commission's exercise of an authority expressly granted by Congress or EPAct 2005.

and manipulative practices.[75]  The "in connection with" language, in particular, has been construed "broadly and flexibly, not technically and restrictively," in order to accomplish its remedial purposes.[76]  Taken as a whole, the use of the "any entity" language coupled with the "directly or indirectly" and "in connection with" language, reflects congressional intent to expand FERC's jurisdiction to punish manipulative conduct by those who do not trade in physical gas but whose manipulation (as here) has a direct, substantial, and harmful connection to FERC-jurisdictional markets.

Other provisions of EPAct 2005, *in pari materia*, also show that Congress intended to expand FERC's authority over financial energy markets.  For example, EPAct 2005 directed the CFTC and FERC to execute the MOU to establish, among other things, provisions ensuring that investigations pertaining to markets within the respective jurisdiction of each agency are properly coordinated.[77]  There would be no need for such coordination if there existed between the two agencies the solid jurisdictional wall as Amaranth posits.

---

[75] Order No. 670, 71 Fed. Reg. 4244, 4249 at ¶ 25 (quoting *Aaron v. SEC,* 446 U.S. 680, 690 (1980)).  Consistent with the mandate that certain aspects of FERC's new authority be exercised in a manner consistent with Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and consistent with Congress's modeling of EPAct 2005 Sections 315 (new NGA Section 4A) and 1283 (new FPA Section 222) on Section 10(b) of the Exchange Act, FERC modeled the Anti-Manipulation Rule on SEC Rule 10b-5.  Order No. 670, 71 Fed. Reg. 4244, 4246 at ¶ 7; *see also* Exchange Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

[76] *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citations omitted); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971).  As Amaranth observes,  *Zandford* held that a conduct may be shown to be  "in connection with" a securities transaction when it "coincides" with a securities transaction, but then Amaranth asserts that FERC has not identified any purchase or sale of physical natural gas that "coincides with any transaction engaged in by Amaranth."  Amaranth Memo. at 17.  Amaranth can only reach this conclusion by ignoring the data in the OSC that shows Amaranth's alleged manipulation did not merely "coincide" with physical sales but set directly, immediately, and knowingly the sales price of physical transactions that are specifically identified by seller, date, volume, and price.  OSC (Exhibit 3 at ¶ 23).

[77] EPAct 2005 § 316, 15 U.S.C. 717t-2(c)(1).

FERC's construction of EPAct 2005, issuance of Order No. 670, and application of Rule 1c.1 are, in addition, consistent with congressional understanding. FERC promulgated Order No. 670 under the watchful eye of Congress. Following EPAct 2005, Congress closely monitored what *FERC was doing* to police the energy markets. Because EPAct 2005 broadened FERC's authority to "review transactions in the financial market related to natural gas," Senator Bingaman wanted to know how FERC was monitoring trading of NYMEX natural gas futures contracts, especially as relates to "end-of-month natural gas trading," which forms the basis of monthly index prices.[78] In commenting on FERC's post-EPAct 2005 efforts, Congress' Government Accountability Office ("GAO") noted that EPAct 2005 gave FERC authority to "examine whether financial market transactions, which are not generally under FERC jurisdiction, affect the physical natural gas markets over which FERC has authority" and enforce against *any* entity, if the manipulative trading, whether intentionally or recklessly, affects physical natural gas markets, which are unquestionably within FERC's jurisdiction.[79] Thus, FERC's overseers in Congress certainly view FERC's new anti-market manipulation regulations as properly applying to "producers, financial companies, local utilities, and natural gas traders, most of which were not previously regulated by FERC."[80] Legal commentary likewise supports FERC's view. A. Horwich, *Warnings to the Unwary: Multi-Jurisdictional Federal Enforcement of Manipulation and Deception in the Energy Markets After the Energy Policy Act of 2005,* 27 ENERGY LAW J. 363, 364, 395-97 (2006) (stating that EPAct 2005 "subjects transactions and actors which were not previously exposed to FERC jurisdiction to the enforcement powers of the agency.")

---

[78] *See* Letter from Senator Bingaman to Chairman Kelliher (Exhibit 7) at 2.

[79] U.S. GOV'T. ACCOUNTABILITY OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN OVERSEEING PRICES (Exhibit 5) at 16.

[80] *Id.* at 15; s*ee also* Order No. 670 at ¶¶ 2, 18, 22.

Because FERC's jurisdictional approach is supported by law, judicial intervention in the Commission's administrative proceeding is not warranted.[81]  Amaranth grossly mischaracterizes FERC's statements in Order No. 670, ¶¶ 16, 20, 22 when it states that FERC there concedes that EPAct 2005 "did not expand" FERC's jurisdiction."[82]  As the foregoing demonstrates, and as Order No. 670 elsewhere makes clear,[83] EPAct 2005 clearly expanded FERC's overall jurisdiction.  EPAct 2005 did not increase the transactions under the Commission's *ratemaking* jurisdiction under pre-existing provisions of the *NGA*.  However, EPAct 2005 dramatically broadened FERC's authority to regulate and punish manipulative or deceptive conduct that, either *directly or indirectly*, is *in connection with* the purchase or sale of natural gas within FERC's jurisdiction.

Ironically, the targets of these enforcement actions have urged in press statements that FERC's OSC is just a response to political pressure from Congress.[84]  As noted above, FERC began its investigation of Amaranth *before* the above-referenced Congressional oversight activities, but it is a strange argument indeed that FERC is responding to pressure from Congress to exercise authority that Congress never intended for FERC to have.

---

[81] *Touche, Ross & Co. v. SEC*, 76 Civ. 4489, 1978 U.S. Dist. LEXIS 17974, at *11-*12 (S.D.N.Y. May 3, 1978) (attached as Exhibit 23) (to enjoin the SEC's administrative proceeding, plaintiff must show that the SEC acted in "flagrant violation of statutory authority.");  *see also The Times Mirror Co. v. FTC*, No.78-3422, 1979 U.S. Dist. LEXIS 11738, at *15-*16 (C.D. Cal. June 13, 1979) (Exhibit 17) (because the jurisdictional question is not free from doubt, the court will deny the motion for preliminary injunction and dismiss plaintiff's action so that the FTC may complete its administrative proceeding).

[82] Amaranth Memo. at 13.

[83] Order No. 670, 71 Fed. Reg. 4,244, 4248-50 at ¶¶ 18, 25, 22, 29.

[84] *See* Bloomberg.com, *U.S. Seeks $458 Million as Gas Market Cases Expand*, July 26, 2007 (attached as Exhibit 24) (Mr. Kim, Hunter's attorney, claimed allegations by FERC and CFTC the result of political pressure); Forbes.com, *FERC Lacks Authority to Regulate Futures Markets, Says Brian Hunter's Attorneys*, July 26, 2007 (attached as Exhibit 25) (Kim called the FERC and CFTC enforcement actions "baseless political stunts").

2.      **Manipulation of Natural Gas Markets Is Not Within the CFTC's "Exclusive" Jurisdiction**

Amaranth wrongly contends that a stay is warranted because the CFTC has "exclusive jurisdiction" over manipulation related to natural gas sales if it involves NG Futures Contracts and, therefore, FERC's action will infringe on this Court's jurisdiction over the CFTC claims.  The CFTC does *not* have "exclusive" jurisdiction over manipulation of physical sales of natural gas involving NG Futures.  Therefore, FERC is not precluded from proceeding and the resolution of FERC's OSC will not interfere with this Court's resolution of the CFTC complaint or lead to "inconsistent judgments."

The central fallacy in Amaranth's argument is the mischaracterization of the scope of the CFTC's exclusive jurisdiction:  in a nutshell, it presumes that if the CFTC regulates a given activity or subject matter, it does so exclusively.  Such is a "specious contention."  *See FTC v. Roberts,* 276 F.3d 583, 591 (D.D.C. 2001) ("[defendant] appears to assume that, at a minimum, whatever the Commission [CFTC] may regulate, it regulates exclusively.  This is a specious contention.")

The CFTC has both *exclusive* and *non-exclusive* jurisdiction provisions, but natural gas market-related manipulation does not come within the scope of its exclusive jurisdiction.  Section 2(a)(1)(A) of the CEA provides that the CFTC has exclusive jurisdiction over "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery."[85] However, market manipulation and similar practices such as false statements do not come within the scope of the CFTC's *exclusive* jurisdiction because they are not "accounts, agreements … and transactions" within the meaning of the CEA.  *See CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1219 (N.D. Okla. 2005) ("a 'contract, agreement, or transaction', as commonly understood, denotes a mutual understanding between the parties creating rights or obligations that are enforceable or

---

[85] 7 U.S.C. § 2(a)(1)(A) (2000).

recognized by law." (quoting Black's Law Dictionary 318 (7th Ed. 1999)).  Indeed, the CFTC itself

has successfully argued that false reporting and manipulation are fraudulent and deceptive conduct,

which, by their very nature, do not involve a "mutual understanding" creating enforceable rights or

obligations with counterparties.  Manipulation and false reporting are merely conduct *related to* a

"contract, agreement or transaction" in a commodity, but are not themselves a "contract, agreement

or transaction."[86]  "Thus, while the CFTC has the clear statutory authority to regulate a [trader's]

deceitful 'practices',  . . . .  there is no reason to think the authority is exclusive.  A 'practice' or

'course of business' is quite plainly not a 'transaction' – either in life or in this statutory provision.

(Nor for that matter is it an 'account' or 'agreement.')."[87]  Accordingly, the exclusive jurisdiction

provision cited by Amaranth does not apply[88] and "other agencies . . . retain their jurisdiction beyond

the confines of 'accounts, agreements, and transaction'" for futures contracts.[89]

This interpretation is consistent with FERC's overall approach, which does not seek to

regulate the day-to-day aspects of futures trading, such as the terms or conditions of sale of NG

Futures Contracts, the operating rules of the NYMEX exchange, or traders' commodity accounts.

FERC's OSC has nothing to do with such regulation.  As Amaranth notes, FERC consistently

---

[86] *See also CFTC v. Reed*, 481 F. Supp. 2d 1190, 1199 (D. Colo. 2007); *U.S. v. Valencia*, No. 03-024, 2003 U.S. Dist. LEXIS 15264, at *36 (S.D. Tex. Aug. 25, 2003) (attached as Exhibit 26); *CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. GA. 2006).  These cases involved interpretation of a parallel provision of the CEA that uses the terms "contract, agreement or transaction."  Given the parallel language, the interpretation should be the same.

[87] *FTC v. Roberts*, 276 F.3d 583, 591 (D.D.C. 2001).

[88] *See also SEC v. Hopper*, No, 04-1054, 2006 U.S. Dist LEXIS 17772 (S.D. Tex. Mar. 24, 2006) (attached as Exhibit 27) (because energy trading transactions were fraudulent and deceptive within the meaning of Rule 10b-5, the SEC could proceed at the same time as FERC and the CFTC); *U.S. v. Reliant Energy Serv*., 420 F. Supp. 2d 1043, 1045 (N.D. Cal. 2006) (FERC's exclusive jurisdiction under the Federal Power Act to regulate the transmission and sale at wholesale of electricity in interstate commerce did not preempt the anti-manipulation jurisdiction under the CEA pertaining to electricity prices during California's energy crisis in Summer 2000).

[89] *Id.*

recognized the CFTC's exclusive jurisdiction, Amaranth Memo. at 3, and the differing allegations in these very different enforcement actions demonstrates that FERC respects these jurisdictional lines. FERC's OSC does not seek to police Amaranth's statements to the NYMEX as the CFTC does, nor does FERC seek to bar Hunter from trading as the CFTC does. FERC's OSC is enforcement against manipulation pertaining to its jurisdictional markets, not regulation of NYMEX accounts.

### 3.    The CEA Preserves FERC's Authority

Even if FERC's claims could somehow be read to fall within the CEA's "exclusive" jurisdiction provisions, the very next sentence, Section 2(a)(1)(A), expressly states that the CEA does not divest other federal regulators of their authority to pursue their own regulatory functions. Amaranth's Memo. omits this CEA "savings clause," which states:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any state, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.[90]

Although the CFTC has exclusive jurisdiction over certain activities specified in section 2(a)(1)(A),

> [I]t does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms. . . .

> Indeed, the inclusion of the so-called "regulatory savings clauses," § 2(a)(1)(A)(I)-(II), makes clear that other agencies … retain their jurisdiction beyond the confines of 'accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery.'"[91]

*Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) ("*CME*"), cited by Amaranth, does not support its argument that the CFTC has exclusive jurisdiction over trading in futures contracts. *CME* involved a dispute over whether a certain financial product was a futures

---

[90] 7 U.S.C. § 2(a)(1)(A).

[91] *Roberts*, 276 F.3d at 591.

contract or a security (or an option on a futures contract or an option on a security), and thus whether it was subject to CFTC or SEC regulation. The SEC and the CFTC tried to reach an agreement to delineate that the SEC had exclusive jurisdiction over securities options and that the CFTC had exclusive jurisdiction over futures contracts and any futures options. The court refused to enforce this accord, holding that agencies cannot alter the scope of their jurisdiction by agreement.[92] Congress subsequently enacted this accord into law with the purpose of preventing regulatory overlap. If anything, *CME* supports FERC's reasoning here. EPAct 2005 was intended to expand FERC's jurisdiction while the CFTC's day-to-day market oversight program was already *well known*. There is no evidence that Congress intended to prevent any regulatory overlap between the CFTC and FERC over manipulation of natural gas, especially in light of the statutory requirement that the two Commissions enter into a MOU to share information about their respective markets.[93] As CFTC Commissioner Michael V. Dunn recently observed in a speech before the American Public Gas Association, "[e]ssentially, the FERC and CFTC have joint jurisdiction over large parts of the energy markets."[94]

### 4.    The Doctrine of Primary Jurisdiction Does Not Apply

Amaranth's motion makes much of the doctrine of "primary jurisdiction," but Amaranth's arguments turn the doctrine on its head. Rather than allocating jurisdiction among competing federal agencies, as Amaranth contends, the doctrine of primary jurisdiction allocates jurisdiction for identical claims among an agency *and a court*, with deference to be given to the agency.[95] The

---

[92] *Chicago Mercantile Exch.*, 883 F.2d at 545.

[93] *See* EPAct 2005 § 316(c)(1).

[94] Michael V. Dunn, Commissioner, CFTC, Speech at APGA Annual Meeting at 7 (Aug. 7, 2007) (attached as Exhibit 28).

[95] *See U.S. v. Western Pac. R.R.*, 352 U.S. 59, 64 (1956) (primary jurisdiction applies where a claim originally brought in the courts is suspended because enforcement of the claim requires the

doctrine has no application here where Amaranth seeks to stop one agency (not proceeding in a court) in favor of another (proceeding in a court). If anything, the spirit of the doctrine would urge this court to defer to FERC, not the other way around.[96]

## IV. CONCLUSION

This Court should deny Amaranth's motion. Only the Court of Appeals has jurisdiction to review FERC's OSC. That is the only question that any district court needs to reach in these various collateral attacks on FERC's OSC.

This Court could also deny Amaranth's motion on the merits. Allowing FERC to proceed with its enforcement action will not irreparably harm Amaranth. Indeed, simultaneous resolution of claims will be more efficient for the regulators, Amaranth, and the public. The FERC action will not infringe on the jurisdiction of this Court because the claims alleged and the relief sought by FERC are separate and distinct from the allegations made and relief sought by the CFTC. Because Congress expanded FERC's jurisdiction, FERC has authority to prohibit Amaranth from using a manipulative device in the financial markets, directly or indirectly in connection with the sale of

---

resolution of issues that are within the special competence of an administrative body); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) ("The doctrine's central aim is to allocate initial decision-making responsibility between courts and agencies and to ensure that they 'do not work at cross purposes.'" (citing *Fulton Cogeneration Ass'n. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996)). None of the seven cases cited by Amaranth are factually analogous to this case because they do not involve a court deferring the administrative proceedings of one administrative agency acting within the scope of its authority in favor of another. Amaranth Memo. at 19-20 and n.15. Instead, the cases cited by Amaranth address situations in which courts deferred their proceedings in favor of an administrative agency.

[96] In fact, the two Court of Claims cases cited by Amaranth, *Northrop Corp. v. U.S.*, 27 Ct. Cl. 795 (1993), and *Haustechnik v. U.S.*, 34 Ct. Cl. 740 (1996), resulted in the district court staying its own proceedings. Amaranth selectively quotes *Hydrocarbon Trading and Transp. Co. v. Exxon Corp.*, 89 F.R.D. 650, 652 (S.D.N.Y. 1981), to support its contention that the CFTC complaint should be resolved first. The *very next line* in the *Hydrocarbon* decision explains that the doctrine "is intended to accommodate and avoid conflict of 'the complementary roles of *courts* and administrative agencies.'" (quoting *Far East Conference v. U.S.*, 342 U.S. 570, 575 (1952)).

natural gas because that manipulation impacted Commission-jurisdictional markets.  Moreover, the CFTC does not have exclusive jurisdiction that is relevant here.

The staying of a federal agency's important enforcement proceeding by a federal district court based solely on claims before the court involving similar issues and parties, especially where the agency is not before the court, would be an extraordinary judicial act.  Amaranth fails to cite a *single case* where a court has done so.  It has not met its heavy burden here of showing that this is the case where such a sweeping judicial order should first issue.  The Motion must be denied.

DATED:  September 28, 2007                    Respectfully submitted,


SUSAN J. COURT
ROBERT E. PEASE
LEE ANN WATSON


___/s/_ P. Todd Mullins_____
Todd Mullins (D.C. Bar # 429539)
Leslie B. Bellas (D.C. Bar # 429707)
Mark Higgins
Justin Shellaway
David Tobenkin
Nicole Brisker
Jamie A. Jordan
Aaron A. Fate
FEDERAL ENERGY REGULATORY COMMISSION
Office of Enforcement
Division of Investigations
888 First Street, NE
Washington, DC  20426
(202) 502-8594

Attorneys for The Federal Energy Regulatory
Commission

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                                       Plaintiff,

    v.

AMARANTH ADVISORS L.L.C., et al.,

                                   Defendants.

07 Civ. 6682 (DC)

ECF CASE

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION
STAYING THE FEDERAL ENERGY REGULATORY COMMISSION

COMMODITY FUTURES TRADING
COMMISSION
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9733
Attorneys for Plaintiff

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .........................................................................................................................1

BACKGROUND ............................................................................................................................1

I.     CFTC Sues Amaranth and Hunter In This Court. ..............................................................1

II.    The Other Relevant Proceedings. .......................................................................................2

POINTS OF LAW ..........................................................................................................................3

I.     The Extraordinary Relief Sought by Amaranth Is Neither Necessary nor Proper. ............3

    A.    The Extraordinary Relief of a Stay Should Not be Issued Merely to Avoid
        Possible Issue Preclusion. ...........................................................................................6

    B.    Amaranth's Request for Relief from This Court Is Not Proper. ..................................6

    C.    Amaranth's Motion Improperly Interferes with the Rights of Non-Parties. ................8

II.    The Exclusive Jurisdiction Over Futures Trading Granted by Congress to CFTC. ...........9

    A.    Congress has outlined clearly the scope of the CFTC's exclusive jurisdiction
        in CEA Section 2(a)(1)(A). .......................................................................................10

        1. The legislative history of the CEA reinforces the scope of the CFTC's
           authority regarding futures trading on designated contract markets. ..................12

        2. Courts have consistently recognized the CFTC's exclusive jurisdiction over
           futures trading on designated contract markets. ..................................................14

    B.    FERC's anti-manipulation authority. ........................................................................17

    C.    The Energy Policy Act does not affect Section 2(a)(1)(A) of the CEA. ...................18

    D.    FERC's Proceeding. ..................................................................................................19

CONCLUSION ............................................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alemite Manufacturing Corp. v. Staff,*
  42 F.2d 832 (2d Cir. 1930) ..................................................................................3

*American Agriculture Movement, Inc. v. Board of Trade of City of Chicago,*
  977 F.2d 1147 (7th Cir. 1992) ...........................................................................17

*Bartels v. International Commodities Corp.,*
  435 F. Supp. 865 (D. Conn. 1977).....................................................................16

*Board of Trade of the City of Chicago v. SEC,*
  677 F.2d 1137 (7th Cir. 1982),
  *vacated as moot on other grounds,* 459 U.S. 1026 (1982)..............................15, 19

*Branch v. Smith,*
  538 U.S. 254 (2003) ...........................................................................................18

*Brown v. General Services Administration,*
  425 U.S. 820 (1976) ...........................................................................................19

*CFTC v. Atha,*
  420 F. Supp. 2d 1373 (N.D. Ga. 2006)...............................................................16

*CFTC v. Bradley,*
  408 F. Supp. 2d 1214 (N.D.Okla. 2005).............................................................16

*CFTC v. Johnson,*
  408 F. Supp. 2d 259 (S.D. Tex. 2005)................................................................16

*CFTC v. Reed,*
  481 F. Supp. 2d 1190 (D. Colo. 2007) ...............................................................16

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ...............................................................................................4

*Chicago Mercantile Exchange v. SEC,*
  883 F.2d 537 (7th Cir. 1989) .........................................................................15, 19

*In re Diet Drugs Products Liability Litigation,*
  282 F.3d 220 (3d Cir. 2002) .................................................................................5

*E.F. Hutton & Co., Inc. v. Schank,*
  456 F. Supp. 507 (D. Utah 1976) .......................................................................16

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ........................................................................................ 11

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2002) ................................................................. 15, 16

*Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.,*
    470 F. Supp. 610 (S.D.N.Y. 1979) ............................................................... 16

*Gompers v. Buck's Stove & Range Co.,*
    221 U.S. 418 (1911) ........................................................................................ 4

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ........................................................................................ 1

*Landis v. North Amer. Co.,*
    299 U.S. 248 (1936) ........................................................................................ 5

*Mallen v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
    605 F. Supp. 1105 (N.D. Ga. 1985) ................................................ 16, 16-17, 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353 (1982) ...................................................................................... 10

*Morton v. Mancari,*
    417 U.S. 535 (1974) ...................................................................................... 18

*Peck v. United States,*
    522 F. Supp. 245 (S.D.N.Y. 1981) ................................................................. 5

*Retirement Systems of Ala. v. J.P. Morgan Chase & Co.,*
    386 F.3d 419 (2d Cir. 2004) ........................................................................... 6

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ...................................................................................... 18

*SEC v. American Commodity Exchange,*
    546 F.2d 1361 (10th Cir. 1976) ............................................................... 14, 15

*SEC v. Univest, Inc.,*
    405 F. Supp. 1057 (N.D. Ill. 1975),
    *remanded without op.,* 556 F.2d 584 (7th Cir. 1977) (table decision) ............... 14, 19

*United States v. 43.47 Acres of Land,*
    45 F. Supp. 2d 187 (D. Conn. 1999) ............................................................... 5

*United States v. Fausto,*
    484 U.S. 439 (1988) ...................................................................................... 18

*United States v. Reliant Energy Services, Inc.*,
    420 F. Supp. 2d 1043 (S.D. Cal. 2006) ........................................................................17

*Venture Mortgage Fund, L.P. v. Schmutz*,
    282 F.3d 185 (2d Cir. 2002) ........................................................................................11

*Vernitron Corp. v. Benjamin*,
    440 F.2d 105 (2d Cir. 1971) ..........................................................................................6

*Volmar Distributions, Inc. v. New York Post Co.*,
    152 F.R.D. 36 (S.D.N.Y. 1993) ......................................................................................5

*Messer v. E.F. Hutton & Co.*,
    847 F.2d 673 (11th Cir. 1988) .....................................................................................16

*Westlake v. Abrams*,
    504 F. Supp. 337 (N.D. Ga. 1980) ...............................................................................16

*Xiao Xing Ni v. Gonzales*,
    494 F.3d 260 (2d Cir. 2007) ..........................................................................................4

## FEDERAL STATUTES, RULES AND REGULATIONS

Commodity Exchange Act § 2(a)(1)(A), 7 U.S.C. § 2(a)(1)(A) ...............................*passim*

Commodity Exchange Act § 9(a)(2), 7 U.S.C. § 13(a)(2)...............................................17

Commodity Exchange Act § 2(g), 7 U.S.C. § 2(g) ........................................................16

Commodity Exchange Act § 9(a)(4), 7 U.S.C. § 13(a)(4)................................................1

Commodity Exchange Act § 12(e)(1), 7 U.S.C. § 16(e)(1)..............................................13

15 U.S.C. § 717(b) .......................................................................................................18

15 U.S.C. § 717r(b) .............................................................................................8, 9, 18

15 U.S.C. § 717c-1 ...........................................................................................2, 9, 17, 18

15 U.S.C. §§ 791a-828c.................................................................................................17

28 U.S.C. § 1294 ............................................................................................................8

28 U.S.C. § 1651 ............................................................................................................4

Fed. R. Civ. P. 65(d)....................................................................................................3-4

Prohibition of Energy Market Manipulation, 71 Fed. Reg. 4244 ¶20 (January 26, 2006)............18

FERC Rule 1c.1, 18 C.F.R. § 1c.1 ("Rule 1c.1") ...................................................................*passim*

18 C.F.R. § 385.209......................................................................................................................7

H. Rep. No. 93-975, 93d Cong., 2d Sess. (1974) .................................................................12-13

S. Rep. No. 93-1131 (1974),
    *as reprinted in* 1974 U.S.C.C.A.N. 5843 ........................................................................12, 13

S. Rep. No. 97-384, 97th Cong., 2d Sess. 28 (1982)....................................................................13

## OTHER AUTHORITIES

Black's Law Dictionary (8th Ed.)...................................................................................................11

Merriam-Webster's Third New International Dictionary..............................................................11

v

## INTRODUCTION

Plaintiff Commodity Futures Trading Commission ("CFTC") respectfully submits this memorandum of law in opposition to the motion of Defendants Amaranth Advisors L.L.C. and Amaranth Advisors (Calgary) ULC (together, "Amaranth") for an order pursuant to this Court's inherent powers staying the non-party Federal Energy Regulatory Commission ("FERC") from proceeding with its administrative adjudication against Amaranth and other entities and persons not parties to this action. The Court should deny Amaranth's motion because the extraordinary relief sought is neither necessary nor proper.

## BACKGROUND

### I.    The CFTC Sues Amaranth and Hunter In This Court.

On Wednesday, July 25, 2007, the CFTC brought this action against Amaranth and their chief natural gas trader, Brian Hunter. *See* Ex. A. In its Complaint, the CFTC alleges that Amaranth and Hunter attempted to manipulate the price of the March 2006 and May 2006 natural gas futures contracts (the "NYMEX NG contracts") during the last half hour of the last day of trading of those contracts on the New York Mercantile Exchange ("NYMEX"). The Complaint also alleges that Amaranth violated Section 9(a)(4) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 13(a)(4), by making false statements to NYMEX in response to NYMEX's inquiry regarding Amaranth's trading of the May 2006 NYMEX NG contract.[1]

---

[1]    Amaranth has emphasized that the CFTC has charged attempted manipulation, not perfected (*i.e.,* successful) manipulation. Although the Complaint alleges that Defendants intended to manipulate the NG market and took overt acts to do so, nowhere in the complaint does the CFTC allege that Defendants were unsuccessful in manipulating the market. Nor does the CFTC expect to introduce evidence that the manipulation was not successful. The decision by the CFTC to charge certain acts or violations but not others should never be read to mean that the CFTC has concluded that no such violation thus occurred. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").

## II.     The Other Relevant Proceedings.

On or about Thursday, July 19, 2007, FERC notified Brian Hunter, Amaranth and others that, in connection with an anticipated enforcement filing in no less than five days, it would publicly release certain information that had been provided to FERC during the course of its investigation.  On Monday, July 23, 2007, Hunter brought a declaratory judgment action against FERC before the District Court for the District of Columbia essentially claiming that FERC's proposed enforcement action was *ultra vires* because FERC lacked jurisdiction to institute the proceeding.  *See* Ex. B.  Hunter also sought a temporary restraining order and preliminary injunction against FERC's enforcement action.  *See* Ex. C.  On July 24, District Judge Richard Leon denied the TRO *(see* Ex. D, at 35:19-20), and on August 7, Judge Leon heard oral arguments on the preliminary injunction motion.

On July 26, 2007, FERC filed an administrative proceeding charging the defendants in this case, as well as another trader named Matthew Donohoe, two other entities related to Amaranth, and the master and feeder investment pools advised by Amaranth, with engaging in a manipulative scheme related to the settlement price of the March, April, and May 2006 NYMEX NG contracts.  In its Order to Show Cause ("OSC") that instituted these charges *(see* Ex. E), FERC alleges that Amaranth's trading violated FERC's anti-manipulation rule, 18 C.F.R. § 1c.1 ("Rule 1c.1"), promulgated under Section 4A of the Natural Gas Act ("NGA"), 15 U.S.C. § 717c-1.

The OSC alleges that Amaranth manipulated the settlement prices for the February, March, and April 2006 NYMEX NG contracts by trading NYMEX NG contracts on three specific days.  *See* Ex. E ¶¶1, 5.  Because the settlement price of NYMEX NG contracts serves as a benchmark for setting the price of physical natural gas contracts, FERC alleges that the charged manipulation of the NG contracts fraudulently affected natural gas prices in violation

2

of FERC Rule 1c.1. *See id.*, ¶6. Specifically, FERC alleges that Amaranth violated Rule 1c.1's

prohibitions against using "any device, scheme, or artifice to defraud" and against engaging "in

any act, practice, or course of business that operates or would operate as a fraud or deceit upon

any entity." *See id.*, ¶44.

On August 27, 2007, Amaranth (and two of its related entities) moved FERC for

expedited rehearing of the decision to issue the OSC on the grounds that FERC lacks jurisdiction

over the acts set forth in the OSC. *See* Ex. F. To the CFTC's knowledge, this motion has not

been as yet joined by the master or feeder pools, or by the individual respondents.

## POINTS OF LAW

### I.    The Extraordinary Relief Sought by Amaranth Is Neither Necessary nor Proper.

Amaranth here moves this court for an order preventing multiple non-parties to

this action from obtaining timely resolution of FERC's allegations – namely, FERC, the

Amaranth funds, and Donohoe. Yet the operative rule for any court is that its orders generally are

limited to the parties before it. As Judge Learned Hand stated for the court of appeals over 75

years ago, "no court can make a decree which will bind any one but a party; a court of equity is

as much so limited as a court of law . . .." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir.

1930). This traditional rule is expressly incorporated into Rule 65(d) of the Federal Rules of

Civil Procedure:

> Every order granting an injunction and every restraining order . . .
> is binding only upon the parties to the action, their officers, agents,
> servants, employees, and attorneys, and upon those persons in
> active concert or participation with them who receive actual notice
> of the order by personal service or otherwise.

Fed. R. Civ. P. 65(d) (2007). (Indeed, Amaranth originally sought this stay pursuant to Rule 65 by seeking an order to show cause (*see* Ex. G) that was served but never formally filed with the clerk. Thus, the very rule upon which Amaranth initially moved precludes the relief sought.)

In the filed notice of motion,[2] Amaranth apparently recognized that relief against a non-party cannot be granted pursuant to the Federal Rules of Civil Procedure. Yet, Amaranth does not identify *any* rule or statute that justifies the extraordinary relief it seeks against a non-party to this action. Although in its memorandum of law Amaranth appears to invoke the "inherent powers" of the courts to support the stay, Amaranth does so without acknowledging the extraordinary basis of such a request. The inherent powers of courts "to protect themselves, and their members, from being disturbed in the exercise of their functions is long established." *Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 267, (2d Cir. 2007) (internal quotations and citations omitted). "This inherent power generally extends only to a court's management of its own affairs: to impose decorum, to maintain order, to control admission to the bar, to discipline attorneys, to punish for contempt, and to vacate its own judgments if tainted by fraud." *Id.* (internal quotations and citations omitted). "'Because of their very potency, inherent powers must be exercised with restraint and discretion.'" *Id.* at 270 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). "[T]he amplitude of the power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 451 (1911).[3]

---

[2]  After the status conference with this Court on August 16, 2007, Amaranth re-served its papers with a notice of motion.

[3]  The All Writs Act, also not cited in Amaranth's memorandum of law, sets forth similar conditions on the exercise of this judicial power: "all courts established by Act of Congress may issue all writs *necessary or appropriate* in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (emphasis supplied).

Finally, none of the cases cited by Amaranth support the specific relief it seeks here – namely, the intrusion by the judicial branch into the timing of an executive agency's administrative enforcement proceeding. The only case cited by Amaranth that involves a federal court staying a state court proceeding is *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220 (3d Cir. 2002) – a case involving the power of a court, in the context of approving the settlement of a mass tort class action consolidated under multi-district litigation rules, to enjoin parallel state court actions against parties to the settlement. *See id.* at 236-37 ("Any state court action that might interfere with the District Court's oversight of the settlement at that time, given the careful balancing it embodied, was a serious threat to the District Court's ability to manage the final stages of this complex litigation.") Such global settlement concerns are not at issue here.

In fact, most of the cases cited by Amaranth stand for a wholly different proposition – namely, the propriety of a federal court staying a case on its own docket while awaiting the outcome of a case before another federal court[4] or before an agency.[5] The notion that a court (or an agency) has the discretion to stay its own proceeding is a far cry from the proposition that a court should stay a parallel administrative action barring some extraordinary showing that the administrative proceeding will significantly interfere with the court's jurisdiction over the matter before it.

---

[4] *See, e.g., Landis v. North Amer. Co.*, 299 U.S. 248 (1936) (affirming power of a district court to stay actions before it challenging implementation of new law pending resolution of a similar challenge before a different district court); *Peck v. United States*, 522 F. Supp. 245 (S.D.N.Y. 1981) (acknowledging power to stay the case on its own docket pending resolution of a related appeal but declining to do so); *Volmar Distributions, Inc. v. New York Post Co.*, 152 F.R.D. 36 (S.D.N.Y. 1993) (entering stay of discovery in the case before the court pending resolution of related criminal actions).

[5] *See, e.g., U.S. v. 43.47 Acres of Land*, 45 F. Supp. 2d 187, 191 (D. Conn. 1999) (staying its case pending resolution of related agency proceeding) (cited in Amaranth Mem. at 20).

A.    **The Extraordinary Relief of a Stay Should Not be Issued Merely to Avoid Possible Issue Preclusion.**

Amaranth complains of a theoretical risk of a "race" to judgment in which one forum must give preclusive effect to the findings in the other forum. *See* Amaranth Mem. at 3-4. However, the illusory fears raised by Amaranth are not a legitimate basis for staying another proceeding. As the Second Circuit has held, "a federal district court, even assuming it has some interest in avoiding delay in its own proceedings, has no interest – no interest that can be vindicated by the exercise of the federal injunction power – in being the *first* court to hold a trial on the merits." *Retirement Systems of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 429 (2d Cir. 2004) (emphasis in original). As the Second Circuit has similarly stated in the context of reviewing an injunction of state court proceedings issued on the basis of avoiding problems like collateral estoppel: "'The subsequent effect of collateral estoppel, far from requiring the federal court to stay proceedings in the state court, is *a result which should be welcomed* to avoid the task of reconsidering issues which have already been settled by another competent tribunal.'" *Id.* (quoting *Vernitron Corp. v. Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971)) (emphasis added).

Thus, the extraordinary relief of a stay must not be based upon the theoretical "risk" of issue preclusion or any other issue that may merely inconvenience the parties. *See Retirement Systems*, 386 F.3d at 430. Amaranth, however, has not identified any specific dangers. Nor has Amaranth articulated any reason why application of traditional rules of issue preclusion will cause it harm. Any injunction based on such unarticulated fears would fly in the face of the Second Circuit's pronouncements on the propriety of such injunctions.

B.    **Amaranth's Request for Relief from This Court Is Not Proper.**

As noted above, the question of FERC's jurisdiction is already squarely before FERC and, separately, the U.S. District Court for the District of Columbia. FERC's

administrative process will provide Amaranth with an opportunity to address the fundamental question of whether its trading activity falls within FERC's jurisdiction. The very nature of FERC's OSC is that any assertions therein, including the "statement of the authority under which [FERC] is acting" is "tentative." 18 C.F.R. § 385.209(b) (2007).

The Court should allow FERC, in the first instance, to analyze the jurisdictional issues as a matter of appropriate deference to Congress's decision to empower FERC to adjudicate its enforcement actions. Indeed, recognizing that FERC is the appropriate forum in which to raise the jurisdictional issue, on August 27, 2007 Amaranth moved FERC for an expedited rehearing on the very issue raised here. *See* Ex. F. Thus, the issue is now squarely before FERC.

Even if a federal court would be the proper place to raise the question of FERC's jurisdiction, that should be done through a separate declaratory judgment action against FERC. In fact, that has occurred. After extensive coordination between Hunter and Amaranth (*see* Ex. D at 7:12-16), Hunter filed a declaratory judgment in federal district court in the District of Columbia seeking exactly that determination. Moreover, Amaranth has represented to this Court on multiple occasions that it intends to intervene in that action alongside Hunter. *See* Amaranth Mem. at 4, n. 6; Ex. H at 8:16-21.[6]

Further, Amaranth's motion is not proper because this request is merely a thinly-veiled attempt to forum shop for a favorable ruling on the jurisdictional issue. As noted above, Amaranth, Hunter and FERC are already parties to actions where the stay can be properly litigated: Hunter's declaratory action *and* FERC's administrative hearing itself. Although

---

[6]     Even if Amaranth were inclined to file a separate declaratory judgment action in this Court (and assuming it would be related to this action under Rule 15 of the Division of Business Rules), under the first to file rule such an action should be transferred to the District of Columbia District Court. By Hunter's own admission, Amaranth and Hunter are coordinating their defense closely, and filing multiple declaratory judgment actions would be nothing more than forum shopping, just like this motion.

