**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRIAN HUNTER, ) | |
| ) | Civil Action No. CV07-1307 (RJL). |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ENERGY REGULATORY ) | |
| COMMISSION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT FEDERAL ENERGY REGULATORY COMMISSION'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR DECLARATORY JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.     Hunter's Challenge Is Subject to NGA § 19(b) . . . . . . . . . . . . . . . . . . . . . 2

    B.     FERC's "Legal Conclusion" and the OSC
           Are Not Proper Subjects for a Declaratory Judgment . . . . . . . . . . . . . . . 4

    C.     Even If The OSC Were Ripe for Review, the Court Should
           Defer to FERC's Ongoing Administrative Proceeding . . . . . . . . . . . . . . 12

    D.     There Is No Basis for Declaratory Judgment . . . . . . . . . . . . . . . . . . . . . . . 16

          1.     FERC Has Statutory Authority to Bring an
                 Enforcement Case Relating to the Conduct Alleged . . . . . . . . . . 16

          2.     The CFTC Does Not Have Exclusive Jurisdiction
                 Over Manipulation of Natural Gas Futures Contracts . . . . . . . . . 21

          3.     The Anti-Manipulation Provision of the
                 Natural Gas Act Extends to Natural Persons . . . . . . . . . . . . . . . . . 24

               a.     The Phrase "Any Entity" Reflects Congressional
                     Intent For Broad Application of
                     the Anti-Manipulation Provision . . . . . . . . . . . . . . . . . . . . . 25

               b.     The Context in which "Any Entity" Appears
                     Supports Application of the Anti-Manipulation
                     Provision to Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

               c.     A Broad Interpretation of "Any Entity" is
                     Consistent with the Broad Remedial
                     Purpose of the Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

               d.     FERC's Interpretation that "Any Entity"
                     Includes Individuals Is Reasonable and
                     Entitled to Substantial Deference . . . . . . . . . . . . . . . . . . . . . 31

## I.    INTRODUCTION

FERC's motion to dismiss demonstrated that Hunter cannot challenge in this Court FERC's preliminary determinations contained in the OSC.  Hunter does not contest this point in his Opposition.  Instead, in an attempt to evade the administrative rehearing process and mandatory circuit court review specified by Congress in section 19(b) of the Natural Gas Act (NGA), processes Hunter has intentionally avoided, Hunter claims in his Opposition that his "request for a declaratory judgment from the Court does not concern the OSC, or any FERC 'order,' but instead concerns FERC's determination of jurisdiction."  Plaintiff Brian Hunter's Memorandum of Points and Authorities in Opposition to Federal Energy Regulatory Commission's Motion to Dismiss and in Support of Hunter's Cross-Motion for Declaratory Judgment ("Hunter Opp.") at 4.  Hunter challenges a theorized, undated, internal Commission "legal conclusion" that he presumes occurred, and a supposed secret "determination," that FERC has the authority under EPAct 2005 to bring an enforcement action concerning alleged manipulation of the settlement price of NYMEX natural gas futures contracts.[1]

However, Hunter's Complaint and his actions make clear that he is truly challenging the OSC; therefore the uncontested argument in the motion to dismiss is dispositive.  Any challenge to FERC's deliberative or investigative processes, as evidenced by non-public orders or correspondence, is not ripe for review, as any deliberations have not been embodied into final agency action.  Even if Hunter's challenge could be reviewed judicially, the Court should defer to FERC's ongoing administrative proceeding.  Should this Court proceed to the merits of Hunter's action, FERC maintains its preliminary conclusion in the OSC, subject to review in its

---

[1] Although Hunter discusses the procedures under which he believes the determination was made, he does not allege any procedural defect.

ongoing administrative proceeding, that it possesses the jurisdiction challenged in Hunter's

Complaint and thus a declaratory judgment should not obtain.

The Court has already passed on many of the issues presented by FERC's Motion, and

some of the issues presented in Hunter's Cross-Motion, in the slightly (but not materially)

different context of denying Hunter's motion for a preliminary injunction, including ruling that:

- Hunter "has failed to demonstrate that FERC's action is sufficiently outside its
  statutory authority (*i.e. ultra vires*) to be likely to succeed on the merits . . . . This is
  particularly true when Congress, in adopting EPAct 2005, expanded FERC's
  enforcement authority to reach *any* entity, that directly or indirectly, engages in
  manipulative practices, *in connection with*, natural gas transportation and sales" Op.
  at 13, n.6.

- Any challenge to FERC's assertion of jurisdiction is properly made only to a U.S.
  Circuit Court of Appeals under Section 19(b) of the Natural Gas Act. Op. at 13, n.6.

- FERC issuance of an OSC is not a final agency action because the FERC has not yet
  imposed any obligation, denied any right, or fixed any legal relationship . . . . ." Op.
  at 11.

- "[T]he public interest would not be served" by stopping FERC's administrative
  proceeding because of "harm . . . to FERC's enforcement authority"  Op. at 13.

- "Hunter will have a full opportunity to respond to FERC's initial findings.  Simply
  stated, the issuance of an OSC does not have any binding legal effect . . . ." Op. at 12.
  Hunter "does not, for example, have to pay any fines or comply with any orders" Op.
  at 12.

 For these and other reasons stated below, the Court should dismiss this action.

## II.    ARGUMENT

### A.    Hunter's Challenge Is Subject to NGA § 19(b)

Hunter disclaims any challenge to any order of the Commission.[2]  He instead claims to

challenge FERC's internal legal conclusion that it has certain jurisdiction under the NGA.

---

[2] Accordingly, Hunter is not arguing that either the pre-OSC jurisdictional "legal conclusion" or
the letter of Chairman Kelliher are orders.  Similarly, he does not challenge any FERC non-
public order of investigation.

However, no amount of clever recasting can obscure Hunter's real challenge. In law and in fact, Hunter's challenge is to the OSC and it must be heard, if at all, in a Court of Appeals after rehearing at the Commission.

As FERC demonstrated in its motion to dismiss, the only remaining count in Hunter's Complaint, Count I, challenges the OSC. *See* Compl. at 11 ("COUNT I; DECLARATORY JUDGMENT; FERC's Imminent Enforcement Action by OSC Is Beyond The Scope of Its Authority"), ¶¶ 59, 60. By its terms, the Complaint challenges the OSC, not an internal FERC staff legal conclusion or non-public order, as now claimed in the Opposition.

The timing of Hunter's lawsuit reveals Hunter's intent to challenge the OSC. Hunter did not mount a court challenge to FERC's "legal conclusion" upon the issuance of the Chairman's letter he cites. Nor did Hunter act in response to any of the supposed injury milestones Hunter claims occurred during the various phases of FERC's investigation. Only when FERC informed him of its intention to issue the OSC imminently did Hunter attempt this end run around FERC's administrative procedure. Only then did Hunter challenge, *ex parte* on an emergency basis, FERC's right to issue an order which, according to his Opposition, he is not now challenging in his declaratory judgment action. To the contrary, Hunter's actions demonstrate that the OSC is in fact the only true basis for his Complaint and Hunter's current revisionism is merely an attempt to avoid the operation of Section 19(b) of the NGA. The Court should not indulge such a "preemptive strike" intent on forum shopping. *See Williams Natural Gas Co. v. Oklahoma City*, 890 F.2d 255, 257, 264 (10th Cir. 1989) (where litigant "commenced the race to the courthouse and filed a declaratory judgment action" in state court just before competitor could complete certificate application at FERC, court found error in refusing to enjoin state court

"preemptive strike" or permitting federal district court challenge in light of NGA § 19(b)

provision for exclusive review in circuit court).[3]

### B.    FERC's "Legal Conclusion" and the OSC Are Not Proper Subjects for a Declaratory Judgment

Even if this Court finds that Hunter's declaratory judgment action does not concern the

OSC and is not otherwise governed by the NGA's exclusive review provision, Hunter's quest for

a declaratory judgment as to FERC staff's internal "legal conclusion" as to its own jurisdiction or

the Commission's internal authorization of an investigation is not ripe for review by a district

court because it does not constitute final agency action.  FERC's motion to dismiss articulated

how the OSC is not final agency action and thus is not ripe for review.  Events such as the

Commission staff's internal legal opinion and the Commission's authorization of an

investigation are even less final agency actions ripe for review.[4]

"[T]he ripeness doctrine['s] … basic rationale is to prevent the courts, through avoidance

of premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties.'"  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967).  Factors

---

[3] Moreover, Hunter should not be rewarded for his failure to request rehearing of the OSC at the Commission and then seek subsequent review in the circuit court, as several Amaranth entities did.  *See Williams Natural Gas*, 890 F.2d at 262 n.8 (refusing "to allow parties to circumvent the scheme of judicial review under § 19 simply by choosing not to file a petition for review with FERC or the court of appeals" and thus defeat § 19(b) exclusive review); *Public Utility District No. 1 of Snohomish County v. FERC*, 315 F. Supp. 2d 89, 93 (D.D.C. 2004) (refusing to permit plaintiff to avoid similar jurisdictional limitation of Federal Power Act by not challenging FERC's orders directly).