Amaranth has sought rehearing of the OSC, it did not ask FERC to stay its own action pending the conclusion of this case, nor has Amaranth expressed any intention to do so.

A decision in either the declaratory judgment action (pending in the District Court for the District of Columbia) or FERC's administrative action likely could be appealed only to the Court of Appeals for the District of Columbia. *See* 28 U.S.C. § 1294(1) (governing taking of appeals from district courts); 15 U.S.C. § 717r(b) (governing appellate review of FERC orders).[7] Instead, Amaranth inserts the same issue (already squarely in front of the D.C. District Court and FERC itself) into this wholly separate civil action in a different district and circuit. Amaranth's action is nothing more than improper forum shopping for multiple bites at the jurisdiction apple.

**C.    Amaranth's Motion Improperly Interferes with the Rights of Non-Parties.**

The problematic nature of issuing a stay involving non-parties to this action is made more apparent given that FERC's administrative proceeding includes a number of other entities that are not parties to this action. These respondents include the master and feeder funds themselves (as distinguished from the fund advisors that are defendants here), as well as another individual named Matthew Donohoe who, to the CFTC's understanding, no longer works for Amaranth or any of its related entities nor for Hunter.

While it is *conceivable* that these non-parties would also prefer that the FERC action be stayed, the Court should not assume that they desire a stay absent affirmative evidence to that effect. This is especially true given that the funds in the exercise of their fiduciary duties to their remaining investors, and an individual in Donohoe's position, might prefer to resolve

---

[7]    Specifically, 15 U.S.C. § 717r(b) states that review can be sought in either the Court of Appeals for the D.C. Circuit or the court of appeals for the circuit where "the natural gas company to which the order relates is located or has its principal place of business." Because FERC's OSC does not relate to any specific natural gas company, it appears that the only available review will be from the D.C. Circuit.

8

quickly any administrative charges in order to be able fully to liquidate or to move on professionally without the distraction of the FERC proceeding.

## II.    The Exclusive Jurisdiction Over Futures Trading Granted by Congress to the CFTC.

For the reasons discussed above, FERC should be permitted to determine in the first instance the scope of its new anti-manipulation authority under Section 4A of the NGA, 15 U.S.C. § 717c-1, and FERC Rule 1c.1, in light of the pre-existing statutory grant of exclusive jurisdiction over futures trading to the CFTC in the CEA, 7 U.S.C. § 2(a)(1)(A). If FERC's determination is adverse to the respondents in that action (which include all of the defendants here), they will have an opportunity to petition for review of that decision by the U.S. Court of Appeals for the District of Columbia. *See* 15 U.S.C. § 717r(b). The CFTC respectfully submits that this Court should refrain from ruling prematurely on the jurisdictional argument presented by Amaranth so that normal administrative processes – including development of a factual record, the application of the law to those facts by the agency, and judicial review of those processes – can be permitted to work as Congress intended. The Court should not render the administrative process nugatory at its inception, especially because Amaranth has recently presented to FERC the same jurisdictional argument it has made to this Court. *See* Ex. F. Rather, the Court should deny Amaranth's motion based on its numerous procedural deficiencies.

Nevertheless, the Court stated at the August 16, 2007 status conference that the exclusive jurisdiction issue "should be addressed" by the parties. *See* Ex. H at 11:4. Pursuant to the Court's instruction, the CFTC sets forth its views below regarding the exclusive jurisdiction provisions of the CEA, based solely on the FERC OSC.

9

A.   **Congress has outlined clearly the scope of the CFTC's exclusive jurisdiction in CEA Section 2(a)(1)(A).**

In 1974, Congress amended the CEA and created the CFTC. *See generally* 7

U.S.C. §§ 1-27(f). *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353,

357-67 (1982) (discussing the legislative history of 1974 CEA amendments). In Section

2(a)(1)(A) of the CEA, Congress granted the CFTC "exclusive jurisdiction" over futures trading

on "designated contract markets" (the statutory term in the CEA for futures exchanges) such as

NYMEX. Section 2(a)(1)(A) provides:

> The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated or derivatives transaction execution facility registered pursuant to section 7 or 7a of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. *Except as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.[8]

7 U.S.C. § 2(a)(1)(A) (emphasis added).

The first sentence of Section 2(a)(1)(A) states that accounts, agreements and

transactions involving futures contracts traded on designated contract markets are within the

CFTC's exclusive jurisdiction. The second sentence of Section 2(a)(1)(A) then goes on to

provide that with respect to such accounts, agreements, and transactions where the CFTC's

---

[8] Section 2(a)(1)(A) contains exceptions from CFTC exclusive jurisdiction for certain types of transactions such as security futures products as well as off-exchange transactions in foreign currency and statutorily defined "excluded" and "exempt" commodities. None of these exceptions is relevant to this case, which involves trading in natural gas futures contracts on NYMEX.

10

jurisdiction is exclusive, other federal and state regulatory authorities are without jurisdiction. It states that "[e]xcept as hereinabove provided" (*i.e.*, except as provided in the first sentence), the jurisdiction of other federal and state regulatory authorities is not superseded or limited by the grant of exclusive jurisdiction to the CFTC. This leads unavoidably to the conclusion that the jurisdiction of other federal and state regulatory authorities is superseded or limited with respect to the accounts, agreements and transactions as to which the CFTC possesses exclusive jurisdiction.

Because the CEA does not define the term "jurisdiction," the term should be given its generally accepted meaning. *FDIC v. Meyer,* 510 U.S. 471, 476 (1994). According to *Black's Law Dictionary* (8th Ed.), the term "jurisdiction" means, with respect to an agency's jurisdiction, "[t]he regulatory or adjudicative power of a government administrative agency over a subject matter or matters." The *Merriam-Webster's Third New International Dictionary* defines "jurisdiction" as "the power, right, or authority to interpret and apply the law" or "the power or right to exercise authority."[9] Accordingly, the plain language of Section 2(a)(1)(A) vests the CFTC with sole power and authority among federal regulatory agencies to adjudicate the lawfulness of futures trading on designated contract markets such as the NYMEX. *See Venture Mortgage Fund, L.P. v. Schmutz,* 282 F.3d 185, 188 (2d Cir. 2002) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms.")[10]

---

[9]    Available online at http://mwu.eb.com/mwu/print?queryword=jurisdiction&searchtype=va [Accessed September 5, 2007].

[10]    This grant of authority to the CFTC does not affect the powers of the federal courts, as the final sentence of CEA Section 2(a)(1)(A) makes clear.

1.    **The legislative history of the CEA reinforces the scope of the CFTC's authority regarding futures trading on designated contract markets.**

Even if the language of Section 2(a)(1)(A) were not as clear as it is, the legislative history of the provision is in accord. Before the 1974 amendments to the CEA, questions had arisen regarding the authority of the SEC and state securities administrators to assert jurisdiction with respect to futures-related accounts and futures transactions. Section 2(a)(1)(A) was meant to address these claims of overlapping jurisdiction and to make plain that the CFTC's jurisdiction is exclusive with respect to futures trading on designated contract markets. This is confirmed through reading the committee reports and floor statements. For example, the Report of the Senate Committee on Agriculture, Nutrition and Forestry on the 1974 CEA amendments states:

> While the Committee did wish the jurisdiction of the Commodity Futures Trading Commission to be exclusive with regard to the trading of futures on organized contract markets, it did not wish to infringe on the jurisdiction of the Securities and Exchange Commission or other government agencies. Therefore, the Committee adopted clarifying amendments to the House bill. *The Committee wished to make clear that where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies.*

*See* S. Rep. No. 93-1131, at 23 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5843, 5863 (1974) (emphasis added). The Report of the House Agriculture Committee is to the same effect:

> Although the expanded definition of "commodity" . . . may include rights and interests which are securities as defined in the federal securities laws, *except in the area of transactions involving a contract market*, the jurisdiction of the Commodity Futures Trading Commission ... over any such rights and interest is intended to exist concurrently with the jurisdiction vested in the Securities and Exchange Commission. *Accordingly, . . . the*

12

> *CFTC's jurisdiction shall be exclusive with respect to transactions*
> *involving contracts of sale of a commodity for future delivery*
> *which are traded or executed on a contract market . . . .*

*See* H. Rep. No. 93-975, 93d Cong., 2d Sess., at 28, (1974) (emphasis added).[11]

In a similar vein, the Conference Report on the 1974 CEA amendments states:

> The House bill provides for exclusive jurisdiction of the
> Commission over all futures transactions. However, it is provided
> that such exclusive jurisdiction would not supersede or limit the
> jurisdiction of the Securities and Exchange Commission or other
> regulatory authorities.

> The Committee amendment retains the provision of the House bill
> but adds three clarifying amendments. *The clarifying amendments*
> *make clear that (a) the Commission's jurisdiction over futures*
> *contract markets or other exchanges is exclusive and includes the*
> *regulation of commodity accounts, commodity trading agreements,*
> *and commodity options; (b) the Commission's jurisdiction, where*
> *applicable, supersedes State as well as Federal agencies . . . .*

*See* S. Rep. No. 93-1131, at 6, *as reprinted in* 1974 U.S.C.C.A.N. 5843, 5848 (1974) (emphasis

added).  The Conference Committee amendments were included in the final legislation.  The

legislative history thus confirms that Congress intended to vest in the CFTC exclusive

jurisdiction over futures trading on designated contract markets, and, further, that Congress

intended for other federal agencies not to exercise jurisdiction in that administrative sphere.[12]

---

[11]   The relevant pages of the House Agriculture Committee Report are included as Exhibit I.

[12]   The legislative history associated with Section 12(e)(1) of the CEA, 7 U.S.C. § 16(e)(1), enacted in 1982, further demonstrates Congressional intent to confer upon the CFTC exclusive jurisdiction over futures trading on designated contract markets.  In the Report of the Senate Committee on Agriculture, Nutrition and Forestry on the 1982 CEA amendments, eight years after granting exclusive jurisdiction, the Committee stated that Section 12(e) created an "open season" on off-exchange conduct by permitting multiple federal and state law actions based on futures trading on unregulated entities, but added that:

> Activities that are subject to the comprehensive regulatory powers of the
> Commission, including exchange-traded futures, foreign futures (except as
> otherwise specified by the Commission), authorized commodity options, and
> regulated leverage transactions will remain within the Commission's exclusive
> jurisdiction.

*See* S. Rep. No. 97-384, 97th Cong., 2d Sess., at 27 (1982) (relevant portion included as Exhibit J).

13

**2.    Courts have consistently recognized the CFTC's exclusive jurisdiction over futures trading on designated contract markets.**

Consistent with the text and legislative history of Section 2(a)(1)(A), courts have repeatedly acknowledged the CFTC's exclusive jurisdiction with respect to futures trading on designated contract markets vis-à-vis other federal agencies. The courts have likewise dismissed private civil actions brought under statutes other than the CEA when those actions relate to futures trading on designated contract markets. Relying on the "[e]xcept as hereinabove provided" clause that introduces the savings clause, courts have uniformly rejected the notion that the second sentence of Section 2(a)(1)(A) permits concurrent regulatory jurisdiction regarding the accounts, agreements and transactions described in the prior sentence. One court characterized this argument as "simply invalid." *SEC v. Univest, Inc.,* 405 F. Supp. 1057, 1058 (N.D. Ill. 1975), *remanded without op.,* 556 F.2d 584 (7th Cir. 1977) (table decision). In *Univest,* the SEC brought an enforcement action in federal district court alleging violations of securities laws based in part on the defendant's trading in options on futures contracts. *Id.* Relying on Section 2(a)(1)(A), the district court dismissed the claims involving the options on futures. As the court explained:

> The key phrase in this [savings clause] proviso is the introductory one; I must assume that it means exactly what it says. The fact is that the statements "hereinabove provided" do limit the jurisdiction of the S. E. C. with regard to commodity futures trading. In effect, those statements transfer jurisdiction from the S. E. C. to the new Commodity Futures Trading Commission.

*Id.* at 1058.

Around the same time, in *SEC v. American Commodity Exchange,* 546 F.2d 1361 (10th Cir. 1976), the Tenth Circuit considered whether to dismiss an SEC enforcement action based on trades executed before the enactment of Section 2(a)(1)(A). The SEC charged violations of the securities laws and SEC Rule 10(b). *Id.* at 1363. Relying on the text of Section

14

2(a)(1)(A), the court found the CFTC's jurisdiction exclusive with respect to futures trading that occurred after the 1974 CEA amendments. *Id.* at 1368.[13]

The Seventh Circuit continued this trend supporting the CFTC's exclusive jurisdiction in a series of cases in the 1980s. In *Board of Trade of the City of Chicago v. SEC*, 677 F.2d 1137, 1145-46 (7th Cir. 1982), *vacated as moot on other grounds*, 459 U.S. 1026 (1982) (appeal mooted because Congress amended CEA to exempt transactions that were at issue), a case involving exchange-traded options on exempt securities, the court held that the "[e]xcept as hereinabove provided" clause did not authorize the SEC's assertion of regulatory jurisdiction over certain financial instruments that had characteristics of futures contracts. Similarly, in *Chicago Mercantile Exchange v. SEC*, 883 F. 2d 537 (7th Cir. 1989), the court held that the SEC lacked jurisdiction to approve trading of futures contracts, regardless of any positive effects that might flow from the SEC's exercise of jurisdiction. *See id.* at 550.

In the most recent case construing the CEA exclusivity provision, the D.C. Circuit addressed the permissibility under Section 2(a)(1)(A) of a Federal Trade Commission investigation into whether "investor-education" advertisements constituted deceptive trade practices. *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2002). The court in *Ken Roberts* held that the CFTC's exclusive jurisdiction over futures trading did not bar the FTC from issuing a civil investigative demand to look into marketing practices that were separate from actual futures trading. *Id.* at 584, 592. In the course of reaching this conclusion, the court analyzed the text and legislative history of Section 2(a)(1)(A) to determine what falls within, and outside of, the exclusive jurisdiction provision. The court's decision makes clear that while the marketing activities there at issue fell outside the scope of Section 2(a)(1)(A), the trading of futures

---

[13] Guided by the legislative history of the 1974 CEA amendments, though, the court ruled that SEC possessed concurrent jurisdiction over trading that occurred before the 1974 amendments, even if the SEC enforcement action was not filed until after the amendments became effective. *Id.* at 1368.

contracts on designated contract markets falls squarely within that provision. *Id.* at 590-91.[14] As the *Ken Roberts* court stated, the legislative history of the CEA "repeatedly emphasizes that the CFTC's jurisdiction was to be exclusive with regard to the trading of futures *on organized contract markets.*" *Id.* at 591 (internal quotation omitted; emphasis in original).

In cases not involving federal regulators, courts have determined that Section 2(a)(1)(A) is a jurisdictional bar to non-CEA claims relating to futures trading. For example, in *Mallen v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 605 F. Supp. 1105, 1107 (N.D. Ga. 1985), the plaintiff alleged that defendants engaged in futures trades in violation of federal securities laws including SEC Rule 10b-5. *Id.* The district court dismissed the securities claims reasoning that the savings clause in Section 2(a)(1)(A) barred the court from applying securities laws to claims based on futures contracts. *Id.* at 1113-1114.[15] The Eleventh Circuit reached a similar conclusion in *Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988), holding that Section 2(a)(1)(A) barred claims that futures trades were made in violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. The court added that a "different result would 'defeat[] the fundamental congressional design in revamping the Commodity Exchange Act in 1974 and granting exclusive jurisdiction to the new CFTC – to avoid a duplicative or

---

[14]  *Ken Roberts* is consistent with CFTC enforcement actions involving false reporting of off-exchange energy transactions. In those cases, the off-exchange trading was excluded from the CEA's jurisdiction under Section 2(g) of the CEA, 7 U.S.C. § 2(g), whose language ("agreement, contract or transaction") is similar to Section 2(a)(1)(A) of the CEA. As the courts recognized in those cases, the focal point of the CFTC's claims was not the trading activity, but rather the separate conduct of false reporting. Courts have repeatedly held that false reporting activity falls outside the scope of a Section 2(g) "agreement, contract or transaction." *See CFTC v. Reed,* 481 F. Supp. 2d 1190, 1198 (D. Colo. 2007); *CFTC v. Atha,* 420 F. Supp. 2d 1373, 1379 (N.D. Ga. 2006); *CFTC v. Johnson,* 408 F. Supp. 2d 259, 272 (S.D. Tex. 2005); *CFTC v. Bradley,* 408 F. Supp. 2d 1214, 1219 (N.D.Okla. 2005).

[15]  Four other district courts also have rejected claims based on securities laws or rules for lack of jurisdiction. *See Westlake v. Abrams,* 504 F. Supp. 337, 345 (N.D. Ga. 1980); *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.,* 470 F. Supp. 610, 614 (S.D.N.Y. 1979); *Bartels v. International Commodities Corp.,* 435 F. Supp. 865, 869 (D. Conn. 1977); and *E.F. Hutton & Co., Inc. v. Schank,* 456 F. Supp. 507, 512-513 (D. Utah 1976).

contradictory regulatory structure.'" *Id.* at 676 (citing *Mallen*, 605 F. Supp. at 1114).[16] Indeed, the exclusive jurisdiction provision was adopted to further one of the principal goals of Congress in enacting the CEA, and creating the CFTC – to bring uniformity to the regulation of the futures markets. *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1155-57 (7th Cir. 1992).

<center>* * *</center>

It is against this backdrop of statutory text, legislative history, and case law regarding the CEA's exclusive jurisdiction provision that the scope of the authority granted to FERC under the Energy Policy Act of 2005 must be evaluated.

## B.    FERC's anti-manipulation authority.

Section 315 of the Energy Policy Act of 2005 added a new § 4A to the Natural Gas Act, 15 U.S.C. § 717c-1, which states that:

> It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of this title) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. Nothing in this section shall be construed to create a private right of action.

15 U.S.C. § 717c-1. In January 2006, FERC adopted Rule 1c.1, which states in part that:

> (a) It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the

---

[16] The case of *United States v. Reliant Energy Services, Inc.*, 420 F. Supp. 2d 1043, 1045 (S.D. Cal. 2006), is not to the contrary. The *Reliant* court concluded that FERC's jurisdiction under the Federal Power Act ("FPA") over electricity transactions did not preempt the CEA's anti-manipulation jurisdiction. *See* OSC ¶48. *Reliant* is factually distinguishable from this case. First, unlike the CEA, the Federal Power Act does not include an express statutory grant of exclusive jurisdiction to FERC. *See* 15 U.S.C. §§ 791a-828c. *See Reliant Energy*, 420 F. Supp. 2d at 1064 (Congress has not revealed "an intent to keep electricity wholesales outside the reach of the CEA's anti-manipulation provisions"). Moreover, the charged violations were based on CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2), which expressly applies to cash transactions as well as futures trades. *Id.* at 1065.

<center>17</center>

> Commission, (1) To use or employ any device, scheme, or artifice
> to defraud, (2) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under which
> they were made, not misleading, or (3) To engage in any act,
> practice, or course of business that operates or would operate as a
> fraud or deceit upon any entity.

18 C.F.R. § 1c.1 (2007).

### C.    The Energy Policy Act does not affect Section 2(a)(1)(A) of the CEA.

The Energy Policy Act did nothing to affect the scope of the CFTC's exclusive

jurisdiction.  Nor did it change the scope of FERC's jurisdiction over natural gas transactions as

set forth in 15 U.S.C. § 717(b).  *See* Prohibition of Energy Market Manipulation, 71 Fed. Reg.

4244 ¶20 (January 26, 2006).  Had Congress intended in the Energy Policy Act to reverse 30

years of unbroken precedent regarding the application of Section 2(a)(1)(A) of the CEA to

futures trading on designated contract markets, it would have done so clearly and

unambiguously.  Because nothing in the Energy Policy Act *explicitly* repeals any provision of the

CEA, the question arises whether Congress's grant of authority to FERC in 15 U.S.C. § 717c-1

implies an intention to do so.  But as the Supreme Court has stated: "[It] can be strongly

presumed that Congress will specifically address language on the statute books that it wishes to

change." *United States v. Fausto*, 484 U.S. 439, 453 (1988).  Repeals by implication are not

favored in law, and they will not be found unless a congressional intent to repeal "is clear and

manifest." *See Rodriguez v. United States*, 480 U.S. 522, 524 (1987) (citations omitted); *see also*

*Morton v. Mancari*, 417 U.S. 535, 550-51 (1974).  The Supreme Court rarely has found a repeal

by implication. *See Branch v. Smith*, 538 U.S. 254, 293 (2003).

Further, a settled canon of statutory construction dictates that "a precisely drawn,

detailed statute pre-empts more general remedies." *Brown v. General Services Administration,*

425 U.S. 820, 834 (1976).  The general authority provided to FERC in the Energy Policy Act to

combat the effects of manipulative behavior on FERC jurisdictional markets is insufficient to carve out an implicit exception to the exclusive jurisdiction that the CEA adopted as part of a carefully-crafted statutory regime to specifically govern futures trading on designated contract markets.

In short, nothing in the text or legislative history of the Energy Policy Act evinces a Congressional intention to change the long settled law in this area. We respectfully submit that this Court should not, in an effort to "harmonize" the CEA and the Natural Gas Act, effectively read the exclusive jurisdiction provision out of the CEA with respect to natural gas absent a clear indication that this is what Congress intended to do.

### D.    FERC's Proceeding.

FERC's OSC against Amaranth and related parties alleges that the respondents manipulated natural gas prices in violation of FERC Rule 1c.1 by engaging in certain futures trading practices on NYMEX which are alleged to have had downstream effects on prices for cash settled natural gas contracts. OSC ¶¶1, 5. As we understand it, there is no dispute that the transactions at the core of the scheme were futures trades on NYMEX. Moreover, FERC charges the respondents with violating a FERC rule that is substantively different from the manipulation standards applicable under the CEA and therefore could impose different standards of conduct on persons engaging in futures trading on designated contract markets. Based on its OSC, FERC's administrative action is analogous to the SEC actions that the courts dismissed in the *Univest*, *Board of Trade of the City of Chicago*, and *Chicago Mercantile Exchange* cases discussed above. *See supra.* Moreover, the courts have made clear that it is impermissible to apply non-CEA laws or rules to conduct that falls within the scope of Section 2(a)(1)(A). *See, e.g., Mallen*, 605 F. Supp. at 1113-14 (and cases discussed in n. 15, above).

19

While Section 2(a)(1)(A), its legislative history, and applicable case law establish that the CFTC's jurisdiction is exclusive, this has little to do with the propriety of the relief that Amaranth seeks now.  As discussed earlier, this Court should set aside Amaranth's jurisdictional argument and issue a ruling based on the procedural infirmities of Amaranth's motion. Amaranth has already asserted its arguments to FERC in the administrative process.  FERC should now have the opportunity to interpret the new mandate that Congress has given it, and to determine how to apply its new Rule 1c.1 in light of the exclusive jurisdiction that Congress granted in CEA Section 2(a)(1)(A) with respect to futures trading on NYMEX.

## CONCLUSION

Plaintiff CFTC respectfully requests that the Court take into account the foregoing

considerations raised and deny Amaranth's motion for a stay of FERC's order to show cause

proceedings.


Dated:  New York, New York
        September 28, 2007

                                Respectfully submitted,

                                COMMODITY FUTURES TRADING
                                COMMISSION
                                Terry S. Arbit
                                  General Counsel
                                Bradford M. Berry
                                  (admission *pro hac vice* pending)
                                  Deputy General Counsel
                                Gloria P. Clement,
                                  Assistant General Counsel
                                Office of the General Counsel
                                Three Lafayette Centre
                                1155 21st Street, NW
                                Washington, DC 20581


                                Stephen J. Obie

                                Stephen J. Obie
                                  Regional Counsel/Associate Director
                                Manal Sultan
                                  Chief Trial Attorney
                                David W. MacGregor (admitted *pro hac vice*)
                                  Chief Trial Attorney
                                Division of Enforcement
                                140 Broadway, 19th Floor
                                New York, NY 10005
                                (646) 746-9733
                                Attorneys for Plaintiff

121 FERC ¶ 61,224
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Joseph T. Kelliher, Chairman;
                       Suedeen G. Kelly, Marc Spitzer,
                       Philip D. Moeller, and Jon Wellinghoff.


| | |
|---|---|
| Amaranth Advisors L.L.C. | Docket No.  IN07-26-001 |
| Amaranth LLC | |
| Amaranth Management Limited Partnership | |
| Amaranth International Limited | |
| Amaranth Partners LLC | |
| Amaranth Capital Partners LLC | |
| Amaranth Group Inc. | |
| Amaranth Advisors (Calgary) ULC | |
| Brian Hunter | |
| Matthew Donohoe | |


ORDER DENYING REHEARING

(Issued November 30, 2007)

1.      This order addresses whether the Commission has authority under section 4A of the Natural Gas Act (NGA) to sanction manipulative trading of natural gas futures contracts when it finds that such manipulative trading had a nexus to and significant effect on the prices of Commission jurisdictional wholesale sales of natural gas.  On July 26, 2007, the Commission issued an Order to Show Cause (OSC) to the above ten Respondents, directing them to show why they had not violated section 4A of the NGA and section 1c.1 of the Commission's regulations, 18 C.F.R. §1c.1 (2006) (Anti-Manipulation Rule) as well as to show cause why they should not be assessed civil penalties and be required to disgorge unjust profits, plus interest.  On August 27, 2007, four of the ten Respondents, Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) ULC, Amaranth Management Limited Partnership, and Amaranth Group (collectively "Amaranth") filed a request for expedited rehearing of the OSC (Rehearing Request).  Amaranth seeks to terminate the OSC proceeding because it claims that the Commission lacks subject matter jurisdiction over Amaranth's alleged manipulation.  As discussed

below, the Commission denies Amaranth's rehearing request.[1]  Some of the other six Respondents also filed requests for rehearing of the OSC but their rehearing requests are not addressed in this order.  They will be addressed in a future order.[2]

# I.     Background

## A.     The Order to Show Cause

2.      In the OSC, the Commission preliminarily concluded that Amaranth's trading in Natural Gas Futures Contracts (NG Futures Contracts) had a direct and substantial effect on the price of Commission-jurisdictional transactions, affecting natural gas customers and ratepayers across the United States, both of which the Commission is required by statute to protect.[3]

3.      Amaranth traded in NG Futures Contracts[4] on the New York Mercantile Exchange (NYMEX).  Trading NG Futures Contracts creates a "settlement price," which is the volume-weighted average price of trades made during the last 30 minutes of trading (typically from 2:00 p.m. to 2:30 p.m.) on the third-to-last business day of the month preceding the next calendar month.  The Commission detailed in the OSC preliminary findings that Amaranth appears to have manipulated (in this case driving down) the

---

[1] On October 12, 2007, the Commission extended the date for responses to the OSC to fourteen days after the Commission's ruling on Amaranth's Request for Rehearing.  Pursuant to that Notice, Respondents shall now answer the OSC, as specified in P 140(a) and (b) of the OSC, not later than 14 days from the issuance of this Order.

[2] We are disposing of Amaranth's rehearing request in its entirety.  We will address issues raised in rehearing requests by other Respondents, such as the authority to assess civil penalties, the construction of the term "any entity" as to individuals, or the liability of such Respondents, in a future order.

[3] *See generally Order to Show Cause*, 120 FERC ¶ 61,085 (July 26, 2007) (OSC).

[4] NG Futures Contracts are standardized contracts that specify the terms under which a buyer will accept and a seller will deliver a specified quantity of natural gas at a specified place and over a specified month in the future.  Typically, NG Futures Contracts provide for the future delivery of 10,000 MMBtus of natural gas over the course of the contract month to the buyer's interconnection on the Henry Hub in Louisiana.  *See* Natural Gas Futures Contracts, NYMEX Exchange Rulebook §§ 220.05, 220.10-12, http://www.nymex.com/rule_main.aspx?pg=33#220.05 (last visited Sept. 14, 2007).

Docket No. IN07-26-001                                                              - 3 -

settlement price of NG Futures Contracts by selling an extraordinary amount of NG Futures Contracts during the last 30 minutes of trading before the contracts expired.[5] Considered in isolation, Amaranth's trading could be economically irrational because it made less on the sales of these contracts. However, because Amaranth took positions several times *larger* in various financial derivatives whose value *increased* as a direct result of the decrease in the settlement price of NG Futures Contracts, Amaranth could have gained on its overall financial positions.

4.      The Commission also explained that NG Futures Contracts are not purely financial instruments because some futures contracts traders take their contracts "to delivery," meaning they hold the contracts into the month during which the contract becomes a contract for actual purchase and delivery of 10,000 MMBtus' of natural gas at the Henry Hub delivery point in Erath, Louisiana.[6] The price of that *physical* natural gas transaction is the NG Futures Contracts settlement price. In addition, "physical basis" transactions are based on the NG Futures Contracts settlement price.[7] The NG Futures Contracts settlement price is directly incorporated into many published price "indices," which are relied upon by physical buyers and sellers as a benchmark to determine the prevailing price for natural gas at a given location, or a specified differential to a published price index in the event the gas is to be delivered at a different location.[8] Therefore, the Commission explained, Amaranth's actions, if proven to have driven down the NG Futures Contracts settlement price, had a direct and substantial effect on the price of several different types of *physical* natural gas transactions – transactions that are indisputably within the Commission's jurisdiction.[9]

5.      If the NG Futures Contracts settlement price was driven down by Amaranth's trading, sellers who went to delivery on short NG Futures Contracts, as well as producers

---

[5] OSC at PP 84, 91 and 106.

[6] *Id.* at PP 5, 26.

[7] *Id.* at P 20.

[8] *Id.* at PP 21-24. To compile monthly "indices" of those prices at various physical natural gas trading locations, publishers of natural gas industry newsletters (*e.g.,* Platts or NGI) conduct price surveys of market participants. Those surveys capture a significant amount of the aforementioned physical basis transactions. *See generally Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121, *clarification granted*, 105 FERC ¶ 61,282 (2003).

[9] OSC at PP 20-27, 108-10.

and other natural gas market participants, may have been paid an artificially lower price for their natural gas.  Such manipulation undermines confidence in and integrity of energy markets that are critical to supporting an adequate natural gas infrastructure and that provide consumers reasonable prices for natural gas.  Finally, the pecuniary interests of state and federal governments may have been harmed when natural gas from public lands was sold for royalties that are also tied to the NYMEX settlement price.

6.      The Commission preliminarily concluded in the OSC that Amaranth and the other Respondents violated the Commission's Anti-Manipulation Rule, which was adopted pursuant to section 4A of the NGA, 15 U.S.C. § 717, as amended by the Energy Policy Act of 2005, Pub. L. No. 109-58, § 315 (2005) (codified at 15 U.S.C. 717c-1) (EPAct 2005).  It proposes that Amaranth pay civil penalties and disgorge unjust profits under similarly new enhanced penalty provisions also added to the NGA by EPAct 2005.[10]  It also ordered responses to the OSC's specific allegations.  Amaranth sought leave, and it and all other Respondents have been permitted, to file responses to the OSC within fourteen days after this ruling.

###   B.   Amaranth's Request for Expedited Rehearing on the Issue of the Commission's Jurisdiction

7.      Amaranth's rehearing request generally raises the issue of the Commission's subject matter jurisdiction to proceed with its OSC under section 4A of the NGA.  New section 4A was added to the NGA, along with a parallel provision which was added to the Federal Power Act (FPA), by EPAct 2005.  It provides as follows:

> It shall be unlawful for *any entity*, directly *or indirectly*, to use or employ, *in connection with* the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, *any* manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 . . .in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers.  (emphasis added).

8.      In support of its Rehearing Request, Amaranth raises three principal points of error.  First, Amaranth contends that section 4A of the NGA does not confer jurisdiction on the Commission to regulate trading of futures that takes place exclusively on the NYMEX because such transactions are within the "exclusive jurisdiction" of the

---

[10] *Id*. at P 75.

Docket No. IN07-26-001                                                                - 5 -

Commodity Futures Trading Commission (CFTC).[11]  Amaranth contends that the CFTC
has exclusive jurisdiction to regulate manipulation within financial markets, even if such
conduct directly and substantially impacts the Commission's jurisdictional natural gas
markets.  Amaranth maintains that the EPAct 2005 amendments to the NGA did not
expand the Commission's jurisdiction to include trading "solely" in natural gas futures
that affects Commission-jurisdictional markets and that there is no jurisdictional overlap
between the Commission and CFTC because the Commodity Exchange Act, P.L. 74-765,
49 Stat. 149 (1936) (CEA) grants the CFTC "exclusive jurisdiction . . . with respect to
accounts, agreements and transactions involving contracts for the sale of a commodity for
future delivery."[12]  Amaranth cites legislative history from 1974 to support its claim that
the Commission is preempted from regulating futures markets.[13]  In further support of
this argument, Amaranth claims that the "savings clause" in section 23 of the NGA (a
natural gas market transparency provision which was added to the NGA by EPAct 2005),
confirms that Congress did not expand the Commission's jurisdiction to include
manipulation of futures contracts, but instead withheld regulatory power from the
Commission by re-affirming the CFTC's exclusive jurisdiction under the CEA.[14]
According to Amaranth, decisions holding that two agencies may conduct separate
investigations are inapplicable because the CFTC has exclusive jurisdiction over the
claims at issue.[15]  Amaranth also contends that section 23 gave the Commission authority
only to collect from market participants and disseminate information about the
availability and prices of natural gas sold at wholesale in interstate commerce.[16]
According to Amaranth, the related requirement that the Commission enter into a
Memorandum of Understanding (MOU) with the CFTC is intended to ensure only that
information requests are coordinated, and not to authorize the Commission to take
regulatory action.[17]

---

[11] Rehearing Request at 13-16.

[12] 7 U.S.C. § 2(a)(1)(A) (2000).  *See generally* Rehearing Request at 16-25.

[13] Rehearing Request at 15.

[14] *Id.* at 16-21.

[15] *Id.* at 24-25.

[16] *Id.* at 17-18

[17] *Id.* at 18-19.

Docket No. IN07-26-001                                                    - 6 -

9.      Second, Amaranth argues that the Commission exceeded its jurisdictional bounds, principally because the "in connection with" language of section 4A of the NGA does not confer subject matter jurisdiction over the types of futures transactions addressed by the OSC.[18]  While the Commission stated in the OSC that EPAct 2005 expanded its authority to police all forms of manipulation in connection with its jurisdictional markets, Amaranth contends that the "in connection with" language in section 4A of the NGA added by EPAct 2005 did not confer upon the Commission jurisdiction to regulate so-called "non-jurisdictional" activity or entities even if the actions affect Commission-jurisdictional markets.[19]  Because Amaranth was not itself a party to the purchase or sale of physical natural gas contracts, Amaranth claims the manipulation alleged by the Commission was not "in connection" with Commission-jurisdictional transactions. Specifically, Amaranth maintains that, our statements in the OSC notwithstanding, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(b) (2000) (Securities Exchange Act) and cases applying that provision, do not guide the analysis of whether the NG Futures Contracts transactions were "in connection with" physical natural gas markets because the Commission was not given the enforcement powers provided in section 10(b).[20]  According to Amaranth, Congress only meant to incorporate into section 4A the definitions of certain *terms* used in section 10(b).  Alternatively, if statutory construction of the "in connection with" clause of section 10(b) is applicable to NGA section 4A, Amaranth contends that legal precedent supports its position that Amaranth would be subject to the Commission's jurisdiction only if Amaranth traded in physical natural gas that "coincided with" or was "in furtherance" of the manipulative scheme.[21]  Because Amaranth claims it did not engage in such transactions, it asserts that the "in connection with" element is not satisfied.

10.     Third, accepting its own interpretation of the EPAct 2005 and the NGA, Amaranth argues that our Order No. 670 adopting the Anti-Manipulation Rule[22] likewise stated that we do not regulate fraud and manipulation in "non-jurisdictional" transactions, such as

---

[18] *Id.* at 26-39.

[19] *Id.* at 26-31.

[20] *Id.* at 31-32.

[21] *Id.* at 34-36.

[22] *Prohibition of Energy Market Manipulation*, Order No. 670, 71 Fed. Reg. 4244 (January 26, 2006), FERC Stats. & Regs. ¶ 31,202 (codified at 15 U.S.C. 717c-1) (Order No. 670).