[4] Thus, FERC will reprise selected points from the motion to dismiss and FERC's opposition to the motion for preliminary injunction that apply to Hunter's purported challenge to any pre-OSC FERC legal opinion.  *See* Defendant Federal Energy Regulatory Commission's Memorandum of Points and Authorities in Support of Motion to Dismiss ("Mot. to Dismiss") at 4-12; FERC's Opposition to Plaintiff's Motion for Preliminary Injunction at 10-12.

relevant to the court's determination include: (1) whether the action represents a definitive statement of the agency's position; (2) whether the agency action has a "direct and immediate … effect on the day-to-day business" of the complaining party; and (3) whether the action is legal or factual in nature.  *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980) (quoting *Abbott Labs*, 387 U.S. at 152.[5]

> First, FERC's challenged actions leading up to the OSC and the OSC itself are not final. "Final orders" "impose[] an obligation, den[y] a right, or fix[] some legal relationship, usually at the consummation of an administrative process."  *NRDC v. NRC,* 680 F.2d 810, 815 (D.C. Cir. 1982) (quoting *Honicker v. NRC*, 590 F.2d 1207, 1209 (D.C. Cir. 1978)).  The Court's finding that FERC's OSC is not final, *see* Op. at 11, holds even more true for FERC's internal thought processes, its correspondence written by a single Commissioner (the Chairman), any non-public order of investigation, and its monitoring and investigation activities.  None of these challenged actions is a definitive statement as to whether Hunter violated the law, nor do any impose any liabilities or obligations, or come at the conclusion of an administrative process.  Indeed, the internal staff decisions and Commissioner correspondence are not orders or even actions under Commission precedent, and thus are not final.  "The Commission, a five-member agency … acts through its written orders … which are "issued" following a favorable vote of the majority…. Phrased differently, in the absence of such orders, including before it has issued such orders, the

---

[5] "The District Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'"  *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*, 324 F.3d 726, 731 (D.C. Cir. 2003) (citing the Administrative Procedure Act, 5 U.S.C. § 704); *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (final agency action is one that marks the culmination of the agency's decision-making process and the action determines rights or obligations); *Beverly Enter., Inc. v. Herman*, 50 F. Supp. 2d, 7, 12 (D.D.C. 1999) (where completion of the agency process may obviate the need for judicial review, the intermediate agency action is not final) (citing *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1215 (D.C. Cir. 1996)).

Commission cannot be said to have acted." *MidAmerican Energy Holdings Co.*, 118 FERC

¶61,003, at n.45 (2007) (citations omitted) (attached to Declaration of Justin M. Shellaway in

Opposition to Plaintiff's Cross-Motion for Declaratory Judgment and in Support of Defendant's

Motion to Dismiss, sworn to January 22, 2008 ("Shellaway Declaration") as Exhibit A); *see also*

42 U.S.C. § 7171(e) ("Actions of the Commission shall be determined by a majority vote of the

members present."). Nor was any non-public order of investigation "issued." The non-public

order to which Hunter refers, and the only Commission "order" involved here, merely converted,

on an internal administrative basis, a pre-existing staff "preliminary" investigation to a more

formal Commission-authorized investigation that provides staff with subpoena authority, it did

not identify Hunter or any other person, and contained no legal conclusions. A decision to

permit an investigation (of any variety) is not final agency action. *The Reliable Automatic*

*Sprinkler Co. v. Consumer Product Safety Commission*, 324 F.3d 726, 731 (D.C. Cir. 2003). The

OSC is the only operative agency action in this case. No prior "determination" applied

specifically to Hunter.[6]

---

[6] The authoritative statement in *National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 692 (D.C. Cir. 1971), is different than the Chairman's letter. In that case, the Wage-Hour administrator of the Department of Labor answered specific fact-intensive questions the petitioner had submitted to solicit an opinion from the agency, and the Administrator's response was intended as an authoritative statement outlining behavior with which compliance was expected. Also, *Standard Oil Co. v. Dep't of Energy*, 596 F.2d 1029, 1055-56 (Temp. Emer. Ct. App. 1978), and *Clay v. Johnson*, 50 F. Supp. 2d 816, 820 n.4 (N.D. Ill. 1999), consider agency pronouncements not for the purpose of determining final agency action (*i.e.*, determining if the pronouncements are final and binding on the public), but in assessing the agency's own consistency in order to decide the amount of deference to afford the agency's legal interpretations. As demonstrated herein, the Chairman's letter does not carry the force of law in part because it was signed only by him. Nor was it directed at Hunter or anyone in order to require specific behavior. Hunter's attack on the internal decisionmaking of an agency and the statement of a single Commissioner as authoritative statements of position binding all within the agency's jurisdiction, if successful, would open the door to myriad legal challenges that would discourage any agency speech at all apart from orders.

Hunter has articulated no cognizable obligations or harms that create a "direct and immediate … effect on the day-to-day business" which "effects [are] felt in a concrete way by the challenging part[y]." *Abbott Labs*, 387 U.S. at 148-49, 152.  Unlike situations where a party challenges the promulgation of a rule that could have immediate effect on the regulated community and could subject those parties to sanctions for non-compliance, Hunter has not, and cannot, demonstrate that the Commission staff's preliminary internal legal opinions would have such an immediate legal effect.  *See Abbott Labs*, 387 U.S. at 152-3 (the challenged regulation forced manufacturers to either change their labels, advertisements, and/or promotional materials or risk serious criminal or civil penalties); *Belle Fourche Pipeline Co. v. FERC*, 751 F.2d 332, 335 n. 3 (10th Cir. 1984) (suit challenging FERC's authority to regulate the action of plaintiffs was premature); *compare Brendsel v. Office of Federal Housing Enter. Oversight*, 339 F. Supp. 2d 52, (D.D.C. 2004) (Defendant's effort to freeze plaintiff's assets and payment of compensation had immediate effect on plaintiff).

As noted above, in denying the preliminary injunction, the Court considered Hunter's likelihood of success on the merits, and observed FERC has not yet imposed an obligation, denied any right, or fixed some legal relationship.  Op. at 11.  The Court noted, for instance, that Hunter does not have to pay any fines or comply with any orders.  Op. at 12.  Nor are the other obligations or harms listed by Hunter in his Opposition cognizable in determining ripeness.  For one, Hunter articulates no obligation or harm from certain supposed evidence of FERC staff's preliminary internal legal determination,  FERC staff's "monitoring" of natural gas futures trading or,  the Commission's issuance of a non-public order of investigation.  For another, obtaining documents from Amaranth and testimony from Hunter was a voluntary process; Hunter cannot contend otherwise, as he has offered no evidence of FERC compulsion such as a

subpoena (because there was none). Also, the CFTC subpoena under which Hunter testified is self-evidently compulsory from the CFTC, not FERC.

Hunter also complains that he must answer the OSC. Thus, after disclaiming in his Opposition any attack on a FERC order, he reverts to an indirect attack on the true target of this lawsuit. But such burden is not cognizable in determining final agency action. "[T]he burden of responding to charges made against [respondent,] [a]lthough … certainly [] substantial, is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980); *see also Times Mirror Co. v. FTC*, No. 78-3422, 1979 U.S. Dist. LEXIS 11738 (C.D. Cal. June 13, 1979) ("Litigation expenses which are normal incidents of participation in the agency process do not constitute irreparable injury.") (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938)); *Pepsico v. FTC*, 472 F.2d 179, 187 (2d Cir. 1972) (citing *Myers*). The Court's finding that Hunter is not suffering irreparable harm from the operation of FERC's administrative process, though not as directly relevant here as in the preliminary injunction context, also counsels against district court review. Op. at 8; *see Toilet Goods Assoc. v. Gardner*, 387 U.S. 158, 165-66 (denying review, in part because there were "no irremediable adverse consequences" from requiring a later challenge to the regulation in question, as agency's determination can be promptly challenged through administrative procedure, which in turn is reviewable by a court and which review "will provide an adequate forum for testing the regulation in a concrete situation"). Hunter's action is unlike *ARCO* where, as the Court has noted, the plaintiff faced the prospect of complying with mandated discovery orders. *See* Op. at

8

12 (citing *ARCO*, 769 F.2d at 782-84).  Thus, FERC's conduct so far has not had the force or

effect required to make Hunter's complaint ripe.[7]

Third, notwithstanding Hunter's claim to the contrary, the *ultra vires* claim is not a purely

"legal" issue.  Hunter does not challenge the FERC's statutory or regulatory authority to issue an

order and/or pursue claims of market manipulation.  Instead, Hunter asserts that the relevant anti-

market manipulation provision of the Energy Policy Act of 2005 ("EPAct 2005"), Pub. L. No.