NG Futures Contracts.[23]  Amaranth recites language from Order No. 670 which it claims is inconsistent with our preliminary conclusions in the OSC.  From there, Amaranth contends the Commission's OSC is arbitrary, capricious, and an abuse of discretion because we failed to explain why we "departed" from our determination in Order No. 670.[24]

## II.    Commission Determination

11.    As the Supreme Court has held, the primary purpose of the NGA is to "protect consumers against exploitation."[25]  The Commission is required by statute to ensure that certain physical sales of natural gas sales are just, reasonable and not unduly discriminatory or preferential under the NGA and that natural gas consumers are thereby protected.[26]  Beginning in the 1980s, the Commission regulated jurisdictional wholesale sales of natural gas on a market basis and thus its responsibility to assure just and reasonable rates is fulfilled by ensuring that natural gas markets remain competitive.  In the OSC we preliminarily determined that Amaranth's manipulative trading of NG Futures Contracts, which are not directly regulated by the Commission on a day-to-day basis, nevertheless had a direct effect on the price of natural gas sales which are within the Commission's jurisdiction.[27]  Because of this direct effect on jurisdictional sales, the behavior fell within the NGA section 4A prohibition of direct or indirect manipulation in connection with jurisdictional sales.  In making our preliminary findings in the OSC, we took into account the CFTC's exclusive jurisdiction to oversee the operation of the futures markets.[28]  The Commission neither asserted jurisdiction over day-to-day regulation of CFTC-regulated futures contracts transactions nor sought to interfere with that jurisdiction.  Rather, as we stated in the OSC, the Commission's jurisdiction over activities that affect its markets is complementary to the CFTC's jurisdiction over the activities that affect futures markets.[29]

---

[23] Rehearing Request at 39-41.

[24] *Id.* at 41

[25] *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944).

[26] 15 U.S.C. § 717t-2(a)(1) (2000).

[27] OSC at PP 108-10.

[28] *Id.* at PP 48, 55.

[29] *Id.* at PP 48.

12.     As discussed in detail below, the statutory language of NGA section 4A, in conjunction with Congress' recognition of the overlap in FERC and CFTC regulated markets in the NGA section 23 transparency provision that was enacted simultaneously by Congress, supports the Commission's interpretation.  Further, the historical context in which Congress considered the NGA section 4A and parallel FPA section 222 amendments supports the interpretation that Congress intended the Commission to ensure that there is no regulatory gap in sanctioning manipulative behavior affecting jurisdictional gas and electric markets.  The result of our interpretation is that although the Commission and the CFTC each have exclusive jurisdiction over the day-to-day regulation of their respective physical energy and financials markets, where, as here, there is manipulation in one market that directly or indirectly affects the other market, both agencies have an enforcement role.  This is a dual role that was contemplated by Congress, that should be coordinated and consistent wherever possible, and that, in the end, will redound to the benefit of all market participants.

### A.     The Commission's NGA Section 4A Jurisdiction

13.     Although presented as the second point in Amaranth's "specification of errors," the question of whether the Commission has jurisdiction, in light of the "in connection with" language of NGA section 4A, or otherwise, is the most fundamental issue presented (regardless of the CFTC's jurisdiction).  Accordingly, we turn to that question first and, after resolving that question, we turn to Amaranth's other arguments, as necessary.

14.     Before addressing Amaranth's jurisdictional arguments, we note four basic factual points that were contained in the OSC and are, at this point in the proceedings, undisputed by Amaranth:

        a.     Amaranth does not dispute that the alleged manipulation in this case involves three interrelated markets:  (1) the NG Futures Contracts market; (2) a variety of "derivative" financial products; and (3) Commission-jurisdictional wholesale natural gas sales, namely, wholesale natural gas sales in interstate commerce that are not "first sales" within the meaning of the Natural Gas Policy Act of 1978 (NGPA).[30]  Amaranth does not dispute that the first market affects the second and third inasmuch as the NG Futures Contracts settlement price determines, in whole or in part, the value of the derivatives and the price of a substantial volume of Commission-jurisdictional wholesale natural gas sales.[31]

---

[30] 15 U.S.C. § 3431(a) (2000).

[31] OSC at PP 2, 6, 108-10.

b.      Amaranth does not dispute that the "settlement price" attaches to any NG Futures Contracts that becomes a contract for the sale of physical natural gas. During the months of interest in this matter, blanket certificate holders such as ConocoPhillips, BP, Louis Dreyfus, UBS, and Merrill Lynch each sold natural gas by holding more than 2,000 NG Futures Contracts through expiration in one or more of the months for approximately 20 billion cubic feet of physical gas that went to delivery.[32]  These physical natural gas sales were, in whole or in part, Commission-jurisdictional transactions.  Amaranth presents no evidence or argument to the contrary.

c.      Amaranth does not dispute that substantial volumes of bid week[33] transactions are "physical basis" transactions that are priced using the NG Futures Contracts settlement price and that such sales are largely Commission-jurisdictional.[34]

d.      Amaranth does not dispute that monthly indices at many trading centers are set primarily by physical basis transactions during "bid week" and thus also use the NG Futures Contracts settlement price as a reference price.  Amaranth also does not dispute that, in turn such price indices are widely used in bilateral natural gas markets that are subject to the jurisdiction of the Commission.[35]  Thus, as Amaranth agrees, the "public relies on the [NYMEX] settlement price" as a "key price benchmarked for physical . . . contracts involving natural gas."[36]  Nor does Amaranth dispute that state regulators sometimes look to index or settlement price-based purchases of natural gas by local distribution companies in evaluating whether such purchases were prudent.

---

[32]  *Id.* at P 25 (*citing* NYMEX open interest, trade, and delivery data, ferc_item13_ng_top_tdr_final2.xls).

[33]  "Bid week" is the last five business days of the month.  *See generally Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121, *clarification granted*, 105 FERC ¶ 61,282 (2003).

[34]  OSC at P 22.

[35]  *Id.* at 22-23, 25.

[36]  Letter from Michael Carrieri, Compliance Director of Amaranth, to Anthony Densieski, Senior Director, Market Surveillance, NYMEX (Aug. 30, 2006).

1.    **The Commission's Preliminary Jurisdictional Findings and the Language and Purpose of the Anti-Manipulation Provisions**

15.    Although the rehearing request offers a number of detailed and specific legal points and authorities, Amaranth's central argument with respect to our jurisdiction is that the NGA and the Anti-Manipulation Rule do not confer jurisdiction on the Commission to prohibit the conduct alleged in the OSC.[37]  As with any issue of statutory and regulatory construction, we begin with text and purpose of the statute (including pertinent legislative history), our rule implementing the statute, and our order adopting the rule.  We then apply the legal interpretation to the facts at hand.

16.    As noted above, section 315 of EPAct 2005 added a new section 4A to the NGA that provides in pertinent part:

> It shall be unlawful for *any* entity, directly *or indirectly*, to use or employ, *in connection with* the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, *any* manipulative deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. (emphasis added).[38]

17.    This language, in particular the broad and general terms used therein, is most reasonably read to give the Commission broad authority to sanction manipulative conduct where, as here, such conduct has a nexus to and significantly affects jurisdictional sales. The language making it unlawful for "any entity" to engage in manipulative conduct in

---

[37] Rehearing Request at 10-12 (rejecting the OSC findings in PP 44-51 and 108-10).

[38] 15 U.S.C. § 717c (2005).  With respect to the "subject to the jurisdiction of the Commission" element, section 1(b) of the NGA grants the Commission jurisdiction over "the sale in interstate commerce of natural gas for resale."  15 U.S.C. § 717(1)(a) (2000). The NGPA, 15 U.S.C. §§ 3301 *et seq.* (2000), and the Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989), exclude from the Commission's NGA jurisdiction all "first sales," 15 U.S.C. § 3431(a) (2000), which are all sales from the producer to the consumer, unless and until the gas is purchased by an interstate pipeline, intrastate pipeline, or local distribution company or an affiliate thereof.  15 U.S.C. § 3301(2)(21)(A) (2000).  *See also Amendments to Blanket Sales Certificates*, Order No. 644, FERC Stats. & Regs. ¶ 31,153 at P 14 (2003), *reh'g denied*, 107 FERC ¶ 61,174 (2004).

connection with jurisdictional transactions demonstrates Congress' intent to capture not only natural gas companies or other jurisdictional companies historically subject to the NGA but rather any individual, corporation, or governmental or non-governmental entity that engages in the prohibited behavior.  The language "directly or indirectly" is reasonably read to prohibit behavior not only by entities engaging in Commission jurisdictional transactions but entities engaging indirectly, for example through intermediaries,  in such transactions, or in behavior indirectly affecting such transactions.[39]  Similarly, the language "any manipulative device or contrivance" is reasonably read to capture a broad array of manipulative or deceptive conduct that may harm Commission jurisdictional markets and customers.  The legislative history of the enactment of this new provision and the parallel provision in the FPA, section 222, supports a reasonably broad interpretation of the Commission's authority to sanction manipulative or deceptive conduct.  While the Conference Report accompanying EPAct 2005 does not contain discussion of the anti-manipulation provisions, there is ample discussion in floor debates leading up to EPAct 2005 to demonstrate that Congress intended to confer on the Commission  broad authority to prohibit manipulation affecting jurisdictional markets.  In floor debates discussing the scope of manipulative practices to be prohibited, two different versions of the anti-manipulation provisions were introduced and considered in May 2005: the "Cantwell Amendment," which sought to add broad anti-manipulation language similar to that of section 10(b) of the Securities Exchange Act and a narrower "Domenici Amendment" that had a specific list of prohibited practices.[40]  The broad Cantwell Amendment, modeled on section 10(b), became what is now section 4A of the NGA and section 4A expressly provides that terms common to section 10b and

---

[39] Cases interpreting section 10(b), which provides that it "shall be unlawful for any person, directly or indirectly," to use any instrumentality of interstate commerce in connection with a manipulative or deceptive device or contrivance, held that the "word 'indirectly' is quite broad and pervasive" and, therefore, use of a telephone to arrange a meeting for purposes of effectuating a fraud satisfies the requirements of section 10(b). *Nemitz v. Cunny*, 221 F. Supp. 571, 573 (N.D. Ill. 1963).  Therefore, section 10(b) and Rule 10b-5 have been read to impose liability on any person who participated in a manipulative or deceptive scheme, even if a material misstatement by another person created the connection between the scheme and the securities market.  *In re Lernout & Haupsie Sec. Lit.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003).

[40] *See* 151 Cong. Rec. S 7451 at 40 (daily ed. June 28, 2005) (Statement of Sen. Cantwell).

4A are used in the same manner in section 4A as in section 10(b).  Congress then expressly delegated *to the Commission* the task of adopting rules to give life to section 4A.[41]

18.    In commenting on the essentially identical electric anti-manipulation provision that was ultimately adopted alongside section 4A, Senator Jeff Bingaman, Ranking Member of the Senate Committee on Energy and Natural Resources when EPAct 2005 was enacted, stated that "we should give FERC this tool and make it clear in the law that all of these deceptive and manipulative practices are illegal.  Once we make that clear, we are in a position to hold FERC accountable, if in fact, manipulation or deceptive practices occur in the future."[42]

19.    It is reasonable to infer from this statement that, in the aftermath of the manipulative practices by Enron and other companies that were uncovered in connection with the Western energy crisis of 2000-2001, Congress intended to give the Commission the tools needed to sanction future manipulation affecting jurisdictional prices and services and to rely on the Commission's expertise and knowledge of relevant markets to craft rules that would most fully effectuate the prevention, detection, and punishment of manipulation affecting Commission jurisdictional markets.

20.    To implement section 315 of EPAct 2005 and NGA section 4A, the Commission promulgated its Anti-Manipulation Rule, section 1c.1 of the Commission's rules, which prohibits:

> any entity, directly or indirectly, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission [from using] or employ[ing] any device, scheme, or artifice to defraud, [or from engaging in] any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.[43]

21.    In adopting this rule, we issued Order No. 670 and expressly ruled the Anti-Manipulation Rule is an intentionally broad proscription against all kinds of deception, manipulation, deceit and fraud.[44]  We clarified the following elements of a manipulation

---

[41] *See* 15 U.S.C. §717(c) (2005) (the "Commission may prescribe as necessary [rules] in the public interest or for the protection of natural gas ratepayers.").

[42] 149 Cong Rec. S 10182 (daily ed. July 30, 2003) (statement of Sen. Bingaman).

[43] 18 C.F.R. § 1c.1 (2006).

[44] Order No. 670 at P 49.

claim: "an entity: (1). . .engages in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite *scienter*; (3) in connection with the purchase or sale of natural gas . . . subject to the jurisdiction of the Commission."[45]  Order No. 670 explained that fraud is defined generally to include "any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market."[46]

22.    The Anti-Manipulation Rule applies whether or not the manipulator's principal or exclusive purpose is the manipulation of physical natural gas sales.  In Order No. 670, we stated "we do not intend to construe the Final Rule so broadly as to convert every common law fraud that happens to touch a jurisdictional transaction into a violation of" the Anti-Manipulation Rule.[47]  Yet, such a transaction would be covered if "in committing fraud, the entity . . . intended to affect, or have acted recklessly to affect, a jurisdictional transaction."[48]  We pointed out that the "in connection with" language is drawn from similar language of Rule 10b-5, which has been very liberally construed.[49] Accordingly, we held in Order No. 670 and observed in the OSC that the Anti-Manipulation Rule applies where there is a "nexus" between the manipulative conduct and the jurisdictional transaction.  Under the analogous Rule 10b-5 precedent, the alleged manipulator need not be a party to the jurisdictional transaction, nor must the connection be overwhelmingly direct.[50]  Finally, we also explained that a determination of manipulation, in general, is "a question of fact that is to be determined by all the circumstances of a case."[51]  We note that after significant commentary relating to our notice of proposed rulemaking as to the Anti-Manipulation Rule, there were no appellate challenges to our Final Rule.

---

[45] *Id.* at P 50.

[46] *Id.* (*citing Dennis v. United States*, 384 U.S. 855, 861 (1966) (noting that fraud within the meaning of a statute need not be confined to the common law definition of fraud: any false statement, misrepresentation or deceit)).

[47] *Id.* at P 22 (emphasis added).

[48] *Id.* (emphasis added).

[49] *Id.*

[50] As discussed below, the Anti-Manipulation Rule prohibits an entity from "directly or indirectly" committing fraud.

[51] Order No. 670 at P 50.

Docket No. IN07-26-001                                                                          - 14 -

23.    Based on information developed to date, the Commission preliminarily concluded that Amaranth's manipulation of the NG Futures Contracts settlement price was "in connection with" Commission-jurisdictional transactions.[52]  First, the settlement price directly sets the price for any NG Futures contracts that ultimately went to delivery at Henry Hub.  As noted, the contracts were substantial in number.  This connection is certainly direct.  Second, the settlement price is indirectly incorporated into the price for physical basis transactions.  Finally, the price of a substantial proportion of physical basis transactions are used in indices, and those indices, in turn, price a substantial volume of physical natural gas.  The OSC presented data supporting the conclusion that a significant proportion of these sales are jurisdictional to the Commission.  As we noted in the OSC, millions of consumers, particularly on the East Coast, are affected by these prices.  Some of these various types of connections are direct, others are indirect.  They each vary in magnitude.  As discussed below, all of them qualify Amaranth's conduct as "in connection with" Commission jurisdictional transactions.

## 2.    The Language of NGA Section 4(a) as Compared to NGA Section 4A

24.    Amaranth contends that the phrase "in connection with" in NGA section 4A should be interpreted identically to the same phrase that appears in NGA section 4(a)[53] (governing the Commission's ratemaking authority) because section 4A's anti-manipulation language "closely tracks" the section 4(a) ratemaking language.[54]  In passing, we note that Amaranth's rehearing request makes several additional arguments about the "in connection with" language, including its relationship to other phrases in the Anti-Manipulation Rule, the breadth of the phrase under the securities laws, and the like.  Thus, we are called upon to address it from several different perspectives throughout this order.[55]  This particular argument rests on the fact that two sections of the NGA, 4A and 4(a), use the phrase "in connection with."  Section 4(a) of the NGA provides that:

> [a]ll rates and charges made, demanded, or received by any natural gas company for or in connection with the transportation or sale of natural gas subject to the

---

[52] OSC P 108-10.

[53] Prior to and after EPAct 2005, the NGA has a "section 4(a)." The new Anti-manipulation provision added by EPAct 2005, which did not replace section 4(a), was denominated "section 4A."

[54] Rehearing Request at 36-31.

[55] *See* further discussion *infra* at paragraphs 34-45.

jurisdiction of the Commission . . . shall be just and reasonable, and any such rate
or charge that is not just and reasonable is declared to be unlawful.[56]

25.    The language of section 4(a) provides the Commission with ratemaking authority
over natural gas companies with respect to rates and charges "in connection with" the
transportation or wholesale sales of natural gas within the Commission's jurisdiction as
defined (and limited) in section 1(b) of the NGA.  However, use of the term "in
connection with" is where the similarity of the two provisions begins and ends, and the
fundamental flaw in Amaranth's argument is that Congress expressly patterned section
4A, including the "in connection with" language therein, on section 10(b) of the
Securities Exchange Act, *not* on section 4(a) of the NGA.  No one challenged the
Commission's statement in Order No. 670 that it would  interpret "in connection with" in
a manner consistent with section 10(b).  Thus it is reasonable to rely on section 10(b)
precedent, and not section 4(a) precedent, to interpret the phrase "in connection with."
EPAct 2005 does not increase the variety of transactions within the Commission's
ratemaking jurisdiction under pre-existing NGA section 4(a).  We re-iterate here our
findings in the OSC that such a jurisdictional transaction must be directly or indirectly
affected by manipulative or deceptive conduct in order for the manipulation or deception
to violate the Anti-Manipulation Rule.[57]  However, Congress did broaden (with language
in section 4A that is not present in section 4(a)) the conduct affecting such transactions
that the Commission may police, namely manipulative or deceptive conduct by any entity
that, either directly or indirectly, is in connection with the purchase or sale of natural gas
or transportation services within the Commission's jurisdiction.  *See* further discussion
*infra* at paragraphs 30-45 and 59.

26.    The cases cited by Amaranth for the proposition that "identical words used in
different parts of the same act are intended to have the same meaning"[58] did not involve a
situation, as here, where Congress amended a statute with a new provision expressly
modeled on a provision in another act.[59]  The "in connection with" language used in

_____

[56] 15 U.S.C. § 717c(a) (2005).

[57] OSC at P 110.

[58] Rehearing Request at 30.

[59] *See Envtl. Def.  v. Duke Energy Corp.*, 127 S.Ct. 1423, 1424 (2007) (the same
statutory terms used in different parts of the statute may be construed differently in order
to satisfy distinct statutory objectives); *Bailey v. United States*, 516 U.S. 137, 145 (1995)
(the meaning of statutory language depends on the context in which it is used).

Docket No. IN07-26-001                                                                  - 16 -

section 4A must be read in the context of the entire section 4A provision.  We believe
that the differences in the language used in section 4(a) and in section 4A, taken in their
entirety, reflect the broad remedial purpose of Congress in enacting section 4A.  Thus, it
is not only reasonable as a matter of statutory interpretation, but is consistent with
congressional intent to interpret each provision (4(a) and 4A) based on the entirety of
each provision as a whole.  Furthermore, section 4A, which was modeled after the
Securities Exchange Act provision, provides that terms common to section 10(b) and 4A
(such as "to use or employ, in connection with" and "any manipulative or deceptive
device or contrivance in contravention of such rules") should be interpreted as those
terms are used in section 10(b), not 4(a).

27.    The section 4(a) cases cited by Amaranth supporting its restrictive interpretation
of "in connection with" are inapposite.  In *Conoco, Inc. v. FERC*, 90 F.3d 536 (D.C Cir.
1996) (*Conoco*), the court held that the phrase "in connection with" appearing in section
4(a) of the NGA did not allow the Commission to regulate gathering facilities because
they are expressly exempt from the Commission's jurisdiction in section 1(b) of the
NGA, 15 U.S.C. § 717(b) (1994).[60]  Similarly, in *Federal Power Comm'n v. Panhandle
Eastern Pipe Line Co.*, the Supreme Court ruled that facilities, such as reserves and gas
leases used for gas production and gathering, are likewise beyond the jurisdiction of the
Commission because they too fall within section 1(b) exemptions.[61]  However, "the
scope of the Commission's power under the inclusive 'in connection' with' language of
§§ 4 and 5 [of  the NGA] was not at issue."[62]  Finally, *Williams Natural Gas Processing-
Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335 (D.C. Cir. 2004) (*Williams*) does not hold,
as Amaranth contends, that a gathering affiliate is beyond the Commission's jurisdiction
if it does not directly participate in natural gas markets.  Rather, the *Williams* holding
concerns whether the Commission can disregard the corporate form and reassert
jurisdiction over a gathering facility, which is expressly exempt from regulation under
section 1(b) of the NGA, because its activities are interrelated to an affiliated interstate
pipeline.[63]

---

[60] *Conoco*, 90 F.3d at 552 (section 1(b) expressly exempts from the Commission's
jurisdiction the gathering of natural gas).

[61] 337 U.S. 498, 504 (1949).

[62] *See Northern Natural Gas Co. v. FERC*, 929 F.2d 1261, 1272 (8th Cir. 1991)
(discussing the scope of the Supreme Court's decision in *Federal Power Comm'n  v.
Panhandle Eastern Pipe Line Co.*).

[63] *Williams*, 373 F.3d at 1342-43.

28.    These decisions simply concluded that section 4(a) could not be construed in a manner that would expand the jurisdiction expressly foreclosed in section 1(b). They did not address (nor could they, since section 4A had not been enacted) the broader scope of section 4A which expressly applies to "*any* entity" – not just natural gas companies – that "directly *or indirectly*" take certain actions in connection with the "*purchase* or sale" of jurisdictional services. In this case, the Commission's construction of its jurisdiction under section 4A does not conflict with section 1(b) because that section does not exempt financial market participants, such as Amaranth, or trading in natural gas futures markets. Furthermore, the logic, if not the result, of the *Conoco* decision can be read to support the Commission's view here that when non-jurisdictional transactions, such as natural gas futures contracts, affect jurisdictional markets, the "in connection with" requirement of section 4(a) would be met.[64] We find no relevance to the few cases cited by Amaranth[65] in which the courts have rejected jurisdictional assertions by the Commission in other contexts that are not present here, other than for the general proposition that the Commission cannot create jurisdiction that Congress has not conferred.[66]

---

[64] The court in *Conoco* held that when exempt gathering facilities become "intertwined with jurisdictional activities, the Commission's regulation of the latter may inpinge on the former." 90 F.3d at 549. Thus, "[a]s an abstract matter, [the court had] no reason to doubt the Commission's conclusion that a nonjurisdictional entity could act in a manner that would change its status by enabling an affiliated interstate pipeline to manipulate access and costs of gathering." *Id.* The holding in *Conoco* simply rested on the section 1(b) exemption which trumped the section 4(a) language, a construct not relevant here.

[65] Rehearing Request at 36-39.

[66] Amaranth's reliance on *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996), *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005), *pet. for cert. pending,* No. 07-155 (filed Aug. 6, 2007); *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004), and *N. States Power Co. v. FERC*, 176 F.3d 1090 (8th Cir. 1999) is misplaced. In each of these decisions, the courts concluded that the plain language of the statute clearly delineated FERC's jurisdiction. *Altamont,* 92 F.3d 1239 (NGA expressly reserved to states the authority to determine the intrastate rate structures); *Bonneville,* 422 F.3d 908 at 917-19 (FPA expressly states that FERC's jurisdiction extends to public utilities and that FERC's refund authority does not extend to governmental entities); *California Indep. Sys. Operator*, 372 F.3d at 401 (FPA limited FERC's authority over public utility boards); and *N. States Power Co.*, 176 F.3d at 1095 (federal regulation extends to matters not subject to state regulation and states have authority over retail rates and practices). In this case, the NGA expressly confers

(continued…)

Docket No. IN07-26-001                                                      - 18 -

29.    Amaranth's proposed reading is also problematic because it essentially eliminates much of the intended effect of the new section 4A that was hard fought for and prevailed in Congress.  Prior to 2005, the Commission had authority under section 4(a) to punish manipulation by sellers in physical natural gas markets and, therefore, had promulgated "Market Behavior Rules" prohibiting manipulation by such sellers.[67]  Congress is not presumed to enact surplusage.[68]   The better interpretation is that Congress meant to expand Commission authority beyond what existed in 2005 to proscribe the conduct alleged in the OSC.  *See* further discussion of the "in connection with" language *infra* at paragraphs 34-45 and 59.

## 3.    Whether the Anti-Manipulation Rule is Limited to "Physical Sellers" or "Sales" Transactions.

30.    Amaranth's next specific argument is that the Commission is "bootstrapping"[69] language in the NGA's new section 4A into a new and broad jurisdictional grant that reaches beyond physical sellers and their sales transactions.  This argument is without merit because it ignores the simple fact that new section 4A was, indeed, a new and broad jurisdictional grant by Congress to the Commission that goes beyond prior Commission jurisdiction to prohibit manipulation involving entities and transactions traditionally not regulated by the Commission.

31.    As Amaranth concedes, Congress granted the Commission broad authority to police market manipulation by "*any* entity."  The word "any" gives the word it modifies (in this case, "entity") an expansive meaning.[70]  Thus, Amaranth's argument that the

---

jurisdiction upon FERC to prohibit market manipulation that is "in connection with" its jurisdictional markets.  No other NGA provisions limit FERC's authority to prevent market manipulation.

[67] *See* 18 C.F.R. § 284.403(a) (2005).

[68] *City of Roseville v. Norton*, 348 F.3d 1020, 1028 (D.C. Cir. 2003) (*citing Babbitt v. Sweet Home Chapter of Cmty. for a Great Oregon*, 515 U.S. 687. 698 (1995)).

[69] Rehearing Request at 36.

[70] *Norfolk S. Rwy. Co. v. Kirby*, 543 U.S. 14, 31-32 (2004) (the word "any" gives the word it modifies an expansive reading); *Dep't of Hous. and Urban Dev. v. Rucker*, 535 U.S. 125, 130-31 (2002); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (one must give effect to each word in a statute so that none is rendered superfluous); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("any" is an expansive term, meaning "one or some indiscriminately of whatever kind,"); *New York v. EPA*, 443 F.3d 880, 885-87

(continued…)

Docket No. IN07-26-001                                                              - 19 -

Commission has authority to assess civil penalties for manipulation only against a physical seller of natural gas is inconsistent with the language of the statute.[71]  First, section 4A and the Anti-Manipulation Rule prohibits any entity from "directly or indirectly" engaging in manipulation "in connection with" a jurisdictional transaction. Neither speaks in terms of conduct by an entity "engaged in" or "a party to" such transaction.  Contrary to Amaranth's sweeping assertion that the physical and financial markets are "completely separate,"[72] the manipulation alleged here had a profound cross-market effect: on the futures contracts that went to physical delivery, on physical basis transactions, and on transactions based off indices calculated using physical basis transactions.  "Increasingly, the price of natural gas in many supply contracts between suppliers and local distribution companies ("LDC") . . . . is determined based upon monthly price indexes closely tied to the monthly settlement of the NYMEX futures contract . . . without question a participant's trading conduct in one venue can effect, and has affected, the price of natural gas contracts in the other."[73]  Second, Amaranth's contention that section 23 of the NGA, which directs the Commission to promulgate rules that facilitate price transparency in natural gas markets, confirms that the Commission has civil penalty authority only against "sellers" of natural gas is based on a misreading of the statute.  Section 23, which is separate and distinct from section 4A, allows the Commission to obtain information about the price and availability of natural gas from "any market participant," not simply sellers.[74]  Section 23(e) specifies that civil penalties for violating *this section* are limited to the three years before notice of the proposed penalty, except in cases where a seller engaged in fraudulent or manipulative activities in violation of section 4A that materially affected the sales contract.[75]  This exception to a limitation on a subset of NGA violations implicated by section 23 does not override the

---

(D.C. Cir. 2006) (the word "any" is broadly construed to reflect Congress' intent that all types of physical changes are subject to the Clean Air Act's New Source Review program).

[71] Rehearing Request at 20.

[72] *Id.* at 26.

[73]  Testimony of Laura Campbell, Assistant Manager of Energy Resources, Memphis Light, Gas & Water on behalf of APGA before the CFTC (Sept. 18, 2007).

[74] 15 U.S.C. § 717t-2(a)(3)(A).

[75] *Id.* at §§ 717t-2(e)(1) and (2).

broader language of section 4A.[76]  In contrast, NGA section 22(a) specifies the Commission's civil penalty authority for violations of *the Act*, which includes violations of section 4A.[77]

32.     Consistent with the foregoing authorities, Order No. 670 provides that the statutory phrase "any entity" (which is repeated in the Rule) covers not only companies that have traditionally been subject to the Commission's jurisdiction (such as natural gas pipeline companies or public utilities), but also any company or firm, and natural persons[78] who, "intended to affect, or have acted recklessly to affect, a jurisdictional transaction."[79]  Amaranth's contention that only direct purchasers or sellers of physical natural gas are subject to the Commission's anti-manipulation jurisdiction not only is contradicted by the "any entity" language of section 4A, but is directly contradicted by the Supreme Court decision on which it relies.  In *United States v. O'Hagan*, the Supreme Court stated that "as written, [section 10(b)] does not confine its coverage to deception of a purchaser or seller of securities; rather the statute reaches *any* deceptive device used "in connection with" the purchase or sale of a security." (citation omitted) (emphasis added).[80]  Other cases decided under the Securities Exchange Act generally demonstrate that one can violate Rule 10b-5 (which implements section 10(b)) without being a purchaser or seller of a security.[81]

33.     Moreover, section 4A expressly prohibits any entity from "directly or *indirectly*" using a manipulative or deceptive device.  The term "indirectly" supports the conclusion that Congress intended the NGA's anti-manipulation prohibition to apply to more than conduct *within* the Commission's traditionally regulated market and more than just the direct wholesale seller of the physical commodity.  Amaranth's statutory interpretation

---

[76] *Id.*

[77] *Id.* at §§ 717t-1.

[78] Order No. 670 at PP 2, 18.

[79] *Id.* at P 22.

[80]  *O'Hagan*, 521 U.S. 642, 658 (1997).

[81] *See, e.g.*, *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) (permitting shareholder suit for damages under Rule 10b-5 where company made misleading statements that affected its own stock).

Docket No. IN07-26-001                                                                - 21 -

effectively reads the term "indirectly" out of the statute, thereby violating the basic rule of statutory construction to give meaning to all statutory terms.[82]

## 4.    The "In Connection With" Requirement

34.    Amaranth contends most fundamentally that the Commission lacks jurisdiction over trades outside the physical natural gas markets because of the "in connection with" requirement in NGA section 4A.[83]  We find that Amaranth reads the requirement too narrowly and in a manner that precludes the achievement of much of what Congress intended.  Congress could have, but did not, prohibit manipulative or deceptive conduct that occurred *in* Commission-jurisdictional markets.  Instead, Congress used expansive language that prohibits manipulative or deceptive practices by any entity, directly or indirectly, "in connection with" the purchase, sale or transportation of natural gas historically within the Commission's jurisdiction.  We discussed this phrase in the OSC[84] and we revisit it more fully here.

35.    Because the clause "in connection with" is undefined, we begin with an examination of ordinary usage.[85]  According to Fowler's Modern English Usage, "in connection with" is noted for . . . its "pliability."[86]  Furthermore, "connection" is defined by Webster's Third New International Dictionary 481 (1981) as a "relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement."[87]  Therefore, in a variety of contexts, courts have broadly and flexibly

---

[82] *TRW Inc.*, 534 U.S. at 31 (each word in a statute must be given meaning).

[83] Rehearing Request at 26-39.

[84] OSC at PP 50, 110.

[85] *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004) (statutory construction begins with the plain language of the statute and the assumption that the ordinary meaning of the language reflects the statutory purpose); *Bailey v. United States*, 516 U.S. 137, 144-45 (1995) (interpret undefined statutory terms by referring to the term's ordinary usage).

[86] Fowler's Modern English Usage 172 (R.W. Burchfield ed., 3d ed. 1996).

[87] *See also* American Heritage Dictionary of the English Language 400 (3d ed. 1992) (connection is an association or relationship).

interpreted the phrase "in connection with" to encompass a wide variety of relationships and always with an eye to accomplishing statutes' broad remedial purposes.[88]

36.     In addition to considering the common definition of language used in the statute, we also evaluate (as we did in Order No. 670) how "in connection with" is used in section 10(b) of the Securities Exchange Act, on which section 4A was modeled.[89]  Cases construing section 10(b) and Rule 10b-5, as well as legislative history of section 10(b), are therefore relevant to the Commission's construction of section 4A.  In its Rehearing Request, Amaranth claims that only the phrase "manipulative scheme or device" (and not the rest of NGA section 4A) are to be construed consistent with section 10(b).[90]  While section 4A states that the phrase is to be so construed, a comparison of identical phrases used throughout section 4A and section 10(b) shows that Congress intended section 4A and the implementing rules to be modeled after section 10(b).

37.     The "in connection with" language of section 10(b) has been construed expansively by the Supreme Court to accomplish the broad remedial purposes of section 10(b) which was enacted to restore the integrity of securities markets and promote investor confidence following the stock market crash of 1929.[91]  In *Zandford* and

---

[88] *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (*Zandford*) ("in connection with" should be read broadly and flexibly, not restrictively); *Superintendent of Ins. of New York v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971); *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996) ("in connection with" is interpreted expansively); *United States v. Thompson*, 32 F.3d 1, 6-7 (1st Cir. 1994) (same); *SEC v. Hopper*, No. 04-1054, 2006 U.S. Dist. LEXIS 17772 (S.D. Tex. Mar. 24, 2006) ("[a] plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive conduct affects a market for securities.") (*quoting In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 472, 505-06 (S.D.N.Y. 2005)).

[89] 15 U.S.C. § 717c (2005) (terms are used in the same manner as section 10(b)).

[90] Rehearing Request at 31-32.

[91] *See Zandford*, 535 U.S. at 819 (the "in connection with requirement" of the SEC regulatory scheme, on which the Anti-Manipulation Rule is modeled, should be interpreted flexibly, not technically and restrictively, to accomplish the statutes' remedial purposes of promoting market integrity and investor confidence) (*citing United States v. O'Hagan*, 521 U.S. 642, 651 (1997)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006) ("the magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated"); *Bankers Life & Cas. Co.*, 404 U.S. at 10 (construction of section 10(b) extends beyond maintaining the integrity of securities markets).

*Bankers Life & Cas. Co.*, the Supreme Court upheld the SEC's broad and flexible reading of the "in connection with" requirement of section 10(b) to accomplish the broad remedial purpose of the statute. Here we note the historical similarity of the posture of the Securities and Exchange Commission (SEC) in 1934 to our own situation with respect to the anti-manipulation provisions. In response to the Western energy crisis of 2000-2001, EPAct 2005's parallel anti-manipulation provisions were added to both the FPA and NGA to ensure that the Commission had sufficient tools to address and punish manipulative behavior such as that engaged in by Enron during the crisis. Congress clearly did not want to limit the types of manipulation that might harm jurisdictional markets and thus provided broad, general language to allow the Commission to sanction unforeseen types of manipulation that could harm customers. As the SEC broadly construed the Securities Exchange Act in early enforcement actions to restore confidence in financial markets, we will similarly broadly construe the "in connection with" provision to effectuate the Congressional purpose of the anti-manipulation provisions enacted as part of EPAct 2005.

38.      In *Zandford*, the Supreme Court held that the "in connection with" requirement was met when deceptive acts, such as the misappropriation of proceeds from the purchase or sale of securities, coincided with the purchase or sale of securities, even though the transactions themselves are lawful.[92]   Similarly, *SEC v. Hopper* held that even though "round-trip" trading (which involves pre-arranged sham transactions designed to artificially increase trading volumes) may not have involved directly the purchase or sale of a security, "a plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendant's deceptive conduct affects a market for securities."[93] Thus, the court held that the alleged fraud which arose from statements about transactions, and not the transactions themselves, may satisfy the "in connection with"

---

[92] *Zandford*, 535 U.S. at 819-20 (even though the stockbroker's actual sale of securities was lawful, section 10(b) extends to the stockbroker's scheme to defraud his clients). *See also Bankers Life & Cas. Co.*, 404 U.S. at 12-13 (the "in connection with" requirement is met when the deceptive act of misrepresenting who would receive the proceeds from the sale of bonds "touches" the purchase or sale of a security). *See also Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596 (2001) (although a formal transaction in the securities market did not take place, section 10(b) applied to an oral contract for the sale of an option on a security, while the seller secretly intended to never allow the purchaser to exercise the option.).

[93] *SEC v. Hopper*, No. 04-1054, 2006 U.S. Dist LEXIS 17772 at *39 (S.D. Tex. Mar. 24, 2006) (*quoting In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 472, 505-06 (S.D.N.Y. 2005)).

Docket No. IN07-26-001                                                                     - 24 -

requirement if investors considered the energy company's false trading numbers in deciding whether to purchase or sell the company's securities.[94]  Indeed, the entire line of section 10(b) "insider trading" cases where a "tipper" does not herself trade in securities but only the outsider "tippee" does so, are predicated on the notion that the section 10(b) violation need not be directly tied (either contractually or temporally) to the securities trading.[95]

39.    In its most recent pronouncement on the "in connection with" requirement, the Supreme Court again reaffirmed the breadth of the phrase.  "[W]hen this Court *has* sought to give meaning to the phrase ["in connection with"] in the context of section 10(b) and Rule 10b-5, it has espoused a broad interpretation."[96]  Importantly, the Court in *Shadi* also affirmed that this breadth is imported into other statutes where, as with NGA section 4A, Congress replicates section 10(b) language in those other statutes.[97] "Congress can hardly have been unaware of the broad construction adopted by both [the Supreme Court] and the SEC when it imported the key phrase - - 'in connection with the purchase or sale' into" other statutes.[98]

40.    Congress' intention to cover a wide range of conduct is further evidenced in the broad remedial purpose and legislative history of section 10(b), wherein the Congressional committee reporting on what became section 10(b) noted that deceptive practices "constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers" in the regulatory

---

[94] *Hopper* at *40-41.