109-58, § 315 (2005) (codified as an amendment to the Natural Gas Act ("NGA") at 15 U.S.C.

§717c-1) does not apply to his conduct (here, trading in natural gas futures) and, therefore,

FERC's internal jurisdictional determination and supposed results including the enforcement

action are improper.  Hunter's attempt to carve out a purely legal issue fails because his

argument rests on factual assertions that are disputed.  Since the time the parties briefed the

jurisdictional issues to the Court on the preliminary injunction motion, Hunter has appeared and

responded in the FERC administrative proceeding, the next step in the process after issuance of

the OSC.  *See* Brian Hunter's Memorandum in Response to the Federal Energy Regulatory

Commission's Order to Show Cause and Notice of Proposed Penalties (attached, without

---

[7] Because there is no cognizable harm, Hunter's cases finding district court jurisdiction where
there is "sufficient immediacy" to the dispute do not apply.  Indeed, the harm in those cases was
distinct from what is complained of here.  In *Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir.
1983), the potential harm was the imminent release of confidential information.  In *Steffel v.
Thompson*, 415 U.S. 452, 462 (1974), the plaintiff wished to proceed with activity that was
arguably constitutionally protected, without exposing himself to criminal proceedings; and in
that case, there was no state case pending in which plaintiff's rights would be adjudicated (unlike
FERC's pending OSC).  In addition, *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) and
*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) do not
support a conferral of jurisdiction under 28 U.S.C. § 1331 in this case because there is no
cognizable "injury by act of government official which is in excess of his express or implied
powers," and also because there is no *ultra vires* act (discussed *infra*).  *Dart v. United States*, 848
F.2d 217, 218 (D.C. Cir. 1988), also is distinguishable because in that case the Secretary of
Commerce, in violation of agency procedure, imposed fines and banned petitioner from pursuing
his present livelihood for 15 years.

accompanying attachments, to Shellaway Declaration as Exhibit B) ("Hunter OSC Resp."); *see also* Enumerated Response of Brian Hunter to Order to Show Cause and Notice of Proposed Penalties (attached to Shellaway Declaration as Exhibit C).  In his filings before the Commission, Hunter raised factual assertions in conflict with the factual assertions in the FERC OSC which are part of the basis for FERC's jurisdiction.  Specifically, Hunter challenged (1) whether the settlement price of the NYMEX Natural Gas Futures Contract impacts the price for contracts that "go to delivery" (*i.e.*, become physical wholesale natural gas sales subject to FERC's jurisdiction), (2) whether the settlement price impacts the "physical basis" transactions subject to FERC's jurisdiction, and (3) whether the settlement price impacts the "index prices" and their impacts on wholesale gas sales subject to the jurisdiction of the Commission.  Hunter OSC Resp. at 55-62.  These assertions at FERC belie Hunter's claim here that FERC's actions to date raise purely legal questions.  For these same reasons, though FERC submits the Court should grant FERC's motion to dismiss and thus not reach Hunter's motion for summary judgment, that motion similarly raises genuine issues as to material facts and is therefore unsustainable. *See* further discussion at Section II(D), below. FERC's administrative determination of factual and legal issues in Hunter's Complaint should continue.  *See Beverly Enter.*, 50 F. Supp. 2d at 14 (pre-enforcement review of regulations is premature because resolution of the issues will require an inquiry into the statutory purpose, and an understanding of the enforcement problems faced by the agency).  As such, *ARCO* is different than Hunter's case because ARCO challenged the procedure by which the Department of Energy was proceeding. "ARCO's challenge to the Department's power to establish adjudicatory procedures applicable to [its statutory] proceedings is jurisdictionally very different from a challenge to the agency's construction or application of those regulations.  Were ARCO attacking the merits of the

administrative decisions to impose discovery sanctions, we might agree with the District Court that ARCO's action was premature." *Atlantic Richfield Co. v. Dept. of Energy*, 769 F.2d 771, 780 & n.56 (D.C. Cir. 1984). Hunter does not challenge FERC's procedures, but its substantive application of its anti-manipulation authority to his conduct.

Clever framing of the dispute cannot save Hunter from the necessity of administrative adjudication and appellate court review. *See Toilet Goods*, 387 U.S. at 163, 165-66 (explicitly recognizing plaintiff's framing of their contention as a purely legal question and plaintiff's inference that at hearing Commissioner may not consider challenge to his statutory authority to promulgate regulation, but nevertheless requiring plaintiff to exhaust administrative process).[8]

Even if the issues at hand were purely legal, Hunter's attempt to circumvent the jurisdictional requirement of final agency action requirement by casting the FERC's action as *ultra vires* is still unavailing. Though Hunter may disagree with the FERC's assertion of jurisdiction, he cannot demonstrate that the FERC's Order to Show Cause is in "brazen defiance" of its statutory authority as the cases require. *Phillip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir. 1985) (plaintiff's claim that the Patent and Trademark Office's decision was *ultra vires* failed because there was no evidence that the agency acted in "brazen defiance" of its statutory authority). Hunter's expansive interpretation of the *ultra vires* doctrine could effectively be used to preclude or delay all administrative adjudication. *Royster-Clark Agribusiness*, *Inc. v. Johnson*, 391 F. Supp. 2d 21, 25 (D.D.C. 2005). Indeed, in its finding that enjoining FERC was not in the public interest, the Court indicated that FERC, unlike the agency in *Brendsel*, had not abdicated its statutory authority by acting in conflict with a statutory directive in a manner that is

---

[8] Hunter supports FERC's argument by his citation to *California ex rel. State Water Resources Control Bd. v. FERC*, 966 F.2d 1541, 1562 (9th Cir. 1992), for the proposition that courts should review an agency's statutory authority; in that case the petitioners sought the proper method of review: in the court of appeals following a FERC decision.

clear from the plain language of the statute.  Op. at 13-14 (contrasting *Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 63 (D.D.C. 2004)).  Thus, the Court should not follow any of the cases Hunter cites as permitting district court review.[9]

**C.    Even If The OSC Were Ripe for Review, the Court Should Defer to FERC's Ongoing Administrative Proceeding**

Hunter has answered the OSC, and raised his claims regarding FERC's jurisdiction over manipulation of certain futures trading and over individual persons.  *See* Hunter OSC Resp. (attached to Shellaway Declaration as Exhibit B).  Thus, it is appropriate for this Court to defer to the Commission's ongoing action, which has been proceeding for nearly six months.  *See National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 703 (D.C. Cir. 1971) (agency may invoke the sound discretion of the court on the ground that an enforcement action was in preparation or imminent).  As the Court correctly stated, "Hunter will have a full opportunity to respond to FERC's initial findings."  Op. at 12; *see also Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21, 27-28 (D.D.C. 2005).[10]

Moreover, because Hunter may appeal any adverse Commission ruling only to the court of appeals under NGA Section 19(b), the Court should not permit judicial review in two different fora.  *See Public Utility District No. 1 of Snohomish County v. FERC*, 315 F. Supp. 2d 89, 93

---

[9] The cited cases are also factually distinguishable from this case.  *Leedom v Kyne*, 385 U.S. 184, 189 (1958), involved an agency plainly doing what its own statute expressly commanded it "shall not do."  And unlike in *Pepsico, Inc. v. FTC*, 472 F.2d 179, 187 (2d Cir. 1972), FERC is not "plainly beyond its jurisdiction" as a matter of law (and in addition, there is no final agency action as in *Pepsico*).

[10] Unlike in *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), in which there was no other statutory means to appeal an Executive Order except to district court, Hunter can proceed under NGA § 19(b), or possibly, the Administrative Procedure Act.  Also, in *Carolina Aluminum Co. v. Federal Power Commission*, 97 F.2d 435, 436 (4th Cir. 1938), the court found it had no order to consider.  In our case, the circuit court could have considered an appeal from Hunter following his request for rehearing of the OSC, if he had made such request, and can still review FERC's completed adjudication of the OSC.

(D.D.C. 2004) (under similar Federal Power Act provision, 16 U.S.C. § 825l, finding

presumption against circuit court and district court exercising concurrent jurisdiction).