[95] *E.g. SEC v. Rocklage*, 470 F.3d 1, 8-10 (1st Cir. 2006) (spouse of insider who passed on inside information to a third person, but did not herself trade securities, satisfied the "in connection with" requirement and was found to violate securities trading laws within the meaning of *Zandford* because she knew that the likely result of her tip would be to affect securities trading).

[96] *Merrill, Lynch, Pierce, Fenner & Smith Inc. v. Shadi*, 547 U.S. 71, 85 (2006).

[97] *Id.* at 85-86.

[98] *Id.* at 85 (the court broadly construed the "in connection with" requirement contained in the Securities Litigation Uniform Standards Act of 1998).

agency "have been found practically essential."[99]  Similarly, as noted above, the 109th Congress favored the broad prohibitory language we have in the statute today.

41.    Amaranth states that in the vast majority of securities cases, the conduct may directly involve the purchaser of a security.[100]  But this, even if true, is because the SEC would ordinarily seek to punish fraud that is perpetrated against a specific investor by an offeror or seller.  In such cases, the sale of a security will be present.  The frequency of this fact pattern, however, does not amount to a legal requirement.  Where, as here, the Commission is responsible for protecting wholesale markets and the customers that rely on those markets, we believe it is reasonable to interpret section 4A in a way that does not permit market manipulation abuses that, as here, have a direct link to jurisdictional prices of gas, to go unremedied by the Commission.

42.    There are multiple decisions holding that the "in connection with" requirement is met under fact patterns similar to those presented in the OSC.  The Supreme Court defined market manipulation under Rule 10b-5 as conduct "*controlling or artificially affecting* the price of securities"[101] or practices that "artificially affect market activity."[102] Courts have sustained Rule 10b-5 claims when misrepresentations and omissions are made regarding Treasury bill futures contracts (even though futures contracts are not "securities") because the asset *underlying* the futures contract (a Treasury bill) is a security.[103]  Similarly, in this case, the Commission preliminarily concluded in the OSC that Amaranth's trading in NG Futures Contracts actually set the NG Futures settlement price, which is directly incorporated into the pricing of physical natural gas within the Commission's jurisdiction.  Given the connections between the trading behavior at issue and physical natural gas markets, a finding that the "in connection with" requirement is met is appropriate.

---

[99] *Bankers Life & Cas. Co.*, 404 U.S. at 12 (*quoting* H.R. Rep. No. 1383, 73d Cong. 2d Sess. 7).

[100] Rehearing Request at 32.

[101] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (emphasis added).

[102] *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

[103] *Paine Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 210 (N.D. Ala. 1981).  *See also Fisher v. Dean Witter Reynolds, Inc.* 526 F. Supp. 558, 560 (E.D. Pa. 1981) (fraud in the sale of treasury bills futures contracts violates SEC Rule 10b-5).

43.    The cases cited by Amaranth to support its narrow construction of the "in connection with" requirement are inapposite.[104]  First, *Ontario Pub. Serv. Employees v. Nortel Networks Corp.* is a *standing* case which concludes that one who is not actually injured by securities-related conduct cannot bring a private right of action.[105]  Because the court found "that the plaintiffs lack standing under section 10(b), [the court did] not reach the 'in connection with' requirement.".[106]  Second, *Rand v. Anaconda-Ericsson, Inc.*[107] (*Rand*) did not hold, as Amaranth contends, that the fraudulent conduct must be *in* a securities transaction.  Instead, the court held that a press release declaring a company in default under a security agreement does not violate Rule 10b-5's anti-fraud provision because the prohibited conduct did not have "incidental involvement of securities."[108]  The *Rand* court also noted that "misrepresentations about the financial condition of a broker-dealer were 'in connection with' a securities transaction where the broker-dealer's financial strength was directly related to its ability to carry out obligations under agreements calling for the repurchase or resale of government securities.  The misrepresentations went to the consideration for a securities transaction."[109]  Thus, the *Rand* court clearly acknowledged that the purchase or sale of securities in the securities market is not a pre-requisite to SEC jurisdiction.

44.    Amaranth reads the securities cases, particularly *Zandford*, as permitting the "in connection with" test to be satisfied only where the manipulation "coincided with the sales themselves."[110]  We do not read the cited language of *Zandford* as the complete expression of the test, but were it so, the test would certainly be satisfied on the facts of

---

[104] *See* Rehearing Request at 33.

[105] *Ontario Pub. Serv. Employees v. Nortel Networks Corp.*, 369 F.3d 27, 33 (2d Cir. 2004) (*Ontario*).

[106] *Id.*  This decision did not address whether a regulator could enforce a prohibition on the identified conduct.

[107] 794 F.2d 843, 847 (2d Cir. 1986).

[108] *Id.*

[109] *Id.* (*citing* in *SEC  v. Drysdale Sec. Corp.*, 785 F.2d 38 (2d Cir. 1986)).

[110] Rehearing Request at 32 (*citing Zandford*, 535 U.S. at 820).

this case.[111]  The OSC alleges that Amaranth traded between 2:00 and 2:30 PM on each of the three settlement days with the specific intent and actual effect of artificially setting the price of the NG Futures Contracts.  Further, the OSC alleges that within an instant of that trading, effectively at 2:31 PM, and as a direct result of that trading, the settlement price became the price for the above-identified physical sales at Henry Hub.  It is difficult to imagine how much more "coincidence" there could be between Amaranth's trading and Commission jurisdictional sales.

45.    Finally, post-enactment oversight inquiries from Congress support the Commission's determination regarding its anti-manipulation jurisdiction.  Senator Bingaman, who was Ranking Member on the Senate Committee on Energy and Natural Resources when EPAct 2005 was enacted, noted in a letter to the Commission that "the evolution of complex and interrelated markets for financial and physical energy commodities has elevated the importance of the Federal Energy Regulatory Commission's . . . role."[112]  The Senator also inquired into "efforts [by the Commission] to monitor *trading of NYMEX gas futures contracts*, especially as it relates to end-of-month natural gas trading."[113]  Similarly, the Government Accountability Office (GAO) noted that EPAct 2005 gave the Commission authority to "examine whether financial market transactions, which are not generally under the Commission's jurisdiction, affect the physical natural gas markets over which FERC has authority" and enforce it against any entity, if the manipulative trading, whether intentionally or recklessly, affects physical natural gas markets.[114]  These views are consistent with the Commission's interpretation that section NGA section 4A properly applies to "producers, financial

---

[111] Although the *Zandford* court certainly determined that the securities transactions "coincide"[d] with the wrongful conduct and "therefore were in connection with" securities sales within the meaning of §10(b)," *Zandford* at 822, we do not read the opinion as holding that this "coincidence" is the only way to meet the "in connection with" requirement.  We read *Zandford* as supporting the view that "[t]he precise contours of the in connection with requirement are not self-evident.  It seems unavoidable 'that the standard be fleshed out by a cautious case-by-case approach.'" *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 942-43 (2d Cir. 1984).

[112] *See* Letter from Senator Bingaman, Chairman, Committee on Energy and Natural Resources, to Joseph Kelliher, Chairman, FERC (Feb. 6, 2007).

[113] *See Id. a*t 2 (emphasis added).

[114] U.S. GOV'T. ACCOUNTABILITY OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN OVERSEEING PRICES at 16.

companies, local utilities, and natural gas traders, most of which were not previously regulated by FERC," that engage in manipulative conduct that affect the Commission's jurisdictional markets.[115]

**B.    The Commission's Anti-Manipulation Authority As Compared to the CFTC's Jurisdiction**

46.     Amaranth's central contention is that manipulation of natural gas markets of the type alleged by the Commission in the OSC is within the CFTC's "exclusive" jurisdiction and, therefore, even if the alleged conduct is covered by the NGA, the Commission is pre-empted from taking action.[116]  Explicit in Amaranth's jurisdictional argument is the underlying notion that the financial and physical natural gas markets are "completely separate" markets (*see, e.g.* Amaranth CFTC Brief at 15), and that the CFTC is the only agency to police the financial markets, while the Commission may police only the physical natural gas market.[117]  We address each argument below.

**1.    CFTC's Exclusive and Non-Exclusive Jurisdiction**

47.     Amaranth contends that section 2(a)(1)(A) of the CEA conclusively establishes that the CFTC has exclusive jurisdiction over Amaranth's conduct.[118]  The CEA provides that "[t]he Commission [CFTC] shall have exclusive jurisdiction . . . with respect to accounts, agreements  . . . and transactions involving contracts of sale of a commodity for future delivery."[119]  This Commission indisputably recognizes that the CFTC has exclusive jurisdiction over transactions involving contracts of sale of a commodity for future delivery, *i.e.*, futures transactions, just as this Commission has exclusive jurisdiction over rates, terms and conditions of jurisdictional sales of resale of natural gas in interstate commerce, *i.e.*, physical transactions.  The fact that the CFTC has exclusive jurisdiction over these activities does not mean that it has exclusive jurisdiction over fraudulent or deceptive practices associated with those transactions, or that other agencies such as this Commission are precluded from examining fraudulent or deceptive conduct in exercising their regulatory responsibilities, particularly where this Commission has

---

[115] *Id.* at 15.  *See also* Order No. 670 at PP 2, 18, and 22.

[116] Rehearing Request at 12-16.

[117] *Id.* at 13-16.

[118] *Id.* at 22.

[119] 7 U.S.C. § 2(a)(1)(A) (2006).

been provided express authority with respect to such conduct if it has a nexus to jurisdictional physical sales.[120] For the reasons discussed below, we do not believe it is reasonable to interpret section 2(a)(1)(A) of the CEA, when read in conjunction with other provisions of law, to give the CFTC exclusive jurisdiction over manipulative conduct involving futures transactions.

48.    A line of court decisions under the CEA, known as the "exempt commodities cases," support the position that the CFTC does not have exclusive jurisdiction as to manipulation. The CEA provides that "agreements, contracts, and transactions" in "exempt" commodities, such as natural gas, are beyond the CFTC's jurisdiction.[121] However, to assert jurisdiction over false reporting, manipulation, and other fraudulent and deceptive conduct in exempt commodities, the CFTC successfully argued that manipulation and deceptive conduct, by their very nature, do not involve a "mutual understanding" creating enforceable rights or obligations with counterparties and, therefore, such conduct is not a "contract, agreement or transaction," but merely conduct *related to* a "contract, agreement or transaction" in a commodity.[122]  In *CFTC v. Bradley,*[123] the CFTC argued it had jurisdiction under the CEA to punish the manipulative conduct of knowingly providing false and misleading information concerning natural gas transactions. The CFTC argued that such manipulative conduct is not a "contract, agreement, or transaction," because those terms, "as commonly understood, denote[] a mutual understanding between the parties creating rights or

---

[120] *See FTC v. Roberts*, 276 F.3d 583, 591 (D.C. Cir. 2001) ("it does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms.").

[121] *See* 7 U.S.C. §§ 2(a) (exclusive jurisdiction provision), 2(g) and 2(h) (exemptions from § 2(a)) (2000).

[122] *Roberts*, 276 F.3d at 591.  *See also CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007); *U.S. v. Valencia*, No. 03-024, 2003 U.S. Dist. LEXIS 15264 (S.D. Tex. Aug. 25, 2003); and *CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006).  These cases involved interpretation of a parallel provision of the CEA that uses the terms "contract, agreement, or transaction."  Given the parallel language and same broad remedial purpose, the interpretation should be the same.

[123] 408 F. Supp. 2d 1214 (N.D. Okla. 2005).

obligations that are enforceable or recognized by law."[124]  The court sustained that argument.

49.     Accordingly, these cases stand for the general proposition that in interpreting the exclusive and non-exclusive jurisdiction under the CEA, manipulation does not involve a mutual understanding or meeting of the minds necessary to consummate an "account, agreement, or transaction," or a "contract, agreement, or transaction" as those terms are commonly understood and, therefore, manipulation is neither excluded from CFTC's jurisdiction over otherwise "exempt commodities" nor is it within the CFTC's *exclusive* jurisdiction.  Although most of these cases involved manipulation of markets caused by false reporting of information (a fact not present here), the CFTC recently filed a case against Energy Transfer Partners (ETP), alleging attempted manipulation that did not involve false reporting.[125]  In *ETP*, the CFTC maintains that it has jurisdiction over manipulative trading in physical natural gas markets, which are otherwise exempt from the CFTC's jurisdiction, because manipulative conduct is not a "contract, agreement, and transaction."  By extension, manipulation is also not within the CFTC's exclusive jurisdiction.

50.     The case of *FTC v. Roberts* (*Roberts*) is the most recent and comprehensive review of this subject and makes the distinction between the CFTC's exclusive

---

[124] *Id*. at 1219 (*quoting* Black's Law Dictionary 318 (7th Ed. 1999)).  In *CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007), the CFTC successfully argued that "false reporting of market information concerning natural gas and attempted manipulation of natural gas price indices [] does not implicate an 'agreement, contract, or transaction.'" *Id.* at 1198 (*quoting U.S. v. Valencia*, No. 03-024, 2003 U.S. Dist. LEXIS 15264 at * 36 (S.D. Tex. Aug. 25, 2003)).  *See also CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006) (false price reporting is not an account, agreement or transaction).  Most recently, the court in *CFTC v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005) held that false reporting of natural gas transactions is not an "account, agreement, or transaction" and, therefore, the CFTC had jurisdiction over attempted manipulation of natural gas prices.

[125] As with this matter, the Commission's staff coordinated its lengthy investigation with a parallel investigation by the CFTC staff into alleged market manipulation of physical natural gas by ETP.  Those investigations, as here, resulted in simultaneous enforcement actions by the two agencies, including the CFTC asserting its jurisdiction in a complaint filed in the United States District Court for the Northern District of Texas. *CFTC v. Energy Transfer Partners, L.P.*, Civil Action No.  3-07-Cv. 1301 (N.D. Texas).  The Commission's Order to Show Cause issued to *ETP* in IN06-3-002.

Docket No. IN07-26-001                                                                  - 31 -

jurisdiction over "accounts, agreements, and transactions" and its non-exclusive
jurisdiction over fraudulent and deceptive practices. *Roberts* explained that "while the
CFTC has clear statutory authority to regulate a [trader's] deceitful 'practices' . . . .
there is no reason to think the authority is exclusive. A 'practice' or 'course of business'
is quite plainly not a 'transaction' – either in life or in this statutory provision. (Nor for
that matter is it an 'account' or 'agreement.')."[126]  The D.C. Circuit held in *Roberts* that
the notion that whatever the CFTC regulates it does so exclusively is a "specious
contention." [127]  Thus, the case law supports the interpretation that the exclusive
jurisdiction provision cited by Amaranth does not apply to Amaranth's alleged
manipulative conduct[128] and, the CEA language notwithstanding, "other agencies . . .
retain their jurisdiction beyond the confines of 'accounts, agreements, and transaction'"
for futures contracts.[129]

51.     The majority of cases cited by Amaranth in support of the claim that the CFTC has
exclusive jurisdiction in this case address the narrow question of whether CFTC or the
SEC has enforcement jurisdiction *in the first instance* over certain market segments and
products. [130]  None of these cases address whether the particular manipulative activity

---

[126] 276 F.3d at 591.

[127] *Id.*

[128] *See also SEC v. Hopper*, No, 04-1054, 2006 U.S. Dist. LEXIS 17772 at *37-42
(S.D. Tex. Mar. 24, 2006) (because energy trading transactions were fraudulent and
deceptive within the meaning of Rule 10b-5, the SEC could proceed at the same time as
the Commission and the CFTC); *U.S. v. Reliant Energy Serv*., 420 F. Supp. 2d 1043,
1045 (N.D. Cal. 2006) (the Commission's exclusive jurisdiction under the FPA to
regulate the transmission and sale at wholesale of electricity in interstate commerce did
not preempt the anti-manipulation jurisdiction under the CEA pertaining to electricity
prices during the Western energy crisis).

[129] *Roberts*, 276 F.3d at 591.

[130] Rehearing Request at 35-36 (*citing Chicago Merc. Exch. v. SEC,* 883 F.2d 537
(7th Cir. 1989), *Chicago Bd. Of Trade v. SEC,* 677 F.2d 1137 (7th Cir. 1982), *SEC v. Am.
Commodity Exch.* 546 F.2d 1361 (10th Cir. 1976), and *SEC v. Univest, Inc*., 405 F. Supp.
1057, 1058 (N.D. Ill. 1975)).  Each case resolved a dispute over whether a certain
financial product was a futures contract or an option on a futures contract subject to the
exclusive jurisdiction of the CFTC, or a security or an option on a security subject to SEC
regulation.

was subject to the jurisdiction of both agencies or whether the manipulation was "in connection with" the SEC's jurisdictional markets, *i.e.*, whether the conduct might fall within both agencies' non-exclusive jurisdiction.  Indeed, in *Chicago Merc. Exch. v. SEC,* the court expressly stated it was not deciding the related question of whether the SEC has authority to apply its anti-fraud rules to commodity options transactions.[131]  The other cases cited by Amaranth generally resolve broad questions of whether the SEC could set terms or perform other "prospective" oversight or regulation over designated contract markets, a question not present here.[132]  In any event, these cases pre-date the 2000 amendments to the CEA, which affirmed the SEC's jurisdiction over fraud claims involving futures.[133]

## 2.   The CEA "Other Regulatory Authorities" Savings Clause and the Commission's Jurisdiction

52.     Even if the conduct alleged by the Commission in the OSC could be read to fall within the text of the exclusive jurisdiction provision of the CEA, "it does not follow.  . . . that Congress intended to preempt the activities of all other federal agencies in their regulatory realms. . . . Preemption of the regulation of the market does not also mean preemption of all law that might involve participants in the market."[134]  This is clarified in the "savings clause" contained in the CEA.

---

[131] 883 F.2d 537 (7th Cir. 1989).

[132] *Chicago Bd. of Trade v. SEC,* 677 F.2d 1137 (7th Cir. 1982); *Chicago Merc. Exch. v. SEC,* 883 F.2d 537 (7th Cir. 1989).

[133] In 2000, Congress passed the Commodities Futures Modernization Act (CFMA), which amended and re-authorized portions of the CEA.  One purpose of the CFMA, *inter alia*, was to clarify that the CFTC and the SEC would *share* jurisdiction over products that had characteristics of both securities and futures.  Because section 10(b) and Rule 10b-5 serve as the model for section 4A and Order No. 670, the legal precedent upholding the SEC's jurisdiction over fraud and manipulation in these "non-securities" transactions that involve a security as the underlying commodity strongly supports the Commission determination that the CEA does not eclipse section 4A.

[134] *Roberts*, 276 F.3d at 591 (*quoting Poplar Grove Planting and Ref. Co. v. Bache Halsey Stuart Inc.*, 465 F. Supp. 585, 592 (D. La. 1979)).

Docket No. IN07-26-001                                                    - 33 -

53.    The CEA savings clause, which immediately follows the exclusive jurisdiction provision, states:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any state, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.[135]

54.    The purpose of any savings clause is to "preserve something from immediate interference."[136]  Contrary to Amaranth's claim, there is no evidence that Congress intended the savings clause to prevent a "regulatory overlap" between the CFTC and the Commission over manipulation of natural gas markets.  Instead, "[i]nclusion of the so-called 'regulatory savings clauses,' § 2(a)(1)(A)(I)-(II), makes clear that other agencies . . . retain their jurisdiction beyond the confines of 'accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery.'"[137]  The expansive anti-manipulation authority given to the Commission in NGA section 4A and FPA section 222 was enacted by Congress five years subsequent to the most recent amendments to the CEA, and several years after the Commission uncovered the manipulative practices occurring in both natural gas and electric markets in connection with its investigation of the Western energy crisis of 2000-2001.  More to the point, neither section 4A nor section 222 contain a savings clause, suggesting that Congress did not intend the CEA to trump the broad authority conferred on the Commission to take action against any entity that directly or indirectly employs, in connection with a purchase or sale subject to the jurisdiction of the Commission, a manipulative device. We interpret the CEA's section 2(a) savings clause to simply preserve any and all authority conferred to the Commission by Congress.[138]

---

[135] 7 U.S.C. § 2(a)(1)(A) (2006).

[136] *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 162 (1920).

[137] *Roberts*, 276 F.3d at 591(*quoting Chicago Merc. Exch. v. SEC,* 883 F.2d 537, 550 (7th Cir. 1989) (section 2 "carries no implicit pre-emptive force")).

[138] Similarly, the savings clause in NGA section 23(c)(2) likewise preserves the jurisdiction conferred by the CEA to the CFTC.  That provision does not, as Amaranth contends at page 19 of its Rehearing Request, establish that Congress intended to withhold regulatory power from the Commission.

55.     Amaranth's argument that the CEA permits the Commission to retain jurisdiction only for matters "beyond the confines of accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery"[139] is not in conflict with our own view.  The manipulation in this case (as in the CFTC's cases pertaining to manipulation of physical natural gas) is conduct that goes "beyond" the "confines" of "accounts, agreements, and transactions."[140]   However, if there is any doubt on this score, we interpret the savings clause, in conjunction with the broad wording of section 4A itself and Congress' reasons for adding the anti-manipulation provisions to the NGA and FPA, to resolve the issue in favor of our jurisdiction.

56.     We do not interpret the phrase "except as hereinabove" in the CEA savings clause to transfer any jurisdiction over "accounts, agreements, and transactions" from other agencies to the CFTC.  This would render the savings clause superfluous and would exclude other agencies (both federal and state) from taking any action with respect to those activities and there would be no need for a savings clause.  The better view, which is consistent with basic rules of statutory construction and legal precedent discussing the purpose of savings clauses, is that the phrase "except as hereinabove provided" means that, unless Congress expressly modified "hereinabove" the jurisdiction of the SEC or other federal agencies, the jurisdiction of the SEC and other federal agencies remains undisturbed.[141]

### 3.      The Commission's Overall Construction of the Statutes

57.     The Commission's jurisdictional determination is in harmony with Congress' more recent expression on these related issues, EPAct 2005, as well as judicial precedent permitting multiple agencies to protect their respective constituents.[142]   Indeed, the

---

[139] Rehearing Request at 15.

[140] *Id.* at 15-16.

[141] In fact, Congress did just that in preceding sections where it divided certain areas of responsibility between the CFTC and SEC.  *See, e.g.,* 7 U.S.C § 2(a)(1)(D).  We recognize that a 1975 decision of a United States District Court, subsequently remanded without opinion, reached a contrary construction of the savings clause.  *SEC v. Univest, Inc.*, 405 F. Supp. 1057, 1058 (N.D. Ill 1975).  Our review of that opinion discloses virtually no analysis of the issues and we choose instead to follow an analysis which is more consistent with overall statutory scheme before us and the much more recent and thorough analysis of the D.C. Circuit in *Roberts* as noted above.

[142] *See FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) (two or more agencies may proceed simultaneously against the same parties and the same conduct); *Bristol-Meyers*

(continued…)

foregoing analyses are the most reasonable way to harmonize the various provisions and precedents relating to our jurisdiction, the jurisdiction of the CFTC, and cases construing section 10(b) of the Securities Exchange Act, which served as the model for new NGA section 4A and the parallel FPA section 222.[143]  It is a basic tenet of statutory construction that when courts are construing different statutes on the same subject matter, they do so in a way that gives effect to each.[144]  Amaranth's interpretation undermines the very intent of section 4A to give the Commission ability to sanction manipulation that has a clear nexus to and significant effect on jurisdictional prices.

58.    The Commission's determination does not interfere with the CEA's mandate that the CFTC regulate exclusively the day-to-day aspects of futures trading (albeit not manipulation), such as the terms or conditions of sale of NG Futures contracts, the operating rules of the NYMEX exchange, or traders' commodity accounts.  The CFTC focuses its efforts on regulating instruments related to sixty-seven products and making sure that "designated contract markets," such as the NYMEX, operate properly.  The CFTC is not focused on the underlying or downstream markets.  The Commission respects these exclusive regulatory functions and the CFTC's expertise and exclusive regulatory authority with respect to operation of the futures markets for dozens of commodities.  The Commission does not seek to police the NYMEX or other exchanges, nor does the Commission seek to prevent Amaranth from trading on futures markets. Instead, the Commission is exclusively concerned with protecting the integrity and competitiveness of energy markets.  When manipulation of NG Futures Contracts spans both financial and energy markets, the Commission has authority to investigate and, if

---

*Co. v. FTC*, 738 F.2d 554, 559-60 (2d Cir. 1984) (concurrent Federal Trade Commission/Food and Drug Administration jurisdiction approved); *Warner-Lambert Co. v. FTC,* 361 F. Supp. 948, 952-53  (D.D.C. 1973) (court upheld concurrent enforcement action by the FDA and FTC, even though they involved the same parties or issues, because the statutory remedies of the two agencies are cumulative and not mutually exclusive).  *See also U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043, 1064 (N.D. Cal. 2006) (where two federal laws cover the same conduct, both may be applied because "congressional intent behind one federal statute should not be thwarted by the application of another federal statute").

[143] It is a fundamental canon of statutory construction that statutes relating to the same subject matter should be construed harmoniously and, if not, the more recent or specific statute should prevail over the older and more general law.  *Tug Allie-B. v. U.S.*, 273 F.3d 936, 941 (11th Cir. 2001).

[144] *United States v. Borden Co.,* 308 U.S. 188, 191 (1939) (where two statutes address the same subject, the "rule is to give effect to both if possible").

appropriate, punish that manipulation that affects its jurisdictional markets.  Congress recognized through EPAct 2005 that both agencies have an enforcement role to protect their respective markets and interests.  We pursued this role in the present case and the CFTC has taken similar action in its manipulation case against ETP.  There, the CFTC alleged that ETP manipulated futures markets subject to its jurisdiction, even though the alleged misconduct occurred in physical natural gas markets that are subject to our exclusive jurisdiction, not that of the CFTC.  There, as here, each agency has merely sought to police manipulation that substantially impairs the competitiveness of the markets it regulates.

59.    The legislative history of EPAct 2005 confirms that Congress expanded the Commission's jurisdiction, while the CFTC's day-to-day market oversight program was already well known.[145]  In fact, a few Senators expressed concern that the Cantwell Amendment would lead to "unnecessary duplication" of effort by enforcement agencies such as the SEC and the CFTC.[146]  Congress nevertheless "put in place the first ever broad prohibition on manipulation in electricity and natural gas markets."[147] Congress knew that it was placing an additional cop on the beat alongside the CFTC and the SEC by giving FERC additional tools to ensure that manipulative and deceptive practices do not occur in energy markets.  Thus, Congress expected to hold "FERC [not just the CFTC] accountable if, in fact, manipulative or deceptive practices occur in the future."[148]

---

[145]  149 Cong. Rec. S 13997 at 9 (daily ed. Nov. 5, 2005) (statement of Sen. Bennett) (Both the CFTC and the SEC have broad authority to prohibit market manipulation); 151 Cong. Rec. S 7451 at 40 (daily ed. June 28, 2005) (statement of Sen. Cantwell) (the Cantwell Amendment, which was eventually incorporated into EPAct 2005, gave FERC the tools to prevent abuses in energy markets).  *See also* 151 Cong. Rec. S 9335 at 16-17 (daily ed. June 29, 2005) (statement of Sen. Cantwell) ("This Energy bill puts in place the first ever broad prohibition on manipulation of electricity and natural gas markets" and is modeled on a measure authored by Senator Cantwell and passed twice in the Senate).

[146]  *See* 149 Cong. Rec. S 13997 at 9 (daily ed. Nov. 5, 2005) (statement of Sen. Bennett).

[147]  151 Cong. Rec. S 9335 at 17 (daily ed. July 29, 2005) (statement of Sen. Cantwell).

[148]  149 Cong. Rec. S 10173 at 21 (daily ed. July 30, 2003) (statement of Sen. Bingaman).  In our view, Congress' delegation to FERC in new section 4A indicates Congress' recognition that the Commission has expertise to bring to bear on matters of

(continued…)

60.    The legislative history of EPAct 2005 also confirms that Congress expressly rejected a proposal to state that the CFTC's exclusive jurisdiction was not trumped by the NGA. The House Energy and Commerce Committee Report on HR 6 contained a completely new provision to be added to the NGA, known as "section 26," which provided that *nothing* in the NGA shall affect the "exclusive jurisdiction of the [CFTC] with respect to 'accounts, agreements, or transactions in commodities under the CEA.'"[149]   However, that provision was rejected, as it does not appear in the final bill. Instead, Congress included only a narrower savings clause in section 23 (Natural Gas Market Transparency Rules), which provides that nothing in that section (pertaining to gathering information from market participants) can be construed to limit the CFTC's exclusive jurisdiction. Nowhere in the EPAct 2005 amendments, whether a savings clause or elsewhere, did Congress indicate any intent to give only the CFTC authority over manipulative practices. Having considered the matter, had Congress intended to confer upon the CFTC exclusive jurisdiction over manipulation occurring in natural gas futures markets, it could have done so explicitly in the NGA section 4A and FPA section 222 sections, incorporated "section 26" into the NGA as a whole, or, at a minimum, included the savings clause in the NGA's Anti-Manipulation provision, section 4A. Instead, section 4A makes no mention of the CFTC's jurisdiction nor does it contain a savings clause, which is included in the more narrowly focused section 23.[150]   Congress made an explicit choice to refer to the CFTC's exclusive jurisdiction only in the regulatory arena of information gathering, not in the Anti-Manipulation jurisdictional section at issue here. Thus, with respect to day-to-day regulation, such as gathering data as discussed in NGA section 23, the CFTC's jurisdiction is exclusive and the agencies must work through each other. With respect to enforcement against manipulation as specified in section 4A, jurisdiction is not exclusive and Congress did not include a savings clause. Therefore, Amaranth's arguments about the meaning of this savings clause in section 23 are unpersuasive and, in fact undercut Amaranth's position that Congress intended section 4A to confer only limited jurisdiction to the Commission.

61.    Amaranth also misconstrues the Commission's discussion in the OSC regarding NGA section 23 and its language pertaining to the MOU with the CFTC.[151]   The Commission does not contend that section 23 confers jurisdiction over manipulation

---

energy market manipulation. As we noted in the OSC, Commission staff includes experts in both the physical and financial natural gas markets. OSC at P 52.

[149] H. R. Rep. No. 109-49, at 7 (2005).

[150] *See* EPAct 2005 § 316(c)(1).

[151] Rehearing Request at 16-17 (discussing OSC at P 48).

claims.[152]  The statutory authority to issue the OSC comes from section 4A, not section 23.  Instead, the Commission states that section 23 supports its construction of section 4A.

62.    The Commission largely agrees with Amaranth that section 23 authorizes the Commission to collect information from market participants about the availability and prices of natural gas.  Section 23 reflects Congress' recognition of the potential for the Commission and the CFTC to seek the same information, so it required the Commission and the CFTC to coordinate their data gathering activities.  However, there is nothing in section 23 that prohibits the Commission from using that information in any investigation of manipulation, nor is there any language in section 23 suggesting that inter-agency coordination under the MOU would not include investigations.  It is an odd notion indeed that Congress intended the Commission to gather information pertaining to exchanges under the CFTC's jurisdiction, but if we thereby detected manipulation affecting our jurisdictional markets to have no enforcement role to punish and deter such manipulation.  Unremarkably, the MOU itself and the year-long joint Commission-CFTC investigation of Amaranth's conduct illustrate that both agencies (at least until recently) read the statute to contemplate joint investigation activities that go beyond the collection of information when they agreed that: "the CFTC and the FERC may from time to time engage in oversight *or investigations of activity affecting both CFTC-jurisdictional and FERC jurisdictional markets.*"  MOU at 3 (emphasis added).

### C.    The Commission's Assertion of Jurisdiction in the OSC As Compared to Order No. 670

63.    Amaranth's final assertion is that the Commission's determination that it has jurisdiction in this matter departs from Order No. 670.[153]  Amaranth contends that the statement in Order No. 670 that "this Final Rule does not, and is not intended to, expand the types of transactions subject to the Commission's jurisdiction," is a concession by the Commission that its anti-manipulation subject matter jurisdiction is limited to "wholesale transactions that remain within the ambit of the NGA, NGPA, and FPA."[154]  Amaranth's argument, which takes a few words in Order No. 670 out of context, is unavailing.[155]

---

[152] OSC at PP 3, 44-45.

[153] Rehearing Request at 39-41.

[154] *Id.* at 40.

[155] NARUC characterized Amaranth's argument as "exceptionally convoluted." NARUC *Amicus* Brief at 11.

64.     Order No. 670 clarified that EPAct 2005 broadened the Commission's overall jurisdiction to prohibit any entity, directly or indirectly, from using a manipulative or deceptive device in connection with the purchase or sale of natural gas subject to the jurisdiction of the Commission.  In Order No. 670 we delineated the elements essential to manipulation: "an entity: (1). . .engages in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite *scienter*; (3) in connection with the purchase or sale of natural gas  . . . subject to the jurisdiction of the Commission."[156]  The language Amaranth points to deals only with the second part of the third element.  As stated in Order No. 670, and we reiterate here, EPAct 2005 did not affect the Commission's jurisdiction under NGA section 1(b) to regulate ratemaking of interstate commerce and wholesale transactions of natural gas, and non-affiliated entities.[157]  In fact, we agreed with commentators in the Anti-Manipulation Rule rulemaking, and re-affirm here, that the scope of "transactions" in that third element is the same as that covered by pre-existing NGA provisions and was not expanded by EPAct  2005.[158]  Consequently, in neither Order No. 670 nor the OSC did the Commission assert that EPAct 2005 expanded the types of jurisdictional transactions that would satisfy section 4A's requirement that the affected markets must be "subject to the Commission's jurisdiction."  For this reason, by way of example, we noted that a manipulation pertaining only to a "first sale" would not be covered.[159]

65.     However, the broad language of section 4A enlarged the conduct (as identified in the other elements) with respect to those transactions that we can regulate.[160]  Order No. 670 elsewhere clearly provides that manipulative or deceptive conduct that affects the very same jurisdictional markets identified in section 1(b) would be subject to the Commission's broader Anti-Manipulation Rule.[161]  Moreover, the statement in Order No. 670 that the new regulations apply where there is a *nexus* between fraud and a

---

[156] Order No. 670 at P 49.

[157] 15 U.S.C. § 717b (2005).

[158] Order No. 670 at P 20.

[159] *Id.*

[160] *Id.* at P 21 (specifically rejecting comment urging that section 4A did not increase the Commission's reach beyond the rules already promulgated).

[161] *Id.* at P 22 ("the Commission views the 'in connection with' element in the energy context as encompassing situations in which there is a nexus between the fraudulent conduct of an entity and a jurisdictional transaction.").

jurisdictional transaction (as opposed to conduct that *is* a jurisdictional transaction) is consistent with section 4A's "in connection with" requirement.[162]  In this case, the Commission preliminarily finds that the requisite nexus is established because Amaranth's manipulation directly and substantially affected *jurisdictional* transactions. Therefore, the Commission's preliminary findings in the OSC are entirely consistent with EPAct 2005, the Anti-Market Manipulation Rule, and Order No. 670.

## III.  Conclusion

66.    The Commission denies Amaranth's request for expedited rehearing on the issue of the Commission's jurisdiction to punish manipulative trading of NG Futures Contracts that had a direct effect on the price of physical natural gas within the Commission's jurisdiction.  The Commission's determination is supported by the language of the NGA; it is consistent with, and does not infringe upon, the jurisdiction of the CFTC; and it furthers the objective of the NGA to ensure that energy markets remain fair and competitive.  Our tolling order in this docket, dated September 26, 2007, remains in effect as to all other timely filed rehearing requests.  In addition, pursuant to the Notice issued October 12, 2007, Respondents shall now answer the OSC, as specified in P 140(a) and (b) of the OSC, not later than 14 days from the issuance of this Order.

The Commission orders:

Amaranth's request for rehearing is hereby denied.

By the Commission.

( S E A L )


Kimberly D. Bose,
Secretary.

---

[162] *Id.* at P 16 ("[a]bsent such *nexus to a jurisdictional transaction* . . .  fraud and manipulation in a non-jurisdictional transaction (such as a first or retail deal) is not subject to the new regulations.") (emphasis added).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Amaranth Advisors L.L.C.                          Docket No.  IN07-26-000
Amaranth LLC
Amaranth Management Limited Partnership
Amaranth International Limited
Amaranth Partners LLC
Amaranth Capital Partners LLC
Amaranth Group Inc.
Amaranth Advisors (Calgary) ULC
Brian Hunter
Matthew Donohoe

ORDER GRANTING REHEARING FOR
FURTHER CONSIDERATION

(September 26, 2007)

Rehearing has been timely requested of the Commission's Order to Show Cause and Notice of Proposed Penalties issued on July 26, 2007, 120 FERC ¶ 61,085 (2007), in the above-captioned proceeding.  In the absence of Commission action within 30 days, those requests for rehearing (and any timely requests for rehearing filed subsequently)[1] would be deemed denied.  18 C.F.R. § 385.713 (2007).