The now-pending petition for review filed by Amaranth and others in the United States

Court of Appeals for the D.C. Circuit (herein the "Amaranth Appeal"),[11] far from providing

grounds to support Hunter's effort for a ruling on the merits here as to his declaratory judgment

action (Mot. to Dismiss at 10 n.6), punctuates the impropriety of his effort here.  Hunter's Cross-

Motion is improper for the very reason that he has failed to follow the same procedural path to

the Court of Appeals mandated by Section 19(b) (seeking rehearing at the Commission followed

by a petition for review). He should not be rewarded for this evasion with a ruling that might

send him to the Court of Appeals on a different path.  Moreover, there is little assurance (as

Hunter argues in his Opposition and Cross-Motion at 16 n.13) that any ruling by this Court

would allow Hunter to raise the same issues with the Court of Appeals on a timetable close to the

same schedule, as may be presented in the Amaranth appeal.  First, how that appeal may proceed

is unclear;  the parties to that appeal are in the midst of sorting out preliminary matters before

that Court and that may be the subject of preliminary motions (now due to be filed January 28,

2008).[12]   That appeal also presents issues of the timing of judicial review (though it is at least in

the right court). Moreover, it is not at all clear that the timing of any ruling by this Court on the

merits (if obtained) would be such that an appeal by Hunter to the D.C Circuit could somehow

meet up with the Amaranth appeal.  Second, there is no assurance that the Court of Appeals will

---

[11] *See* Petition for Review by Amaranth Advisors L.L.C., *et al.*,  *Amaranth Advisors L.L.C. v. Federal Energy Regulatory Commission*, No 07-1491 (consolidated with No. 07-1504) (D.C. Cir. Dec. 6, 2007); Petition for Review by Matthew Donohoe, *Donohoe v. Federal Energy Regulatory Commission*, No. 07-1504 (consolidated with No. 07-1491) (D.C. Cir. Dec. 11, 2007).
[12] *See* Order, *Amaranth Advisors L.L.C. v. Federal Energy Regulatory Commission*, No 07-1491 (consolidated with No. 07-1504) (D.C. Cir. Dec. 13, 2007).

pass on the same issues that might result in a ruling on the present motions before this Court. For example, the issue of whether the NGA Anti-Manipulation rule covers a "natural person" (raised here) has not been reheard at the Commission and is not properly before the D.C. Circuit in the Amaranth appeal.[13]  Further, as here, the petition for review in the Amaranth Appeal presents several independent bases for attacking FERC's jurisdiction. This Court could rule on one of those issues but not the others (because they were unnecessary to reach) while the Court of Appeals might rule on others. Finally, the Amaranth Appeal is interlocutory and it is possible that the Court will decline to review the matter at this time.

Hunter also claims that the public interest demands this Court intervene, primarily because of arguments made by a number of Wall Street interest groups in *amicus* briefs filed with the United States District Court for the Southern District of New York for its consideration of Amaranth's bid to stop FERC's proceeding.  Hunter Opp. at 14-15.  As the Court is aware, the Southern District of New York declined to stay the FERC action. Op at 13.  And, before that Court were also several *amicus* briefs filed by consumer groups and state regulators supporting FERC's jurisdiction and noting that stopping FERC would harm the interests of consumers and the states, one which argued:

> Fair gas and electric markets are vital to *amici* and their members. This week, APGA testified before the CFTC on the direct linkage between NG Futures Contracts and physical gas pricing. "Increasingly, the price of natural gas in many supply contracts between suppliers and local distribution companies ("LDC"), including APGA members, is determined based upon monthly price indexes closely tied to the monthly settlement of the NYMEX futures contract. ...[W]ithout question, a participant's trading conduct in one venue can affect, and has affected, the price of natural gas contracts in the other." This is the exact same

---

[13] Another Respondent to the FERC OSC, Matthew Donohoe, has included this issue in his petition for review at the D.C. Circuit, but (as the Commission briefed to the D.C. Circuit in successfully opposing Donohoe's emergency motion for a stay of the FERC OSC), he failed timely to seek rehearing on this issue at the Commission (a jurisdictional prerequisite) and thus the Commission has not denied rehearing (also a jurisdictional prerequisite).

factual nexus that FERC has preliminarily identified as the basis for its exercise of regulatory authority in the Show Cause proceeding. FERC's enforcement efforts will help to protect not only millions of natural gas consumers, but also millions of electricity consumers, because of the pervasive effect natural gas prices has on the price of electricity.

Memorandum of Law of *Amicus Curiae* American Public Gas Association, American

Public Power Association and National Rural Electric Cooperative Association in Opposition to

Motion for a Preliminary Injunction Against the Federal Energy Regulatory Commission, at 14-

15, *Commodity Futures Trading Commission v. Amaranth Advisors L.L.C.* , 07 CIV. 6682

(S.D.N.Y. Sept. 28, 2007) (footnote omitted) (attached to Shellaway Declaration as Exhibit D).

Another argued:

> [EPAct 2005] provides the FERC with tools and jurisdiction to play a primary role in wholesale energy market regulation and oversight, *while leaving regulation of the exchanges themselves and terms of exchange-traded instruments to the CFTC and other federal agencies*.  If Amaranth's position prevails, it will gut the market manipulation provisions of the EPAct2005 and leave energy consumers vulnerable to market manipulation affecting FERC-jurisdictional energy markets … The contention that Amaranth must actually trade "physical gas" ignores Congress' instructions for FERC to penalize "any entity" whose actions – in this case manipulation of the Natural Gas Futures Contract Settlement price – are "in connection with" FERC jurisdictional transactions.  FERC's analysis is based on a plain reading of the statutory text and there is no question that the conduct at issue can impact FERC jurisdictional transactions … Moreover, much of the CFTC-specific jurisprudence Amaranth cites to support its arguments that CFTC's jurisdiction ousts FERC from the current enforcement action, predates the 2005 legislation and is of limited utility in the required analysis of the EPAct2005 language that is the basis for FERC's jurisdictional assertions.

Memorandum of Law of the National Association of Regulatory Utility Commissioners

as *Amicus Curiae* in Opposition to the Motion for a Preliminary Injunction, at 1, 11 (emphasis in

original, footnote omitted), *Commodity Futures Trading Commission v. Amaranth Advisors*

*L.L.C.* , 07 CIV. 6682 (S.D.N.Y. Sept. 28, 2007) (attached to Shellaway Declaration as Exhibit

E).

**D.    There Is No Basis for Declaratory Judgment**

The Court should grant FERC's motion to dismiss and not reach Plaintiff's Cross-Motion for Declaratory Judgment.  FERC files this Opposition to Plaintiff's Cross-Motion for Declaratory Judgment conditionally in the event that the Court denies FERC's Motion to Dismiss.

**1.    FERC Has Statutory Authority to Bring an Enforcement Case Relating to the Conduct Alleged**

Section 315 of EPAct 2005 added a new section 4A to the NGA that provides in pertinent part:

> It shall be unlawful for *any* entity, directly *or indirectly*, to use or employ, *in connection with* the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, *any* manipulative deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. (emphasis added).[14]

This language, in particular the broad and general terms used therein, is most reasonably read to give the Commission broad authority to sanction manipulative conduct where, as here, such conduct has a nexus to and significantly affects jurisdictional sales.  Since the time the Court was briefed on the preliminary injunction motion, the Commission has ruled upon a request for rehearing of the OSC by Amaranth (Hunter did not seek rehearing).   The Commission evaluated in detail the legal arguments presented to it and exposited at length its

---

[14] 15 U.S.C. § 717c (2005). With respect to the "subject to the jurisdiction of the Commission" element, section 1(b) of the NGA grants the Commission jurisdiction over "the sale in interstate commerce of natural gas for resale."  15 U.S.C. § 717(1)(a) (2000).  The NGPA, 15 U.S.C. §§ 3301 *et seq.* (2000), and the Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989), exclude from the Commission's NGA jurisdiction all "first sales," 15 U.S.C. § 3431(a) (2000), which are all sales from the producer to the consumer, unless and until the gas is purchased by an interstate pipeline, intrastate pipeline, or local distribution company or an affiliate thereof.  15 U.S.C. § 3301(2)(21)(A) (2000); *see also Amendments to Blanket Sales Certificates*, Order No. 644, FERC Stats. & Regs. ¶ 31,153 at P 14 (2003), *reh'g denied*, 107 FERC ¶ 61,174 (2004).

position on those raised.  Thus, FERC includes in this Opposition only a summary discussion of

the most salient cases and points that apply to Hunter's action and in the interest of brevity

respectfully refers the Court for a fuller treatment to the Commission's Order Denying Rehearing

of the OSC, 121 FERC ¶ 61,224, at ¶¶ 11-33 (Nov. 30, 2007) ("Order Denying Rehearing")

(attached to Declaration of Justin V. Shur in Opposition to Defendant's Motion to Dismiss the

Complaint ("Shur Declaration") as Exhibit J).  To wit, the language making it unlawful for "any

entity" to engage in manipulative conduct in connection with jurisdictional transactions

demonstrates Congress' intent to capture not only natural gas companies or other jurisdictional

companies historically subject to the NGA but rather any individual, corporation, or

governmental or non-governmental entity that engages in the prohibited behavior.  *Id.* at ¶¶ 17,

30-32.  The language "directly or indirectly" is reasonably read to prohibit behavior not only by

entities engaging in Commission jurisdictional transactions but entities engaging indirectly, for

example through intermediaries,  in such transactions, or in behavior indirectly affecting such

transactions.[15]  *Id.* at ¶¶ 17, 30, 33.  Similarly, the language "any manipulative device or

contrivance" is reasonably read to capture a broad array of manipulative or deceptive conduct

that may harm Commission jurisdictional markets and customers.   *Id.* at ¶ 17.