In order to afford additional time for consideration of the matters raised or to be raised, rehearing of the Commission's order is hereby granted for the limited purpose of further consideration, and timely-filed rehearing requests will not be deemed denied by

---

[1] *See San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange*, 95 FERC ¶ 61,173 (2001) (clarifying that a single tolling order applies to all rehearing requests that were timely filed).

Docket No. IN07-26-000                                           - 2 -

operation of law.  Rehearing requests of the above-cited order filed in this proceeding
will be addressed in a future order.  As provided in 18 C.F.R. § 385.713(d), no answers to
the rehearing requests will be entertained.


                        Nathaniel J. Davis, Sr.,
                        Acting Deputy Secretary.

**Energy Speculation: Is Greater Regulation Necessary to Stop Price Manipulation?**

**Testimony of the Honorable Joseph T. Kelliher**
**Chairman**
**Federal Energy Regulatory Commission**
**Before the**
**Subcommittee on Oversight and Investigations**
**Committee on Energy and Commerce**
**United States House of Representatives**

**December 12, 2007**

### Introduction and Summary

Mr. Chairman and Members of the Subcommittee, thank you for the opportunity to speak with you today about the Federal Energy Regulatory Commission's (FERC or Commission) role in protecting energy consumers against price manipulation in wholesale energy markets. Because of the critical role that energy plays in our economy and in the welfare of our nation's citizens, it is imperative that regulators have the necessary tools to protect energy consumers. I welcome the Subcommittee's review of these important issues.

FERC is an independent agency charged with regulating wholesale sales and transportation or transmission of natural gas and electric power, rates for oil pipelines, approval for new interstate energy facilities and licensing and safety for non-federal hydroelectric projects.

However, at heart FERC is a consumer protection agency. Our primary task since the 1930s is to guard the consumer from exploitation. Historically, we have done that by ensuring that jurisdictional wholesale rates for natural gas and electric energy are just, reasonable and not unduly discriminatory or preferential. We are charged under the Natural Gas Act and the Federal Power Act with regulating certain wholesale sales of natural gas and electric energy in interstate commerce, as well as transportation of natural gas and transmission of electric energy in interstate commerce.

Today my comments will focus primarily on our natural gas rate regulation and the steps FERC has taken to ensure the integrity of wholesale gas markets and prevention of market manipulation under the new authorities granted to it under the Energy Policy Act of 2005. However, I note that our authorities to protect customers against market manipulation generally are parallel under both the Natural Gas Act and Federal Power

Act.  Manipulation in gas markets can also affect the price of electricity for consumers since natural gas is a key input to the cost of many electric power facilities.

FERC has adapted its regulations over the years to rely on a mixture of competition and regulation where possible to produce just and reasonable prices for wholesale energy customers, but to apply cost-based regulation where competition does not exist or where market power can be exercised.  The Energy Policy Act gave FERC important new regulatory authorities to enhance its ability to protect natural gas and electric energy customers.  I thank the Committee for supporting FERC's request for this additional regulatory authority two years ago and credit the Committee for recognizing that FERC needed new regulatory tools to discharge its historical duty to guard the consumer.

In particular, the Energy Policy Act amended our statutes in several significant ways to protect against market manipulation.

First, it amended both the Natural Gas Act and Federal Power Act to explicitly prohibit entities from engaging in deceptive or manipulative conduct in connection with FERC-regulated energy markets and authorized us to implement rules to enforce this prohibition.  Second, it directed us to facilitate price transparency in jurisdictional markets and gave us authority to require any market participant to disseminate information about the price and availability of natural gas and electric energy and the transportation and transmission of those products.  Third, it gave FERC enhanced civil penalty authority under both the Natural Gas Act and Federal Power Act.  These tools provide FERC the foundation for a strong enforcement program to protect energy consumers.

We acted quickly to exercise the new regulatory powers Congress gave us to guard the consumer.  In the wake of the Energy Policy Act, I established the Office of Enforcement at FERC.  That office is charged with monitoring energy markets and with conducting investigations of possible violations of FERC rules, including our anti-manipulation rule.  Significantly, the staff of the Office of Enforcement meet every day to discuss market developments over the prior 24 hours.  In particular, they discuss price movements, and have the ability to initiate investigations in the event they identify price movements that do not appear consistent with market fundamentals.  My testimony discusses the FERC market oversight and enforcement program in more detail.

As we monitor energy markets and protect against market manipulation, it is important to understand that price formation in sophisticated energy markets has become increasingly complex.  Regulators must understand and consider the interplay between financial and futures energy markets, on the one hand, and physical energy markets, on the other hand.  While FERC has jurisdiction over physical wholesale gas sales, and the Commodity Futures Trading Commission (CFTC) has jurisdiction over futures, the link

2

between futures and physical markets cannot be overstated. In a sense, these markets have effectively converged. Manipulation does not recognize jurisdictional boundaries and we must be vigilant in monitoring the interplay of these markets if we are to adequately protect consumers.

When Congress passed the Energy Policy Act, it recognized the convergence of physical and futures energy markets and the need for FERC and CFTC to cooperate in their market oversight and regulation. The Act required the two agencies to enter into a memorandum of understanding (MOU) to share market information. I note that the two agencies accelerated their development of the MOU in the wake of Hurricanes Katrina and Rita, in order to improve coordination during a period of great volatility in natural gas prices. This is one of the Energy Policy Act deadlines that FERC exceeded. The MOU has worked extremely well with respect to information sharing and coordination of investigations and I want to reassure the Subcommittee that the recent disagreement between the two agencies with respect to the scope of FERC's anti-manipulation authority has in no way undermined the cooperation and effective interaction of the staffs of the two agencies. The two agencies continue to share market information and coordinate on a number of important investigations.

At this time I do not believe FERC needs any additional legal authority to protect consumers from market manipulation. You gave us the tools we needed two years ago. However, it is important that those tools not be taken away from us or diminished.

**Energy Policy Act of 2005**

FERC's core mission has remained the same for 70 years: to protect natural gas and electric power consumers from exploitation. But energy markets changed significantly since the 1930s. FERC reacted to those developments by changing its approach to regulation over time. Ultimately, it became apparent that we needed new regulatory tools to discharge our historical duty to guard the consumer from exploitation and we sought additional regulatory authority from Congress.

The experience of the Western energy crisis of 2000-2001 showed that energy consumers were exposed to the threat of market manipulation. Yet, market manipulation was not explicitly barred by either the Natural Gas Act or the Federal Power Act. FERC also lacked adequate civil penalty authority to assure compliance with both tariffs and market rules governing wholesale natural gas and power markets. I personally argued in favor of additional authority in these and other areas because I believed we could not otherwise adequately discharge our duty to protect consumers.[1]

---

[1] Hon. Joseph T. Kelliher, *Market Manipulation, Market Power, and the Authority of the Federal Energy Regulatory Commission*, 26:1 Energy L.J. 1 (2005); 108 CONG. REC. S13,999 (daily ed. Nov. 5, 2003) (statement of Sen. Cantwell introducing letter from

The Energy Policy Act granted FERC express authority to prohibit market manipulation.  It also prescribed an underlying definition for market manipulation based on the long-standing precedent of the Securities Exchange Act of 1934.  This provides a strong grounding for our efforts to oversee wholesale energy markets.  We exercised this authority quickly, issuing proposed anti-manipulation rules two months after enactment of the Energy Policy Act, and making a final rule effective on January 26, 2006, making the rule effective immediately on an emergency basis. Within six months after you enacted the anti-manipulation provisions of the Energy Policy Act, we had fully implemented this new authority.

The Energy Policy Act also gave FERC greater authority to assure the transparency of wholesale energy markets.  The transparency provisions gave us the authority to increase the amount of market information available to market participants and observers.  We have exercised this authority as well.  In proposed rules issued earlier this year, FERC proposed two changes that would increase the transparency of wholesale natural gas markets.  The first change would require intrastate pipelines to post more information about physical flows on their systems, which would allow the market better to assess supply and demand trends.  The second change would require annual reporting by wholesale natural gas buyers and sellers that would let us determine the overall level of index-based trading and activity in markets that set price indices.  This second change would better allow FERC, market participants and others to assess the size of physical wholesale natural gas markets.

Before the Energy Policy Act, FERC did not have all the tools it needed to be a strong enforcement agency.  The penalties we could apply to violations were largely limited to disgorgement of profits.  The Energy Policy Act increased our civil penalty authority to $1 million per day per violation and greatly expanded the scope of violations subject to FERC civil penalties.

There were other important provisions of the Energy Policy Act that granted FERC significant regulatory authority.  For example, Congress expanded our merger authority, which improves our ability to prevent the accumulation of market power.  I will not discuss these provisions, since they do not directly relate to the subject of the

---

FERC nominee Kelliher and pointing out his agreement that "markets subject to manipulation cannot operate properly and there is an urgent need to proscribe manipulation of [energy] markets"); *Market Manipulation Penalties*, Dow Jones, Feb. 17, 2003 (describing FERC nominee Kelliher's concern about need for anti-manipulation legislation and expanded FERC penalty authority).

4

hearing today.  However, the Energy Policy Act clearly reflected a judgment by Congress that natural gas and electric power markets had changed significantly since the 1930s, and FERC needed additional regulatory authority to discharge its historical duty to guard the consumer.  In my view, the Energy Policy Act represents the largest single grant of regulatory authority to FERC since the New Deal.  You gave us the tools we needed.

### Implementing the Energy Policy Act:  Anti-Manipulation

The Energy Policy Act certainly provided FERC with needed new authorities.  It also gave us a substantial to-do list with ambitious deadlines.  I am proud that the Commission implemented all the provisions of the Energy Policy Act within those deadlines.  We met every deadline you set for us – and even beat a few.  We also were careful in the manner we implemented the new authorities granted by Congress two years ago.

In January 2006, we issued Order No. 670, a final rule implementing regulations to prevent market manipulation in wholesale power and gas markets and in transmission and transportation services.  In my view, this provision of the Energy Policy Act was among the most important and challenging to implement.

We were careful in our approach.  The anti-manipulation provision of the Energy Policy Act directed FERC to adopt the statutory model in section 10(b) of the Securities Exchange Act of 1934, rather than the anti-manipulation provision administered by the CFTC.  We studied the securities model and adapted it where necessary to our legal construct.  We also studied the anti-manipulation provisions in commodities law, which in turn is also modeled on the Securities Exchange Act of 1934.  In the end, we modeled our rule closely on Securities Exchange Commission rules implementing section 10(b).  We believe this approach makes germane the substantial body of precedent with respect to the 1934 Act.

The anti-manipulation regulations promulgated in Order No. 670 closely follow the language of the Energy Policy Act.  Under our final rules,  it is unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or transmission services subject to FERC jurisdiction, or the purchase or sale of natural gas or transportation service subject to FERC jurisdiction, to (1) use or employ any device, scheme, or artifice to defraud, (2) make material false statements of fact or omit material facts, or (3) engage in any act, practice or course of business that operates or would operate as a fraud or deceit on any person.

That provides FERC structure to identify  market manipulation and also gives market participants the information they need to discipline their own behavior.  Importantly, consistent with the Energy Policy Act, these rules apply not only to public utilities and natural gas companies, but also to any entity that commits a fraud affecting

jurisdictional transactions. "Public utility" and "natural gas company" are defined terms in federal electricity and natural gas law since the 1930s, meaning companies that engage in jurisdictional sales or provide jurisdictional transmission or transportation service. Yet Congress provided that our anti-manipulation authority apply not just to companies that engage in jurisdictional sales or provide jurisdictional service, but to "any entity" that engages in manipulation "in connection with" such sales or services. We have interpreted "any entity" to be a much broader category than "public utility" and "natural gas company," an interpretation which we believe to be consistent with Congressional intent.

### Implementing the Energy Policy Act:  Enforcement

The Energy Policy Act permanently changed FERC – turning us into an enforcement agency with significant civil penalty authority. We have used the new authority carefully and have developed a strong track record of enforcement over the past two years.

In October 2005, we issued a Policy Statement on Enforcement, establishing a general approach of "firm but fair" enforcement. To assure fairness, the Policy Statement provided that we would consider mitigating factors in determining penalties in any particular case, including whether the company reported its own violation, how committed it was to its compliance programs, and how well it cooperated with FERC during an investigation.

We also established a new process for "No Action Letters" for certain types of issues. This lets companies seek informal staff advice as to whether staff would recommend an enforcement action with regard to a particular transaction, practice or situation.

Moreover, we recently held a Conference on Enforcement Policy to assess the agency's implementation of its Energy Policy Act enforcement authority. We heard a variety of proposals for improving our processes from all parts of the industry. We will consider these proposals carefully in the coming months.

Since October 2005, FERC Enforcement staff has closed or completed 64 investigations. In 47 of these cases, we assessed no penalty either because there was not enough evidence of a violation or because the violation was not serious enough to warrant a sanction. The Commission has approved twelve settlements of investigations that resulted in the companies paying  $39.8 million in penalties,  filing compliance plans, and taking other remedial actions. We have exercised prosecutorial discretion to concentrate our enforcement resources on the most significant violations that pose the greatest threat to consumers.

In two key cases, we have issued Orders to Show Cause and Notices of Proposed Penalties. Under these orders, FERC made preliminary findings that two groups of companies and individual traders (collectively, Amaranth and Energy Trading Partners) may have manipulated energy markets. These orders do not represent final determinations and make no final conclusions. Both groups of respondents have been given the opportunity to rebut the preliminary conclusions set forth in the orders. Energy Transfer Partners has filed its answer, while Amaranth's answer is currently due December 14. If the final conclusions reflect the preliminary findings, we propose to impose penalties that approach the maximum for certain violations – $291 million for the Amaranth entities and $167 million for the Energy Transfer Partners entities, for total civil penalties of $458 million.

### Amaranth and Energy Transfer Partners Investigations

Before I discuss the Amaranth and Energy Transfer Partners investigation, it is important to offer a few comments about natural gas transactions. Natural gas is traded in a wide variety of products. Some of these products are physical products potentially subject to FERC jurisdiction. Other products are futures or financial products subject to CFTC jurisdiction. Pricing of these products can be quite complicated. Natural gas futures in the United States are traded on the New York Mercantile Exchange (NYMEX). By contrast, many products, both physical and financial, are negotiated bilaterally, some online through brokers like the IntercontinentalExchange (ICE). For buyers and sellers interested in market prices, but not interested in trading themselves, physical next-day and next-month prices are collected by the trade press and used to construct price indices. As discussed below, along the East Coast and the Gulf Coast, monthly indices are constructed using transactions with prices set, in part, by settling futures prices. As a result, futures prices determine, in part, the price of physical natural gas purchased by customers. In addition, ICE supports trade of a financial swap, which is otherwise known as a "look-alike" swap, that sets its price based in the futures settlement price. These transactional links between futures and physical and futures and financial prices proved especially important in the Amaranth investigation, as discussed below.

The Amaranth investigation began when FERC Market Oversight staff noticed peculiar trading patterns in the close of the NYMEX futures contract for May 2006. In particular, prices fell dramatically toward the end of the last half hour of trading, which determines the final settlement price for the monthly contract. I credit the vigilance of FERC Market Oversight staff in identifying these patterns.

Of course, the CFTC has jurisdiction over the regulation of NYMEX markets. But the pattern of trading was important to us because a large number of monthly contracts for physical natural gas are pegged to the monthly NYMEX close, so that every penny change in the NYMEX close flows directly into the physical price.

7

To understand the relationship between futures prices and physical natural gas prices, it is necessary to recognize that some futures contracts become physical natural gas contracts, or, in the terms of the industry, "go to delivery." In addition, there is a class of monthly physical transactions (called physical basis transactions) that tie their prices directly to the settled futures price. These transactions are so common along the East Coast and the Gulf of Mexico that monthly indices in these regions depend almost entirely on physical basis transactions. The attached map shows the regions affected. In that way, the NYMEX contract closing price not only affects physical basis deals themselves, but also all deals that are linked to local indices. Thus, the effects on physical markets of changes in futures prices are direct and significant.

Based on the evidence developed in the investigation, we made a preliminary finding that Amaranth may have deliberately obtained and then sold large futures positions in the last half hour of trading on the settlement date in order to manipulate prices downward. Thus, Amaranth may have benefited from even larger, opposing positions they held on ICE, and that they did all this fully knowing that their actions would affect physical prices as well. Downward manipulation of the monthly futures contract would have benefited their financially settled swaps.

To be clear, we do not believe that Amaranth engaged in any FERC jurisdictional sales. Amaranth did not seemingly seek to manipulate monthly futures prices in order to obtain a benefit from the sale or purchase of physical products. We believe they may have manipulated monthly futures prices in order to benefit from the settling swaps and to influence the value of other positions within their portfolio. However, manipulation of the monthly futures price can affect physical gas sales, given the direct setting of contracts that go to delivery and the widely understood price relationship relating to physical basis and indices.

The Energy Transfer Partners case began when Commission staff received a call on its Enforcement Hotline, alleging that the market for monthly physical gas at the Houston Ship Channel was manipulated on September 28, 2005. Based on the evidence from the investigation, we made a preliminary finding that Energy Transfer Partners dominated physical fixed-price gas sales at Houston Ship Channel and may have manipulated the reported index price. Despite its sales at Houston Ship Channel, Energy Transfer Partners was consistently a net buyer of physical gas from contracts linked to the Houston Ship Channel index. Thus, Energy Transfer Partners may have manipulated the index price downward to benefit its overall portfolio of purchases and other financial positions.

### Cooperation with the CFTC

In both the Amaranth and Energy Transfer Partners cases, we began an investigation and shared our information fully with the CFTC. The CFTC began its own investigations of both matters soon thereafter.

The two agencies cooperated closely throughout the investigations. As noted, the CFTC and FERC had entered into an MOU to ensure that we share information quickly and effectively. The MOU worked well throughout the fourteen months of the Amaranth investigation and the twenty-one months of the Energy Transfer Partners investigation, and continues to do so. The two agencies conducted parallel investigations that were closely coordinated.

This cooperation was significant. As described above, the Amaranth investigation examined possible manipulation of futures price to obtain a benefit from positions held in financial products. CFTC has jurisdiction over futures. Any such manipulation would affect physical natural gas consumers, given how the monthly futures price is used to price physical gas transactions. FERC is charged with protecting physical natural gas consumers. By contrast, the Energy Transfer Partners investigation involved possible manipulation of FERC jurisdictional physical natural gas sales to obtain a benefit from positions in other physical and financial products. In a sense, one investigation examined manipulation that may have occurred within CFTC jurisdiction and affected FERC jurisdictional sales. The other involved manipulation that may have occurred within FERC jurisdiction that affected other CFTC jurisdictional transactions. Both investigations involved possible manipulation that may have crossed the jurisdictional lines between the two agencies. Cooperation between FERC and CFTC is essential in order to police this type of manipulation.

In the end, the CFTC initiated action against Amaranth on July 25, 2007, and against Energy Transfer Partners on July 26, 2007. We initiated action against both parties on July 26, 2007. The enforcement actions were coordinated, as were the investigations themselves. Both agencies publicly praised the investigations conducted by the other agency.

### Litigation on Amaranth Jurisdiction

Amaranth has raised arguments about whether FERC has jurisdiction over manipulation of the monthly futures price. Even before we issued our Order to Show Cause, Amaranth's lead trader, Brian Hunter, filed in the United States District Court for the District of Columbia seeking to enjoin issuance of the order, claiming FERC lacked jurisdiction. Judge Richard Leon denied the request for a temporary restraining order, at which point the litigation became an effort on Hunter's part to prevent further proceedings under the Order to Show Cause. The ruling in this matter has not yet issued.

Within weeks after the Order to Show Cause, Amaranth filed a motion to stay FERC's action in the civil action filed by the CFTC against Amaranth in the U.S. District Court for the Southern District of New York (under our respective statutes, the CFTC brought its enforcement action in court, while we proceeded administratively). Amaranth argued, among other things, that we lack jurisdiction and CFTC has sole jurisdiction over the conduct described in our Order to Show Cause. Although CFTC opposed Amaranth's motion to stay our order, the CFTC maintained that it had exclusive jurisdiction over all trading in natural gas futures. This would have the effect of preempting FERC's ongoing enforcement proceeding against Amaranth. I consider this to have been a significant change in the CFTC position.

On November 1, Judge Chin denied Amaranth's motion, holding, among other things, that under the Natural Gas Act, any review of our jurisdiction must be conducted in a court of appeals.

At this point, the two agencies have a difference of opinion about the proper interpretation of the anti-manipulation provisions of the Energy Policy Act, and how these provisions should be interpreted in concert with the Commodity Exchange Act. This disagreement will likely be resolved by the courts. In this regard, we recently issued an order addressing Amaranth's legal arguments on FERC's jurisdiction. Attached to my testimony is a copy of our order, which details our interpretation of the anti-manipulation provision.

There is a great deal at stake in this legal dispute. The key issue is the reach of FERC's anti-manipulation authority, the extent of our ability to protect consumers. If the attack on our jurisdiction is successful, our ability to guard the consumer from exploitation would be significantly reduced. As I stated earlier, our fundamental duty is to guard the consumer. We would not be able to sanction manipulation of CFTC-regulated futures markets that affects physical gas sales under our jurisdiction. We would not be able to discharge our duty effectively, as Congress has a right to expect.

FERC and CFTC are different agencies, with different duties. We are a consumer protection agency. The CFTC has a different mission. We have greater penalty authority than the CFTC, and are more likely to order disgorgement of profits in a market manipulation case, which holds out the promise to consumers that they can be made whole. It is also much harder for the CFTC to prove manipulation than FERC because they operate under a higher statutory standard. As a result, the CFTC is more likely to charge attempted manipulation, while FERC is more likely to charge manipulation. That is borne out by the Amaranth litigation.

I think consumers see a difference. That is why the national association of state regulators and a host of individual state commissions have declared support for FERC's

position. They have even gone so far as to enter the litigation, filing briefs in the New York district court supporting FERC. Perhaps the best judge is the consumers themselves. Various consumer groups, including the American Public Gas Association, the American Public Power Association, and the National Electric Rural Cooperative Association also filed briefs there in support of the FERC position.

We recognize the CFTC has exclusive jurisdiction to regulate aspects of futures trading, such as the terms or conditions of sale of futures contracts, the operating rules of NYMEX, or traders' commodity accounts, and we recognize the importance of the futures markets. The CFTC focuses its efforts on regulating instruments related to futures and financial products and making sure that designated contract markets, such as NYMEX, operate properly. FERC respects the CFTC's exclusive jurisdiction in these areas and we do not seek to regulate futures or regulate the exchanges, nor do we seek to bar entities from trading as CFTC does. However, the CFTC is charged with protecting the integrity of futures markets, not energy markets.

In our order denying rehearing, we stand by our position that Amaranth's activities fall within our jurisdiction insofar as they affected physical sales of natural gas. Amaranth does not dispute that physical sales were affected. The statute provides that: "It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the sale of transportation service any manipulative or deceptive practice (as those terms are commonly used in section 10(b) of Securities Exchange Act of 1934 …." We believe that this language gives FERC broad authority to sanction manipulative conduct where it significantly affects jurisdictional sales. Comments in the floor debate on the Energy Policy Act clearly indicate Congress's intent that FERC implement the broadest possible prescriptions necessary to protect energy consumers.

The reference to "any entity" shows Congress's intent to capture not only natural gas companies historically subject to FERC jurisdiction under the Natural Gas Act, but also anyone else that engages in prohibited behavior that affect jurisdictional physical sales. Congress could have limited the expanse of FERC anti-manipulation authority to "natural gas companies." It did not do so. It chose a much broader term, namely "any entity." We must conclude that decision was deliberate and meaningful.

We also believe that the "in connection with" language in the statute indicates Congress intended an expansive definition of the activities we could sanction. Congress could have prohibited only manipulation that occurs in Commission-jurisdictional markets. It chose instead the more expansive language. It is hard to imagine what "in connection with" could mean if it does not cover conduct that clearly and substantially affects prices in physical markets under our jurisdiction. In fact, should the courts decide that we do not have jurisdiction, our ability to protect customers, as contemplated in the Energy Policy Act, would be substantially impaired.

11

Finally, we believe that, under the Energy Policy Act, FERC and the CFTC each have exclusive jurisdiction over the day-to-day regulation of their respective physical and financials markets. But where manipulation in one market directly or indirectly affects the other, both agencies have an enforcement role. This is a dual role that Congress intended and that will redound to the benefit of all market participants in the end.

**Cooperation Continues**

I regret that this disagreement between FERC and the CFTC has arisen in recent months. But I want to be clear that this disagreement over jurisdiction has not impeded cooperation between the two agencies. We have a respectful disagreement over interpretation of the anti-manipulation provisions of the Energy Policy Act, a disagreement that in my view is best resolved by the courts.

I also want to be clear that I do not question the CFTC's commitment to preventing market manipulation – they are as committed to preventing market manipulation as we are. They have demonstrated that by continuing to cooperate with FERC on matters of mutual interest, notwithstanding their legal opinion on the scope of our jurisdiction.

The disagreement has not impeded cooperation between the two agencies on ongoing investigations of mutual interest. Our MOU continues in place, and we continue to coordinate our information gathering. Staff members from the two agencies continue to meet periodically to discuss more general issues of common interest. And the two agencies are discussing other ideas on how to improve cooperation in investigations and enforcement.

**Maintaining Access to Market Data**

FERC oversees natural gas and electric markets vigilantly every day, using all of the information available to it. The Amaranth case arose because our analysts saw an anomaly in NYMEX trading as it was happening during the monthly close.

Several legislative proposals are currently circulating that would close what is called the "Enron loophole" and give the CFTC jurisdiction over ICE and other electronic trading venues that provide significant price discovery. Unless carefully crafted, these proposals could affect our ability to oversee natural gas and electric power markets, because many of these venues trade physical as well as financial contracts.

ICE is a good example. Some analysts have referred to ICE as a "dark market." Our experience is different. ICE produces a great deal of information about current and forward markets for both natural gas and electric power all over the United States.

Indeed, ICE is our leading source of information about a large part of the physical market for both commodities, especially in real-time. The attached graph shows the kind of detailed information that we have contracted to see every day from ICE, including the timing, volume and price of all the relevant transactions that occurred on ICE that day. In this case, the graph shows daily physical trading at Henry Hub for delivery on November 29, 2007. We do not see counter-party information, except when we undertake an investigation. But we can and do get such information under our subpoena power when needed.

Please note that in the attached graph, all of the transactions are for physical delivery of natural gas on the following day. It is true that most ICE transactions are for financial products – 95 percent of total trading. In fact, we track the transactions on ICE of their futures look-alike swap to give us additional context for natural gas price development. Far more important for us, most of the information we can see about many of our physical markets comes from the other five percent of trading on ICE. Also, some financial transactions, such as basis swaps, are central to setting many physical prices. Any delay or limitation on our access to this information would significantly diminish our Enforcement efforts.

The general point is that individual market venues, like ICE, frequently trade both physical and financial products. It is very important for us to maintain our current level of authority over, and information access to, the physical aspects of those market venues.

**Conclusion**

The Energy Policy Act gave us the tools we need to oversee physical natural gas and electric power markets. Over the last two years, we have moved both carefully and quickly to implement the relevant parts of the Energy Policy Act – especially the anti-manipulation, civil penalty, and transparency authorities.

Our experience so far is that the new authorities give us what we need to penalize and deter price manipulation. Our track record shows how effective those authorities can be. I do not anticipate that we would need further authorities.

However, a legal question has arisen regarding one of our most important new regulatory authorities – our ability to prevent and sanction market manipulation. We believe it is important to clarify the extent of FERC authority to prevent market manipulation. There is much at stake in this dispute. If the courts were to agree with the position taken by Amaranth, FERC's ability to protect consumers would be significantly impaired.

Figure 1: Use of Physical Basis in Natural Gas Price Indices at Major Trading Points, 2007



Source: Derived from *Platts* data for January through October 2007 indices.

Figure 2:  ICE Daily Physical Natural Gas Prices at Henry Hub, Flow Date 11/27/2007



Note: Every point represents one transaction

14

**APPENDIX**

121 FERC ¶ 61,224
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
                       Suedeen G. Kelly, Marc Spitzer,
                       Philip D. Moeller, and Jon Wellinghoff.

Amaranth Advisors L.L.C.                            Docket No.  IN07-26-001
Amaranth LLC
Amaranth Management Limited Partnership
Amaranth International Limited
Amaranth Partners LLC
Amaranth Capital Partners LLC
Amaranth Group Inc.
Amaranth Advisors (Calgary) ULC
Brian Hunter
Matthew Donohoe

ORDER DENYING REHEARING

(Issued November 30, 2007)

1.      This order addresses whether the Commission has authority under section 4A of
the Natural Gas Act (NGA) to sanction manipulative trading of natural gas futures
contracts when it finds that such manipulative trading had a nexus to and significant
effect on the prices of Commission jurisdictional wholesale sales of natural gas.  On
July 26, 2007, the Commission issued an Order to Show Cause (OSC) to the above ten
Respondents, directing them to show why they had not violated section 4A of the NGA
and section 1c.1 of the Commission's regulations, 18 C.F.R. §1c.1 (2006) (Anti-
Manipulation Rule) as well as to show cause why they should not be assessed civil
penalties and be required to disgorge unjust profits, plus interest.  On August 27, 2007,
four of the ten Respondents, Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary)
ULC, Amaranth Management Limited Partnership, and Amaranth Group (collectively
"Amaranth") filed a request for expedited rehearing of the OSC (Rehearing Request).
Amaranth seeks to terminate the OSC proceeding because it claims that the Commission
lacks subject matter jurisdiction over Amaranth's alleged manipulation.  As discussed

below, the Commission denies Amaranth's rehearing request.[2]  Some of the other six Respondents also filed requests for rehearing of the OSC but their rehearing requests are not addressed in this order.  They will be addressed in a future order.[3]

## I.    Background

### A.    The Order to Show Cause

2.      In the OSC, the Commission preliminarily concluded that Amaranth's trading in Natural Gas Futures Contracts (NG Futures Contracts) had a direct and substantial effect on the price of Commission-jurisdictional transactions, affecting natural gas customers and ratepayers across the United States, both of which the Commission is required by statute to protect.[4]

3.      Amaranth traded in NG Futures Contracts[5] on the New York Mercantile Exchange (NYMEX).  Trading NG Futures Contracts creates a "settlement price," which is the volume-weighted average price of trades made during the last 30 minutes of trading (typically from 2:00 p.m. to 2:30 p.m.) on the third-to-last business day of the month preceding the next calendar month.  The Commission detailed in the OSC preliminary findings that Amaranth appears to have manipulated (in this case driving down) the settlement price of NG Futures Contracts by selling an extraordinary amount of NG

---

[2] On October 12, 2007, the Commission extended the date for responses to the OSC to fourteen days after the Commission's ruling on Amaranth's Request for Rehearing.  Pursuant to that Notice, Respondents shall now answer the OSC, as specified in P 140(a) and (b) of the OSC, not later than 14 days from the issuance of this Order.

[3] We are disposing of Amaranth's rehearing request in its entirety.  We will address issues raised in rehearing requests by other Respondents, such as the authority to assess civil penalties, the construction of the term "any entity" as to individuals, or the liability of such Respondents, in a future order.

[4] *See generally Order to Show Cause*, 120 FERC ¶ 61,085 (July 26, 2007) (OSC).

[5] NG Futures Contracts are standardized contracts that specify the terms under which a buyer will accept and a seller will deliver a specified quantity of natural gas at a specified place and over a specified month in the future.  Typically, NG Futures Contracts provide for the future delivery of 10,000 MMBtus of natural gas over the course of the contract month to the buyer's interconnection on the Henry Hub in Louisiana.  *See* Natural Gas Futures Contracts, NYMEX Exchange Rulebook §§ 220.05, 220.10-12, http://www.nymex.com/rule_main.aspx?pg=33#220.05 (last visited Sept. 14, 2007).

2

Futures Contracts during the last 30 minutes of trading before the contracts expired.[6]
Considered in isolation, Amaranth's trading could be economically irrational because it
made less on the sales of these contracts. However, because Amaranth took positions
several times *larger* in various financial derivatives whose value *increased* as a direct
result of the decrease in the settlement price of NG Futures Contracts, Amaranth could
have gained on its overall financial positions.

4.      The Commission also explained that NG Futures Contracts are not purely financial
instruments because some futures contracts traders take their contracts "to delivery,"
meaning they hold the contracts into the month during which the contract becomes a
contract for actual purchase and delivery of 10,000 MMBtus' of natural gas at the Henry
Hub delivery point in Erath, Louisiana.[7]  The price of that *physical* natural gas
transaction is the NG Futures Contracts settlement price.  In addition, "physical basis"
transactions are based on the NG Futures Contracts settlement price.[8]  The NG Futures
Contracts settlement price is directly incorporated into many published price "indices,"
which are relied upon by physical buyers and sellers as a benchmark to determine the
prevailing price for natural gas at a given location, or a specified differential to a
published price index in the event the gas is to be delivered at a different location.[9]
Therefore, the Commission explained, Amaranth's actions, if proven to have driven down
the NG Futures Contracts settlement price, had a direct and substantial effect on the price
of several different types of *physical* natural gas transactions – transactions that are
indisputably within the Commission's jurisdiction.[10]

5.      If the NG Futures Contracts settlement price was driven down by Amaranth's
trading, sellers who went to delivery on short NG Futures Contracts, as well as producers
and other natural gas market participants, may have been paid an artificially lower price
for their natural gas.  Such manipulation undermines confidence in and integrity of
energy markets that are critical to supporting an adequate natural gas infrastructure and

---

[6] OSC at PP 84, 91 and 106.

[7] *Id.* at PP 5, 26.

[8] *Id.* at P 20.

[9] *Id.* at PP 21-24.  To compile monthly "indices" of those prices at various
physical natural gas trading locations, publishers of natural gas industry newsletters (*e.g.,*
Platts or NGI) conduct price surveys of market participants.  Those surveys capture a
significant amount of the aforementioned physical basis transactions.  *See generally
Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121,
*clarification granted*, 105 FERC ¶ 61,282 (2003).

[10] OSC at PP 20-27, 108-10.

that provide consumers reasonable prices for natural gas. Finally, the pecuniary interests of state and federal governments may have been harmed when natural gas from public lands was sold for royalties that are also tied to the NYMEX settlement price.

6.    The Commission preliminarily concluded in the OSC that Amaranth and the other Respondents violated the Commission's Anti-Manipulation Rule, which was adopted pursuant to section 4A of the NGA, 15 U.S.C. § 717, as amended by the Energy Policy Act of 2005, Pub. L. No. 109-58, § 315 (2005) (codified at 15 U.S.C. 717c-1) (EPAct 2005). It proposes that Amaranth pay civil penalties and disgorge unjust profits under similarly new enhanced penalty provisions also added to the NGA by EPAct 2005.[11] It also ordered responses to the OSC's specific allegations. Amaranth sought leave, and it and all other Respondents have been permitted, to file responses to the OSC within fourteen days after this ruling.

### B.    Amaranth's Request for Expedited Rehearing on the Issue of the Commission's Jurisdiction

7.    Amaranth's rehearing request generally raises the issue of the Commission's subject matter jurisdiction to proceed with its OSC under section 4A of the NGA. New section 4A was added to the NGA, along with a parallel provision which was added to the Federal Power Act (FPA), by EPAct 2005. It provides as follows:

> It shall be unlawful for *any entity*, directly *or indirectly*, to use or employ, *in connection with* the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, *any* manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 . . .in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. (emphasis added).

8.    In support of its Rehearing Request, Amaranth raises three principal points of error. First, Amaranth contends that section 4A of the NGA does not confer jurisdiction on the Commission to regulate trading of futures that takes place exclusively on the NYMEX because such transactions are within the "exclusive jurisdiction" of the Commodity Futures Trading Commission (CFTC).[12] Amaranth contends that the CFTC has exclusive jurisdiction to regulate manipulation within financial markets, even if such conduct directly and substantially impacts the Commission's jurisdictional natural gas

---

[11] *Id*. at P 75.

[12] Rehearing Request at 13-16.

markets.  Amaranth maintains that the EPAct 2005 amendments to the NGA did not expand the Commission's jurisdiction to include trading "solely" in natural gas futures that affects Commission-jurisdictional markets and that there is no jurisdictional overlap between the Commission and CFTC because the Commodity Exchange Act, P.L. 74-765, 49 Stat. 149 (1936) (CEA) grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements and transactions involving contracts for the sale of a commodity for future delivery."[13]  Amaranth cites legislative history from 1974 to support its claim that the Commission is preempted from regulating futures markets.[14]  In further support of this argument, Amaranth claims that the "savings clause" in section 23 of the NGA (a natural gas market transparency provision which was added to the NGA by EPAct 2005), confirms that Congress did not expand the Commission's jurisdiction to include manipulation of futures contracts, but instead withheld regulatory power from the Commission by re-affirming the CFTC's exclusive jurisdiction under the CEA.[15]  According to Amaranth, decisions holding that two agencies may conduct separate investigations are inapplicable because the CFTC has exclusive jurisdiction over the claims at issue.[16]  Amaranth also contends that section 23 gave the Commission authority only to collect from market participants and disseminate information about the availability and prices of natural gas sold at wholesale in interstate commerce.[17]  According to Amaranth, the related requirement that the Commission enter into a Memorandum of Understanding (MOU) with the CFTC is intended to ensure only that information requests are coordinated, and not to authorize the Commission to take regulatory action.[18]

9.      Second, Amaranth argues that the Commission exceeded its jurisdictional bounds, principally because the "in connection with" language of section 4A of the NGA does not confer subject matter jurisdiction over the types of futures transactions addressed by the OSC.[19]  While the Commission stated in the OSC that EPAct 2005 expanded its authority to police all forms of manipulation in connection with its jurisdictional markets, Amaranth contends that the "in connection with" language in section 4A of the NGA

---

[13] 7 U.S.C. § 2(a)(1)(A) (2000).  *See generally* Rehearing Request at 16-25.