The alleged manipulation in this case involves three interrelated markets:  (1) the NG

Futures Contracts market; (2) a variety of "derivative" financial products; and (3) Commission-

---

[15] Cases interpreting section 10(b), which provides that it "shall be unlawful for any person,
directly or indirectly," to use any instrumentality of interstate commerce in connection with a
manipulative or deceptive device or contrivance, held that the "word 'indirectly' is quite broad
and pervasive" and, therefore, use of a telephone to arrange a meeting for purposes of
effectuating a fraud satisfies the requirements of section 10(b).  *Nemitz v. Cunny*, 221 F. Supp.
571, 573 (N.D. Ill. 1963).  Therefore, section 10(b) and Rule 10b-5 have been read to impose
liability on any person who participated in a manipulative or deceptive scheme, even if a material
misstatement by another person created the connection between the scheme and the securities
market.  *In re Lernout & Haupsie Sec. Lit.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003).

17

jurisdictional wholesale natural gas sales, namely, wholesale natural gas sales in interstate commerce that are not "first sales" within the meaning of the Natural Gas Policy Act of 1978 (NGPA).[16] The first market affects the second and third inasmuch as the NG Futures Contracts settlement price determines, in whole or in part, the value of the derivatives and the price of a substantial volume of Commission-jurisdictional wholesale natural gas sales.[17] Order Denying Rehearing ¶ 14(a) (attached to Shur Declaration as Exhibit J). Thus, Hunter's conduct as alleged in the OSC and challenged in his Complaint falls within the ambit of FERC's anti-manipulation authority.

Congress could have, but did not, prohibit manipulative or deceptive conduct that occurred *in* Commission-jurisdictional markets. Instead, Congress used expansive language that prohibits manipulative or deceptive practices by any entity, directly or indirectly, "in connection with" the purchase, sale or transportation of natural gas historically within the Commission's jurisdiction. *Id.* at ¶ 34.

It is useful to evaluate how "in connection with" is used in section 10(b) of the Securities Exchange Act, on which section 4A was modeled.[18] The "in connection with" language of section 10(b) has been construed expansively by the Supreme Court to accomplish the broad remedial purposes of section 10(b) which was enacted to restore the integrity of securities markets and promote investor confidence following the stock market crash of 1929.[19] FERC

---

[16] 15 U.S.C. § 3431(a) (2000).

[17] OSC at ¶¶ 2, 6, 108-10 (attached to Shur Declaration as Exhibit E).

[18] 15 U.S.C. § 717c (2005) (terms are used in the same manner as section 10(b)).

[19] *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (the "in connection with requirement" of the SEC regulatory scheme, on which the Anti-Manipulation Rule is modeled, should be interpreted flexibly, not technically and restrictively, to accomplish the statutes' remedial purposes of promoting market integrity and investor confidence) (*citing United States v. O'Hagan*, 521 U.S. 642, 651 (1997)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006)

notes the historical similarity of the posture of the Securities and Exchange Commission (SEC) in 1934 and the posture of FERC after the enactment of the anti-manipulation provisions in response to the Western energy crisis of 2000-2001. Order Denying Rehearing ¶¶ 36-37 (attached to Shur Declaration as Exhibit J).

There are multiple decisions holding that the "in connection with" requirement is met under fact patterns similar to those presented in the OSC. The Supreme Court defined market manipulation under Rule 10b-5 as conduct "*controlling or artificially affecting* the price of securities"[20] or practices that "artificially affect market activity."[21] Courts have sustained Rule 10b-5 claims when misrepresentations and omissions are made regarding Treasury bill futures contracts (even though futures contracts are not "securities") because the asset *underlying* the futures contract (a Treasury bill) is a security.[22] Similarly, in this case, the Commission preliminarily concluded in the OSC that Amaranth's trading in NG Futures Contracts actually set the NG Futures settlement price, which is directly incorporated into the pricing of physical natural gas within the Commission's jurisdiction. Given the connections between the trading behavior at issue and physical natural gas markets, a finding that the "in connection with" requirement is met is appropriate.

---

("the magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated"); *Superintendent of Ins. of New York v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971) (construction of section 10(b) extends beyond maintaining the integrity of securities markets).

[20] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (emphasis added).

[21] *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

[22] *Paine Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 210 (N.D. Ala. 1981). *See also Fisher v. Dean Witter Reynolds, Inc.* 526 F. Supp. 558, 560 (E.D. Pa. 1981) (fraud in the sale of treasury bills futures contracts violates SEC Rule 10b-5).

Hunter reads the securities cases, particularly *Zandford*, as permitting the "in connection with" test to be satisfied only where the manipulation "coincided with the sales themselves."[23] The cited language of *Zandford* is not the complete expression of the test, but were it so, the test would certainly be satisfied on the facts of this case.[24]   The OSC alleges that Amaranth traded between 2:00 and 2:30 PM on each of the three settlement days with the specific intent and actual effect of artificially setting the price of the NG Futures Contracts.  Further, the OSC alleges that within an instant of that trading, effectively at 2:31 PM, and as a direct result of that trading, the settlement price became the price for the above-identified physical sales at Henry Hub.  It is difficult to imagine how much more "coincidence" there could be between Amaranth's trading and Commission jurisdictional sales.[25]

In recent oversight hearings, the members of Congress who were personally responsible for shepherding the EPAct 2005 anti-manipulation provisions through the legislative process made clear, on a bi-partisan basis, that FERC's actions in investigating this matter and issuing the OSC are precisely the sort of enforcement action they expected under EPAct 2005:

- Rep. Barton, the Ranking Member of the House Energy and Commerce Committee, and Chairman of that Committee in 109th Congress when EPAct 2005 was passed (and its principal sponsor and Chairman of the Conference Committee), stated with respect to Amaranth and other matters: "Mr. Kelliher [FERC Chairman] and his compadres at FERC are doing exactly or at least attempting to do exactly what we hoped they would do, which is work with [CFTC] but use their own authorities to ferret out these bad

---

[23] Cross-Motion at 21 (*citing Zandford*, 535 U.S. at 820).

[24] Although the *Zandford* court certainly determined that the securities transactions "coincide"[d] with the wrongful conduct and "therefore were in connection with" securities sales with respect to the meaning of  §10(b)," *Zandford*, 535 U.S. at 822, the opinion does not hold that this "coincidence" is the only way to meet the "in connection with" requirement.  *Zandford* supports the view that "[t]he precise contours of the in connection with requirement are not self-evident. It seems unavoidable 'that the standard be fleshed out by a cautious case-by-case approach.'" *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 942-43 (2d Cir. 1984).

[25] Hunter's disputes with these matters alleged in the OSC are all the more reason not to grant a declaratory judgment.

actors." Transcript of questioning by Rep. Barton (R-TX) at 176-79 (attached to Shellaway Declaration as Exhibit F) at December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations.

• Rep. Stupak noted one "tool in addressing manipulation is ensuring FERC's authority to police price manipulation trades that impact delivery of energy. Legislative intent on the part of this Committee is clear. We fully expect that the authority granted to FERC through the Energy Policy Act of 2005 will be upheld." Statement of Subcommittee Chairman Rep. Bart Stupak (D-MI) at 3 (attached to Shellaway Declaration as Exhibit G) given at December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations.

• Representative Dingell (D-MI), Chairman of the House Energy and Commerce Committee, noted with approval FERC's "considerable progress over the past two years in improving its market surveillance capabilities and exercising its enforcement authorities" and cited "the explicit grant of such authority to FERC by Congress in the Energy Policy Act of 2005." Statement of Committee Chairman Rep. Dingell (D-MI) at 2 (attached to Shellaway Declaration as Exhibit H) given at December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations.

## 2.     The CFTC Does Not Have Exclusive Jurisdiction Over Manipulation of Natural Gas Futures Contracts

Hunter's central contention is that manipulation of natural gas markets of the type alleged by the Commission in the OSC is within the CFTC's "exclusive" jurisdiction and, therefore, even if the alleged conduct is covered by the NGA, the Commission is pre-empted from taking action. This issue was also extensively treated in FERC's Order on Rehearing. *See* Shur Declaration, Exhibit J ¶¶ 46-62. Thus, with respect to this issue FERC would also respectfully refer the Court to that legal discussion rather than fully reprising it here, and discusses here only the most fundamental points.