[14] Rehearing Request at 15.

[15] *Id.* at 16-21.

[16] *Id.* at 24-25.

[17] *Id.* at 17-18

[18] *Id.* at 18-19.

[19] *Id.* at 26-39.

added by EPAct 2005 did not confer upon the Commission jurisdiction to regulate so-called "non-jurisdictional" activity or entities even if the actions affect Commission-jurisdictional markets.[20]  Because Amaranth was not itself a party to the purchase or sale of physical natural gas contracts, Amaranth claims the manipulation alleged by the Commission was not "in connection" with Commission-jurisdictional transactions. Specifically, Amaranth maintains that, our statements in the OSC notwithstanding, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(b) (2000) (Securities Exchange Act) and cases applying that provision, do not guide the analysis of whether the NG Futures Contracts transactions were "in connection with" physical natural gas markets because the Commission was not given the enforcement powers provided in section 10(b).[21]  According to Amaranth, Congress only meant to incorporate into section 4A the definitions of certain *terms* used in section 10(b).  Alternatively, if statutory construction of the "in connection with" clause of section 10(b) is applicable to NGA section 4A, Amaranth contends that legal precedent supports its position that Amaranth would be subject to the Commission's jurisdiction only if Amaranth traded in physical natural gas that "coincided with" or was "in furtherance" of the manipulative scheme.[22]  Because Amaranth claims it did not engage in such transactions, it asserts that the "in connection with" element is not satisfied.

10.    Third, accepting its own interpretation of the EPAct 2005 and the NGA, Amaranth argues that our Order No. 670 adopting the Anti-Manipulation Rule[23] likewise stated that we do not regulate fraud and manipulation in "non-jurisdictional" transactions, such as NG Futures Contracts.[24]  Amaranth recites language from Order No. 670 which it claims is inconsistent with our preliminary conclusions in the OSC.  From there, Amaranth contends the Commission's OSC is arbitrary, capricious, and an abuse of discretion because we failed to explain why we "departed" from our determination in Order No. 670.[25]

---

[20] *Id.* at 26-31.

[21] *Id.* at 31-32.

[22] *Id.* at 34-36.

[23] *Prohibition of Energy Market Manipulation*, Order No. 670, 71 Fed. Reg. 4244 (January 26, 2006), FERC Stats. & Regs. ¶ 31,202 (codified at 15 U.S.C. 717c-1) (Order No. 670).

[24] Rehearing Request at 39-41.

[25] *Id.* at 41

## II.    **Commission Determination**

11.    As the Supreme Court has held, the primary purpose of the NGA is to "protect consumers against exploitation."[26]  The Commission is required by statute to ensure that certain physical sales of natural gas sales are just, reasonable and not unduly discriminatory or preferential under the NGA and that natural gas consumers are thereby protected.[27]  Beginning in the 1980s, the Commission regulated jurisdictional wholesale sales of natural gas on a market basis and thus its responsibility to assure just and reasonable rates is fulfilled by ensuring that natural gas markets remain competitive.  In the OSC we preliminarily determined that Amaranth's manipulative trading of NG Futures Contracts, which are not directly regulated by the Commission on a day-to-day basis, nevertheless had a direct effect on the price of natural gas sales which are within the Commission's jurisdiction.[28]  Because of this direct effect on jurisdictional sales, the behavior fell within the NGA section 4A prohibition of direct or indirect manipulation in connection with jurisdictional sales.  In making our preliminary findings in the OSC, we took into account the CFTC's exclusive jurisdiction to oversee the operation of the futures markets.[29]  The Commission neither asserted jurisdiction over day-to-day regulation of CFTC-regulated futures contracts transactions nor sought to interfere with that jurisdiction.  Rather, as we stated in the OSC, the Commission's jurisdiction over activities that affect its markets is complementary to the CFTC's jurisdiction over the activities that affect futures markets.[30]

12.    As discussed in detail below, the statutory language of NGA section 4A, in conjunction with Congress' recognition of the overlap in FERC and CFTC regulated markets in the NGA section 23 transparency provision that was enacted simultaneously by Congress, supports the Commission's interpretation.  Further, the historical context in which Congress considered the NGA section 4A and parallel FPA section 222 amendments supports the interpretation that Congress intended the Commission to ensure that there is no regulatory gap in sanctioning manipulative behavior affecting jurisdictional gas and electric markets.  The result of our interpretation is that although the Commission and the CFTC each have exclusive jurisdiction over the day-to-day regulation of their respective physical energy and financials markets, where, as here,

---

[26] *Federal Power Comm'n  v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944).

[27] 15 U.S.C. § 717t-2(a)(1) (2000).

[28] OSC at PP 108-10.

[29] *Id.* at PP 48, 55.

[30] *Id.* at PP 48.

there is manipulation in one market that directly or indirectly affects the other market, both agencies have an enforcement role.  This is a dual role that was contemplated by Congress, that should be coordinated and consistent wherever possible, and that, in the end, will redound to the benefit of all market participants.

### A.    The Commission's NGA Section 4A Jurisdiction

13.    Although presented as the second point in Amaranth's "specification of errors," the question of whether the Commission has jurisdiction, in light of the "in connection with" language of NGA section 4A, or otherwise, is the most fundamental issue presented (regardless of the CFTC's jurisdiction).  Accordingly, we turn to that question first and, after resolving that question, we turn to Amaranth's other arguments, as necessary.

14.    Before addressing Amaranth's jurisdictional arguments, we note four basic factual points that were contained in the OSC and are, at this point in the proceedings, undisputed by Amaranth:

> a.    Amaranth does not dispute that the alleged manipulation in this case involves three interrelated markets:  (1) the NG Futures Contracts market; (2) a variety of "derivative" financial products; and (3) Commission-jurisdictional wholesale natural gas sales, namely, wholesale natural gas sales in interstate commerce that are not "first sales" within the meaning of the Natural Gas Policy Act of 1978 (NGPA).[31]  Amaranth does not dispute that the first market affects the second and third inasmuch as the NG Futures Contracts settlement price determines, in whole or in part, the value of the derivatives and the price of a substantial volume of Commission-jurisdictional wholesale natural gas sales.[32]
>
> b.    Amaranth does not dispute that the "settlement price" attaches to any NG Futures Contracts that becomes a contract for the sale of physical natural gas. During the months of interest in this matter, blanket certificate holders such as ConocoPhillips, BP, Louis Dreyfus, UBS, and Merrill Lynch each sold natural gas by holding more than 2,000 NG Futures Contracts through expiration in one or more of the months for approximately 20 billion cubic feet of physical gas that went to delivery.[33]  These physical natural gas sales were, in whole or in part, Commission-jurisdictional transactions.  Amaranth presents no evidence or argument to the contrary.

---

[31] 15 U.S.C. § 3431(a) (2000).

[32] OSC at PP 2, 6, 108-10.

[33] *Id.* at P 25 (*citing* NYMEX open interest, trade, and delivery data, ferc_item13_ng_top_tdr_final2.xls).

c.     Amaranth does not dispute that substantial volumes of bid week[34] transactions are "physical basis" transactions that are priced using the NG Futures Contracts settlement price and that such sales are largely Commission-jurisdictional.[35]

d.     Amaranth does not dispute that monthly indices at many trading centers are set primarily by physical basis transactions during "bid week" and thus also use the NG Futures Contracts settlement price as a reference price.  Amaranth also does not dispute that, in turn such price indices are widely used in bilateral natural gas markets that are subject to the jurisdiction of the Commission.[36]  Thus, as Amaranth agrees, the "public relies on the [NYMEX] settlement price" as a "key price benchmarked for physical . . . contracts involving natural gas."[37]  Nor does Amaranth dispute that state regulators sometimes look to index or settlement price-based purchases of natural gas by local distribution companies in evaluating whether such purchases were prudent.

## 1.     The Commission's Preliminary Jurisdictional Findings and the Language and Purpose of the Anti-Manipulation Provisions

15.     Although the rehearing request offers a number of detailed and specific legal points and authorities, Amaranth's central argument with respect to our jurisdiction is that the NGA and the Anti-Manipulation Rule do not confer jurisdiction on the Commission to prohibit the conduct alleged in the OSC.[38]  As with any issue of statutory and regulatory construction, we begin with text and purpose of the statute (including pertinent legislative history), our rule implementing the statute, and our order adopting the rule.  We then apply the legal interpretation to the facts at hand.

---

[34] "Bid week" is the last five business days of the month.  *See generally Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121, *clarification granted*, 105 FERC ¶ 61,282 (2003).

[35] OSC at P 22.

[36] *Id.* at 22-23, 25.

[37] Letter from Michael Carrieri, Compliance Director of Amaranth, to Anthony Densieski, Senior Director, Market Surveillance, NYMEX (Aug. 30, 2006).

[38] Rehearing Request at 10-12 (rejecting the OSC findings in PP 44-51 and 108-10).

16.     As noted above, section 315 of EPAct 2005 added a new section 4A to the NGA that provides in pertinent part:

> It shall be unlawful for *any* entity, directly *or indirectly*, to use or employ, *in connection with* the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, *any* manipulative deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. (emphasis added).[39]

17.     This language, in particular the broad and general terms used therein, is most reasonably read to give the Commission broad authority to sanction manipulative conduct where, as here, such conduct has a nexus to and significantly affects jurisdictional sales. The language making it unlawful for "any entity" to engage in manipulative conduct in connection with jurisdictional transactions demonstrates Congress' intent to capture not only natural gas companies or other jurisdictional companies historically subject to the NGA but rather any individual, corporation, or governmental or non-governmental entity that engages in the prohibited behavior. The language "directly or indirectly" is reasonably read to prohibit behavior not only by entities engaging in Commission jurisdictional transactions but entities engaging indirectly, for example through intermediaries, in such transactions, or in behavior indirectly affecting such transactions.[40] Similarly, the language "any manipulative device or contrivance" is

---

[39] 15 U.S.C. § 717c (2005). With respect to the "subject to the jurisdiction of the Commission" element, section 1(b) of the NGA grants the Commission jurisdiction over "the sale in interstate commerce of natural gas for resale." 15 U.S.C. § 717(1)(a) (2000). The NGPA, 15 U.S.C. §§ 3301 *et seq.* (2000), and the Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989), exclude from the Commission's NGA jurisdiction all "first sales," 15 U.S.C. § 3431a(a) (2000), which are all sales from the producer to the consumer, unless and until the gas is purchased by an interstate pipeline, intrastate pipeline, or local distribution company or an affiliate thereof. 15 U.S.C. § 3301(2)(21)(A) (2000). *See also Amendments to Blanket Sales Certificates*, Order No. 644, FERC Stats. & Regs. ¶ 31,153 at P 14 (2003), *reh'g denied*, 107 FERC ¶ 61,174 (2004).

[40] Cases interpreting section 10(b), which provides that it "shall be unlawful for any person, directly or indirectly," to use any instrumentality of interstate commerce in connection with a manipulative or deceptive device or contrivance, held that the "word 'indirectly' is quite broad and pervasive" and, therefore, use of a telephone to arrange a meeting for purposes of effectuating a fraud satisfies the requirements of section 10(b). *Nemitz v. Cunny*, 221 F. Supp. 571, 573 (N.D. Ill. 1963). Therefore, section 10(b) and Rule 10b-5 have been read to impose liability on any person who participated in a

10

reasonably read to capture a broad array of manipulative or deceptive conduct that may harm Commission jurisdictional markets and customers. The legislative history of the enactment of this new provision and the parallel provision in the FPA, section 222, supports a reasonably broad interpretation of the Commission's authority to sanction manipulative or deceptive conduct. While the Conference Report accompanying EPAct 2005 does not contain discussion of the anti-manipulation provisions, there is ample discussion in floor debates leading up to EPAct 2005 to demonstrate that Congress intended to confer on the Commission  broad authority to prohibit manipulation affecting jurisdictional markets. In floor debates discussing the scope of manipulative practices to be prohibited, two different versions of the anti-manipulation provisions were introduced and considered in May 2005: the "Cantwell Amendment," which sought to add broad anti-manipulation language similar to that of section 10(b) of the Securities Exchange Act and a narrower "Domenici Amendment" that had a specific list of prohibited practices.[41] The broad Cantwell Amendment, modeled on section 10(b), became what is now section 4A of the NGA and section 4A expressly provides that terms common to section 10b and 4A are used in the same manner in section 4A as in section 10(b). Congress then expressly delegated *to the Commission* the task of adopting rules to give life to section 4A.[42]

18.     In commenting on the essentially identical electric anti-manipulation provision that was ultimately adopted alongside section 4A, Senator Jeff Bingaman, Ranking Member of the Senate Committee on Energy and Natural Resources when EPAct 2005 was enacted, stated that "we should give FERC this tool and make it clear in the law that all of these deceptive and manipulative practices are illegal. Once we make that clear, we are in a position to hold FERC accountable, if in fact, manipulation or deceptive practices occur in the future."[43]

19.     It is reasonable to infer from this statement that, in the aftermath of the manipulative practices by Enron and other companies that were uncovered in connection with the Western energy crisis of 2000-2001, Congress intended to give the Commission the tools needed to sanction future manipulation affecting jurisdictional prices and

---

manipulative or deceptive scheme, even if a material misstatement by another person created the connection between the scheme and the securities market. *In re Lernout & Haupsie Sec. Lit.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003).

[41]  *See* 151 Cong. Rec. S 7451 at 40 (daily ed. June 28, 2005) (Statement of Sen. Cantwell).

[42] *See* 15 U.S.C. §717(c) (2005) (the "Commission may prescribe as necessary [rules] in the public interest or for the protection of natural gas ratepayers.").

[43] 149 Cong Rec. S 10182 (daily ed. July 30, 2003) (statement of Sen. Bingaman).

services and to rely on the Commission's expertise and knowledge of relevant markets to craft rules that would most fully effectuate the prevention, detection, and punishment of manipulation affecting Commission jurisdictional markets.

20.    To implement section 315 of EPAct 2005 and NGA section 4A, the Commission promulgated its Anti-Manipulation Rule, section 1c.1 of the Commission's rules, which prohibits:

> any entity, directly or indirectly, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission [from using] or employ[ing] any device, scheme, or artifice to defraud, [or from engaging in] any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.[44]

21.    In adopting this rule, we issued Order No. 670 and expressly ruled the Anti-Manipulation Rule is an intentionally broad proscription against all kinds of deception, manipulation, deceit and fraud.[45]  We clarified the following elements of a manipulation claim: "an entity: (1). . .engages in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite *scienter*; (3) in connection with the purchase or sale of natural gas  . . . subject to the jurisdiction of the Commission."[46]  Order No. 670 explained that fraud is defined generally to include "any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market."[47]

22.    The Anti-Manipulation Rule applies whether or not the manipulator's principal or exclusive purpose is the manipulation of physical natural gas sales.  In Order No. 670, we stated "we do not intend to construe the Final Rule so broadly as to convert every common law fraud that happens to touch a jurisdictional transaction into a violation of" the Anti-Manipulation Rule.[48]  Yet, such a transaction would be covered if "in committing fraud, the entity . . . intended to affect, or have acted recklessly to affect, a

---

[44] 18 C.F.R. § 1c.1 (2006).

[45] Order No. 670 at P 49.

[46] *Id.* at P 50.

[47] *Id.* (*citing Dennis v. United States*, 384 U.S. 855, 861 (1966) (noting that fraud within the meaning of a statute need not be confined to the common law definition of fraud: any false statement, misrepresentation or deceit)).

[48] *Id.* at P 22 (emphasis added).

jurisdictional transaction."[49]  We pointed out that the "in connection with" language is drawn from similar language of Rule 10b-5, which has been very liberally construed.[50] Accordingly, we held in Order No. 670 and observed in the OSC that the Anti-Manipulation Rule applies where there is a "nexus" between the manipulative conduct and the jurisdictional transaction.  Under the analogous Rule 10b-5 precedent, the alleged manipulator need not be a party to the jurisdictional transaction, nor must the connection be overwhelmingly direct.[51]  Finally, we also explained that a determination of manipulation, in general, is "a question of fact that is to be determined by all the circumstances of a case."[52]  We note that after significant commentary relating to our notice of proposed rulemaking as to the Anti-Manipulation Rule, there were no appellate challenges to our Final Rule.

23.     Based on information developed to date, the Commission preliminarily concluded that Amaranth's manipulation of the NG Futures Contracts settlement price was "in connection with" Commission-jurisdictional transactions.[53]  First, the settlement price directly sets the price for any NG Futures contracts that ultimately went to delivery at Henry Hub.  As noted, the contracts were substantial in number.  This connection is certainly direct.  Second, the settlement price is indirectly incorporated into the price for physical basis transactions.  Finally, the price of a substantial proportion of physical basis transactions are used in indices, and those indices, in turn, price a substantial volume of physical natural gas.  The OSC presented data supporting the conclusion that a significant proportion of these sales are jurisdictional to the Commission.  As we noted in the OSC, millions of consumers, particularly on the East Coast, are affected by these prices.  Some of these various types of connections are direct, others are indirect.  They each vary in magnitude.  As discussed below, all of them qualify Amaranth's conduct as "in connection with" Commission jurisdictional transactions.

## 2.     The Language of NGA Section 4(a) as Compared to NGA Section 4A

24.     Amaranth contends that the phrase "in connection with" in NGA section 4A

---

[49] *Id.* (emphasis added).

[50] *Id.*

[51] As discussed below, the Anti-Manipulation Rule prohibits an entity from "directly or indirectly" committing fraud.

[52] Order No. 670 at P 50.

[53] OSC P 108-10.

should be interpreted identically to the same phrase that appears in NGA section 4(a)[54] (governing the Commission's ratemaking authority) because section 4A's anti-manipulation language "closely tracks" the section 4(a) ratemaking language.[55]  In passing, we note that Amaranth's rehearing request makes several additional arguments about the "in connection with" language, including its relationship to other phrases in the Anti-Manipulation Rule, the breadth of the phrase under the securities laws, and the like. Thus, we are called upon to address it from several different perspectives throughout this order.[56]  This particular argument rests on the fact that two sections of the NGA, 4A and 4(a), use the phrase "in connection with."  Section 4(a) of the NGA provides that:

> [a]ll rates and charges made, demanded, or received by any natural gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission . . . shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.[57]

25.    The language of section 4(a) provides the Commission with ratemaking authority over natural gas companies with respect to rates and charges "in connection with" the transportation or wholesale sales of natural gas within the Commission's jurisdiction as defined (and limited) in section 1(b) of the NGA.  However, use of the term "in connection with" is where the similarity of the two provisions begins and ends, and the fundamental flaw in Amaranth's argument is that Congress expressly patterned section 4A, including the "in connection with" language therein, on section 10(b) of the Securities Exchange Act, *not* on section 4(a) of the NGA.  No one challenged the Commission's statement in Order No. 670 that it would  interpret "in connection with" in a manner consistent with section 10(b).  Thus it is reasonable to rely on section 10(b) precedent, and not section 4(a) precedent, to interpret the phrase "in connection with." EPAct 2005 does not increase the variety of transactions within the Commission's ratemaking jurisdiction under pre-existing NGA section 4(a).  We re-iterate here our findings in the OSC that such a jurisdictional transaction must be directly or indirectly affected by manipulative or deceptive conduct in order for the manipulation or deception to violate the Anti-Manipulation Rule.[58]  However, Congress did broaden (with language

---

[54] Prior to and after EPAct 2005, the NGA has a "section 4(a)." The new Anti-manipulation provision added by EPAct 2005, which did not replace section 4(a), was denominated "section 4A."

[55] Rehearing Request at 36-31.

[56] *See* further discussion *infra* at paragraphs 34-45.

[57] 15 U.S.C. § 717c(a) (2005).

[58] OSC at P 110.

in section 4A that is not present in section 4(a)) the conduct affecting such transactions that the Commission may police, namely manipulative or deceptive conduct by any entity that, either directly or indirectly, is in connection with the purchase or sale of natural gas or transportation services within the Commission's jurisdiction. *See* further discussion *infra* at paragraphs 30-45 and 59.

26.    The cases cited by Amaranth for the proposition that "identical words used in different parts of the same act are intended to have the same meaning"[59] did not involve a situation, as here, where Congress amended a statute with a new provision expressly modeled on a provision in another act.[60]  The "in connection with" language used in section 4A must be read in the context of the entire section 4A provision.  We believe that the differences in the language used in section 4(a) and in section 4A, taken in their entirety, reflect the broad remedial purpose of Congress in enacting section 4A.  Thus, it is not only reasonable as a matter of statutory interpretation, but is consistent with congressional intent to interpret each provision (4(a) and 4A) based on the entirety of each provision as a whole.  Furthermore, section 4A, which was modeled after the Securities Exchange Act provision, provides that terms common to section 10(b) and 4A (such as "to use or employ, in connection with" and "any manipulative or deceptive device or contrivance in contravention of such rules") should be interpreted as those terms are used in section 10(b), not 4(a).

27.    The section 4(a) cases cited by Amaranth supporting its restrictive interpretation of "in connection with" are inapposite.  In *Conoco, Inc. v. FERC*, 90 F.3d 536 (D.C Cir. 1996) (*Conoco*), the court held that the phrase "in connection with" appearing in section 4(a) of the NGA did not allow the Commission to regulate gathering facilities because they are expressly exempt from the Commission's jurisdiction in section 1(b) of the NGA, 15 U.S.C. § 717(b) (1994).[61]  Similarly, in *Federal Power Comm'n v. Panhandle Eastern Pipe Line Co.*, the Supreme Court ruled that facilities, such as reserves and gas leases used for gas production and gathering, are likewise beyond the jurisdiction of the Commission because they too fall within section 1(b) exemptions.[62]  However, "the

---

[59] Rehearing Request at 30.

[60] *See Envtl. Def.  v. Duke Energy Corp.*, 127 S.Ct. 1423, 1424 (2007) (the same statutory terms used in different parts of the statute may be construed differently in order to satisfy distinct statutory objectives); *Bailey v. United States*, 516 U.S. 137, 145 (1995) (the meaning of statutory language depends on the context in which it is used).

[61] *Conoco*, 90 F.3d at 552 (section 1(b) expressly exempts from the Commission's jurisdiction the gathering of natural gas).

[62] 337 U.S. 498, 504 (1949).

scope of the Commission's power under the inclusive 'in connection' with' language of §§ 4 and 5 [of the NGA] was not at issue."[63]  Finally, *Williams Natural Gas Processing-Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335 (D.C. Cir. 2004) (*Williams*) does not hold, as Amaranth contends, that a gathering affiliate is beyond the Commission's jurisdiction if it does not directly participate in natural gas markets.  Rather, the *Williams* holding concerns whether the Commission can disregard the corporate form and reassert jurisdiction over a gathering facility, which is expressly exempt from regulation under section 1(b) of the NGA, because its activities are interrelated to an affiliated interstate pipeline.[64]

28.    These decisions simply concluded that section 4(a) could not be construed in a manner that would expand the jurisdiction expressly foreclosed in section 1(b).  They did not address (nor could they, since section 4A had not been enacted) the broader scope of section 4A which expressly applies to "*any* entity" – not just natural gas companies – that "directly *or indirectly*" take certain actions in connection with the "*purchase* or sale" of jurisdictional services.  In this case, the Commission's construction of its jurisdiction under section 4A does not conflict with section 1(b) because that section does not exempt financial market participants, such as Amaranth, or trading in natural gas futures markets.  Furthermore, the logic, if not the result, of the *Conoco* decision can be read to support the Commission's view here that when non-jurisdictional transactions, such as natural gas futures contracts, affect jurisdictional markets, the "in connection with" requirement of section 4(a) would be met.[65]  We find no relevance to the few cases cited by Amaranth[66] in which the courts have rejected jurisdictional assertions by the Commission in other contexts that are not present here, other than for the general proposition that the

---

[63] *See Northern Natural Gas Co. v. FERC*, 929 F.2d 1261, 1272 (8th Cir. 1991) (discussing the scope of the Supreme Court's decision in *Federal Power Comm'n v. Panhandle Eastern Pipe Line Co.*).

[64] *Williams*, 373 F.3d at 1342-43.

[65] The court in *Conoco* held that when exempt gathering facilities become "intertwined with jurisdictional activities, the Commission's regulation of the latter may inpinge on the former."  90 F.3d at 549.  Thus, "[a]s an abstract matter, [the court had] no reason to doubt the Commission's conclusion that a nonjurisdictional entity could act in a manner that would change its status by enabling an affiliated interstate pipeline to manipulate access and costs of gathering."  *Id.*  The holding in *Conoco* simply rested on the section 1(b) exemption which trumped the section 4(a) language, a construct not relevant here.

[66] Rehearing Request at 36-39.

Commission cannot create jurisdiction that Congress has not conferred.[67]

29.    Amaranth's proposed reading is also problematic because it essentially eliminates much of the intended effect of the new section 4A that was hard fought for and prevailed in Congress.  Prior to 2005, the Commission had authority under section 4(a) to punish manipulation by sellers in physical natural gas markets and, therefore, had promulgated "Market Behavior Rules" prohibiting manipulation by such sellers.[68]  Congress is not presumed to enact surplusage.[69]   The better interpretation is that Congress meant to expand Commission authority beyond what existed in 2005 to proscribe the conduct alleged in the OSC.  *See* further discussion of the "in connection with" language *infra* at paragraphs 34-45 and 59.

### 3.    Whether the Anti-Manipulation Rule is Limited to "Physical Sellers" or "Sales" Transactions.

30.    Amaranth's next specific argument is that the Commission is "bootstrapping"[70] language in the NGA's new section 4A into a new and broad jurisdictional grant that reaches beyond physical sellers and their sales transactions.  This argument is without merit because it ignores the simple fact that new section 4A was, indeed, a new and broad

---

[67] Amaranth's reliance on *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996), *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005), *pet. for cert. pending,* No. 07-155 (filed Aug. 6, 2007); *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004), and *N. States Power Co. v. FERC*, 176 F.3d 1090 (8th Cir. 1999) is misplaced.  In each of these decisions, the courts concluded that the plain language of the statute clearly delineated FERC's jurisdiction.  *Altamont,* 92 F.3d 1239 (NGA expressly reserved to states the authority to determine the intrastate rate structures); *Bonneville,* 422 F.3d 908 at 917-19 (FPA expressly states that FERC's jurisdiction extends to public utilities and that FERC's refund authority does not extend to governmental entities); *California Indep. Sys. Operator*, 372 F.3d at 401 (FPA limited FERC's authority over public utility boards); and *N. States Power Co.*, 176 F.3d at 1095 (federal regulation extends to matters not subject to state regulation and states have authority over retail rates and practices).  In this case, the NGA expressly confers jurisdiction upon FERC to prohibit market manipulation that is "in connection with" its jurisdictional markets.  No other NGA provisions limit FERC's authority to prevent market manipulation.

[68] *See* 18 C.F.R. § 284.403(a) (2005).

[69] *City of Roseville v. Norton*, 348 F.3d 1020, 1028 (D.C. Cir. 2003) (*citing Babbitt v. Sweet Home Chapter of Cmty. for a Great Oregon*, 515 U.S. 687. 698 (1995)).

[70] Rehearing Request at 36.

jurisdictional grant by Congress to the Commission that goes beyond prior Commission jurisdiction to prohibit manipulation involving entities and transactions traditionally not regulated by the Commission.

31.    As Amaranth concedes, Congress granted the Commission broad authority to police market manipulation by "*any* entity."  The word "any" gives the word it modifies (in this case, "entity") an expansive meaning.[71]  Thus, Amaranth's argument that the Commission has authority to assess civil penalties for manipulation only against a physical seller of natural gas is inconsistent with the language of the statute.[72]  First, section 4A and the Anti-Manipulation Rule prohibits any entity from "directly or indirectly" engaging in manipulation "in connection with" a jurisdictional transaction.  Neither speaks in terms of conduct by an entity "engaged in" or "a party to" such transaction.  Contrary to Amaranth's sweeping assertion that the physical and financial markets are "completely separate,"[73] the manipulation alleged here had a profound cross-market effect: on the futures contracts that went to physical delivery, on physical basis transactions, and on transactions based off indices calculated using physical basis transactions.  "Increasingly, the price of natural gas in many supply contracts between suppliers and local distribution companies ("LDC") . . . . is determined based upon monthly price indexes closely tied to the monthly settlement of the NYMEX futures contract . . . without question a participant's trading conduct in one venue can effect, and has affected, the price of natural gas contracts in the other."[74]  Second, Amaranth's contention that section 23 of the NGA, which directs the Commission to promulgate rules that facilitate price transparency in natural gas markets, confirms that the Commission has civil penalty authority only against "sellers" of natural gas is based on a misreading of the statute.  Section 23, which is separate and distinct from section 4A, allows the Commission to obtain information about the price and availability of natural gas from

---

[71] *Norfolk S. Rwy. Co. v. Kirby*, 543 U.S. 14, 31-32 (2004) (the word "any" gives the word it modifies an expansive reading); *Dep't of Hous. and Urban Dev. v. Rucker*, 535 U.S. 125, 130-31 (2002); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (one must give effect to each word in a statute so that none is rendered superfluous); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("any" is an expansive term, meaning "one or some indiscriminately of whatever kind,"); *New York v. EPA*, 443 F.3d 880, 885-87 (D.C. Cir. 2006) (the word "any" is broadly construed to reflect Congress' intent that all types of physical changes are subject to the Clean Air Act's New Source Review program).

[72] Rehearing Request at 20.

[73] *Id.* at 26.

[74] Testimony of Laura Campbell, Assistant Manager of Energy Resources, Memphis Light, Gas & Water on behalf of APGA before the CFTC (Sept. 18, 2007).

"any market participant," not simply sellers.[75] Section 23(e) specifies that civil penalties for violating *this section* are limited to the three years before notice of the proposed penalty, except in cases where a seller engaged in fraudulent or manipulative activities in violation of section 4A that materially affected the sales contract.[76] This exception to a limitation on a subset of NGA violations implicated by section 23 does not override the broader language of section 4A.[77] In contrast, NGA section 22(a) specifies the Commission's civil penalty authority for violations of *the Act*, which includes violations of section 4A.[78]

32. Consistent with the foregoing authorities, Order No. 670 provides that the statutory phrase "any entity" (which is repeated in the Rule) covers not only companies that have traditionally been subject to the Commission's jurisdiction (such as natural gas pipeline companies or public utilities), but also any company or firm, and natural persons[79] who, "intended to affect, or have acted recklessly to affect, a jurisdictional transaction."[80] Amaranth's contention that only direct purchasers or sellers of physical natural gas are subject to the Commission's anti-manipulation jurisdiction not only is contradicted by the "any entity" language of section 4A, but is directly contradicted by the Supreme Court decision on which it relies. In *United States v. O'Hagan*, the Supreme Court stated that "as written, [section 10(b)] does not confine its coverage to deception of a purchaser or seller of securities; rather the statute reaches *any* deceptive device used "in connection with" the purchase or sale of a security." (citation omitted) (emphasis added).[81] Other cases decided under the Securities Exchange Act generally demonstrate that one can violate Rule 10b-5 (which implements section 10(b)) without being a purchaser or seller of a security.[82]

33. Moreover, section 4A expressly prohibits any entity from "directly or *indirectly*"

---

[75] 15 U.S.C. § 717t-2(a)(3)(A).

[76] *Id.* at §§ 717t-2(e)(1) and (2).

[77] *Id.*

[78] *Id.* at §§ 717t-1.

[79] Order No. 670 at PP 2, 18.

[80] *Id.* at P 22.

[81] *O'Hagan*, 521 U.S. 642, 658 (1997).

[82] *See, e.g., Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) (permitting shareholder suit for damages under Rule 10b-5 where company made misleading statements that affected its own stock).

using a manipulative or deceptive device. The term "indirectly" supports the conclusion that Congress intended the NGA's anti-manipulation prohibition to apply to more than conduct *within* the Commission's traditionally regulated market and more than just the direct wholesale seller of the physical commodity. Amaranth's statutory interpretation effectively reads the term "indirectly" out of the statute, thereby violating the basic rule of statutory construction to give meaning to all statutory terms.[83]

### 4.    The "In Connection With" Requirement

34.    Amaranth contends most fundamentally that the Commission lacks jurisdiction over trades outside the physical natural gas markets because of the "in connection with" requirement in NGA section 4A.[84] We find that Amaranth reads the requirement too narrowly and in a manner that precludes the achievement of much of what Congress intended. Congress could have, but did not, prohibit manipulative or deceptive conduct that occurred *in* Commission-jurisdictional markets. Instead, Congress used expansive language that prohibits manipulative or deceptive practices by any entity, directly or indirectly, "in connection with" the purchase, sale or transportation of natural gas historically within the Commission's jurisdiction. We discussed this phrase in the OSC[85] and we revisit it more fully here.

35.    Because the clause "in connection with" is undefined, we begin with an examination of ordinary usage.[86] According to Fowler's Modern English Usage, "in connection with" is noted for . . . its "pliability."[87] Furthermore, "connection" is defined by Webster's Third New International Dictionary 481 (1981) as a "relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement."[88] Therefore, in a variety of contexts, courts have broadly and flexibly

---

[83] *TRW Inc.*, 534 U.S. at 31 (each word in a statute must be given meaning).

[84] Rehearing Request at 26-39.

[85] OSC at PP 50, 110.

[86] *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004) (statutory construction begins with the plain language of the statute and the assumption that the ordinary meaning of the language reflects the statutory purpose); *Bailey v. United States*, 516 U.S. 137, 144-45 (1995) (interpret undefined statutory terms by referring to the term's ordinary usage).

[87] Fowler's Modern English Usage 172 (R.W. Burchfield ed., 3d ed. 1996).

[88] *See also* American Heritage Dictionary of the English Language 400 (3d ed. 1992) (connection is an association or relationship).

interpreted the phrase "in connection with" to encompass a wide variety of relationships and always with an eye to accomplishing statutes' broad remedial purposes.[89]

36.    In addition to considering the common definition of language used in the statute, we also evaluate (as we did in Order No. 670) how "in connection with" is used in section 10(b) of the Securities Exchange Act, on which section 4A was modeled.[90]  Cases construing section 10(b) and Rule 10b-5, as well as legislative history of section 10(b), are therefore relevant to the Commission's construction of section 4A.  In its Rehearing Request, Amaranth claims that only the phrase "manipulative scheme or device" (and not the rest of NGA section 4A) are to be construed consistent with section 10(b).[91]  While section 4A states that the phrase is to be so construed, a comparison of identical phrases used throughout section 4A and section 10(b) shows that Congress intended section 4A and the implementing rules to be modeled after section 10(b).

37.    The "in connection with" language of section 10(b) has been construed expansively by the Supreme Court to accomplish the broad remedial purposes of section 10(b) which was enacted to restore the integrity of securities markets and promote investor confidence following the stock market crash of 1929.[92]  In *Zandford* and *Bankers Life & Cas. Co.*, the Supreme Court upheld the SEC's broad and flexible reading of the "in connection with" requirement of section 10(b) to accomplish the broad

---

[89] *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (*Zandford*) ("in connection with" should be read broadly and flexibly, not restrictively); *Superintendent of Ins. of New York v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971); *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996) ("in connection with" is interpreted expansively); *United States v. Thompson*, 32 F.3d 1, 6-7 (1st Cir. 1994) (same); *SEC v. Hopper*, No. 04-1054, 2006 U.S. Dist. LEXIS 17772 (S.D. Tex. Mar. 24, 2006) ("[a] plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive conduct affects a market for securities.") (*quoting In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 472, 505-06 (S.D.N.Y. 2005)).

[90] 15 U.S.C. § 717c (2005) (terms are used in the same manner as section 10(b)).

[91] Rehearing Request at 31-32.

[92] *See Zandford*, 535 U.S. at 819 (the "in connection with requirement" of the SEC regulatory scheme, on which the Anti-Manipulation Rule is modeled, should be interpreted flexibly, not technically and restrictively, to accomplish the statutes' remedial purposes of promoting market integrity and investor confidence) (*citing United States v. O'Hagan*, 521 U.S. 642, 651 (1997)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006) ("the magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated"); *Bankers Life & Cas. Co.*, 404 U.S. at 10 (construction of section 10(b) extends beyond maintaining the integrity of securities markets).

remedial purpose of the statute.  Here we note the historical similarity of the posture of the Securities and Exchange Commission (SEC) in 1934 to our own situation with respect to the anti-manipulation provisions.  In response to the Western energy crisis of 2000-2001, EPAct 2005's parallel anti-manipulation provisions were added to both the FPA and NGA to ensure that the Commission had sufficient tools to address and punish manipulative behavior such as that engaged in by Enron during the crisis.  Congress clearly did not want to limit the types of manipulation that might harm jurisdictional markets and thus provided broad, general language to allow the Commission to sanction unforeseen types of manipulation that could harm customers.  As the SEC broadly construed the Securities Exchange Act in early enforcement actions to restore confidence in financial markets, we will similarly broadly construe the "in connection with" provision to effectuate the Congressional purpose of the anti-manipulation provisions enacted as part of EPAct 2005.