Hunter contends that section 2(a)(1)(A) of the Commodity Exchange Act (CEA) conclusively establishes that the CFTC has exclusive jurisdiction over his conduct. The CEA provides that "[t]he Commission [CFTC] shall have exclusive jurisdiction . . . with respect to

accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery."[26] But the fact that the CFTC has exclusive jurisdiction over these activities does not mean that it has exclusive jurisdiction over fraudulent or deceptive practices associated with those transactions, or that other agencies such as FERC are precluded from examining fraudulent or deceptive conduct in exercising their regulatory responsibilities, particularly where FERC has been provided express authority with respect to such conduct if it has a nexus to jurisdictional physical sales.[27] Order Denying Rehearing ¶ 47 (attached to Shur Declaration as Exhibit J).

In a line of court decisions under the CEA, known as the "exempt commodities cases," to assert jurisdiction over false reporting, manipulation, and other fraudulent and deceptive conduct in exempt commodities, the CFTC successfully argued that manipulation and deceptive conduct, by their very nature, do not involve a "mutual understanding" creating enforceable rights or obligations with counterparties and, therefore, such conduct is not a "contract, agreement or transaction," but merely conduct related to a "contract, agreement or transaction" in a commodity.[28] Accordingly, these cases stand for the general proposition that in interpreting the exclusive and non-exclusive jurisdiction under the CEA, manipulation does not involve a mutual understanding or meeting of the minds necessary to consummate an "account, agreement, or transaction," or a "contract, agreement, or transaction" as those terms are commonly understood

---

[26] 7 U.S.C. § 2(a)(1)(A) (2006).

[27] *See FTC v. Roberts*, 276 F.3d 583, 591 (D.C. Cir. 2001) ("it does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms.").

[28] *Roberts*, 276 F.3d at 591; *see also CFTC v. Bradley,* 408 F. Supp. 2d 1214 (N.D. Okla. 2005); *CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007); *U.S. v. Valencia*, No. 03-024, 2003 U.S. Dist. LEXIS 15264 (S.D. Tex.  Aug. 25, 2003); and *CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006).  These cases involved interpretation of a parallel provision of the CEA that uses the terms "contract, agreement, or transaction."  Given the parallel language and same broad remedial purpose, the interpretation should be the same.

and, therefore, manipulation is neither excluded from CFTC's jurisdiction over otherwise "exempt commodities" nor is it within the CFTC's exclusive jurisdiction. Order Denying Rehearing ¶¶ 48-49 (attached to Shur Declaration as Exhibit J).

*FTC v. Roberts* explained that "while the CFTC has clear statutory authority to regulate a [trader's] deceitful 'practices' . . . . there is no reason to think the authority is exclusive. A 'practice' or 'course of business' is quite plainly not a 'transaction' – either in life or in this statutory provision. (Nor for that matter is it an 'account' or 'agreement.')." 276 F.3d at 591. The D.C. Circuit held in *Roberts* that the notion that whatever the CFTC regulates it does so exclusively is a "specious contention." *Id.* Thus, the case law supports the interpretation that the exclusive jurisdiction provision cited by Amaranth does not apply to Amaranth's alleged manipulative conduct[29] and, the CEA language notwithstanding, "other agencies . . . retain their jurisdiction beyond the confines of 'accounts, agreements, and transaction'" for futures contracts. *Roberts*, 276 F.3d at 591.

The *Chicago Mercantile Exchange* case cited by Hunter addresses the narrow question of whether CFTC or the SEC has enforcement jurisdiction in the first instance over certain market segments and products.[30] The case does not address whether the particular manipulative activity was subject to the jurisdiction of both agencies or whether the manipulation was "in connection with" the SEC's jurisdictional markets, *i.e.*, whether the conduct might fall within both agencies'

---

[29] *See also U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043, 1045 (N.D. Cal. 2006) (the Commission's exclusive jurisdiction under the FPA to regulate the transmission and sale at wholesale of electricity in interstate commerce did not preempt the anti-manipulation jurisdiction under the CEA pertaining to electricity prices during the Western energy crisis).

[30] *Chicago Merc. Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989). The case resolved a dispute over whether a certain financial product was a futures contract or an option on a futures contract subject to the exclusive jurisdiction of the CFTC, or a security or an option on a security subject to SEC regulation.

non-exclusive jurisdiction.  Indeed, the court expressly stated it was not deciding the related

question of whether the SEC has authority to apply its anti-fraud rules to commodity options

transactions.   It generally helped to resolve the broad question of whether the SEC could set

terms or perform other "prospective" oversight or regulation over designated contract markets, a

question not present here.   In any event, it pre-dates the 2000 amendments to the CEA, which

affirmed the SEC's jurisdiction over fraud claims involving futures. Moreover, all of the

authorities cited for the so-called CFTC "exclusive jurisdiction" predate EPAct 2005 and, as key

authors of EPAct 2005 noted in the recent Congressional oversight hearings, "there is no way

[CFTC] can have exclusive jurisdiction with this statutory authority on the books [referring to

EPAct 2005]."[31]

### 3.    The Anti-Manipulation Provision of the Natural Gas Act Extends to Natural Persons

Hunter's Complaint does not allege that any supposed pre-OSC FERC legal conclusion

determined whether natural persons are subject to FERC's anti-manipulation authority.  Hunter's

Complaint only challenges natural gas futures jurisdiction.  Therefore his current arguments

regarding this question are irrelevant and should be given no weight.

Even if the Court considers them, Hunter shows no evidence that FERC has made a

definitive determination on this subject other than the citing the discovery to which he submitted.

---

[31] Transcript of questioning by Rep. Barton (R-TX) at 176-79 (attached to Shellaway Declaration as Exhibit F) at December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations; *see also* Statement of Committee Chairman Rep. Dingell (D-MI) at 2 (attached to Shellaway Declaration as Exhibit H) given at December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations (criticizing CFTC limited interpretations of "FERC's authority to investigate and pursue energy market manipulators, despite the explicit grant of such authority to FERC by Congress in the Energy Policy Act of 2005").

Thus, the argument bears no more weight than the jurisdictional argument regarding futures. However, should the Court reach this issue, Hunter's argument must be rejected.

The plain language and broad remedial purpose of the anti-manipulation provision of the Natural Gas Act, as amended by EPAct 2005, support the interpretation that individuals, such as Brian Hunter, who use or employ manipulative devices are subject to enforcement action.

### a.    The Phrase "Any Entity" Reflects Congressional Intent For Broad Application of the Anti-Manipulation Provision

The relevant EPAct 2005 provision reads:

> Sec. 4A. It shall be unlawful for *any entity*, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance . . . in contravention of such *rules and regulations as the Commission may prescribe* as necessary. . . .[32]

In Order No. 670, which is the Commission Order adopting regulations barring market manipulation, FERC specifically considered this issue and stated:

> "Any entity" is a deliberately inclusive term. Congress could have used the existing defined terms in the NGA and FPA of "person," "natural gas company," or "electric utility," but instead chose to use a broader term without providing a specific definition. Thus, the Commission interprets "any entity" to include any person or form of organization, regardless of its legal status, function or activities.[33]

No one appealed the Commission's ruling in this regard. Hunter now argues that use of the term "entity" in Section 4A reflects Congress' intent to *exclude* enforcement of the anti-manipulation provision against natural persons. Hunter Opp. at 23. Hunter's argument is contrary to the statutory text and broad remedial purpose of the statute.

---

[32] Energy Policy Act of 2005 ("EPAct 2005"), Pub. L. No. 109-58, § 315, 119 Stat. 594, 691 (2005) (codified as an amendment to the Natural Gas Act ("NGA") at 15 U.S.C. §717c-1) (emphasis supplied).

[33] *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244, 4,248 at ¶ 18 (Jan. 26, 2006) (hereinafter, "Order No. 670") (footnotes omitted).

The NGA has had a general definition of "person" that includes "an individual *or a corporation*."[34]  When EPAct amended the NGA to prohibit "any entity" from using or employing a manipulative device or contrivance, Congress *expanded* application of the law by using, as Congress has done in other contexts, "the broadest of all definitions which relates to bodies or units."[35]

Because "entity" is not defined in EPAct or the NGA, the term should be construed in accordance with its ordinary meaning.[36]  In general, the term "entity" may include "*a natural person*, a corporation, a partnership, a limited liability company, a limited partnership, a trust, an estate, an association."[37]  Moreover, Congress' decision to modify "entity" with "any" prohibits

---

[34] 15 U.S.C. § 717a(1) (emphasis added).  The NGA's definition of "person," which includes corporations, is consistent with the broad legal meaning of "person."  *See e.g.,* 1 U.S.C. § 1 (in general, "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.")  The American Heritage Dictionary of the English Language, Fourth Edition, defines "entity" as "[s]omething that exists as a particular and discrete unit: *Persons* and corporations are equivalent entities under the law" (emphasis supplied).  The Thesaurus lists the following synonyms to "entity" being, *individual*, material, matter, object, stuff, substance. (Merriam-Websters Collegiate Thesaurus) (emphasis added).  Hunter's attempt to draw a distinction between natural persons and corporate/man-made entities is expressly contradicted by the plain language of the NGA and their ordinary meaning.