38.    In *Zandford*, the Supreme Court held that the "in connection with" requirement was met when deceptive acts, such as the misappropriation of proceeds from the purchase or sale of securities, coincided with the purchase or sale of securities, even though the transactions themselves are lawful.[93]  Similarly, *SEC v. Hopper* held that even though "round-trip" trading (which involves pre-arranged sham transactions designed to artificially increase trading volumes) may not have involved directly the purchase or sale of a security, "a plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendant's deceptive conduct affects a market for securities."[94] Thus, the court held that the alleged fraud which arose from statements about transactions, and not the transactions themselves, may satisfy the "in connection with" requirement if investors considered the energy company's false trading numbers in deciding whether to purchase or sell the company's securities.[95]  Indeed, the entire line of

---

[93] *Zandford*, 535 U.S. at 819-20 (even though the stockbroker's actual sale of securities was lawful, section 10(b) extends to the stockbroker's scheme to defraud his clients).  *See also Bankers Life & Cas. Co.*, 404 U.S. at 12-13 (the "in connection with" requirement is met when the deceptive act of misrepresenting who would receive the proceeds from the sale of bonds "touches" the purchase or sale of a security).  *See also Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596 (2001) (although a formal transaction in the securities market did not take place, section 10(b) applied to an oral contract for the sale of an option on a security, while the seller secretly intended to never allow the purchaser to exercise the option.).

[94] *SEC v. Hopper*, No. 04-1054, 2006 U.S. Dist LEXIS 17772 at *39 (S.D. Tex. Mar. 24, 2006) (*quoting In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 472, 505-06 (S.D.N.Y. 2005)).

[95] *Hopper* at *40-41.

section 10(b) "insider trading" cases where a "tipper" does not herself trade in securities but only the outsider "tippee" does so, are predicated on the notion that the section 10(b) violation need not be directly tied (either contractually or temporally) to the securities trading.[96]

39.     In its most recent pronouncement on the "in connection with" requirement, the Supreme Court again reaffirmed the breadth of the phrase.  "[W]hen this Court *has* sought to give meaning to the phrase ["in connection with"] in the context of section 10(b) and Rule 10b-5, it has espoused a broad interpretation."[97]  Importantly, the Court in *Shadi* also affirmed that this breadth is imported into other statutes where, as with NGA section 4A, Congress replicates section 10(b) language in those other statutes.[98] "Congress can hardly have been unaware of the broad construction adopted by both [the Supreme Court] and the SEC when it imported the key phrase - - 'in connection with the purchase or sale' into" other statutes.[99]

40.     Congress' intention to cover a wide range of conduct is further evidenced in the broad remedial purpose and legislative history of section 10(b), wherein the Congressional committee reporting on what became section 10(b) noted that deceptive practices "constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers" in the regulatory agency "have been found practically essential."[100]  Similarly, as noted above, the 109th Congress favored the broad prohibitory language we have in the statute today.

41.     Amaranth states that in the vast majority of securities cases, the conduct may directly involve the purchaser of a security.[101]  But this, even if true, is because the SEC

---

[96] *E.g. SEC v. Rocklage*, 470 F.3d 1, 8-10 (1st Cir. 2006) (spouse of insider who passed on inside information to a third person, but did not herself trade securities, satisfied the "in connection with" requirement and was found to violate securities trading laws within the meaning of *Zandford* because she knew that the likely result of her tip would be to affect securities trading).

[97] *Merrill, Lynch, Pierce, Fenner & Smith Inc. v. Shadi*, 547 U.S. 71, 85 (2006).

[98] *Id.* at 85-86.

[99] *Id.* at 85 (the court broadly construed the "in connection with" requirement contained in the Securities Litigation Uniform Standards Act of 1998).

[100] *Bankers Life & Cas. Co.*, 404 U.S. at 12 (*quoting* H.R. Rep. No. 1383, 73d Cong. 2d Sess. 7).

[101] Rehearing Request at 32.

would ordinarily seek to punish fraud that is perpetrated against a specific investor by an offeror or seller.  In such cases, the sale of a security will be present.  The frequency of this fact pattern, however, does not amount to a legal requirement.  Where, as here, the Commission is responsible for protecting wholesale markets and the customers that rely on those markets, we believe it is reasonable to interpret section 4A in a way that does not permit market manipulation abuses that, as here, have a direct link to jurisdictional prices of gas, to go unremedied by the Commission.

42.    There are multiple decisions holding that the "in connection with" requirement is met under fact patterns similar to those presented in the OSC.  The Supreme Court defined market manipulation under Rule 10b-5 as conduct "*controlling or artificially affecting* the price of securities"[102] or practices that "artificially affect market activity."[103]  Courts have sustained Rule 10b-5 claims when misrepresentations and omissions are made regarding Treasury bill futures contracts (even though futures contracts are not "securities") because the asset *underlying* the futures contract (a Treasury bill) is a security.[104]  Similarly, in this case, the Commission preliminarily concluded in the OSC that Amaranth's trading in NG Futures Contracts actually set the NG Futures settlement price, which is directly incorporated into the pricing of physical natural gas within the Commission's jurisdiction.  Given the connections between the trading behavior at issue and physical natural gas markets, a finding that the "in connection with" requirement is met is appropriate.

43.    The cases cited by Amaranth to support its narrow construction of the "in connection with" requirement are inapposite.[105]  First, *Ontario Pub. Serv. Employees v. Nortel Networks Corp.* is a *standing* case which concludes that one who is not actually injured by securities-related conduct cannot bring a private right of action.[106]  Because the court found "that the plaintiffs lack standing under section 10(b), [the court did] not

---

[102] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (emphasis added).

[103] *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

[104] *Paine Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 210 (N.D. Ala. 1981).  *See also Fisher v. Dean Witter Reynolds, Inc.* 526 F. Supp. 558, 560 (E.D. Pa. 1981) (fraud in the sale of treasury bills futures contracts violates SEC Rule 10b-5).

[105] *See* Rehearing Request at 33.

[106] *Ontario Pub. Serv. Employees v. Nortel Networks Corp.*, 369 F.3d 27, 33 (2d Cir. 2004) (*Ontario*).

24

reach the 'in connection with' requirement.".[107]  Second, *Rand v. Anaconda-Ericsson, Inc.*[108] (*Rand*) did not hold, as Amaranth contends, that the fraudulent conduct must be *in* a securities transaction.  Instead, the court held that a press release declaring a company in default under a security agreement does not violate Rule 10b-5's anti-fraud provision because the prohibited conduct did not have "incidental involvement of securities."[109] The *Rand* court also noted that "misrepresentations about the financial condition of a broker-dealer were 'in connection with' a securities transaction where the broker-dealer's financial strength was directly related to its ability to carry out obligations under agreements calling for the repurchase or resale of government securities.  The misrepresentations went to the consideration for a securities transaction."[110]  Thus, the *Rand* court clearly acknowledged that the purchase or sale of securities in the securities market is not a pre-requisite to SEC jurisdiction.

44.    Amaranth reads the securities cases, particularly *Zandford*, as permitting the "in connection with" test to be satisfied only where the manipulation "coincided with the sales themselves."[111]  We do not read the cited language of *Zandford* as the complete expression of the test, but were it so, the test would certainly be satisfied on the facts of this case.[112]  The OSC alleges that Amaranth traded between 2:00 and 2:30 PM on each of the three settlement days with the specific intent and actual effect of artificially setting the price of the NG Futures Contracts.  Further, the OSC alleges that within an instant of that trading, effectively at 2:31 PM, and as a direct result of that trading, the settlement price became the price for the above-identified physical sales at Henry Hub.  It is difficult

---

[107] *Id.*  This decision did not address whether a regulator could enforce a prohibition on the identified conduct.

[108] 794 F.2d 843, 847 (2d Cir. 1986).

[109] *Id.*

[110] *Id.* (*citing* in *SEC v. Drysdale Sec. Corp.*, 785 F.2d 38 (2d Cir. 1986)).

[111] Rehearing Request at 32 (*citing Zandford*, 535 U.S. at 820).

[112] Although the *Zandford* court certainly determined that the securities transactions "coincide"[d] with the wrongful conduct and "therefore were in connection with" securities sales within the meaning of  §10(b)," *Zandford* at 822, we do not read the opinion as holding that this "coincidence" is the only way to meet the "in connection with" requirement.  We read *Zandford* as supporting the view that "[t]he precise contours of the in connection with requirement are not self-evident.  It seems unavoidable 'that the standard be fleshed out by a cautious case-by-case approach.'" *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 942-43 (2d Cir. 1984).

to imagine how much more "coincidence" there could be between Amaranth's trading and Commission jurisdictional sales.

45.    Finally, post-enactment oversight inquiries from Congress support the Commission's determination regarding its anti-manipulation jurisdiction. Senator Bingaman, who was Ranking Member on the Senate Committee on Energy and Natural Resources when EPAct 2005 was enacted, noted in a letter to the Commission that "the evolution of complex and interrelated markets for financial and physical energy commodities has elevated the importance of the Federal Energy Regulatory Commission's . . . role."[113]   The Senator also inquired into "efforts [by the Commission] to monitor *trading of NYMEX gas futures contracts*, especially as it relates to end-of-month natural gas trading."[114]   Similarly, the Government Accountability Office (GAO) noted that EPAct 2005 gave the Commission authority to "examine whether financial market transactions, which are not generally under the Commission's jurisdiction, affect the physical natural gas markets over which FERC has authority" and enforce it against any entity, if the manipulative trading, whether intentionally or recklessly, affects physical natural gas markets.[115]   These views are consistent with the Commission's interpretation that section NGA section 4A properly applies to "producers, financial companies, local utilities, and natural gas traders, most of which were not previously regulated by FERC," that engage in manipulative conduct that affect the Commission's jurisdictional markets.[116]

## B.    The Commission's Anti-Manipulation Authority As Compared to the CFTC's Jurisdiction

46.    Amaranth's central contention is that manipulation of natural gas markets of the type alleged by the Commission in the OSC is within the CFTC's "exclusive" jurisdiction and, therefore, even if the alleged conduct is covered by the NGA, the Commission is pre-empted from taking action.[117]   Explicit in Amaranth's jurisdictional argument is the underlying notion that the financial and physical natural gas markets are "completely

---

[113] *See* Letter from Senator Bingaman, Chairman, Committee on Energy and Natural Resources, to Joseph Kelliher, Chairman, FERC (Feb. 6, 2007).

[114] *See Id. a*t 2 (emphasis added).

[115] U.S. GOV'T. ACCOUNTABILITY OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN OVERSEEING PRICES at 16.

[116] *Id.* at 15. *See also* Order No. 670 at PP 2, 18, and 22.

[117] Rehearing Request at 12-16.

26

separate" markets (*see, e.g.* Amaranth CFTC Brief at 15), and that the CFTC is the only agency to police the financial markets, while the Commission may police only the physical natural gas market.[118]  We address each argument below.

### 1.    CFTC's Exclusive and Non-Exclusive Jurisdiction

47.     Amaranth contends that section 2(a)(1)(A) of the CEA conclusively establishes that the CFTC has exclusive jurisdiction over Amaranth's conduct.[119]  The CEA provides that "[t]he Commission [CFTC] shall have exclusive jurisdiction . . . with respect to accounts, agreements  . . . and transactions involving contracts of sale of a commodity for future delivery."[120]  This Commission indisputably recognizes that the CFTC has exclusive jurisdiction over transactions involving contracts of sale of a commodity for future delivery, *i.e.*, futures transactions, just as this Commission has exclusive jurisdiction over rates, terms and conditions of jurisdictional sales of resale of natural gas in interstate commerce, *i.e.*, physical transactions.  The fact that the CFTC has exclusive jurisdiction over these activities does not mean that it has exclusive jurisdiction over fraudulent or deceptive practices associated with those transactions, or that other agencies such as this Commission are precluded from examining fraudulent or deceptive conduct in exercising their regulatory responsibilities, particularly where this Commission has been provided express authority with respect to such conduct if it has a nexus to jurisdictional physical sales.[121]  For the reasons discussed below, we do not believe it is reasonable to interpret section 2(a)(1)(A) of the CEA, when read in conjunction with other provisions of law, to give the CFTC exclusive jurisdiction over manipulative conduct involving futures transactions.

48.     A line of court decisions under the CEA, known as the "exempt commodities cases," support the position that the CFTC does not have exclusive jurisdiction as to manipulation.  The CEA provides that "agreements, contracts, and transactions" in "exempt" commodities, such as natural gas, are beyond the CFTC's jurisdiction.[122]

---

[118] *Id.* at 13-16.

[119] *Id.* at 22.

[120] 7 U.S.C. § 2(a)(1)(A) (2006).

[121] *See FTC v. Roberts*, 276 F.3d 583, 591 (D.C. Cir. 2001) ("it does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms.").

[122] *See* 7 U.S.C. §§ 2(a) (exclusive jurisdiction provision), 2(g) and 2(h) (exemptions from § 2(a)) (2000).

However, to assert jurisdiction over false reporting, manipulation, and other fraudulent and deceptive conduct in exempt commodities, the CFTC successfully argued that manipulation and deceptive conduct, by their very nature, do not involve a "mutual understanding" creating enforceable rights or obligations with counterparties and, therefore, such conduct is not a "contract, agreement or transaction," but merely conduct *related to* a "contract, agreement or transaction" in a commodity.[123]  In *CFTC v. Bradley,*[124] the CFTC argued it had jurisdiction under the CEA to punish the manipulative conduct of knowingly providing false and misleading information concerning natural gas transactions.  The CFTC argued that such manipulative conduct is not a "contract, agreement, or transaction," because those terms, "as commonly understood, denote[] a mutual understanding between the parties creating rights or obligations that are enforceable or recognized by law."[125]  The court sustained that argument.

49.    Accordingly, these cases stand for the general proposition that in interpreting the exclusive and non-exclusive jurisdiction under the CEA, manipulation does not involve a mutual understanding or meeting of the minds necessary to consummate an "account, agreement, or transaction," or a "contract, agreement, or transaction" as those terms are commonly understood and, therefore, manipulation is neither excluded from CFTC's jurisdiction over otherwise "exempt commodities" nor is it within the CFTC's *exclusive* jurisdiction.  Although most of these cases involved manipulation of markets caused by

---

[123] *Roberts*, 276 F.3d at 591.  *See also CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007); *U.S. v. Valencia*, No. 03-024, 2003 U.S. Dist. LEXIS 15264 (S.D. Tex. Aug. 25, 2003); and *CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006).  These cases involved interpretation of a parallel provision of the CEA that uses the terms "contract, agreement, or transaction."  Given the parallel language and same broad remedial purpose, the interpretation should be the same.

[124] 408 F. Supp. 2d 1214 (N.D. Okla. 2005).

[125] *Id*. at 1219 (*quoting* Black's Law Dictionary 318 (7th Ed. 1999)).  In *CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007), the CFTC successfully argued that "false reporting of market information concerning natural gas and attempted manipulation of natural gas price indices [] does not implicate an 'agreement, contract, or transaction.'" *Id.* at 1198 (*quoting U.S. v. Valencia*, No. 03-024, 2003 U.S. Dist. LEXIS 15264 at * 36 (S.D. Tex. Aug. 25, 2003)).  *See also CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006) (false price reporting is not an account, agreement or transaction).  Most recently, the court in *CFTC v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005) held that false reporting of natural gas transactions is not an "account, agreement, or transaction" and, therefore, the CFTC had jurisdiction over attempted manipulation of natural gas prices.

false reporting of information (a fact not present here), the CFTC recently filed a case against Energy Transfer Partners (ETP), alleging attempted manipulation that did not involve false reporting.[126]  In *ETP*, the CFTC maintains that it has jurisdiction over manipulative trading in physical natural gas markets, which are otherwise exempt from the CFTC's jurisdiction, because manipulative conduct is not a "contract, agreement, and transaction."  By extension, manipulation is also not within the CFTC's exclusive jurisdiction.

50.     The case of *FTC v. Roberts* (*Roberts*) is the most recent and comprehensive review of this subject and makes the distinction between the CFTC's exclusive jurisdiction over "accounts, agreements, and transactions" and its non-exclusive jurisdiction over fraudulent and deceptive practices.  *Roberts* explained that "while the CFTC has clear statutory authority to regulate a [trader's] deceitful 'practices'  . . . . there is no reason to think the authority is exclusive.  A 'practice' or 'course of business' is quite plainly not a 'transaction' – either in life or in this statutory provision.  (Nor for that matter is it an 'account' or 'agreement.')."[127]  The D.C. Circuit held in *Roberts* that the notion that whatever the CFTC regulates it does so exclusively is a "specious contention." [128]  Thus, the case law supports the interpretation that the exclusive jurisdiction provision cited by Amaranth does not apply to Amaranth's alleged manipulative conduct[129] and, the CEA language notwithstanding, "other agencies . . . retain their jurisdiction beyond the confines of 'accounts, agreements, and transaction'"

---

[126] As with this matter, the Commission's staff coordinated its lengthy investigation with a parallel investigation by the CFTC staff into alleged market manipulation of physical natural gas by ETP.  Those investigations, as here, resulted in simultaneous enforcement actions by the two agencies, including the CFTC asserting its jurisdiction in a complaint filed in the United States District Court for the Northern District of Texas. *CFTC v. Energy Transfer Partners, L.P.*, Civil Action No.  3-07-Cv. 1301 (N.D. Texas).  The Commission's Order to Show Cause issued to *ETP* in IN06-3-002.

[127] 276 F.3d at 591.

[128] *Id.*

[129] *See also SEC v. Hopper*, No, 04-1054, 2006 U.S. Dist. LEXIS 17772 at *37-42 (S.D. Tex. Mar. 24, 2006) (because energy trading transactions were fraudulent and deceptive within the meaning of Rule 10b-5, the SEC could proceed at the same time as the Commission and the CFTC); *U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043, 1045 (N.D. Cal. 2006) (the Commission's exclusive jurisdiction under the FPA to regulate the transmission and sale at wholesale of electricity in interstate commerce did not preempt the anti-manipulation jurisdiction under the CEA pertaining to electricity prices during the Western energy crisis).

for futures contracts.[130]

51.    The majority of cases cited by Amaranth in support of the claim that the CFTC has exclusive jurisdiction in this case address the narrow question of whether CFTC or the SEC has enforcement jurisdiction *in the first instance* over certain market segments and products. [131]   None of these cases address whether the particular manipulative activity was subject to the jurisdiction of both agencies or whether the manipulation was "in connection with" the SEC's jurisdictional markets, *i.e.*, whether the conduct might fall within both agencies' non-exclusive jurisdiction.  Indeed, in *Chicago Merc. Exch. v. SEC,* the court expressly stated it was not deciding the related question of whether the SEC has authority to apply its anti-fraud rules to commodity options transactions.[132]   The other cases cited by Amaranth generally resolve broad questions of whether the SEC could set terms or perform other "prospective" oversight or regulation over designated contract markets, a question not present here.[133]   In any event, these cases pre-date the 2000 amendments to the CEA, which affirmed the SEC's jurisdiction over fraud claims involving futures.[134]

---

[130] *Roberts*, 276 F.3d at 591.

[131] Rehearing Request at 35-36 (*citing Chicago Merc. Exch. v. SEC,* 883 F.2d 537 (7th Cir. 1989), *Chicago Bd. Of Trade v. SEC,* 677 F.2d 1137 (7th Cir. 1982), *SEC v. Am. Commodity Exch.* 546 F.2d 1361 (10th Cir. 1976), and *SEC v. Univest, Inc*., 405 F. Supp. 1057, 1058 (N.D. Ill. 1975)).  Each case resolved a dispute over whether a certain financial product was a futures contract or an option on a futures contract subject to the exclusive jurisdiction of the CFTC, or a security or an option on a security subject to SEC regulation.

[132] 883 F.2d 537 (7th Cir. 1989).

[133] *Chicago Bd. of Trade v. SEC,* 677 F.2d 1137 (7th Cir. 1982); *Chicago Merc. Exch. v. SEC,* 883 F.2d 537 (7th Cir. 1989).

[134] In 2000, Congress passed the Commodities Futures Modernization Act (CFMA), which amended and re-authorized portions of the CEA.  One purpose of the CFMA, *inter alia*, was to clarify that the CFTC and the SEC would *share* jurisdiction over products that had characteristics of both securities and futures.  Because section 10(b) and Rule 10b-5 serve as the model for section 4A and Order No. 670, the legal precedent upholding the SEC's jurisdiction over fraud and manipulation in these "non-securities" transactions that involve a security as the underlying commodity strongly supports the Commission determination that the CEA does not eclipse section 4A.

## 2.    The CEA "Other Regulatory Authorities" Savings Clause and the Commission's Jurisdiction

52.    Even if the conduct alleged by the Commission in the OSC could be read to fall within the text of the exclusive jurisdiction provision of the CEA, "it does not follow. . . . that Congress intended to preempt the activities of all other federal agencies in their regulatory realms. . . . Preemption of the regulation of the market does not also mean preemption of all law that might involve participants in the market."[135]  This is clarified in the "savings clause" contained in the CEA.

53.    The CEA savings clause, which immediately follows the exclusive jurisdiction provision, states:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any state, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.[136]

54.    The purpose of any savings clause is to "preserve something from immediate interference."[137]  Contrary to Amaranth's claim, there is no evidence that Congress intended the savings clause to prevent a "regulatory overlap" between the CFTC and the Commission over manipulation of natural gas markets.  Instead, "[i]nclusion of the so-called 'regulatory savings clauses,' § 2(a)(1)(A)(I)-(II), makes clear that other agencies . . . retain their jurisdiction beyond the confines of 'accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery."[138]  The expansive anti-manipulation authority given to the Commission in NGA section 4A and FPA section 222 was enacted by Congress five years subsequent to the most recent amendments to the CEA, and several years after the Commission uncovered the manipulative practices occurring in both natural gas and electric markets in connection with its investigation of the Western energy crisis of 2000-2001.  More to the point, neither section 4A nor section 222 contain a savings clause, suggesting that Congress did

---

[135] *Roberts*, 276 F.3d at 591 (*quoting Poplar Grove Planting and Ref. Co. v. Bache Halsey Stuart Inc.*, 465 F. Supp. 585, 592 (D. La. 1979)).

[136] 7 U.S.C. § 2(a)(1)(A) (2006).

[137] *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 162 (1920).

[138] *Roberts*, 276 F.3d at 591(*quoting Chicago Merc. Exch. v. SEC,* 883 F.2d 537, 550 (7th Cir. 1989) (section 2 "carries no implicit pre-emptive force")).

31

not intend the CEA to trump the broad authority conferred on the Commission to take action against any entity that directly or indirectly employs, in connection with a purchase or sale subject to the jurisdiction of the Commission, a manipulative device. We interpret the CEA's section 2(a) savings clause to simply preserve any and all authority conferred to the Commission by Congress.[139]

55.    Amaranth's argument that the CEA permits the Commission to retain jurisdiction only for matters "beyond the confines of accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery"[140] is not in conflict with our own view.  The manipulation in this case (as in the CFTC's cases pertaining to manipulation of physical natural gas) is conduct that goes "beyond" the "confines" of "accounts, agreements, and transactions."[141]    However, if there is any doubt on this score, we interpret the savings clause, in conjunction with the broad wording of section 4A itself and Congress' reasons for adding the anti-manipulation provisions to the NGA and FPA, to resolve the issue in favor of our jurisdiction.

56.    We do not interpret the phrase "except as hereinabove" in the CEA savings clause to transfer any jurisdiction over "accounts, agreements, and transactions" from other agencies to the CFTC.  This would render the savings clause superfluous and would exclude other agencies (both federal and state) from taking any action with respect to those activities and there would be no need for a savings clause.  The better view, which is consistent with basic rules of statutory construction and legal precedent discussing the purpose of savings clauses, is that the phrase "except as hereinabove provided" means that, unless Congress expressly modified "hereinabove" the jurisdiction of the SEC or other federal agencies, the jurisdiction of the SEC and other federal agencies remains undisturbed.[142]

---

[139] Similarly, the savings clause in NGA section 23(c)(2) likewise preserves the jurisdiction conferred by the CEA to the CFTC.  That provision does not, as Amaranth contends at page 19 of its Rehearing Request, establish that Congress intended to withhold regulatory power from the Commission.

[140] Rehearing Request at 15.

[141] *Id.* at 15-16.

[142] In fact, Congress did just that in preceding sections where it divided certain areas of responsibility between the CFTC and SEC.  *See, e.g.,* 7 U.S.C § 2(a)(1)(D).  We recognize that a 1975 decision of a United States District Court, subsequently remanded without opinion, reached a contrary construction of the savings clause.  *SEC v. Univest, Inc.*, 405 F. Supp. 1057, 1058 (N.D. Ill 1975).  Our review of that opinion discloses virtually no analysis of the issues and we choose instead to follow an analysis which is

### 3.    The Commission's Overall Construction of the Statutes

57.    The Commission's jurisdictional determination is in harmony with Congress' more recent expression on these related issues, EPAct 2005, as well as judicial precedent permitting multiple agencies to protect their respective constituents.[143]   Indeed, the foregoing analyses are the most reasonable way to harmonize the various provisions and precedents relating to our jurisdiction, the jurisdiction of the CFTC, and cases construing section 10(b) of the Securities Exchange Act, which served as the model for new NGA section 4A and the parallel FPA section 222.[144]   It is a basic tenet of statutory construction that when courts are construing different statutes on the same subject matter, they do so in a way that gives effect to each.[145]   Amaranth's interpretation undermines the very intent of section 4A to give the Commission ability to sanction manipulation that has a clear nexus to and significant effect on jurisdictional prices.

58.    The Commission's determination does not interfere with the CEA's mandate that the CFTC regulate exclusively the day-to-day aspects of futures trading (albeit not manipulation), such as the terms or conditions of sale of NG Futures contracts, the operating rules of the NYMEX exchange, or traders' commodity accounts.  The CFTC focuses its efforts on regulating instruments related to sixty-seven products and making

---

more consistent with overall statutory scheme before us and the much more recent and thorough analysis of the D.C. Circuit in *Roberts* as noted above.

[143] *See FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) (two or more agencies may proceed simultaneously against the same parties and the same conduct); *Bristol-Meyers Co. v. FTC*, 738 F.2d 554, 559-60 (2d Cir. 1984) (concurrent Federal Trade Commission/Food and Drug Administration jurisdiction approved); *Warner-Lambert Co. v. FTC,* 361 F. Supp. 948, 952-53  (D.D.C. 1973) (court upheld concurrent enforcement action by the FDA and FTC, even though they involved the same parties or issues, because the statutory remedies of the two agencies are cumulative and not mutually exclusive).  *See also U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043, 1064 (N.D. Cal. 2006) (where two federal laws cover the same conduct, both may be applied because "congressional intent behind one federal statute should not be thwarted by the application of another federal statute").

[144] It is a fundamental canon of statutory construction that statutes relating to the same subject matter should be construed harmoniously and, if not, the more recent or specific statute should prevail over the older and more general law.  *Tug Allie-B. v. U.S.*, 273 F.3d 936, 941 (11th Cir. 2001).

[145] *United States v. Borden Co.,* 308 U.S. 188, 191 (1939) (where two statutes address the same subject, the "rule is to give effect to both if possible").

sure that "designated contract markets," such as the NYMEX, operate properly. The CFTC is not focused on the underlying or downstream markets. The Commission respects these exclusive regulatory functions and the CFTC's expertise and exclusive regulatory authority with respect to operation of the futures markets for dozens of commodities. The Commission does not seek to police the NYMEX or other exchanges, nor does the Commission seek to prevent Amaranth from trading on futures markets. Instead, the Commission is exclusively concerned with protecting the integrity and competitiveness of energy markets. When manipulation of NG Futures Contracts spans both financial and energy markets, the Commission has authority to investigate and, if appropriate, punish that manipulation that affects its jurisdictional markets. Congress recognized through EPAct 2005 that both agencies have an enforcement role to protect their respective markets and interests. We pursued this role in the present case and the CFTC has taken similar action in its manipulation case against ETP. There, the CFTC alleged that ETP manipulated futures markets subject to its jurisdiction, even though the alleged misconduct occurred in physical natural gas markets that are subject to our exclusive jurisdiction, not that of the CFTC. There, as here, each agency has merely sought to police manipulation that substantially impairs the competitiveness of the markets it regulates.

59.    The legislative history of EPAct 2005 confirms that Congress expanded the Commission's jurisdiction, while the CFTC's day-to-day market oversight program was already well known.[146] In fact, a few Senators expressed concern that the Cantwell Amendment would lead to "unnecessary duplication" of effort by enforcement agencies such as the SEC and the CFTC.[147] Congress nevertheless "put in place the first ever broad prohibition on manipulation in electricity and natural gas markets."[148] Congress knew that it was placing an additional cop on the beat alongside the CFTC and the SEC

----

[146]  149 Cong. Rec. S 13997 at 9 (daily ed. Nov. 5, 2005) (statement of Sen. Bennett) (Both the CFTC and the SEC have broad authority to prohibit market manipulation); 151 Cong. Rec. S 7451 at 40 (daily ed. June 28, 2005) (statement of Sen. Cantwell) (the Cantwell Amendment, which was eventually incorporated into EPAct 2005, gave FERC the tools to prevent abuses in energy markets). *See also* 151 Cong. Rec. S 9335 at 16-17 (daily ed. June 29, 2005) (statement of Sen. Cantwell) ("This Energy bill puts in place the first ever broad prohibition on manipulation of electricity and natural gas markets" and is modeled on a measure authored by Senator Cantwell and passed twice in the Senate).

[147] *See* 149 Cong. Rec. S 13997 at 9 (daily ed. Nov. 5, 2005) (statement of Sen. Bennett).

[148] 151 Cong. Rec. S 9335 at 17 (daily ed. July 29, 2005) (statement of Sen. Cantwell).

by giving FERC additional tools to ensure that manipulative and deceptive practices do not occur in energy markets. Thus, Congress expected to hold "FERC [not just the CFTC] accountable if, in fact, manipulative or deceptive practices occur in the future."[149]

60.    The legislative history of EPAct 2005 also confirms that Congress expressly rejected a proposal to state that the CFTC's exclusive jurisdiction was not trumped by the NGA. The House Energy and Commerce Committee Report on HR 6 contained a completely new provision to be added to the NGA, known as "section 26," which provided that *nothing* in the NGA shall affect the "exclusive jurisdiction of the [CFTC] with respect to 'accounts, agreements, or transactions in commodities under the CEA.'"[150] However, that provision was rejected, as it does not appear in the final bill. Instead, Congress included only a narrower savings clause in section 23 (Natural Gas Market Transparency Rules), which provides that nothing in that section (pertaining to gathering information from market participants) can be construed to limit the CFTC's exclusive jurisdiction. Nowhere in the EPAct 2005 amendments, whether a savings clause or elsewhere, did Congress indicate any intent to give only the CFTC authority over manipulative practices. Having considered the matter, had Congress intended to confer upon the CFTC exclusive jurisdiction over manipulation occurring in natural gas futures markets, it could have done so explicitly in the NGA section 4A and FPA section 222 sections, incorporated "section 26" into the NGA as a whole, or, at a minimum, included the savings clause in the NGA's Anti-Manipulation provision, section 4A. Instead, section 4A makes no mention of the CFTC's jurisdiction nor does it contain a savings clause, which is included in the more narrowly focused section 23.[151] Congress made an explicit choice to refer to the CFTC's exclusive jurisdiction only in the regulatory arena of information gathering, not in the Anti-Manipulation jurisdictional section at issue here. Thus, with respect to day-to-day regulation, such as gathering data as discussed in NGA section 23, the CFTC's jurisdiction is exclusive and the agencies must work through each other. With respect to enforcement against manipulation as specified in section 4A, jurisdiction is not exclusive and Congress did not include a savings clause. Therefore, Amaranth's arguments about the meaning of this savings clause in section 23 are unpersuasive and, in fact undercut Amaranth's position that Congress intended section 4A to confer only limited jurisdiction to the Commission.

---

[149] 149 Cong. Rec. S 10173 at 21 (daily ed. July 30, 2003) (statement of Sen. Bingaman). In our view, Congress' delegation to FERC in new section 4A indicates Congress' recognition that the Commission has expertise to bring to bear on matters of

energy market manipulation. As we noted in the OSC, Commission staff includes experts in both the physical and financial natural gas markets. OSC at P 52.

[150] H. R. Rep. No. 109-49, at 7 (2005).

[151] *See* EPAct 2005 § 316(c)(1).

61.     Amaranth also misconstrues the Commission's discussion in the OSC regarding NGA section 23 and its language pertaining to the MOU with the CFTC.[152]  The Commission does not contend that section 23 confers jurisdiction over manipulation claims.[153]  The statutory authority to issue the OSC comes from section 4A, not section 23.  Instead, the Commission states that section 23 supports its construction of section 4A.

62.     The Commission largely agrees with Amaranth that section 23 authorizes the Commission to collect information from market participants about the availability and prices of natural gas.  Section 23 reflects Congress' recognition of the potential for the Commission and the CFTC to seek the same information, so it required the Commission and the CFTC to coordinate their data gathering activities.  However, there is nothing in section 23 that prohibits the Commission from using that information in any investigation of manipulation, nor is there any language in section 23 suggesting that inter-agency coordination under the MOU would not include investigations.  It is an odd notion indeed that Congress intended the Commission to gather information pertaining to exchanges under the CFTC's jurisdiction, but if we thereby detected manipulation affecting our jurisdictional markets to have no enforcement role to punish and deter such manipulation.  Unremarkably, the MOU itself and the year-long joint Commission-CFTC investigation of Amaranth's conduct illustrate that both agencies (at least until recently) read the statute to contemplate joint investigation activities that go beyond the collection of information when they agreed that: "the CFTC and the FERC may from time to time engage in oversight *or investigations of activity affecting both CFTC-jurisdictional and FERC jurisdictional markets.*"  MOU at 3 (emphasis added).

## C.    The Commission's Assertion of Jurisdiction in the OSC As Compared to Order No. 670

63.     Amaranth's final assertion is that the Commission's determination that it has jurisdiction in this matter departs from Order No. 670.[154]  Amaranth contends that the statement in Order No. 670 that "this Final Rule does not, and is not intended to, expand the types of transactions subject to the Commission's jurisdiction," is a concession by the Commission that its anti-manipulation subject matter jurisdiction is limited to "wholesale transactions that remain within the ambit of the NGA, NGPA, and FPA."[155]  Amaranth's

---

[152] Rehearing Request at 16-17 (discussing OSC at P 48).

[153] OSC at PP 3, 44-45.

[154] Rehearing Request at 39-41.

[155] *Id.* at 40.

36

argument, which takes a few words in Order No. 670 out of context, is unavailing.[156]

64.     Order No. 670 clarified that EPAct 2005 broadened the Commission's overall jurisdiction to prohibit any entity, directly or indirectly, from using a manipulative or deceptive device in connection with the purchase or sale of natural gas subject to the jurisdiction of the Commission.  In Order No. 670 we delineated the elements essential to manipulation: "an entity: (1). . .engages in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite *scienter*; (3) in connection with the purchase or sale of natural gas  . . . subject to the jurisdiction of the Commission."[157]  The language Amaranth points to deals only with the second part of the third element.  As stated in Order No. 670, and we reiterate here, EPAct 2005 did not affect the Commission's jurisdiction under NGA section 1(b) to regulate ratemaking of interstate commerce and wholesale transactions of natural gas, and non-affiliated entities.[158]  In fact, we agreed with commentators in the Anti-Manipulation Rule rulemaking, and re-affirm here, that the scope of "transactions" in that third element is the same as that covered by pre-existing NGA provisions and was not expanded by EPAct  2005.[159]  Consequently, in neither Order No. 670 nor the OSC did the Commission assert that EPAct 2005 expanded the types of jurisdictional transactions that would satisfy section 4A's requirement that the affected markets must be "subject to the Commission's jurisdiction."  For this reason, by way of example, we noted that a manipulation pertaining only to a "first sale" would not be covered.[160]

65.     However, the broad language of section 4A enlarged the conduct (as identified in the other elements) with respect to those transactions that we can regulate.[161]  Order No. 670 elsewhere clearly provides that manipulative or deceptive conduct that affects the very same jurisdictional markets identified in section 1(b) would be subject to the

---

[156] NARUC characterized Amaranth's argument as "exceptionally convoluted." NARUC *Amicus* Brief at 11.

[157] Order No. 670 at P 49.

[158] 15 U.S.C. § 717b (2005).

[159] Order No. 670 at P 20.

[160] *Id.*

[161] *Id.* at P 21 (specifically rejecting comment urging that section 4A did not increase the Commission's reach beyond the rules already promulgated).