[35] *Alarm Indus. Communications Comm. v. FCC*, 131 F.3d 1066, 1069 (quoting 2 Collier on Banruptcy P 101.15 (15th ed. 1997)).

[36] *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 186 (1995).

[37] *City of Abilene, TX v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999) (emphasis added).  Despite its determination that "entity" is a broad term, the court in *City of Abilene* limited the definition of "entity" to exclude municipalities in this case only because *Gregory v. Ashcroft*, 501 U.S. 452 (1991) mandates that any time a federal law interferes with the relationship between a State and its political subdivision, Congress must clearly state that it intended the Telecommunications Act to govern State-local relationships regarding the provision of telecommunications services.  *Id.* No such application of *Gregory* is relevant here.   The U.S. Court of Appeals for the Eighth Circuit and the Western District of Virginia reviewed and expressly rejected the D.C. Circuit's decision to apply *Gregory v. Ashcroft* to the definition of "any entity" because it "failed to mention the Supreme Court decision "regarding the effect of the modifier 'any' on the modified term [entity]."  *Missouri Municipal League, et al. v FCC*, 299 F.3d 949, 954-55 (8th Cir. 2002); *City of Bristol*, 145 F. Supp. 2d at 749.

a narrow construction of this term.[38]  Thus, "any entity" should be construed to include all things

that could be considered an entity, including a natural person.[39]

> **b.**    **The Context in which "Any Entity" Appears Supports Application of the Anti-Manipulation Provision to Individuals**

The meaning of "any entity" is also evident when placed in context and considered in

light of the EPAct 2005's overall statutory scheme.[40]  Section 318 of EPAct 2005, entitled

"Prohibition of Trading and Serving by Certain *Individuals*," amended the NGA by specifically

prohibiting trading by *individuals* who engaged in anti-manipulative activities proscribed by its

anti-manipulation section.  In relevant part, Section 318 states:

> (d) In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, *any individual* who is engaged or has engaged in practices constituting a violation of section 4A [EPAct's anti-manipulation provision] (including related rules and regulations) from—
>
> (1) acting as an officer or director of a natural gas company; or
> (2) engaging in the business of –
>      (A) the purchasing or selling of natural gas or . . .[41]

---

[38] *Norfolk S. Rwy. Co. v. Kirby*, 543 U.S. 14, 31-32 (2004) (the word "any" gives the word it modifies an expansive reading); *Dep't of Hous. and Urban Dev. v. Rucker*, 535 U.S. 125, 130-31 (2002); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (one must give effect to each word in a statute so that none is rendered superfluous); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("any" is an expansive term, meaning "one or some indiscriminately of whatever kind,"); *New York v. EPA*, 443 F.3d 880, 885-87  (D.C. Cir. 2006) (the word "any" is broadly construed).

[39] *Missouri Municipal League, et al. v FCC*, 299 F.3d 949, 954-55 (8th Cir. 2002) ("any entity" should be broadly construed to include municipalities); *City of Bristol*, 145 F. Supp. 2d at 749 (same); *see also City of Abilene, TX v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999) (the term "entity" in the Telecommunications Act "may include a natural person").

[40] *Bailey v. United States*, 516 U.S. 137, 145 (1995) (the meaning of statutory language depends on the context in which it is used); *United States v. Morton*, 467 U.S. 822, 828 (1984) (statutory phrases are not construed in isolation; instead the statute is read as a whole) (citations omitted).

[41] EPAct 2005 § 318, codified at 15 U.S.C. § 717s (emphasis supplied).

This newly added provision would make little sense, and in effect would be a nullity, if natural persons were not prohibited from engaging in anti-manipulative activities covered by section 4A of the NGA.[42]

Section 22 of EPAct, which likewise amends the NGA, provides that "*any person* that violates this Act . . . shall be subject to a civil penalty of not more than $1,000,000 per day violation for as long as the violation continues."  Had Congress intended to exclude natural persons from the meaning of "any entity," then the Commission would have virtually no authority to impose civil penalties for fraud and manipulation of jurisdictional markets.

There are other sections of EPAct 2005 that use of the term "entity" in a manner that includes persons.[43]  For example, EPAct 2005 added a new section 221 of the FPA, which provides that "[n]o *entity* . . . shall willfully and knowingly report any [false] information . . . which . . . *the person or other entity* knew to be false at the time of reporting".[44]

Similarly, the anti-manipulation provision added by EPAct 2005 to the FPA also uses the term "entity" in a manner showing the term includes persons:

> It shall be unlawful for *any entity* (*including an entity described in section 201(f)*), directly or indirectly, to use or employ, in connection with a purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, any manipulative or deceptive device . . . .[45]

---

[42] *Dodd v. United States*, 545 U.S. 353, 358 (2005) (it is a basic canon of statutory construction that a statute should not be interpreted in such a manner as to nullify an entire section).

[43] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000) (the meaning of one statute may be affected by other Acts).

[44] EPAct 2005 § 1282, codified at 16 U.S.C. § 824u (emphasis supplied).  *See also* EPAct 2005 § 1288, 16 U.S.C. § 825m, which prohibits "any individual" who violates the false reporting provision from acting as an officer or director.

[45] EPAct 2005 § 1283, codified at 16 U.S.C. § 824v (emphasis supplied).

Section 201(f), in turn, refers to both governmental bodies and to persons.[46]  By referencing FPA

Section 201(f), Congress eliminated an exception that would otherwise have applied.  Because

the NGA does not have an analog to FPA Section 201(f), there was no need for Congress to add

a corresponding provision specifying which "entities" were covered in new section 4A of the

NGA, as discussed above.

The language of the NGA and EPAct 2005 support the conclusion that Congress intended

the anti-manipulation provisions to apply to persons as well as companies and governmental

bodies.  For this reason Hunter's reliance on *American Dental Ass'n v. Shalala*, 3 F.3d 445, 446

(D.C. Cir. 1993), is misplaced.  Hunter Opp. at 23-24.[47]  This interpretation is consistent with

legal precedent holding individual investment advisors liable under section 10b for manipulative

conduct.[48]  Given that the intent of Congress was to adopt the broad remedial effects of 10(b) in

prohibiting manipulation of energy markets, it would make little sense to construe EPAct's anti-

---

[46] 16 U.S.C. § 824(f) ("[n]o provision in this Part shall apply to . . . the United States, a State or any political subdivision of a State, or any agency . . . or any corporation . . . *or any officer, agent, employee of any of the foregoing* ).

[47] *American Dental* applies the same analysis as the FERC offers in this case.  In the relevant statute addressed in that case, "entity" was found to "refer[] uniformly to groups and organizations.  Whenever the Act discusses individual persons, words such as 'physicians,' doctor,' . . .are consistently employed."  *American Dental Ass'n v. Shalala*, 3 F.3d at 446.  The court also looked to the context in which "entity" appeared to conclude that for purposes of the Health Care Quality Improvement Act of 1986, the term "entity" did not include individuals. EPAct, on the other hand, uses entity through out its amendments to both the NGA and FPA to include natural persons. *Wolverine Power Co. v. FERC*, 295 U.S. App. D.C. 343 (D.C. Cir. 1992), also cited by Hunter, is likewise inapposite because in that case, the statute used restrictive, not expansive, terms to limit civil penalty authority to "licensees, permittees, or exemptees."  In section 4A, Congress used the more expansive term "any entity."

[48] *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 600 (2d Cir. 1978) (upholding verdict that investment advisor was liable under 10b); *In re Penn Cent. Sec. Lit.,* 395 F. Supp. 192 (D. Pa. 1975).  Because Section 4A was modeled after Section 10b of the Securities Exchange Act, cases construing 10b are relevant to the construction of section 4(a).  *See* 15 U.S.C. § 717c (2005) (terms are used in the same manner as section 10(b)).

fraud provision so that individuals, such as Hunter, who the OSC preliminarily concludes designed and effectuated the manipulative conduct, are excused from liability and civil penalties for such conduct.[49]

### c.    A Broad Interpretation of "Any Entity" is Consistent with the Broad Remedial Purpose of the Statute

Hunter does not dispute that that section 10b and the NGA's section 4A have broad remedial purposes.  The Supreme Court acknowledged that "the magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."[50]  Consequently, courts apply a broad and flexible construction of anti-fraud statutes to insure that markets are maintained.[51]  Section 10(b) and Rule 10b-5 impose liability on *any person* who participated in a manipulative or deceptive scheme, even if a material misstatement by another person created the connection between the scheme and the securities market.[52]  Because section 4A of EPAct 2005 is modeled on section 10b, there is no reason to believe that FERC was given less authority to prevent abuses in energy markets.[53]

---

[49] *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982) (courts should avoid statutory interpretations that lead to futile or absurd results) (citing *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543 (1940)).