Commission's broader Anti-Manipulation Rule.[162]  Moreover, the statement in Order No. 670 that the new regulations apply where there is a *nexus* between fraud and a jurisdictional transaction (as opposed to conduct that *is* a jurisdictional transaction) is consistent with section 4A's "in connection with" requirement.[163]  In this case, the Commission preliminarily finds that the requisite nexus is established because Amaranth's manipulation directly and substantially affected *jurisdictional* transactions. Therefore, the Commission's preliminary findings in the OSC are entirely consistent with EPAct 2005, the Anti-Market Manipulation Rule, and Order No. 670.

## III.  Conclusion

66.    The Commission denies Amaranth's request for expedited rehearing on the issue of the Commission's jurisdiction to punish manipulative trading of NG Futures Contracts that had a direct effect on the price of physical natural gas within the Commission's jurisdiction.  The Commission's determination is supported by the language of the NGA; it is consistent with, and does not infringe upon, the jurisdiction of the CFTC; and it furthers the objective of the NGA to ensure that energy markets remain fair and competitive.  Our tolling order in this docket, dated September 26, 2007, remains in effect as to all other timely filed rehearing requests.  In addition, pursuant to the Notice issued October 12, 2007, Respondents shall now answer the OSC, as specified in P 140(a) and (b) of the OSC, not later than 14 days from the issuance of this Order.

The Commission orders:

        Amaranth's request for rehearing is hereby denied.

By the Commission.

( S E A L )


                        Kimberly D. Bose,
                          Secretary.

---

    [162] *Id.* at P 22 ("the Commission views the 'in connection with' element in the energy context as encompassing situations in which there is a nexus between the fraudulent conduct of an entity and a jurisdictional transaction.").

    [163] *Id.* at P 16 ("[a]bsent such *nexus to a jurisdictional transaction* . . .  fraud and manipulation in a non-jurisdictional transaction (such as a first or retail deal) is not subject to the new regulations.") (emphasis added).

39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------
                                    :

U.S. COMMODITY FUTURES TRADING   :
COMMISSION,
                                      :

                Plaintiff,   :      07 Civ. 6682 (DC)

                                      :

               v.           :

                                      :

AMARANTH ADVISORS L.L.C., et al.,    :

                                      :

              Defendants.   :

                                      :
-------------------------------------------------------------

## MEMORANDUM OF LAW OF THE AMICI CURIAE
## FUTURES GROUP IN SUPPORT OF PLAINTIFF COMMODITY
## FUTURES TRADING COMMISSION'S EXCLUSIVE JURISDICTION
## AND DEFENDANT AMARANTH ADVISORS' STAY MOTION

Mark D. Young
**KIRKLAND & ELLIS LLP**
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
(202) 879-5084

Eric F. Leon
**KIRKLAND & ELLIS LLP**
153 East 53rd Street
New York, New York 10022
(212) 446-4731

*Attorneys for Amici Curiae Futures Group*
*Futures Industry Association, Inc.*
*Managed Funds Association, Inc.*
*New York Mercantile Exchange, Inc.*
*Chicago Mercantile Exchange Group, Inc.*
*International Swaps and Derivatives*
   *Association, Inc.*

## LIST OF AMICI CURIAE FUTURES GROUP

Barbara Wierzynski, Esq.
**FUTURES INDUSTRY ASSOCIATION, INC.**
2001 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20006
(202) 466-5460

John G. Gaine, Esq.
**MANAGED FUNDS ASSOCIATION, INC.**
2025 M Street, N.W., Suite 800
Washington, D.C. 20006
(202) 367-1140

Christopher K. Bowen, Esq.
**NEW YORK MERCANTILE EXCHANGE, INC**.
One North End Avenue
World Financial Center
New York, New York 10282
(212) 299-2200

Jerrold E. Salzman, Esq.
**CHICAGO MERCANTILE EXCHANGE GROUP, INC.**
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0718

Gregory P.J. Zerzan, Esq.
**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.**
1101 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20004
(202) 756-5008

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.  Because the CEA's Exclusive Jurisdiction Provision Ousts FERC of Futures
    Market Price Manipulation Jurisdiction, Defendants Have a Strong Likelihood of
    Success. ......................................................................................................... 3

    A.  The Statutory Text of the CEA's Grant of Exclusive Jurisdiction. ......................... 4

    B.  The 1974 Legislative History Affirms the Scope of Exclusive Jurisdiction. .......... 7

    C.  Courts Uniformly Hold CEA Exclusive Jurisdiction Bars Other Agencies
        From Futures Regulation. ....................................................................... 9

    D.  The 2005 Energy Act Did Not Repeal CEA Exclusive Jurisdiction. .................... 11

II. A Stay Would Serve The Public Interests Underlying CFTC Exclusive
    Jurisdiction. .................................................................................................. 12

CONCLUSION ....................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AAM v. CBOT*,
977 F.2d 1147 (7th Cir. 1992) ............................................................. 3

*Bartels v. International Commodities Corporation*,
435 F. Supp. 865 (1977) ...................................................................... 10

*Board of Trade of the City of Chicago v. SEC*,
677 F.2d 1137 (7th Cir. 1982),
*vacated as moot*, 459 U.S. 1026, 103 S.Ct. 434 (1982)............................. 7, 10

*California v. Arizona*,
440 U.S. 59 (1979)............................................................................. 6

*Chicago Mercantile Exchange v. Securities and Exchange Commission*,
883 F.2d 537 (7th Cir. 1989) .............................................................. 6, 10

*FTC v. Roberts*,
276 F.3d 583 (D.C. Cir. 2001) .......................................................... 5, 8, 10

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432, 119 S. Ct. 755 (1999)...................................................... 3

*International Trading v. Bell*,
556 S.W. 2d 420 (Ark S.C. 1977)........................................................ 9

**Statutes**

7 U.S.C. § 1(a)(4)............................................................................ 5, 7

7 U.S.C. § 2(a)(1)(A) ...................................................................... passim

7 U.S.C. § 2(a)(1)(C) ......................................................................... 6

7 U.S.C. § 2(a)(1)(D) ......................................................................... 6

7 U.S.C. § 2(c)-(i) ............................................................................ 6

7 U.S.C. § 5(a) ............................................................................. 12, 14

7 U.S.C. § 5(b) ................................................................................ 14

7 U.S.C. § 7..................................................................................... 5

7 U.S.C. § 7(d)(3) ................................................................................................ 1

7 U.S.C. § 7(d)(4) ........................................................................................... 1, 14

7 U.S.C. § 9 .......................................................................................................... 5

7 U.S.C. § 13b ...................................................................................................... 5

Commodity Futures Modernization Act, Public Law 106-544 ............................ 6

**Other Authorities**

120 Cong. Rec. 30459 (1974) ............................................................................. 12

120 Cong. Rec. 34736 (1974) ............................................................................. 12

120 Cong. Rec. 34737 (1974) ............................................................................... 9

120 Cong. Rec. 34997 (1974) ............................................................................... 9

Energy Policy Act of 2005,
    Pub. L. No. 109-58 (2005) ......................................................................... 11

H.R. Rep. No. 93-1383 (1974) .............................................................................. 8

H.R. Rep. No. 93-975 (1974) ................................................................... 3, 8, 9, 13

H.R. Rep. No. 95-1181 (1978) ............................................................................... 3

Memorandum of Understanding (MOU) ............................................................. 11

New York Mercantile Exchange,
    No. EL 95-81-000, 74 FERC (1996) ........................................................ 12

Peterson, Goodlatte, Etheridge, Moran
    Letter to CFTC Acting Chairman Walt Lukken, Sept. 27, 200[7] .................. 12

Public Law 97-303 Sec 1 (1982) ........................................................................... 6

Public Law 97-303 Sec 2 (1982) ........................................................................... 6

Public Law 97-444 Sec 101 (1983) ....................................................................... 6

S. Rep. No. 93-1131 ........................................................................................... 8, 9

S. Rep. No. 95-850 (1978) .................................................................................. 12

Talley, I.,
  *UPDATE: Court May Settle CFTC, FERC Oversight Turf Battle,* Factiva[®],
  Dow Jones International News,
  Sept. 26, 2007 ..................................................................................................................... 2

**INTRODUCTION**

On August 16, 2007, the Court summed up this case's posture succinctly: "two federal agencies [are] going after the same parties based on the same conduct seeking essentially the same relief." (Ct. Conf. Tr. 4, Aug. 16, 2007). In this action, the Commodity Futures Trading Commission alleges under its statute -- the Commodity Exchange Act -- an attempt to manipulate the natural gas futures market price. In an administrative proceeding, the Federal Energy Regulatory Commission alleges under its statute -- the Natural Gas Act -- an actual manipulation of the natural gas futures market price. To reduce the possibility of conflicting adjudications, defendant Amaranth Advisors has moved to stay the FERC proceeding. Granting this motion would not dismiss FERC's proceeding or affect any Court of Appeals jurisdiction. It would simply allow the CFTC action in this court to be decided first.

The *amici curiae* Futures Group is comprised of the Managed Funds Association, Inc. and International Swaps and Derivatives Association, Inc. (major futures market participants); the Futures Industry Association, Inc. (major futures market intermediaries); and the New York Mercantile Exchange, Inc. and Chicago Mercantile Exchange Group, Inc. (major futures exchanges). The bulk of all U.S. futures trading occurs on NYMEX and CME in a wide-range of commodities, including natural gas, crude oil, metals, currencies, corn, soybeans, U.S. Treasury Securities and stock indexes. The Futures Group expresses no view on Amaranth's guilt or innocence. We know well the dangers of futures price manipulation; no legitimate market participant, brokerage firm or exchange would tolerate misconduct designed to create an artificial price. The CEA imposes on CFTC-approved exchanges, like NYMEX and CME, a clear affirmative duty to deter or detect manipulation of futures prices on their markets. 7 U.S.C. § 7(d)(3) and (4). Their efforts combine with the CFTC's constant policing to make preventing and punishing price manipulation the core of the CEA and CFTC regulation.

1

The Futures Group has a substantial interest in addressing two of the factors the Court will consider in deciding the stay motion: likelihood of success on the merits and the public interest. On the former, the issue the Court posed on August 16 was: "whether FERC is precluded from pursuing this matter administratively because the CFTC has exclusive jurisdiction." (Ct. Conf. Tr. 11) The answer is "yes," based on the text of the CEA's exclusive jurisdiction provision, 7 U.S.C. § 2(a)(1)(A), as well as its history and an unbroken chain of judicial precedent. (See Section I.)

Exclusive jurisdiction is not a matter of agency turf: it was intended instead to make the CEA and CFTC regulations supreme as the body of law for futures markets and trading thereon. CEA exclusive jurisdiction is therefore central to the public interests served by, as well as the operation and competitiveness of, the U.S. futures markets. Allowing FERC to proceed now would undermine these public interests. For 32 years, the CEA and CFTC regulations have provided the single legal standard -- the intentional creation of an artificial price -- for deciding whether a futures market price was manipulated. Every day, the NYMEX, CME and other self-regulating futures exchanges apply that standard to discharge their statutory duties. Now FERC claims a different legal standard for manipulation should be applied to futures markets, and possibly not just natural gas futures markets.[1] Its claim has generated considerable uncertainty among self-regulatory bodies, like NYMEX and CME, as well as futures market participants.

Congress enacted CEA exclusive jurisdiction to avoid this type of legal uncertainty, by preventing both duplicative and conflicting regulation of futures trading. Congress knew "the futures markets play a significant role in the economic well being of our country," (H.R. Rep.

---

[1] On September 26, 2007, Dow Jones cited the view of a FERC Commissioner that FERC's jurisdiction could extend to currency and metals futures markets as well. I. Talley, *UPDATE: Court May Settle CFTC, FERC Oversight Turf Battle,* Factiva® , Dow Jones International News, Sept. 26, 2007.

No. 93-975, at 60 (1974)), and designed the CEA's exclusive jurisdiction provision "to bring the markets under a uniform set of regulations" found in the CEA, and subject to the CFTC's expert administration. *AAM v. CBOT*, 977 F.2d 1147 at 1156 (7th Cir. 1992). After 32 years under CEA exclusive jurisdiction, the U.S. futures markets have grown to $5 trillion in daily trading volume by escaping the uncertainty, confusion and cost of "varying and potentially conflicting legal standards" (*id.*), exactly as Congress intended.

In sum, Congress enacted CEA exclusive jurisdiction because it did "not believe the public interest would be served by duplicating in one or more additional agencies regulatory authority over futures markets that presently exists in the Commodity Futures Trading Commission." H.R. Rep. No. 95-1181, at 13 (1978). Neither does the Futures Group. Neither should this Court. (See Section II.)

## ARGUMENT

**I.    Because the CEA's Exclusive Jurisdiction Provision Ousts FERC of Futures Market Price Manipulation Jurisdiction, Defendants Have a Strong Likelihood of Success.**

The Commodity Exchange Act's exclusive jurisdiction provision means what it says: the CFTC "shall have exclusive jurisdiction . . . with respect to . . . transactions involving" natural gas futures contracts trading on a CFTC-designated contract market, like NYMEX. 7 U.S.C. § 2(a)(1)(A). Where, as here, a statute's terms are patently clear, that is the end of the inquiry. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 at 438, 119 S. Ct. 755 (1999). "This Court's review . . . begins with the statute's language. Where that language provides a clear answer, it ends there as well." (internal citations omitted)

Ironically, FERC responds with a different "exclusive jurisdiction" claim -- that appellate courts have "exclusive jurisdiction" on appeal from FERC orders. FERC Br. at 1, 18-21. Embedded in this argument is a telling, perhaps conclusive, admission. FERC concedes that if

one party is granted by statute "exclusive jurisdiction," that statute must be read to preclude any other party from exercising its powers within the "exclusive" area. Otherwise the word "exclusive" is meaningless. FERC never explains, because it cannot explain, why the asserted appellate "exclusive jurisdiction" divests this Court of jurisdiction, but CFTC "exclusive jurisdiction" does not divest FERC of jurisdiction. As the CFTC's brief confirms, FERC should lose on the merits because Congress granted "exclusive jurisdiction" to the CFTC to preclude other agencies from acting as FERC has here.

A.    The Statutory Text of the CEA's Grant of Exclusive Jurisdiction.

The text of the Commodity Exchange Act reveals why FERC has no jurisdiction to pursue a case for futures price manipulation. It says:

> The [CFTC] **shall have exclusive jurisdiction**, *except to the extent otherwise provided* in subparagraphs (C) and (D) of this paragraph and subsections (c) through (i) of this section, **with respect to** accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and *transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated* or derivatives transaction execution facility registered pursuant to section 7 or 7a of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. *Except as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

7 U.S.C. § 2(a)(1)(A) (emphasis supplied). This provision establishes three things: 1) CFTC jurisdiction over futures trading on an exchange like NYMEX is "exclusive;" 2) any exceptions to exclusive jurisdiction are set out in the provision itself; and 3) "except" for those matters committed to CFTC exclusive jurisdiction, FERC and other agencies retain their full powers.

The FERC alleges that Amaranth's futures trading misconduct manipulated the natural gas futures price on NYMEX. Those allegations fit comfortably within the statutory description of the statute's mandate: the CFTC "shall have exclusive jurisdiction . . . with respect to . . . transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). Giving meaning to each statutory term in that provision, FERC has no valid jurisdictional claim.

Three parts of the exclusive jurisdiction grant have specific statutory definitions. Natural gas is a "commodity" under 7 U.S.C. § 1(a)(4) (any goods, articles, rights and interests in which futures are traded). NYMEX is a "designated contract market" under 7 U.S.C. § 7. Its futures contracts are what the statute calls "contracts of sale of a commodity for future delivery."

The issue here thus turns on whether the elastic phrase -- "jurisdiction . . . with respect to . . . transactions involving" NYMEX natural gas futures contracts -- encompasses a market participant's trading of such contracts. An order to buy or sell, as well as the buying and selling of a futures contract, are surely "transactions." See *FTC v. Roberts*, 276 F.3d 583, 590 (D.C. Cir. 2001) ("transactions" in the exclusive jurisdiction provision "seems most naturally read as encompassing . . . a set of arrangements directly related to the actual sale of commodities futures"). All trading conduct is easily covered by jurisdiction "with respect to" and "involving" orders to buy and sell futures contracts, including misconduct which constitutes futures price manipulation (7 U.S.C. § 9, 13b). FERC's claim that futures price manipulation is not captured by that phrase (FERC Br. 34-36) cannot be squared with the actual words Congress used: futures price manipulation is surely conduct "with respect to transactions involving futures contracts."

5

Now consider the statutory prelude, the "[CFTC] shall have exclusive jurisdiction." The Random House Dictionary (2d ed. 1967) defines "exclusive" to mean "shutting out all others from a part or share."[2] The plain meaning of 7 U.S.C. § 2(a)(1)(A) is that the CFTC's jurisdiction over Amaranth's trading in natural gas futures contracts shuts out FERC from sharing that jurisdiction. As the Seventh Circuit has ruled, the congressional grant of exclusive jurisdiction under the CEA could have "no other possible meaning." *Chicago Mercantile Exchange v. Securities and Exchange Commission*, 883 F.2d 537, 544 (7th Cir. 1989).

FERC argues Congress created an exception to CFTC exclusive jurisdiction in 2005. The text of 7 U.S.C. § 2(a)(1)(A) disproves that contention. When Congress wants to shave off part of exclusive jurisdiction, it enacts exemptions within 7 U.S.C. § 2(a)(1)(A) itself, as exemplified by the phrase "except to the extent otherwise provided in subparagraphs (C) and (D) of this paragraph and subsections (c) through (i) of this section." FERC is not relying on any of those exceptions for its jurisdictional claim. Nor could it. Those provisions cover amendments in 1982 and 2000 that were designed to a) reassign some CFTC jurisdiction to the Securities and Exchange Commission, b) identify new products over which CFTC and SEC share jurisdiction or c) describe areas where the CFTC had no jurisdiction, let alone exclusive jurisdiction.[3]

The second sentence in 7 U.S.C. § 2(a)(1)(A) also is of no help to FERC. It begins "except as hereinabove provided" and then recites that agencies other than the CFTC retain their

---

[2] The plain meaning of exclusive should be beyond dispute. The Supreme Court itself has construed its own "exclusive jurisdiction" to deny the jurisdiction of other federal courts to hear cases brought by one state against another. *California v. Arizona*, 440 U.S. 59 (1979).

[3] Subparagraph (C) originally was enacted as part of the 1982 Shad-Johnson Jurisdictional Accord. The 1982 Accord reassigned jurisdiction over some products to the SEC. Public Law 97-303 Sec 1, 2 (1982); Public Law 97-444 Sec 101 (1983). *See* 7 U.S.C. § 2(a)(1)(C). In 2000, the Commodity Futures Modernization Act, Public Law 106-544 (Appendix E) (2000), created security futures products to be jointly regulated by CFTC and SEC 7 U.S.C. § 2(a)(1)(D) and granted various statutory exclusions and exemptions under 7 U.S.C. § 2(c)-(i).

6

own statutory powers under the statutes they administer. Through this phrase, Congress has reaffirmed that CFTC exclusive jurisdiction is a trump card. If actions or conduct are subject to CFTC authority with respect to transactions involving futures contracts, the CFTC's authority is exclusive. If not, and only if not, then other agencies may exercise their applicable statutory powers. As the Seventh Circuit noted long ago, what is provided "hereinabove" in 7 U.S.C. § 2(a)(1)(A) is CFTC exclusive jurisdiction. *Board of Trade of the City of Chicago v. SEC*, 677 F.2d 1137 at 1145 (7th Cir. 1982), *vacated as moot*, 459 U.S. 1026, 103 S.Ct. 434 (1982). Thus, if Amaranth's trading activities fit within CFTC exclusive jurisdiction, the savings clause does not revive FERC's jurisdictional claim.

The statute's terms offer strong support for Defendant's likely success on the jurisdictional merits. Its history and relevant case law further strengthen that support.

B.      The 1974 Legislative History Affirms the Scope of Exclusive Jurisdiction.

Congress enacted exclusive jurisdiction in the Commodity Futures Trading Commission Act of 1974. Before 1974, the Commodity Exchange Act applied to futures trading in only the commodities listed in 7 U.S.C. § 1(a)(4) and was enforced by an agency within the U.S. Department of Agriculture. In the CFTC Act, Congress expanded the reach of the CEA so that it applied to futures trading in anything but onions (*see Board of Trade of the City of Chicago,* 677 F.2d at 1142, n. 9), and created the CFTC as an independent regulatory agency charged with administering the provisions of the CEA.

The key feature of the 1974 legislative history was the role of the Conference Committee in reconciling the differing House and Senate versions of the pending bills' exclusive jurisdiction provisions. The Conference Committee decided the House version was ambiguous, so the Committee adopted the Senate's provision to make sure "the Commission's jurisdiction over futures contract markets …is exclusive … and *the Commission's jurisdiction, where applicable,*

*supersedes* State as well as *Federal agencies*."[4]   The Conference Committee further explained: "Under the exclusive grant of jurisdiction to the Commission, the authority of the Commodity Exchange Act (and regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

The context in which Congress acted in 1974 adds further support to the expansive and crucial nature of exclusive jurisdiction.  A number of themes run throughout this history.

- Congress recognized "the futures markets play a significant role in the economic well being of our country."  H.R. Rep. No. 93-975, at 60 (1974).

- Congress wanted to strengthen futures regulation, create a comprehensive regulatory structure for the esoteric futures trading complex, and avoid regulatory gaps.  H.R. Rep. No. 93-975, at 1 (1974); S. Rep. No. 93-1131, at 19; 120 Cong. Rec. 34736 (1974) (statement of H. Comm. Chairman Poage) ("It was the intent of the [Conference] Committee to fill all regulatory gaps -- to regulate trading in futures and in options relating to commodities or commodity futures, because such trading is now poorly regulated, if it is regulated at all.").

- Congress wanted to create an independent agency for futures, modeled after the SEC, but recognized securities regulation principles would be a poor fit for futures.  S. Rep. No. 93-1131, at 19 (1974; H.R. Rep. No. 93-975, at 70-72 (1974).

- Congress wanted the new agency to be an expert in futures regulation which "requires highly specialized skills;"  H.R. Rep. No. 93-975, at 71 (1974), see also S. Rep. No. 1131, at 22 (1974 ("persons of demonstrated knowledge in futures trading").

- Congress wanted the CFTC to be a neutral arbiter of futures prices, without the conflict of interest (not inclined to seek higher or lower prices) other agencies, including USDA, would have, H.R. Rep. No. 93-975, at 60 (1974).  "The proper regulatory function of an agency which regulates futures trading is to assure the market is free of manipulation and other practices which prevent the market from being a true reflection of supply and demand." (S. Rep. No. 93-1131, at 21 (1974.)

---

[4]   H.R. Rep. 93-1383, at 35 (1974) (Conf. Rep.) (*emphasis supplied*); S. Rep. No. 93-1131, at 23 (1974) (same).  It is surprising in light of this clear statement twice from Committees of Congress -- CFTC regulatory authority over futures where applicable supersedes other federal agencies -- for the D.C. Circuit to have called it "specious" to contend that what the CFTC regulates it regulates exclusively.  *FTC v. Roberts*, 276 F.3d at 591.  Perhaps the difference is that the FTC investigation at issue in Roberts did not focus on regulation of futures trading.

- Congress appreciated that as futures trading and regulation expanded to new commodities other agencies could try to regulate or otherwise exercise jurisdiction over futures markets. (S. Rep. No. 93-1131, at 23 (1974).)

- Congress knew that futures and options trading had been subjected to the vagaries of state blue sky laws and SEC enforcement actions prior to 1974. (H R. Rep. No. 93-975, at 48, 120 Cong. Rec. 34737 (1974) (statement of H. Chairman Poage), 120 Cong. Rec. 34997 (1974) (Statement of Sen. Comm. Chairman Talmadge).

This last point is critical in the context of FERC's jurisdictional assertions. Congress enacted CFTC exclusive jurisdiction to close down efforts by the SEC and state regulators to enforce their laws against those engaged in futures and options activities. This broad reach of CFTC exclusive jurisdiction was so well understood in 1974 that Congress added Section 412 to the CFTC Act to make sure that other agencies knew they could continue to investigate pre-1974 cases under their existing regulatory statutes. However, no regulatory agencies would be able to investigate or prosecute cases relating to futures misconduct arising after CFTC exclusive jurisdiction took effect, as the case law the CFTC's brief cites makes clear.

C.   Courts Uniformly Hold CEA Exclusive Jurisdiction Bars Other Agencies From Futures Regulation.

The CFTC's brief describes well the history of judicial acceptance of CFTC exclusive jurisdiction largely in two contexts. The first group of decisions arose when state or federal regulators have sought to enforce their regulatory statutes against persons engaging in alleged misconduct with respect to transactions within the CFTC's exclusive jurisdiction. A universal theme running through these decisions is that, because Congress had established exclusive authority in the CFTC over activities in the futures markets, other regulatory agencies could not "exercise concomitant or supplemental regulatory authority over the identical activity." *International Trading v. Bell*, 556 S.W. 2d 420 at 425 (Ark S.C. 1977). One court, in discussing the SEC's attempt to patrol commodity options trading, was particularly blunt stating "whatever

9

authority the Securities and Exchange Commission previously exercised . . . [it] has been unequivocally ended by Congress." *Bartels v. International Commodities Corporation*, 435 F. Supp. 865 at 869 (1977). [5]

A second class of cases illustrates further the reach of CFTC exclusive jurisdiction. Even where the SEC approved and stood ready to regulate securities exchange trading of new products that were, as a matter of economic substance, a commodity option or a stock index futures contract, the U.S. Court of Appeals for the Seventh Circuit nullified the SEC's approval, holding the CFTC's authority over the trading of such products to be exclusive. *Board of Trade of the City of Chicago*, 677 F.2d at 1138; *Chicago Mercantile Exchange*, 883 F.2d at 549-550.

The one case FERC relies upon where an exclusive jurisdiction claim was not upheld actually read 7 U.S.C. § 2(a)(1)(A) to include "business deals that involve the buying and selling of futures, which comports with Congress' goal of conferring the CFTC with sole regulatory authority over 'futures contract markets . . .'" *FTC v. Roberts*, 276 F.3d at 590. If the *Roberts* reading of CFTC exclusive jurisdiction is applied here, FERC plainly has no jurisdiction. In *Roberts* the Court concluded that CFTC exclusive jurisdiction did not preclude the Federal Trade Commission from investigating (rather than prosecuting) a firm that instructed people in how to trade futures, activity the D.C. Circuit was not at all sure was subject to any CFTC regulatory jurisdiction, let alone exclusive jurisdiction. 276 F.3d at 589. In contrast, as the CFTC's brief shows, it is patently clear that the Defendants' futures trading here falls well within the CEA's exclusive jurisdiction provision.

---

[5]    The FERC's brief asserts that its new manipulation powers, modeled after SEC Rule 10b-5, overcome the word "exclusive" in the CEA's exclusive jurisdiction provision. FERC Br. at 10, 30-36. In 32 years, no court has ever held that the SEC itself could bring an enforcement action under Rule 10b-5 against futures traders solely for futures market manipulation. The SEC has never filed such a case.

D.     The 2005 Energy Act Did Not Repeal CEA Exclusive Jurisdiction.

The CFTC's brief also correctly analyzes the 2005 Energy Act.  As FERC's brief explains, its jurisdiction, like that of the CFTC, is transaction-based (FERC Br. at 4).  ("NGA grants FERC jurisdiction over 'the sale of natural gas for re-sale.'")  In 2005, Congress did not expand the scope of natural gas sales subject to FERC's jurisdiction in any way.  The best evidence again is found in the statute itself:  FERC's new manipulation authority is expressly limited to misconduct in connection with natural gas sales that already are "subject to the jurisdiction of the Commission."  Energy Policy Act of 2005, Pub. L. No. 109-58, § 315 (2005).  The absence of any stated change to FERC's transaction-based jurisdiction dispels any possible notion its new authority silently repealed CEA exclusive jurisdiction.

FERC itself is on record agreeing with that statement.  At Congress' direction in the 2005 Energy Act, the FERC and CFTC entered into a Memorandum of Understanding (MOU).  FERC explicitly recognized "the CFTC has exclusive jurisdiction with respect to . . . transactions involving" natural gas futures contracts, while CFTC recognized FERC's natural gas physical market jurisdiction was "exclusive."  FERC and CFTC MOU, Oct. 12, 2005.  This agreement shows that contemporaneous with the passage of its new anti-manipulation powers in 2005, FERC did not challenge the scope of CFTC exclusive jurisdiction in any way or suggest that it had been implicitly, partially repealed by Congress.

FERC claims the words "in connection with" in its new manipulation authority excuse it from the CEA's exclusive jurisdiction provision because natural gas physical sales may rely derivatively on futures prices and may result from that small percentage of futures contracts that are not offset, but held to delivery.  (FERC Br. at 7-9)  FERC cites, however, no evidence that Congress understood those words to override the CEA's provisions.  Moreover, if FERC's theory is accepted, it would end CFTC exclusive jurisdiction because other agencies, including

11

the SEC, Treasury Department and Agriculture Department, would have similar claims on futures market jurisdiction. Congress surely never intended that.

## II.    A Stay Would Serve The Public Interests Underlying CFTC Exclusive Jurisdiction.

If a stay is denied and FERC proceeds with its administrative action, it would imperil the public interests served by the CEA's exclusive jurisdiction provision. Congress designed exclusive jurisdiction to prevent uncertain and conflicting legal standards, as well as regulatory duplication, from interfering with the smooth functioning of U.S. futures markets in order to allow those markets to serve the public interests in hedging and price dissemination. 7 U.S.C. § 5(a). FERC's proceeding endangers that congressional objective.

In 1974, Senator Herman Talmadge emphasized: "In establishing this Commission, it is the Committee's intent to give it exclusive jurisdiction over those areas delineated in the act. This will ensure that the affected entities -- exchanges, traders, customers, et cetera -- will not be subject to conflicting agency rulings."[6] The FERC itself has read this same history and found that Congress intended the CEA's exclusive jurisdiction provision "to give a single expert agency the responsibility for developing a coherent regulatory program for the commodities industry and to prevent the costs and confusion associated with multiple regulators."[7] Yet

---

[6]    120 Cong. Rec. 30459 (1974) (Sen. Comm. Chairman Talmadge). *See also* 120 Cong. Rec. 34736 (1974) (House Committee Chairman Poage explained the Conference Committee adopted the Senate exclusive jurisdiction formulation "in an attempt to avoid unnecessary overlapping and duplicative regulation.") In 1978, the Senate Committee on Agriculture, Nutrition and Forestry again reported, "The vesting of jurisdiction to regulate commodity futures trading in more than one agency would only lead to costly duplication and possible conflict of regulation or over-regulation." S. Rep. No. 95-850 at 23 (1978).

[7]    New York Mercantile Exchange, No. EL 95-81-000, 74 FERC ¶ 61311 (1996). Just last week, the leadership of the House Committee on Agriculture echoed FERC's understanding of this history. *See* Sept. 27, 200[7] Letter to CFTC Acting Chairman Walt Lukken from U.S. Reps. Peterson, Goodlatte, Etheridge and Moran. ("Congress made this unusual grant of exclusive jurisdiction to end the confusion caused by two separate federal regulators. This wisdom continues to prove itself.")

FERC's proceeding will lead to just the sort of "costs and confusion" it acknowledged Congress sought to prevent.

The CEA has a well-known, time-tested legal standard for futures price manipulation -- intentional creation of an artificial price. In FERC's proceeding, it will apply a different standard for futures price manipulation, one modeled after SEC Rule 10b-5. Congress long ago realized, however, that securities law concepts should not be exported to futures regulation, concluding it was "erroneous" to view futures and securities regulation as "twins." H.R. Rep. No. 93-975, at 71 (1974). Thus, a futures manipulation standard grounded in securities regulation cannot be further from the result Congress envisioned in 1974.

FERC's manipulation standard would be problematic even if it was not securities law-based as it will result in legal uncertainty or conflict, the worst of the ills for which exclusive jurisdiction was to be the antidote.[8] Neither futures market participants nor self-regulating futures exchanges will know what price manipulation standard applies to their trading or market surveillance. Just that uncertainty alone may cause large and reputable market participants to find other markets or methods by which to manage natural gas price risks. But if FERC adopts, as its brief suggests, a definition of manipulation that would punish unintentional, yet reckless, conduct, the impact on futures trading could be potentially devastating.

In futures markets, even the most innocent futures trader or commonplace trading strategies may have a price impact, depending upon market liquidity and other circumstances. Logically, that would be more true when market participants take larger futures positions, as

---

[8]  Merely duplicative futures regulation will inevitably lead to increased costs for market participants, firms and exchanges. This would be enough to tilt the public interest scales in favor of a stay. Higher trading costs make it more costly to hedge or provide necessary market liquidity. They could also lead to a serious competitive disadvantage for U.S. futures markets.

many businesses do that use futures markets to hedge, for example, the risk of a future change in natural gas prices. If FERC applies an unintentional price manipulation standard to this futures trading (including its now undefined "reckless disregard" standard), legitimate traders engaging in common trading practices may eschew U.S. futures markets for fear of becoming ensnared in an after-the-fact dragnet by FERC, which lacks the CFTC's experience and expertise in futures markets and trading. FERC might even miscite such a trader's positions and conduct as reckless and the cause of a FERC-perceived manipulative price movement in natural gas futures.

The point is that FERC's enforcement of a new futures market manipulation standard will, at best, breed uncertainty, and more likely, legal conflict, into this important economic activity. That uncertainty or conflict may trigger a loss in market liquidity and related hedging opportunities, with dire consequences for U.S. futures markets. 7 U.S.C. § 5(a) (Congress finds national public interest served by liquid, fair and financially secure futures markets).

The problems for self-regulating exchanges are just as profound. NYMEX conducts constant market surveillance to prevent price manipulation of its natural gas futures markets under the CEA. 7 U.S.C. § 7(d)(4). In fact, Congress found that "effective self-regulation" by NYMEX and other exchanges under the CEA "serve[s] the public interests." 7 U.S.C. § 5(b). Technically, NYMEX would be expected to discharge its statutory duty to prevent manipulation under the legal standard defined in the CEA. Are NYMEX and other exchanges also supposed to apply the FERC manipulation standard? The CFTC's brief would say "no," because the CFTC's jurisdiction is exclusive and it is NYMEX's regulator. But FERC's brief and its proceeding cast a cloud on the CFTC's position.

The FERC might answer that NYMEX is supposed to enforce one set of anti-manipulation rules under the CEA, while FERC waits in the wings with admittedly very different

14

standards.  It is hard to think of a more confused or uncertain law enforcement scenario where one set of cops on the beat (NYMEX and CFTC) are enforcing one set of traffic laws at the "Futures Square Intersection," while another officer (FERC) enforces a different, yet unknown, set of traffic laws at the same Intersection.  Any reasonable driver would avoid that intersection.

The stay motion urges this Court to provide for an orderly, sequential adjudication of these price manipulation cases.  Logically, that would avoid the conundrum this Court could face if FERC proceeds first and finds Amaranth not to have intended to manipulate the futures price and not to have recklessly done so either.  How could this Court then find that Amaranth intended to attempt to manipulate the futures price?  Similarly, if this Court finds that Amaranth *did not* intend to attempt to manipulate the futures price under the CEA, and FERC finds that Amaranth *did* intend to manipulate the futures price, how will that conflict be resolved?  And what market impact would be triggered by such legal uncertainty about the law of manipulation?

Granting the stay would allow the CFTC's case against Amaranth to move forward expeditiously.  In the interim, FERC could concentrate its resources on other matters.  It would also allow the CFTC and FERC to discuss ways to ensure the two agencies do not find themselves again in the situation where the CFTC believes FERC has no jurisdiction, but cannot convince FERC to stand down, even temporarily.  This Court's eventual resolution of the merits of this case also could make it unnecessary or impractical for FERC itself to proceed.  Thus, an orderly approach may conserve government resources.

The CFTC's posture in this Court is understandably conflicted.  On the merits of exclusive jurisdiction, the CFTC knows FERC is wrong.  But the CFTC does not want to appear to support a defendant whom it believes engaged in serious misconduct.  What the CFTC's brief discounts, however, is that Congress enacted the CEA's grant of exclusive jurisdiction to serve

15

identified public interests, not to protect any agency's territory. Exclusive jurisdiction was designed expressly to allow those, like the Futures Group, who compete in this specialized and complex area of commerce to conduct their legitimate and important business operations with the certainty that they must meet one set of legal standards, established by one regulatory body with experience and expertise in futures trading and markets. Granting the stay would promote that public interest. Denying the stay would not.

## CONCLUSION

For the above stated reasons, the *amici curiae* Futures Group urges this Court to find that defendant Amaranth has a strong likelihood of success on the merits of its argument based on the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)(A) and that the public interest would be well served by granting the requested stay.

Respectfully submitted,

_____

Mark D. Young
**KIRKLAND & ELLIS LLP**
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
(202) 879-5084

Eric F. Leon
**KIRKLAND & ELLIS LLP**
153 East 53rd Street
New York, New York 10022
(212) 446-4731

*Attorneys for Amici Curiae Futures Group*
*Futures Industry Association, Inc.*
*Managed Funds Association, Inc.*
*New York Mercantile Exchange, Inc.*
*Chicago Mercantile Exchange Group, Inc.*
*International Swaps and Derivatives*
*    Association, Inc.*

16