[50] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006).

[51] *See, e.g.*, *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (the "in connection with requirement" of the SEC regulatory scheme, on which the Anti-Manipulation Rule is modeled, should be interpreted flexibly, not technically and restrictively, to accomplish the statutes' remedial purposes of promoting market integrity and investor confidence) (*citing United States v. O'Hagan*, 521 U.S. 642, 651 (1997)); *Bankers Life & Cas. Co.*, 404 U.S. at 10 (construction of section 10(b) extends beyond maintaining the integrity of securities markets).

[52] *In re Lernout & Haupsie Sec. Lit.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003).

[53] 149 Cong. Rec. S 13997 at 9 (daily ed. Nov. 5, 2005) (statement of Sen. Bennett) (Both the CFTC and the SEC have broad authority to prohibit market manipulation); 151 Cong. Rec. S 7451 at 40 (daily ed. June 28, 2005) (statement of Sen. Cantwell) (the Cantwell Amendment, which was eventually incorporated into EPAct 2005, gave FERC the tools to prevent abuses in energy markets).  See also 151 Cong. Rec. S 9335 at 16-17 (daily ed. June 29, 2005) (statement of Sen. Cantwell) ("This Energy bill puts in place the first ever broad prohibition on manipulation of electricity and natural gas markets").

Congress' use of the term "entity" instead of "person" as used in section 10(b) was instead simply aimed at accommodating the other terms such as "person" and "corporation" that were already found in the NGA.

> **d.    FERC's Interpretation that "Any Entity" Includes Individuals Is Reasonable and Entitled to Substantial Deference**

If the Court were somehow to conclude that Congress was silent or ambiguous with respect to the application of section 4A to natural persons, then the Court must defer to a "reasonable interpretation made by an agency."[54]

Although the FERC plainly stated in Order No. 670 its intention to interpret "entity" to include natural persons and no one appealed Order No. 670, Hunter argues that the FERC was without power to interpret its own rule in this manner because this is greater authority than granted it by Congress.  Opp. at 23.  However, as shown above, the Commission interpreted the scope of its authority in a manner completely consistent with the intent of Congress to prohibit market manipulation by any and all market participants.

Unlike situations where Congress enacts directly a prohibition, EPAct Section 315 delegated *to FERC* authority to enact the anti-manipulation proscriptions that fulfill the Congressional mandate.  Congress conferred the broadest possible regulatory authority to the FERC when Congress hinged the proscriptive language in section 4A of EPAct on "such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers."  Thus, FERC's interpretation of the anti-manipulation provision should "receive utmost deference if 'it appears that Congress delegated authority to the

---

[54] *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984).

agency generally to make rules carrying the force of law, and that agency interpretation claiming

deference was promulgated in the exercise of that authority.'"[55]

FERC's interpretation of its broad regulatory authority to protect natural gas ratepayers

from manipulative or deceptive practices is not arbitrary and capricious.  Indeed, it is entirely

reasonable given the remaining provisions of EPAct, the Court should accord the interpretation

the maximum deference under *Chevron U.S.A., Inc.  v. NRDC, Inc. et al.,* 467 U.S. 837 (1984),

and its progeny.

## ORAL ARGUMENT REQUESTED

Should this Court deny Defendant's Motion to Dismiss and proceed to consider

Plaintiff's Cross-Motion for Declaratory Judgment, Defendant FERC requests that this Court

hold oral argument on Plaintiff's Cross-Motion for Declaratory Judgment.

---

[55] *Pauley v. BethEnergy Mines*, 501 U.S. 680, 697 (1991) (courts must defer to the agency entrusted by Congress to implement the highly complex and technical regulatory program) (citations omitted); *Apotex, Inc. v. FDA.*, No. 06-0627, 2006 U.S. Dist. LEXIS 20894, at *25-*26 (D.D.C. Apr. 19, 2006) (applying *Chevron* and quoting *United States v. Mead*, 533 U.S. 218, 226-27 (2001)).

January 22, 2008                              Respectfully submitted,


                                              _____/s/_____
                                              Todd Mullins (D.C. Bar # 429539)
                                              Leslie B. Bellas (D.C. Bar # 429707)
                                              Justin M. Shellaway (D.C. Bar # 476170)
                                              Federal Energy Regulatory Commission
                                              Office of Enforcement
                                              Division of Investigations
                                              888 First Street, NE
                                              Washington, DC 20426
                                              (202) 502-8594

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **BRIAN HUNTER,** ) | |
| ) | |
| ) | **Civil Action No. CV07-1307 (RJL).** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **FEDERAL ENERGY REGULATORY** ) | |
| **COMMISSION,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>ORDER</u>

For the reasons set forth in the Memorandum Opinion above, it is this ____ day of

_____, 2008, hereby

**ORDERED** that the Plaintiff's Cross-Motion for Entry of Declaratory Judgment  [#44] is

**DENIED**.

**SO ORDERED.**

_____
RICHARD J. LEON
United States District Court Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. CV07-1307 (RJL). |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT FEDERAL ENERGY REGULATORY COMMISSION'S STATEMENT IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR DECLARATORY JUDGMENT

Defendant Federal Energy Regulatory Commission ("FERC" or the "Commission") submits this statement of all material facts as to which FERC contends there is a genuine issue, pursuant to Rules 7 and 56.1 of the Local Civil Rules of the United States District Court for the District of Columbia, in support of FERC's opposition to Plaintiff's cross-motion for declaratory judgment.

1.     FERC disputes Hunter's statement #2 as to which he contends there is no genuine issue, within his Statement in Support of Plaintiff Brian Hunter's Cross-Motion for Declaratory Judgment ("Plaintiff's Statement in Support").  There is a genuine issue as to whether the Memorandum of Understanding Between the Federal Energy Regulatory Commission (FERC) and the Commodity Futures Trading Commission (CFTC) Regarding Information Sharing and Treatment of Proprietary Trading and Other Information ("MOU") affirmed "the CFTC's exclusive jurisdiction to regulate natural gas futures trading."  *See* Declaration of Justin V. Shur. Sworn to January 7, 2008, ("Shur Declaration"), Exhibit A.  The MOU did not affirm that the CFTC had exclusive jurisdiction to address manipulative natural gas futures trading that is in connection with FERC-jurisdictional markets.  Instead, it merely stated that "the CFTC has exclusive jurisdiction with respect to accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery, including, but not limited to, natural gas . . . ."  MOU at 2.

2.     The settlement price of the NYMEX Natural Gas Futures Contract ("settlement price") impacts the price for contracts that "go to delivery" (*i.e.*, become physical wholesale natural gas sales subject to FERC's jurisdiction).  *See* Order Denying Rehearing of the OSC, 121 FERC ¶ 61,224, at ¶¶ 4, 14(a), (b), 23 (Nov. 30, 2007) ("Order Denying Rehearing") (attached to Shur Declaration as Exhibit J).

3.      The settlement price impacts the "physical basis" transactions subject to FERC's jurisdiction.  Order Denying Rehearing ¶¶ 4, 14(a), (c), 23.

4.      The settlement price impacts the "index prices" and they impact wholesale gas sales subject to the jurisdiction of the Commission.  Order Denying Rehearing  ¶¶ 4, 14(a), (d), 23.

5.      For other material facts as to which FERC contends there is a genuine issue, FERC refers the Court to Brian Hunter's Memorandum in Response to the Federal Energy Regulatory Commission's Order to Show Cause and Notice of Proposed Penalties (attached, without accompanying attachments, to Declaration of Justin M. Shellaway in Opposition to Plaintiff's Cross-Motion for Declaratory Judgment and in Support of Defendant's Motion to Dismiss, sworn to January 22, 2008 ("Shellaway Declaration") as Exhibit B) and Enumerated Response of Brian Hunter to Order to Show Cause and Notice of Proposed Penalties (attached to Shellaway Declaration as Exhibit C).

January 22, 2008                              Respectfully submitted,


                                        _____/s/_____
                                        Todd Mullins (D.C. Bar # 429539)
                                        Leslie B. Bellas (D.C. Bar # 429707)
                                        Justin M. Shellaway (D.C. Bar # 476170)
                                        Federal Energy Regulatory Commission
                                        Office of Enforcement
                                        Division of Investigations
                                        888 First Street, NE
                                        Washington, DC 20426
                                        (202) 502-8594