## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIAN HUNTER,** ) | |
| ) | **Civil Action No. CV07-1307 (RJL).** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **FEDERAL ENERGY REGULATORY** ) | |
| **COMMISSION,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>DECLARATION OF JUSTIN M. SHELLAWAY IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR DECLARATORY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

I, Justin M. Shellaway, declare as follows:

1.     I am an attorney admitted to practice law in the District of Columbia and before the United States District Court for the District of Columbia.  I am an attorney with the Federal Energy Regulatory Commission ("FERC" or the "Commission") and represent the Commission in this action.

2.     I submit this declaration in order to provide to the Court documents in support of FERC's opposition to plaintiff's cross-motion for declaratory judgment and in support of FERC's motion to dismiss.

3.     Attached hereto as Exhibit A is a true and correct copy of an order of the Commission entitled *MidAmerican Energy Holdings Co.*, 118 FERC ¶61,003 (2007).  In relevant part, the Order provides, "The Commission, a five-member agency … acts through its written orders … which are "issued" following a favorable vote of the majority…. Phrased differently, in the absence of such orders, including before it has issued such orders, the Commission cannot be said to have acted."

4.     Attached hereto as Exhibit B is a true and correct copy of  Brian Hunter's Memorandum in Response to the Federal Energy Regulatory Commission's Order to Show Cause and Notice of Proposed Penalties (without accompanying attachments), dated December 14, 2007.  In this Memorandum, Plaintiff Brian Hunter contested many of the assertions contained within FERC's Order to Show Cause and Notice of Proposed Penalties, 120 FERC ¶ 61,085 (2007).

5.     Attached hereto as Exhibit C is a true and correct copy of the Enumerated Response of Brian Hunter to Order to Show Cause and Notice of Proposed Penalties, dated December 14, 2007.  In this Response, Plaintiff Brian Hunter contested many of the assertions contained within FERC's Order to Show Cause and Notice of Proposed Penalties, 120 FERC ¶ 61,085 (2007).

6.     Attached hereto as Exhibit D is a true and correct copy of the Memorandum of Law of *Amicus Curiae* American Public Gas Association, American Public Power Association and National Rural Electric Cooperative Association in Opposition to Motion for a Preliminary Injunction Against the Federal Energy Regulatory Commission, filed in the United States District Court for the Southern District of New York in the case of *U.S. Commodity Futures Trading Commission v. Amaranth Advisors L.L.C. et al*, 07 CIV. 6682 (Sept. 28, 2007).

7.     Attached hereto as Exhibit E is the Memorandum of Law of the National Association of Regulatory Utility Commissioners as *Amicus Curiae* in Opposition to the Motion for a Preliminary Injunction, filed in the United States District Court for the Southern District of New York in the case of *U.S. Commodity Futures Trading Commission v. Amaranth Advisors L.L.C. et al*, 07 CIV. 6682 (Sept. 28, 2007).

8.     Attached hereto as Exhibit F is a true and correct copy of a transcript of questioning by Rep. Barton (R-TX) at the December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations.

9.     Attached hereto as Exhibit G is a true and correct copy of the Statement of Subcommittee Chairman Rep. Bart Stupak (D-MI) given at the December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations.

10.    Attached hereto as Exhibit H is a true and correct copy of the Statement of Committee Chairman Rep. Dingell (D-MI) given at the December 12, 2007 oversight hearing of the House Energy and Commerce Committee, Subcommittee on Oversight and Investigations.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my

knowledge and belief.

Justin M. Shellaway

January 22, 2008
Washington, DC

**COMM-OPINION-ORDER, 118 FERC ¶61,003, MidAmerican Energy Holdings Company, Scottish Power plc, PacifiCorp Holdings, Inc., and PacifiCorp, Docket No. EC05-110-001 January 3, 2007**

© 2008, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**MidAmerican Energy Holdings Company, Scottish Power plc, PacifiCorp Holdings, Inc., and PacifiCorp, Docket No. EC05-110-001**

**[61,004]**

## [¶61,003]

**MidAmerican Energy Holdings Company, Scottish Power plc, PacifiCorp Holdings, Inc., and PacifiCorp, Docket No. EC05-110-001**

**Order Denying Rehearing**

### (Issued January 3, 2007)

**Before Commissioners: Joseph T. Kelliher, Chairman; Suedeen G. Kelly, Marc Spitzer, Philip D. Moeller, and Jon Wellinghoff.**

1. On January 6, 2006, Public Citizen's Energy Program (Public Citizen) requested rehearing of the Commission's December 20, 2005 Order in this proceeding.[1] In that order, the Commission granted a joint application filed by MidAmerican Energy Holdings Company (MidAmerican Holdings), Scottish Power plc (Scottish Power), PacifiCorp Holdings, Inc. (PacifiCorp Holdings), and PacifiCorp (collectively, Applicants) pursuant to Section 203 of the Federal Power Act (FPA)[2] and the Merger Policy Statement,[3] which requested Commission authorization for a disposition of jurisdictional facilities associated with the sale of PacifiCorp by PacifiCorp Holdings to MidAmerican Holdings. In this order the Commission

**[61,005]**

denies Public Citizen's request for rehearing as discussed below.

2. On August 16, 2006, Public Citizen moved to supplement the record, attaching correspondence between Public Citizen and the Commission concerning its Freedom of Information Act request for documents relating to pre-filing meetings between MidAmerican and this Commission's commissioners.[4]

### Background

3. Scottish Power, PacifiCorp Holdings, and MidAmerican Holdings entered into a Stock Purchase Agreement, under which PacifiCorp will become a direct wholly-owned subsidiary of MidAmerican Holdings; MidAmerican Holdings will purchase all of the outstanding common stock of PacifiCorp for approximately $5.1 billion in cash.[5]

4. The December 20 Order found that the proposed transaction was consistent with the public interest. The Commission found that the combination of generation assets would not adversely affect competition in any relevant market, and that the proposed transaction would not adversely affect wholesale power rates or transmission rates. The Commission also found that the proposed transaction would not adversely affect regulation because Applicants had committed that, for wholesale ratemaking, they will follow the Commission's policy regarding the pricing of affiliate transactions for non-power goods and services. Furthermore, the December 20 Order concluded that the proposed transaction will not impair the ability of any state commission to regulate any of Applicants. Finally, the Commission noted that no state commission had protested the proposed transaction.

### Request for Rehearing

5. On January 6, 2006, Public Citizen requested rehearing of the Commission's December 20 Order. Public Citizen reiterates its protest that Applicants' representatives held multiple private meetings with some or all of the Commissioners before the July 22, 2005 filing at the Commission and after they had filed details of the proposed transaction with the Securities and Exchange Commission.

6. Public Citizen states that it is making this request because Commissioners are forbidden by the Administrative Procedure Act (APA)[6] to hold off-the-record meetings when they know the content and subject of those meetings "will be noticed" for hearing.[7] Public Citizen imputes knowledge by the Commission that the proposed transaction filing would be "noticed for hearing" because the companies had already filed "details of the merger with the U.S. Securities and Exchange Commission on May 27, 2005."[8]

7. Public Citizen further contends that the Commission's *ex parte* regulations, prohibiting only off-the-record communications with "decisional" employees in a "contested on-the-record proceeding," conflict with federal law. According to Public Citizen, the APA limits the ability of federal agencies to conduct "off-the-record" meetings: "the prohibitions of this subsection shall apply beginning at such time as the agency may designate, but in no case shall they begin to apply later than the time at which a proceeding is noticed for hearing unless the person responsible for the communication has knowledge that it will be noticed, in which case the prohibitions shall apply beginning at the time of his acquisition of such knowledge."[9] Public Citizen underscores the language quoted above, including the language following "unless," and contends that any pre-filing meetings were in violation of the APA because "[i]t was clear to FERC Commissioners beginning on May 27, 2005 that the merger between MidAmerican and PacifiCorp would have to be 'noticed for hearing,' since Section 203 of the Federal Power Act requires an 'opportunity for hearing.'"[10]

8. Public Citizen argues, as it did in its original protest, that all participants in any and all of these meetings with the Commissioners --including the Commissioners themselves --should testify under oath concerning what was discussed at the meetings, and that this testimony should be included as part of the public record of this proceeding.[11]

### Discussion

9. We disagree that the pre-filing meetings at issue in this proceeding were in violation of the APA or that the Commission's regulations, as applied in this case, conflict with federal law. Accordingly, we deny rehearing.

10. Before turning to Public Citizen's request for rehearing, we note that the Commission's decision, the reasons for that decision, and the record that formed the basis for that decision, are all public. The December 20 Order is public, and that

**[61,006]**

order contains the Commission's decision and the reasons for that decision. That order indicates, as well, the record upon which the Commission made its decision. Hence, the Commission has complied with the APA's directives that "[a]ll decisions ... shall include a statement of ... findings and conclusions, and the reasons or basis therefor."[12]

### A. Public Citizen's Argument Is Untimely

11. Turning to Public Citizen's request for rehearing, as a preliminary matter, Public Citizen's request for rehearing amounts to an impermissible collateral attack on the Commission's regulations applicable to off-the-record communications.[13] In Order No. 607, in adopting the regulations, the Commission determined that "the prohibitions on off-the-record communications do not apply prior to the initiation of a proceeding at the

Commission,"[14] and explained that "pre-filing communications generally fall outside the scope of the APA's definition of ex parte."[15] That is so because "they take place prior to the filing of an application, and therefore prior to any 'proceeding' at the Commission."[16] The Commission went on to state that "pre-filing communications [are] harmonious with the APA and ... [the Commission] does not believe that any bar to communications should exist prior to the time a matter is formally contested, let alone prior to the time a matter is filed for its consideration."[17] The regulations were adopted in 1999 and reaffirmed on rehearing in 2000; Public Citizen did not take issue with them at that time and it is too late to do so now.[18] Fundamental principles settled in final orders cannot be attacked in subsequent proceedings before the Commission.[19]

### B. Public Citizen's Argument Is Inconsistent

12. We note at the outset that Public Citizen's argument, on rehearing, focuses on alleged prohibited ex parte communications with Commissioners.[20] Public Citizen has no objection, however, to communications with Commission staff; indeed, Public Citizen notes (seemingly with approval) that the Commission's regulations allow for such communications,[21] and Public Citizen "encourage[s]" communications with Commission staff.[22] If the latter is permissible, though, then the former should be no less permissible.[23] In this regard, the Commission's regulations define "decisional employee" to include both the Commissioners and Commission staff,[24] and the Commission's regulations prohibiting off-the-record communications

### [61,007]

apply to "decisional employees."[25] Similarly, in this regard, the ex parte prohibition of the APA also does not distinguish between Commissioners and Commission staff.

### C. Pre-Filing Meetings Are Allowed Under the APA

13. Turning to the substance of Public Citizen's claim regarding the APA, we disagree that pre-filing meetings like those at issue here are barred by the APA. Indeed, the ex parte prohibition of the APA simply does not apply here and thus does not bar pre-filing meetings like those complained of here.

14. In its decision-making, the Commission traditionally has employed procedures generally similar to those spelled out in APA Section 557. However, the Commission's doing so does not mean that the Commission was required to follow the APA. In the present context, where less-than- formal adjudication is implicated,[26] the ex parte prohibition of the APA does not apply.[27] The ex parte prohibition of the APA, Section 557(d)(1),[28] applies only to proceedings that are required by statute to be conducted "on the record," i.e. , in a trial-type hearing; Section 557 prohibits ex parte communications in formal adjudications subject to Section 554 of the APA,[29] and such adjudications are those "required by statute to be determined on the record after opportunity for an agency hearing."[30] Section 203 of the FPA does not require an APA "on the record," i.e., trial-type, hearing.[31] Hence, the ex parte prohibition of the APA does not apply to proceedings under Section 203 of the FPA and does not bar pre-filing meetings like those at issue here.

15. The legislative history of APA Section 557(d)(1) supports our reading. Adopted as part of the Government in the Sunshine Act,[32] the legislative history makes clear that the ex parte prohibition is intended for formal, trial-type proceedings.[33] The House Judiciary Committee Report describes this language as focused on "formal" proceedings, and in particular as focused on "formal, trial-type proceedings."[34] That report, as well as the House Government Operations Committee Report and the Senate Government Operations Committee Report, indicates that the ex parte prohibition "only applies to formal agency adjudication," and that "[i]nformal rulemaking proceedings and other agency actions that are not required to be on the record after an opportunity for a hearing will not be affected by the provision."[35] All three committee reports correspondingly offer the same explanation of what triggers APA Section 557(d)(1)(E) in particular, i.e., an agency's institution of a trial-type hearing. "[T]he prohibitions against ex parte communications apply

### [61,008]

as soon as a proceeding is noticed for a hearing."$\underline{^{36}}$

16. In this regard, we also recently engaged a leading expert on administrative law to conduct an independent report on whether the *ex parte* prohibition of the APA applies to Commission proceedings.$\underline{^{37}}$ The report examined the APA prohibition on ex parte communications and concluded that "the ex parte provisions of the APA do not apply to FERC proceedings":

APA §557(d)(1) prohibits ex parte communications in any agency proceeding that is subject to APA §557(a). That section applies "when a hearing is required to be conducted in accordance with Section 556 of this title." APA §556 applies "to hearings required by Section ... 554 of this title to be conducted in accordance with this section." ...APA §554(a) makes §§556 and 557 applicable "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing,...." Thus, the APA prohibition on ex parte communications applies only when a statute requires an agency to issue a rule or to resolve an adjudicatory dispute "on the record after opportunity for agency hearing."

....

No FERC-administered statute contains the language "on the record after opportunity for agency hearing" or any equivalent language that triggers the prohibition on ex parte communications in APA §557(d).... Thus, FERC is not required by statute to engage in ... formal adjudication, and therefore the ex parte provisions of the APA do not apply to FERC proceedings....[$\underline{^{38}}$ ]

17. Moreover, even if we were to assume that the APA applies to Section 203 proceedings, it would not bar the pre-filing meetings at issue here. APA Section 557(d)(1) applies the *ex parte* prohibition only to "agency proceedings";$\underline{^{39}}$ here, as we explain elsewhere in this order, at the time of the pre-filing meetings at issue, there was no proceeding. Moreover, for the same reason, there were no "parties" to whom "notice" could be given of any such communication.$\underline{^{40}}$ Therefore, the ex parte prohibition highlighted by Public Citizen, APA Section 557(d)(1)(E),$\underline{^{41}}$ would not apply to the pre-filing meetings at issue here.

18. Public Citizen seeks to avoid this conclusion by relying on language in Section 557(d)(1)(E) of the APA which provides that *ex parte* prohibitions shall "apply no later than the time at which a proceeding is noticed for hearing unless the person responsible for the communication has knowledge that it will be noticed, in which case the [*ex parte*] prohibitions shall apply beginning at the time of his acquisition of such knowledge." According to Public Citizen, a pre- filing meeting triggers this clause because the Commissioner attending the meeting "has knowledge" that a proceeding will be "noticed for hearing." This is not correct. First, as a threshold matter, Section 557(d)(1) does not apply to Section 203 proceedings for the reasons explained above. Second, even if Section 557(d)(1) were applicable, it would not produce a different result. Under this clause, the *ex parte* prohibition applies no earlier than at the time the "person responsible for the communication"$\underline{^{42}}$ has "knowledge" that "it" (i.e., the proceeding) will be "noticed for hearing," not merely knowledge that a proceeding may be instituted (i.e., that there may be a filing).$\underline{^{43}}$

### [61,009]

"Noticed for hearing," the Commission found in Order No. 607, refers to formally setting a proceeding for hearing.$\underline{^{44}}$ And knowledge that a "proceeding" will be "noticed for hearing" certainly cannot exist earlier than when a "proceeding" is first instituted by a filing with the Commission. Further, such knowledge that a "proceeding" will be "noticed for hearing," it likewise follows, can only occur when the Commission issues an order$\underline{^{45}}$ formally setting a "proceeding" for a trial- type hearing and not when a "proceeding" is first instituted. Thus, we reject any claim that the Commissioners or Commission staff in this case had the requisite knowledge to trigger the ex parte communication prohibitions, and that the pre-filing meetings were prohibited. To this, we add that knowledge that a proceeding will be instituted and "notice" of the filing will be published in the Federal Register for public comments is not the same as "knowledge" that a proceeding will be set for a trial-type hearing as provided in the APA.$\underline{^{46}}$

### D. *Commission Rule 2201 Does Not Conflict with the APA*

19. Our regulations are, in fact, consistent with the APA. Like the APA, our regulations prohibit off-the-record communications in any "contested" proceedings.[47] As relevant here, the Commission defines a "contested" proceeding as "any proceeding before the Commission to which there is a right to intervene and in which an intervenor disputes any material issue."[48] Just as we explained above with respect to the APA, before a filing has been made at the Commission, there is no proceeding, let alone a proceeding in which an intervenor is disputing a material issue. At the time of the pre-filing meetings at issue here, there had been no filing at the Commission, there was no docketed proceeding at the Commission, and there was no intervenor disputing a material issue in a docketed proceeding at the Commission.[49] In short, prior to filing, just as the APA would not have applied, Rule 2201's prohibitions on ex parte communication did not apply,[50] and pre-filing

**[61,010]**

meetings like those at issue here were not prohibited.[51]

20. It is noteworthy, we add, that the standard which our *ex parte* regulations apply is not only easily administered and practicable, but also initiates the *ex parte* prohibitions earlier than would be required under the APA (if the APA applied) and thus is more stringent than the APA (if the APA applied).[52] That is, as discussed above, once a filing is contested, the Commission's regulations prohibit off-the-record communications, even if the proceeding ultimately is not "noticed for hearing."[53]

21. Finally, it is worth repeating that the Commission based its decision to approve the proposed transaction on the extensive and public record of Applicants' filings and the many responsive pleadings received from intervenors, including Public Citizen. That Commission decision is contained in a public order that details how the public record supports each finding made by the Commission. At no point did the Commission rely on any information received at any pre-filing meetings to make its decision.[54]

### E. *Public Citizen's Motion for Stay*

22. We will deny Public Citizen's alternative motion for stay. Under the standards of the APA, the Commission may stay its action "when justice so requires."[55] In addressing motions for stay, the Commission considers: (1) whether the moving party will suffer irreparable injury without a stay; (2) whether issuing the stay will substantially harm other parties; and (3) whether a stay is in the public interest.[56] The Commission's general policy is to refrain from granting a stay of its orders, to assure definiteness and finality in Commission proceedings.[57] The key element in the inquiry is irreparable injury to the moving party.[58] However, the Commission may examine the other factors where appropriate.[59]

23. The Commission has considered Public Citizen's motion for a stay in light of the legal standards described above, and does not find that Public Citizen has demonstrated that it will suffer irreparable injury. Furthermore, the disposition of jurisdictional facilities associated with the sale of PacifiCorp by PacifiCorp Holdings to MidAmerican Holdings has already been accomplished. We will therefore deny Public Citizen's alternative motion for stay.

### *The Commission orders:*

(A) Public Citizen's request for rehearing is hereby denied, as discussed in the body of this order.

(B) Public Citizen's alternative motion for stay is hereby denied.

[1] *MidAmerican Energy Holdings Co.*, 113 FERC ¶61,298 (2005) (December 20 Order).

[2] 16 U.S.C. §824b (2000), *amended by* Energy Policy Act of 2005, Pub. L. No. 109-58, §1289, 119 Stat. 594, 982-83 (2005) (EPAct 2005).

[3] Inquiry Concerning the Commission's Merger Policy Under the Federal Power Act: Policy Statement, Order No. 592, 61 Fed. Reg. 68,595 (December 30, 1996), FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,044 (1996), reconsideration denied, Order No. 592-A, 79 FERC ¶61,321 (1997) (Merger Policy Statement ); see also, Revised Filing Requirements Under Part 33 of the Commission's Regulations, Order No. 642, 65 Fed. Reg. 70,983 (November 28, 2000), FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,111 (2000), order on reh'g, Order No. 642-A, 66 Fed. Reg. 16,121 (March 23, 2001), 94 FERC ¶61,289 (2001); Transactions Subject to FPA Section 203, Order No. 669, 71 Fed. Reg. 1,348 (January 6, 2006), FERC Statutes and Regulations, Regulations Preambles 2001-2005 ¶31,200 (2005).

[4] While Public Citizen asserts that these documents provide evidence of improper communications, we disagree. Although Public Citizen demonstrates that pre-filing meetings did occur (which we have never denied), it does not demonstrate that the meetings were improper. As explained below, we conclude that the meetings were not improper.

[5] Approximately $4.3 billion in net debt and preferred stock will remain outstanding at PacifiCorp. The ownership of PPM Energy, whose direct parent is PacifiCorp Holdings, will not be affected by the proposed transaction.

[6] 5 U.S.C. §§551et seq. (2000).

[7] 5 U.S.C. §557(d)(1)(C) (2000).

[8] Request for Rehearing at 2.

[9] 5 U.S.C. §557(d)(1)(E) (2000).

[10] Request for Rehearing at 3.

[11] Insofar as we find below that the APA's ex parte prohibition does not apply in the circumstances present here, we see no need for an evidentiary hearing or for individual Commissioners to testify under oath concerning the pre-filing meetings at issue here.

[12] 5 U.S.C. §557(c) (2000).

[13] 18 C.F.R. §385.2201 (2006); Regulations Governing Off- the-Record Communications, Order No. 607, 64 Fed. Reg. 51,222 (September 15, 1999), FERC Statutes and Regulations, Regulations Preambles July 1996- December 2000 ¶31,079 (1999), order on reh'g, Order No. 607-A, 65 Fed. Reg. 71,247 (November 30, 2000), FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,112 (2000).

[14] Order No. 607, FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,079, at p. 30,892.

[15] Id. at p. 30,890.

[16] Id. at p. 30,879.

[17] Id. at p. 30,891. In adopting our current ex parte regulations, which we note that we previously have found are consistent with the APA in allowing pre-filing meetings, see id. at pp. 30,890-91, we explained that our ex parte regulations reflect "fundamental APA principles" and "further[] ... basic tenets of fairness." Id. at p. 30,878. We did not, however, expressly address the applicability of the ex parte prohibition of the APA; rather, to the extent that we considered the matter at all, we simply assumed the applicability of the ex parte prohibition of the APA. Likewise, in Electric Power Supply Association v. FERC, 391 F.3d 1255 (D.C. Cir. 2004) (EPSA ), we again essentially assumed (as did the court) the applicability of the ex parte prohibition of the APA. In neither instance did we closely examine the question of whether, in fact, the ex parte prohibition of the APA applied. Here, prompted by allegations in this and other recent cases that we have violated the ex parte prohibition of the APA by allowing pre-filing meetings, we have closely examined the question (and also engaged a leading expert on administrative law to look into the question), and, as explained below, we have concluded (and that expert likewise concluded) that the ex parte prohibition of the APA does not apply to this and similar proceedings and

does not bar pre-filing meetings in such proceedings. Indeed, as explained in greater detail below, we chose to adopt (and that expert likewise has noted that we have adopted) *ex parte* regulations that go beyond what is required by the APA.

[18] See *Exelon Corp.*, 113 FERC ¶61,299 at P 97 (2005) (finding Public Citizen's arguments are an impermissible collateral attack on the Commission's regulations).

To the extent that Public Citizen cites *EPSA* to suggest that "FERC's rules are not the last word on whether an *ex parte* contact is lawful," Request for Rehearing at 4-5, Public Citizen makes a collateral and belated attack on the Commission's regulations. Public Citizen did not file comments in the Commission's rulemaking proceeding proposing its regulations governing off-the-record communications, however, nor did Public Citizen seek rehearing of the Commission's order promulgating the regulations. Order No. 607, *FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000* ¶31,079, at p. 30,878 n.14, pp. 30,896-97 (Appendix A); Order No. 607-A, *FERC Statutes and Regulationss, Regulations Preambles July 1996-December 2000* ¶31,112, at p. 31,924. It is therefore too late for Public Citizen to challenge the Commission's regulations.

Moreover, in *EPSA* the court did not overturn those regulations. In any event, the court also addressed a very different circumstance than that presented here. In *EPSA* , the court noted that it was addressing "Congress' directive banning *ex parte* communications relevant to *pending on-the-record proceedings* between decisional staff and interested persons outside the agency." *EPSA*, 391 F.3d at 1266 (emphasis added). That is not the circumstance presented here.

[19] See *Southwest Gas Corp. v. FERC*, 145 F.3d 365, 370 (D.C. Cir. 1998) ("The Commission need not revisit the reasoning of a general order every time it applies it to a specific circumstance.").

[20] See Request for Rehearing *passim* .

[21] See *id.* at 5 & n.8.

[22] *Id.* at 5.

[23] As Public Citizen contends that a regulation (such as 18 C.F.R. §§35.6, 388.104 (2006)) cannot trump a statute, the natural consequence of Public Citizen's argument if we were to rule in Public Citizen's favor would be to bar precisely the kinds of informal contacts with Commission staff that our regulations allow and that Public Citizen "encourage[s]."

[24] See 18 C.F.R. §§385.102(a), 385.2201(c)(3) (2006).

[25] See 18 C.F.R. §385.2201(b) (2006).

[26] See generally, Richard J. Pierce, Jr. *et al.*, *Administrative Law and Process* 298-307 (3d ed. 1999).

[27] See *United States v. Florida East Coast Ry. Co.* , 410 U.S. 224, 240 (1973) (construing "hearing" mandate in agency's governing statute as not invoking APA requirements for formal adjudication; *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742 (1972) (statute must require hearing "on the record" to implicate APA's formal adjudication and *ex parte* provisions); *Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37, 42-43 (D.C. Cir. 2000) (in absence of statutory command, agencies may grant additional procedural rights, but reviewing courts may not impose them if agencies have not granted them; APA's *ex parte* prohibition did not apply to application to transfer of registry of eight vessels); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534 (9th Cir. 1993) (APA's *ex parte* prohibition applied because Endangered Species Act mandated an "on the record" final determination).

Compare *Izaak Walton League v. Marsh*, 655 F.2d 346, 361 n.37 (D.C. Cir. 1981) ("The APA itself does not use the term 'informal adjudication.' Informal adjudication is a residual category including all agency actions that are not rulemaking and that need not be conducted through 'on the record' hearings. The APA fails to specify the procedures that must be followed for agency actions that fall within this category." ), *with PBGC v. LTV Corp.*, 496 U.S. 633, 655-56 (1990) (distinguishing between "formal adjudication ... pursuant to the trial-type procedures set forth in [APA §§554, 556, and 557]" and "informal adjudication, the minimal requirements for which are set forth in §555 of the APA...."), *and* 5 U.S.C. §555(b), (e) (2000) (requiring each agency, "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, [to] proceed to

conclude a matter presented to it," and to give "[p]rompt notice ... of the denial of a written application, petition, or other request of an interested person made in connection with any agency proceeding ... [with] a brief statement of the grounds for denial").

[28] 5 U.S.C. §557(d)(1) (2000).

[29] Id. §554.

[30] Id. §554(a)(1) (emphasis added).

[31] 16 U.S.C. §824b (2000). While Section 203 of the FPA does not require APA "on the record," i.e., trial-type, hearings, we do on occasion opt to hold trial-type hearings. That fact does not change our analysis or our conclusion. Section 203 of the FPA does not require that we hold such hearings, and so the ex parte prohibition of the APA does not apply to Section 203 of the FPA and to actions taken and decisions made under Section 203 of the FPA.

Most commonly, as in this instance, decisions under Section 203 of the FPA are based on a written, and public, record (what we sometimes refer to as a "paper" record). That record would consist, as it does here, of the application and any amendments or supplements, any interventions, protests and comments, and any answers that we have accepted. Again, the fact that we have developed a record does not change our analysis or our conclusion. Section 203 of the FPA does not require that we hold an APA "on the record," i.e., trial-type, hearing, and so the ex parte prohibition of the APA does not apply to Section 203 of the FPA and to actions taken and decisions made under Section 203 of the FPA.

[32] Pub. L. No. 94-409, §4(a), 90 Stat. 1241, 1246 (1976).

[33] This, we note, is consistent with the approach taken in our regulations --discussed elsewhere in this order.

[34] H.R. Rep. No. 94-880, pt. 2, at 18 (1976) (House Judiciary Committee Report). Our prior orders take a similar view. See Order No. 607, FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,079, at p. 30,891 n.95.

[35] House Judiciary Committee Report at 18; H.R. Rep. No. 94-880, pt. 1, at 19 (1976) (House Government Operations Committee Report); S. Rep. No. 94-354, at 35 (1975) (Senate Government Operations Committee Report).

[36] House Judiciary Committee Report at 21; accord House Government Operations Committee Report at 21 (using substantially identical language); Senate Government Operations Committee Report at 38 (same as House Government Operations Committee Report).

As explained below, the Commission has chosen in its regulations to time the application of the ex parte prohibition to the contesting of a proceeding, regardless of whether a trial-type hearing is ultimately ordered. See 18 C.F.R. §385.2201(a), (c) (2006); see also, Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Maritime Admin., 215 F.3d 37, 42-43 (D.C. Cir. 2000) (in absence of statutory command, agencies may grant additional procedural rights, but reviewing courts may not impose them if agencies have not granted them). The legislative history of APA Section 557(d)(1) similarly indicates that the ex parte prohibition is focused on contested proceedings: "The purpose of this provision is to notify the opposing party and the public...." House Government Operations Committee Report at 21 (emphasis added); accord House Judiciary Committee Report at 20 (same); Senate Government Operations Committee Report at 37 (same).

[37] Richard J. Pierce, Jr., Federal Energy Regulatory Commission Ex Parte Regulations and Practices (November 27, 2006) (FERC Ex Parte Regulations), available at <http://www.ferc.gov>.

[38] Id. at 2-3 (footnotes omitted); accord id. at 4 ("FERC is not required to use formal adjudication to conduct any adjudication. It is free to use informal adjudication, and the APA does not prohibit ex parte communications in informal adjudications.") (footnote omitted).

[39] 5 U.S.C. §557(d)(1) (2000).

[40] Compare 5 U.S.C. §551(14) (2000) with 5 U.S.C. §551(3) (2000) (defining "party" under APA), 18 C.F.R. §385.102(c) (2006) (defining "party" in Commission proceedings), and 18 C.F.R. §385.214(c) (2006) (discussing granting of party status in Commission proceedings).

[41] 5 U.S.C. §557(d)(1)(E) (2000).

[42] We note that the person to whom this phrase refers is difficult to determine. Normally, it is the outside party that initiates the communication, so the Commissioners or Commission staff would not be the person "responsible" for the communication. It is not that person but the Commission or Commission staff, however, that ultimately will have knowledge (following receipt of and analysis of all the various filings and pleadings) that a proceeding will be "noticed for hearing." For the sake of the following discussion, we will assume that the Commissioners and Commission staff are the "person responsible for the communication." Compare 5 U.S.C. §557(d)(1)(C) (2000) with id. §557(d)(1)(E).

[43] On the facts of this case, where the meetings pre-dated the filing and thus the proceeding, there was certainly no violation of the Commission's regulations or the APA. The Commission's regulations, like the APA, define prohibited off- the-record communications in the context of contested proceedings, see 18 C.F.R. §385.2201(a), (b), (c)(1) (2006); Order No. 607, FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,079, at p. 30,892 ("the proscriptions apply ... from the time of the filing of an intervention disputing any material issue that is the subject of a proceeding"), 30,893 ("prohibitions on off-the-record communications will typically be triggered by the filing of a protest or an intervention that disputes any material issue" ), and at the time of the meetings at issue there was no contested proceeding.

[44] Order No. 607, FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,079, at p. 30,891 & n.95.

[45] The Commission, a five-member agency (see 16 U.S.C. §792 (2000); 18 C.F.R. §376.102 (2006)), acts through its written orders (see, e.g., Indianapolis Power & Light Co., 48 FERC ¶61,040, at p. 61,203 & n.29 ("The Commission speaks through its orders."), order on reh'g, 49 FERC ¶61,328 (1989)), which are "issued" following a favorable vote of the majority. Cf. Joseph Martin Keating, 47 FERC ¶61,170, at p. 61,554 (1989) (Commissioner Trabandt dissenting) (referring to several recent cases "that by majority vote" took certain actions), remanded on other grounds, 927 F.2d 616 (D.C. Cir. 1991). Phrased differently, in the absence of such orders, including before it has issued such orders, the Commission cannot be said to have acted.

[46] See 16 U.S.C. §824b(a) (2000), amended by Energy Policy Act of 2005, Pub. L. No. 109-58, §1289, 119 Stat. 594, 982-83 (2005) (providing for "notice" so that interested persons may seek to intervene and protest). While every FPA Section 203 filing --indeed, virtually every FPA filing --is "noticed," in that notice of the filing is issued and published in the Federal Register, comparatively few filings are set for trial-type hearings.

[47] 18 C.F.R. §385.2201(a)-(b), (2006).

[48] 18 C.F.R. §385.2201(c)(1) (2006) (emphasis added); accord Order No. 607-A, FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶31,112, at p. 31,925 & n.6.

[49] Moreover, just as our regulations did not preclude MidAmerican from seeking a pre-filing meeting in this instance, so our regulations do not preclude potential intervenors (like Public Citizen) from seeking pre-filing meetings in anticipation of filings under Section 203 of the FPA. As with MidAmerican here, at the time of any such pre-filing meetings, there would be no filing yet, no docketed proceeding yet, and no intervenor disputing a material issue in a docketed proceeding yet.

[50] In this regard, the independent report on ex parte communications that we commissioned states:

FERC's ban on ex parte communications does not apply to pre-filing meetings. FERC therefore allows informal communications to occur prior to the time a filing is made and disputed by an intervenor on a material issue. There is, as indicated, nothing unlawful about this practice.

FERC Ex Parte Regulations at 8.

We add that informal meetings and conversations are used in many contexts and not just in the pre-filing context.

They occur in the context of other provisions of the FPA, as well as in the context of holding company-related matters, hydroelectric-related matters, and natural gas-related matters; such informal meetings and conversations involve all of the industries that the Commission regulates. Such informal contacts --which can be and are not only with regulated public utilities but also with customers --are the "'bread and butter' of the process of administration" and they are "completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness." *Louisiana Ass'n of Indep. Producers and Royalty Owners v. FERC*, 958 F.2d 1101, 1113 (D.C. Cir. 1992) (*Louisiana*); *see* 18 C.F.R. §§35.6, 388.104 (2006) (providing for informal advice by Commission staff); 18 C.F.R. §2.1a (2006) (soliciting suggestions, comments, and proposals from the public, including persons regulated by the Commission); Order No. 607, *FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000* ¶31,079, at p. 30,878, pp. 30,892-93. And here, given the facts of a public decision, rationale, and record, there is no basis on which a claim can be made that judicial review will be frustrated or that serious questions of fairness exist. *Louisiana* , 958 F.2d at 1113.

Moreover, in this regard, since the range of persons and companies that potentially can file is so wide, *see* 18 C.F.R. §§385.206(a), .207(a) (2006), if the Commission were to agree with Public Citizen the Commission arguably could be barred from meeting with anyone on anything, which would hurt not only the Commission, but also those who appear before it. *See* 18 C.F.R. §§35.6, 388.104 (2006) (providing for informal advice by Commission staff); 18 C.F.R. §2.1a (2006) (soliciting suggestions, comments, and proposals from the public, including persons regulated by the Commission).

[51] Further, Public Citizen does not explain when it believes a proceeding would begin for purposes of the APA or Rule 2201, which effectively puts no limit on how early a proceeding begins.

[52] The independent report on *ex parte* communications that we commissioned notes that the Commission "has adopted restrictions on ex parte communications in informal adjudications even though the APA does not require such restrictions." FERC Ex Parte Regulations at 4-5; *Id.* at 3 (noting that the Commission's restrictions on *ex parte* communications "go beyond what is required by the APA.").

[53] Order No. 607, *FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000* ¶31,079, at pp. 30,880-81 (extending *ex parte* prohibition to contested proceedings).

[54] *See Louisiana*, 958 F.2d at 1113.

[55] 5 U.S.C. §705 (2000).

[56] *See, e.g., CMS Midland, Inc., Midland Cogeneration Venture Limited Partnership*, 56 FERC ¶61,177, at p. 61,361 (1991) (*CMS Midland*), *aff'd sub nom. Michigan Municipal Cooperative Group v. FERC*, 990 F.2d 1377 (D.C. Cir.), *cert denied*, 510 U.S. 990 (1993).

[57] *CMS Midland*, 56 FERC at p. 61,630; *see also, Sea Robin Pipeline Co.*, 92 FERC ¶61,217 (2000).

[58] *CMS Midland*, 56 FERC at p. 61,621.

[59] *See Montana Power Co.*, 85 FERC ¶61,400, at p. 62,535 (1998).

© 2008, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Amaranth Advisors L.L.C.<br>Amaranth LLC<br>Amaranth Management Limited<br>Partnership<br>Amaranth International Limited<br>Amaranth Partners LLC<br>Amaranth Capital Partners LLC<br>Amaranth Group Inc.<br>Amaranth Advisors (Calgary) ULC<br>Brian Hunter<br>Matthew Donohoe | Docket No. IN07-26-000 |

## BRIAN HUNTER'S MEMORANDUM IN RESPONSE TO THE FEDERAL ENERGY REGULATORY COMMISSION'S ORDER TO SHOW CAUSE <u>AND NOTICE OF PROPOSED PENALTIES</u>

KOBRE & KIM LLP

800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

1919 M Street, N.W.
Washington, D.C. 20036
Tel: 202.664.1900
Fax: 202.664.1900

*Counsel for Brian Hunter*

# TABLE OF CONTENTS

Preliminary Statement ......................................................................................... 1

Statement of Facts and Evidence ....................................................................... 3

    I.     Background ................................................................................. 3

    II.    Events Surrounding The Three Expiry Dates At Issue ........................... 15

        A.     February 24, 2006:  March Expiry .............................................. 15

        B.     March 29, 2006:  April Expiry ................................................... 29

        C.     April 26, 2006: May Expiry ....................................................... 30

Argument ......................................................................................................... 49

    I.     The Commission Lacks Personal Jurisdiction Over Brian Hunter .......... 49

    II.    The Commission Lacks The Statutory Authority To Proceed In This Matter ........................................................................................... 54

    III.   Applying The Anti-Manipulation Rule Now To Hunter's 2006 Conduct Violates Due Process ................................................................ 62

    IV.   The Commission's Manipulation Claim Fails On The Merits As A Matter Of Law ....................................................................................... 67

        A.     Applicable Law ..................................................................... 67

        B.     The Commission Must Prove Its Case By A Preponderance Of The Evidence ............................................... 73

        C.     The Commission Has Failed To Show That Hunter's Conduct Was Manipulative Or Deceptive, As It Must ............. 75

        D.     The Commission Has Failed To Show That Hunter Acted With The Requisite State of Mind ................................ 80

            1.     There Is No Evidence That Hunter's Sole Purpose Was To Depress The Price Of Physical Natural Gas—The Requisite State of Mind For This Manipulation Claim ........................................... 80

            2.     Even Under The Commission's Novel Theory Of The Requisite Scienter, The Commission Has

Failed To Meet That Standard As A Matter of Law ................................................................ 82

a.    There Is No Evidence That Hunter Specifically Intended To Depress The NYMEX Settlement Price .................................... 83

    (i)    The Commission Has Failed To Produce Any Direct Evidence Of Intent ........................................................ 83

    (ii)    The Commission's Purported Circumstantial Evidence Does Not Reasonably Support An Inference of Intent ........................................................ 84

        (a)    There Is No Evidence That Hunter Believed It Was Even Possible For a Speculative Trader to Affect the Settlement Price Merely By Selling Futures .............................. 85

        (b)    The Commission Fails To Show A Sufficiently Concrete and Personal Benefit That Hunter Would Realize From The Alleged Manipulation ................................. 87

        (c)    The Commission Has Not Demonstrated That The Alleged Scheme Produced Or Would Even Produce A Net Benefit To Hunter's Book As A Whole ........................................ 89

    (iii)    The Commission Ignores Substantial Evidence That Hunter's Purpose Was Legitimate And Either Misquotes Or Draws Unreasonable Inferences From The Evidence It Does Cite .................................................... 96

    (iv)    The Commission Conveniently Ignores The Evidence That Hunter Executed Trades During This Time Period That Were Inconsistent With

An Intent To Depress The Settlement
Price ........................................................ 113

b.      There Is No Evidence That Hunter Knew or
Was Extremely Reckless As To The Impact
That The NYMEX Settlement Price Would
Have On The Price Of Physical Natural Gas...... 116

E.      There Is No Evidence That The Trades Had Any
Material Impact On Price Or That Price Was Artificially
Affected .................................................................. 119

1.      The Commission Fails To Demonstrate Any
Correlation Between The Trades At Issue and
Price Movements .......................................... 120

2.      Dr. Kaminski's Analysis Is Fundamentally Flawed..... 124

3.      There Is No Evidence That The Price Movements
Were Abnormal, As They Were Within The
Expected Range ............................................ 126

4.      Price   Movements   After   The   Expiry   Are
Inconsistent   With   Manipulation   During   The
Expiry .......................................................... 129

5.      Price   Movements   During   the   Expiries   Are
Explained By Fundamentals.......................... 130

F.      The Commission Has Failed To Establish That Hunter's
Conduct Was In Connection With The Purchase Or Sale
Of Physical Natural Gas ........................................ 133

V.      The OSC Contains A Variety Of Other Miscellaneous False Or
Irrelevant Allegations............................................................. 133

VI.     Due Process Requires A Trial Before Any Finding Of Liability By
The Commission ..................................................................... 136

VII.    The Proposed Penalties In The Show Cause Order Far Exceed The
Commission's Authority.......................................................... 138

VIII.   Any Assessment Of Penalties Should Be Mitigated by Hunter's
Cooperation............................................................................. 141

IX.     Hunter Is Entitled To A Trial *De Novo* In Federal District Court
Before Any Imposition of Civil Penalties................................ 144

iv

Conclusion ............................................................................................................. 147

# TABLE OF AUTHORITIES

## Cases

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................................ 87

*Asahi Metal Indus., Co. v. Superior Court*, 480 U.S. 102 (1987).............................. 49, 53

*ATSI Communications, Inc. v. Shaar Fund*, Ltd., 493 F.3d 87 (2d Cir. 2007)..... 69, 71, 75

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d
     Cir. 2002)........................................................................................................ 50

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975) ...................................... 51

*Cajun Electric Power Coop. v. FERC*, 28 F.3d 173 (D.C. Cir. 1994)........................... 135

*Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL
     342050 (S.D.N.Y. June 25, 1998) ...................................................................... 88

*CFTC v. Amaranth Advisors LLC,* No. 07 Civ. 6682 (S.D.N.Y. filed July 25,
     2007)................................................................................................................. 65

*Chandler v. Roudebush*, 425 U.S. 840 (1976) .............................................................. 143

*Crane Company v. Westinghouse Air Brake Company*, 419 F.2d 787 (2d Cir.
     1969)................................................................................................................. 71

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)........................................................ 68

*Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D.Conn. 1991) ...................................... 87

*FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300 (D.C.
     Cir. 1980).......................................................................................................... 49

*Gates & Fox Co. v. OSHRC*, 790 F.2d 154  (D.C. Cir. 1986) ........................................ 64

*General Motors Corp. v. FERC*, 656 F.2d 791 (D.C. Cir. 1981) .................................. 135

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ...... 68, 69, 75, 76, 118

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................................ 64

*Greenwich Collieries v. Dir., Office of Workers' Comp. Programs*, 990 F.2d
     730 (3d Cir. 1993) .............................................................................................. 74

*Gruntal & Co. v. San Diego Bancorp*, 901 F.Supp. 607 (S.D.N.Y. 1995)................ 70, 75

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) .............................................. 73

*Hunter v. Federal Energy Regulatory Commission*, No. 07. Civ. 1307
     (D.D.C. filed July 24, 2007) .............................................................................. 54

*In re Axis Capital Holdings Ltd. Securities Litigation*, 456 F.Supp.2d 576
     (S.D.N.Y. 2006).................................................................................................. 87

*In re College Bound Consolidated Litigation*, Nos. 93 Civ. 2348 (MBM), 94
     Civ. 3033 (MBM), 1995 WL 450486 (S.D.N.Y. July 31, 1995) ........................... 70, 72

*In re Interbank Funding Corp. Securities Litigation*, 329 F. Supp. 2d 84 (D.D.C. 2004) ............................................................................................ 88

*In re Kocherhans*, No. 3-8611, 1995 WL 723989 (Dec. 6, 1995) ....................... 71, 72, 76

*In re Olympia Brewing Co. Securities Litigation*, 613 F.Supp. 1286 (N.D. Ill. 1985) ..................................................................................................... 68, 75

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) ................................................................................................... 50, 51

*Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2002) .............................................. 71, 72, 81

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..................................................... 136, 144, 145

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)........................................................................................................ 52

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................ 64

*Nanopierce Technologies, Inc., v. Southridge Capital Management LLC*, No. 02 Civ. 0767 (LBS), 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002)............... 71, 72, 79

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)................................................................. 86

*Rockies Fund, Inc., v. SEC*, 428 F.3d 1088 (D.C. Cir. 2005) ................................ 115, 118

*Santa Fe Industries, Inc., v. Green*, 430 U.S. 462 (1977).................................................. 68

*Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1 (1985) ............................................... 68

*SEC v. Masri*, No. 04-Civ. 1584 (RJH), 2007 WL 4126773 (S.D.N.Y. Nov. 20, 2007).............................................................................................. 71, 72

*SEC v. McCaskey*, 2002 WL 85000 (S.D.N.Y. Mar. 26, 2002)..................................... 139

*SEC v. Schiffer*, 97 Civ. 5853 (RO), 1998 WL 226101 (S.D.N.Y., May 5, 1998)........................................................................................................ 71, 73, 76

*SEC v. Tanner*, 2003 WL 21523978 (S.D.N.Y. July 3, 2003)....................................... 139

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)........................................................ 51

*Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124 (2d Cir. 1994) ...................................... 87

*Steadman v. SEC*, 450 U.S. 91 (1981) ...................................................................... 73, 74

*Stoller v. CFTC*, 834 F.2d 262 (2d Cir. 1987) ................................................................. 64

*Sullivan & Long v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995)....................... 68, 70, 75

*Union Pacific Fuels v. FERC*, 129 F.3d 157 (D.C. Cir. 1997) ...................................... 135

*United States v. Hoechst Celanese Corp.*, 128 F.3d 216 (4th Cir. 1997)................... 64, 66

*United States v. Lanier*, 520 U.S. 259 (1997)................................................................. 64

*United States v. Menendez*, 48 F.3d 1401 (5th Cir. 1995) ............................................ 135

*United States v. Mulheren*, 938 F.3d 364 (2d Cir. 1991)........................................... 72, 78

**Statutes**

15 U.S.C. § 717c-1 ..................................................................................... 54

15 U.S.C. § 717t-1 ................................................................... 135, 137, 143

15 U.S.C. § 717u .................................................................................... 143

17 C.F.R. § 240.10b-5 .............................................................................. 139

17 C.F.R. Part 38 ........................................................................................ 6

18 C.F.R. § 1c.1 ................................................................................... 66, 67

18 C.F.R. § 385 ..................................................................................... 1, 135

28 U.S.C. § 1335(a) ............................................................................... 143

5 U.S.C. § 556(d) ............................................................................... 73, 136

7 U.S.C. § 13(a) ...................................................................................... 66

7 U.S.C. § 2(a)(1)(A) ............................................................................ 9, 54

7 U.S.C. § 7(d) ........................................................................................... 6

7 U.S.C. § 9(a)(2) ...................................................................................... 66

**Other Authorities**

NYMEX Exchange Rulebook ......................... 4, 5, 6, 7, 8, 9, 12, 21, 26, 38, 77

Pursuant to 18 C.F.R. § 385.213, Brian Hunter, through his undersigned counsel, respectfully submits this Memorandum, accompanied by his Answer and supporting affidavits, in response to the Order to Show Cause and Notice of Proposed Penalties, 120 FERC ¶ 61,085, issued by the Federal Energy Regulatory Commission (the "Commission") on July 26, 2007 (the "Order to Show Cause," or "OSC").[1]

## Preliminary Statement

The only trades at issue in this case were lawful, arms-length transactions in natural gas futures contracts. Therefore, as a matter of law, this entire action should be dismissed.

On the other side of each of Amaranth Advisors LLC's ("Amaranth") sales were real buyers, who were buying the futures from Amaranth for whatever reasons they had—whether it was speculation, a desire to buy back their own short positions and avoid attendant delivery obligations, or some other reason. There is no evidence or even allegation that Amaranth's trades were in any way fictitious or deceptive. They did not involve wash sales, matched orders, rigged prices or some other deceptive conduct. The market was not deceived as to who was buying or selling the futures, how many futures were actually traded or at what price. Hunter did not inject false information into the marketplace or fail to disclose any information he was obligated to disclose. He did not violate any New York Mercantile Exchange ("NYMEX") rule by selling futures during the closing range. And there is no evidence that the futures were sold at anything other than prevailing prices. In short, there is no evidence that Hunter engaged in any

---

[1] Hunter's counsel submits this Memorandum along with the accompanying Answer and supporting material with full reservation and without waiver of Hunter's objections to the premise of this entire purported administrative proceeding, including the Commission's assertion of jurisdiction over him personally and to its assertion of its statutory authority to bring this enforcement action.

deceptive, manipulative conduct. Accordingly, while the Commission's Order to Show Cause might make for sensationalistic press quotes, under the law, this entire action is fundamentally baseless and misguided.

The Commission claims that Hunter—while allegedly directing these indisputably legitimate, open-market trades—intended to depress the NYMEX settlement price of the prompt month futures contract. The Commission also claims that Hunter was in turn reckless as to the impact that the alleged depression of futures prices would have on the price of physical natural gas. However, not only are those contentions legally insufficient to save FERC's claim, there is no factual basis for them. To the contrary, there is substantial evidence that Hunter's purpose in directing these sales was perfectly legitimate and that Hunter did not have the motive that the Commission imagines he had.

In any event, Hunter's trades did not actually cause any material effect on the market price of natural gas futures, and hence had no effect on the NYMEX settlement price. That fact not only disproves the Commission's claim; it negates the Commission's statutory jurisdiction: since Hunter did not trade in physical natural gas, and since his sales had no impact on the NYMEX settlement price of the natural gas futures contracts, his alleged manipulation was not "in connection with" any purchase or sale of physical natural gas.

But whether or not the Commission agrees on these questions should have no legal consequence: the Commission lacks statutory authority to bring an enforcement action related to this matter. Further, it lacks personal jurisdiction over Hunter.

<u>Statement of Facts and Evidence</u>[2]

I.    **Background**

    A.    **Natural Gas Markets**

It is undisputed that all of the conduct alleged in this case took place in the *financial market* related to natural gas, and that none of it took place in the *physical market* for natural gas.  (OSC ¶ 6.)  These two markets are separate and distinct, as described further below.

In the *physical market*, participants typically enter into customized, individually negotiated, and proprietary contracts for the definite delivery of physical natural gas.  The contracts are not standardized.  (*See, e.g., Platts*, Methodology and Specifications Guide, North American Natural Gas, February 2007, highlighting the variety of types of transaction in the physical natural gas market by requesting that natural gas transactions reported to *Platts* "should be listed individually…[by] the delivery point…price ($/MMBtu/day or, inside Canada, C$/gigajoule), volume (MMBtu/day or gigajoule/day, source (company name), buy/sell indicator, trade date, start flow date, end flow date…")[3] Terms—including price terms—vary and are the result of whatever the parties agree to. Participants in the physical market are generally referred to as "commercial traders," and typically include producers, distributors, utilities and other entities that are actually capable of making or taking delivery of physical natural gas.  (Commodity Futures

---

[2]      Additional facts and evidence are presented within the Argument section, *infra*, as appropriate.
[3]      This document is attached as Exhibit 3 to the accompanying Declaration of Leif T. Simonson, dated December 14, 2007 ("Simonson Decl.").  The document is also available at: http://www.platts.com/Content/Natural%20Gas/Resources/Methodology%20&%20Specifications/na_gas_methodology.pdf

Trading Commission ("CFTC") Glossary, defining "commercial" as an "entity involved in the production, processing or merchandising of a commodity.")[4]

In the *financial market*, by contrast, participants enter into standardized contracts that generally either provide for the potential future delivery of physical gas, or provide for cash settlement (where no physical gas is actually delivered) based on certain price differentials. (*See, e.g.,* NYMEX Exchange Rulebook § 220.01, *et seq.*, providing the specifications for the NYMEX natural gas futures contract; IntercontinentalExchange ("ICE") Clearing Product Specifications, July 25, 2007.[5]) In contrast to the physical market, contracts in the financial market rarely result in the actual physical delivery of natural gas, as explained further below. Participants in the financial market include both "commercial traders," (*i.e.,* those who have the willingness and capacity to make and take delivery of physical natural gas) and "non-commercial traders" (*i.e.,* those who do not or cannot make or take delivery of physical natural gas).

Relevant contracts in the financial market include futures, swaps and options.

### 1. Futures and the NYMEX

A natural gas future is a standardized contract whereby one party (the buyer of the futures contract) is obligated to take delivery and the other party (the seller of the futures contract) is obligated to make delivery of 10,000 MMBtu of natural gas over the course of the contract month to the buyer's interconnection point on the Sabine Pipe Line

---

[4]     This document is attached as Exhibit 2 to the Simonson Decl. It is also available at:
http://www.cftc.gov/stellent/groups/public/@educationcenter/documents/file/cftcglossary.pdf
[5]     This document is attached as Exhibit 4 to the Simonson Decl. It is also available at:
https://www.theice.com/publicdocs/clearing_product_specs.pdf

Company's Henry Hub in Louisiana, the primary interconnection point in the United States.[6]  (NYMEX Exchange Rulebook §§ 220.05, 220.10-12; OSC ¶ 11.)

The buyer of the futures contract ("future") is referred to as having "gone long" or taken a "long" position.  The seller of the future is referred to as having "gone short" or taken a "short" position.  (*See* NYMEX Glossary of Terms ("NYMEX Glossary").[7])  Since every future involves both a buyer and a seller, each future by definition creates both one long position and one short position.  Each creates in one party the potential obligation to make delivery and in the other party the potential obligation to take delivery, unless those obligations are liquidated.  Thus, there is a symmetry to the obligations created to make or take delivery.

For example, if Trader A is long one June 2008 contract by having purchased a future from Trader B, Trader A is obligated to take delivery of 10,000 MMBtu of natural gas over the course of June 2008.  Trader A must take that delivery unless, prior to the expiration of the June 2008 contract (which will occur in late May, as described below), Trader A "exits" or "closes out" that long June 2008 position by selling an offsetting June 2008 future (thus netting its delivery obligations to zero).  Similarly, Trader B, who is short, must make delivery of 10,000 MMBtu of natural gas over the course of June 2008, unless prior to the expiration, Trader B closes out its short position by purchasing an offsetting June 2008 future.[8]

---

[6]     NYMEX remains an "open-outcry" market, defined by the CFTC as "[a] method of public auction, common to most U.S. commodity exchanges, where trading occurs on a trading floor and traders may bid and offer simultaneously either for their own accounts or for the accounts of customers. Transactions may take place simultaneously at different places in the trading pit or ring.  (CFTC Glossary.)
[7]     This document is attached as Exhibit 5 to the Simonson Decl.  It is also available at: www.nymex.com/media/glossary.pdf.
[8]     *See., e.g.,* NYMEX Glossary, defining a long as "the market position of a futures contract buyer whose purchase obligates him to accept delivery unless he liquidates his contract with an offsetting sale"

Futures are traded over exchanges designated by the CFTC.  The exchanges in turn set various rules for when and how the futures may be traded, including position limits, margin requirements, rules governing commodity delivery, and various record-keeping requirements.  In addition, these exchanges monitor exchange-traded positions to prevent manipulation or price distortion, submit trading data on a daily basis to the CFTC, maintain emergency authority to liquidate trading positions, suspend trading, or impose special margin requirements, and publish trading data.[9]  In the case of natural gas futures, the NYMEX serves as the designated exchange.

On the NYMEX, the "prompt-month" futures contract (*i.e.*, the futures contract relating to the next calendar month) "expires" (*i.e.*, ceases trading) three business days before the first day of the prompt-month (the "expiry date").  (NYMEX Exchange Rulebook § 220.09; OSC ¶ 14.)  Thus, for example, the June 2008 contract will expire on May 28, 2008.  If Trader A holds an open short interest in the June 2008 contract (obligating it to make delivery throughout June 2008), Trader A can avoid the delivery obligation by purchasing an offsetting long interest in the June 2008 contract prior to the close of trading on May 28, 2008.  But if Trader A retains its open short interest through the end of trading on May 28 (an action known as "taking the contract to delivery"),

---

and a short as "the market position of a futures contract seller whose sale obligates him to delivery the commodity unless he liquidates his contract by an offsetting purchase."

[9]     *See* Exhibit 6 to the Simonson Decl. (also available at www.cftc.gov/industryoversight/tradingorganizations/designatedcontractmarkets/index.htm) (providing an overview of the criteria for obtaining and renewing status as a CFTC designated contract market and the core principles behind the designated contract market system); *see also* 17 C.F.R., Part 38, Appendix A for further information on compliance with these core principles.  In addition, under the Commodity Exchange Act, regulated markets are obligated to publish information concerning daily settlement prices, volume, and available open interest.  7 U.S.C. § 7(d); *see also* Exhibit 7 to the Simonson Decl. (providing information on the CFTC's "Large Trader Reporting Program," with which designated contract markets must comply) (also available at www.cftc.gov/industryoversight/marketsurveillance/ltrp.html).

Trader A is then obligated to make delivery of the relevant amount of natural gas throughout June 2008.

The vast majority of NYMEX futures do not go to delivery, however. Indeed, for the contract months at issue here (February, March and April 2006), less than 2% of the largest open interest actually went to delivery. (OSC ¶ 15.) Thus, for those contract months, more than 98% of the open long positions successfully avoided the obligation to take delivery by selling offsetting futures, and likewise, more than 98% of the open short positions successfully avoided the obligation to make delivery by purchasing offsetting futures.

Each day, the NYMEX publishes an end-of-day price for each of the 72 individual contracts (relating to the next 72 months) traded on the exchange. This end-of-day published price is referred to as the "NYMEX settlement price." It is not simply the last price at which that particular futures contract was traded. Instead, the NYMEX settlement price is calculated as the volume-weighted average of all trading in that contract during the "closing range," (often also referred to as the "settlement period").[10] (NYMEX Exchange Rulebook § 1.06; OSC ¶ 14; NYMEX Glossary ("The settlement price is derived by calculating the weighted average of prices during [the closing] period").)

On non-expiry dates, the closing range is the final two minutes of daily trading (from 2:28 p.m. to 2:30 p.m.). (*Id.*) On the expiry date, the closing range for the expiring prompt-month contract is expanded to include the last half-hour of trading in the expiring

---

[10]     Among other things, the NYMEX settlement price is used to determine margin calls for accounts held on the NYMEX. (*See* CFTC Glossary.)

contract—or the period from 2:00 p.m. to 2:30 p.m. (*Id.*) The closing range for the non-expiring contracts, however, remains the final two minutes of daily trading.

Contrary to what is suggested in the OSC (*see* ¶ 16), the 30-minute closing period for trading in the prompt-month natural futures contract involves significant volumes of trading because of the need and/or desire for traders to exit their open positions and avoid delivery obligations. (See Affidavit of Michael Quinn, Ph.D., dated December 14, 2007, attached hereto ("Quinn Aff."), ¶¶ 58, 59 and Exs. 12-14.) During this period, unless they are among the few traders willing to take their contracts to delivery, traders who have open long interests must sell futures, while traders who have open short interests must buy futures. As mentioned above, most of the time, traders are not willing to take their contract to delivery.

The NYMEX settlement price is determined by the NYMEX settlement committee after the closing period is over. (NYMEX Exchange Rulebook § 1.31 ("The term 'settlement price' shall mean the daily closing price of commodity futures contracts *as determined by the Exchange*") (emphasis added); NYMEX Glossary (noting that the settlement price is determined by the NYMEX "settlement committee at the close of each trading period").) The settlement price is a price published by the NYMEX after futures trading has been completed. In other words, the settlement price is set by the day's trading in futures during the closing range, but no futures contract is actually traded at that price and, moreover, the settlement price cannot be known by futures traders until after it has been determined by the NYMEX.

It is undisputed that the CFTC has exclusive jurisdiction over all futures contracts traded on the NYMEX. (OSC ¶ 48 ("It is undisputed that we do not have jurisdiction

directly to regulate trading in the NG Futures Contract that does not affect our jurisdictional markets."); 7 U.S.C. § 2(a)(1)(A) describing the "exclusive jurisdiction" of the CFTC over all futures contracts.)

## 2. Swaps and Options

In addition to futures contracts, participants in the financial natural gas markets may also buy and sell "swap" contracts (or "swaps").  Swaps typically involve a "fixed" price (*i.e.*, a price determined at the time the swap transaction is executed) and a "floating" price, (*i.e.*, an agreed upon variable future price, unknown at the time of execution of the swap transaction).  (*Barron's* Financial Dictionary, 7th Ed. (2006) (highlighting that in a swap contract "one party agrees to pay the other party a fixed rate…in exchange for a floating rate.").)  When the swap is "settled," net payments are exchanged: if the floating price is higher than the fixed price, then the seller pays the buyer the difference; whereas if the floating price is lower than the fixed price, the buyer pays the seller the difference.[11]  One commonly-traded type of swap contract in the financial natural gas markets involves defining the variable price as the expiring prompt-month NYMEX settlement price.  (OSC ¶ 18, n. 22 (citing both NYMEX Exchange Rulebook § 508.02, the Henry Hub Swap Futures Contract, and ICE, Product Details for Natural Gas Swap, Fixed for NYMEX LD1).)  Swap contracts are always bilateral; they may be standardized contracts traded on electronic clearinghouses, such as the ICE or NYMEX ClearPort, or "over-the-counter" ("OTC") exchanges, typically directly between two counterparties.

---

[11]    For instance, if an entity purchases a June natural gas swap contract at $7 and the settlement price of the June NYMEX natural gas futures contract is $7.50, the buyer has made a profit of $0.50 per contract; by contrast, if the settlement price is $6.50, it is the seller who has made a $0.50 profit.

Traders in the financial natural gas markets may also trade "option" contracts (or "options").  The buyer of a "call" option purchases the right, but not the obligation, to purchase a natural gas futures contract on the expiration date of that contract (a "physically-settled option") or natural gas swap contract (a "financially-settled option") at a pre-determined price, known as the "strike price."  Likewise, the buyer of a "put" option, purchases the right, but not the obligation to sell a futures or swap contract at the strike price.  (*See, generally,* OSC ¶ 19.)  Options may be physically or financially settled.  The majority of options "expire" and must be exercised on the day preceding the expiry date.

### 3.    Participants in the Financial Markets

As mentioned above, typically only commercial traders (*i.e.*, those who have the willingness and capacity to make and take delivery of physical natural gas) participate in the physical market.  By contrast, participants in the financial market include both "commercial traders" and "non-commercial traders" (*i.e.*, those who do not or cannot make or take delivery of physical natural gas).

Commercial traders participate in the financial market in order to hedge against the risk of adverse price movements in the physical market (and thus are sometimes referred to as "hedgers").  For example, an industrial user of natural gas may be concerned that the price of natural gas will rise between now and December 2008, when it needs natural gas, as a result of potential hurricanes in summer 2008.  The user may hedge against that risk by purchasing 100 December 2008 futures contracts, at $9 per MMBtu, representing the right to take delivery of 1,000,000 MMBtu of natural gas in December 2008.  If, during a particularly bad hurricane season, the prices of natural gas shoot up, and the price of the December contract rises to $13, the industrial user has

successfully hedged against that situation, as it can now take delivery of natural gas in December at $9 per MMBtu rather than market price of $13 per MMBtu, thus saving $4 million.[12]

Non-commercial traders (or speculators) participate in the financial market solely in order to profit based on price changes in the financial instruments in which they trade (*e.g.*, futures, swaps and options). Non-commercial traders serve an indispensable function to commercial traders' efforts to hedge risk by adding liquidity, and therefore efficiency, to the financial market (through their willingness to be counterparties to commercial traders).

B.    **Brian Hunter and His Trading Strategies**

From April 2004 to September 2006, Brian Hunter was a trader at Amaranth Advisors LLC or an affiliate, an advisor to certain pooled investor funds (commonly referred to as a "hedge fund"). During the relevant time period, Hunter was Co-Head of the Commodities Trading Group and was responsible for overseeing Amaranth's natural gas, power, natural gas liquids, and metals trading. As such, Hunter made speculative trades on behalf of Amaranth in various investment vehicles, including futures, swaps and options in natural gas.

As a fund trader, Hunter's job was to produce investment returns for the funds (collectively, the "Funds") advised by Amaranth Advisors LLC (the "Advisors") while simultaneously minimizing the risk to which Fund was exposed; in essence, he sought to optimize the "risk return dynamics" of his portfolio. (*See* Transcript of Deposition of Brian Hunter conducted by the Securities and Exchange Commission on November 16,

---

[12]    Alternatively, the industrial user could accomplish the same thing by purchasing December 2008 swaps at $9. When the swaps settle at $13, the user can purchase natural gas on the spot market for $13, and use the $4 million profit from the swaps to offset the increased price.

2006 ("Tr. 11/16/06").)[13]  This objective required Hunter to observe market behavior, to attempt to predict and capitalize on price movements (whether or not such price movements were the result of market "fundamentals"), and to generate and employ creative and innovative trading strategies in response to such observations and predictions.  (Tr. 11/16/06 at 34:21-24; 35:10-13.)

To maximize the risk-reward ratio, Hunter employed a variety of trading strategies.  Principally, he took various "spread" positions.  (Tr. 11/16/06 at 30:15-17.)  Spread positions are positions in which Advisors would be simultaneously long and short in two related contracts.  As a hypothetical example, if Advisors took a long position in Contract A by purchasing 100 futures at $9, it could reduce the risk of this position by taking a simultaneous short position in Contract B (a hypothetical contract whose prices are generally correlated to Contract A) by selling 100 futures short at $7.  In this example, if the price of Contract A falls from $9 to $7, Advisors loses $2 million on its long position in Contract A (the "long leg" of the spread).[14]  However, if the price of Contract B simultaneously falls from $7 to $5, then Advisors simultaneously gains $2 million on its short position in Contract B (the "short leg" of the spread).  The Advisors has lost nothing on a net basis.  Likewise, if the price of Contract B rises from $7 to $10, Advisors loses $3 million on the short leg of the spread, but if the price of Contract A simultaneously rises from $9 to $12, then Advisors gains $3 million on the long leg of the spread, and Advisors has again lost nothing on a net basis.

---

[13]    Representatives of the Commission were present at this deposition.  Transcripts of Hunter's deposition testimony were provided to counsel on the condition that they not be shared outside the firm.  Therefore, we are not in a position to file the transcript with the Commission.  However, we understand that the Commission is in possession of all of Hunter's deposition transcripts.  (OSC ¶ 55)..)

[14]    As indicated above, NYMEX quotes futures prices per MMBtu.  (NYMEX Exchange Rulebook § 220.08.)  Each futures contract, in turn, constitutes an obligation to deliver 10,000 MMBtu of natural gas.  (NYMEX Exchange Rulebook § 220.05.)  Hence, 100 futures at a price of $9 would cost $9 million.

Thus, by taking a spread position, Advisors is *indifferent* to the isolated price movements of Contract A or Contract B.  Rather, Advisors makes or loses money only by virtue of the price movement of Contract A *in relation to* the price movement of Contract B.  In this hypothetical example, Advisors has invested in the proposition that the "spread" between Contracts A and B (the difference between the $9 at which Advisors bought Contract A and the $7 at which it sold Contract B) will widen.  Thus, if the price of Contract A falls from $9 to $8, but the price of Contract B falls from $7 to $5, then the spread has widened $1 and Advisors gains $1 million.  On the other hand, even if the price of Contract A rises from $9 to $10, if the price of Contract B simultaneously rises from $7 to $9, then the spread has contracted by $1, and Advisors has lost $1 million.

During the relevant time period, Hunter's portfolio employed a complex web of various spread positions.  In fact, of the five core investment strategies that Hunter employed at this time, four of them involved spread strategies.  (*See* Declaration of Brian Hunter, attached hereto, dated December 14, 2007 ("Hunter Decl.").)

One such core strategy was investing in the "summer/winter spread."  (Tr. 11/16/06 at 34:7.)  In this strategy, Hunter generally held a net short position in the contracts associated with summer months (generally, April through October), while simultaneously holding a net long position in the winter contract months (generally, November through March).  This allowed Hunter to be indifferent to the specific movement of the price of either summer or winter month contracts.  Rather, Hunter was only banking that the *difference* between the price of the summer month contracts and the price of winter month contracts would *increase*.  (*See* Transcript of Deposition of Brian

Hunter conducted by the CFTC on June 15, 2007 ("Tr. 6/15/07") at 127:18-19; 127:23-25.)

Other core strategies employed during this time included:

- November 2006/January 2007 spread: *i.e.*, banking that the price of January 2007 would increase relative to the price of November 2006;

- Calendar 2007/2010 spreads: *i.e.*, banking that the price of contracts in 2010 would increase relative to the price of 2007 contracts;

- Deferred March/April spreads (2008, 2009): *i.e.*, banking that the price of March contracts would increase relative to the price of April contracts for years 2008 and 2009;

- Net directional length: *i.e.*, generally banking on the fact that, on a net basis, prices of the entire curve of futures would increase.

(Hunter Decl. ¶ 5.)

Importantly, in using spread positions as a means of minimizing risk while maximizing return, Hunter also employed his view that prices of the various contract months generally "correlate" along the forward curve.[15]  (*See* Transcript of Deposition of Brian Hunter conducted by the CFTC on November 17, 2006 ("Tr. 11/17/06") at 177:11-12.)  In essence, this means that Hunter believed that if the price of one contract month (for example, February) moved, the price of all other contract months (for example, March through December and beyond) would also move in the same general direction and by a generally commensurate amount.  (Tr. 11/17/06 at 190:22-191:4.)

As a result of this general correlation, Hunter also believed that the price of spreads (*i.e.*, the difference between the price of the two contracts) were generally much less volatile (and hence less risky) than the price of each leg of the spread.  For example,

---

[15]     The "forward curve" is trading parlance for the set of prices at any given point in time for each of the 72 natural gas futures contract months traded on the NYMEX.  Each point on the forward curve equals the current price of natural gas contracts in each of the next 72 months.

14

even if the price of Contracts A and B each could move 25 cents in a day, given the effect of price correlation, during the relevant period it would be unlikely that the spread between the two contracts would move more than 2 cents. (*See, e.g.,* Tr. 6/15/07 at 53:23-54:6.)

Because the only core strategy not involving spreads employed net directional length (see the fourth in the above list), there were generally only two circumstances under which Hunter's portfolio could make money from these core strategies: if the relevant spreads changed, or if the entire forward curve shifted upward. By contrast, if spreads did not change and the entire forward curve shifted *downward*, it would be impossible for Hunter's core strategies to profit: his net directional length strategy would lose money, while all of his four core spread strategies remained neutral.

In addition to these general core spread strategies, Hunter also occasionally employed other, more discrete strategies that were separate from his core strategies but were designed to respond to observed market behaviors with respect to specific contracts. (Hunter Decl. ¶ 6.) As discussed further below, Hunter employed such a discrete strategy on February 24, in response to market behavior he observed the day before in the March and April futures contracts.

II.    **Events Surrounding The Three Expiry Dates At Issue**

A.    **February 24, 2006: March Expiry**

It is undisputed that on February 23, 2006, Brian Hunter instructed Matthew Donohoe, another Amaranth trader, to acquire March 2006 futures and sell them generally ratably on the NYMEX exchange throughout the settlement period ("MoC").

(*See* AALLC_REG0684055;[16] Hunter Decl. ¶ 28; *see also* Tr. 6/15/07 at 174:10-11.)

What is disputed is Hunter's purpose behind this trading strategy. The Commission

speculates that Hunter sought to artificially depress the March settlement price. There is

no basis for that proposition other than rank speculation. In fact, the evidence

overwhelmingly demonstrates that Hunter's purpose behind this strategy was to see if he

could make a small profit by selling into a period of aggressive buying, which he

anticipated would occur based upon highly unusual price movements he observed the day

before. (Tr. 6/15/07 at 36:19-37:4; 37:25-38:20; 66:11-19; 71:11-15; 74:10-21; 77:20-

78:4.)

### 1.   Hunter's Observation: "Really, Really Unusual" Price Movements The Day Before

Hunter anticipated aggressive buying based upon anomalous behavior he

observed in the price of the March 2006 and April 2006 futures contracts during the

settlement of options contracts the day before. (Tr. 6/15/07 at 36:19-37:4; 37:25-38:20;

77:20-78:4.) On February 23, during the two-minute NYMEX closing period between

2:28 and 2:30 p.m., Hunter observed the spread between the March 2006-April 2006

contracts (the "H/J spread") compress suddenly and dramatically. (*Id.*) For several days

prior to those two minutes, the H/J spread had been trading with relative constancy at

approximately 15-17 cents (Tr. 6/15/07 at 36:19-22) and with very low price volatility

(Tr. 6/15/07 at 38:3; *see also* Quinn Aff., Ex. 15 (indicating that between February 7 and

February 21, the H/J spread did not move by more than one cent per day in a range of 17

---

[16]     Documents referenced by Bates number were produced by Amaranth Advisors LLC to the Commission, among other regulatory bodies, and are attached as Exhibit 1 to the Simonson Decl., Ex. 1 (with the exception of the documents Bates-stamped AALLC_REG0150183-201, AMARANTH_REG055721, and AMARANTH_REG075312, which Amaranth Advisors LLC has requested not be made public, but which counsel for Hunter understands have already been produced to the Commission.)

cents to 20 cents.)  During the two-minute settlement, however, Hunter witnessed the spread contract radically.  He recalls that the spread contracted from 17 cents to under 5 cents, resulting in a value at settlement of 5 cents.  (Tr. 6/15/07 at 36:19-25; 38:4-8; 77:22-78:3.)  Less than one hour later, by 3:28 p.m., the value of the spread had reverted to about 15 cents.  (Tr. 6/15/07 at 36:25-37:2, 78:2-4; AALLC_REG0684058.)

Hunter viewed this sudden contraction and reversion as "really unusual, really, really unusual."  (Tr. 6/15/07 at 37:3-4.)  Hunter recalls thinking "this is shocking."  (Tr. 6/15/07 at 67:14.)  "[I]t is a shocking option settlement and it's the only time there had ever been huge interest on CSO's [calendar spread options on H/J]."  (Tr. 6/15/07 at 67:15-18.)

That these unusual movements figured prominently in Hunter's mind is well supported by the evidence.  Hunter's reaction to this highly unusual price movement, along with a similar reaction by several other traders, is captured in several instant messages ("IMs") sent in "real time":[17]

- Starting at about 2:28 p.m., Brian Flannery ("bflan92") of GA Options messaged Hunter: "who is buying. . . . that's huge. . . . yeeeeahhhhhaawwwww."  Hunter wrote back, "option guys I guess? . . . no idea."  Flannery remarked, "that's huge."  (*See* AALLC_REG0684017.)

- Between 2:28:08 p.m. and 2:34:36 p.m., Hunter had another exchange about the strange movement with Donohoe.  He messaged: "look at NYMEX . . . someone getting hosed on options."  In one message referring to the observed anomalous compression, Hunter simply wrote "?"  Donohoe echoed Hunter's surprise, noting it was "nutty" and "market just crazy."  (*See* AALLC_REG0684002-03.)

- At almost the exact same time, Calhoun messaged Hunter regarding the settlement, "what the hell was that?"  Hunter replied that the settlement demonstrated "huge Moc [market on close] buying."  Calhoun agreed, writing back "I guess so."  Hunter then wrote, "don'tknow [sic] what caused it…I had no

---

[17]    *See* Hunter Decl. ¶ 21 for the correspondences' of individuals' names and AOL Instant Messenger handles referenced in this section.

idea last day was that bid [sic]." Calhoun summarized their reaction to the day's events in two words: "holy crap." (*See* AALLC_REG0684015.)

- In instant messages with Carl Shimaitis ("cshimaitis") of the AAA Fund at about 2:48 p.m., Hunter wrote "that NG settle is going to get A LOT of questions adked [sic]." His correspondent concurred, "that was nuts . . . for the technicians out there . . . we had a turtle soup." (*See* AALLC_REG0684026.)

- Conferring about the settle with Cathy Clarkson ("cathyaeco") of Choice Energy, Hunter wrote: "nice buys on those . . . after HUGE rally . . . its 20 cents lower now . . . all crap." Clarkson responded, "no kidding . . . amazing." (*See* AALLC_REG0684037.)

- Discussing the settlement with Hunter ten minutes after the close, at 2:40 p.m., Donohoe mused, in regard to marking the book, "gonnabe [sic] a messed up settle." Hunter sent his estimate of the forward price curve and remarked, "funny movements on spreads." (*See* AALLC_REG0684031.)

- About an hour later, Matthew McGlynn ("rokclymr") of Spectron Energy Inc. messaged Hunter and noted, "what's up all the spreads screwed?" Hunter wrote back, "yeah . . . market went crazy on the close . . . not sure what was up." McGlynn replied, "I heard one guy had 5,000 lots to buy market on close." (*See* AALLC_REG0684046; Tr. 6/15/07 at 88:7-18.)

The sudden contraction and reversion of the H/J spread suggested to Hunter that other traders had somehow intentionally moved the market price, either by deliberately buying up large volumes of March futures, deliberately selling large volumes of April futures, or both. (Tr. 6/15/07 at 89:8-19; 94:7-9; 94:19-25; 170:16-17; 37:17-22; 39:4-6; 42:10-15; AALLC_REG0684029.) As Hunter testified, "On the 23rd there was obviously what I thought at the time an obvious squeeze on the March-April spread, that somebody had driven it in just for that settlement because it traded right out afterwards." (Tr. 6/15/07 at 37:17-22; *see also* 38:9-11; 84:11-15.)

Whoever the culprits were, Hunter concluded that they would likely attempt to do the same thing again the next day and that as a result there would be aggressive buying of March futures during the final settlement of the March contract on the following day. (Tr. 6/15/07 at 38:12-38:16; 65:9-65:18; 67:19-68:5; 96:11-22.)

18

## 2.    Strategy: "A Bit Of An Expiriment [sic] Mainly"

Hunter decided he would use this prediction as an opportunity to experiment with the potential ability to profit from the anticipated aggressive buying by others.  He planned to do so by selling futures during the half-hour close on February 24 through a strategy described more fully below (Tr. 6/15/07 at 70:16; 71:3-71:6; 71:13-15; 68:3-5.)  Instant messages from the time demonstrate the connection between Hunter's observations on February 23 and this strategy.  Indeed, it was less than ten seconds after commenting to Donohoe that the H/J spread had now reverted to 13.5 cents,[18] that Hunter instructed Donohoe at 3:39 p.m. to "make sure we have lots of futures to sell MoC [market on close] tomorrow."  (*See* AALLC_REG0684055.)  As explained further below, the reason Hunter wanted to have March "futures to sell" during the February 24 close was because he wanted to see if he could profit by selling them into the predicted aggressive buying.  (Tr. 6/15/07 at 71:5-6; 71:13-15, 67:25-68:5; 42:24-43:7; 42:12-15.)

Hunter's prediction of aggressive buying was based on the following:  the squeeze indicated to Hunter that there would likely be aggressive buying during the March settlement on February 24.  (Tr. 6/15/07 at 67:19-68:5; 71:11-13.)  Hunter thought, "If someone is going to squeeze March-April again on the settlement, they're going to have to buy March off at the close and sell April very aggressively."  (Tr. 6/15/07 at 67:22-68:3.)[19]  As he testified, "I strongly suspect[ed] that there would be residual positions on March and April [H/J] because [the anomalous options settlement on February 23] just

---

[18]    "PBN [the brokerage Prebon Energy] trading 13.5 for size H.J."  (AALLC_REG0684055.)

[19]    Hunter believed "someone was going to try and squeeze it again because it clearly hurt somebody."  (Tr. 6/15/07 at 65:15-16.)  Hunter believed that, "if someone wanted that spread…to come in that day, it's reasonable to assume they want it to come in the next day."  (Tr. 6/15/07 at 39:5-8.)  Furthermore, the exercise of the H/J calendar spread options "would [have] thrown other people into short positions."  (Tr. 6/15/07 at 66:8-10.)  Hunter believed that buying back these short positions would involve buying expiring March futures on February 24.  (Tr. 6/15/07 at 42:25-43:2; 74:17-21.)

19

changed people's visions so quickly, so violently going into the expiry the next day." (Tr. 6/15/07 at 65:9-14.)

Hunter therefore used this predicted pricing pressure as an opportunity to "expiriment [sic]." (AALLC_REG0684227.) The experiment was to see whether, by selling March futures generally ratably (that is, periodically and in roughly equal amounts) during the settlement period, he could replicate the ability that floor traders have to observe aggressive buying in "real time" in the trading pit and thereby capture the premium from the resulting upward pricing pressure. (Tr. 6/15/07 at 170:11-20; 43:18-25, 167:11-16.) There is no NYMEX rule that would prohibit such selling. As the experiment was structured, that gain (or loss) would be measured as the difference between Amaranth's average selling price during the close and the ultimate settlement price (roughly calculated as the volume weighted average of all trades during the thirty minute settlement period). (Tr. 6/15/07 at 102:8-15; 145:10-13, 145:22-146:2; 146:11-15, 150:13-22.) Thus, Hunter hoped to "beat the settle" by obtaining a higher sales price on average than the overall average sales price over the course of the close. (Tr. 6/15/07 at 105:15-19; 139:8-10; 141:4.)

Thus, the sole reason Hunter directed that March futures be acquired and sold during the expiry was to capture the opportunity from the anticipated aggressive buying and see if he could make a "quick dollar" from it. (Tr. 6/15/07 at 74:17-21; 42:25-43:7; 141:25-142:3.) As he testified, "The squeeze is the reason we did th[e] futures trade" during the close on February 24. (Tr. 6/15/07 at 81:24-82:2; *see also* 156:20-23.)

Hunter knew that, like any experiment, the strategy could fail to make a profit, and even lose money. (Tr. 6/15/07 at 102:23-25; 170:21-24.) Nevertheless, for reasons explained below, it was also structured in such a way that it had limited downside risk.

Hunter's execution plan was as follows: on the morning of February 24 Advisors would build an expiring-month position consisting of long futures contracts and an equivalent number of offsetting short swaps. (Tr. 6/15/07 at 103:19-104:19.) Throughout the half-hour closing range between 2:00 and 2:30 p.m., some portion during which Hunter predicted there would be aggressive buying, Amaranth would sell the long futures position generally ratably for cash. (Tr. 6/15/07 at 43:14-18; 45:5-9; 70:4-6.) At 2:30 p.m., upon the expiration of the swaps, Amaranth would deliver cash at the swaps' settlement price as the terms of the swap contract required.

The success of Hunter's strategy obviously depended on Amaranth receiving the best and most competitive prices for its NYMEX futures. In order to profit, Amaranth's average sales price would have to be higher than the weighted average settlement price. (Tr. 6/15/07 at 150:13-14; 150:18-19; 151:8-11.) Successful execution of Amaranth's futures sales depended on having offers "lifted," rather than on having bids "hit." (Tr. 6/15/07 at 103:5-16; 105:15-19; 106:4-9.) As Hunter testified, he expected that the floor broker executing the order would be "holding out offers" (Tr. 6/15/07 at 43:24-25) and that it would perform its duties to obtain the best possible price (Tr. 11/17/06 at 123:22-124:10; *see also* NYMEX Exchange Rulebook §§ 6.05, 6.06, and 6.16.) The market would then ideally buy up these offers either at or slightly above the current market price, given the predicted aggressive buying. (Tr. 6/15/07 at 42:24-43:7.) The purpose was therefore ***not*** for the floor broker to be hitting bids, which would "defeat[] the purpose."

21

(Tr. 6/15/07 at 103:5-6; *compare* OSC ¶ 72.)  For the same reasons, the strategy was ***not*** intended to deter aggressive buying at higher prices.  On the contrary: the strategy depended on the willingness of aggressive buyers to lift a significant volume of Amaranth's offers (Tr. 6/15/07 at 102:9-10; 103:5-16; *compare* OSC ¶ 71.)

Because the strategy required Amaranth to be selling at the same time as the aggressive buying, and because Hunter had no way of knowing exactly when within the closing range that aggressive buying would occur, Hunter designed the sales to be generally ratable over the closing range.  (Tr. 6/15/07 at 150:15-20.)  Otherwise, if Amaranth were to have sold over only a portion of the closing range, it would risk obtaining an average sales price that was significantly less than the volume-weighted average price over the entire close.  (Tr. 6/15/07 at 150:25-151:7.)  Furthermore, by selling in small increments over the course of the closing period, Hunter believed his trades would avoid "slippage costs," the price discount that a seller often must take when attempting to sell a relatively large volume.  (Tr. 6/15/07 at 90:10-11.)

Hunter estimated that this strategy could earn as much as 3 cents to 5 cents per sale.  (Tr. 6/15/07 at 43:6-7.)  Optimistically, he thought he could "beat the settle by 5 cents."  (Tr. 6/15/07 at 68:3-5.)  Execution costs could reasonably be expected to be minimal, and not to exceed 2 cents.  (*See* Tr. 6/15/07 at 157:17-21; 104:25-105:2; *see also* AALLC_REG0684134.)  The resulting profit of 1 cent to 3 cents per contract would translate to gains on the order of $300,000 to $1 million for his book.

The fact that the purpose of Hunter's sales on February 24 was about an experiment to see if he could "beat the settle" (not an experiment to manipulate the market as alleged by the FERC) is evidenced by instant messages from that time.  Indeed,

22

it is reflected in an instant message that the Commission cites as evidence of manipulative intent, but fails to quote fully. (*See* OSC ¶ 70.) On February 24, between 1:30 and 1:33 p.m., roughly half an hour before the NYMEX closing range began, Hunter had the following conversation with trader Bart Glover:

| | |
|---|---|
| Hunter: | [Floor broker] Sandy [Goldfarb] and [floor brokerage firm] RBI bidding the H [*i.e.*, the March futures contract]…nothing trading…I wonder what will hapen…lots of EFS went through…OI [*i.e.*, open interest in the expiring contract] down alot |
| Glover: | all i am told…is it is going to rally hard…but guys running on floor…lol |
| Hunter: | We have 4000 to sell MoC…shhh |
| Glover: | come on |
| Hunter: | y |
| Glover: | unless you are huge bearish…position…why the f would yo do that |
| Hunter: | *all from options yesterday* [sic]…so *we'll see what the floor has*…bit of an expiriment [sic] mainly |
| Glover: | what the f…that is huge |

(*See* AALLC_REG0684227 (emphasis added); *compare* OSC ¶ 70.)

Thus, Hunter explained to Glover that the motivation to sell futures during the February expiry was due to what he observed during the options settlement on February 23 ("all from options yestrday [sic]"). (Tr. 6/15/07 at 166:2-9.) He further relayed that he expected that someone during the settlement was going to come to the floor and be an aggressive buyer ("we'll see what the floor has"), but that he would wait to see if it happened, and that it was an experiment ("expiriment") to see if he could beat the settlement price. (*Id.* at 167:8-16; 170:9-20.) Further, despite Glover's speculative

23

question, Hunter specifically did not state that his reason for having futures to sell was to benefit some bearish position.  (AALLC_REG0684227.)

There was nothing particularly out of the ordinary about this conversation. During this general time-period, Hunter would converse with Glover every couple of weeks.  (Tr. 6/15/07 at 46:2-6.)  They would often chat about "market costs, market thoughts, fundamental thoughts, lows, things like that," but never did direct trades with one another.  (Tr. 6/15/07 at 47:23-48:8.)  Interactions among traders like this are informal and "fairly common…sometimes you say little bits and pieces of what you're doing to get an exchange for little bits of what other people are doing and you're always trying to piece together a picture of what's happening, sometimes out of shear [sic] boredom."  (Tr. 6/15/07 at 164:21-165:7.)

Importantly, Hunter was not relaying this information so that Glover would take some action, and he did not expect him to do so.  (Tr. 6/15/07 at 117:9-17, 163:18-21.) He wrote "shhhh" because he specifically did not want Glover to tell anyone else about his plan to sell into the close, as it could interfere with his ability to beat the settle.  (Tr. 6/15/07 at 164:7-14.)  As Hunter testified, "It's like…we're trying to beat the settle here, so don't tell anybody."  (Tr. 6/15/07 at 164:12-14.)  Hunter is not aware of Glover ever telling anyone else in the marketplace about Amaranth's position (Tr. 6/15/07 at 118:10-14), and there is no evidence that Glover did so.

### 3.    Obtaining the futures

On the morning of February 24, Donohoe, at Hunter's direction, positioned Amaranth's book to benefit from this strategy of capturing the anticipated aggressive buying in the March futures in two ways:  One was by simultaneously buying long futures and short swaps by means of what are known as EFS contracts (for "Exchange

24

Future for Swap").  (Tr. 6/15/07 at 103:19-104:3, 111:19-22.)  Another was by buying H/J spreads, which meant buying March futures and selling April futures.  (Tr. 6/15/07 at 145:16-21.)

The futures were acquired throughout the morning.  Sometime prior to or going into February 24, Advisors had a short position of (1,729) futures.  (Tr. 6/15/07 at 40:9-22.)  At about 12:22 p.m., Donohoe updated Hunter that Advisors now held "3111 fut." (*See* AALLC_REG0684197.)  Upon hearing this, Hunter instructed Donohoe: "cool… that should be enough."  By this, Hunter meant that Donohoe should "stop buying futures."  (Tr. 6/15/07 at 143:3-11.)  Donohoe clearly appears to have understood the communication in this sense, because he responded "ok no more futures will be traded." (*See* AALLC_REG0684197.)

Hunter's choice to trade approximately 3,111 futures reflected his estimation that the amount would have to be meaningful to make his experiment worthwhile while at the same time not putting too much at risk.  (Tr. 6/15/07 at 102:16-25; 105:21-24.)

### 4.    "Telling Vinnie"

Sometime between 12:30 p.m. and the start of the close, Hunter may have called Vincent Rufa, the phone clerk for Amaranth's floor broker ALX, to let him know that he would be selling approximately 3,000 futures generally ratably over the course of the close.  (Tr. 6/15/07 at 146:21-147:13; s*ee* AALLC_REG0684197 (informing Donohoe that he was "telling Vinnie").)  Although Hunter does not specifically remember this call, he believes the purpose of the call would have been merely to give Rufa a "heads up" as to the order to permit the broker to coordinate the ratable order along with any other orders the broker may have.  (Tr. 6/15/07 at 147:16-24.)  Such a courtesy call would not be unusual.  Traders often place a courtesy call to their floor broker giving advance notice

of their plans by about half an hour before the settlement begins, in order to enable the floor broker to tally aggregate lot numbers and coordinate trades. (Tr. 6/15/07 at 119:9-17; 148:21-150:3.) The advance notice would help enable ALX to know "exactly what they have to do," not in regard to Amaranth's trades only, but regarding the orders placed by all their customers. (Tr. 6/15/07 at 150:2-3.)

In instructing ALX to sell generally ratably, Hunter understood that ALX would attempt to obtain the best possible price. (Tr. 11/17/06 at 124:7-10.) Hunter did not instruct ALX to execute the order at anything other than best price (*see* Tr. 6/15/07 at 147:2-3), and there is no evidence suggesting otherwise. Indeed, obtaining the best possible price on an MoC order is exactly what Hunter understood ALX's job to be. (Tr. 11/17/06 at 123:25-124:10 ("Generally it's [the broker's] job to get the best fill"); *see also* NYMEX Exchange Rulebook §§ 6.05, 6.06 and 6.16.) The alleged blank spot on ALX's trade tickets is consistent with this arrangement: Rather than reflecting that Hunter was indifferent to price, it reflects that Amaranth was giving ALX the discretion to determine what the best possible price would be. (*Id.*; *see also* Quinn Aff. ¶ 68.)

Consistent with this strategy, ALX then sold Amaranth's futures position in small lot sizes at short discrete intervals throughout the closing range, rather than in large chunks at longer intervals. (Tr. 6/15/07 at 43:14-20; 45:5-9; 70:4-6.) Trading data reflects that the sales were executed in a manner that was generally—though not perfectly—ratable, as follows:

26

| Time | No. of Contracts Sold |
|------|----------------------|
| 2:00 – 2:05 | 547 |
| 2:06 – 2:10 | 347 |
| 2:11 – 2:15 | 762 |
| 2:16 – 2:20 | 400 |
| 2:21 – 2:25 | 154 |
| 2:26 – 2:30 | 691 |

(*See* Quinn Aff., Ex. 1 (providing a minute by minute breakdown of the sales).)

### 5.    Awareness of the Short ICE Position

Hunter does not recall being aware that Amaranth held a substantial short position on ICE: On the contrary, Hunter testified that he does not recall having any substantial position with respect to March, other than the positions that were acquired and sold as part of the experiment described above.  Hunter testified: "Other than that…I don't really remember having much on it."  (Tr. 6/15/07 at 39:11-15; 70:21-25.)  Hunter specifically does not recall his book to have held the short ICE swaps alleged by the Commission.  As he recalled, "I didn't have a March swap position on that was meaningful."  (Tr. 6/15/07 at 127:13-14; *see also* 69:6-9; 72:10-17; 125:13-14; 145:8-10.)   Hunter's lack of recollection demonstrates that he conceived his profit-seeking "experiment" independent of any such position.

### 6.    Price Movements During the Settlement

Trading of March futures during the settlement period on February 24 began at $7.44. (*See generally* OSC, Figure 2; NYMEX trading data provided to counsel by CFTC.[20])  Ultimately, the settlement price for the March futures was $7.11.  (OSC ¶ 42.) This number is lower than the market price at 2:00 p.m. by 33 cents.

---

[20]    This data includes both a time stamp indicating the "pit time" and a time stamp indicating the "imp time."  As discussed in more detail in Quinn Aff. ¶ 17, n.10, this discussion uses the "imp" time stamp.

The net downward price movement during the close did not occur steadily throughout the half hour, however. Rather, in the first seven minutes of trading, the price plummeted from $7.44 to $6.97, or close to 50 cents. Indeed, by 2:03 p.m., or just three minutes into the close, the price had already dropped to $7.29 (a price decline of approximately 15 cents). During those first three minutes, Amaranth sold only 397 contracts of the 3,111 contracts it would sell during the closing period (*i.e.*, roughly 1/8). (*See, generally*, Quinn Aff. ¶¶ 14-17 and Ex. 1 for discussion of Amaranth's sales during the closing period.) By 2:05 p.m., or just five minutes into the close, the price had already dropped to $7.07, a price decline of approximately 40 cents (almost a third *more* than the total downward price movement). During those first five minutes, Amaranth sold only 542 contracts (*i.e.*, less than 20% of the total contracts it sold during the close). During the first seven minutes of trading, as the price plummeted to $6.97, Amaranth sold about 844 contracts (*i.e.*, approximately one fourth of the total number of contracts it sold during the close).

During the next 23 minutes of trading (from 2:07 p.m. to 2:30 p.m.), the price of the March 2006 NG futures contract fluctuated some, but generally increased. In any one-minute period, there was no larger than a roughly 3-cent incremental movement; and in any five-minute period, there was no larger than an 11-cent incremental movement. That 11-cent incremental movement was upward, and occurred between 2:16 p.m. and 2:21 p.m. From a low of $6.97 at 2:07 p.m., the price ultimately increased to $7.05. The ultimate settlement price, $7.11, was 14 cents higher than where the instantaneous price had been after the first seven minutes of the close. During the remaining 23-minute

28

period, there were several one-minute time intervals during which Amaranth sold over 500 contracts and during which price increased. (*See* Quinn Aff., Ex. 1.)

In summary, the data shows that Amaranth sold more than 70% of its 3,111 futures contracts *after* the 47-cent price decline between 2:00 p.m. and 2:07 p.m. It is also shows that, from 2:07 p.m. through 2:30 p.m., a period during which the price of the March 2006 NG contract *increased* from a low of $6.97 (the price at 2:07 p.m.), Amaranth sold 2,272 contracts.

None of this trading activity contravened any CFTC regulation, NYMEX rule, or involved any deceit or fraud. Amaranth was absolutely entitled to engage in all the trades in question.

### B.  **March 29, 2006:  April Expiry**

Hunter did not participate in the April Expiry. The undisputed evidence is that Hunter was on vacation in the Maldives for the entire latter half of March, including during the April expiry on March 29. (*See* Tr. 6/15/07 at 50:15-51:6; 51:11-18; 52:11-14; 206:9-12; Tr. 11/16/06 at 80:9-13; OSC ¶ 90 n.149.) The Maldives are islands in the Indian Ocean, in a time zone separated by ten hours from Advisors' headquarters in Greenwich, Connecticut. (*See* Tr. 6/15/07 at 51:13-14.) Due to the remoteness of the islands and their infrastructure, it was difficult for Hunter to communicate with the United States. As he recalled, "I only had sporadic cell phone access." (*See* Tr. 6/15/07 at 51:12-13.)

Hunter has no idea what trading Advisors conducted on March 29. (Tr. 6/15/07 at 50:20-21.) He has no recollection of any contact with his colleagues on that expiry date. (Tr. 6/15/07 at 51:10.) He had no involvement in the expiry trading at the time. (Tr.

6/15/07 at 51:18.)  Hunter has no recollection of instructing Donohoe to take any action with his positions.  (Tr. 6/15/07 at 206:12.)

Furthermore, Hunter did not give any trading directions on March 29.  (Tr. 6/15/07 at 52:14.)  Hunter's managerial duties were not continuing because Hunter's co-head of Advisors' energy and commodities desk, Harpreet Arora, was available and qualified to direct Donohoe.  (Tr. 6/15/07 at 205:4-7.)  Hunter also knew that Donohoe could go to any of his fellow traders to solicit advice about routine trading matters, including Matthew Calhoun and Brad Basarowich, or risk personnel Robert Jones or David Chasman.  (Tr. 6/15/07 at 205:19-25.)

In fact, to the extent Hunter had any work-related contact during his vacation at this time, the only evidence establishes that it was directed to matters *other than* his book on March 29.  Some time after Hunter had left for vacation, Arora decided to resign from Amaranth (*see* Tr. 6/15/07 at 205:5-8), and his departure was timed very closely with the April futures contract expiry.  The drama of Arora's sudden departure unfolded during the day on March 29.  (*See* AALLC_REG0701555.)  Documentary evidence indicates that Donohoe attempted to contact Hunter during this time, requesting that Hunter call Donohoe immediately about a non trading-related issue—presumably, the resignation of Arora.  Donohoe wrote, "Call me asap…Your book. Is fine.  attn [sic] is needed elsewhere immediAtely [sic] unfortunately." (*See* AALLC_REG0700464.)

C.    **April 26, 2006: May Expiry**

On April 26, 2006, Amaranth placed orders to sell approximately 3,044 May NG futures contracts during the May settlement period.  (*See* OSC ¶ 93.)  These sales were the result of a strategy that Hunter attempted to employ in order to reduce Amaranth's large positions in the summer-winter spread, while simultaneously attempting to

30

minimize certain risks and difficulties that are associated with attempting to reduce such large positions. (Tr. 6/15/07 at 21:15-19; 25:11-26:10; 30:2-6.) Contrary to the Commission's unsupported contentions, there is no evidence that Hunter tried to drive down or otherwise influence the price of May futures, or that any such purpose played a role in his decision to make these trades. (Tr. 11/17/06 at 129:18-21; *see also* Tr. 6/15/07 at 17:2-16). (In any event, as noted below, the law dictates that engaging in trades without fraud or deceit, even with an expectation of causing price movements, is completely legitimate).

### 1.    Amaranth's Risk Reduction Endeavor

At the end of April, Amaranth's Executive Committee made the decision to reduce risk in Hunter's portfolio. (Tr. 11/16/06 at 49:1-5; *see also* 41:19-42:1; 108:14-16.) That decision came after a highly profitable month of April, which success was due to volatility in the natural gas futures market trending in favor of Hunter's spreads. (Tr. 11/16/06 at 99:8-25; 105:1-2.) The Fund's overall success in April 2006 caused Advisors to seek to reduce its holdings and consolidate its gains. (Tr. 11/17/06 at 44:20-21, 49:11-13.) Beginning around this time period, perhaps due to the volatility in the natural gas markets exhibited by the portfolio's exceptional April 2006 gains, Advisors' founder, Nicholas Maounis, became increasingly involved in the discussions about risk in the natural gas book. (Tr. 11/16/06 at 90:10-11.) Ultimately, the Executive Committee decided to reduce risk in the summer/winter spread, in which Amaranth held large positions that were generally short summer and long winter. (*See* AMARANTH_REG_054788.) This decision was communicated to Hunter, and Hunter, in turn, made trading decisions based upon it. (Tr. 11/17/06 at 49:1-5.) From this

decision from the Executive Committee, Hunter felt "a lot of pressure to reduce risk in the book internally" at the time. (Tr. 6/15/07 at 21:16-19.)

This risk reduction strategy is reflected in a number of documents from the time period.  For example, on April 21, Hunter e-mailed Manos Vourkoutiotis, one of the managers on Advisors' five-member Executive Committee, that he would "take the book down from here on month end."  (*See* AALLC_REG0147847.)  Similarly, on April 21, Hunter wrote, "Going to take the book down from here on month end…Within two weeks our NG and copper risk will be down a lot." (AALLC_REG_0150052.)  On April 21, Chasman wrote to Donohoe, "hey can you and brian [sic] sit down and give me the trades that you are going to do to reduce your position by 25%."  (*See* AALLC_REG0629420; *see also* Tr. 11/16/06 at 88:17-25; 91:1-11.)    And on April 28, when Hunter pointed out to Chasman that the risk management process executed on April 26 had resulted in significant opportunity costs, Chasman responded sharply, "Look, the book needs to be trimmed."  (*See* AALLC_REG0593383.)

## 2.    Overview of Hunter's Positions and Strategy

Hunter entered April 26 with the understanding that Amaranth held approximately (36,000) short summer positions and 36,000 long winter positions.  The short summer position consisted of approximately (3,000) net short May swaps, (19,000) net short June swaps, and a (14,000) net short balance in the remaining summer months.[21] (AALLC_REG0150182-201.)  Entering the expiry, Hunter's strategy was to attempt to

---

[21]    Hunter's basis for believing Advisors started the day with a net short expiring May position of (3,000) was certain "position reports" he received from Donohoe, and certain "risk reports" generated by David Chasman and Robert Jones.  (AALLC_REG0150182; AMARANTH_REG075312.)  However, the reports generated by Donohoe were the more current and reliable of the two.  (*See, e.g.,* AALLC_REG0695513 (Donohoe correcting Chasman position report).)

reduce the summer/winter spread position by approximately 12,000 to 15,000 lots and thereby significantly reduce the risk in the book.[22]

Hunter's strategy would ultimately involve the following elements (a more detailed explanation of these elements and his reasons for choosing them follows in the next section):

(i) *Selling as many long winter contracts as possible, predicted to be approximately 12,000 to 15,000 lots*.  Hunter would try to sell as many long winter positions as possible.  To the extent Hunter reduced Advisors' positions in long winter contracts, he would reduce its net short position in summer contracts, as described in (ii) and (iii) below.

(ii) *Moving forward (10,000) short swaps from June into May by entering May/June spread trades with Centaurus Energy*:  The effect of these spread trades would ultimately be to decrease Advisors' short June 2006 (M) position by 10,000 lots, and increase its expiring short May 2006 (K) position by (10,000) lots.  (Tr. 6/15/07 at 19:10-20.)  As May and June are both summer months and are roughly interchangeable (because the spreads between them are static), the trade had no impact on the summer/winter spread.  Rather, it merely increased the extent to which May was net short by (10,000) and decreased the extent to which June was net short by 10,000.  (Tr. 11/17/06 at 51:20-52:7; Tr. 6/15/07 at 21:8-14; 22:17-23; *compare* OSC ¶ 104.)  Hunter intended to let these short May swaps expire at settlement to correspond to the long

---

[22] Hunter sent a message to Chasman at about 1:00 p.m. noting the portfolio had a short May swap position of "15k," reflecting the final total of positions he intended to expire. (*See* A_CFTC032876.)  As described *infra,* this number would have represented the upper bound of the 3,000-lot range of summer/winter spread positions that Hunter sought to reduce.  Due to the difficulty in reconstructing Hunter's understanding of his precise positions at a given point in time, this number is given as a best estimate based on the data currently available.

winter contracts he hoped to sell as part of the strategy described in (i).  (Tr. 6/15/07 at 23:23-24:3.)   The effect would be a reduction in the summer short position (the expiration of approximately (10,000) May swaps) to correspond to the reduction in the winter long position (the sale of approximately 10,000 winter contracts).

(iii) *Purchasing 3,000 long May futures and a corresponding (3,000) short May swaps*:  This trade had no impact on Amaranth's risk portfolio, since it was offsetting (*i.e.*, equally short and long in the same month).  However, it provided Hunter a reservoir of 3,000 May long futures that he could "roll" if necessary to further reduce Amaranth's short summer position in the event that he was able to sell off more long winter contracts than he had corresponding short May swaps to expire.  (Tr. 6/15/07 at 55:15-23; 58:4-10.)  In other words, if Hunter was able to sell more long winter positions than he held ***net*** short May contracts, then he could then sell a corresponding amount of these May futures for June futures ("roll" them into June).   The effect of this roll would be a reduction in the summer short position (due to the increase in June futures as a result of the roll of long contracts from May, effectively decreasing the extent to which Amaranth's summer position was short once the prompt position expired) to correspond to the reduction in the winter long position (the sale of potentially 3,000 additional winter contracts).  (Tr. 6/15/07 at 56:17-25.)

### 3.    Hunter's Thinking Behind The Strategy

#### a.    The Choice Behind "Legging Out" And Using The Expiry

Hunter believed there were several potential ways Amaranth could reduce its summer/winter spread position.  (Tr. 11/17/06 at 45:11-21, 75:22-25.)

The first and simplest option would have been to sell the position as a spread position to one or more counterparties (*i.e.*, sell both legs of the spread position to the same buyer(s)).  (Tr. 11/17/06 at 76:5-10.)

Amaranth first tried this method, but ultimately found it to be "very difficult" and therefore abandoned it.  (Tr. 6/15/07 at 20:15-16; 21:15-16.)  Among other things, this method of exiting spreads had two disadvantages.  First, Amaranth did not want knowledge of its positions getting into the market.  Approaching counterparties in order to accomplish risk reduction would risk this outcome.  (Tr. 6/15/07 at 20:12-21.)  The market's learning of Advisors' positions could cause other traders to begin anticipating its sales and increase execution costs or prevent successful trading.  (Tr. 11/17/06 at 76:7-10.)  Second, incipient illiquidity in the market for summer/winter spreads made it difficult to sell both legs at once as a single unit.  Trying to offer the spreads directly with counterparties seemed likely to result in damage to Advisors' positions on both the short and long legs of the spread and have a greater cost.  (Tr. 6/15/07 at 20:12-23; Tr. 11/17/06 at 76:7-10.)

These considerations led Hunter to the conclusion that Amaranth's best recourse was instead to exit the short summer and long winter legs of the spread separately and independently, a process that traders refer to as "legging out" of the spread.  (Tr. 6/15/07 at 20:23-21:2.)  There were two different ways this could be accomplished.

One option for "legging out" of a spread would be to sell each leg separately to different counterparties.  An advantage of this method would be to make it difficult for the market to divine the actual spread position Amaranth held, comprising both short and long contracts.  But a disadvantage would be the "execution risk" implicit in buying and

35

selling two contracts at the same time: potentially, it could be expensive if buying back the short summer position could only be achieved at increased prices, while selling the winter position could only happen at diminished prices, resulting in Advisors not obtaining market price on either legs of the spread.  (Tr. 11/17/06 at 75:24-76:4.)

An alternative method of "legging out" was to use the expiry as an opportunity to expire the nearest short summer month position, and sell only the further-dated long winter leg.  In general, Hunter believed this to be the best alternative:  This option "gives you…much better price execution risk," and "it's not as transparent to the market of [sic] what you're trying to do with spreads overall."  (Tr. 11/17/06 at 76:11-15.)  In other words, in contrast to trading out of both contracts independently, expiring short contracts would enable Advisors to achieve market price for its summer leg.  By expiring off one leg, Advisors thus reduces the price "slippage" implicit in its execution risk.  (Tr. 11/17/06 at 75:16-21; Tr. 6/15/07 at 26:3-10.)

But "legging out" of the spread—either by trading both legs or by trading one and expiring the other—created a different risk as a result of a potential timing mismatch: to the extent that the legs were not exited at precisely the same time, Advisors was exposed to "price risk" on the remaining leg during the time it continued to hold it.  (Tr. 11/17/06 at 75:2-6.)  That is, the remaining leg of the spread would continue to be subject to price volatility, but this price volatility would now be unmitigated by the former spread position, *i.e.*, would no longer be balanced by the counteracting price movements in the opposite leg of the spread, since that leg no longer existed and the position had shifted from a spread to a naked position.[23]

---

[23]    The risk can be demonstrated by the following example: suppose Advisors sought to expire off a 15,000 lot summer-winter spread position, in which Advisors held 15,000 short summer futures and 15,000

Hunter viewed that risk, though temporary, as considerable compared to the risk that Advisors faced in maintaining the spread position. As Hunter testified, "to take on incremental price risk at the expense of minimizing spread risk isn't a good risk decision. You can certainly do it but it's riskier and that's not the point, it's to reduce risk and not add it." (Tr. 11/17/06 at 78:20-23.)

In legging out of the summer-winter spread position through expiring off the short summer position, Amaranth would be exposed to price risk under two scenarios: first, Hunter could sell a significant volume of the long winter position early in the day. In that case, his remaining short summer position would be exposed to price risk throughout the entire day until the expiry. (Tr. 6/15/07 at 59:15-21.) Second, Amaranth might not be able to sell as much winter length as Hunter predicted it could. In that case, upon the expiration of Amaranth's short summer positions at the end of the day, its book would be net long and its remaining long winter position would be exposed to price risk until Amaranth could ultimately rebalance the book—which might not be until the next day or considerably later.

Given these concerns, it was important to the strategy to be able to predict— within a range—approximately how many non-expiring (long winter) positions Advisors would be able to sell in order to determine how many (short summer) positions to expire: Overestimating would expose Hunter to price risk with respect to the expiring leg until

---

long winter futures. The price volatility *on either leg* is potentially high. Hunter believed it was approximately 20-25 cents per day (meaning that on any given day, the price of the leg may move on average 20-25 cents). (Tr. 6/15/07 at 54:4-6; Tr. 11/17/06 at 78:7; 90:5-6.) However, because the prices between the two periods generally correlate, price volatility *on the spread* is relatively low. Hunter believed it was approximately 1-2 cents per day. (Tr. 6/15/07 at 53:23-54:4) (meaning that, if the price of summer decreased 25 cents, the price of winter would also decrease, and it would likely decrease anywhere from 26 cents to 24 cents, such that the volatility of the spread would remain within a range of 1 to 2 cents). Thus, if Amaranth were to exit the summer position without simultaneously exiting the winter position, then it would be left with a full exposure to the potential 25-cent price movement. (Tr. 11/17/06 at 75:1-18; Tr. 6/15/07 at 59:16-60:3.)

the time that the non-expiring (long winter) positions could be sold. At the same time, Hunter did not want to underestimate the amount of long winter positions he could sell. Given the pressure he felt from management to reduce risk, Hunter wanted to expire off as much as possible and therefore sought a strategy that would also give him flexibility, in case he was able to sell more than expected. That is where the May futures, ultimately sold during the expiry, came into play.

b.    **The Choice Behind Using Futures To Create Flexibility**

A reservoir of futures provided Hunter with flexibility in terms of trying to reduce the short summer position by the same amount as he was ultimately able to sell long winter positions. Depending on the number of long winters sold, Hunter could either roll them into June (in the event he sold more winter length than expected and needed them to further reduce the net short summer position) or sell them during the expiry (in the event he did not sell as much winter length as he had hoped). (*See* Tr. 11/17/06 at 172:25-173:3.)

Futures provided a distinct advantage over swaps in providing this flexibility because of the way swaps settle: The price of a given future is determined by whatever price the buyer and seller agree to. That is, the price of the future is determined by the market at whatever time the future actually trades. The price of a given swap, on the other hand, is determined by the settlement price of the futures contract. That is, a swap settles for the volume weighted average of all futures sold during the half-hour settlement period. (OSC ¶ 18; NYMEX Exchange Rulebook § 508.02.) As a consequence, as the settlement period approaches, the price at which swaps trade begins to "dissociate" from market price for futures and instead begins to gravitate toward the expected settlement price. (Tr. 11/17/06 at 66:15-19.)

38

As a hypothetical example, if during a settlement futures trade at $7 at 2:00 p.m., $7.25 at 2:15 p.m. and $7.50 at 2:30 p.m., then, given this pricing trend line, the market price of a future traded at 2:29 p.m. would likely be roughly $7.49.  However, because the ultimate settlement price will be $7.25 (the average price over the half-hour settlement period), the market price of a swap at 2:29 p.m. would be roughly $7.25.  The difference between $7.49 and $7.25 is the difference between the settlement price and the market price.  (*See* Tr. 11/17/06 at 67:9-20.)  In practice, this "dissociation" generally begins to occur shortly before the settlement period starts, around 1:45 p.m.  (Tr. 6/15/07 at 58:2-4.)

As a result, Hunter found it preferable to use futures instead of swaps for purposes of having a reservoir available in case he should be able to sell additional long winter contracts.  (Tr. 11/17/06 at 66:15-21.)  With futures, Hunter could continue trading the long winter contracts theoretically until 2:15 p.m., knowing that he could still obtain market price on the futures in the event he would need to roll them over.  After 2:15 p.m., the realities of trading required Hunter to determine how many futures to sell and how many to roll.  (Tr. 11/17/06 at 102:10-17.)  With swaps, by contrast, Hunter could no longer obtain market price for them beginning at approximately 1:45 p.m.  Hunter testified in regard to prompt-month swaps as of 1:45 p.m. on expiry dates: "It's technically tradeable at that point.  It's not a useful instrument.  Again it's an average of a whole bunch of other trades that are occurring in the futures which is tradeable."  (Tr. 11/17/06 at 67:20-23; Tr. 6/15/07 at 58:2-4.)  In other words, trading swaps would not enable Amaranth to exit its spreads at market price during this period of dissociation from the curve.  Given Amaranth's ambitious risk reduction goals, Hunter would prefer to

have that additional 30 or so minutes (nearly one-tenth of the trading day) to try to sell more winter contracts. This 30 minutes would occur at one of the most liquid parts of the trading day. (Tr. 6/15/07 at 58:4-9; *see also* Tr. 6/15/07 at 60:22-25; Quinn Aff. ¶¶ 58-59 and Exs. 12-14 (providing clear evidence contrary to the Commission's claims concerning "vanishing liquidity" during the settlement period); *compare* OSC ¶ 96.)[24] Thus, because futures gave Hunter an extra half hour to exit his spread positions at market price, they were preferable.

### 4. Execution

#### a. Predicting the Number of Winter Contracts That Could Be Sold

In order to execute the above-described strategy and in order to stay relatively balanced, Hunter needed to determine the number of May short positions he would expire off, which in turn required him to estimate a range of long winter positions he reasonably expected to sell. (Tr. 6/15/07 at 23:18-24:11.) As described in detail above, several things factored into that estimation: the risk reduction goals articulated by the senior management of Advisors, his personal expectations about potential market liquidity, likely slippage costs based on timing and execution, and the importance of maintaining the confidentiality of his portfolio.

Predicting the number of long winter positions Advisors could sell was very difficult, as it would depend on the overall liquidity of the market that day, which is difficult to predict. (Tr. 11/17/06 at 47:4-10.) During his testimony, for example, Hunter indicated that he did not know whether Advisors would be able to sell 5,000 winter

---

[24]    In addition to its incorrect claims concerning the behavior of market participants during the closing period, the Commission provides an inaccurate measurement of market liquidity as "open interest." (*See* Quinn Aff. ¶¶ 56-57; *compare* OSC ¶¶ 59, 104)..) Furthermore, the Commission's contentions concerning a lack of liquidity in winter contracts (OSC ¶ 104) are simply incorrect. (Quinn Aff. ¶ 57.)

contracts or 15,000.  (Tr. 11/17/07 at 55:21-25.)  Nor did Hunter know *when* during the

course of the day Advisors would be able to complete its sales of winter length.  The

ultimate course the strategy took depended on the liquidity of the contracts Amaranth

tried to sell.  On expiry dates, markets tend to be most liquid at the beginning and the end

of the day.  (Tr. 6/15/07 at 58:6-8.)

Hunter ultimately estimated that he would be able to reduce the summer/winter

spread by about 12,000 to 15,000 positions.  (*See* A_CFTC032876 (reflecting final total

of (15,000) short May swaps going into the close).)[25]  He recognized that the number was

ambitious.  However, he felt he needed to be ambitious: he was facing internal pressure

from management to reduce as much risk as possible.  (Tr. 6/15/07 at 21:17-19; 58:15-

22.)  In any case, he believed that the number of winter contracts he intended to sell to

correspond to the short swaps he rolled into May—though ambitious—was reasonable.

(Tr. 6/15/07 at 30:20-31:13.)  He also understood that the process might not have perfect

results and that he could not guarantee success.  (Tr. 11/17/06 at 88:4-10; 88:22-23.)

In light of his goal, Hunter knew that selling the desired winter length could take a

full day.  (Tr. 6/15/07 at 57:14-15; Tr. 11/17/06 at 86:18-20.)  He would likely not know

until the end of the day whether he was successful or not, and therefore whether he would

need to sell the May futures or roll them into June.  As a result, he would likely have to

hold the long May futures position until the closing range before determining whether to

sell or roll it then.  (Tr. 11/17/06 at 89:21-23.)

---

[25]    Previously, in his testimony, Hunter assumed that the range of summer/winter spreads he sought
to expire was between 10,000 and 13,000, as stated in a letter from Amaranth Advisors LLC to NYMEX.
(AMARANTH_REG_054788.)  He explained that while he believed these numbers were accurate, he was
not certain that they were correct.  (Tr. 11/17/06 at 43:4.)  For the sake of conservatism, the 12,000 to
15,000 range here is used as the best available estimate of Hunter's subjective belief at the time, on the
basis of his message to Chasman at 1:00 p.m. (A_CFTC032876.)

b.    **The Centaurus Trade, May Spread and June Put Options**

As described above, the strategy involved pulling forward (10,000) short swaps into May in order to adjust the size of Hunter's expiring position ultimately to about (15,000) short May swaps.  Prior to the settlement date, Hunter had also set up his book for the strategy by buying 3,000 long May futures and selling (3,000) May swaps.

The Fund pulled forward the (10,000) short swaps by executing a series of trades with Centaurus Energy.  As part of these trades, Centaurus purchased 10,000 June swaps and sold Amaranth (10,000) May swaps.  The trade was executed in several waves, between 11 a.m. and 12:40 p.m.  The trade was to further the risk reduction strategy.  Hunter did not view it as an independent profit-seeking strategy.  (Tr. 11/17/06 at 155:15-156:4; Tr. 6/15/07 at 29:22-30:10.)  Instead, the purpose was to redistribute the short summer position into the expiring month.  (Tr. 11/17/06 at 155:15-20; *see also* 52:11-13, 19-25.)

The Fund also acquired approximately 3,000 offsetting May futures and swaps by the beginning of the expiry date.  (OSC ¶ 93.)  This trade created the reservoir of 3,000 May futures that Advisors could either roll into June or, in the event Advisors failed to sell enough long winter contracts, sell during the expiry.

Finally, to further hedge against the possibility that Amaranth would not be able to sell enough winter contracts and would thus be net longer after the expiry (and therefore subject to risk that prices would decrease), Hunter purchased a total of about 11,750 June (M) put options with strike prices of $7.00 and $7.25.  As described below, he later decided to purchase an additional 3,000 similar June puts.  (*See* OSC ¶ 100.)  Whereas downward price movements of the forward curve would harm Hunter's

42

potential residual long winter position, they would now also benefit his new summer put options, *i.e.*, they would hedge against the possibility that he would fail to sell sufficient winter length.  Within a day after the expiry, this proved to be a wise decision.  Fellow trader Shane Lee wrote on April 27, as the curve trended downward, "thank god hunter bought 15000 puts or he would be having a real bad day."  (AALLC_REG0670297.)

c.    **The Attempted Sale of Long Winter Contracts and the Holding of the May Futures**

Hunter tried to sell winter contracts aggressively all day.  (Tr. 6/15/07 at 14:3-5; Tr. 11/17/06 at 95:23-24.)  The Fund started trying to sell its long winter contracts "first thing in the morning," and continued throughout the day.  (Tr. 11/17/06 at 77:11-12; 95:20-24.)  To the extent Advisors did not execute winter sales immediately, "there just might not have been bids that were in the level we were looking for, the size we were looking for."  (Tr. 11/17/06 at 95:20-24.)

As Advisors continued aggressively to try to sell off its winter position, it held the May futures contracts in case it would need to roll them into June.  Since Advisors wanted to sell as many winter positions as possible, it made sense to delay making that determination as long as possible in order to maximize selling time on the winter positions.  (Tr. 11/17/06 at 89:21-23.)

Thus, there were several reasons that Advisors held its May futures until 2:15 p.m. during the settlement period.  First, prospecting winter bids took time.  Hunter explained, "we'd be looking first thing and checking prices to see what the bids are. As a practical trading issue, you try to line up the series of bids throughout the day, just sort of hitting the first guy and selling, you'd get a bid from somebody and try to keep them

interested for a few hours and try to get several other people all lined up and hit them at once maybe later in the day." (Tr. 11/17/06 at 90:18-25.)

Second, in selling the winter contracts, Hunter was trying to obtain a good price, which required time and patience. "We would have been holding off to wait for better pricing. We were actively seeking the best current prices." (Tr. 11/17/06 at 97:2-4.)

Third, the whole purpose in reserving the May futures was the advantage they had over swaps after 1:45 p.m. due to swaps' "dissociation" from market prices (described above). Futures gave Hunter an extra half hour to sell, which was significant. That half hour fell between 1:45 p.m. and 2:15 p.m., when the realities of trading meant that Amaranth would have to determine how many futures to keep and how many to roll. (*Compare* Tr. 11/17/06 at 66:15-67:2 and 90:3-6; Tr. 6/15/07 at 58:8-10.)

Fourth, Hunter expected to find relatively more liquidity in the closing range than earlier in the day. As he explained: "[y]ou'd like to sell maybe 2,000/2,000 in the morning, in the afternoon maybe another 2,000 or 3,000, then another 5,000 or something in the last half hour." (*See* Tr. 6/15/07 at 60:4-15.) The Fund's hope that liquidity would materialize during the half hour between 1:45 p.m. and 2:15 p.m. motivated it to wait as long as possible before deciding whether to sell or roll its long May futures. A decision to sell the May futures before the settlement period would have been tantamount to abandoning all hope of selling into the desired window of winter contracts. (Tr. 6/15/07 at 151:20-152:6.) As Hunter testified, the end of the day is typically one of the most liquid periods. (Tr. 6/15/07 at 58:6-8.)

Throughout the day, Hunter and Donohoe discussed the attempt to sell the long winter contracts. Hunter testified, "We'd be having a small discussion about what's

44

available, how are we doing and what are we doing, we're running out of time, when are we going to do this. I remember having that conversation…We would have had a lot of those conversations." (Tr. 11/17/06 at 103:15-21.) In light of the goal of maximizing the number of winter contracts sold, Hunter and Donohoe agreed to wait as long as comfort would permit before selling the May futures or rolling them into June. (Tr. 6/15/07 at 10:10-12.)

### d.    Lack of Success Due Primarily to Liquidity Issues

The Fund was ultimately not successful in selling as many winter contracts as it had estimated it could. Hunter later came to understand that the market was much less liquid than he had believed it would be going into the Expiry Date. (Tr. 11/17/06 at 72:24-73:2; Tr. 11/16/06 at 92:15-16.) At the time, Hunter was unsure why the liquidity in winter length was poor. (Tr. 11/16/06 at 92:20-21.) Hunter later came to understand that during the period from April-May 2006, there was an abnormal amount of new sell-side volume, created by a combination of producer hedging (in this context, natural gas producers selling futures contracts short in order to be able to protect themselves against downward price movements in the physical market that would lower their profits from the sale of physical natural gas) and a large Texas power utility's decision to build a number of large power plants, which led to further hedging on the part of this utility against downward price movements in the physical energy markets (both natural gas and electric power). (Tr. 11/16/06 at 159:3-160:25.) The phenomenon of a large-number of newly aggressive sellers came to "saturate" the market (Tr. 11/16/06 at 161:3), which did not have a corresponding increase in the number of buy-side players. As a result, the price of natural gas futures had to be "reset" (Tr. 11/16/06 at 161:4) before price and volume conditions would again be conducive to the amount of selling that Hunter wished

45

to execute and would render more favorable the prices at which he intended to execute those sales.

e.    **Selling the May Futures**

Ultimately, at approximately 2:15 p.m., Hunter made the decision to stop the effort to sell winter contracts and to begin to sell the May futures so that Amaranth could be flat by the end of the close. (Tr. 11/17/06 at 102:10-17.)  Hunter testified that "after 2:15 you don't have a choice any more [sic]…You can't hold a futures contract, you can't take deliveries, you have to sell them.  So there is a point that despite your best efforts you have to sort of give up and not roll the contracts and just sell them.  In spite of our best efforts we just reached that point and had to make a decision to sell the May contracts." (*Id*.)

In selling the May futures, Hunter did not seek to depress prices.  (Tr. 11/17/06 at 175:13.)  Further, he did not attempt to maximize downward price movements by selling them during the final minutes of the close.[26]  (Tr. 6/15/07 at 17:2-21.)

Hunter does not recall ever instructing anyone, including Donohoe, to wait until the last eight minutes to sell the futures, and he does not believe he did so.  (Tr. 6/15/07 at 10:7-15; 16:6-8.).  Indeed, he had no knowledge about any eight-minute execution orders. (Tr. 6/15/07 at 12:5.)  There is no evidence that he did so.  Hunter simply told Donohoe when to start trying to sell the futures.  (Tr. 6/15/07 at 9:11-14; 16:6-8.)

---

[26]    Indeed, to the extent the Commission's theory is that sales during the final few minutes would maximize downward pressure due to vanishing liquidity, Hunter testified that the close was in fact *more liquid* during the last five to ten minutes of trading.  (Tr. 11/17/06 at 117:8, 118:23-119:3; *compare* OSC ¶ 96.)  His observation is borne out by official NYMEX data from the last minute of trading on April 26, showing that more May futures traded on NYMEX during the final minute of the settlement than had traded during the entire intra-day period prior to the beginning of the closing range.  (Quinn Aff. ¶ 58;, Exs. 12-14, indicating sell volume on the NYMEX, excluding Amaranth, during the three subject settlements.)

46

f.    **Additional June Put Options**

When the closing range came to an end, it was now clear that Amaranth would not be able to sell a sufficient number of winter contracts.  As a result, Hunter needed to take additional steps to protect his portfolio from the effect of downward price movements on the long contracts he knew his book would retain.  To that end, Donohoe purchased an additional 3,000 lots of June (M) put options as the close came to an end.  Donohoe instructed broker "teschnell" to purchase 1000 lots at 2:28:05 p.m.  Following the close, at 2:30:02 p.m., Donohoe placed an additional order for another 2000 lots.  The broker's efforts continued many minutes after the close, beyond 2:40 p.m.  (*See* AALLC_REG0695651; *see* OSC ¶ 100.)

g.    **Impact of the Price Movements**

It is clear that Hunter did not deliberately cause the price movements at issue that occurred on April 26.  In fact, the various price movements on April 26, which the Commission claims Hunter deliberately caused, were clearly detrimental to Advisors. (Tr. 6/15/07 at 17:18-19; 32:7-34:4.)

For example, Amaranth's expiring short May swaps position declined in value during the half-hour settlement period:  trading in the May futures began at about $7.12. Ultimately, the final settlement price was $7.20, representing an upward price movement of .08 cents.  (*See* OSC ¶ 98; Quinn Aff. Ex. 15.)  Thus, if Advisors' May position were considered in isolation, Amaranth did not derive any financial benefit from the price movements in the expiring contract month.  This fact is reflected in Hunter's IMs at the time:  Referring to the price movement in the May contract during the settlement period, Hunter wrote a colleague after the close: "we got smashed o[n] the stuff we rolled off." (*See* AALLC_REG0593146.)   Shortly before the closing range began, Hunter estimated

47

that he had an expiring position of roughly (15,000) short K contracts. (A_CFTC032876.)  On that basis, an 8-cent price movement during the closing range would cost Advisors approximately $12 million.

In addition, the short May position was primarily made up of a spread position by being paired with a long June position—the result of the spread trades that Hunter had concluded with Centaurus Energy.  These spread trades also lost money due to price movements during the expiry.  Whereas Hunter's trade with Centaurus represented a bet that the spread between May and June would increase, in fact it decreased during the settlement period.

More specifically, the bulk of these trades were executed at approximately 21.5 cents per contract.  Prior to the settlement period on April 26, the spread had traded with prices consistently between a low of 19 cents and a high of 24 cents.  The small daily volatility of the spread thus implied that the contract should have settled in that range on April 26.  (*See* Quinn Aff., Ex. 15.)  However, the price paths taken by the May and June contracts during the last half hour of trading on April 26, when combined with their different settlement periods (thirty minutes for May and two minutes for June), caused the May/June spread to settle at an abnormally compressed value of 7 cents.  (*See id.*) This final settlement figure is far less than where the spread settled on April 25 (20 cents) and also far less than the low end of the spread's trading range on every other day in April 2006 (19 cents).  (*See id.*)  As Hunter recalled, "that was a big contraction on the spread."  (Tr. 11/17/06 at 198:7.)  Calhoun noted the extraordinary compression in the spread at the time, writing to Hunter "K/M unreal."  (AALLC_REG0593149.)

48

The compression of the spread had an adverse impact on Hunter's 10,000-lot May/June spread trade with Centaurus Energy. By basic arithmetic, the trade's value would be reduced by $1 million per 1-cent price drop in the May/June spread. Considered relative to the approximate 21.5 cents at which Advisors executed the majority of the spread trades, the price shifts thereafter resulted in a 14.5-cent compression in the May/June spread and a corresponding $14.5 million dollar *loss* for Hunter's May/June trade. Considered in relation to the Commission's charge that Amaranth manipulated the price of the May contract downward by 3 cents, and the June contract downward by 6 cents, for a total 3-cent compression of the May/June spread (OSC ¶ 99), the compression translates to a $3 million *loss* on the Centaurus trade that Hunter had initiated earlier in the day.

## <u>Argument</u>

## I.     The Commission Lacks Personal Jurisdiction Over Brian Hunter

The Commission lacks personal jurisdiction over Brian Hunter and therefore should immediately dismiss the OSC as to him. *See FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1321 n.119 (D.C. Cir. 1980) (stating that the Due Process Clause limits the personal jurisdiction of federal agencies, preventing them from exercising their authority over a foreign entity that lacks sufficient contacts with the United States). In order to establish that the exercise of personal jurisdiction over Hunter would satisfy the requirements of due process, the Commission must demonstrate: (a) that Hunter purposefully established sufficient minimum contacts with the United States; and (b) that the exercise of jurisdiction over Hunter would not offend traditional notions of fair play and substantial justice. *See Asahi Metal Indus., Co. v. Superior Court*, 480 U.S. 102, 105 (1987). The Commission cannot meet either prong of this two-part test.

49

### A.    Hunter Does Not Have Sufficient Minimum Contacts With The United States

The evidence does not support that Hunter purposefully established sufficient minimum contacts with the United States.  The Commission admits that Hunter is a foreign citizen who was stationed in Canada during the period in which the alleged manipulative trading occurred.  (OSC ¶ 35.)  Indeed, Hunter is not alleged to have committed a single act within the United States related to the alleged violation, or to have even been present here during the relevant time period.  Further, Hunter's actual employer during the entire relevant time period was not even a U.S. entity, but rather a Canadian entity.  (OSC ¶ 33.)

In a situation such as this, where an individual has not acted within the forum, the relevant test for specific jurisdiction[27] is whether the individual "cause[d] effects in the state by an act done elsewhere *with respect to any cause of action arising from these effects* unless the nature of the effects and the individual's relationship to the state makes the exercise of…jurisdiction *unreasonable*."  *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972) (quoting Restatement (Second) of Conflict of Laws § 37 (1989)) (emphasis added).  Here, the Commission's claim arises out of the alleged effect that Hunter's conduct caused on the *U.S. market for physical natural gas*.  Indeed, as the Commission concedes, its entire statutory authority to proceed in this matter is premised on that alleged effect.  Thus, it is that alleged effect that is relevant for purposes of determining jurisdiction.

---

[27]    There is no support for the proposition that Hunter had "continuous and systematic" general business contacts with the United States sufficient to give rise to "general jurisdiction," *i.e.*, jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).

50

Courts have warned, however, that the principle of asserting jurisdiction over a non-resident for having caused effects within the forum state is one that "must be exercised with caution, particularly in an international context." *Leasco*, 468 F.2d at 1341. "*At minimum* the conduct must meet the test laid down in § 18 of the Restatement (Second) of Foreign Relations Law, including the *important requirement* that the effect 'occurs as a *direct and foreseeable* result of the conduct outside the territory.'" *Id.* (emphasis added). Courts have also held that, "[N]ot every causal connection between action abroad and ultimate injury to American investors will suffice" for personal jurisdiction purposes. *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 1000 (2d Cir.), *cert. denied*, 423 U.S. 1018 (1975)). Further, "Not every securities law violation involving shares of a United States corporation will have the requisite effect within the United States." *Unifund SAL*, 910 F.2d at 1033. Thus, at the very least, the Commission must establish that the alleged effect on the U.S. markets for physical natural gas was the "direct" and "foreseeable" result of Hunter's conduct. *Leasco*, 468 F.2d at 1341; *see Bersch,* 519 F.2d at 1000 (dismissing claim for lack of personal jurisdiction and holding that, even if the defendants' acts had some causal relation to the alleged injuries, the test for personal jurisdiction is "more demanding" and requires a showing "at minimum [that] the effect [occurred] 'as a direct and foreseeable result of the conduct outside the territory'") (citations omitted).

Here, for reasons described in much greater detail below, the evidence fails to meet these standards. First, the Commission fails to demonstrate that Hunter's conduct actually had *any effect* on the U.S. market for physical natural gas. (*See* Section IV.E,

*infra*).  Moreover, Hunter never even traded physical natural gas; rather, he only traded in natural gas financial derivative contracts (futures, swaps and options).   Thus, the Commission fails to establish that the effect of Hunter's conduct on the U.S. market for physical natural gas would either be *direct* or *foreseeable*.   (*See* Sections III and IV.D.2.b, *infra*).  There is no evidence that Hunter was aware of any purported effect of his futures trading on physical gas prices.

We are not aware of a single case where a court found personal jurisdiction over a trader who traded in one market (here, the futures market) due to the alleged effects that that trading had on an entirely different market (here, the market for physical natural gas).  Thus, the Commission has failed to establish that Hunter had sufficient minimum contacts with the United States such that the exercise of jurisdiction over him would be reasonable.[28]

### B.  The Exercise Of Jurisdiction Is Not Consistent With Traditional Notions of Fair Play and Substantial Justice

The assertion of jurisdiction over Hunter also fails to "comport[] with traditional notions of fair play and substantial justice."  *See Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (internal citation omitted).  This second prong of the due process analysis requires consideration of several factors, including the burden on Hunter, the interests of the forum jurisdiction, and the

---

[28]    In addition, aside from the failure to demonstrate any effect on the U.S. market for physical natural gas, the OSC should be dismissed because the relationship that Hunter had with the NYMEX trades at issue is too attenuated.  There is no evidence that Hunter personally executed the trades.  Furthermore, even if Hunter could be deemed to have somehow "caused" the trades at issue, he was trading on behalf of his foreign-based employer.  While the fact that he was acting as an employee does not insulate him from a finding of jurisdiction, the Commission fails to demonstrate that Hunter was a "primary participant" in the alleged violation.  *Compare Calder v. Jones*, 465 U.S. 783 (1984) (in a non-international case, finding jurisdiction comported with due process where defendants were the ones who actually wrote and edited the article alleged to have caused the injury).

Commission's interest in obtaining relief.  *See id.*  These factors counsel for dismissal of the OSC against Hunter.

*Burden on Hunter*.  The burden on Hunter here is severe.  As argued in Section VI, *infra*, the Commission may not assess penalties by merely conducting a "paper hearing."  Rather, the Commission should have its claim adjudicated *de novo* in a federal district court.  To defend against this proceeding adequately, Hunter—a Canadian citizen residing in Western Canada who at all relevant times was working in Canada for a Canadian affiliate of Amaranth Advisors LLC— would be required to traverse several thousand miles from his home in Calgary to wherever the hearing is ultimately held and litigate in what, for him, are a foreign set of procedures and laws.  Indeed, the Commission has not even made clear what procedures it will follow in this case, which merely exacerbates the due process violation here (see Section III, *infra*).  Courts place significant weight on these unique burdens in assessing the reasonableness of stretching personal jurisdiction over national borders.  *See Asahi Metal Indus. Co.*, 480 U.S. at 115 ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.") (internal citation omitted).

*Interest of the United States*.  As mentioned above and detailed below, the U.S. market for physical natural gas was not even affected by Hunter's trades.  In this context, the interest of the United States in adjudicating this matter is not particularly compelling.

*Interest of the Commission*.  An action against Hunter would do little to advance the Commission's ability to obtain the relief it seeks against him: even assuming the Commission prevailed on its claim within the U.S. judicial system, it would still need to have that judgment domesticated in Alberta Province, Canada (where Hunter lives and

works).  A U.S. judgment against Hunter, in turn, may not necessarily be recognized or enforced in Alberta, as it would likely neither be summarily imported in Alberta nor imported as a matter of right.[29]   Thus, in order to enforce a judgment against Hunter, the Commission would likely need to commence a civil action in the Alberta courts and may have to litigate the entire case against Hunter all over again.   At best, then, the Commission would be able to domesticate such judgment in Canada but only after a lengthy and litigious battle.  Thus, this factor does not weigh in favor of forcing Hunter to undergo a lengthy proceeding in this Court, where most likely the entire litigation would have to be repeated in Canada.

## II.    The Commission Lacks The Statutory Authority To Proceed In This Matter

The Commission lacks the statutory authority to bring this enforcement action because Hunter is a *natural person* who is alleged to have traded in *natural gas futures* only (not physical natural gas).  Hunter has extensively argued these points to the Commission previously.  Rather than repeat those arguments in detail here, Hunter hereby incorporates by reference all of his prior briefing and argument on that fundamental, threshold issue.[30]

---

[29]    The Canadian statute that provides a litigant the ability to register a foreign judgment as an Alberta judgment (the Reciprocal Enforcement of Judgments Act (c. R-6, Statutes of Alberta) ("REJA")) appears inapplicable here.  Under REJA, it appears the procedure by which to domesticate a judgment in Alberta is only available to a limited number of "reciprocating jurisdictions," none of which *appear to include the federal courts of the United States*."

[30]    That prior briefing and argument is attached as Exhibits 9 through 16 of the Simonson Decl. and includes: Letter from Michael S. Kim to Todd Mullins, Esq., dated June 26, 2007;  Memorandum of Law In Support of Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and Declaratory Relief, filed in *Hunter v. Federal Energy Regulatory Commission*, No. 07. Civ. 1307 (RJL) (D.D.C. filed July 24, 2007) ("*Hunter v. FERC*"); Transcript of Hearing in *Hunter v. FERC* on July 24, 2007; Plaintiff's Memorandum of Points and Authorities in Response to Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction and Declaratory Relief, filed in *Hunter v. FERC* on August 3, 2007; Plaintiff's Memorandum In Support Of Motion for Preliminary Injunction, filed in *Hunter v. FERC* on August  7, 2007; Transcript of Hearing in *Hunter v. FERC* on August 8, 2007, Letter from Kobre & Kim LLP to Honorable Richard J. Leon dated October 3, 2007; and Plaintiff's Memorandum of Supplemental Authority, filed in *Hunter v. FERC* on November 2, 2007.

In short, for all the reasons detailed in his prior briefing and argument, the Commission lacks statutory authority to proceed in this matter because the relevant anti-manipulation provision does not apply to natural persons such as Hunter. *See* 15 U.S.C. § 717c-1 (referring only to unlawful conduct by "any entity," not by "any person"). Furthermore, the Commission lacks the statutory authority to pursue anti-manipulation enforcement actions against those who solely traded in natural gas futures, not physical natural gas.   Moreover, the Commodity Exchange Act vests exclusive jurisdiction to regulate all transactions involving futures contracts—including those involved here—in the CFTC.  7 U.S.C. § 2(a)(1)(A).  Finally, the "in connection with" language of the Natural Gas Act does not operate to extend the Commission's jurisdiction to natural gas futures contracts.

In addition to being wrong on whether the anti-manipulation provision applies to a natural person who traded in natural gas futures only—a purely legal question that a court can decide without any factual inquiry, the Commission does not even provide adequate evidentiary support for the basic factual proposition on which its assertion of jurisdiction is purportedly based: namely, that the NYMEX settlement price supposedly has a "direct and substantial effect" on the price of physical natural gas.  (*See* Order Denying Rehearing, 121 FERC ¶ 61,224, issued November 30, 2007, ¶ 2 ("Order Denying Rehearing").)

The Commission's conclusion that there is such a "direct and substantial effect" is based on three factual claims.  First, the Commission claims that NG futures contracts that ultimately go to delivery do so at the NYMEX settlement price.  (OSC ¶¶ 14-15, 108.)  Second, the Commission claims that a substantial proportion of physical market

55

transactions, which the Commission terms "physical basis" transactions, are priced in part by direct reference to the NYMEX settlement price. (*See* OSC ¶¶ 20, 108.) Third, the Commission claims that an even "larger category of Commission-jurisdictional transactions," which the Commission terms "index" transactions, are priced based on published price indices which include in some manner the prices established for "physical basis" transactions. (*See* OSC ¶¶ 21-24, 109.) Each of these claims is either flatly false or unsupported by any competent evidence.

A.     **NYMEX Futures That "Go To Delivery"**

The Commission's claim that "[t]he settlement price directly sets the price for any [futures] contracts that ultimately go to delivery at Henry Hub" (OSC ¶ 108) is categorically incorrect. In fact, ***no*** futures contract—even those contracts that "go to delivery"—are ever traded at the NYMEX settlement price. Rather, the price of futures that go to delivery is simply the price at which the contract was purchased by the ultimate holder of the expiring long position. (*See* NYMEX Glossary (noting that a futures contract is "a supply contract between a buyer and seller, whereby the buyer is obligated to take delivery and the seller is obligated to provide delivery…*at a predetermined price* at a specific location") (emphasis added); CFTC Glossary (noting that a futures contract is "an agreement to purchase or sell a commodity for delivery in the future…at a price that is determined *at initiation of the contract*") (emphasis added).)

For example, a trader may purchase a futures contract two years prior to the expiry at a fixed price (*e.g.*, $5.00 per MMBtu) and decide to take it to delivery at the expiry. That trader will pay $50,000 for the contract (and thus for the physical natural gas), regardless of how gas prices change in the intervening two years and regardless of the ultimate NYMEX settlement price. (Quinn Aff. ¶ 62.) Indeed, it is this basic

56

characteristic of futures contracts—the ability to lock in future prices in the present—that creates a market for natural gas futures and other financial instruments among both hedgers and speculators.

Thus, the price at which a futures contract goes to delivery is determined by open trading on the NYMEX and *not* by the NYMEX settlement price. The NYMEX settlement price, in turn, is only used to set the price for certain types of *non-deliverable* financial transactions such as swaps. The Commission, therefore, cannot assert jurisdiction over trading that sets the NYMEX settlement price based on the claim that futures contracts that go to delivery do so at the NYMEX settlement price.

B.      **"Physical Basis Transactions"**

The Commission's claim that "the settlement price is directly incorporated into the price for physical basis transactions" (OSC ¶ 108) is unsupported by any evidence or citation. (*See* Quinn Aff. ¶ 63.) Indeed, the Commission does not cite competent evidence as to the existence of such transactions, let alone provide details of any specificity as to the terms underlying such a transaction.

Moreover, the Commission does not provide any evidentiary support for its claim that such transactions make up a "substantial proportion" of "Commission-jurisdictional transactions." (OSC ¶ 20.) The Commission does not even attempt to describe the number of such transactions existing in the marketplace or provide any specifics behind its vague assertion of "substantial proportion," leaving a court without any evidence by which it may evaluate whether such transactions actually give rise to a "nexus" sufficient to permit the Commission to exercise jurisdiction over an area that is indisputably otherwise within the exclusive jurisdiction of the CFTC. Furthermore, the Commission does not identify when in time these purported transactions supposedly came to make up

57

a "substantial proportion" of "Commission-jurisdictional transactions."  Specifically, the Commission has not cited any data evidencing the use of the alleged "physical basis transactions" during the time period relevant to the allegations (*i.e.*, February through April, 2006).

Furthermore, the Commission does not even contend that the price of physical basis transactions actually equals the NYMEX settlement price.  Nor does it provide evidence that there is, in fact, a one-to-one relationship between the price of a physical basis transaction and the NYMEX settlement price.  Rather, the Commission only asserts that the NYMEX settlement price functions as one *input* into the price of physical basis transaction.  The Commission concedes that the price of the physical basis transaction also depends on *other* inputs that are not the NYMEX settlement price, such as the cost of delivering natural gas at the specified delivery location versus at the Henry Hub. (OSC ¶ 20.)  Because these types of delivery and transportation-related costs are variable, the "basis" component of a physical basis transaction may not represent a constant, fixed input into the pricing structure of such a transaction.  Furthermore, the cost of transportation of natural gas to points across North America (*i.e.*, basis) is necessarily linked to the price of gas at the Henry Hub, the primary North American interconnection point.  As a result, it is quite plausible that the price of the basis component of a physical basis transaction would adjust, through the course of normal market behavior, to account for any changes in the NYMEX settlement price.  Certainly, the Commission provides no argument or evidence for why this type of adjustment would not occur.  Finally, the Commission provides no citation for the legal proposition that such an indirect

relationship suffices for a sufficient nexus so as to meet the "in connection with" requirement.

The Commission has the burden of proof here, and such burden cannot be met with mere conclusory assertions.

C.     **"Index Transactions"**

With respect to "index transactions," the Commission admits that their relation to the NYMEX settlement price is (at best) indirect:  it depends on the prevalence of the so-called "physical basis transactions" and the relationship, in turn, between the price of "physical basis transactions" and the NYMEX settlement price.   But here, the Commission fails even to establish the extent to which the price of the "index transactions" actually reflects the price of the "physical basis transactions."   The Commission simply asserts that "physical basis transactions make up all or a substantial majority of the bid week monthly transactions at trading points in the East, Mid-Continent, and the Gulf Coast, which are used to calculated the monthly price indices at these points."  (OSC ¶ 109.)   However, its evidentiary support for this proposition is practically non-existent.

To support this vague assertion, the Commission only cites a single survey published by the American Gas Association ("AGA"), "a trade group for natural gas local distribution companies," known as LDCs.  (OSC ¶ 23.)  The Commission concedes that it does not have access to information as to "the precise volume or proportion of total 'jurisdictional' gas transactions that are priced using physical basis or that are sold at index prices determined, in whole or in part, by physical basis trades."  (OSC ¶ 25.)  In fact, its survey data sheds no light on that issue at all.  The Commission provides only "Figure 1," which purports to reflect that "physical basis" transactions predominate in

59

certain regions of the country. The Commission then infers from this data—unreasonably—that "monthly indices at these locations are set primarily by physical basis transactions" (OSC ¶ 22), but cites no evidence to support this proposition. To the extent that the Commission implies here and elsewhere that the NYMEX settlement price is used "in all or a substantial majority" (OSC ¶ 109) of gas commodity transactions, this assertion is incorrect. (Quinn Aff. ¶ 63.) Furthermore, the Commission provides no justification for the usage of the survey data provided by the AGA: it does not describe the methodology of the AGA survey (which was apparently conducted for a separate purpose), nor does it provide any details on the identity of the survey's respondents. It is left undetermined, for instance, whether the 30 LDCs surveyed in the AGA report serve as a representative sample of market participants in the physical natural gas markets. Most egregiously, the Commission does not appear to have vetted the methodology used by the AGA, nor made the underlying data available for evaluation by an independent expert. (Quinn Aff. ¶¶ 64-65.)

Moreover, the Commission does not provide adequate information on the methodology used by the trade publications that publish monthly index prices, concluding only that that "the NG Futures Contract settlement price is included in the calculation of indices for locations where bid week physical basis trades are reported to publishers." (OSC ¶ 21.) Specifically, although the Commission indicates that "physical basis" transactions are "included" in monthly index calculations, it does not provide any evidence concerning the percentage of total transactions considered in the monthly index calculations are represented by "physical basis" transactions. Certainly, in reporting monthly index prices, neither trade publication referenced in the Order to Show Cause—

*Platts* and *Natural Gas Intelligence*—breaks down the types of trades that have gone into the calculation of the index price.  (*See*, *e.g.*, *CFTC v. Bradley*, 408 F.Supp. 2d 1214, 1216 (N.D. Okla. 2005) (describing the pricing methodology used by reporting firms such as *Platts* and *Natural Gas Intelligence*); *Platts* Methodology and Specifications Guide, North American Natural Gas, February 2007.)  Because the Commission has failed to provide such information, the Commission has not met its burden of providing a sufficient nexus between any change in the NYMEX settlement price and changes in monthly index prices.

Indeed, large physical market participants, such as BP, specifically *exclude* the types of "physical basis" transactions described in the OSC from the data they report to publications such as *Platts* and *Natural Gas Intelligence*.  BP explicitly states:

> BP will submit the monthly base load data to *Inside FERC* and
> *Natural Gas Intelligence* that involve only those physical fixed
> price deals for the prompt month and physical basis deals
> transacted during bid week *and prior to NYMEX close*. Prices
> reported will *exclude* financial transactions, exchanges for
> physicals ("EFP"), trigger deals unless transacted and triggered
> during bid week *and any deals referencing an index*.[31]

Thus it is clear that "physical basis" transactions are *excluded* from the information provided by at least some participants in the physical market, both because such deals reference a price index (the NYMEX settlement price) and because such deals must necessarily be transacted only after the NYMEX close.  Certainly, Hunter would not have been aware of which (if any) specific physical market participants actually report the prices of "physical basis" transactions to publications that publish price indices.

---

[31]    *Code of Conduct for Voluntarily Submitting Natural Gas and NGL Pricing Data to Bona Fide Publications*, attached as Exhibit 8 to the Simonson Decl. (emphasis added).  This document is also available at: http://www.bp.com/liveassets/bp_internet/globalbp/STAGING/global_assets/downloads/B/BPEC_BP_energy_company_price_reporting_code_of_conduct_for_portal.pdf.

In sum, the Commission simply cannot and does not know how *Platts* and *Natural Gas Intelligence* evaluate the various types of pricing data they receive when calculating monthly index prices: it certainly has not shown, as it argues, that any "artificial price element will be directly transmitted into index prices" (OSC ¶ 22) or that any given price elements will be transmitted into index prices at all.

*     *     *

In summary, as argued previously, the Commission's lack of jurisdiction over natural persons who are alleged to have traded in natural gas futures only is purely a legal question that does not turn on the purported relationship between the NYMEX settlement price and the price of physical natural gas.  But in any event, the Commission has failed to provide adequate evidentiary support in support of the factual claim that there is a link between the two.  Therefore, the Commission should immediately cease proceeding in this matter, as it is acting *ultra vires*.

## III.   Applying The Anti-Manipulation Rule Now To Hunter's 2006 Conduct Violates Due Process

To suddenly construe the Anti-Manipulation Rule (which covers manipulation "in connection with" a purchase or sale of physical natural gas") to apply to trading in natural gas futures (something indisputably within the exclusive jurisdiction of the CFTC) would clearly violate due process.  Simply stated, Hunter had no reasonable notice or fair warning that his conduct would be subject to regulation by the Commission or could be deemed to violate the Commission's Anti-Manipulation Rule.

The first public indication that the Commission intended to interpret the Commission's Order 670 (*Prohibition of Energy Market Manipulation*, Order No. 670, 71 Fed. Reg. 4244 (Jan. 26, 2006), FERC Stats. & Regs. ¶ 31,202) ("Order 670") as

62

reaching futures-only trading came well after the conduct alleged here. It appears to have come informally and only after a series of inquiries from the U.S. Senate Committee on Energy and Natural Resources on February 6, 2007 seeking clarity on whether and how the Commission would consider futures markets in the exercise of its enforcement authority.[32] One of these inquiries specifically stated that "[l]ast fall's collapse of the Amaranth hedge fund—with its very large positions in financial natural gas markets—has led to heightened concerns" about the relationship between futures markets and physical markets, without, however, identifying any concrete reasons for such concerns. (Bingaman Letter at 2.) Responding to this and other questions by letter dated February 21, 2007—after the Commission had already attended two depositions Hunter gave to the SEC and the CFTC without asking a single question of its own—Chairman Kelliher announced that the Commission now "interpret[s] the anti-manipulation language of EPAct 2005 as *allowing* the Commission to sanction market manipulation in financial transactions of natural gas that affect jurisdictional sales." (Kelliher Letter at 7-8, 11 (emphasis added).) Chairman Kelliher did not state that EPAct 2005 *required* the Commission to sanction such manipulation perhaps in part because this interpretation was not evident from the face of the statute or any previous public determination by the Commission.

In addition to coming after the fact in this case, the Commission's unappealable "stealth" approach to providing notice of its regulations violates Hunter's due process rights. Recently, the Commission conceded that it needs "to provide greater clarity to the

---

[32]     Letter from the Honorable Jeff Bingaman to Chairman Joseph T. Kelliher, dated February 6, 2007 (the "Bingaman Letter")."), attached as Exhibit 17 to the Simonson Decl. *See also* Letter from Chairman Joseph Kelliher to the Honorable Jeff Bingaman, dated February 21, 2007 (the "Kelliher Letter")."), attached as Exhibit 18 to the Simonson Decl.

regulated community and the public on how [the Commission] approach[es] enforcement."[33]  Even after the Commission instituted its formal order of investigation against Hunter, Chairman Kelliher publicly recognized that market participants were still "reading tea leaves" in regard to the Commission's enforcement authority.[34]  These comments concede that the Commission has not clearly stated its enforcement position. But subsequent efforts to solidify the Commission's enforcement stance does nothing to remedy the violation of Hunter's due process rights in this case.

Due process requires that a person receive "fair warning" that his conduct is unlawful.  *United States v. Lanier*, 520 U.S. 259, 265 (1997).  An essential component of fair notice under due process norms is the requirement that a statute or regulation be written with sufficient clarity and avoid such ambiguity that "men of common intelligence must necessarily guess at its meaning and differ as to its application."  *Id.* at 266; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.").

Courts have applied fair notice requirements to deprivation of property in the civil context.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313-4 (1950). The Due Process Clause thus precludes administrative agencies from sanctioning individuals without adequate warning that the alleged conduct was prohibited. Regulations must be expressed clearly enough that the public can understand with "ascertainable certainty" what conduct it prohibits.  *Gates & Fox Co. v. OSHRC*, 790

---

[33]      Statement, Federal Energy Regulatory Commission, Chairman Joseph T. Kelliher's Statement at Conference on Enforcement Policy (Nov. 14, 2007).), attached as Exhibit 19 to the Simonson Decl.
[34]      "Kelliher: Regulatory Certainty and Reforms Work In Tandem to Address Energy Needs," *Platts, Inside FERC*, at 3 (May 21, 2007).), attached as Exhibit 20 to the Simonson Decl.

F.2d 154, 156 (D.C. Cir. 1986). Penalties may not be imposed pursuant to regulations that are so ambiguous that they do not give fair notice that the charged conduct is prohibited. *Id.* at 156-7; *see also United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 217, 227, 230 (4th Cir. 1997) (finding agency interpretation of regulations to be reasonable, but setting aside administrative sanction on fair warning grounds because of ambiguity in the regulations). *Stoller v. CFTC*, 834 F.2d 262 (2d Cir. 1987) provides an instructive parallel to the instant case. In *Stoller*, the defendant was charged by the CFTC with having carried out a number of transactions that the CFTC claimed were "wash sales." In response, the defendant argued that the CFTC had not previously considered the types of transactions in which he had engaged to be "wash sales." Finding for the defendant, the Second Circuit agreed with the defendant and held that the defendant could not be held liable for violating the CFTC's new interpretations of its regulations.

 "If [an agency] suddenly changes its view…with respect to what transactions are 'bona fide trading transactions,' it may not charge a knowing violation of that revised standard and thereby cause undue prejudice to a litigant who may have relied on the agency's prior policy or interpretation." *Id.* at 266. Summarizing, the Court held that the CFTC "may well have [had] the power to construe the statue in such a subtle and refined way," but that it could not hold the public "accountable under [its new] construction without some appropriate notice." *Id.* at 267.

Here, the Commission did not provide fair notice that the alleged conduct was prohibited by Order 670. Brian Hunter is not alone in his perplexity that the Commission's regulation could have been violated by the alleged conduct: numerous futures market participants, including NYMEX and ICE, have filed strongly worded

65

challenges to the Commission's current application of its regulation in the action *CFTC v. Amaranth Advisors L.L.C.,* No. 07 Civ. 6682 (S.D.N.Y. filed July 25, 2007).[35]  Yet as the Commission itself has pointed out, "[n]o one challenged the Commission's statement in Order No. 670 [about how] it would interpret 'in connection with'" at the time the regulation was issued.  (Order Denying Rehearing ¶ 25.)  **No one** obviously includes all of the futures-market participants who are now up in arms precisely because their attorneys closely monitor regulatory developments for decisions that could potentially affect them.  What better empirical evidence could there be that **no one** subject to this application of the Commission's authority understood that Order 670 would be used to reach their trading?

The evidence thus establishes that Hunter had no notice that sales of NYMEX futures (even during the closing range) could or would subject him to Commission regulation.  Far less could he anticipate that in interpreting Order 670, the Commission would apply a recklessness standard, when the CFTC applies a specific intent standard.  (*Compare* OSC  ¶¶ 112 and 114-118, 7 U.S.C. §§ 9(a)(2) and 13(a) (2000).)  Moreover, due process principles certainly cannot support a proposed relief of anything close to the $30 million sought by the Commission. *See Hoechst Celanese Corp.*, 128 F.3d at 227, 230.

---

[35]      *See, e.g.,* "Memorandum of Law of the Amici Futures Group In Support of Plaintiff Commodity Futures Trading Commission's Exclusive Jurisdiction And Defendant Amaranth's Stay Motion," filed on October 3, 2007, attached as Exhibit 21 to the Simonson Decl.

**IV.    The Commission's Manipulation Claim Fails On The Merits As A Matter Of Law**

Not only does the Commission lack statutory authority to proceed, but its claim against Hunter fails on the merits as a matter of law.  As detailed below, there are several reasons why this is so.

First, there is no evidence that Hunter engaged in any deceptive or manipulative conduct, as a claim under 18 C.F.R. § 1c.1 *requires*.  *See* Subsection C, *infra*.  Second, there is no evidence that Hunter acted with the requisite state of mind—the specific intent to depress the price of physical natural gas.  *See* Subsection D.1, *infra*.  Third, there is no evidence to support the inference that Hunter acted with the purpose of depressing the settlement price of natural gas futures, s*ee* Subsection D.2.a, *infra;* further, there is no evidence that Hunter acted recklessly with respect to the price of physical natural gas, *see* Subsection D.2.b, *infra*.  Finally, there is no evidence that Hunter's trading actually had any material impact on the settlement price.  *See* Subsection E, *infra*.

For each of these independent reasons, if the Commission proceeds on the merits, it should not find that Hunter violated the Anti-Manipulation Rule.

A.    **Applicable Law**

The Commission's Anti-Manipulation Rule makes it "unlawful for any entity, directly or indirectly, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, (1) to use or employ any device, scheme, or artifice to defraud, or … (3) to engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity."  18 C.F.R. § 1c.1.

Since this case marks the first time the Commission has ever exercised its authority under the Anti-Manipulation Rule (*see* OSC ¶¶ 4, 44), the elements of a violation of this Rule have never been delineated.  By congressional statute and the Commission order, however, the Anti-Manipulation Rule is to be construed in accordance with case law interpreting Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.[36]

Under that applicable legal precedent, in order to establish that Hunter violated the Anti-Manipulation Rule, the Commission must establish that: (1) in connection with the purchase or sale of physical natural gas, (2) Hunter "engaged in deceptive or manipulative conduct by injecting inaccurate information in the marketplace or creating a false impression of supply and demand for the [physical natural gas]; (3) for the purpose of artificially depressing . . . the price of [physical natural gas]."  *See, e.g.*, *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001).

The Supreme Court has held that "manipulative conduct"—the unlawful conduct that the Commission alleges here—is "virtually a term of art . . .  The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  *Santa Fe Industries, Inc., v. Green*, 430 U.S. 462, 476 (1977) (internal quotation marks and citations omitted).

---

[36]    The relevant sections of the EPAct and the anti-manipulation prohibition issued by the Commission, Order 670, both expressly provide that Order 670's language be interpreted consistent with precedent interpreting Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  (*See* OSC ¶ 45.)  As the Commission noted in issuing Order 670, "[t]his approach will benefit entities subject to the new rule because there is a substantial body of precedent applying the comparable language of Rule 10b-5."  (Order 670, ¶ 7.)

Manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976); *see also Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999), citing *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12 (1985) ("The gravamen of manipulation is *deception* of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not *rigged* by manipulators") (emphasis added).

"[T]he essence of the offense [of manipulation] is creating 'a false impression of supply or demand,' for example through wash sales, where parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock." *Sullivan & Long v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995); *In re Olympia Brewing Co. Securities Litigation*, 613 F.Supp. 1286, 1292 (N.D. Ill. 1985) ("the essential element is that *inaccurate* information is being injected into the marketplace") (emphasis in original).

The Second Circuit recently observed that "[a]lthough not explicitly described as such, case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in *market activity aimed at deceiving investors* as to how other market participants have valued a security." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) (emphasis added). The court continued, "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market." *Id.* Thus, the court noted that, "There must be some market activity, such as 'wash sales, matched orders, or rigged prices." *ATSI Communications*, 493 F.3d at 101 (citing *Sante Fe*, 430

69

U.S. at 476).  Finally, it noted that "short selling—even in high volumes—is not, by itself, manipulative."  *Id.*

The purpose in requiring a showing of fictitious trades or some other similarly deceptive conduct is to permit courts to distinguish "between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers."  *GFL Advantage*, 272 F.3d at 205.

Consistent with these observations, courts have almost invariably found manipulation only when the alleged manipulator either engaged in some form of *fictitious* trading—such as wash sales, matched orders, or rigged prices—or at least engaged in some other *deceptive conduct* that would similarly inject inaccurate information into the marketplace or give investors a false impression of supply and demand.  *See, e.g.*, *GFL Advantage,* 272 F.3d at 207  (affirming summary judgment for alleged manipulator where it had engaged in massive short selling of stock, allegedly in order to depress the price of the stock, finding that such massive short selling in and of itself failed to constitute deceptive or manipulative conduct as it did not inject false or inaccurate information into the marketplace or create the false impression of supply and demand for the stock); *Sullivan & Long,* 47 F.3d at 864 (affirming dismissal of claim, concluding that defendant's "unprecedented massive short selling" did not create "a false impression of supply and demand" because on the other side of defendant's transactions "were real buyers, betting against [defendant], however foolishly, that the price of [the] stock would rise");  *In re College Bound Consolidated Litigation*, Nos. 93 Civ. 2348 (MBM), 94 Civ. 3033 (MBM), 1995 WL 450486, at *7 (S.D.N.Y. July 31, 1995) (dismissing complaint not only  because complaint failed to allege the defendant's sole intent was to raise the

70

price of stock, but also because plaintiffs failed to allege facts that suggest the open-market purchase of securities was deceptive, and rejecting notion that mere "closing the market" trading was deceptive); *Olympia Brewing Co.*, 613 F.Supp. at 1292 (dismissing on summary judgment market manipulation claim based on pattern of short sales, stating "it is clear that the essential element of the claim [of market manipulation] is that *inaccurate* information is being injected into the marketplace"); *Gruntal & Co. v. San Diego Bancorp*, 901 F.Supp. 607 (S.D.N.Y. 1995) (dismissing claim for manipulation based on allegation that alleged manipulator intentionally accumulated large volume of stock and then sold it in order to depress price, finding that such conduct did not mislead investors as it did not "artificially" affect the marketplace).

Thus, where courts have found potential manipulation in the context of ostensibly legitimate, non-fictitious trades (so called "open-market manipulation" cases), they have almost invariably done so only where there was also some other *deceptive conduct*, such as secretly executing transactions through nominee accounts, secretly absorbing securities into inventory or deliberately trading at something other than prevailing market prices. *See, e.g., Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2002) (affirming liability where defendant had dominated the market, maintained high bid prices and secretly absorbed all unwanted securities into inventory, thereby preventing sales from depressing market prices); *Nanopierce Technologies, Inc., v. Southridge Capital Management LLC*, No. 02 Civ. 0767 (LBS), 2002 WL 31819207, at *8 (S.D.N.Y. Oct. 10, 2002) (finding market manipulation where court found deceptive conduct, including that defendant traded through a non-market maker suggesting that it was not obtaining best price for the stock, dominant or near-dominant trading volume throughout a six-month period, and an

71

extensive pattern of similar conduct in the past); *Crane Company v. Westinghouse Air Brake Company*, 419 F.2d 787, 793 (2d Cir. 1969) (finding manipulation claim where purchaser of stock engaged in simultaneous off-market "private sales," such that "only 50,000 of the 170,000 shares [purportedly purchased] represented an actual increase in [defendant's] holding"); *In re Kocherhans*, No. 3-8611, 1995 WL 723989 (Dec. 6, 1995) (finding manipulation where majority of purchases closed the market and were at prices higher than previously reported trades); *SEC v. Schiffer*, 97 Civ. 5853 (RO), 1998 WL 226101 (S.D.N.Y., May 5, 1998) (granting preliminary injunction where purchases were made through nominee accounts at something other than prevailing market prices, and defendant had also filed false and misleading statements, engaged in insider trading and made "bogus" Regulation S transactions).[37]

Finally, where courts have considered manipulation of securities in the context of non-fictitious trades, they have also universally required a showing that the alleged manipulator's "sole intent" in executing the trades was to affect the price of the securities. *See College Bound*, 1995 WL 450486, at * 5 (dismissing claim in part because plaintiffs failed to plead that defendants' "sole intent" was to raise the price of the stock); *United States v. Mulheren*, 938 F.3d 364, 368-69 (2d Cir. 1991) (assuming theory of liability based upon an investor's engaging in open market transactions with "sole intent"

---

[37]    In *SEC v. Masri*, No. 04-Civ. 1584 (RJH), 2007 WL 4126773 (S.D.N.Y. Nov. 20, 2007), a district court recently declined "to adopt [the] *per se* rule that open-market activity cannot be considered manipulative based solely on manipulative intent . . . without additional deceptive or fraudulent conduct." *Id.* at *8.  We respectfully  submit, however, that this decision is wrong, as the court failed to address the Second Circuit's binding and contrary precedent of *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), a case that was decided four months earlier.  Indeed, it appears that the *Masri* court may not have been aware of the binding *ATSI* decision because it erroneously stated that "the law of the Second Circuit on so-called open-market manipulation—where the alleged manipulator has made otherwise legitimate trades, yet with the subjective intent to affect the stock price thereby—is not yet fully settled," and only discussed to Second Circuit cases from 2002.  *Id.* at *6 (internal citation omitted). The *Masri* decision, therefore, should be disregarded.

to affect the price of the security while expressing "misgivings" and "doubt" about it, and nevertheless reversing conviction based upon such a theory); s*ee also Markowski*, 274 F.3d at 528 (recognizing the "interesting questions" raised by the prospect of liability for manipulation involving non-fictitious transactions, stating that the proposition would suggest that "[l]egality would thus depend entirely on whether the investor's intent was 'an investment purpose' or '*solely to affect the price of [the] security*'") (emphasis added) (internal citation omitted); *Nanopierce Technologies,* 2002 WL 31819207 at *6, *8 (defining "open-market manipulation" as "where the alleged manipulator has made otherwise legitimate trades, yet with the *subjective intent to affect the stock price* thereby," and finding market manipulation where there was a combination of subjective intent and deceptive conduct, while nevertheless recognizing the "closeness of the issue") (emphasis added); *Kocherhans*, 1995 WL 723989 at *2 (SEC order finding the defendant liable where he not only traded at above-market prices but also bought stock "*for the purpose* of increasing its closing price and avoiding margin maintenance calls" where the defendant had testified that that was his very reason) (emphasis added); *Schiffer*, 1998 WL 226101, at *1 & n.3 (finding defendant potentially liable for market manipulation, among a number of other securities fraud violations, for having directed stockbrokers to execute intra-day purchases "*in order to* cause price increases" and to engage in "marking-the-close" transactions "*in order to* affect its closing price") (emphasis added).

B.    **The Commission Must Prove Its Case By A Preponderance Of The Evidence**

The Commission bears the burden of proof in this case. The Administrative Procedure Act ("APA") provides, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). In this agency

adjudicatory proceeding, the Commission must prove all elements of the manipulation charge, including intent, by a preponderance of the evidence. *See Steadman v. SEC*, 450 U.S. 91, 102 (1981) (construing section 7(c) of the APA, 5 U.S.C. § 556(d), as establishing a preponderance of the evidence standard of proof in agency adjudicatory proceedings). The preponderance of the evidence standard is consistent with the standard applied in analogous securities law precedent. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-88 (1983) (holding that the preponderance of proof standard applies in actions for fraud under the securities laws, whether in the lower federal courts or in administrative actions before the SEC).

Under the preponderance of the evidence standard, the agency is required to rule consistent with the *weight* of the evidence. As the Supreme Court has stated:

> The language of § 7(c) [5 U.S.C. § 556(d)], therefore, requires that the agency decision must be "in accordance with" the weight of the evidence, not simply supported by enough evidence "to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Steadman*, 450 U.S. at 99-100 (citations omitted).

In other words, where more than one inference can be drawn from the evidence, the Commission must determine which inference is more plausible or better supported. *Id.* at 100-01 (quoting from APA's legislative history to construe requirements for burden of proof and noting that "[w]here there is evidence pro and con, the agency must weigh it and decide in accordance with the preponderance.") Importantly, the Commission may not choose its own preferred contrary interpretation simply because there is *some* evidence to support it. *See also Greenwich Collieries v. Dir., Office of Workers' Comp. Programs*, 990 F.2d 730, 736 (3d Cir. 1993) ("[The finder of fact] must at least be convinced that the evidence considered as a whole, its 'preponderance' to use the

74

traditional term, indicates that the facts asserted by the plaintiff are probably true. . . .  If

in their minds the probabilities of those facts being true or false appear equal the plaintiff

has not met his burden of proof and a finding for the plaintiff would be inconsistent with

the fact-finder's duty to render a true  verdict.") (emphasis omitted), *aff'd*, 512 U.S. 267

(1994).  Rather, the Commission may only choose its own interpretation of the evidence

if it is *more likely* than any plausible counter interpretation.

C.     **The Commission Has Failed To Show That Hunter's Conduct Was Manipulative Or Deceptive, As It Must**

The Commission's claim fails because there is no evidence that Hunter engaged

in any manipulative or deceptive conduct.   As discussed above, a claim for market

manipulation requires some showing of manipulative or deceptive conduct, such as wash

sales, matched orders, rigged prices or some other form of deception.   Under the law,

mere selling—even massive selling with the knowledge that it will result in a lowering of

price—does <u>not</u> amount to illegal market manipulation.  *See ATSI Communications*, 493

F.3d at 101 ("[S]hort selling—even in high volumes—is not, by itself, manipulative.");

*GFL Advantage*, 272 F.3d at 209 ("Once again, short selling, even in large volumes, is

not in and of itself unlawful and therefore cannot be regarded as market manipulation.");

*Sullivan & Long,* 47 F.3d at 864 (concluding that defendant's "unprecedented massive

short selling" did not create "a false impression of supply and demand" because on the

other side of defendant's transactions were "real buyers, betting against [defendant],

however foolishly, that the price of the [the] stock would rise"); *Olympia Brewing*, 613

F.Supp. at 1296 (stating that "short selling is simply not unlawful and even if the trading

does negatively affect the purchase price"); *Gruntal*, 901 F.Supp. at 618 (dismissing

claim alleging that alleged manipulator "intentionally accumulated the [claimant's] stock

75

in order to depress the shares" stating that "section 10(b) was designed to protect investors from manipulative and deceptive conduct, not to protect large share prices from the adverse consequences of large block sales").

Here, however, mere selling is all that is involved. Each of Hunter's trades was indisputably a legitimate trade conducted openly on the NYMEX market. The trades all involved real purchasers, real transactions and real money. Nothing was concealed from the marketplace. This is not a case of fictitious trades, rigged prices or artificial squeezes or corners. No inaccurate information was injected into the market. The market was not given a false impression as to how many transactions were actually taking place, by whom or at what price. Hunter did not collude with any counterparty. No NYMEX rule was been violated by the fact that these sales occurred during the closing range. Hunter did not conceal anything that he was obligated to disclose. In short, the Commission "has offered nothing but evidence that [Hunter] engaged in lawful" sales of natural gas futures, "which alone is insufficient to prevail on a claim of market manipulation . . ." *GFL Advantage*, 272 F.3d at 211.

The Commission's citation to precedent relating to the practice of "marking the close," or "the practice of attempting to influence the closing price of a stock by executing purchase or sale orders at or near the close of the market" (*see* OSC ¶ 45 and n.67 (citing *Kocherhans* and *Schiffer*)) is wholly misleading. Each of these "marking the close" cases involved defendants deliberately trading at something other than prevailing market prices and through fraudulent means. *See In re Kocherhans*, No. 3-8611, 1995 WL 723989 (Dec. 6, 1995) (finding manipulation where majority of purchases closed the market and were at prices higher than previously reported trades); *SEC v. Schiffer*, 97

Civ. 5853 (RO), 1998 WL 226101 (S.D.N.Y. May 5, 1998) (granting preliminary injunction where purchases were made through nominee accounts at something other than prevailing market prices, in addition to committing several other securities law violations).  Here, there is simply no evidence or allegation that Hunter attempted to trade at something other than prevailing market price.

In fact, the undisputed evidence reflects just the opposite.   As the Commission itself concedes, Amaranth initiated the trades of March futures by placing "market orders."  (OSC ¶ 71.)  This fact only further supports the *legitimacy* of Hunter's conduct, since a market order is a type of order that occurs virtually every minute on the floor of the NYMEX.  (*See Barron's* Dictionary of Finance and Investment Terms, 7th Ed. (2006) (defining a market order as an "order to buy or sell a security at the *best available price*" and noting that "most orders executed on the exchanges are market orders") (emphasis added).)  Indeed, NYMEX defines a "market order" (in a Rule titled "Standard Forms of Orders") as "an order to buy or sell a stated number of futures or options contracts at *the best price obtainable* immediately after the order is received in the ring."  (NYMEX Exchange Rulebook § 6.15 (emphasis added).)  The CFTC similarly defines a "market order" as an order to be filled "at *whatever price is obtainable* at the time it is entered in the ring, pit, or other trading platform."  (CFTC Glossary; *see also* OSC ¶ 71 (emphasis added).)  Thus, contrary to the Commission's mischaracterization, the fact that Amaranth placed market orders did not reflect that Hunter was "indifferent to the price received for these contracts, as long as they sold."  (OSC ¶ 71.)  By definition, "market orders submitted to a broker without a price specified have an implicit time and price associated with them and do not indicate price indifference."  (Quinn Aff. ¶ 68.)  Rather, it reflects

77

that Hunter wanted the floor brokers to achieve best obtainable price.  In fact, the Commission's mischaracterizations aside, the only *evidence* on this issue is Hunter's testimony that he believed (correctly) that the floor brokers were obligated to sell at the best possible price.  (Tr. 11/17/06 at 123:25-124:10; *see also* NYMEX Exchange Rulebook §§ 6.05 and 6.06.)  There is simply no evidence that Hunter ever instructed anyone to get something less than best price for the futures he sold.

Furthermore, the fact that the sales were actually executed in a manner that was only roughly ratable (as opposed to perfectly ratable) is further evidence that Hunter did not instruct anyone to sell at something less than prevailing market price.   If the floor broker had executed the ratable order in a manner that was truly indifferent to price, then one would expect the order to have been executed in perfectly even amounts (*e.g.*, exactly 500 every six minutes).  However, in fact, as described above, the order was executed in rather uneven, though roughly ratable amounts.  This suggests that the brokers actually sought best price, and did not simply offer futures in a manner completely indifferent to price.

The Commission also suggests that Hunter sought to move prices by somehow sending a "signal" to the market that he was selling in large volume. (OSC ¶¶ 68; 79-80; 83.)  However, again, there is no evidence that the market received any *false* or *inaccurate* information.  Even accepting *arguendo* the Commission's allegation as true, there is nothing illegal or unlawful about a seller signaling to the market that it intends to sell in large volumes.  Thus, even if prices dropped as a result of the market's perception that Amaranth had many futures to sell (which, as discussed in Subsection E, *infra*, prices did not), that drop is not an "artificial" one.  It is not the result of any *mis*information.

Rather, it is merely the market responding to *accurate* information.  As discussed above, under the law, any resulting price movement is simply not the product of illegal manipulation.

Finally, the Commission suggests that Hunter "manipulated" price by selling with concentrated market power.  However, courts have explicitly rejected as a basis for a manipulation claim the type of short-term "market power" that the Commission alleges here (*see, e.g.*, OSC ¶ 76, alleging that Amaranth's "selling represented *at times* between forty and fifty percent of all sales in the opening minutes of the close" (emphasis added)), on the obvious logic that the government can *always* establish such "market power" simply by picking a sufficiently narrow time-frame.  In *Mulheren*, the Second Circuit noted: "The percent of domination must be viewed *in light of the time period involved* and *other indicia of manipulation*…If the percentage of control be measured in terms of minutes or hours, anyone could find himself labeled as a manipulator."  938 F.2d at 371. Indeed, the Commission has not presented any evidence that Amaranth's sales in these opening minutes were quantitatively or qualitatively different than the sales of any other large market participants, nor has the Commission defined what it views as an "extraordinary amount" of futures sales during any 30-minute NYMEX settlement period.  (OSC ¶ 5.)   In any case, as discussed in Section D, *infra,* even the factual basis for the Commission's claim of market dominance is faulty.

D.      **The Commission Has Failed To Show That Hunter Acted With The Requisite State of Mind**

1.      **There Is No Evidence That Hunter's Sole Purpose Was To Depress The Price Of Physical Natural Gas—The Requisite State of Mind For This Manipulation Claim**

The Commission's claim fails because the Commission has failed to offer any evidence (much less allege) that Hunter's purpose in selling the futures during the NYMEX closing period was to depress the price of physical natural gas. As discussed above, claims of manipulation require a showing that the alleged manipulator's sole purpose was to affect the price of a *jurisdictional transaction*. *See GFL Advantage*, 272 F.3d at 212 (granting summary judgment where evidence failed to establish that alleged manipulator's sales were executed "*for the purpose* of depressing *the stocks' prices*" (emphasis added)); *Nanopierce Technologies*, 2002 WL 31819207, at *6 (defining "open-market manipulation" as "where the alleged manipulator has made otherwise legitimate trades, yet *with the subjective intent* to affect *the stock price* thereby" (emphasis added)).

Here, the relevant jurisdictional transaction is the purchase or sale of *physical natural gas*. Yet the Commission has not even alleged, let alone offered any evidence, that Hunter's purpose was to depress the price of physical natural gas. Nor could such a purpose be inferred from any of the evidence in the record. Indeed, Hunter was a non-commercial trader who lacked the capacity to do anything with actual physical natural gas. His job was to trade futures and other financial instruments. In fact, in recent public comments, Commission Chairman Kelliher has acknowledged as much, stating, "We did not conclude that there was any attempt to manipulate physical gas sales by

Amaranth, but that physical gas customers were harmed by manipulation that occurred in the futures that affect prices of physical gas sales…"[38]

The Commission claims to have satisfied the scienter requirement by alleging that Hunter's purpose was to manipulate the NYMEX settlement price and that he was simultaneously reckless as to the impact that that allegedly manipulated settlement price would have on the price of physical natural gas. (OSC ¶¶ 6, 112.) However, the Commission cites no authority for such a standard. Rather, in asserting that these allegations somehow satisfy the scienter requirement, the Commission has cobbled together a non-existent standard from other standards that have no place here.

First, the Commission has cited no authority for the proposition that a specific intent to affect the price of a *non*-jurisdictional transaction (here, NG futures) can somehow substitute for a specific intent to affect the price of a jurisdictional transaction (here, physical natural gas) in the context of an open-market manipulation claim. We are aware of no authority that would support such a proposition.

Second, the Commission has cited no authority that a claim of open-market manipulation (as opposed to a claim grounded in fraudulent misstatements or omissions) can be satisfied by a mere showing of recklessness. Indeed the only relevant precedent that the Commission does cite on this issue—including a case decided by the D.C. Circuit Court of Appeals—directly supports the "sole purpose" requirement (as opposed to recklessness) in cases such as this one. *See Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2002).

---

[38]    *See* Craig S. Cano, *Kelliher Offers Inside Look at Enforcement Cases, Rallies Support in Turf War with CFTC, Inside FERC,* Nov. 19, 2007, at 14, attached as Exhibit [].  23 to the Simonson Decl.

In *Markowski*, the D.C. Circuit addressed the question of liability in the case of non-fictitious trading, stating that it "in fact raises interesting questions" given the fact that, without such transactions, "the core of the offense can be obscure" and it therefore "may be hard to separate a 'manipulative' investor from one who is simply over-enthusiastic, a true believer in the object of investment."  Citing *Mulheren*, 938 F.2d at 348, the D.C. Circuit reasoned that "[l]egality would thus depend entirely on *whether the investor's intent* was 'an investment purpose' or '*solely to affect the price of [the] security*.'"  *Markowski*, 274 F.3d at 528 (emphasis added).  Ultimately the Court affirmed the SEC's determination of liability, noting that the alleged manipulators improperly supported the price of the securities by maintaining high bid prices and reabsorbing unwanted securities into inventory.

Having failed to show that Hunter's purpose was to affect the price of physical natural gas, the Commission's claim fails.

     **2.**     **Even Under The Commission's Novel Theory Of The Requisite Scienter, The Commission Has Failed To Meet That Standard As A Matter of Law**

Even if, despite the clear authority to the contrary, a court were to accept the Commission's novel (and legally defective) theory as to the scienter requirement—*i.e.*, that scienter may be satisfied by showing: (i) an intent to manipulate the NYMEX settlement price coupled with (ii) recklessness as to the impact of that settlement price on the price of physical natural gas— the Commission's claim would still fail as a matter of law with respect to both allegations.

a.    **There Is No Evidence That Hunter Specifically Intended To Depress The NYMEX Settlement Price**

The thrust of the Commission's scienter allegations is the claim that Hunter specifically intended to depress the NYMEX settlement price. However, there is no evidence that can reasonably support such an inference. Furthermore, the Commission ignores substantial evidence negating such an intent.

(i)    **The Commission Has Failed To Produce Any Direct Evidence Of Intent**

It is beyond dispute that there is no direct evidence reflecting any intent on Hunter's part to depress the price of NG futures. The Commission claims to have reviewed "millions of bytes of instant message texts" (OSC ¶ 64), Hunter's and other Respondents' "memoranda, reports, emails, IM's and tape recorded telephone conversations" (OSC ¶ 53) as well as the "sworn testimony of over fifteen witnesses" (*id.*). Yet, it has not produced a single statement by Hunter or any of the others involved that Hunter was selling futures during the expiry in order to depress the settlement price. Indeed, the Commission does not even offer a single IM in which the short positions allegedly benefited are so much as mentioned. While direct evidence of state of mind is not required, its absence is certainly noteworthy here, given the great abundance of instant messages that reflect an almost real-time transcript of Hunter's statements to the others involved.[39]

---

[39]    The Commission may seek to characterize Hunter's instant message that Amaranth "just needs H to get smashed on settle" (AALLC_REG0684186) as somehow constituting direct evidence of intent to manipulate. However, that statement does not reflect an intent to manipulate for reasons stated below in Section (iii), *infra*.

(ii)     **The Commission's Purported Circumstantial Evidence Does Not Reasonably Support An Inference of Intent**

Having failed to produce any direct evidence of intent, the Commission apparently seeks to prove it through circumstantial evidence. Courts generally permit intent to be shown through circumstantial evidence either by: (a) presenting evidence of a motive and opportunity to manipulate or (b) presenting some other circumstantial evidence from which the requisite state of mind (in this case, specific intent) can be reasonably inferred. *See, e.g.*, *In re Northern Telecom Ltd. Securities Litigation*, 116 F.Supp.2d 446, 462 (S.D.N.Y. 2000) (granting summary judgment where plaintiff failed to show motive).

From the evidence produced, however, no reasonable fact finder could infer Hunter's intent to manipulate. Indeed, the Commission fails to demonstrate that Hunter believed it was even possible for a speculative trader to affect the settlement price through mere selling (see Subsection (a), *infra*). The Commission also fails to demonstrate motive because it fails to show: (a) that Hunter would realize any concrete and personal benefit from the alleged manipulation (see Subsection (b), *infra*) and (b) that Hunter's book as a whole would realize a net benefit from the alleged manipulation (see Subsection (c), *infra*). Furthermore, the Commission seeks to draw unreasonable inferences from the purported circumstantial evidence of intent, and ignores overwhelming evidence of Hunter's legitimate intent (see Subsection (iii), *infra*). Consequently, the Commission has failed to show intent and the claim should therefore be dismissed.

> **(a)** **There Is No Evidence That Hunter Believed It Was Even Possible For a Speculative Trader to Affect the Settlement Price Merely By Selling Futures**

To show that it was Hunter's purpose to affect the settlement price, it is axiomatic that the Commission must demonstrate that Hunter believed it was even possible to do so. Otherwise, it cannot be reasonably inferred from circumstantial evidence that affecting the settlement price was Hunter's purpose in selling the futures.

In fact, however, Hunter reasonably believed it was *not* possible for a speculative trader such as Amaranth to affect the settlement price by merely selling futures during the closing period of a balanced settlement. The reason is simple: the settlement price represents the volume weighted *average* price of *all* trades during the closing period. During that time, all traders that are not willing or able to take their futures to delivery must exit their open positions, whether short or long, in order to avoid delivery obligations. Every long position held by one trader necessarily creates a short position held by some other participant. As the Commission itself concedes, well less than 2% of the largest open interest in the relevant futures contract actually went to delivery (OSC ¶ 15), which necessarily means that for almost every long position that Amaranth held into the closing range, there was a corresponding short position that some other trader would be seeking to exit. Thus, even if the sale of Amaranth's positions resulted in downward pricing pressure, there was necessarily an upward pricing pressure at some point during the closing period created by the need or desire of other traders to buy back their corresponding short positions. These pressures balance themselves out in the averaging that creates the settlement price.

Accordingly, as Hunter testified, he did not believe it was even possible for a non-commercial trader to affect the *settlement* price (as opposed to market price) merely by selling futures.  For example, he testified that he does not believe Amaranth's sale of the May futures had any effect on the settlement price.  (Tr. 11/17/06 at 121:17-122:3.) When asked why, he testified:

> A. [I]t's my belief that if there's a balance of expirey [sic], meaning there's a fairly matched number of buyers and sellers in futures, no matter what way you execute, no matter what – all the futures can trade at the very beginning – the weighted average is going to come out the same or so close to the same over time but I think it would have no effect, if it's a balance.

> Q. If the price during close is trading throughout the majority of the close and then there was a sharp decline at the end, would that affect the futures price – the settlement price, excuse me?

> A. The settlement price?

> Q. Yes.

> A. The[sic] balance settle, no.

> Q. Was April 26 the [sic] balance settle?

> A. I believe so.

(Tr. 11/17/06 at 122:6-21; *see also* 164:3-10, 175:16-17; Tr. 6/15/07 at 92:20-22.)  Even if a noncommercial trader sells futures in a high concentration (e.g., "all the futures can trade at the very beginning"), Hunter believed that noncommercial traders' exiting long futures positions cannot affect the settlement price because the very structure of the market guarantees that, at some point during that half hour period, other noncommercial traders will be required to engage in equal and opposite trades to close out of their corresponding short positions.  (*Id.*; *see also* Tr. 11/17/06 at 127:7-11.)  Unless Advisors had access to the means of producing or consuming physical gas—which it did not—it

could not have brought about an imbalance of buyers and sellers of futures by causing an abnormal volume of gas to go to delivery. (Tr. 11/17/06 at 122:24; *see also* 128:17-20, 129:11-17.)

Thus, Hunter reasonably believed it would have been futile for Amaranth to attempt to depress the settlement price merely by selling NYMEX futures, no matter the rate or concentration at which Amaranth executed the orders. Hunter testified: "if it's a balance[d] settlement, it doesn't matter how you execute it. You're probably going to get the same price regardless." (Tr. 11/17/06 at 175:16-18.)

The Commission has not produced a scintilla of evidence proving that Hunter believed otherwise. As a result, it cannot reasonably be inferred that affecting prices was his purpose in selling the futures into the close.

> **(b)    The Commission Fails To Show A Sufficiently Concrete and Personal Benefit That Hunter Would Realize From The Alleged Manipulation**

The Commission's theory of intent appears to be that Hunter was motivated to depress the settlement price of the NG futures contracts in order to benefit certain short positions that Advisors purportedly held on the ICE. (OSC ¶ 5.) However, such a theory fails to establish motive as a matter of law because it does not amount to a "concrete and personal benefit" that would flow personally to Hunter.

To establish scienter by demonstrating motive, case law makes clear that the Commission must show that Hunter would "benefit[] in some concrete *and personal way*" from committing the alleged manipulation. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (emphasis added). Here, the Commission has cited no evidence that

Hunter would personally benefit from a depression of the settlement price of the relevant futures contracts. Thus, it fails to prove motive as to him.

The law is clear that it is insufficient to allege that a company's employee was motivated to do wrong by indirectly benefiting from the company's prosperity. (As a threshold matter, the Commission has not even demonstrated that the trading at issue actually increased Advisors' overall profitability. This critical point is discussed further below). (*See* Subsection (c), *infra*.)  Moreover, courts universally reject the idea that such "general motives," possessed by virtually all corporate executives, are sufficient to prove intent. *See, e.g.*, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (upholding dismissal of complaint and rejecting motive allegations where plaintiffs had alleged that an increase in the stock price resulting from fraud would increase defendants' compensation); *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1130-31 (2d Cir. 1994) (rejecting motive based on the desire to "protect their executive positions and the compensation and prestige they enjoy thereby"); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D.Conn. 1991) (rejecting allegation that officers had motive based on fact that they were compensated based on yearly corporate financial performance); *In re Axis Capital Holdings Ltd. Securities Litigation*, 456 F.Supp.2d 576 (S.D.N.Y. 2006) (rejecting motive based on large performance-based bonuses, stating "the law is clear that the desire of individual defendants 'to . . . increase their compensation by artificially inflating . . . stock price' is not sufficient to establish motive"). In *Shields*, the court stated:

> Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations.

*Shields*, 25 F.3d at 1130.

Courts have applied the same logic to cases involving brokers as well. *See, e.g.*, *In re Interbank Funding Corp. Securities Litigation*, 329 F. Supp. 2d 84 (D.D.C. 2004) (dismissing complaint against broker and rejecting motive allegation, in which it was alleged that broker was motivated based on fact that it would receive a percentage of sale price of each of the defendant company's securities it sold); *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998) (dismissing claim against broker-dealer alleging that defendants had motive to conceal poor performance of their proprietary funds because doing so ensured that more customers would invest in those funds, resulting in increase in commissions and various fees, on the grounds that mere economic gain from fraud was insufficient to survive motion to dismiss).

Thus, the Commission has failed to establish that Hunter would personally benefit from the alleged manipulation in any legally cognizable way. Its attempt to prove intent through motive therefore fails.

**(c)    The Commission Has Not Demonstrated That The Alleged Scheme Produced Or Would Even Produce A Net Benefit To Hunter's Book As A Whole**

Even assuming, *arguendo*, that a benefit to Advisors would be legally sufficient for purposes of establishing *Hunter's* motive (which, for reasons described above, it is not), the Commission has failed to demonstrate that the alleged manipulation would actually result in any benefit to Advisors.

89

The Commission attempts to show the benefit to Advisors from the alleged manipulation in two ways.  First, it alleges that the price depression attributable to the alleged manipulation resulted in gains in Amaranth's prompt and prompt-next month positions for each of the three Expiry Dates at issue.  (*See* OSC ¶¶ 81, 88, 99.)  Second, it alleges that the portfolio earned a one-day net trading profit for the February 24 and April 26 Expiries.  (*See* OSC ¶¶ 82, 102.)  However, each of these supposed measures of Advisors' "benefit" is so fundamentally flawed that it cannot possibly form the basis for establishing intent.

> 1. *Examining Only The Prompt and Prompt-Next Months Fails To Account For The Effect of Spread Positions And Price Correlation*

The Commission's contention that gains in prompt and prompt-next months caused by artificially lowering the settlement price could provide evidence of Hunter's motive is overly simplistic.  To prove motive, the Commission must show that that the manipulation, if successful, would actually be beneficial to Hunter's overall portfolio on a *net* basis.  It would be nonsensical, for example, for Hunter to depress prices in order to benefit his June short position if that depression would simultaneously result in a greater net loss to his November long position.  However, the Commission's calculation that Hunter's prompt and prompt-next month positions gained by virtue of the price depression stops short, as it fails to disprove that very real possibility.

Two facts demonstrate the inherent flaw in the Commission's failure to consider the effect on the entirety of Hunter's book.

First, as discussed above (see Section I.B, *supra*), Hunter's portfolio consisted almost exclusively of *spread* positions.  Indeed, Advisors employed a complex web of

several spread strategies.  On a broad level, these included strategies based on summer versus winter month spreads, November 2006 versus January 2007 spreads, calendar year spreads, and March versus April spreads for deferred years.  As discussed above, in using a spread strategy, Advisors is basically indifferent to directional price movements: Advisors benefits only to the extent that prices between two months or periods either converge or diverge, depending on the nature of the spread position.  Thus, it is nonsensical for the Commission to consider only the effect of price on the prompt and prompt-next month positions and then assume, without any analysis, that this provided an overall net benefit to Advisors.

Second, prices generally correlate closely along the forward curve, meaning that a downward price movement in one month generally correlates to downward movement in other months.  This correlation is evidenced by the low daily volatility of spreads.  (*See* Quinn Aff., Ex. 15.)  Furthermore, for the months at issue, even though the prices of the prompt and prompt-next months declined on an absolute basis, they did not decline relative to the forward curve.

Thus, to demonstrate that Hunter hoped to benefit by depressing prices during the three expiries, the Commission must demonstrate that Hunter believed that any benefit in the near-month short leg of the spread would not be offset by corresponding losses in the further-month long leg of the spread caused by the price depression across the curve. There is simply no evidence that Hunter had that view.  On the contrary, the overwhelming evidence shows that Hunter (a) considered his portfolio on a spread basis, not a directional basis; and (b) thought that prices generally correlate along the curve. (*See* Tr. 6/15/07 at 26:14-27:7; 32:17-25; 54:21-25; 86:12-21; Tr. 11/17/06 at 190:11-16.)

2.    *The Commission's Vague Unsup-*
*ported Suggestion That Hunter*
*Caused Spreads to Widen is*
*Contradicted By the Evidence*

Perhaps recognizing that it is wholly insufficient to merely show that Amaranth's

prompt and prompt-next month positions were benefited by the price depression, the

Commission drops a vague footnote that conceivably might be read to constitute an

attempt by the Commission to recognize Amaranth's spread positions and to assert that

the alleged manipulation would have benefited Advisors by causing summer/winter

spreads to widen.  Specifically, the Commission states:

> [T]he downward movement of subsequent contract months was
> generally beneficial to Amaranth's book because it had a net short
> position in the March 2006 through November 2006 NG Futures
> Contracts.  Moreover, the impact of changes in the prompt-month
> contract on other contract months generally decreases as the time
> to the contract's maturity increases.

(OSC ¶ 82 n.142.)  In fact, however, actual settlement data (*See* Quinn Aff., Ex. 15) flatly

contradicts the Commission's unsupported claim.

For example, in the April 26 expiry, while summer/winter spreads appear to have

widened, the majority of that widening occurred in the further-dated months, not in the

near-dated months.  To see this, consider the price movements of the June 2006/February

2007 (M6/F7) spread, a typical summer/winter spread position.  On April 25, this spread

settled at about $4.49, and on April 26, it settled at about $4.59; thus it widened 10 cents.

Importantly, however, and in direct contradiction to the allegation quoted above (OSC ¶

82 n.142), the majority of this widening took place on further-dated parts of the curve:

September/December 2006 widened by 7 cents, whereas the June/July 2006 spread

remained constant.  (*Id.*)  The Commission offers no explanation for how Hunter's sale of

May futures would have caused widening of spreads with respect to further dated months, but not near months.

As another example, on March 29, the July/December 2006 spread actually narrowed by 5 cents (from $2.61 to $2.56); the majority of this movement came in a 8-cent narrowing of the October-December 2006 spread; whereas the spread between July and October actually widened by 3 cents. The Commission again does not explain how this could be so.

In fact, the Commission provides no description of its view of the effect on spreads of the price movements during the 30-minute settlement periods on each of the expiry days at issue. Other than describing movements in the prompt and prompt-next contracts, the Commission appears to have no theory concerning spread behavior generally, nor any evidence concerning a widening of the summer/winter spread caused by movements in the prompt-month contract during the settlement period.

Furthermore, in each of the expiries at issue, the price of the prompt-next month contracts (and others) declined *more* than the price of the prompt month contracts. Again, the Commission does not explain how this is consistent with its unsupported claim that "the impact of changes in the prompt-month contract on other contract months generally decreases as the time to the contract's maturity increases." (OSC ¶ 82 n.142.)

Finally, even if spreads did happen to widen in a way that was ultimately favorable to Amaranth (which the Commission has not shown), there is no evidence that Hunter actually expected them to do so. That is, the Commission has not provided any evidence that Hunter could have expected that, if he were to artificially depress the price of the prompt month contracts, the effects of that depression would be net beneficial to

93

his book. On the contrary, all the evidence demonstrates that Hunter believed that prices generally correlate along the forward curve. (*See* Tr. 6/15/07 at 26:14-27:7; 32:17-25; 54:21-25; 86:12-21; Tr. 11/17/06 at 190:11-16.)

> 3.   *Reference To The Daily P&L On The Expiry Days Fails To Establish Whether The Alleged Manipulation Was Actually Profitable*

While the Commission alleges that Calgary Energy's daily profit and loss ("P&L") had gains on the February 24 and April 26 expiries (*See* OSC ¶¶82, 102),[40] it has failed to connect any of those gains to the alleged artificial price effects of Hunter's trading. Rather, in a glib and conclusory footnote, the Commission claims, without support, that the overall effect of the alleged conduct was "generally beneficial" to the portfolio. (*See* OSC ¶ 82 n.142.) Elsewhere, the Commission even admits that it has no idea how the purported influence of Amaranth's trading on the forward curve ultimately affected its portfolio. For example, it concedes that the "net gains *probably* include gains and losses unrelated to the manipulation" without attempting to calculate the impact as part of its "necessarily imprecise" analysis. (OSC ¶ 102 (emphasis added).)

But there are gross flaws both in the methods and in the portrayal of the results. For example, the cited daily P&L analysis measured the marked-to-market gains from trading over an approximate twenty-four hour period, from settlement on the day before the expiry to the settlement on the day of the expiry. (Hunter Decl. ¶ 11-13.) However, the allegedly artificial price movements occurred only between 2:00 p.m. and 2:30 p.m. on the expiry date. Thus, the cited P&L includes many hours of trading, both on and off

---

[40]    The Commission does not allege that Calgary Energy's daily P&L had any gains on March 29. In fact, the same report cited by the Commission with respect to February 24 and April 26 reflects that Calgary Energy showed losses of some $18 million that day. (AMARANTH_REG055721.)

market, during which the Commission does not allege any manipulation to have occurred (*See, e.g.,* OSC ¶¶ 82, 88, 102.)  However, the Commission does not even attempt to analyze how much of the profit or loss accrued to Amaranth prior 2:00 p.m., when the supposed artificial price movements allegedly began.

Furthermore, the Commission's analysis does not account for the fact that Amaranth used its own settlement figures for purposes of calculating mark-to-market P&L.  The Commission merely assumes that Amaranth settled its book according to published NYMEX prices.  But Advisors routinely marked its book, and calculated its daily P&L, according to its own estimate of the fair value of contracts along the forward curve.  (*See, e.g.,* Tr. 6/15/07 at 82:10-12; 85:7-20.)  For example, where Advisors perceived the NYMEX settlement prices to be abnormal, such as on February 23, it often substituted its own figures.  (*See, e.g.,* AALLC_REG0684031.)

Without connecting Amaranth's P&L to the alleged price artificiality, the Commission has not provided any evidence that Amaranth's cited profits did not arise "from trades that were unrelated to the manipulation."  (OSC ¶ 82 n.142.)  Meanwhile, the Commission concedes that such trades exist and affected daily P&L. (OSC ¶ 83 n.143.)

The Commission attempts to avoid analyzing this issue by making rough guesses. Rather than perform the necessary analysis, the Commission accepts its own speculation as the "necessarily imprecise" result of a "complicated book."  (*See* OSC ¶¶ 82, 102.) However, even if, as the Commission alleges, "the greatest gains show up in the portions of the book where [prompt and prompt-next] swap positions were held," this would not prove anything.  As the Commission acknowledges, these gains could be equally

95

"offset...by losses elsewhere" in the book.  (*See* OSC ¶ 82.)  Because those losses could

be related to the gains in the prompt and prompt-next months (due to spread positions, as

described above), even a large incremental benefit to a given contract does not imply that

it made up any part of the net gain to the portfolio.[41]  For this reason the Commission's

claims about where "the greatest gains show up" is irrelevant.

**(iii)    The Commission Ignores Substantial Evidence
That Hunter's Purpose Was Legitimate And
Either Misquotes Or Draws Unreasonable
Inferences From The Evidence It Does Cite**

As set forth above in the Statement of Facts and Evidence, there is substantial

evidence that Hunter's trades during the February 24 and April 26 Expiries were for a

legitimate purpose.  In summary, on February 24, Hunter was experimenting to see

whether he could capture the premium from anticipated aggressive buying during the

closing range, based on market behavior he and others observed the day before (Tr.

6/15/07 at 42:10-43:2; 74:17-21; 81:24-82:2; 156:7-20.)   On April 26, Hunter was

executing a flexible risk reduction strategy that sought to mitigate inherent risks flowing

from exiting large positions while permitting him the flexibility to reduce as much risk as

possible, in conformance with Amaranth's goals.  (*See* Tr. 11/16/06 at 89:24-25; Tr.

6/15/07 at 21:14-19.)  The evidence of these legitimate purposes is substantial.  It is set

forth in the Statement of Facts and Evidence above and will not be repeated here.

The Commission entirely ignores this evidence.  Instead, the Commission

concocts a grand conspiracy theory based on rank speculation, unreasonable inferences,

---

[41]    The Commission's logic is easily disproved by a counterexample.  Suppose that a book is
composed of only two assets: one H/J spread and one long outright October 2007 ("V7") contract.  Further
suppose trading starts with H at $7, J at $8, and V7 at $9, and trading ends with H at $5, J at $6, and V7 at
$10.  When the book is marked to market, the greatest gains will show up in the H contract, which has
earned $2.  However, that gain is exactly offset by the change in the related J contract, which has lost $2.
As an asset, the H/J spread has thus earned $0.  The true net gain accrues to Amaranth from the change in
the outright V7 contract, which has gained the smaller value of $1.

misquotations and/or mischaracterizations of instant messages.  The Commission has failed to offer competent evidence that can reasonably support a finding of intent.

(a)    **February 24**

1.    *"ok – end of day tomorrow still stands"*

The Commission begins its narrative by citing Hunter's message to Donohoe "ok – end of day tomorrow still stands" and speculates that this "cryptic comment" refers to the alleged scheme to manipulate.  (OSC ¶ 65.)  This citation is typical of the Commission's flawed fact-finding methodology.  The Commission has taken some random statement among what it concedes to be "millions of bytes of instant message texts" produced to the staff and conjectures that it must be related to its alleged scheme.  Hunter gave Donohoe hundreds of instructions a day.  (As described below, in one 40-minute period, Hunter and Donohoe exchanged 51 instant messages.)  In the context of the "millions of bites of instant messages," Hunter's comment could literally be referring to *anything*.  It is unreasonable to attempt to guess as to its meaning.

The Commission attempts to connect this comment to the sale of the futures during the closing range by quoting Hunter's instant message, "make sure we have lots of futures to sell MoC tomorrow." (OSC ¶ 65.)  However, those messages are separated by 41 minutes, during which Donohoe and Hunter exchanged dozens of instant messages on numerous different topics, all unrelated to the sale of futures during the close.[42]

---

[42]    AALLC_REG0684033; AALLC_REG0684056.   Between 2:58 and 3:39 p.m., the time span between the two messages, Hunter and Donohoe exchanged 51 instant messages, which were unrelated to the sale of futures "market on close" and which were mostly related to calendar spread options.

In any case, however, given the fact that Hunter's purpose in selling the March futures during the closing range was legitimate, this instant message is not probative of any bad intent.

> 2.    *"make sure we have lots of futures to sell MoC"*

While the Commission attempts to characterize the message "make sure we have lots of futures to sell MoC tomorrow" as evidence of fraud, this message is simply in furtherance of Hunter's legitimate strategy. More importantly, however, is that its timing and context *further supports* that the sale of the futures was in response to what Hunter witnessed during the options close. (Tr. 6/15/07 at 37:17-22; 38:9-39:11; 73:24-74:5; 84:11-15.) The very same instant message indicates that the directive was part of the new strategy in response to the "really unusual" market behavior observed on February 23. It refers to the "big changes" observed on February 23. The directive comes shortly after Donohoe's observation "rallying here" and immediately following Hunter's comment "PBN trading 13.5 for size H.J." (AALLC_REG0684055.)

Furthermore, the message Hunter sent immediately after this instruction demonstrates the innocuous purpose behind the strategy. Just after sending the message, at 3:40 p.m., he wrote that Donohoe should plan to acquire "1000 or close to." (AALLC_REG0684073.) While it is unclear when Hunter decided to increase the number of futures that his strategy would employ to about 3,000, this clarification demonstrates that he had no intent to move the market when designing his strategy. The "draft" number also further evidences that Hunter had not planned out the strategy prior to this time.

Meanwhile, the message contains no reference to the alleged short ICE position. Indeed, the Commission has offered no evidence that that alleged position ever even entered Hunter's mind as part of his decision to sell March futures during the close. Furthermore, given that the short ICE position that allegedly benefited from the sales existed well before this instant message (*see* OSC ¶ 62), if the above message was part of a plan to depress prices in order to benefit that position, it could have come at any point in time. The Commission offers nothing to support why its interpretation of the message is more plausible than the legitimate purpose set forth herein, when evidence of that legitimate purpose is contained within the very same message.

*3. "telling Vinnie"*

The series of events that the Commission imagines—without any evidentiary support—following Hunter's message to Donohoe that he would be "telling Vinnie" is, quite frankly, astounding. (*See* OSC ¶¶ 67-74.) It is simply unreasonable as a matter of law.

As a threshold matter, the Commission has provided no evidence that such a call ever took place. Although the Commission reviewed telephone calls to and from Amaranth to ALX, as well as testimony from Rufa, Donohoe, and Hunter, the Commission has no apparent evidence of any such call, let alone what was said during that call.

In any case, however, there is nothing unusual, let alone nefarious, about Hunter telling the floor broker that he would be placing a trade with him. As Hunter testified, such calls are routine and permit the execution broker to plan out their order. *See* Statement of Facts and Evidence.

The Commission's theory that Hunter must have told Rufa about an alleged plan to drive down prices so that Rufa, in turn, would figure out "how to execute the order so as to maximize the intended effect" (OSC ¶ 67) is grounded on pure speculation and bald conjecture. There is simply no evidence supporting such a claim. Rufa's purported testimony that he "owed a certain loyalty to Amaranth—that he communicated conditions in the pit directly to either Hunter or Donohoe, and that he did so all day long" (OSC ¶ 67 n.104) does not support the ungrounded inference that Hunter called Rufa to tell him about some plan to drive down price and that they then colluded to maximize the manipulative effect of the trades.[43] Even if Rufa's testimony actually supports the point about "loyalty" and frequent communications (although the Commission does not offer any quotations), that point is completely innocuous and totally unrelated to the proposition that Rufa would collude with Hunter to drive down prices.

The Commission then asserts that the subsequent actions of Jim DeLucia—whom Hunter has not even met—"in one manner or another, disseminated to the pit that Amaranth would be a large seller," and in doing so cites the highly colorful testimony of Eric T. Bolling. (OSC ¶¶ 68-69, 72-73.) However, what Bolling actually describes, even if accepted as true, is entirely consistent with Hunter's plan to sell generally ratably during the close—namely, selling in small increments over time rather than dumping a massive quantity all at once.

The Commission then further surmises that DeLucia "arm[ed] Bolling and other significant locals with knowledge and the opportunity to trade Amaranth contracts virtually risk free" and thereby "further magnified the effect of Amaranth's trading

---

[43]     Rufa was not even Hunter's close friend or associate. (Tr. 11/17/2006 at 25:1-6) Moreover, Hunter has never met any other broker employed at ALX, including Jim DeLucia, ALX's floor broker. (Tr. 11/17/2006 at 25:7-9.)

activity." (OSC ¶ 74.) However, having apparently deposed DeLucia (OSC ¶ 74 n.129), the Commission has still not produced any evidence that DeLucia did anything but sell generally ratably during the close, which, again, is entirely consistent with and in furtherance of Hunter's legitimate plan. There is no evidence DeLucia sent secret "signal[s] to the trading pit." (OSC ¶ 74.) Even if he did (which is sheer speculation), there is certainly no evidence that Hunter instructed anyone that he do so, or that he was even aware of it. Furthermore, there is no evidence that such signals would be inaccurate or send false information to the market. In short, the Commission has entered the world of pure fantasy, surmising the substance of a train of communications without any evidence—from Hunter to Rufa, from Rufa to DeLucia, from DeLucia to Bolling, and from Bolling to the rest of the NYMEX trading floor. (*See also* Quinn Aff. ¶¶ 46, 51-52, noting the inability to conduct an objective, empirical analysis of these purely speculative claims.)

4.    *"4000 to sell MoC. . . Shhhh"*

The Commission also cites Hunter's IM to Bart Glover that he had "4000 to sell MoC." (OSC ¶ 70.) Quite noticeably, however, the Commission fails to quote the entire discussion and omits the very portion that clearly supports Hunter's defense. As discussed above (see Subsection II.A.2, *supra*), the *full* quote demonstrates that the reason Hunter had "4000 to sell MoC" was "all from options yesterday [sic]." (AALLC_REG0684227.) Further, it demonstrates that Hunter would try to get best price, as he tells Glover, "so we'll see what the floor has . . . bit of an expiriment [sic] mainly." Finally, it provides a far more plausible explanation for why Hunter wrote "shhhh": not, as the Commission implies, because he thought he was doing something wrong (*see* OSC ¶ 124); but rather, so that he could increase his chances of beating the

101

settlement price.  (Tr. 6/15/07 at 164:13-14 ("It's like . . . we're trying to beat the settle here, so don't tell anybody.").)

5.    *"Need H to get smashed"*

The Commission cites Hunter's message to Calhoun that he would "just need H to get smashed on settle . . . then the day is done."  (OSC ¶ 70.)  However, the Commission again fails to quote the relevant portion in full, and in doing so, avoids the obvious, innocuous meaning of this statement.  Given its full context, this statement merely reflects a desire that summer/winter spreads widen, not an intent to drive down the price of March in order to benefit an expiring short position.

The full exchange with Calhoun reads:

| | | |
|---|---|---|
| 12:14:34 | Hunter: | jv/xh [summer/winter spreads] seems very big…jv7 [April/October 2007 spread] is strong |
| 12:15:10 | Calhoun: | yeah, not many sellers out there |
| 12:15:44 | Hunter: | that's pushing up the summer winter...and 7/10 [calendar 2007/ 2010 spreads]...hello...sweet |
| 12:16:00 | Calhoun: | lol...pain everywhere |
| 12:16:28 | Hunter: | just need H [March] to get smashed on settle...then day is done |
| 12:16:43 | Calhoun: | OI [open interest] is huge for...ld [last day]...33k...you think cl [NYMEX light, sweet crude futures] holds these gains? |
| 12:25:54 | Hunter: | yeah...premium stays big |
| 12:27:06 | Calhoun: | great day for that spread so far |
| 12:29:39 | Hunter: | eayh [sic]...unwinding jv/xh [summer/winter spreads] here is good for us... |
| 12:33:23 | Calhoun: | definitely...u [sic] still have jv7 to sell to me? |

(AALLC_REG0684186.)

As Hunter testified, when he wrote "just need H to get smashed on settle . . . then day is done," he meant that a downward movement in the March settlement price would further benefit Amaranth's long summer/winter spread position, because it would likely have the effect of pulling the other summer months down with it.  (Tr. 6/15/07 at 124:9-

102

23; 126:8-11; 126:22-25; 127:14-17.)  In other words, the benefit to Amaranth of a lower March settlement price would be the consequent widening effect on its summer/winter spreads. (Tr. 6/15/07 at 124:24-125:5; 125:17-19; 125:21-126:4.)  As he clarified in his testimony, "if it had happened that day or the day after or a week down the road, it would have been just as good."  (Tr. 6/15/07 at 127:7-10.)

Importantly, Hunter did not mean that a lower March settlement would benefit an expiring short position.  (Tr. 6/15/07 at 127:12-18.)  Indeed, as discussed above, Hunter does not recall being aware of any such position.  (Tr. 6/15/07 at 127:12-14; *see also* 69:6-9; 72:10-17; 125:13-14; 145:8-10.)

Hunter's meaning is clearly evidenced by the lead-up discussion contained within the IM itself.  The comment occurs after (a) Hunter first comments that the summer-winter spread was "very big"; (b) Calhoun comments that there were not many sellers; (c) Hunter responds that the effect was to push up summer/winter spread, by which he meant that the lack of sellers was pushing up the price of the winter months; and (d) Calhoun comments "pain everywhere," which Hunter understood  to mean that the movement of the market was causing more people to lose money than make money.  (Tr. 6/15/07 at 131:15-24.)   Clearly, then, the comment is about the desire for summer/winter spreads to widen, not to depress the March futures settlement price.

In any case, the comment is at most a statement about what Hunter *desired* to happen, not a comment that he intended to *make it happen* by manipulating prices. Hunter wrote that he would like "H to get smashed," not that he planned to "smash H." There is a world of difference between those two statements.

6.    *"Came together quite nicely"; "h will settle lower"; "I'm flexing here"*

The Commission also cites a number of apparently self-congratulatory messages between Hunter and Donohoe, suggesting that they constitute indicia of intent to depress prices. (See OSC ¶ 75.) However, once again, the Commission has presented mere snippets of these conversations out of context and omitted key parts of the quotes.

For example, the Commission purports to quote Hunter's messages to Donohoe at 2:15 p.m., "today came together quite nicely . . . We'll hit the rest near the end of this" (cited by the Commission at OSC ¶ 75). However, it is clear from context that these messages are in fact *not* about an alleged strategy of depressing prices by selling futures ratably during the closing range. Indeed, the messages occurred at a time when half the closing range and half of Amaranth's sales had yet to occur. It also came after eight minutes of price *increases*. Furthermore, the two comments are in fact separated by additional messages from Hunter to Donohoe, which the Commission noticeably omits but which further demonstrate that the messages have nothing to do with the sale of March futures during the closing range. Between the two quoted messages, Hunter wrote to Donohoe, "you can sell [Calhoun] the jv7 [April/October 2007] . . . if you haven't done so." (AALLC_REG0684260.) Thus Hunter's comment "we'll hit the rest near the end of this" is far more likely a reference to selling additional summer 2007 contracts or April 2007/November 2007 spread contracts, since the comment itself follows a reference to those same contracts. (*See* 6/15/2007 Tr. at 178:25-179:3 ("There's too many other references to other things. It could be April, it could be summer 7").)

The Commission also purports to quote the comment "h will settle lower and h/j wider" to suggest that Donohoe means, in substance, the price will settle lower and wider

104

than it would have but for the manipulative scheme. In fact, however, the immediately preceding statement in the IM conversation makes it clear that Donohoe is responding to Hunter having sent him a new pricing "curve" (*i.e.*, estimates for the prices Amaranth would use to mark its portfolio) and to Hunter's question, "what' [sic] do you think? . . . of this curve?" (AALLC_REG0684261.) Indeed, the rest of the message makes even more clear that the context of this conversation is Hunter's estimated price curves, not any manipulative scheme: *e.g.*, "I might adjust a little;" "nice and concervative [sic] on cals [sic] spreads too." (*Id.*) Clearly then, Donohoe's comment is merely commenting on Hunter's estimates.

The portion quoted by the Commission also contains a number of apparently self-congratulatory statements (e.g., "I am flexing here"). However, again, it is clear from the full context that these statements refer to Hunter's price curve that he just sent Donohoe. Indeed, the "I am flexing here" comment immediately follows Donohoe's compliment ("nice") in response to Hunter's question, "what' [sic] do you think? . . . of this curve?" To the extent the traders are pleased with the result, it is clear that it is in reference to Amaranth's profit and loss *for the month* ("2nd best . . . sept/oct last year still the best"), and not to profits from some supposed manipulative scheme performed that day during the closing range. (*See also* Tr. 6/15/07 at 182:17-19.)

### (b)   March 29

With respect to March, the uncontested evidence is that Hunter did not participate in this close and was away on vacation in the Indian Ocean with little contact with the United States. Indeed, the Commission admits it has no reason to doubt that Hunter was traveling (OSC ¶ 90 n.149), but then states, without citation to a single piece of evidence, that it finds it "highly dubious" that Hunter "neither was in contact with Donohoe nor had

left him instructions about the trading." (*Id.*).  Indeed, the only piece of evidence cited by the Commission is an email that on its face demonstrates that they were specifically ***not*** discussing trading.  (AALLC_REG0700464 ("Your book.  Is fine.  Your attn is needed elsewhere immediAtely [sic] unfortunatly [sic]).")  It cannot reasonably be inferred from this that Hunter and Donohoe must have nevertheless discussed Amaranth's trading, and further, that Hunter must have instructed Donohoe to employ a manipulative strategy.

Not only are the Commission's inferences unreasonable, but its reasoning is internally inconsistent.  The Commission explains the fact that "[t]here are virtually no contemporaneous documents for this March 29 trading (as compared to those relating to February 24)" because in March "[t]hey were sitting right next to each other, and it is reasonable to conclude that the instant messages between the two became largely unnecessary." (OSC ¶ 90.)  Given the undisputed evidence that Hunter was in fact *not* "right next to" Donohoe, but rather in fact half-way around the world, the Commission has failed to explain why it cannot come forward with any IMs or emails evidencing intent.

There is also no evidence that Hunter even sought to direct the course of trading on the March Expiry prior to his departure for vacation.  Moreover, it would have been illogical for Hunter to attempt to do so.  For one, natural gas futures markets are volatile and require reactive strategies that cannot be planned out in advance.  An unexpected price movement, such as that which occurred on February 23, may require a market player to recalibrate or even discard his or her trading strategy at a moment's notice.  As described above, the dramatic, anomalous price movement that occurred on the penultimate trading date for the March natural gas futures contract led Hunter to develop

106

a new, responsive trading strategy prior to the close on February 24. After witnessing such an unexpected price shift the day before the expiry in February, it is counterintuitive that one month later Hunter would have directed Donohoe's trading on the expiry weeks in advance.

The complexity of Advisors' portfolio further confirms that it would have been unreasonable for Hunter to have directed trading in advance of the expiry. Each part of Amaranth's natural gas portfolio is interrelated, meaning that trading decisions are constantly being reassessed in light of movements elsewhere in the portfolio. To direct the trading strategy, Hunter would have needed not only information about price movements in the prompt month futures contract, but also information about the price movements of other contracts held by Amaranth to accurately assess the impact of any trading decisions on the overall portfolio. There is no evidence that Hunter possessed any of this information. On the contrary, the record demonstrates that Hunter was not provided with such market data around the time of the March Expiry. It thus would have been impossible for Hunter to foresee in advance the status of all positions in the portfolio and the market movements that could affect them, and then dictate to Donohoe an appropriate strategy for the expiry based on those movements.

### (c)    April 26

#### 1.    *Outright Position*

The Commission claims that Amaranth's position in the expiring May NG Futures Contract was "an outright position (not a spread), that was completely independent of its position in other months." (OSC ¶ 104.) The Commission does not cite any evidence to support this assertion. Further, it is unclear what the Commission even means by this assertion. In any case, however, it cannot be disputed that in order to

reduce risk associated with a portfolio generally comprised of a summer/winter spread (as the uncontroverted evidence demonstrates that Amaranth's was), Amaranth would need both to reduce its winter long position and simultaneously reduce its summer short position. For reasons described in detail above, Hunter believed that the best way to reduce Amaranth's summer short position was to expire it, rather than trying to sell it at the same time as trying to sell his winter long position. Hence, whether or not the May position was an "outright position" or part of a spread position, expiring it was part of a plan of reducing Advisors' general summer/winter spread position.

### 2.     *Alternative strategies*

The Commission has also suggested that Hunter may have employed different strategies to achieve its goal of risk reduction. (OSC ¶ 104.) However, as discussed in the Statement of Facts and Evidence, these alternative strategies would not have been as effective as the one actually employed by Amaranth:

*Rolling May into June.* The Commission claims the Hunter could have simply "rolled" Advisors' position from May to June without expiring off any positions. However, this purported alternative is not risk-reducing, but is, instead, a method of transferring risk from one month to another. Rolling positions from one month to the next does not actually allow a trader to decrease any holdings, as he or she would be able to in expiring positions off. Instead, it simply represents a redistribution of holdings. In addition, rolling forward Amaranth's May positions would have required selling off its May futures position in any event. (Quinn Aff. ¶ 61.)

*Leaving book temporarily unbalanced.* Instead of expiring off Advisors' short summer position in response to selling winter length, the Commission has suggested that Amaranth could simply have left its book temporarily unbalanced. Leaving the book

significantly unbalanced, however, creates additional price risk—defined as the amount of imbalance multiplied by the daily volatility for the one-day imbalance—thereby undercutting the amount of risk reduced through trading.  (*See., e.g.,* Tr. 6/15/07 at 54:7-20.)  Entering the April Expiry Date, Advisors had already made a determination as to how much unbalanced risk it would tolerate, and factored this calculation into its trading strategy on this day.  (Tr. 6/15/07 at 23:23-24; 30:23-31:13.)

*Selling winter outright*.  Similarly, the Commission has taken the position that Advisors should have simply sold winter positions outright, rather than relying on the dual sale-expiry mechanism described above.  Yet, Hunter and Advisors did execute this strategy during the April Expiry Date, and sold a portion of its long winter position outright.  (*See* A_CFTC 032874 (highlighting, as discussed further below, that in response to a question from Chasman concerning "protect[ing] the winter position," Hunter responded that he was planning to "sell cal7 and 8…and H/J," a combination of trades that, in substance, reduced Amaranth's winter holdings).)[44]

*Selling November 2006-December 2006 or November 2006-January 2007 spreads*.  Finally, the Commission apparently believes that Advisors should have simply attempted to sell out of the relevant spread positions directly, rather than selling one leg of the spread and expiring off the other leg.  The record indicates that Hunter and

---

[44]    *See also* Tr. 11/17/06 at 178:11-179:13:

A.  We were legging it to winter selling, so essentially selling calendar strips and then selling March/April…

Q.  "…So the winter position that we talked about earlier where you were waiting for attractive prices, this would be part of that?

A.  Yes…we've been waiting all day trying to sell some volume there, finally getting some volume there."

Advisors considered this possibility initially and attempted to execute it. (Tr. 6/15/07 at 25:11-22.) However, market conditions did not allow them to sell the spreads directly. Moreover, trading spreads outright could have revealed Advisors' positions to other market participants. (*See., e.g.,* Tr. 6/15/07 at 20:12-21 ("Due to market liquidity slash wanting to be quiet about our positions, not trying to let anyone know what positions we have one, we found it very difficult to unwind that spread directly…"); Tr. 11/17/06 at 76:7-15.)

### 3.     *Waiting to sell*

The Commission charges that, seven minutes into the close, Hunter indicated to Chasman that he was "waiting to sell" his May NG futures until later in the settlement period. (OSC ¶ 93.) However, this allegation is false, as the relevant messages in fact support the opposite of what the Commission alleges—they are only further evidence that Hunter's trading during the close on April 26 was motivated by a desire to reduce risk.

Contrary to the allegations, Hunter's messages are evidence that he planned to sell as many long winter contracts as possible before deciding whether to sell or roll forward the May futures. As explained further below, the messages refer not to these sales of May futures, but rather to selling calendar 2007 and 2008 contracts (or "cals") and H/J spreads as a proxy for the winter contracts that Hunter also intended to sell. Concerning his trading in "cals" and H/J spreads that day, Hunter explained that "we were legging it to winter selling." (*See* Tr. 11/17/06 at 178:18-179:13.) The messages' context thus establishes that Hunter and others were discussing contracts ***one or two years distant,*** not expiring futures contracts.

The evidence reflects the following: On the expiry at about 12:45 p.m., Hunter described to Chasman a strategy of selling calendar 2007 and 2008 strips along with H/J

110

spreads as similar to selling winter contracts. (*See* Tr. 11/17/06 at 134:4-5; *see also* A_CFTC032874.) One hour later, roughly fifteen minutes before the closing range began, Hunter told Chasman that he was "trying to get some back stuff done," referring to these and potentially other back-dated contracts. After the close had started, at about 2:02 p.m., Hunter indicated that there were "definitely buyers" facilitating sales all along the curve, but that despite this liquidity event, "we haveyet [*sic*] to sell" the back-dated contracts, e.g. the calendar 2007 and 2008 contracts and H/J spreads he and Chasman had discussed earlier. (A_CFTC032878.)

Further clarifying this reference, Hunter also sent a message Matthew Calhoun a few minutes later at 2:07 p.m.: "we are finally selling h>js [i.e., H/J spreads] / cals [*i.e.,* calendar 2007 and 2008 contracts] / we are wa[i]ting to sell" (A_CFTC032910). The context of this message is clear: Hunter was saying, in substance, "We are finally able to sell H/J spreads; but as for the calendar 2007 and 2008 contracts, we are still waiting to sell those." Importantly—as Hunter's word "finally" clarifies—these messages' references to "waiting" to sell and "having yet" to sell reflect a hope to sell the contracts as soon as possible, rather than a deliberate intention to defer sales. Hunter thus only explained to Chasman that he had yet to sell calendar 2007 and 2008 contracts and H/J spreads, and then five minutes later he told Calhoun that he had sold the H/J spreads.

Neither of the messages cited in the OSC discusses selling May futures, and the Commission offers no evidence to support its inference that they do. (OSC ¶ 93.) But in any case, waiting to sell May futures would simply not be evidence of an intent to drive down the settlement price. Indeed, if it were, it would suggest that all speculative traders must immediately exit their open positions at the very beginning of, or indeed prior to,

the closing period. Such a proposition is obviously absurd and defies the enormous amount of trading that takes place throughout each settlement period. *See., e.g.,* Quinn Aff., Exs. 12-14.

4.    *"Last 8 Minutes"*

The Commission makes much of its purported evidence that Donohoe instructed the floor brokers to sell in the last eight minutes of the closing period. (OSC ¶¶ 94-95.) However, there is no evidence that Hunter instructed Donohoe to do so, or that he was aware that Donohoe had made such a communication to the floor brokers. Furthermore, there is nothing improper about waiting to trade in the last eight minutes. *NYMEX has no rule limiting as to when during the thirty minute close market participants may purchase or sell prompt month contracts.* As a general matter, "by trading during the settlement period, Amaranth was acting consistently with other traders." (Quinn Aff. ¶ 59 and Exs. 12-14.)

Moreover, there are numerous possible legitimate reasons for such an instruction: Donohoe could have been occupied executing the longer-dated sales of winter positions described above, both through bilateral OTC trades and on ICE. Because of the importance of ensuring that Advisors sold all of its prompt month future position (since it could not take physical delivery), Donohoe may have given these instructions to make sure to begin selling by the last eight minutes of the April Expiry Date as a precaution, in the event that Donohoe did not have the opportunity to speak again with the broker. It is also possible that Donohoe believed that he could obtain the best possible NYMEX price by selling at this time, based on prior market behavior during the close or based on specific NYMEX behavior during the April Expiry Date.

> **(iv)    The Commission Conveniently Ignores The Evidence That Hunter Executed Trades During This Time Period That Were Inconsistent With An Intent To Depress The Settlement Price**

In addition to ignoring affirmative evidence of legitimate intent, the Commission also ignores evidence that actually *negates* intent. Specifically, during the time period that the Commission claims Hunter sought to depress prices of the prompt and prompt-next months, Hunter executed several trades that are wholly inconsistent with Hunter having such a purpose.

For example, as discussed above, Subsection II.C.4, *infra*, at the very end of the close on April 26, Amaranth purchased certain June put options. These put options gave Amaranth the right to sell June futures at a certain price, the sale of which would only be profitable if the price fell beneath a certain level. Such a trade would thus hedge against the risks associated with a falling price. Amaranth was otherwise exposed to this type of downward price risk after it failed to sell off as much winter long position as the short position it had expired off on April 26, leaving the book net long. Importantly, the timing of these orders to purchase these put options—at the very end of the close—reflects several things.

First, it reflects that Hunter did not know until late in the trading day on April 26 that he would be left with a large residual position in winter contracts. If, in fact, Hunter had known about this imbalance before then, he could have just purchased the options position at that time, in order to protect against the risk of holding a net long position in his book. Instead, Donohoe appears to have waited until *after* Advisors had committed to a decision on the number of expiring futures contracts it would roll or sell to purchase put options. It was the decision on rolling or selling Advisors' expiring futures that

113

crystallized the actual imbalance of the portfolio as of 2:30 p.m. and led to the need to purchase this protective options position.

Second, if Hunter had purchased these put options in order to capitalize on the downward prices he allegedly intended to create, he would have purchased them prior to when he actually did. It would be nonsensical to purchase them *after* the alleged manipulative trading had begun, much less after the settlement had already occurred (as he did with respect to most of them). In order for Amaranth to benefit from these put options in such a scheme, it would have had to purchase them *before* the alleged downward price manipulation took place, *i.e.*, before Advisors' prompt-month sales had begun, by 2:22 p.m. (*Compare* OSC ¶ 100.) However, it did not.

Hunter's trade with Centaurus Energy also demonstrates a lack of intent, as this trade actually *lost* money due to price movements that the Commission charges Hunter with causing during the expiry. Whereas Hunter's trade with Centaurus represented a bet that the spread between May and June would increase, the Commission charges Hunter with intentionally contracting the price of this spread.

As described above, by entering into the 10,000-lot May/June spreads, Hunter's portfolio became shorter in May contracts and longer in June contracts. From this perspective, therefore, the May/June spread trade bet that the price difference between the two contracts would widen. The bulk of the May/June spreads appear to have been purchased at about 21.5 cents. (AALLC_REG0695677.) Considered in terms of Advisors' daily P&L, as the Commission has framed the allegations in the OSC, Hunter would profit most if the May/June spread settled at the higher end of its recent historical

range, at 24 cents.  (*See* Quinn Aff., Ex. 15.)  The trade's value would vary directly by $1

million per 1-cent variance in the price of the May/June spread.

But paradoxically, the Commission alleges that Hunter artificially compressed the

May/June spread by 3 cents by executing his sales of May contracts during the last eight

minutes.  (OSC ¶ 99.)  Because the May contract settled over a half hour while the June

contract settled over only the last two minutes—meaning that the June settlement price

was more sensitive to trading during that time period—Hunter's trading during the last

eight minutes would predictably have resulted in this adverse compression of the

May/June spread.  (Tr. 11/17/06 at 156:5-9; Tr. 6/15/07 at 33:15-21.)[45]

Had he intended his sales of May futures to cause any of the price effects that the

Commission alleges, therefore, Hunter would have *on purpose* harmed his daily P&L by

about $3 million by executing the sales in the manner he did.  If he had planned out the

alleged manipulative scheme in advance, or had already completed a similar scheme for

two months running—as the Commission alleges—surely he would have executed these

futures sales in some other way that would not compress the May/June spread.  By selling

the same volume of May contracts during the first eight minutes, Hunter would have

avoided the downside of adversely compressing the May/June spread.

Considering Advisors' intra-day trading thus leads to the conclusion that

Amaranth did not intend to maximize profits by executing sales of May futures during the

last eight minutes on April 26.  Instead, the timing of the May futures sales, and the

---

[45]     This analysis assumes *arguendo* that Hunter's trading could affect the settlement price of the June contract.  For reasons described above, Hunter disputes that his noncommercial trading could affect the last-day settlement price of the May contract.  However, that is irrelevant here: The point is only that Hunter's trading would predictably affect the June settlement price by more than the May settlement price, causing the May/June spread to compress.

decision to enter into the Centaurus trade, both emanated from Hunter's intent to reduce

risk.  (Tr. 11/17/06 at 156:2-6; Tr. 6/15/07 at 29:22-24.)

b.   **There Is No Evidence That Hunter Knew or Was Extremely Reckless As To The Impact That The NYMEX Settlement Price Would Have On The Price Of Physical Natural Gas**

The Commission claims that Hunter either "knew that the NG Futures Contract

settlement price affected or determined prices for physical gas" or was "reckless with

respect to the impact of their manipulation of the NG Futures Contract settlement price in

Commission–jurisdictional transactions." (OSC ¶ 112.)  As discussed above (see Section

Section IV.D, supra), however, such a showing is insufficient for purposes of showing

intent.  Rather, since this is a claim for open-market manipulation involving legitimate

trades, the Commission must show specific intent to manipulation the price for physical

natural gas.  However, even accepting the Commission's standard *arguendo*, the

Commission's claim that Hunter knew or was extremely reckless[46] as to the effect that

the NYMEX settlement price had on the price of physical natural gas is unsupported by

evidence.

As its primary piece of evidence, the Commission cites a letter from August 30,

2006 from some other employee at Amaranth (Michael Carrieri) stating that "the public

relies on [the NG Futures Contract settlement price] as a key price benchmark for

physical and financial contracts involving natural gas" (emphasis added).  However,

---

[46]    Although the Commission alleges Hunter was at least "reckless" as to the impact of the settlement price on the price of physical natural gas, a showing of "simple recklessness" would clearly not suffice. *See Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C.Cir. 2005).  Rather, under D.C. Circuit precedent construing Rule 10b-5, defendant must have acted with *at least* "extreme recklessness." *Id.* (deferring the decision whether, in the context of matched orders and washed sales, extreme recklessness, as opposed to specific intent, would suffice).  "Extreme recklessness" is defined as an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

Amaranth's letter states merely that the NG Futures Contract settlement price is a point of comparison (benchmark) for certain other transactions in the physical and financial natural gas markets. The letter does not acknowledge that the NG Futures Contract settlement price directly sets or drives specific transactions in the physical markets, such as those described in the OSC. In addition, there is no evidence *Brian Hunter* ever agreed with this statement, let alone that he held this view *during the relevant time period* (as opposed to several months later when the letter is dated).

Similarly, the Commission cites the testimony of various Amaranth employees purportedly acknowledging "the close relationship between the futures and physical markets and the importance of the NG Futures Contract as a price benchmark for substantial volumes of physical gas." But this evidence suffers from several inadequacies.

First, one of the employees whose testimony the Commission cites, is Brian Hunter. But, Hunter's testimony (Tr. 11/17/06 at 18:3-23) simply does not support the proposition for which it is cited. Rather, in that testimony, Hunter testified about certain financial trades, which he called "Rocky's [sic] basis trades" and which he described as simply transactions arbitraging the difference between the NYMEX settlement price and price of gas at the Rockies regional prompt month price. In the course of describing these financial transactions, Hunter also stated that Rockies "basis" is something that certain participants in the market could "trade[] physical." (*Id.* at 18:23.) However, the transaction that Hunter referred to as capable of being "traded physical" is very different from the "physical basis transactions" or "index transactions" that the Commission describes in the OSC. Rather, such a transaction would merely involve a commercial

117

trader who both owned NYMEX futures, which it held into delivery, and had a corresponding obligation to deliver the same amount of natural gas to the Rockies regional hub at the Rockies regional spot price. The commercial trader would profit from such a "basis" trade to the extent that it could store and transport the natural gas to the Rockies regional hub at a cost that is less than the price difference between the price at which he bought the future and the price at which he sold the delivery obligation. Importantly, nowhere in that transaction was physical natural gas priced based on a reference to the NYMEX settlement price. (Hunter Decl. ¶¶ 16-20.) Thus, Hunter's testimony in no way evidences any understanding that certain commercial traders directly incorporate the NYMEX settlement price for purposes of pricing their trades in physical natural gas.

Second, to the extent that the Commission cites the testimony of other Amaranth employees, even assuming that the Commission has not mischaracterized such testimony (as it has with Hunter's), such testimony is not evidence of *Brian Hunter*'s knowledge or understanding.

The Commission also asserts that Hunter was aware of the purported effect of the NYMEX settlement price on physical gas prices based on his "knowledge of market fundamentals and from [his] experience." (OSC ¶ 112). However, this conclusory assertion constitutes rank speculation. The Commission itself has even admitted that "the use of futures prices to effectively set some physical index prices" is a practice that is "perhaps not well understood." (2006 FERC State of the Markets Report, p. 50.)[47]

---

[47]    This document is attached as Exhibit 23 to the Simonson Decl. It is also available at: http://www.ferc.gov/market-oversight/st-mkt-ovr/som-rpt-2006.pdf

There is simply no evidence that Hunter's experience and knowledge of market fundamentals should have given rise to this practice as of February through April 2006.

In short, the Commission has failed to show that the practice of setting the price of physical natural gas based directly on the NYMEX settlement price was "so obvious that [he] must have been aware of it." *Rockies Fund,* 428 F.3d at 1093 (finding that the SEC failed to prove its manipulation claim as it failed at the very least, to show that the defendant acted with extreme recklessness, while deferring the decision whether such a showing would even suffice as a matter of law). As such, the Commission has failed to meet its own concocted standard for intent.

### E. There Is No Evidence That The Trades Had Any Material Impact On Price Or That Price Was Artificially Affected

The Commission's manipulation claim fails for another reason: there is no evidence that Hunter's trades actually had any effect on the price of NG futures in any case. While, in general, such an absence may not be fatal to a claim of manipulation, *see, e.g.*, *GFL Advantage*, 272 F.3d at 206, here it is fatal to the Commission's claim: Because Hunter did not transact in physical natural gas, the Commission's jurisdiction is solely premised on the purported "nexus" between the NYMEX settlement price and the price of physical natural gas (OSC ¶ 2.) Indeed, the Commission does not provide any quantitative estimate or assessment of the effect of Hunter's trading on the physical markets. However, if Hunter's conduct did not actually have any effect on the NYMEX settlement price, it necessarily had no effect and was not "in connection with" the purchase or sale of physical natural gas.

1.    **The Commission Fails To Demonstrate Any Correlation Between The Trades At Issue and Price Movements**

Although the Commission claims that Amaranth's trading contributed to the price depressions during the expiry, it fails to demonstrate any link or correlation between the two.  In fact, there is none.

Indeed, no statistically-significant correlation between changes in Amaranth's positions and price movements during any of the subject settlements is visible from the trading data.  (*See, generally*, Quinn Aff. ¶ 9.)  This is true either when either when trading during the settlement period is broken down into 1-minute intervals, or when each settlement period is taken as a unit.  (Quinn Aff. ¶¶ 14, 16, Ex. 1 (noting that the correlation coefficients for the February, March, and April Expiries respectively are -0.027, .400, and -.518).)  Without at least some correlation between Amaranth's trading and price movements, the Commission cannot make the necessary showing that Amaranth's trading was the cause of price movements during expiry.  (Quinn Aff. ¶¶ 14, 16-17.)

A full correlation analysis conducted by the Analysis Group is attached in the accompanying affidavit. (*See* Quinn Aff. ¶¶ 14-18; 42 and Ex. 1.)  However, certain examples are illustrative:

- On February 24, 2006, after 2:15 p.m. and 2:20 p.m., Amaranth sold approximately 29% of the total number of March futures contracts it sold during the settlement period.  However, the *price of the March futures contract increased* during that same time period.

- Likewise on March 29, during final five-minutes of trading, between 2:25 p.m. and 2:30 p.m., Amaranth sold 23% of the total number of April futures it had brought into the settlement period.  However, the *price of the April natural gas futures contract again increased* during that same period.

- Finally, during the last minute of trading on April 26, 2006—a period during which Amaranth sold 1,689 contracts, representing over half of its total sell

120

volume during the last 30-minutes of trading on the April 26—*prices again increased.*

This latter fact serves to refute a central proposition asserted in the OSC—one in which Amaranth is accused of waiting until the last minutes of trading on April 26, 2006 to sell the long futures position it held on NYMEX in order to achieve an "extraordinary" market impact. (OSC ¶ 96.) In fact, Amaranth's sales during the last minute of trading coincides with a statistically significant price increase in the prompt month contract. (Quinn Aff. ¶ 42.) Likewise with respect to April 26, the Commission ignores the fact that because of increased liquidity toward the end of the settlement period, trading during the end of the settlement period would be less likely to have any effect as compared to trading during other points in time. (Quinn Aff. ¶ 59.) In addition, it is telling that the Commission does not raise this argument for the other two months at issue here, where Amaranth did not trade a majority of its positions toward the end of the settlement period. In fact, because liquidity does not vanish as the settlement period progresses, "by trading during the settlement period, Amaranth was acting consistently with other traders." (Quinn Aff. ¶¶ 58-59 and Exs. 12-14 (highlighting the fact that, on April 26, 2006 more selling took place on the NYMEX during the last half hour of trading than during the entire pre-settlement period); *see also* Quinn Aff. ¶ 60 (discussing trades executed on March 29, 2006 before the beginning of the closing period).)

These pieces of evidence, along with the general lack of correlation between Amaranth's trading and market price movements, indicate that Amaranth's trading did not have any material effect on the downward price movements during any of the three subject settlements. As a result, the Commission's allegations that Amaranth's

"concentrated buying or selling in the settlement period could move prices…down" (OSC ¶ 61) are not supported by the evidence. (*Compare also* OSC ¶ 5.)

Presumably in reaction to a clear lack of evidence, the Commission further relies on an improper theory of assessing the effect of Amaranth's trading on market prices, suggesting in several instances that the "true" market price (the price that the Commission claims would have existed but for Amaranth's purported manipulation) should be understood to be the price at 2:00 p.m., right before the beginning of the settlement period. (*See., e.g.*, OSC ¶ 43 ("Had a settlement price been calculated based on selling up to the settlement period, the settlement price would have been about $7.42, but instead the contract settled at $7.112").) This claim is unjustified.

The Commission cites no logic or authority for why all trading during the settlement period should simply be discounted. Furthermore, the Commission's cut-off point ("up to the settlement period") is purely arbitrary. Presumably, if the Commission is correct that Amaranth's sale of futures caused prices to decline, then its prior *purchase* of futures before the settlement period would have caused prices to increase. The Commission offers no explanation why the period during which Amaranth purchased futures should be included, but the period during which Amaranth sold futures should be excluded. Likewise, the Commission indicates that trading in the May contract on April 26 is "anomalous" (OSC ¶ 42) because of a price increase, followed shortly by a price decline. This standard for price anomalies is only selectively applied: as indicated in OSC, Figure 4, for instance, between approximately 10:15 a.m. and 10:45 a.m., there appears to be similar evidence of a fall in prices followed closely by a price increase.

The Commission, however, again offers no explanation of why this type of price behavior is not, in its view, "anomalous."

Further, the Commission appears to apply this reasoning only when convenient to it. As the Commission itself acknowledges, on April 26, 2006, "the May NG Futures Contract was trading at about $7.12, and then traded in the range of $7.00-7.30" after that time. (OSC ¶ 98.) Yet, according to the Commission's own data analysis (seen most clearly in Figure 4, OSC ¶ 41), on April 26, *the price at 2:00 p.m. is almost exactly the price at 2:30 p.m.*, after the close of trading. As such, if—as the Commission's reasoning with respect to February would suggest—the price at 2:00 p.m. can be seen as a "true" price, free from even the speculative taint of manipulation, it must follow that there was no manipulative or other price effect on April 26, 2006, since the price entering the expiry is very nearly the equivalent of the price after the expiry.

Faced with these clear, empirical flaws in its analysis of Amaranth's effect on price, the Commission presents an additional theory concerning the pricing signals sent by Amaranth to the "trading pit." (*See, e.g.,* OSC ¶ 80.) As discussed further in the accompanying affidavit, "According to this second theory, irrespective of when Amaranth was actually selling, and what it actually sold, it would move the market." (Quinn Aff. ¶ 52.) As such, the Commission's theory that Amaranth sent various types of signals to the market leads to the empirically-unverifiable and speculative result that, even if Amaranth had not traded any contracts during the close, it would have been responsible for the allegedly artificial price movements. (Quinn Aff. ¶¶ 51-52.) This recollection necessarily "forms an inadequate basis for quantifying estimates of alleged market impact." (*Id.*)

## 2.    Dr. Kaminski's Analysis Is Fundamentally Flawed

The Commission's preliminary finding of a market manipulation by Amaranth relies on the findings of Dr. Wincenti Kaminski, Professor of the Practice in Executive Education at Rice University and currently a managing director at Citigroup. However, although the Commission relies on Dr. Kaminski's expert opinion extensively throughout the OSC, the actual methodology used by Dr. Kaminski to arrive at the various findings described in the OSC is not described or discussed in the OSC or in any accompanying affidavit. As a result, no outside expert can independently evaluate the appropriateness of Dr. Kaminski's findings or methodological approach with respect to Amaranth's impact on NYMEX market prices because the Commission has not presented Dr. Kaminski's analysis, but merely his conclusions. (*See, e.g.,* OSC ¶ 79, noting that Dr. Kaminski "demonstrated a very high degree of correlation between large trader transactions in the settlement period and price movements.")

What little information is revealed about Dr. Kaminski's methodology undermines the reliability of his conclusions. The Commission vaguely indicates in several places that Dr. Kaminski relied on "standard techniques such as the Herfindahl-Hirschman Index (HHI) along with price trends in order to correlate concentration with price effects." (OSC ¶ 79.) However, the HHI Index is far from a standard technique for evaluating the ability of one market player to manipulate prices on the world's largest commodity futures exchange. More typically, the HHI Index is used in the context of proposed large corporate mergers, in order to determine whether further analysis of the combined entity's potential market power must be undertaken. (Quinn Aff. ¶¶ 48, 50 (noting that several authorities on the HHI index have suggested that "high concentration measures are generally not a sufficient condition to infer market power").)

The use of the HHI Index in the current context is not only highly unusual—the analysis has never been deployed in the context of an attempt to prove market manipulation on a futures exchange—but also highly unreliable and methodologically improper. The OSC indicates only that Dr. Kaminski applied his HHI-based test to the three subject settlements, leaving it unclear as to whether Dr. Kaminski used other trading dates as controls on his analysis or whether he applied his analysis on non-Amaranth market participants. (Quinn Aff. ¶ 49 (noting, "[t]o evaluate the potential usefulness of this approach it would also make sense to examine many other trading days…and to see whether this type of analysis produces these results only for natural gas or for other commodities, such as oil").) In the first case, the description of Dr. Kaminski's work in the OSC leaves it unclear as to whether he considered a statistically significant range of trading data. In the second case, the OSC remains unclear as to whether the fact that Amaranth was shown to have had a meaningful effect on prices distinguishes it from any of a number of other large market participants who held positions on the NYMEX. In fact, throughout the OSC, the Commission presents no point of comparison for Amaranth's trading as compared to other large market participants, making it difficult to assess Amaranth's market impact. (Quinn Aff. ¶ 53.)

More broadly than in its application to the HHI analysis, the Commission has provided no indication that Dr. Kaminski conducted any type of comparative analysis to assess how Amaranth's alleged market controlling position compared to that of other large market participants. Without such an analysis, it is effectively impossible to assess accurately Amaranth's market impact. (Quinn Aff. ¶ 53.) In addition, Dr. Kaminski's findings appear to be flawed in at least one other critical way. Notably, for each

settlement period at issue, Dr. Kaminski presents a range of potential damage for which Amaranth is responsible.  For trading in the March 2006 trading contract, this range is identified as $0.29 to $0.09.  (OSC ¶ 81.)  However, it is absurd, as will be outlined more fully below, to suggest that Amaranth is potentially responsible for the entirety of the price movement during the 30-minute settlement period on February 24, when Amaranth represented only 19.4% of total sell-volume during this period.  (Quinn Aff. ¶ 47.)

Dr. Kaminski's analysis also appears selectively specific.  For instance, Dr. Kaminski presents a range for Amaranth's effect on February 24 on the price of the March natural gas futures contract in which the upper estimate is over 300% of the lower bound; on March 29, the proposed range is even greater, with the upper bound representing over 600% of the lower bound.  (OSC ¶¶ 81, 88.)  By contrast, Dr. Kaminski appears able to pinpoint Amaranth's effect on price movements in the May and June natural gas futures contracts on April 26 to be exactly $0.03.  (OSC ¶ 99.)  Although the Commission claims that the "task of estimating Amaranth's impact is greatly simplified by the distinct profile of its selling in the May contract" (OSC ¶ 99), it leaves undefined the definition of this "distinct profile" and its apparently radical methodological effect on the Commission's ability to define Amaranth's speculative manipulative footprint.  Since the Commission has not provided any detail on the analysis conducted by Dr. Kaminski, it is impossible for any rational fact-finder to verify or contest the truth behind these speculative claims.

### 3.    There Is No Evidence That The Price Movements Were Abnormal, As They Were Within The Expected Range

The price movements cited by the Commission as indicative of artificial price movements are indistinguishable from normal, expected market movements in the natural

gas futures market—a market that can generally be characterized as one having significant inter-day and intra-day price volatility.  (*See, generally*, Quinn Aff. ¶ 34.) Without showing that the price movements at issue are outside the bounds of expected price variation, the Commission is necessarily unable to prove that the price movements at issue represent prima facie evidence of manipulation; even if the price movements at issue were found to be abnormal, that would only serve as a prompt for further investigation of the causes behind these price movements.

The fact that price movements during the subject settlements are within the normal bounds of trading can be understood through several different, but related, analyses.  The first analysis sets out a statistically normal range of price changes and evaluates any particular price change based on its deviation from this expected range. This test is known as a "t-statistic" and "is calculated as the difference between the at-issue daily price change and average daily price change of the at-issue contracts during their prompt-months (*i.e.*, February, March, and April 2006) divided by the variability of this difference."  (Quinn Aff. ¶¶ 35-36.)  The second analysis is known as a "rank order test," in which a specific probability (known as the "empirical probability value") is assigned to each individual event in a set of events (in this case each daily price change during the period of time under consideration—February-April 2006).  The probability of a given event occurring—such as a price fall of $.035 as occurred on February 24—is then compared against this master set of probabilities.  (Quinn Aff. ¶¶ 22-23 (methodological discussion of the ranked order test); ¶¶ 37-38 (discussing the results of this test).)

Under *both* analyses, daily price change during the three subject settlement days—February 24, March 29, and April 26 fell well within the range of expected daily price changes. (Quinn Aff., ¶¶ 35-36; 38-39.) Anecdotally, this result should not be surprising: the largest daily price change during the time period under consideration (February-April 2006) was $.62, approximately twice the largest price change under consideration here ($0.35 during February 24, 2006). In addition, there were 10 days during the three-month period during which the daily price changes exceeded $0.35. (Quinn Aff. ¶ 39.)

In addition, the price movements during the last 30-minutes of trading can also be evaluated against what would be expected based on intra-day price movements for each of the subject settlements, when these price movements are evaluated in 1-minute intervals. When such an intra-day analysis is conducted, the price movements during the last 30 minutes for February 24, March 29, and April 26 fall within the expected range of price changes set out by the course of prior trading on each respective date. (Quinn Aff. ¶ 42; Ex. 11.) As a result, these price movements cannot be considered artificial by any means, since they are indistinguishable from non-artificial price movements, which are, by definition, based on the normal forces of supply and demand. Since the price movements at issue appear no different than expected price movements during points in time that the Commission does not allege to have been manipulated, it seems to stretch the boundaries of economic reasoning to suggest that Amaranth's trading during any of the subject settlements constituted an artificial price—one set by factors other than the natural forces of supply and demand.

128

### 4.    Price Movements After The Expiry Are Inconsistent With Manipulation During The Expiry

Short-term market manipulation is characterized by a rapid return to pre-manipulation, non-artificial price levels.  The academic literature on market manipulation is consistent on this proposition.  (Quinn Aff. ¶ 18 (including discussion of Pirrong, Stephen, *The Economics, Law, and Public Policy of Market Power Manipulation*, Kluwer Acadmic Publishers, 1996).[48])  The reasoning behind this proposition relies on basic principles of market behavior—if market participants see prices that seem abnormally high or low, they will quickly recognize the opportunities to buy low or sell high.  In aggregate, this type of behavior should return market prices to the levels dictated by non-manipulative, fundamental factors.  (Quinn Aff. ¶¶ 18-20.)  In plain terms, were the NYMEX settlement price to have been artificially manipulated, other, related prices (e.g., trading in the spot market or trading in the prompt-next contract on ICE and on NYMEX) would have quickly reverted to higher, pre-manipulation levels based on market dynamics.  Incontrovertibly, this reversion did not take place.  (Quinn Aff. ¶ 20.)

This type of anticipated post-manipulation price recovery is simply not observed in trading on any exchange in the days after the subject settlements.  In fact, there is no evidence of any type of price recovery pattern in NYMEX after-hours trading, post-expiration physical market trading or in trading in the prompt next contract on NYMEX and on ICE.  (Quinn Aff., ¶¶ 21-25 and Exs. 2-4 (discussing price effects post-expiry in the physical natural gas market for each of the subject settlements); ¶¶ 26-30 and Exs. 5-7 (discussing trading in the prompt-next swap contract price on ICE).)

---

[48]    Pirrong's work is cited by the Commission at OSC ¶ 51.

The Commission also presents the allegation that Amaranth manipulated the price of the prompt-next futures contract during the subject settlements.  (*See* OSC ¶¶ 77-78 (noting that "if the artificial lower of the prompt-month NG Futures Contract settlement price was effectuated significantly through sales in those final two minutes…the settlement price of the prompt-next month would also be artificially lowered"); ¶ 92 (noting that in April 26, Amaranth intended also to manipulate the price of the June 2006 natural gas futures contract).)   However, here there is again no price rebound observed in the prompt-next contract during any of the subject settlements.  (Quinn Aff. ¶¶ 31-33 and Exs. 8-10.)  In fact, in the day following trading on April 26, the price of the June 2006 futures contract fell by $0.47, suggesting, as articulated more fully below, that the price movements discussed in the OSC are likely the result of fundamental market factors, rather than the result of a deliberate market manipulation.  (Quinn Aff. ¶ 33.)

### 5.    Price Movements During the Expiries Are Explained By Fundamentals

#### a.    February 24, 2006.

The price movements at issue during the subject settlements are within the anticipated bounds of price movements during expiry because they are consistent with a fundamentals-based analysis of market behavior.   The Commission conspicuously does not engage in a discussion of alternative reasons for the price movements observed during the subject settlements, particularly for February 24, 2006, where the price movement during the settlement period is sharpest (Tr. 6/15/07 at 36:19-37:4; 37:25-38:20.).

Surrounding the settlement periods that are the subject of the unsustainable theory of manipulative conduct, the available pricing data does not show any indicia of a

fraudulent, unnatural interplay of supply and demand.  In fact, for February 24, 2006, NYMEX pricing data suggests just the opposite, specifically that the price of prompt month natural gas continued to decrease in the days following the February Expiry Date. This price decrease was consistent with downward pricing trends visible throughout the month of February.  (*See* Quinn Aff., Ex. 2.)

A second way to contextualize the price decrease in the prompt month at the close of trading on February 24 is through a comparison of movements in the prompt-next month contract relative to movements in the prompt month contract.  Such an analysis reveals he price of April 2006 natural gas futures contracts moved in lockstep with that of the March 2006 natural gas futures contract, providing clear evidence that a short term manipulation in the prompt month contract—serving to dissociate trading in one contract month for the purposes of a short term benefit to Amaranth—is not observed.  (Quinn Aff., ¶¶ 31-33; Exs. 8-10.)  Furthermore, the fact that the prompt and prompt-next contract months moved together provides further evidence for the proposition that market fundamental factors were responsible for the downward price movement at issue.

Furthermore, the fact that no price "rebound" is observed for February, along with contemporaneous trade press reports, suggest that, in fact the price drop during the February settlement period was driven by concerns regarding natural gas storage.  (Quinn Aff. ¶ 44.)  Contemporaneous reports in *Natural Gas Intelligence*, a leading trade publication from February 24 suggest that prices moved lower on the day because of reports of "'record high' natural gas storage levels."  (Quinn Aff. ¶ 44.)  Market expectations concerning marginally warmer weather would be likely to lead to a price decrease because of a corresponding decrease in short-term consumer consumption.

(Quinn Aff. ¶ 43.)    Against this backdrop of market expectations, it is reasonable to conclude that market fundamentals drove the price movement during the 30-minute settlement period on February 24, 2006.  (Quinn Aff. ¶ 44.)

b.    **March 29, 2006 and April 26, 2006.**

Similar to February 2006, a longer-dated view of the price trajectory of the April 2006 natural gas futures contract in the days leading up to March 29, 2006 reveals a path similar to that of the March 2006 contract, insofar as prices for the April 2006 natural gas were trending downward days prior to March 29, 2006.  (Quinn Aff., Ex. 3.)  Similar trends are visible in the price trajectory of the May natural gas futures contract.  (Quinn Aff., Ex. 4.)

In fact, in the days leading up to March 29, 2006, reports in the trade press again indicated that "mild weather [would] set in across the Mid-Atlantic and Northeast." (Quinn Aff. ¶ 44.)  This reduction in demand for natural gas among residential consumers would certainly have had a downward impact on the price of the expiring natural gas futures contract.  (*Id.*)  Similarly, on April 26, *Natural Gas Intelligence* reported that the National Weather Service was predicting "far above normal temperatures" in much of the country, again signifying that lower natural futures prices were not unexpected, given market fundamentals.

Accordingly, the Commission has not shown that Amaranth's trading resulted in abnormal market conditions or prices.   Unlike even the trading on the February Penultimate Date (described above), trading in the post-close market did not result in price readjustments as would have been expected if the downward trend had been an "artificial" result of improper market conduct.

132

F.    **The Commission Has Failed To Establish That Hunter's Conduct Was In Connection With The Purchase Or Sale Of Physical Natural Gas**

For all the reasons stated above regarding the Commission's failure to provide evidentiary support for its factual claims that the price of jurisdictional transactions are directly linked to the NYMEX settlement price, the Commission has failed to demonstrate the required element that Hunter's conduct was "in connection with the purchase or sale of [physical] natural gas."

## V.    The OSC Contains A Variety Of Other Miscellaneous False Or Irrelevant Allegations

The OSC contains a variety of other factual inaccuracies, unsupported innuendos, misreadings of the evidence and irrelevant allegations. While many do not appear to be legally relevant to the Commission's claim, to the extent that the Commission may rely on these in proceeding with an enforcement action, we wish to address a few examples here. We also refer the Commission to our Answer accompanying this Memorandum.

A.    **The OSC's References To Hunter's Alleged "Risky Behavior" Are Totally Inappropriate**

The Commission appears to be attempting to smear Hunter's character by making various vague allegations suggesting that Hunter was willing to take "risky" positions and implying that such an alleged willingness gives rise to the inference that Hunter was therefore willing to break the rules. (*See, e.g.,* OSC ¶¶ 39, 40, 126.) This tactic is totally inappropriate. Taking on market "risk"—something all traders do to varying degrees—has absolutely nothing to do with abiding by the law.

Yet the OSC contain a variety of allegations where these concepts are conflated through suggestion and innuendo. For example, the Commission asserts that Amaranth's "risk" personnel were not present in Amaranth's Calgary office. (OSC ¶ 39.) Further,

the Commission connects several unrelated facts: that Arora exited his prompt-month futures position as early as possible to avoid the "risks" of trading in the settlement, and that Arora expressed unspecified concerns about Hunter's natural gas trading to the fund's Chief "Risk" Officer (who supervised Hunter).  (OSC ¶ 40.)  In addition, the Commission makes reference to Hunter's "risky behavior" at his previous employer, Deutsche Bank.  (OSC ¶ 126.)

This type of innuendo unmistakably implies, without daring to explicitly allege, that Hunter's alleged willingness to assume price risk from other traders (and thereby risk gaining or losing money) should have forewarned Amaranth senior management that Hunter was somehow an untrustworthy person or someone who would recklessly or deliberately violate rules.  This inference is totally unreasonable and unwarranted.  Passing references to "risky behavior" do not suffice to stain a hitherto unblemished regulatory record.  (*See* Declaration of Brian Hunter, filed in *Hunter v. FERC,* ¶ 9, attached as Simonson Exhibir 25.)  They are simply irrelevant.[49]

Moreover, because this case is brought in the wake of Amaranth's well-known losses in September 2006, however, for the Commission to characterize Hunter's trading as "risky" (in the sense of taking on market risk) in the same breath as it alleges manipulation, is essentially to use Amaranth's market losses as a means of casting doubt on Hunter's integrity.  There is no justification for this juxtaposition, and the Commission offers none.  Indeed, it concedes that Amaranth's losses were "unrelated to [the alleged] violations."  (OSC ¶ 107.)

---

[49]    Hunter also disputes these allegations.

B.       **The OSC Provides No Valid Basis For Alleging An August 28, 2006 NYMEX Position Limit Violation**

Similarly, the Commission alleges that the fund exceeded its NYMEX position limits on two unrelated occasions. (OSC ¶¶ 129, 130.) Other than providing sensationalistic press clippings for the FERC, the relevance of these supposed violations to price manipulation is unclear: Neither is alleged to have occurred on the expiry dates; neither was allegedly deliberate; and neither was allegedly Hunter's doing. (*Id.*) Furthermore, Hunter has described how, after Amaranth's first inadvertent violation, he spoke to Amaranth's compliance officer, and put in place formal procedures designed to ensure that position limits would be upheld. (Tr. 11/17/06 at 29:17-8, 40:22.)[50]

Moreover, the Commission claims that on August 28, 2006 Hunter exceeded Amaranth's NYMEX prompt-month position limit "by almost 9,000 combined futures and futures-equivalent contracts." (OSC ¶ 130.) That allegation is flatly false. When reconciling positions the next morning, Amaranth and JPMorgan both agreed that the fund held a net NYMEX position of only (1,324.5) prompt lots. (AALLC_REG-0127076.)[51] That number is well within the 2,500-lot NYMEX limit applied by the Commission and thus hardly provides evidence that "Hunter trade[d] at his discretion with minimal supervision." (*See* OSC ¶ 130.)

These discrepancies are especially troubling because they prove one of two things: Either the position reports on which the Commission has relied in raising its

---

[50]       The Commission also implies that Hunter was involved in a misrepresentation to NYMEX regarding the prerequisites for Amaranth's position limit exemptions. (*See* OSC ¶¶ 38-39.) But it does not allege that Hunter knew anything about the process of obtaining such exemptions or the conditions under which they were granted. (*Id.*)

[51]       This figure is the composed of (6,721) NG futures and 5,396.5 NN swaps, measured in futures-equivalent lots. AALLC_REG_0127076; *see also* AALLC_REG_0127073. By contrast, using the same measure, the Commission concludes that Amaranth's net September 2006 position on NYMEX was (11,391) lots, composed of (6,721) NG futures and (4,670) NN swaps. (OSC ¶ 130 n.201.) In making its allegations, the Commission thus appears to have misaccounted for (10,066.5) swaps.

allegations are not trustworthy, or else the Commission has misinterpreted the data it has been given by some (10,066.5) short prompt-month lots.  Regardless of the cause of the error, it would be unreasonable for the Commission to continue to rely upon its estimates of Amaranth's positions in a case where its "clearest" evidence of manipulation concerns a day when Hunter does not recall the existence of the (10,056.5) short prompt-month lots that supposedly motivated his conduct.  (*See* OSC ¶¶ 63, 81.)

## VI.    **Due Process Requires A Trial Before Any Finding Of Liability By The Commission**

For reasons set forth above and in Hunter's Answer, the Commission should dismiss its claim: first, because the Commission lacks jurisdiction; and second, if it nevertheless proceeds, because the Commission's claim fails on the merits.  If the Commission declines to take either of those actions, however, then the only permissible course of action is for the Commission to set all disputed allegations for a trial, with full discovery, before an impartial judge for a decision on the merits and not issue an order adverse to Hunter based solely on its heretofore "paper hearing," as suggested by the Commission in its Order to Show Cause.  (OSC ¶ 4, n.7.)

The Commission has no basis to find Hunter liable at this procedural juncture for market manipulation based solely on the unsworn Order to Show Cause, without an evidentiary hearing following full discovery.  *See United States v. Menendez*, 48 F.3d 1401, 1414 (5th Cir. 1995) (holding that agency could not rely on unsworn allegations to meet its burden of showing liability).  The Commission bears a "weighty burden in justifying a denial of an evidentiary hearing."  *General Motors Corp. v. FERC,* 656 F.2d 791, 798 (D.C. Cir. 1981).  Moreover, the Commission's regulations, consistent with mandates of due process, require an evidentiary hearing "when a genuine issue of

material fact exists." *Cajun Electric Power Coop. v. FERC*, 28 F.3d 173 (D.C. Cir. 1994)

(quoting *Vermont Dept. of Public Service v. FERC*, 817 F.2d 127, 140 (D.C. Cir. 1987)).

Case law is clear that, when "motive, intent or credibility is at issue or there is a dispute

over a past event," the Commission may not resolve factual issues solely based on the

written record. *Union Pacific Fuels v. FERC*, 129 F.3d 157, 164 (D.C. Cir. 1997).[52]

       In this case, a trial is required because factual issues as to motive, intent and

credibility are each in dispute. Indeed, one of the core factual disputes is *why* Hunter

allegedly made the trades that he did (as well as what his state of mind was with respect

to the physical gas market). This is the classic type of dispute that requires a trial.

Indeed, the Commission relies heavily on the untested deposition testimony of other

witnesses. For example, the Commission devotes no less than five paragraphs (OSC ¶¶

68-69, 72-74) and several footnotes to the colorful testimony of Eric Bolling about the

supposed impact that ALX's trades had on the NYMEX floor. The Commission also

cites the purported deposition testimony of several Amaranth employees for the

proposition that they acknowledged the "close relationship between the futures and

physical markets and the importance of the NG Futures Contract as a price benchmark for

substantial volumes of physical natural gas." (OSC ¶ 112.) This testimony is key to the

Commission's claim. It should be tested in the crucible of cross examination.

       Furthermore, a trial with full discovery is necessary because the Commission has

yet to produce information critical to Hunter's ability to test the Commission's theory of

---

[52]     This requirement stems from the Commission regulations (18 C.F.R. § 385.505 ("[A] participant has the right to present such evidence . . . and *to conduct such cross-examination, as may be necessary to assure true and full disclosure of the facts* . . .") (emphasis added)), the NGA (15 U.S.C. § 717t-1(b) (requiring that civil penalties "be assessed by the Commission after notice and opportunity for public hearing")), the APA (5 U.S.C. § 556(d) ("[a] party is entitled to present his case or defense by oral or documentary evidence . . . and to conduct such cross-examination as may be required for a full and true disclosure of the facts.") (emphasis added)), and the Constitution , *see generally Mathews v. Eldridge*, 424 U.S. 319 (1976)).

its case.   The Commission references numerous sources, including witness deposition transcripts, and expert reports to support its claims.   However, Hunter has not had access to any of these documents.   For instance, the Commission's theory that Hunter's alleged trades actually had an impact on the settlement price is based heavily on the conclusions of Dr. Kaminski.   Hunter should have the opportunity to test that analysis.   However, Hunter is not been privy to any of the transcripts of interviews conducted by Commission Staff, or the report of, and underlying data supporting, Dr. Kaminski's opinions. Accordingly, Hunter invokes his due process right to a full trial-type hearing with the opportunity for meaningful discovery and cross-examination so that he is properly afforded the opportunity to test the Commission's case and have the factual issues as to motive, intent and credibility adequately resolved, before any finding of liability by the Commission.

## VII.    The Proposed Penalties In The Show Cause Order Far Exceed The Commission's Authority

The penalties threatened by the OSC far exceed the Commission's statutory authority.   The Commission proposes to levy civil penalties of $30 million against Hunter.   However, under the NGA, a violator of the anti-manipulation rule "shall be subject to a civil penalty of not more than $1,000,000 per day per violation for as long as the violation continues."   15 U.S.C. § 717t-1 (emphasis added).   Despite the plain language of the enabling state, the Commission claims that there is no "formula" guiding the assessment of civil penalties nor any guidelines for "count[ing]" violations, because "the facts and circumstance of each case" brought under Order 670 must be considered independently. (OSC ¶ 115.)

It strains credulity, however, to suggest, as the Commission does, that the OSC properly alleges 219 separate violations of the NGA, one for each "individual floor transaction." (OSC ¶ 116.) Indeed, it is clear that the Commission alleges only three individual violations of the NGA—one for each allegedly manipulated NYMEX settlement price (*see, e.g.,* OSC ¶ 5)—thus authorizing a maximum civil penalty of $3 million. In alleging 219 violations, the Commission has ignored the relevant law.

The OSC provides for $30 million in proposed penalties against Hunter based on a number of vague and unsubstantiated considerations, including the apparent desire to prevent Hunter from "easily recovering" (OSC ¶ 137) from a judgment against him, Hunter's personal net worth (OSC ¶ 135), and incorrect allegations concerning Hunter's alleged lack of cooperation with the Commission's investigation (*see* OSC ¶ 135, n.204), which is discussed further below. The Commission's proposed penalties simply do not comport with the nature of the allegations discussed in the OSC.

The allegation at the heart of the OSC is that "Amaranth and its traders Hunter and Donohoe intentionally manipulated the settlement price of the NG Futures Contract" (OSC ¶ 6 (emphasis added)) and therefore "recklessly manipulated prices in connection with Commission-jurisdictional transactions." (Id.) In fact, because the OSC alleges that the "NG Futures Contract settlement price determines the price of a substantial proportion of Commission-jurisdictional transactions" (OSC ¶ 20), Hunter is accused of having traded in such a way as to have lowered prices in Commission-jurisdictional artificially via three lowered NYMEX settlement prices in early 2006. Otherwise, for the Commission to properly seek civil penalties for 219 separate floor transactions, it would have to show how each separate transaction independently affected the NYMEX

settlement price in an artificial fashion, and in turn affected Commission-jurisdictional transactions. (*Compare, e.g.,* OSC ¶ 58, in which the Commission claims that it was the general "selling activity" of ALX, rather than individually-placed transactions by Hunter that "in one manner or another, disseminated to the pit that Amaranth would be a large seller.") Since it cannot and has not met this burden (failing even to describe each individual trade placed by Amaranth), the Commission may only seek $3 million in penalties, one for each of the allegations of manipulation that is described in the OSC.

The Commission's calculation of 219 separate "violations" also stands in stark contrast to relevant precedent from the securities context. Under this precedent, Section 10(b) prohibits and punishes the use of any "fraudulent device, scheme or artifice," rather than individual transactions. *See, e.g., SEC v. McCaskey*, 2002 WL 850001, at *13 (S.D.N.Y. Mar. 26, 2002) (finding only one Section 10(b) "violation" even though the "stock manipulation scheme involved wash sales and matched orders conducted through 22 accounts held in misleading names or the names of nominees at 14 different firms" and the defendant's alleged fraudulent behavior "represented a continuing course of wrongful conduct lasting approximately seven months"); *SEC v. Tanner*, 2003 WL 21523978, at *2 (S.D.N.Y. July 3, 2003) (court fined defendant for one "violation" based on alleged scheme over nine months to control the market supply of a certain stock, to create artificial demand for the stock, and to create the appearance of market activity in the stock). The EPAct, which contains identical language to Section 10(b), similarly authorizes civil penalties based on actual "violations" of law, as opposed to individual transactions that, when viewed collectively, purportedly constitute such a violation. *See* OSC ¶ 49; 17 C.F.R. § 240.10b-5 (1995). At most, therefore, the Commission alleges

that Hunter committed three violations of the NGA on three separate days.  Thus, the maximum civil penalty based on the allegations here thus is $3 million, not $30 million as alleged.

## VIII.    Any Assessment Of Penalties Should Be Mitigated by Hunter's Cooperation

Any assessment of penalties should be mitigated by the fact that throughout the Commission's investigation, Hunter's cooperation has been exemplary.  By statute, the Commission must consider this in assessing penalty amounts.  (OSC ¶ 119-120; *see also* EPAct 2005 § 314(b), codified at 15 U.S.C. 717t-1(c).)[53]  Despite residing in a foreign country, Hunter voluntarily flew thousands of miles and sat for three depositions at which the Commission was either present and had an opportunity to ask questions (as on November 11 and November 17, 2006) or had access to the transcript (as on June 15, 2007).  Each of these depositions lasted several hours.  Hunter answered every question asked of him at these depositions.  Hunter could have required the Commission to go through the long and arduous process of serving subpoenas on him via letters rogatory, but he did not.  Moreover, through his corporate counsel at Amaranth, he has provided "millions of bytes" (OSC ¶ 64) of trading and message data to the Commission.  Even the Commission concedes that Hunter's cooperation was "acceptable," at least until "of late." (OSC ¶ 135.)

The Commission is wrong in suggesting that Hunter's cooperation became "unacceptable" as "of late."  The Commission's sole support—an allegation that Hunter "refus[ed] voluntarily to complete his testimony" (OSC ¶ 135)—completely mischaracterizes the facts.  What actually happened was as follows: in advance of a

---

[53]    Consideration of a respondent's cooperation is also consistent with the Commission's practice, as well as the practice of other federal agencies.   (Enforcement of Statutes, Orders, Rules, and Regulations, 113 FERC ¶ 61,068 at 6-9.)

voluntary deposition scheduled for May 9, 2007, Hunter flew six hours from his home in Calgary to New York with the sole purpose of appearing for this voluntary deposition mainly for the FERC's benefit. (Hunter Decl. ¶ 23.) He arrived ready to answer under oath any questions put to him by the Commission, the CFTC and the SEC. (*Id.* ¶ 24.) That morning, a videographer arrived at the conference room where the deposition was to take place. (Child Decl. ¶ 3.) Hunter's attorney, Michael S. Kim ("Kim"), requested that the deposition not be videotaped, as Hunter was concerned that any media attention to his visual depiction could endanger him or his family (as he was aware of threatening communications relating to losses at Amaranth). (*Id.* ¶ 6.) Despite these concerns, the Commission's staff attorney, Todd Mullins, Esq., told Hunter's attorney that he wanted the deposition videotaped as it would provide "superior impeachment material." (*Id.* ¶ 8.)

This remark clearly indicated that, even as the Commission was claiming to conduct an impartial investigation to persuade Hunter to provide testimony voluntarily, in fact the Commission had already pre-determined that it would bring an enforcement action against Hunter, and that the purpose of the deposition was to gather statements and evidence to use against him. Indeed, Mullins admitted that the Commission was already "very close" to deciding to bring an enforcement action and told Kim that deposing Hunter was the "last thing" the Commission needed to do before proceeding further. (*Id.* ¶ 10.) Mr. Mullins also conveyed that the Commission believed it already possessed the "strong evidence" of manipulation necessary to take this view. (*Id.*) Thus, the Commission conveyed that it had already completed its investigation with the exception of this final step of gathering some "impeachment material" against Hunter. Indeed, the Commission has claimed that, in its view, it had "already gathered" a "vast body of

142

inculpatory evidence" and that the Commission believes it did not actually need to take the step of subpoenaing Hunter.  (OSC ¶ 135 n.204.)

Thus, Hunter refused to provide voluntary statements to the Commission occurred only *after* the Commission made clear that it had *already effectively decided* that it would bring an enforcement action, that its investigation was effectively complete, and that its purpose in continuing to ask Hunter questions was to gain potential impeachment material for such an action.

The Commission is also flatly wrong when it alleges that Hunter also "subsequently refused voluntarily to give further sworn testimony, agreeing only to be interviewed not under oath." (*Id.*).  As the Commission itself admits, even after the incident described above, Hunter voluntarily flew from Calgary to New York to provide additional deposition testimony (which was under oath).  (OSC ¶ 135 n.204.)  This deposition was given in front of the CFTC, an agency that had not indicated that it had already decided that Hunter had violated its laws.  Furthermore, the Commission was provided a transcript of that deposition.  (OSC ¶ 135 n.204.)

In short, Hunter has fully cooperated with all agencies who were investigating whether he violated any laws.  He only ceased giving voluntary statements to the Commission once the Commission indicated that it was no longer investigating but rather simply seeking impeachment material to use in an enforcement action.  Under those circumstances, providing any further voluntary statements would have been absurd, and if this matter were to proceed further, the Commission should make available all files and internal communications from which Hunter's attorneys could determine whether in fact

the Commission enforcement staff had already pre-judged the case as of May 9, 2007, and was in effect abusing its investigatory powers to prepare for litigation.

## IX.    Hunter Is Entitled To A Trial *De Novo* In Federal District Court Before Any Imposition of Civil Penalties

Even if the Commission found Hunter liable for the alleged violation, he would be entitled to a *de novo* trial in federal court before any civil penalties could be imposed.  As a threshold matter, federal district courts have original jurisdiction over the determination of civil penalty liability.  *See* 28 U.S.C. § 1331.  Moreover, the statutory provisions of the NGA explicitly require that any civil penalty liability be determined in a *de novo* trial in federal district court.

Specifically, the plain language of sections 22 and 24 of the NGA require that civil penalty liability be adjudicated in federal district court.  Section 22 of the NGA, entitled "Civil Penalty Authority", provides that "[t]he penalty shall be assessed by the Commission after notice and opportunity for *public hearing*." 15 U.S.C. § 717t-1 (emphasis added).  Although section 22 raises the question of what type of "public hearing" suffices to satisfy the NGA, section 24 answers that question.  Pursuant to section 24, federal district courts have *exclusive jurisdiction* over actions to enforce liabilities created by the NGA (*i.e.*, the civil penalties provided for in section 22).[54]  Thus, sections 22 and 24 of the NGA require that, before the Commission seeks to impose any

---

[54]    Section 24 provides that "[t]he District Courts of the United States … shall have exclusive jurisdiction of violations of this Act or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law, brought to enforce *any liability or duty created by*, or to enjoin any violation of, this Act or any rule, regulation, or order thereunder." 15 U.S.C. § 717u.  The civil penalties set forth in section 22 of the NGA constitute such "liability" created by the Act.  Further, as section 24 provides for "exclusive jurisdiction", the standard in federal district court should be *de novo* review.  *See Chandler v. Roudebush*, 425 U.S. 840, 862 (1976) (holding that even though the Civil Rights Act of 1964 ("Act") did not specifically mention "*de novo*" review for federal employees' claims under the Act, the Court nonetheless found that Congress intended for the right of a trial *de novo* due to the "'specific statutory authorization' of a district court 'civil action'").

penalty against Hunter, he be permitted to have any potential civil penalty liability—including whether he violated any legal requirements, whether there should be any penalties, and, if so, what amount—adjudicated in a *de novo* trial in federal district court.[55]

In addition, courts have found that *de novo* civil penalty procedures are proper where, as here, the administrative agency acts as both prosecutor and judge. *See NRC v. Radiation Technology, Inc.*, 519 F. Supp. 1266, 1286 (D. N.J. 1981). Such a checks-and-balances approach is particularly warranted here given that the Commission seeks millions of dollars in penalties. Ultimately, therefore, the Commission is precluded from unilaterally imposing any civil penalties levied against Hunter in the absence of a *de novo* judicial review.

Sound policy considerations further emphasize this point. In the context of a contested enforcement proceeding, the Commission has not yet exercised its significant new authority, bestowed upon it by Congress, which allows the Commission to seek such substantial penalties. Thus, in doing so, it is imperative that the Commission strive to ensure the utmost integrity in the decisional and adjudicatory process, consistent with statutory requirements. A *de novo* federal district court forum ensures that the Commission will not seek an unfair home court advantage by adjudicating substantial civil penalties itself followed by a claim of substantial deference on judicial review.

---

[55]     This conclusion also tracks corresponding language in the Commission's other organic statutes (*i.e.*, the Natural Gas Policy Act and the Federal Power Act). Construing section 24 of the NGA as providing a right to *de novo* review also is consistent with the long-standing approach that Congress has taken generally with respect to penalties. *See* 28 U.S.C. § 1335(a) ("district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty or forfeiture, pecuniary or otherwise, incurred under any Act of Congress").

145

The Commission, further, must recognize Hunter's right to have any civil penalty liabilities adjudicated in a *de novo* trial in federal district court in order to satisfy minimum levels of due process in this case. In *Mathews*, 424 U.S. at 333, the U.S. Supreme Court articulated a balancing test to determine whether administrative procedures comply with the constitutional requirements of due process. The test requires the balancing of factors which include the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, the probable value of additional or substitute safeguards, and the burden on the government. *Id.* As discussed herein, the private interests at issue in this case are significant. Indeed, the Commission is seeking is seeking $30 million in penalties from Hunter). Moreover, the risk of erroneous deprivation is substantial given the appearance, if not reality, that the Commission has prejudged this case.[56] Finally, the administrative burden of adjudicating civil penalty liability in federal district court instead of through an agency hearing is minimal when considering the alternative. Thus, applying each of the *Mathews* factors in this case dictates that, consistent with due process requirements, Hunter must be permitted to have any potential civil penalty liability adjudicated in a trial *de novo* in federal district court.

In sum, if the Commission proceeds to any assessment of civil penalty liability against Hunter, it must institute an action in federal district court where the case can be adjudicated by trial *de novo*. By depriving Hunter of this critical adjudicatory step of the

---

[56]     "What we're doing is we're acting to sanction manipulation of futures that affected FERC jurisdictional transactions." 7/31/2007 Transcript of interview with FERC Chairman Kelliher, available at http://www.eenews.net/tv/transcript/654;, attached as Exhibit 24 to the Simonson Decl.; "We did not conclude that there was any attempt to manipulate physical gas sales by Amaranth, but that physical gas customers were harmed by manipulation that occurred in the futures that affect prices of physical gas sales." Craig S. Cano, *Kelliher Offers Inside Look at Enforcement Cases, Rallies Support in Turf War with CFTC,* Inside FERC, November 19, 2007, at 14, attached as Exhibit 25 to the Simonson Decl.

process, the Commission would violate both the applicable statutory schemes and the mandates of due process.

\*     \*     \*

### Conclusion

For the foregoing reasons, the Commission should immediately stop the proceedings in this matter and dismiss the charges in the Order to Show Cause.

Dated: December 14, 2007
      New York, New York

                      Respectfully submitted,

                      KOBRE & KIM LLP

          By:       _/s/ Michael S. Kim____

                      Michael S. Kim
                      Matthew I. Menchel
                      Leif T. Simonson
                      Zaharah R. Markoe
                      800 Third Avenue
                      New York, New York 10022
                      Tel: 212.488.1200
                      Fax: 212.488.1220
                      E-mail:michael.kim@kobrekim.com
                             matthew.menchel@kobrekim.com
                             leif.simonson@kobrekim.com
                             zaharah.markoe@kobrekim.com

                      Justin V. Shur
                      1919 M Street, N.W.
                      Washington, D.C. 20036
                      Tel: 202.664.1900
                      Fax: 202.664.1920
                      E-mail: justin.shur@kobrekim.com

                      *Counsel for Brian Hunter*

147

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Amaranth Advisors L.L.C.
Amaranth LLC
Amaranth Management Limited
Partnership
Amaranth International Limited
Amaranth Partners LLC                          Docket No. IN07-26-000
Amaranth Capital Partners LLC
Amaranth Group Inc.
Amaranth Advisors (Calgary) ULC
Brian Hunter
Matthew Donohoe

**ENUMERATED RESPONSE OF**
**BRIAN HUNTER**
**TO ORDER TO SHOW CAUSE AND**
**NOTICE OF PROPOSED PENALTIES**

The Federal Energy Regulatory Commission's July 26, 2007 Order to Show

Cause and Notice of Proposed Penalties (the "Order to Show Cause," or "OSC") requires

that Brian Hunter ("Hunter") "to the extent practicable, admit or deny, specifically and in

detail, each material allegation of [the] order and set forth every defense relied upon."

(OSC ¶ 4, n.7)  In the Answer filed herewith, Hunter has complied with this directive by

providing a detailed analysis of all material allegations in the Order to Show Cause,

including identification of factual errors and flaws in the Commission's theories and

analyses, as well as identification of applicable defenses.  Neither the Order to Show

Cause nor the Commission's regulations require a paragraph-by-paragraph response to

the Order to Show Cause — similar to the type of enumerated answer typically filed in a

federal district court proceeding.  Nevertheless, Hunter is providing this Enumerated

Response as a supplement to his Answer to assist the Commission and to ensure that each material allegation in the Order to Show Cause is addressed. Hunter does not attempt to replicate here the detailed analysis that is included in his Answer. Rather, this Enumerated Response is intended to set forth Hunter's position with respect to the material allegations in the Order to Show Cause. We refer the Commission to Hunter's contemporaneously filed Answer for a detailed critique of the material allegations that Mr. Hunter contests, as well as the factual and methodological errors in the Order to Show Cause, including errors in underlying data as well as analysis.

Respondent Brian Hunter, by and through his attorneys, Kobre & Kim LLP, as and for an enumerated response to the Order to Show Cause and Notice of Proposed Penalties dated July 26, 2007, alleges as follows:

1.      The allegations contained in paragraph 1 of the Order to Show Cause are legal conclusions to which no response is required. To the extent that a response is required, Hunter denies that he violated section 1c.1 of FERC's regulations, which prohibits the manipulation of natural gas prices. Therefore, Hunter further denies that he should be assessed civil penalties and required to disgorge unjust profits plus interest.

2.      Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 2 of the Order to Show Cause, except denies the allegations related to manipulation of Commission-jurisdictional prices.

3.      The allegations contained in paragraph 3 of the Order to Show Cause are legal conclusions to which no response is required. To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to

the allegations in paragraph 3, except admits that Congress enacted the Energy Policy Act of 2005.

4.      The allegations contained in paragraph 4 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Hunter denies knowledge or information sufficient to form a belief as to the allegations in paragraph 4 of the Order to Show Cause, except denies the alleged wrongdoing and admits that he presented evidence and argument prior to the issuance of this order, both orally and in writing.

5.      Respondent denies the allegations in paragraph 5 of the Order to Show Cause as they pertain to him, except admits that it appears that the Commission has reached certain conclusions regarding him.

6.      The allegations contained in paragraph 6 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Hunter denies the allegations in paragraph 6 of the Order to Show Cause as they relate to him.

7.      The allegations contained in paragraph 7 of the Oder to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 7 of the Order to Show Cause related to the existence of a manipulative scheme.  Respondent admits that Amaranth suffered losses and ceased operations in the fall of 2006.

8.      The allegations contained in paragraph 8 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is

3

required, Respondent denies that the Commission has authority over him or over this matter, and denies that any violations occurred or that any civil penalty is warranted.

9.     Respondent admits the allegations in paragraph 9 of the Order to Show Cause, except denies all allegations regarding manipulation, denies that all "swaps" derive their value based on the "settlement price" of the NG Futures Contract for a given month, and denies knowledge or information sufficient to form a belief as to the definition of Commission-jurisdictional wholesale natural gas sales and the effect of the NG Futures Contract settlement price on the price of Commission-jurisdictional wholesale natural gas sales.

10.     Respondent admits the allegations in paragraph 10 of the Order to Show Cause, except denies knowledge or information sufficient to form a belief as to whether and how many market participants view NG Futures Contract pricing as a reliable price signal for the purpose of transacting or planning for natural gas sales.

11.     Respondent admits the allegations in paragraph 11 of the Order to Show Cause, except denies knowledge or information sufficient to form a belief as to how the bidding on the NYMEX's trading floor appears.

12.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 12 of the Order to Show Cause, except admits that the NYMEX "pit" is an efficient market clearing environment.

13.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 13 of the Order to Show Cause.

14.     Respondent admits the allegations in paragraph 14 of the Order to Show Cause.

15.     Respondent admits the allegations in paragraph 15 of the Order to Show Cause, except denies that the price for the gas that goes to delivery is the settlement price of the NG futures contract and denies knowledge or information sufficient to form a belief as to height of open interest during the life of the contracts for the contract months in question.

16.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 16 of the Order to Show Cause, but denies that "most" market participates prefer to avoid trading during the settlement period and that market liquidity and open interest are "decreasing" during the settlement period.  Respondent admits that locals are one of the categories of market participants that provide liquidity as the contract proceeds to termination and that some locals also act as brokers for large institutional clients.

17.     Respondent admits the allegations in paragraph 17 of the Order to Show Cause.

18.     Respondent admits the allegations in paragraph 18 of the Order to Show Cause.

19.     Respondent admits the allegations in paragraph 19 of the Order to Show Cause.

20.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 20 of the Order to Show Cause.

21.     Respondent admits that *Platt's* and *Natural Gas Intelligence* publish monthly indices that are calculated as described in paragraph 21 of the Order to Show

Cause. Respondent denies knowledge or information sufficient to form a belief as to the other allegations in paragraph 21.

22.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 22 of the Order to Show Cause.

23.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 23 of the Order to Show Cause.

24.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 24 of the Order to Show Cause.

25.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 25 of the Order to Show Cause.

26.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 26 of the Order to Show Cause.

27.     The allegations contained in paragraph 27 of the Order to Show Cause are legal conclusions to which no response is required. To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 27 of the Order to Show Cause.

28.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 28 of the Order to Show Cause.

29.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 29 of the Order to Show Cause.

30.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 30 of the Order to Show Cause, except denies that as of May 1, 2006 he was employed by Amaranth Group Inc.

31.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 31 of the Order to Show Cause.

32.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 32 of the Order to Show Cause.

33.    Respondent admits the allegations in paragraph 33 of the Order to Show Cause, except Hunter denies knowledge or information sufficient to form a belief as to the legal or corporate relationship between Amaranth Advisors (Calgary) ULC and Amaranth Advisors, and denies knowledge or information sufficient to form a belief as to the reasons that Amaranth established Amaranth Advisors (Calgary) ULC.

34.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 34 of the Order to Show Cause, except admits that Amaranth suffered significant losses in September 2006 and is in the process of dissolution.

35.    Respondent admits the allegations in paragraph 35 of the Order to Show Cause, except denies the existence of manipulative trading at Amaranth.

36.    Respondent admits the allegations in paragraph 36 of the Order to Show Cause, except denies knowledge or information sufficient to form a belief as to the accuracy of the quote from Matthew Donohoe's deposition testimony.

37.    Respondent admits the allegations in paragraph 37 of the Order to Show Cause, except denies that he disliked reporting to Arora, that he first managed his own trading book separate from Arora's beginning in the summer of 2005, and that Amaranth allowed Hunter to increase the size of his natural gas positions.

38.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 38 of the Order to Show Cause.

39.     Respondent admits the allegations in paragraph 39 of the Order to Show Cause, but denies knowledge and information sufficient to form a belief as to representations Amaranth made to the NYMEX to obtain position limit exemptions.

40.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 40 of the Order to Show Cause, except admits that by the end of March 2006 Arora had left Amaranth and that his energy trading book had been a source of profitability in 2005.   Hunter denies that he and Arora had different views on trading NG Futures during the settlement period and that Amaranth senior management "took a rather hands off approach to overseeing [his] trading operation."

41.     The allegations contained in paragraph 41 of the Order to Show Cause are legal conclusions to which no response is required.   To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 41 of the Order to Show Cause.

42.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 42 of the Order to Show Cause.

43.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 43 of the Order to Show Cause.

44.     The allegations contained in paragraph 44 of the Order to Show Cause are legal conclusions to which no response is required.   To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 44.

45.     The allegations contained in paragraph 45 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 45.

46.     The allegations contained in paragraph 46 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 46.

47.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 47 of the Order to Show Cause, except denies that trading in the NG Futures Contract sets the settlement price for physical gas that "goes to delivery."

48.     The allegations contained in paragraph 48 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 48.

49.     The allegations contained in paragraph 49 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 49.

50.     The allegations contained in paragraph 50 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is

required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 50.

51.    The allegations contained in paragraph 51 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 51.

52.    Respondent denies knowledge or information sufficient to form a belief as to allegations in paragraph 52 of the Order to Show Cause.

53.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 53 of the Order to Show Cause, except admits that he provided Investigations with various information, memoranda, and/or documents during the course of its investigation.

54.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 54 of the Order to Show Cause.

55.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 55 of the Order to Show Cause.

56.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 56 of the Order to Show Cause as they relate to other respondents in this matter.  Respondent admits having been notified of Staff's conclusions, and that he provided written and oral responses to those conclusions prior to the issuance of the Commission's Order to Show Cause.

57.    The allegations contained in paragraph 57 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is

required, Respondent denies the allegations in paragraph 57 of the Order to Show Cause to the extent that they allege Respondent engaged in manipulative conduct or had any manipulative intent.

58.     The allegations contained in paragraph 58 of the Order to Show Cause are legal conclusions to which no response is required.   To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 58 of the Order to Show Cause, except denies that Amaranth traded in a manner that had the effect of driving down the NG Futures Contract settlement price, and denies that he had any manipulative intent.

59.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 59 of the Order to Show Cause, except denies that liquidity diminishes rapidly on the termination day, but admits that the amount of "open interest" diminishes during the final thirty minutes of the termination day.

60.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 60 of the Order to Show Cause, but admits that errors in monitoring the position in the prompt-month NG Futures Contract can result in unwanted physical delivery obligations.

61.     Respondent denies the allegations in paragraph 61 of the Order to Show Cause, except admits that the settlement price is a volume-weighted average price.

62.     Respondent denies the allegations in paragraph 62 of the Order to Show Cause, except denies knowledge or information sufficient to form a belief as to the Commission's preliminary findings.

63.    Respondent admits the allegations in paragraph 63 of the Order to Show Cause as they relate to him, except denies the allegations to the extent that they allege any manipulation or manipulative intent.  To the extent that the allegations in paragraph 63 of the Order to show Cause relate to other respondents, Mr. Hunter denies knowledge or information sufficient to form a belief as to those allegations.

64.    Respondent denies the allegations in paragraph 64 of the Order to Show Cause, except admits that he communicated with other Amaranth traders and traders at other firms via instant messages, and admits that one definition of "Market on Close" is to sell during the settlement period.

65.    Respondent denies the allegations in paragraph 65 of the Order to Show Cause, except admits that he had numerous instant message conversations with Mr. Donohoe, that he instructed Donohoe to buy March NG Futures Contracts before the close so that Amaranth would have contracts to sell during the close, and that Amaranth purchased approximately 4,800 March NG Futures Contracts on February 24, 2006, ending with a long position prior to the expiry period.

66.    Respondent admits the allegations in paragraph 66 of the Order to Show Cause, except denies the allegations that he intended to engage in manipulation and denies that Donohoe "asked whether he should get more."

67.    Respondent denies the allegations in paragraph 67 of the Order to Show Cause, except admits that the instant message referenced therein exists and that he spoke with Vincent Rufa, one of ALX's phone clerks, in advance of the expiry period on February 24, 2006.

68.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 68 of the Order to Show Cause.

69.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 69 of the Order to Show Cause.

70.    Respondent denies the allegations in paragraph 70 of the Order to Show Cause, except admits that he had electronic communications with Matthew Calhoun and Bart Glover and that the letter "H" is the market nomenclature for the March NG Futures Contract.

71.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 71 of the Order to Show Cause, except admits that Donohoe carried out his instructions to sell all of the NG Futures Contracts during the close, but denies being entirely indifferent to the price received for those contracts and denies the accuracy of the definitions of an "MoC" order and a "market order."

72.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 72 of the Order to Show Cause.

73.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 73 of the Order to Show Cause.

74.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 74 of the Order to Show Cause.

75.    Respondent denies the allegations in paragraph 75 of the Order to Show Cause, except admits that he corresponded with Donohoe during the expiry period.

76.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 76 of the Order to Show Cause, except admits that

Amaranth sold approximately 3,000 contracts during the February 24, 2006 settlement period.

77.    The allegations contained in paragraph 77 of the Order to Show Cause are legal conclusions to which no response is required.    To the extent that a response is required, Respondent denies the allegations as stated in paragraph 77 of the Order to Show Cause, except admits that on February 24, 2006, Amaranth maintained short positions in the "prompt-next" or April NG Futures Contract; the prompt-month contract and the prompt-next NG Futures Contact are generally similar as to their fundamentals; the settlement price for the prompt-next NG Futures Contract is based on only the last two minutes of the settlement period, but that price is not a final settlement price because those NG Futures Contracts have not yet terminated; and these settlement prices establish the relative value of each contract versus the prompt month contract, and are the basis for determining marked-to-market values for these instruments.

78.    Respondent denies the allegations in paragraph 78 of the Order to Show Cause, except denies knowledge or information sufficient to form a belief as to Amaranth's short position on February 24, 2006.

79.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 79 of the Order to Show Cause.

80.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 80 of the Order to Show Cause, except denies that any manipulation occurred.

81.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 81 of the Order to Show Cause, except denies that he engaged in any sort of manipulation.

82.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 82 of the Order to Show Cause.

83.    The allegations contained in paragraph 83 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 83 of the Order to Show Cause, except denies that he engaged in any manipulation.

84.    The allegations contained in paragraph 84 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations contained in paragraph 84.

85.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 85 of the Order to Show Cause, except denies any implication that he intended to engage in any manipulation, and denies that any manipulation occurred.

86.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 86 of the Order to Show Cause.

87.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 87 of the Order to Show Cause.

88.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 88 of the Order to Show Cause, except denies the implication that he engaged in any manipulation.

89.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 89 of the Order to Show Cause, except denies that he intended to drive down the settlement price.

90.     Respondent denies the allegations in paragraph 90 of the Order to Show Cause, except admits, as noted in footnote 149, that he was on vacation in Asia at the end of March 2006.

91.     The allegations contained in paragraph 91 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 91.

92.     Respondent denies the allegations in paragraph 92 of the Order to Show Cause, except denies knowledge or information sufficient to form a belief as to the contents and accuracy of the vaguely referenced trade and position data, "a few documents which capture communications between Calgary traders and managers in Greenwich", and any taped conversations between Donohoe and brokers on the NYMEX trading floor.

93.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 93 of the Order to Show Cause, except admits that he communicated with David Chasman on April 26, 2006.

94.     Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 94 of the Order to Show Cause.

95.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 95 of the Order to Show Cause.

96.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 96 of the Order to Show Cause, except denies that there is no legitimate explanation or business justification to trade until the settlement period or the final minutes of the settlement period, denies that he had any manipulative intent, and denies that there is vanishing liquidity towards the end of the settlement period.

97.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 97 of the Order to Show Cause, except admits that over time, Amaranth built a long position of May NG Futures Contracts.

98.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 98 of the Order to Show Cause, except denies that any manipulation occurred.

99.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 99 of the Order to Show Cause, except denies that any manipulation occurred.

100.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 100 of the Order to Show Cause, except denies the implication that he had any manipulative intent, but admits that Amaranth engaged in some options trading during the last two trading days for the May NG Futures Contract.

101.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 101 of the Order to Show Cause, except denies the implication that any manipulation occurred.

102.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 102 of the Order to Show Cause, except denies that any manipulation occurred.

103.    The allegations contained in paragraph 103 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent admits that Amaranth sent a letter to NYMEX dated August 15, 2006 in response to an inquiry from NYMEX dated August 2, 2006, except denies that he wrote and/or approved the letter dated August 15, 2006, and denies knowledge or information sufficient to form a belief as to the other allegations in paragraph 103 of the Order to Show Cause.

104.    Respondent denies the allegations contained in paragraph 104 of the Order to Show Cause, except admits that his trading of the May NG Futures Contact on April 26, 2006 was related to Amaranth's desire to reduce its overall Summer-Winter spread position, and denies knowledge or information sufficient to form a belief regarding the testimony of any other Amaranth trader.

105.    The allegations contained in paragraph 105 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies that he intended to provide inaccurate or false information to or conceal information from the NYMEX and denies knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 105 of the Order to Show Cause.

106.    The allegations contained in paragraph 106 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations contained in paragraph 106.

107.    The allegations contained in paragraph 107 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent admits the allegations in paragraph 107 of the Order to Show Cause, except denies that he committed any violation, the implication that he was involved in any manipulation, and the implication that Calgary traders were not always under actual supervision by Amaranth management.  To the extent that the allegations in paragraph 107 relate to others, Hunter denies knowledge or information sufficient to form a belief as to those allegations.

108.    The allegations contained in paragraph 108 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 108, except denies that the NYMEX settlement price "directly sets the price for any contracts that ultimately go to delivery at Henry Hub."

109.    The allegations contained in paragraph 109 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 109.

110.    The allegations contained in paragraph 110 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to

the allegations in paragraph 110, except denies that he engaged in any manipulative conduct.

111.    The allegations contained in paragraph 111 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 111 as they relate to him and denies knowledge or information sufficient to form a belief as to the allegations in paragraph 111 as they relate to others.

112.    The allegations contained in paragraph 112 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 112 as they relate to him and denies knowledge or information sufficient to form a belief as to the allegations in paragraph 112 as they relate to others, except Hunter admits that Amaranth sent a letter to the NYMEX in August 2006.

113.    The allegations contained in paragraph 113 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies that any violation occurred.

114.    The allegations contained in paragraph 114 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 114, except denies that any manipulative trading occurred.

115.    The allegations contained in paragraph 115 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is

required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 115.

116.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 116 of the Order to Show Cause.

117.    The allegations in paragraph 117 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations contained in paragraph 117 as they relate to him and denies knowledge or information sufficient to form a belief as to the allegations in paragraph 117 as they relate to others.

118.    The allegations contained in paragraph 118 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations contained in paragraph 118.

119.    The allegations contained in paragraph 119 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 119.

120.    The allegations contained in paragraph 120 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 120.

121.    The allegations contained in paragraph 121 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to

the allegations in paragraph 121, except admits that he was an employee of Amaranth Advisors (Calgary) ULC during the relevant time period.

122.    The allegations contained in paragraph 122 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 122, except denies that any manipulation occurred.

123.    The allegations contained in paragraph 123 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 123, except denies that any manipulation occurred.

124.    The allegations contained in paragraph 124 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 124 of the Order to Show Cause as they relate to him and denies knowledge or information sufficient to form a belief as to the allegations in paragraph 124 as they relate to others.

125.    The allegations contained in paragraph 125 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 125 as they relate to him and denies knowledge or information sufficient to form a belief as to the allegations as they relate to others.

126.    Respondent admits the allegations in paragraph 126 of the Order to Show Cause as they relate to him, except denies that he engaged in risky behavior at Deutsche

Bank and denies knowledge or information sufficient to form a belief as to the allegations in paragraph 126 as they relate to others.

127.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 127 of the Order to Show Cause, except admits that in October 2005 he moved to Calgary; Amaranth increased his percentage of profits when he was promoted; and Amaranth did not assign risk management or compliance personnel to physically sit with the Calgary natural gas traders in Calgary. Respondent denies that any manipulation occurred.

128.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 128 of the Order to Show Cause, except denies that he and Robert Jones had poor communication, but admits that Nicholas Maounis and Robert Jones visited Calgary once.

129.    The allegations contained in paragraph 129 of the Order to Show Cause are legal conclusions to which no response is required. To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 129 of the Order to Show Cause, except denies the existence of any manipulative trading.

130.    The allegations contained in paragraph 130 of the Order to Show Cause are legal conclusions to which no response is required. To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 130 of the Order to Show Cause, except admits that NYMEX contacted Amaranth the morning of the settlement day for September 2006 contracts, and

that he and Amaranth complied with all NYMEX requests regarding its trading. Respondent denies that he traded at his discretion, with minimal supervision.

131.    The allegations contained in paragraph 131 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 131 of the Order to Show Cause, except admits that he and other Calgary traders were asked to come to Greenwich throughout the summer of 2006.

132.    The allegations contained in paragraph 132 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 132.

133.    The allegations contained in paragraph 133 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 133, except denies the implication that there was any manipulative conduct.

134.    The allegations contained in paragraph 134 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 134.

135.    The allegations contained in paragraph 135 are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations as they relate to him and denies knowledge or information sufficient to form a

belief as to the allegations as they relate to others.  Further, Hunter denies, as stated in footnote 204, that he failed to appear for an agreed-upon second deposition by the Staff and denies the implication that the Staff did not agree to a subsequent non-recorded telephone interview with the Staff that would not be used, offered, or cited by FERC in any legal or administrative proceedings for any purpose, but then cancelled the scheduled telephone interview.  Hunter admits that he earned significant sums of money prior to 2006.

136.    Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 136 of the Order to Show Cause, except denies that any manipulation occurred and admits that he earned approximately 15% of the end-of-year net profits of the energy and commodities trading book.

137.    The allegations contained in paragraph 137 of the Order to Shaw Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies knowledge or information sufficient to form a belief as to the allegations in paragraph 137 of the Order to Show Cause, except admits that he has been developing, along with others, a new hedge fund called Solengo.

138.    The allegations contained in paragraph 138 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies the allegations in paragraph 138 as they relate to him and denies knowledge or information sufficient to form a belief as to the allegations as they relate to others.

139.    The allegations contained in paragraph 139 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is

required, Respondent denies that any violations occurred and denies knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 139.

140.    The allegations contained in paragraph 140 of the Order to Show Cause are legal conclusions to which no response is required.  To the extent that a response is required, Respondent denies that any manipulation occurred and that the proposed Commission orders as they relate to him are appropriate, and denies knowledge or information sufficient to form a belief as to the remainder of the allegations in paragraph 140.

## DEFENSES

### FIRST DEFENSE

**(Lack of Personal Jurisdiction)**

There is no basis for asserting personal jurisdiction over Brian Hunter – a Canadian citizen, who during the relevant time period resided and worked in Canada.

### SECOND DEFENSE

**(Lack of Statutory Authority to Proceed in the Matter/ Lack of Subject Matter Jurisdiction)**

The FERC does not have statutory authority under Section 315 of the Energy Policy Act of 2005 to bring an enforcement action against a natural person nor does it have statutory authority to bring an enforcement action for conduct in the markets for financial or derivative contracts of natural gas.

### THIRD DEFENSE

**(Failure to State a Claim)**

The Commission's claims are barred, in whole or in part, because the

Commission has failed to state a claim for which relief can be granted against Brian Hunter.

## FOURTH DEFENSE

### (Legitimate Business Purpose)

The Commission's claims are barred, in whole or in part, by the legitimate business purpose defense.

## FIFTH DEFENSE

### (Inadequate Notice)

The Commission's claims are barred, in whole or in part, because Section 315 of the Energy Policy Act of 2005 failed to provide adequate notice that the conduct described in the Order to Show Cause could be deemed to constitute a violation of its rules or regulations.

## SIXTH DEFENSE

### (*De Novo* Review is Required)

The Commission's claims are barred, in whole or in part, because the relief sought against Brian Hunter requires a trial *de novo* in federal district court which would impose an impermissible burden upon him, but without which no penalties can be enforced.

## SEVENTH DEFENSE

### (Remote, Speculative, or Contingent Harm or Damages)

The harm or damages for which the Commission seeks to assess penalties against Hunter may not be recovered because it is remote, speculative, and/or contingent.

The inclusion of a defense among the above-listed defenses is not an admission that Brian Hunter bears the burden of proof or persuasion in any claim or issue. Brian Hunter expressly reserves the right to rely on any defense identified by any other Respondent, to assert any additional defenses that may subsequently come to light, and to amend his Answer to assert such additional defenses.

Dated: December 14, 2007
       New York, New York

Respectfully submitted,

KOBRE & KIM LLP

By:      _/s/ Michael S. Kim____

Michael S. Kim
Matthew I. Menchel
Leif T. Simonson
Zaharah R. Markoe
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220
E-mail:michael.kim@kobrekim.com
       matthew.menchel@kobrekim.com
       leif.simonson@kobrekim.com
       zaharah.markoe@kobrekim.com

Justin V. Shur
1919 M Street, N.W.
Washington, D.C. 20036
Tel: 202.664.1900
Fax: 202.664.1920
E-mail: justin.shur@kobrekim.com

*Counsel for Brian Hunter*

<u>Filed via Electronic Filing System</u>

Daniel I. Davidson
Robert C. McDiarmid
Peter J. Hopkins
Mark S. Hegedus
**SPIEGEL & McDIARMID**
1333 New Hampshire Avenue, N.W.
2nd Floor
Washington, D.C.  20036

*Attorneys for Amici*
*American Public Gas Association*
*American Public Power Association*
*National Rural Electric Cooperative Association*


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – –

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** : | |
| : | |
| **Plaintiff,** : | |
| : | **07 CIV. 6682 (DC)** |
| **v.** : | |
| : | |
| **AMARANTH ADVISORS L.L.C.,** : | |
| **AMARANTH ADVISORS (CALGARY) U.L.C.** : | |
| **AND BRIAN HUNTER,** : | |
| : | |
| **Defendants** : | |

– – – – – – – – – – – – – – – – – – – – – – – – –


MEMORANDUM OF LAW OF *AMICUS CURIAE*
AMERICAN PUBLIC GAS ASSOCIATION,
AMERICAN PUBLIC POWER ASSOCIATION AND
NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION
IN OPPOSITION TO MOTION FOR A PRELIMINARY
INJUNCTION AGAINST THE
FEDERAL ENERGY REGULATORY COMMISSION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

STATEMENT OF INTERESTS............................................................................... 1

ARGUMENT ......................................................................................................... 4

I.   THE DISTRICT COURT LACKS JURISDICTION TO REVIEW FERC'S
INTERLOCUTORY SHOW CAUSE ORDER AND ENJOIN FERC'S
ENFORCEMENT PROCEEDING UNDER THE NATURAL GAS ACT ........... 4

    A.   The Exclusive Jurisdiction Vested in the Courts of Appeals "Cuts Off"
This Court From Exercising Jurisdiction Over the FERC Proceeding............. 4

    B.   The Parallel FERC Proceeding Does Not Defeat This Court's
Jurisdiction Over the CFTC Complaint in the Instant Action......................... 7

II.  IT IS CONTRARY TO THE PUBLIC INTEREST TO ENJOIN FERC'S
ENFORCEMENT PROCEEDING UNDER THE NATURAL GAS ACT ........... 10

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

## Federal Court Cases

*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981)..............................................3-4

*Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378 (1959)................11-12

*CFTC v. Chilcott Portfolio Management, Inc.*, 713 F.2d 1477 (10th Cir. 1983) ..........9-10

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944).......................................................8

*FTC v. Cement Institute*, 333 U.S. 683 (1948) ..............................................................8

*FTC v. Standard Oil Co. of California,* 449 U.S. 232 (1980). .........................................9

*In re Diet Drugs Products Liability Litigation*, 282 F.3d 220 (3d Cir. 2002) ...................9

*In re FCC*, 217 F.3d 125 (2d Cir. 2000)..............................................................5, 6, 7

*Jones v. FCC*, No. 02 Civ. 693, 2002 U.S. Dist. LEXIS 16396
   (S.D.N.Y. Sept. 4, 2002) ............................................................... 5, 6, 7, 8

*Kahn v. iBiquity Digital Corp.*, 2006-2 Trade Cas. (CCH) ¶ 75,524 (S.D.N.Y. 2006) ......5

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990) ....................................................8

*Landis v. North American Co.*, 299 U.S. 248 (1936) .......................................................9

*Peck v. United States*, 522 F. Supp. 245 (S.D.N.Y. 1981) ..............................................9

*Petroleum Exploration, Inc. v. Public Service Commission*,
   304 U.S. 209 (1938)...................................................................................9

*Public Utilities Commission v. United Fuels Gas Co.*,
   317 U.S. 456 (1943)...................................................................................9

*Renegotiation Board v. Bannercroft Clothing Co.*, 415 U.S. 1 (1974) .............................9

*SST Global Technology, LLC v. Chapman*, No. 02 Civ. 7687,
   2004 U.S. Dist. LEXIS 22286 (S.D.N.Y. 2004)....................................................4

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998)................................4

*Telecommunications Research & Action Center v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984)............................................................... 5, 6, 8

*Ukiah Adventist Hospital v. FTC*, 981 F.2d 543 (D.C. Cir. 1992).....................6-7, 13, 14

*United States v. Any & All Radio Station Transmission Equipment*,
   207 F.3d 458 (8th Cir. 2000)........................................................................5

*United States v. Palumbo Bros., Inc.*, 145 F.3d 850 (7th Cir. 1998)................................8

*United States v. Reliant Energy Services, Inc.*,
   420 F. Supp. 2d 1043 (N.D. Cal. 2006) ..........................................................8

*Volmer Distributors v. New York Post Co.*, 152 F.R.D. 36 (S.D.N.Y. 1993)....................9

**Federal Agency Cases**

Order to Show Cause and Notice of Proposed Penalties,
    *Amaranth Advisors L.L.C.*, 120 F.E.R.C. ¶ 61,085 (2007) ............ 1, 4-5, 10-11, 14

**Federal Statutes and Regulations**

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ................................................................ 8

Energy Policy Act of 2005, Pub. L. No. 109-58 (2005)
    § 314b (to be codified as part of the
    Natural Gas Act at 15 U.S.C. § 717t-l) ...................................................... 12, 14

    § 315 (to be codified as part of the Natural
    Gas Act at 15 U.S.C. § 717c-l) ...................................................... 1, 3, 4, 12, 14

    § 1283 (to be codified as part of the
    Federal Power Act at 16 U.S.C. § 824v).................................................... 3, 12, 14

Natural Gas Act, 15 U.S.C. § 717 *et seq.* .......................................................... 4, 5, 8, 13

    § 19(b), 15 U.S.C. § 717r(b)........................................................................ 5, 6, 8

Prohibition of Energy Market Manipulation, Order No. 670, 71 Fed. Reg. 4244
    (Jan. 26, 2006), III F.E.R.C. Stat. & Regs. ¶ 31,202 (to be codified
    at 18 C.F.R. pt. 1c), *reh'g denied*, 114 F.E.R.C. ¶ 61,300 (2006) ........................ 11

**Miscellaneous**

Testimony of Arthur Corbin, President & CEO of the Municipal Gas Authority
    of Georgia, on behalf of APGA before the Senate Homeland Security
    and Government Affairs Permanent Subcommittee on Investigations
    (June 25, 2007), *available at*
    http://hsgac.senate.gov/_files/STMTCorbinArthurGeorgia.pdf. .................. 1-2

Testimony of Laura Campbell, Assistant Manager of Energy Resources,
    Memphis Light, Gas & Water on behalf of the American Public Gas
    Association before the Commodity Futures Trading Commission (Sept.
    18, 2007) (footnote omitted), *available at*
    http://www.cftc.gov/stellent/groups/public/@newsroom/documents/
    file/event091807_campbell.pdf. ................................................................. 15

## STATEMENT OF INTERESTS

Defendants Amaranth Advisors, L.L.C. and Amaranth Advisors (Calgary) U.L.C. (collectively "Amaranth" or "Amaranth Defendants") have moved this Court to enjoin a Federal Energy Regulatory Commission ("FERC") enforcement proceeding against them *i.e.,* the FERC Show Cause proceeding in FERC Docket IN07-26-000. *See* Order to Show Cause and Notice of Proposed Penalties, *Amaranth Advisors L.L.C.*, 120 F.E.R.C. ¶ 61,085 (2007) ("Show Cause Order").[1] American Public Gas Association ("APGA"), American Public Power Association ("APPA"), and National Rural Electric Cooperative Association ("NRECA") have vital interests in the FERC Show Cause proceeding and FERC's anti-manipulation authority under 15 U.S.C. § 717c-1 and oppose the Amaranth Defendants' request to enjoin and stay the FERC proceeding.

APGA is a national, not-for-profit association of more than 680 municipal and other publicly-owned local distribution systems in 36 states. APGA members own and operate natural gas distribution systems serving their communities and are served by interstate natural gas pipeline systems located across the country. Publicly-owned gas systems are not-for-profit retail distribution entities owned by and accountable to the citizens they serve. They include municipal gas distribution systems, public utility districts, county districts, and other public agencies that have natural gas distribution facilities. APGA's members serve millions of natural gas customers and are substantial purchasers of natural gas. On June 25, 2007, the Municipal Gas Authority of Georgia submitted testimony on behalf of APGA to the Senate Homeland Security and Government Affairs Permanent Subcommittee on Investigations explaining the adverse impacts of Amaranth's alleged wrongdoing: "[t]he Gas Authority's members were

---

[1] A copy of the FERC Show Cause Order appears at Exhibit D to Amaranth's pleadings. The FERC order is also directed at other parties.

forced to pay an $18 million premium and pass it through to their customers on their gas bills as a result of the excess speculation in the market by Amaranth and others."[2]

APPA is the national service organization representing the interests of not-for-profit, publicly owned electric utilities throughout the United States.  More than 2,000 public power systems provide over 15 percent of all kilowatt-hour ("kWh") sales to ultimate customers, and do business in every state except Hawaii.  APPA's utility members have as their primary goal providing customers in the communities they serve with reliable electric power and energy at the lowest reasonable cost, consistent with good environmental stewardship.  This orientation aligns the interests of APPA-member electric utilities with the long-term interests of the residents and businesses in their communities.  Collectively, public power systems serve over 44 million Americans, many of them living in smaller cities and towns.  Public power systems own almost 10 percent of the nation's electric generating capacity, but purchase nearly 70 percent of the power used to serve their retail consumers.

NRECA is the national service organization dedicated to representing the national interests of cooperative electric utilities and the consumers they serve. NRECA is an advocate for consumer-owned cooperatives on energy and operational issues. NRECA's more than 900 member cooperatives serve more than 40 million people in 47 states, frequently in rural areas. Most of the member distribution systems are consumer-owned cooperatives; some are public power districts.

APPA and NRECA members purchase substantial amounts of natural gas, which is consumed in plants that generate electricity for millions of retail consumers.  Manipulation in

---

[2] Testimony of Arthur Corbin, President & CEO of the Municipal Gas Authority of Georgia, on behalf of APGA before the Senate Homeland Security and Government Affairs Permanent Subcommittee on Investigations 7-8 (June 25, 2007), *available at* http://hsgac.senate.gov/_files/STMTCorbinArthurGeorgia.pdf.

natural gas futures markets affecting natural gas commodity prices also affects the cost of producing electricity from gas-fired plants. Such effects, however, are not limited to the cost of gas-produced electricity but extend to the prices for a significant portion of all electricity consumed regardless of fuel source. Natural gas prices have a multiplier and ripple effect throughout wholesale electric markets, but are not the sole driver of electricity prices. Gas fired electric generation often sets the market clearing price for wholesale electric sales in general under auction-type market designs used in many regions of the country, including the Northeast, the Mid-Atlantic, the Midwest, and California. Further, natural gas prices are often the key marginal variable production cost influencing the marginal clearing electric generator spot market bid price, which is paid to generators participating in such markets regardless of fuel source. These spot market prices, in turn, can affect prices for long-term electricity contracts traded in bilateral markets, as well as the cost of congestion on the interstate electricity transmission grid. FERC oversees these wholesale electricity markets and interstate transmission, and thus plays a key role in protecting consumers from excessive prices. As a result, APPA's and NRECA's interest in the proper functioning of natural gas markets is both broad and deep.

Congress also added a parallel market anti-manipulation provision to the Federal Power Act ("FPA"). *See* FPA § 222, 16 U.S.C. § 824v. FERC's consumer protection mission under the FPA is to ensure just and reasonable rates, terms, and conditions for, *inter alia* jurisdictional wholesale electric power sales. APPA, NRECA, and their members have an added vital interest in the potential impact any ruling on the scope of FERC's jurisdiction under 15 U.S.C. § 717c-1 may have on the scope of FERC's new market anti-manipulation authority under the FPA. The Supreme Court has an "established practice of citing interchangeably decisions interpreting the

pertinent sections of the two statutes [*i.e.,* the NGA and FPA]." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

## ARGUMENT

I.    **THE DISTRICT COURT LACKS JURISDICTION TO REVIEW FERC'S INTERLOCUTORY SHOW CAUSE ORDER AND ENJOIN FERC'S ENFORCEMENT PROCEEDING UNDER THE NATURAL GAS ACT**

The issue of jurisdiction must be addressed "as a threshold matter." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). "That threshold question must be addressed first, since if the Court lacks subject matter jurisdiction the case is not properly before it, and consequently the Court should say nothing about any other issue." *SST Global Tech., LLC v. Chapman*, No. 02 Civ. 7687, 2004 U.S. Dist. LEXIS 22286 *3-4 (S.D.N.Y. 2004).

### A.    *The Exclusive Jurisdiction Vested in the Courts of Appeals "Cuts Off" This Court From Exercising Jurisdiction Over the FERC Proceeding*

Here, the Amaranth Defendants ask this Court to enjoin an ongoing FERC enforcement proceeding against them and others. The Court has no jurisdiction to entertain Amaranth's claim for injunctive relief because FERC is acting under the Natural Gas Act ("NGA")[3] in the Show Cause Proceeding, and Congress has vested jurisdiction to review FERC's orders under the NGA exclusively in the United States courts of appeals.

Amaranth concedes (*e.g.,* Amaranth Br. at 12) that FERC's asserted basis of statutory authority in the Show Cause proceeding is 15 U.S.C. § 717c-1 (a market anti-manipulation provision recently added to the NGA). The FERC Show Cause Order is express on this point. "Congress expanded [the Commission's NGA] anti-manipulation authority with the enactment of the Energy Policy Act of 2005 ("EPAct 2005")." Show Cause Order P 3.[4] "[If Amaranth] fail[s]

---

[3] 15 U.S.C. § 717 *et seq.*

[4] Citing the Energy Policy Act of 2005, Pub. L. No. 109-58, § 315 (2005) (to be codified at 15 U.S.C. § 717c-1).

to address fully the case presented here, the matter will present an appropriate occasion for the

first exercise of [the Commission's] expanded substantive regulatory authority." *Id.* P 4.

It is likewise beyond reasonable dispute that Congress has provided the courts of appeals

with exclusive jurisdiction to review FERC action under the NGA. Section 19 of the NGA

addresses judicial review and provides, in relevant part, that:

> Any party to a proceeding under this chapter aggrieved by an order
> issued by the Commission in such proceeding may obtain a review
> of such order in the court of appeals of the United States for any
> circuit wherein the natural-gas company to which the order relates
> is located … or in the United States Court of Appeals for the
> District of Columbia, by filing in such court … a written petition
> … that the order of the Commission be modified or set aside in
> whole or in part.

15 U.S.C. § 717r(b). Section 19(b) of the NGA is a dispositive jurisdictional bar to Amaranth's

request that this Court enjoin FERC's Show Cause proceeding.

Because "Congress has vested exclusive jurisdiction to review final [NGA] orders in the

Courts of Appeals," the NGA "'cuts off original jurisdiction' in [federal] courts in all other

cases." *Jones v. FCC*, No. 02 Civ. 693, 2002 U.S. Dist. LEXIS 16396 *6-7 (S.D.N.Y. Sept. 4,

2002) (Cote, J.) (dismissing for lack of subject matter jurisdiction complaint challenging FCC

issuance of Notice of Apparent Liability for Forfeiture) (quoting *Telecomm. Research & Action

Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("*TRAC*")). Following *TRAC*, and kindred Eighth

Circuit authority, the Second Circuit has held that "'a preemptive strike by seeking an

injunction'" is "'an evasion of the exclusive jurisdiction of the Court of Appeals.'" *In re FCC*,

217 F.3d 125, 139 (2d Cir. 2000) (quoting *United States v. Any & All Radio Station

Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000)). *See also Kahn v. iBiquity Digital

Corp.*, 2006-2 Trade Cas. (CCH) ¶ 75,524 (S.D.N.Y. 2006) ("a district court may review neither

the FCC's regulatory actions nor the outcome of those actions").

It is hard to imagine more conclusive pronouncements. Per *Jones* this Court's jurisdiction is "cut[] off" and that should be the end of the matter. *Jones*, 2002 U.S. Dist. LEXIS 16396 at \*7.

Amaranth's challenge to FERC's jurisdiction does not take its claim for injunctive relief outside the bar of *Jones* and *In re FCC*. Amaranth's core allegation in support of injunctive relief is that "FERC is acting beyond the scope of its statutory authority." (Amaranth Br. at 4.[5]) This contention, even if it were correct (which it is not), does not get Amaranth over the jurisdictional bar of Section 19(b) of the NGA (15 U.S.C. § 717r(b)). Building upon the *TRAC* decision which this Court quoted and relied upon in *Jones*, *supra*, the District of Columbia Circuit rejected the argument that an entity could seek interlocutory relief in district court to challenge the statutory basis of ongoing agency action. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543 (D.C. Cir. 1992). The *Ukiah* court expressly held that "*all* challenges to an agency's jurisdiction in the context of nonfinal agency action lie within the exclusive jurisdiction of the courts of appeals under *TRAC*." *Id.* at 551 (emphasis in original). *Ukiah* stands four square against Amaranth's attempt here to enjoin FERC's ongoing Show Cause proceeding based upon FERC's alleged lack of statutory jurisdiction.

In *Ukiah* the court of appeals noted that "denial of [interlocutory] review in a district court will *not* foreclose all judicial review." *Id.* at 550 (emphasis in original). The same is true here. If FERC ultimately issues a final order adverse to Amaranth, Amaranth will be able to appeal that order and raise its jurisdictional challenge to the circuit court.

The *Ukiah* court further explained that important policy considerations supported its jurisdictional ruling.

---

[5] Paradoxically, on the same page of its brief at 4 n.6, Amaranth states that it "is not asking this Court to determine whether the FERC has jurisdiction to proceed with its enforcement action." It is unnecessary to resolve the apparent contradiction in Amaranth's statements for purposes of dismissing its request for injunctive relief.

> Allowing questions of jurisdiction to be 'carved out' of ongoing agency proceedings and challenged in district courts would create an unmanageable body of litigation in the federal courts. By establishing an 'agency jurisdiction' exception to the *TRAC* rule, we would invite an endless stream of suits filed in district courts, followed by appeals to this court, by parties seeking to stall or forestall agency action. [Movant's] proffered distinction between 'purely legal' and 'mixed law and fact' jurisdictional questions only exacerbates this concern. [Movant] asks us to draw a line where no line may be drawn − or, just as accurately, where any line may be drawn. … Even were we to find it easy to draw the suggested distinction in this particular case, we can imagine no reason for adopting such a rule.

*Id.* at 550-551.  Consistent with *Jones* and *In re FCC*, this Court should likewise refuse to "adopt[] such a rule."

**B.    The Parallel FERC Proceeding Does Not Defeat This Court's Jurisdiction Over the CFTC Complaint in the Instant Action**

Amaranth addresses the jurisdictional issue in the last two and a half pages of its 30 page brief. The entirety of its jurisdictional argument rests upon the conclusory (and erroneous) assertions that the Court can enjoin FERC: i) to protect its own jurisdiction; and ii) to protect the CFTC's jurisdiction. (Amaranth Br. at 28-30.) Although Amaranth cites inapposite authority, and raises a litany of objections concerning the alleged inequity of its predicament, it *nowhere* attempts to explain how FERC's prosecution of the Show Cause proceeding will interfere with this Court's or the CFTC's jurisdiction.

Amaranth complains that it is:

> unaware of any other instance in which an administrative agency: (1) disregarded the exclusive jurisdiction of another administrative agency who, (2) has already instituted enforcement proceedings against a party, (3) to bring its own enforcement proceeding against that same party, (4) when it has no jurisdiction to do so, and (5) force the party to submit to *two* jurisdictions at the same time with *two* different procedures and evidentiary standards, and face the enormous expense of defending both proceedings.

(Amaranth Br. at 29 (emphasis in original).) None of these objections is in any way relevant to establishing the Court's subject matter jurisdiction. As noted above, Section 19(b) of the NGA "'cuts off original jurisdiction' in [federal district] courts," *Jones*, 2002 U.S. Dist. LEXIS 16396 at *6-7 (quoting *TRAC* at 77) and Amaranth's challenge to FERC's statutory jurisdiction is no exception to this bar. The fact that Amaranth must answer for its alleged wrongdoing in two different proceedings under two different statutes is unexceptional, if not a commonplace occurrence. *See, e.g., Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 213 (1990) (alleged natural gas price fixers answerable to direct purchaser claims under federal antitrust law and indirect purchaser claims under state law arising out of same conspiratorial conduct). The CFTC is required to enforce the Commodity Exchange Act ("CEA")[6] and FERC is required to enforce the NGA. "'[I]t is a cardinal principle of construction that . . . when there are two acts upon the same subject, the rule is to give effect to both.'" *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1064 (N.D. Cal. 2006) (quoting *United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 862 (7th Cir. 1998)). *See also FTC v. Cement Inst.*, 333 U.S. 683, 690 (1948) (same). While the CFTC's regulatory action under the CEA with respect to trading in NG Futures Contracts may incidentally (and importantly) protect consumers of natural gas (and electricity), it is FERC that is charged with that duty under the NGA (and FPA). *See FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944) (Commission's primary duty under the NGA is to protect consumers). It is FERC that first noticed the unusual NYMEX trading activity and precipitated the investigation into Amaranth's market manipulation.

Amaranth fails to explain (and cannot show) how the supposed "enormous expense of defending both proceedings" defeats either this Court's or the CFTC's jurisdiction. Amaranth's

---

[6] 7 U.S.C. § 1 *et seq.*

expense objection does not even constitute a basis for irreparable harm, let alone a basis for

subject matter jurisdiction.

> "[T]he expense and annoyance of litigation is 'part of the social burden of living under government.'" *Petroleum Exploration, Inc. v. Public Service Comm'n*, 304 U.S. 209, 222 (1938). As [the Court] recently reiterated: "Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Board v. Bannercroft Clothing Co.*, 415 U.S. 1, 24 (1974).

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980).

The cases cited by Amaranth in its defense (at 28-30) of this Court's jurisdiction to stay

the FERC proceeding are either irrelevant or damaging to its position.  Taking the cases seriatim,

*Landis v. North American Co.*, 299 U.S. 248 (1936), involved the court's authority to stay a case

before it, not a case before another tribunal, and even that authority was held to be limited.

*Public Utilities Commission v. United Fuels Gas Co.*, 317 U.S. 456 (1943), affirmed a federal

injunction of a state regulatory agency on Supremacy Clause grounds where federal law had

preempted state regulatory power. *Peck v. United States*, 522 F. Supp. 245 (S.D.N.Y. 1981),

involved a district court staying a case on its docket, not a matter in another tribunal.  *In re Diet

Drugs Products Liability Litigation*, 282 F.3d 220 (3d Cir. 2002), involved circumstances far

different from those here: an injunction of federal and state court proceedings issued by a district

judge presiding over 2,000 consolidated cases with a class comprising six million members.  The

Court of Appeals recognized the "general rule [is] that in personam cases must be permitted to

proceed in parallel" but that very complex multidistrict cases are especially vulnerable to parallel

state actions that may frustrate the district court's effort to craft a settlement "thereby destroying

the . . . benefits of consolidation," *id*. at 236.  *Volmer Distribs. v. N.Y. Post Co.*, 152 F.R.D. 36

(S.D.N.Y. 1993), was a case in which a judge stayed some discovery in a case before him to

protect defendants' Fifth Amendment rights in a criminal case in another forum.  In *Commodity

*Futures Trading Commission v. Chilcott Portfolio Management, Inc.*, 713 F.2d 1477 (10th Cir. 1983), the stay granted by the district court was reversed on appeal.

The inability of Amaranth to find any case supporting its position is telling. Also revealing is the fact that there are cases, cited in Amaranth's brief (at 20), of jurisdictional disputes between the CFTC and the SEC where the jurisdictional issue was decided after the required appeal from the agency to a court of appeals.

## II.    IT IS CONTRARY TO THE PUBLIC INTEREST TO ENJOIN FERC'S ENFORCEMENT PROCEEDING UNDER THE NATURAL GAS ACT

FERC views the Show Cause Proceeding as a "*serious* case." Show Cause Order P 122 (emphasis in original). APGA, APPA, and NRECA agree. Following a lengthy and extensive investigation coordinated with the CFTC, FERC has preliminarily found that the "harm to the market was significant," and the "manipulation was the result of intentional and deceitful conduct." *Id.* PP 123 & 124. "The Amaranth Entities are punishable for the actions of their employees, officers, and agents." *Id.* P 121 (footnote omitted). Unless the Amaranth Defendants and other parties can rebut FERC's preliminary findings, the Show Cause proceeding "will present an appropriate occasion for the first exercise of [FERC's] expanded substantive regulatory authority, as well as a substantial exercise of [FERC's] expanded remedial authority." *Id.* P 4. FERC found a direct link between Amaranth's manipulation of the New York Mercantile Exchange (NYMEX) Natural Gas Futures Contract (the NG Futures Contract) and the physical markets entrusted to FERC's regulation: "manipulation of the NG Futures Contract Settlement price will necessarily change the price in [FERC-jurisdictional gas transactions]." *Id.* P 27. With respect to *scienter* FERC found that:

> [t]he evidence summarized above indicates that both [former Amaranth Vice President] Hunter and [former Amaranth trader] Donohoe traded with the intent to manipulate the settlement price of the March, April, and May 2006 NG Contracts. The settlement

> price directly sets the price of any futures contracts that go to delivery. Thus, Amaranth's conduct amounts to the intentional manipulation of the price for that jurisdictional gas.

*Id*. P 111 (footnote omitted).

FERC was also careful to delineate the factual basis for its jurisdiction under its new statutory authority.

> The Anti-Manipulation Rule applies whether or not the manipulator's principal or exclusive purpose is the manipulation of physical natural gas sales. In Order No. 670, we stated that "we do not intend to construe the Final Rule so broadly as to convert every common law fraud that *happens to touch* a jurisdictional transaction into a violation of" the Anti-Manipulation Rule. However, such a transaction would be covered if "in committing fraud, the entity … intended to affect, or have acted recklessly to affect, a jurisdictional transaction." We noted that the "in connection with" language is drawn from similar language of Rule 10b-5 which has been very liberally construed. Accordingly, the Anti-Manipulation Rule applies where there is a "nexus" between the manipulative conduct and the jurisdictional transaction. Under the analogous Rule 10b-5 precedent, the alleged manipulator need not be a party to the jurisdictional transaction, nor must the connection be overwhelmingly direct. Finally, we have also noted that a determination of manipulation, in general, is "a question of fact that is to be determined by all the circumstances of a case." Given the facts discussed above, the manipulative conduct at issue here is more than sufficient to meet the generalized "in connection with" requirement.

*Id*. P 110 (emphasis in original and footnotes omitted, quoting Order No. 670[7]). Based upon an assessment of the relevant penalty factors, FERC preliminarily determined that it would be appropriate to levy against Amaranth "a nearly maximum civil penalty" in the amount of $200,000,000 (*id.* P 134) and disgorgement of at least $59,000,000 in unjust profits. *Id.* P 139.

---

[7] Prohibition of Energy Market Manipulation, Order No. 670, 71 Fed. Reg. 4244 (Jan. 26, 2006), III F.E.R.C. Stat. & Regs. ¶ 31,202 (to be codified at 18 C.F.R. pt. 1c), *reh'g denied*, 114 F.E.R.C. ¶ 61,300 (2006).

FERC is entrusted with ensuring just and reasonable rates, and indeed seeing that the markets it regulates produce "the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 388 (1959) (quoting 52 Stat. 825). In recent years, FERC has moved to a regimen of market based pricing. Following the 2000-01 California electric market meltdown, and the evidence of market manipulation on the part of Enron and others, it was apparent that FERC stood in need of new statutory powers to police against and sanction market manipulation. Congress responded and provided FERC new substantive and remedial authority. *See* EPAct 2005 § 315 (to be codified at 15 U.S.C. § 717c-l*); id*. § 314b (to be codified at 15 U.S.C. § 717t-l); *id.* § 1283 (to be codified at 16 U.S.C. § 824v). APGA, APPA, and NRECA were all active in the legislative proceedings resulting in EPAct 2005 and support FERC's new market anti-manipulation authority under 15 U.S.C. § 717c-l & § 717t-l (and the cognate jurisdiction provided FERC under new section 222 of the FPA, 16 U.S.C. § 824v). That statutory authority means little if it is not exercised. To that end, amici support FERC's Show Cause proceeding, and in a press release dated July 26, 2007, APGA publicly "commend[ed] the Federal Energy Regulatory Commission (FERC) for its vigilance in bringing two separate enforcement actions [including the action against Amaranth]."[8]

Amaranth should not be permitted to execute an end run around FERC's enforcement action by seeking to enjoin the proceeding. Fundamentally, an entity that is accused of manipulation of the markets ought not to be able to choose the authority which will be allowed to investigate it, based on which authority it deems less intrusive or dangerous to its interest. This is

---

[8] Press Release, APGA Commends FERC for its New Enforcement Authority in Two Separate Actions (July 26, 2007), *available at* http://www.apga.org/singlenews.asp?item_ID=3464&comm=0&list_code_int=NEW01-NEWS-INT.

particularly true in a situation where an agency is engaged in a highly fact intensive investigation

which also brings into question how it will choose to exercise its statutory authority.  In 2005,

Congress gave FERC identical authority under the NGA and the FPA to impose penalties upon

those who manipulate markets in natural gas (and electricity). The effect of the relief Amaranth

seeks would come close to a declaration that Congress tasked FERC with policing the natural gas

market but largely hamstrung its ability to do so. It may simply not be possible to draw a clean

distinction between futures markets and physical markets. Many of the contracts that are traded

in NYMEX become physical for settlement purposes if there is no bookout prior to maturity.[9] In

these circumstances, where the agency is still in the process of delineating its own jurisdiction, it

would be particularly egregious to block it from doing so.

Moreover, as the D.C. Circuit warned in *Ukiah*, permitting collateral attacks on ongoing

agency proceedings is likely to create an unmanageable body of litigation in the federal courts.

*Ukiah*, 981 F.2d at 551. The Amaranth Defendants acknowledge that there is a second

independent proceeding before Judge Leon in the United States District Court for the District of

Columbia where FERC defendant Hunter is seeking to enjoin the FERC Show Cause proceeding.

(Amaranth Br. at 4 n.6.) What is FERC to do if Judge Leon denies injunctive relief holding that

the matter is within FERC's authority but this Court orders it? Do the Amaranth Defendants

expect this Court to issue orders against Judge Leon and the United States District Court for the

District of Columbia and perhaps the United States Court of Appeals for the District of Columbia

Circuit? The doctrines of exhaustion and finality, and the statutory scheme permitting judicial

review only from final agency action before the circuit courts of appeals serve to ensure order,

---

[9] The contracts that are traded are described at http://www.nymex.com.

promote judicial economy and help create a body of judicial expertise for purposes of reviewing agency action. The relief that Amaranth seeks is antithetical to all of these considerations.

Collateral and interlocutory review is particularly misguided in regards to a Show Cause Proceeding of the sort here at issue. By its own terms the FERC Show Cause Order makes preliminary findings. *See*, *e.g.*, Show Cause Order P 5 ("[the Commission] preliminarily conclude[s] that the Respondents manipulated the price of Commission-jurisdictional transactions by trading in the NG Futures Contract"). The Show Cause Order also makes clear that FERC's assertion of jurisdiction rests upon a fact-intensive analysis. *E.g.*, *id*. P 110; *see also id*. PP 20-27 (discussing NG Futures Contract settlement price effects on prices in Commission jurisdictional transactions). It is entirely possible that FERC may reach any number of different conclusions incident to any final action in the Show Cause proceeding.[10] It should also be emphasized that this is a case of first impression concerning a new and important source of statutory regulatory authority. Prudence dictates that the important question of the scope of FERC's authority under EPAct 2005 §§ 315 & 314b, 15 U.S.C. §§ 717c-l[11] & 717t-l be addressed first by FERC on a complete record and pursuant to a final order, and then reviewed judicially by a court of appeals consistent with Congress's dictate.

Fair gas and electric markets are vital to *amici* and their members. This week, APGA testified before the CFTC on the direct linkage between NG Futures Contracts and physical gas pricing. "Increasingly, the price of natural gas in many supply contracts between suppliers and local distribution companies ("LDC"), including APGA members, is determined based upon

---

[10] It is worth noting that in the FTC proceeding that gave rise to the *Ukiah* proceeding, the FTC did just that and reversed its preliminary determination to exercise jurisdiction over non-profit hospitals.

[11] As noted above, any discussion of the scope of FERC's NGA authority under 15 U.S.C. § 717c-l also incidentally implicates the scope of FERC's FPA authority under 16 U.S.C. § 824v because the two statutes are typically construed *in pari materia*.

monthly price indexes closely tied to the monthly settlement of the NYMEX futures contract. ...

[W]ithout question, a participant's trading conduct in one venue can affect, and has affected, the

price of natural gas contracts in the other."[12] This is the exact same factual nexus that FERC has

preliminarily identified as the basis for its exercise of regulatory authority in the Show Cause

proceeding. FERC's enforcement efforts will help to protect not only millions of natural gas

consumers, but also millions of electricity consumers, because of the pervasive effect natural gas

prices has on the price of electricity. APGA, APPA and NRECA look to FERC to ensure that

prices in all markets under its jurisdiction are just and reasonable, and FERC's ability to do so

would be frustrated by the Amaranth Defendant's request.

## CONCLUSION

For all of the foregoing reasons, the extraordinary relief Amaranth seeks should be
denied.

Respectfully submitted,

_____s/ Daniel I . Davidson_____
Daniel I. Davidson (SDNY Bar No. DD0194)
Robert C. McDiarmid
Peter J. Hopkins
Mark S. Hegedus

Attorneys for *Amici*
American Public Gas Association, American
Public Power Association, National Rural
Electric Cooperative Association

Law Offices of:
    Spiegel & McDiarmid
    1333 New Hampshire Avenue, NW
    Washington, DC  20036
    (202) 879-4000
    September 28, 2007

---

[12] Testimony of Laura Campbell, Assistant Manager of Energy Resources, Memphis Light, Gas & Water on behalf
of the American Public Gas Association before the Commodity Futures Trading Commission 5 (Sept. 18, 2007)
(footnote omitted), *available at*
http://www.cftc.gov/stellent/groups/public/@newsroom/documents/file/event091807_campbell.pdf.

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing MEMORANDUM OF LAW OF AMICUS CURIAE on all parties via e-mail and U.S. mail, postage prepaid, to the parties listed below on this 28th day of September 2007.

Manual Sultan, Esq.
Stephen Jay Obie, Esq.
David W. MacGregor, Esq.
U.S. Commodity Future Trading
    Commission (NYC)
140 Broadway
New York, NY  10005
Attorneys for U.S. Commodity Future Trading
Commission

Leslie Beth Bellas, Esq.
Lee Ann Watson, Esq.
Patrick Todd Mullins, Esq.
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426
Attorneys for Federal Energy Regulatory
Commission

David E. Mollon, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, NY  10166
Attorneys for Defendants Amaranth
Advisors L.L.C. and Amaranth Advisors
(Calgary) ULC

Michael Kim, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, NY  10022
Attorney for Defendant Brian Hunter

    s/ Marlene Borack
    Marlene Borack

Law Offices of:
    Spiegel & McDiarmid
    1333 New Hampshire Avenue, NW
    Washington, DC  20036
    (202) 879-4000

*James Bradford Ramsay*
GENERAL COUNSEL
*Grace D. Soderberg*
ASSISTANT GENERAL COUNSEL
National Association of Regulatory Utility Commissioners
1101 Vermont Avenue, Suite 200
Washington, DC 20005
(202) 898.1350

*Attorneys for Amicus Curiae*
*National Association of Regulatory Utility Commissioners*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | )<br>)<br>)<br>) |
| **Plaintiff** | )<br>) |
| **v.** | )<br>) |
| **AMARANTH ADVISORS L.L.C., AMARANTH ADVISORS (CALGARY)ULC, And BRIAN HUNTER,** | )<br>)<br>)<br>)<br>) | Civil Action No.<br><br>07-CV-6682 (DC) |
| **Defendants** | )<br>)<br>) |

## MEMORANDUM OF LAW
## OF THE NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS
## AS *AMICUS CURIAE* IN OPPOSITION TO THE MOTION FOR A PRELIMINARY
## INJUNCTION

## TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** ....................................................................................................... ii

**TABLE OF AUTHORITIES** ............................................................................................... iii

**STATEMENT OF INTEREST** .............................................................................................. 1

**ARGUMENT** ....................................................................................................................... 4

    **I.**    United States Court of Appeals Has Exclusive Jurisdiction to Review the FERC's Enforcement Order ............................................................................................................... 4

    **II.**    Assuming, Arguendo, Review of the FERC's Enforcement Order in United States District Court is Proper, Amaranth Fails to Establish the Minimum Prerequisites for a Preliminary Injunction. ............................................................................................................................... 6

        *A.*    *The FERC's Enforcement Order Will Not Cause Amaranth Irreparable Harm.* ............ 7

        *B.*    *Amaranth is Not Likely to Succeed on the Merits.* ........................................................ 10

**CONCLUSION** .................................................................................................................... 13

# TABLE OF AUTHORITIES

### CASES

*Ark. La. Gas Co. v. Hall*, 453 U.S. 571 (1981) --------------------------------------------------- 6

*Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13 (2d Cir. 1987) ---------------------------- 11

*Britol-Meyers Co. v. FTC*, 738 F.2d 554 (2d Cir. 1984)------------------------------------------- 13

*Cox v. CFTC*, 138 F.3d 268 (7th Cir. 1998)------------------------------------------------------------ 13

*Florida Power & Light Co. v. Lorion, d/b/a Center for Nuclear Responsibility, et al.*, 470 U.S. 729, 746 (1984) ---------------------------------------------------------------------------------------------- 9

*FTC v. Cement Institute*, 333 U.S. 683 (1948) ------------------------------------------------------- 13

*Grossfeld v. CFTC*, 137 F.3d 1300 (11th Cir. 1998) ----------------------------------------------- 13

*Hudson v. United States*, 522 U.S. 93 (1997) ------------------------------------------------ 12, 13

*Indianapolis Power and Light Co. v. ICC*, 587 F.2d 1098 (7th Cir. 1982) --------------------- 7

*Jones v. FCC*, No. 02 Civ. 693, 2002U.S. Dist. LEXIS 16396(SDNY Sept. 4, 2002) -------------- 10

*Jones v. SEC*, 115 F.3d 1173 (4th Cir. 1997)---------------------------------------------------------- 13

*Lockerty v. Phillips*, 319 U.S. 182 (1943) -------------------------------------------------------------- 9

*Renegotiation Board v. Bannercraft Co.*, 415 U.S. 1 (1973) ------------------------------------- 11

*SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998)----------------------------------------------------- 12

*Spencer Trask Software & Info Servs. LLC v Rpost Int'l LTD*, 190 F. Supp 2nd 577, (SDNY 2002) -------------------------------------------------------------------------------------------------------- 10

*SST Global Technology, LLC v. Chapman*, No. 02-Civ. 7687, 2004 U.S. Dist. LEXIS 22286 **3-4 (SDNY Nov. 3, 2004) (Haight, J.)---------------------------------------------------------------------- 8

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ------------------------------- 8

*The City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958) ------------------------------- 9

*The Times Mirror Co. v. FTC*, No. 78-3422, 1979 U.S. Dist. LEXIS 11738 (C.D. Cal. June 13, 1979) ----------------------------------------------------------------------------------------------------------- 11

*U.S. v. RCA*, 358 U.S. 334 (1959) ---------------------------------------------------------------------- 14

*USA v. Southern Motor Carrier Rate Conference, et al.*, 467 F.Supp. 471 (N.D. Ga. 1979), aff. 672 F.2d 469 (5th Cir. Unit "B" 1982); aff. en banc, 702 F.2d 532 (5th Cir. Unit "B" 1983, rev'd, 471 U.S. 48 (1985)---------------------------------------------------------------------------------------------- 6

*Warner-Lambert Co. v. FTC*, 361 F. Supp. 948 (D.D.C. 1973) -------------------------------------- 13

*Washington Utilities and Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir. 1976) ----- 7

*Williams Natural Gas Co. v. City of Oklahoma*, 890 F.3rd 255, 262-63 (10th Cir. 1989)--------- 10

*Williston Basin Interstate Pipeline Co. v. FERC*, 475 F. 3rd 330 (D.C. Cir 2006)------------------- 10

*Yakus v. U.S.*, 321 U.S. 414 (1944) ------------------------------------------------------------------------ 9

### STATUTES

15 U.S.C. §717t-2(c)(1) ------------------------------------------------------------------------------ 12, 16

15 U.S. C. § 717r(b) (2005)--------------------------------------------------------------------------9, 10

15 U.S.C. § 717c-1 ---------------------------------------------------------------------------------------6, 14

15 U.S.C. §78j(b)(2000)---------------------------------------------------------------------------------- 15

15 U.S.C. § 78s(d)(2)(2000) ------------------------------------------------------------------------------ 13

15 U.S.C. §717(b) ----------------------------------------------------------------------14
15 U.S.C. §717c(a) ---------------------------------------------------------------------14
15 U.S.C.§717o----------------------------------------------------------------------------14
16 U.S.C. § 824v ---------------------------------------------------------------------- 6
47 U.S.C. § 410 (1986)---------------------------------------------------------------- 6
7 U.S.C. § 21(i)(2000) -----------------------------------------------------------------13


REGULATIONS

17 C.F.R. § 240.10b-5(2006) ---------------------------------------------------------15

ADMINISTRATIVE DECISIONS

Order No. 670, *Prohibition of Energy Market Manipulation*, 114 F.E.R.C. ¶31,202, 71 Fed. Reg.
    4,244 (2006) )------------------------------------------------------------------------ 14, 15
Order to Show Cause and Notice of Proposed Penalties, *Amaranth Advisors L.L.C. et al.* 120
    F.E.R.C. ¶ 61,085 (2007)----------------------------------------------------------- 5

MISCELLANEOUS

"Kelliher stands firm on FERC enforcement as full-scale jurisdictional squabble erupts," *Inside
    FERC* (Platts, The McGraw-Hill Companies, Inc September 24, 2007) --------------------------- 6
*CFTC, CFTC Chairman Jeffrey and FERC Chairman Kelliher Signs MOU on Information
    Sharing, Confidentiality* (Oct. 15, 2005), www.cftc.gov/opa/press05/opa5127-05.htm. --------17
*Memorandum from FERC and CFTC Regarding Information Sharing and Treatment of
    Proprietary Trading and Other Information* (Oct. 15, 2005), http://www.ferc.gov/press-
    room/press-releases/2005/2005-4/10-12-05.asp.----------------------------------------------17
*Memorandum of Law in Support of the Motion of Defendants Amaranth Advisors L.L.C. and
    Amaranth Advisors (Calgary ) ULEC for a Preliminary Injunction Against the Federal Energy
    Regulatory Commission* ("Amaranth Memorandum of Law") (Filed 08/16/2207)--------------- 8
*Remarks of CFTC Commissioner Michael V. Dunn before the American Public Gas
    Association's Annual Meeting*, Albany, NY (August 7, 2007) (Last accessed September 21,
    2007 at <http://www.cftc.gov/newsroom/index.htm#speeches>) ----------------------------------16
Wright, Charles Allen, *Law of Federal Courts* (West Publishing 1984)----------------------------- 9

## STATEMENT OF INTEREST AND BACKGROUND

Defendants Amaranth Advisors, L.L.C., and Amaranth Advisors (Calgary), U.L.C., (collectively "Amaranth") seek to enjoin a Federal Energy Regulatory Commission ("FERC") enforcement action.[1] Amaranth claims that the Commodity Futures Trading Commission ("CFTC") has exclusive jurisdiction to police market manipulation in energy markets and that, consequently, the FERC has no authority to pursue an enforcement action against it. From a procedural perspective, Amaranth's arguments ignore clear precedent on both timing and the required forum for collaterally attacking FERC's jurisdiction. On the merits, they cite dated authority concerning the CFTC that is – at best – of limited utility in examining the provisions of the Energy Policy Act of 2005 (EPAct2005) that are the justification for the FERC's enforcement action. Any clear reading of those provisions indicates that Congress expected both the CFTC and FERC to take action based on the same transactions affecting both agencies' jurisdiction. The challenged FERC action falls squarely within that Congressional expectation. The statute provides the FERC with tools and jurisdiction to play a primary role in wholesale energy market regulation and oversight, *while leaving regulation of the exchanges themselves and terms of exchange-traded instruments to the CFTC and other federal agencies*. If Amaranth's position prevails, it will gut the market manipulation provisions of the EPAct2005 and leave energy consumers vulnerable to market manipulation affecting FERC-jurisdictional energy markets. FERC Chairman Joseph Kelliher has correctly

---

[1]    *See* Order to Show Cause and Notice of Proposed Penalties, *Amaranth Advisors L.L.C. et al.* 120 F.E.R.C. ¶ 61,085 (2007).

pointed out the resulting regulatory gap – which he called the 'Amaranth Gap' - " . . .would dwarf the 'Enron Loophole' ".[2]

Although not parties to this appeal, the National Association of Regulatory Utility Commissioners ("NARUC") has a direct and vital interest in the FERC enforcement proceedings and the FERC's anti-manipulation authority under the Natural Gas Act ("NGA").[3]

NARUC, founded in 1889, is composed of the government officials in the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands, charged with the duty of regulating, *inter alia*, the electric and gas utilities within their respective borders. The United States Congress has called NARUC "the national organization of the State commissions" responsible for economic and safety regulation of the intrastate operation of utilities. See, e.g., 47 U.S.C. § 410 (1986). Moreover, federal Courts have recognized that NARUC is a proper party to represent the collective interest of the State regulatory commissions. See, e.g., *USA v. Southern Motor Carrier Rate Conference, et al.*, 467 F.Supp. 471 (N.D. Ga. 1979), aff. 672 F.2d 469 (5th Cir. Unit "B" 1982); aff. en banc, 702 F.2d 532 (5th Cir. Unit "B" 1983, rev'd, 471 U.S. 48 (1985). See also *Indianapolis Power and Light Co. v. ICC*,

---

[2]     "Kelliher stands firm on FERC enforcement as full-scale jurisdictional squabble erupts," *Inside FERC* (Platts, The McGraw-Hill Companies, Inc September 24, 2007) at page 1.

[3]     15 U.S.C. § 717c-1. Congress also added a parallel anti-market manipulation provision to the Federal Power Act ("FPA"). *See* 16 U.S.C. § 824v. The FERC's consumer protection mission under the FPA is to ensure just and reasonable rates, terms, and conditions for, *inter alia* jurisdictional wholesale electric power sales. This gives NARUC's members an additional vital interest in the potential impact of any ruling on the scope of FERC's jurisdiction under 15 U.S.C. § 717c-1 - which may impact the scope of FERC's new anti-manipulation authority under the FPA. The Supreme Court has adopted an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes [*i.e.,* the NGA and FPA]." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 n.7 (1981).

587 F.2d 1098 (7th Cir. 1982); *Washington Utilities and Transportation Commission v. FCC,* 513 F.2d 1142 (9th Cir. 1976).

Because of the impact on retail consumers, NARUC has consistently supported the enhanced authority granted by EPAct2005 to the FERC to detect, prevent and penalize market manipulation in wholesale energy markets. Amaranth's claim that the CFTC alone has jurisdiction in certain markets runs contrary to EPAct2005 and the needs of the nation's gas and electric consumers.

The statutory provisions establishing the FERC's jurisdiction are especially important to NARUC's State commission members because the FERC has the expertise and relationship with the State regulatory bodies needed to delineate the important effects of the financial markets have on the physical energy markets. If the FERC is unable to police market manipulation in financial markets that affects the price of natural gas, State regulators will be unable to prevent retail customers from being unfairly overcharged. Because natural gas fuels large amounts of electric generation, manipulated wholesale prices not only affect retail gas prices, but retail electricity prices as well. It is important to State regulators and ratepayers that the nation's energy markets operate free from manipulation by unethical traders. Competitive energy markets must work unfettered by unethical traders engaged in market manipulation that distorts markets, deteriorates legitimate competition, and harms the supply and price of electric and gas service.

For these reasons, NARUC strongly opposes Amaranth's request to enjoin the FERC's enforcement proceedings.

## ARGUMENT

### I.     The United States Courts of Appeals Have Exclusive Jurisdiction to Review the FERC's Enforcement Order.

Before advancing to Amaranth's legal arguments, this Court must first determine, as a threshold matter, that it has subject matter jurisdiction.[4]  A close examination of the relevant statutory text and jurisprudence[5] indicates that it does not.

No Court can determine if there is a likelihood of success on the merits of Amaranth's challenge, much less grant a preliminary injunction, without *necessarily* examining the *proper jurisdictional scope* of the FERC enforcement order.[6]

---

[4]     The issue of jurisdiction must be addressed "as a threshold matter." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). "That threshold question must be addressed first, since if the Court lacks subject matter jurisdiction, the case is not properly before it, and consequently the Court should say nothing about any other issue." *SST Global Technology, LLC v. Chapman*, No. 02-Civ. 7687, 2004 U.S. Dist. LEXIS 22286 **3-4 (SDNY Nov. 3, 2004) (Haight, J.).

[5]     On pages 17 – 18 of its memorandum, Amaranth argues that "[C]ourts have prevented the FERC from abusing its jurisdictional authority to do exactly what it is attempting to do here." Though not dispositive, it is revealing that *in the only five cases Amaranth could find to cite for this proposition*, the Courts that stepped in to prevent the alleged FERC abuses – *were all United States Courts of Appeal.* See *Memorandum of Law in Support of the Motion of Defendants Amaranth Advisors L.L.C. and Amaranth Advisors (Calgary ) ULEC for a Preliminary Injunction Against the Federal Energy Regulatory Commission ("Amaranth Memorandum of Law")* (Filed 08/16/2207) at pages 17-18. Compare, *Ukiah Adventis Hosp. v. FTC*, 981 F.2d 543, 551 (D.C. Circ 1992) ("*all* challenges to an agency's jurisdiction in the contest of non-final agency action lie within the exclusive jurisdiction of the courts of appeals…" {Emphasis in the original}).

[6]     According to Amaranth, to rule in its favor, this court will have to find that FERC is attempting ". . . to regulate indirectly activity that it lacks the authority to regulate directly."

In Section 19(b) of the Natural Gas Act, Congress limited review of FERC orders to the United States Courts of Appeals, stating that: "Any party to a proceeding under this Act aggrieved by an order issued by the Commission...may obtain review of such order *in the court of appeals of the United States . . .* within sixty days after the order of the Commission upon the application for rehearing..." {Emphasis Added} 15 U.S. C. § 717r(b) (2005).

It is hornbook law that Congress "...can provide a particular court for hearing certain questions and deny all other courts the power to consider that question, *even to the point of precluding raising the invalidity of a regulation as a* defense in a criminal action, *where there was a court provided in which the invalidity of the regulation might have been asserted.*" {Footnotes omitted and emphasis added}[8]

---

*Amaranth Memorandum of Law* at 17.

[8]    Wright, Charles Allen, *Law of Federal Courts*, at page 35 (West Publishing 1984) citing *Lockerty v. Phillips*, 319 U.S. 182 (1943) and *Yakus v. U.S.*, 321 U.S. 414 (1944); See also *The City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958). ("It can hardly be doubted that Congress . . . may prescribe the procedures and conditions under which, and the court in which, judicial review of administrative orders may be had.") Compare, *Florida Power & Light Co. v. Lorion, d/b/a Center for Nuclear Responsibility, et al.*, 470 U.S. 729, 746 (1984) ("Whether initial subject-matter jurisdiction lies initially in the courts of appeals must of course be governed by the intent of Congress . . . In these cases, the indications of legislative intent we have been able to discern suggest that Congress intended to locate initial subject-matter jurisdiction in the courts of appeals. This result is in harmony with Congress' choice of Hobbs Act review for {NRC} licensing proceedings . . . and is consistent with basic principles respecting the allocation of judicial review of agency action. . ."{citations omitted}.)

That is precisely what Congress did in NGA Section 19(b).

Congress specified a forum for challenging the invalidity of the FERC's regulations, *required challengers to exhaust administrative remedies at FERC before proceeding to ANY judicial forum,*[9] and has precluded their consideration elsewhere.[10] Moreover, Amaranth has effectively conceded, at least, the existence of an alternate forum for airing its grievances by filing a petition for rehearing at the FERC - the referenced statutory prerequisite for "raising the invalidity" of its order *in the forums designated by Congress* for such challenges, the United States Courts of Appeal.

## II.    Assuming, Arguendo, Review of the FERC's Enforcement Order in United States District Court is Proper, Amaranth Fails to Establish the Minimum Prerequisites for a Preliminary Injunction.

To grant Amaranth's motion for a preliminary injunction of the FERC's enforcement action, Amaranth must show: "(a) Irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting preliminary relief." See *Spencer Trask Software & Info Servs. LLC v Rpost Int'l LTD*, 190 F. Supp 2nd 577, 580 (SDNY 2002). Amaranth has failed to satisfy any of these elements.

---

[9]      See *Jones v. FCC*, No. 02 Civ. 693, 2002 U.S. Dist. LEXIS 16396 (SDNY Sept. 4, 2002) (Dismissing, based on a provision similar to 19(b) found in Title 47 of the United States Code, a complaint challenging a Federal Communications Commission Notice of Apparent Liability.)

[10]      See, *Williston Basin Interstate Pipeline Co. v. FERC*, 475 F. 3rd 330, 334(D.C. Cir 2006) NGA Section 19(b), says a party aggrieved by a FERC order and seeking court review must first apply for a rehearing, and sixty days after the FERC rules on that request must "*. . .file a petition for review in the appropriate court of appeals.*"); See also *Williams Natural Gas Co. v. City of Oklahoma*, 890 F.3rd 255, 262-63 (10th Cir. 1989) (Judicial review of a FERC order is exclusive to Court of Appeals.)

A.    **The FERC's Enforcement Order Will Not Cause Amaranth Irreparable Harm.**

On pages 24 – 27 of its memorandum of law, Amaranth essentially argues that because both the CFTC and FERC actions arise from the *same series of transactions*, that the threats of "inconsistent judgments" and the impact of "collateral estoppel (as to issues) and *res judicata* (as to claims)" constitute irreparable harm.

They do not.  Simultaneous, coordinated enforcement actions cannot, by themselves, constitute "irreparable harm" under the applicable precedent.  Conclusory statements that Amaranth will incur greater legal fees and costs associated with defending coordinated, simultaneous proceedings by two agencies cannot justify the extraordinary remedy to stay the FERC's enforcement action.[11]

Moreover, the whole notion that competing agency enforcement actions arising from the same series of transactions could lead to "irreparable injury" is inconsistent on its face with both Congressional intent in the EPAct2005 and extensive jurisprudence allowing more than one agency to impose penalties based on the same conduct or series of transactions.

It is clear Congress anticipated that FERC and the CFTC would be investigating violations of their respective statutes arising from the *same transactions or series of transactions*.  There is no other reasonable explanation of the EPAct2005's requirement, in §316(c)(1), 15 U.S.C. 717t-2(c)(1),

---

[11]    See, *The Times Mirror Co. v FTC*, No. 78-3422, 1979 U.S. Dist. LEXIS 11738 at *6 (C.D. Cal. June 13, 1979) (finding that neither litigation expense nor wasting government resources constitutes irreparable harm.)  See also, *Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13, 16 (2d Cir. 1987)Affirming a denial of an injunction citing, *inter alia*, the fact that the movant produced only conclusory evidence from a company officer.)  See also, *Renegotiation Board v. Bannercraft Co.*, 415 U.S. 1, 24(1973) (litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury).

for the FERC " . . . to conclude a memorandum of understanding with the Commodity Futures Trading Commission relating to information sharing, which shall include, among other things, provisions ensuring that information requests to markets within the respective jurisdiction of each agency are properly coordinated to minimize duplicative information requests, and provisions regarding the treatment of proprietary trading information."

It is hard to square this clear Congressional contemplation of such dual investigations[12] with Amaranth's contentions. But even if one ignores Congress' intent in EPAct 2005, it is a fact that enforcement actions directed at a particular transaction or conduct, by two federal agencies, based on different statutes are not uncommon. That lower courts have consistently found such competing investigations permissible undermines any notion that such dual agency actions can result in irreparable harm. Following the lead of the Supreme Court's 1997 decision in *Hudson v. United States*,[13] lower courts have upheld concurrent penalties imposed by a self-regulatory organization operating under the statutory scheme of the securities or commodities laws and the umbrella federal agency.[14]

---

[12]    The authority to investigate authorized in EPAct2005, on its face, in context, implies an ability to take some action based on those investigations.

[13]    *Hudson v. United States*, 522 U.S. 93, 95-96 (1997). In *Hudson*, the court determined that a defendant subject to a civil penalty is not protected by the Double Jeopardy Clause from a subsequent criminal prosecution for the same conduct. Lower courts subsequently held assessment of a *civil* penalty on a convicted felon for the same conduct were also permissible. See *SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998) (rejecting challenge to civil penalty under the federal securities laws where defendant was convicted in criminal proceeding for the same conduct and sentenced to prison, and ordered to pay restitution and a civil penalty). See also *Cox v. CFTC*, 138 F.3d 268, 272-74 (7th Cir. 1998) (holding a permanent ban on commodity market trading and revocation of floor broker registration under the Commodity Exchange Act were civil remedies that did not implicate the Double Jeopardy Clause).

[14]    *Jones v. SEC*, 115 F.3d 1173, 1182-83 (4th Cir. 1997) (rejecting challenge sanctions in SEC administrative proceeding that followed sanctions by the National Association of Securities Dealers

Based on *Hudson*, it seems clear, if parallel penalties by a self-regulatory organization whose determinations are reviewable by a federal agency[15] are permissible, then parallel penalties imposed by, or at the instance of, two federal agencies with jurisdiction over the same conduct are also permissible.[16]

Finally, Amaranth's concerns about *res judicata* and collateral effects of simultaneous action are, at best, overstated. The CFTC cannot enforce the provisions or address the specific issues that arise under the NGA. The converse is also obviously true, the FERC cannot enforce the provisions of the CEA.[17]

### B.    Amaranth is Not Likely to Succeed on the Merits.

To succeed on the merits, Amaranth's view of FERC's statutory authority with respect to market manipulations, must trump the obvious expectations of Congress for coordinated

---

for the same conduct); *Grossfeld v. CFTC*, 137 F.3d 1300, 1302-04 (11th Cir. 1998) (rejecting challenge to CFTC sanctions imposed after sanctions by the National Futures Association for the same conduct).

[15]    Sanctions imposed by, e.g., the National Association of Securities Dealers are subject to review by the SEC under section 19(d)(2) of the Securities Exchange Act, 15 U.S.C. § 78s(d)(2) (2000). Sanctions imposed by the National Futures Association are subject to review by the CFTC pursuant to section 17(i) of the Commodity Exchange Act, 7 U.S.C. § 21(i) (2000).

[16]    See *FTC v. Cement Institute*, 333 U.S. 683 (1948) (Agencies can proceed simultaneously against the same parties for the same conduct); *Britol-Meyers Co. v. FTC*, 738 F.2nd 554, 559-60 (2nd Cir. 1984) (concurrent Federal Trade Commission and Food and Drug Administration jurisdiction ok): *Warner-Lambert Co. v. FTC*, 361 F. Supp. 948, 952-53 (D.D.C. 1973) (Court upheld concurrent enforcement action by the FDA and FTC involving the same parties because the statutory remedies of the agencies are cumulative.)

[17]    See *U.S. v RCA*, 358 U.S. 334, 346 (1959) because the Court had no power to decide the Federal Communications Act issues, and the Federal Communications Commission had no power to decide antitrust questions, there can be no collateral estoppel or *res judicata* arising out of separate district court and administrative proceedings pursuant to the Sherman Act and the Federal Communications Act.

enforcement arising from the same conduct - evidenced by (1) the text of the statute, (2) the FERC's exegesis of the statutory text, (3) declarations in the required FERC-CFTC Memorandum of Understanding ("MOU") referenced *supra*, and (4) public statements by both FERC and CFTC Commissioners.  Amaranth faces a difficult challenge.  The FERC provides a compelling case that EPAct2005 provides it with clear authority to prohibit market manipulation.[18]  No one can contest that EPAct2005 Sections 315 and 1283 significantly expands FERC's authority to prevent market manipulation that affects FERC-jurisdictional energy markets.[19]  As noted *supra*, given the EPAct2005 instructions for FERC and CFTC to cooperate on investigations of illicit activity, it is also undeniable that Congress anticipated that FERC and the CFTC would engage in simultaneous investigations of violations of their respective statutes arising from the *same transactions or series of transactions*.  It is similarly beyond argument whatever nuances concerning the scope of FERC

---

[18]    See generally – Order No. 670, *Prohibition of Energy Market Manipulation*, 114 F.E.R.C. ¶31,202, 71 Fed. Reg. 4,244 (2006) at ¶¶ 7, 24-27).

[19]    15 U.S.C. § 717(b), 15 U.S.C. §717c(a) and 15 U.S.C. §717o (2000).  EPAct2005 broadly expands FERC's authority to prevent "any entity" from engaging in market manipulation "in connection" with jurisdictional sales.  15 U.S.C. § 717c-1.  EPAct2005 Sections 314 and 1284 significantly increases and broadens the civil and criminal penalty provisions of the FPA and NGA. EPAct2005 Sections 316 and 1281 of EPAct adopted parallel provisions for the NGA and the FPA to require the FERC to facilitate greater transparency of information about the availability and price of natural gas and electric energy.

[21]    See generally, *Order No. 670* at ¶21-22, 25. Order No. 670 notes that ". . .any entity may be subject to the final rule if its fraudulent or manipulative conduct is "in connection with" a purchase or sale of natural gas . . . or transmission service that is subject to the Commissions jurisdiction." The agency argues that a plain reading of the statue demonstrates Congress expanded its jurisdiction, to reach entities, like Amaranth, by using the phrases "any entity", "directly or indirectly", and "in connection with [jurisdictional sales]" to describe covered conduct under the new rules.  The use of "directly or indirectly" indicates Congress meant the provision to apply to more than just a physical jurisdictional sale or the seller of the physical commodity – an interpretation bolstered by the statute's reference to "any entity".  Use of the phrase "in connection with" imposes a broad prohibition because the phrase is modeled after the text of section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b)(2000), and SEC Rule 10-b-5, 17 C.F.R. § 240.10b-5(2006).

authority that remain will be decided based upon, predominately, court review of FERC's exegesis of those EPAct2005 provisions.

Amaranth arguments that FERC lacks jurisdiction to issue its show cause order reflects a deliberate misconstruction of the rationales the FERC has offered to support its action. The suggestion that FERC somehow concedes in *Order No. 670* that EPAct 2005 does not expand its jurisdiction is exceptionally convoluted. The contention that Amaranth must actually trade "physical gas" ignores Congress' instructions for FERC to penalize "any entity" whose actions – in this case manipulation of the Natural Gas Futures Contract Settlement price – are "in connection with" FERC jurisdictional transactions.[21]   FERC's analysis is based on a plain reading of the statutory text and there is no question that the conduct at issue can impact FERC jurisdictional transactions. Amaranth has not presented any credible rebuttal to either FERC's analysis or the fact that their conduct *impacts* FERC jurisdictional transactions. Moreover, much of the CFTC-specific jurisprudence Amaranth cites to support its arguments that CFTC's jurisdiction ousts FERC from the current enforcement action, predates the 2005 legislation and is of limited utility in the required analysis of the EPAct2005 language that is the basis for FERC's jurisdictional assertions.

The text of the MOU and subsequent public statements by both FERC and CFTC commissioners[22] support FERC's reading of the statute. Both agencies – as the MOU notes – have

---

[22]   A recent public speech by CFTC Commissioner Michael V. Dunn is also consistent with FERC's enforcement action against Amaranth. In the August 7, 2007, speech at the American Public Gas Association Annual Meeting, Commissioner Dunn stated: "Essentially, the FERC and CFTC have *joint jurisdiction over large parts of the energy market*. However, their different statutory schemes may lead to two agencies filing different lawsuits over the same set of facts in many energy cases." *Remarks of CFTC Commissioner Michael V. Dunn before the American Public Gas Association's Annual Meeting*, Albany, NY (August 7, 2007) (Last accessed September 21, 2007 at <http://www.cftc.gov/newsroom/index.htm#speeches>).

11

exclusive jurisdiction *to enforce their respective statutes*.[23] The critical question seems to be: under what circumstances can both agencies enforce their respective statutes based on the same transaction or series of transactions. The language of the MOU signed by both agencies and *mandated by Congress* suggests an answer that is consistent with FERC's enforcement action in this case: "...the CFTC and the FERC may from time to time engage in <u>oversight</u> or investigations of *activity affecting both* CFTC-jurisdictional and FERC-jurisdictional markets."[24]  The MOU also provides that the agencies will: ". . . *coordinate* on a regular basis oversight, investigative, and *enforcement activities of mutual interest*."[25]

Because FERC's jurisdictional assertions find strong support in the statutory text and is likely to be upheld on review, judicial intervention in its ongoing enforcement action is inappropriate.

---

[23]    EPAct2005 directs the CFTC and the FERC to execute an MOU to ensure that investigations pertaining to markets within the respective jurisdiction of each agency are properly coordinated. 15 U.S.C. §717t-2(c)(1).

[24]    *Memorandum from FERC and CFTC Regarding Information Sharing and Treatment of Proprietary Trading and Other Information* (Oct. 15, 2005), http://www.ferc.gov/press-room/press-releases/2005/2005-4/10-12-05.asp. <u>See</u> <u>also</u> Press Release, *CFTC, CFTC Chairman Jeffrey and FERC Chairman Kelliher Sign MOU on Information Sharing, Confidentiality* (Oct. 15, 2005), www.cftc.gov/opa/press05/opa5127-05.htm.

[25]    *Id.*

## CONCLUSION

For the reasons set forth above, Amaranth's motion seeking a preliminary injunction of the

FERC enforcement proceedings should be denied.

Respectfully submitted,

The National Association of Regulatory
Utility Commissioners

James Bradford Ramsay
General Counsel
Grace D. Soderberg
Assistant General Counsel

National Association
of Regulatory Utility Commissioners
1101 Vermont Avenue, Suite 200
Washington, DC 20005
(202) 898.1350

13

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with Local Civil Rule 5.3, on this 28th day of September, 2007, I served a copy of the forgoing "MEMORANDUM OF LAW OF THE NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS AS *AMICUS CURIAE* IN OPPOSITION TO THE MOTION FOR A PRELIMINARY INJUNCTION" on all parties by overnight delivery service at the address below. As a courtesy, I have also faxed and e-mailed copies to addresses listed below.

*Masha Shmukler*

**Federal Energy Regulatory Commission**

**Leslie Beth Bellas**
**Lee Ann Watson**
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6528
(202) 208-0057 (fax)
leslie.bellas@ferc.gov

**Patrick Todd Mullins**
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6528
(202) 208-0057 (fax)
todd.mullins@ferc.gov

**Amaranth Advisors (Calgary) U.L.C.**

**David Emilio Mollon**
Winston & Strawn LLP (NY)
200 Park Avenue
New York, NY 10166
(212) 294-4748
(212) 294-4700 (fax)
dmollon@winston.com

14

**U.S. Commodity Futures Trading Commission**

**Stephen Jay Obie**
Commodity Futures Trading Commission (NYC)
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9766
(646) 746-9940 (fax)
sobie@cftc.gov

**Manal Sultan**
Commodity Futures Trading Commission (NYC)
140 Broadway
New York, NY 10005
(646) 746-9766
(646) 746-9940 (fax)
msultan@cftc.gov

**DO NOT DETACH**

**RETURN TO:**

COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
kyle.chapman@mail.house.gov

FAX: (202) 225-5288

**MANUSCRIPT FOR CORRECTION AND RETURN**

Subcommittee: **Subcommittee on Oversight and Investigations**

Hearing Title:  **Energy Speculation:  Is Greater Regulation Necessary to Stop Price
Manipulation?**

Hearing Date: **Wednesday, December 12, 2007**

Referred to: **The Honorable Joseph T. Kelliher**

Corrections Submission Deadline:  **Monday, February, 4, 2008**

　　　Attached please find the portion of the hearing transcript that contains your
remarks. Please clearly indicate any corrections on the document itself and promptly
return the manuscript so your corrections, if any, will appear in the printed volume.
You may e-mail, fax, or send by inside mail the corrections using the information
provided above.  **A PDF of the corrections sent via e-mail is preferred.**

　　　The printed transcript of this hearing will contain a substantially verbatim
account of remarks actually made during the hearing. Thus, only **technical,
grammatical, stenographic, and typographical corrections** will be accepted.

　　　Thank you and please contact me if you have any questions.

Kyle Chapman
Ph: (202) 226-2424

**NOTE: If your corrections are not received by the deadline set above, the
transcript will be presumed accurate.**

1  {York Stenographic Services, Inc.}


2  HIF346.020

3  HEARING ON ``ENERGY SPECULATION: IS GREATER REGULATION

4  NECESSARY TO STOP PRICE MANIPULATION?''

5  WEDNESDAY, DECEMBER 12, 2007

6  House of Representatives,

7  Subcommittee on Oversight and Investigations

8  Committee on Energy and Commerce

9  Washington, D.C.



10      The subcommittee met, pursuant to call, at 9:35 a.m., in

11  Room 2123 of the Rayburn House Office Building, Hon. Bart

12  Stupak [Chairman of the Subcommittee] presiding.

13      Members present:  Stupak, Melancon, Green, Barrow,

14  Inslee, Dingell (ex officio), Whitfield, Walden, Murphy,

15  Burgess, Blackburn, Barton (ex officio), Fossella, and

16  Shimkus.

17      Staff present:  Richard Miller, Investigative Counsel;

18  Scott Schloegel, Professional Staff Member; John Arlington,

|

3305  ^STATEMENTS OF HONORABLE JOSEPH T. KELLIHER, CHAIRMAN,

3306  FEDERAL ENERGY REGULATORY COMMISSION; AND HONORABLE WALTER

3307  LUKKEN, ACTING CHAIRMAN, U.S. COMMODITY FUTURES TRADING

3308  COMMISSION.


3309  ^TESTIMONY OF JOSEPH T. KELLIHER

3310  }   Mr. {Kelliher.}  Thank you, Mr. Chairman.  Mr. Chairman,

3311  members of the subcommittee, thank you for the opportunity to

3312  speak with you today about the Federal Energy Regulatory

3313  Commission's role in protecting energy consumers against

3314  price manipulation in wholesale energy markets.  It is good

3315  to be back at the committee.

3316      My comments today will focus primarily on the steps FERC

3317  has taken to ensure the integrity of wholesale gas markets

3318  and prevent market manipulation under the new authorities

3319  granted to it by Congress in the Energy Policy Act of 2005.

3320  I thank the committee for supporting FERC's request for this

3321  additional authority 2 years ago and credit the committee for

3322  recognizing that FERC needed new regulatory tools to

3323  discharge its historic duty to guard the consumer.

3324      And particularly the Energy Policy Act amended our

3325  statutes in several significant ways to protect against

3326  market manipulation.  First, it granted us expressed

3327    authority to prevent market manipulation.  It also gave us

3328    authority to issues rules to assure greater price

3329    transparency and wholesale gas markets as well as

3330    jurisdictional power markets.  It also gave the committee

3331    enhanced civil penalty authority.

3332        At this time, I do not believe that FERC needs any

3333    additional legal authority to protect consumers from market

3334    manipulation.  You gave us the tools we needed 2 years ago,

3335    and we are using them.  However, it is important that those

3336    tools not be taken away from us or diminished.

3337        The Energy Policy Act granted FERC express authority to

3338    prevent market manipulation.  This provides a strong

3339    grounding for our efforts to oversee wholesale energy

3340    markets.  Under our final anti-manipulation rules, it is

3341    unlawful for any entity, directly or indirectly, in

3342    connection with the purchase or sale of electric energy or

3343    transmission services subject to FERC jurisdiction or the

3344    purchase or sale of natural gas or transportation service

3345    subject to FERC jurisdiction to engage in duplicative or

3346    manipulative practices.

3347        In two recent cases, FERC issued orders to show cause

3348    and notices of proposed penalties in the course of market

3349    manipulation investigations.  Under these orders, FERC made

3350    preliminary findings that two groups of companies and

3351  individual traders, collectively Amaranth and Energy Transfer

3352  Partners, may have manipulated energy markets.  These orders

3353  do not represent final determinations and make no final

3354  conclusions.  Both groups of respondents have been given the

3355  opportunity to rebut the preliminary conclusions set forth in

3356  the orders.  However, if the final conclusions reflect the

3357  preliminary findings, we propose to impose penalties that

3358  approach the maximum for certain violations, $291 million for

3359  the Amaranth entities and $167 million for the Energy

3360  Transfer Partners entities for total civil penalties of $458

3361  million.

3362       Before I discuss the Amaranth and Energy Transfer

3363  Partners investigation, it is important to recognize that

3364  natural gas is traded in a wide variety of products.  That

3365  was made clear in the discussion on the earlier panel.  Some

3366  of these products are physical products, potentially subject

3367  to FERC jurisdiction.  Other products are futures or

3368  financial products subject to CFTC jurisdiction.

3369       However, month indexes used to price physical gas sales

3370  are constructed using transactions with prices set in part by

3371  futures prices.  This is particularly true in the Eastern

3372  United States and the Gulf Coast, as shown by the map that is

3373  attached to my testimony.  As a result, futures prices

3374  determine, in part, the price of physical natural gas

3375  purchased by customers and the effects on physical markets of
3376  changes in futures prices are direct and significant.

3377       Based on the evidence developed in the investigation, we
3378  made a preliminary finding that Amaranth may have
3379  deliberately obtained and then sold large futures positions
3380  in the last half hour of trading on the settlement date and
3381  number of months in order to manipulate prices downward.
3382  Thus, Amaranth may have benefited from even larger opposing
3383  positions that they held on ICE, and they did this full well
3384  knowing that their actions would affect physical prices as
3385  well.

3386       The Energy Transfer Partners investigation looked at a
3387  different scenario where we believe, based on preliminary
3388  conclusions, that Energy Transfer Partners may have
3389  manipulated physical prices, physical transactions, in order
3390  to benefit opposing positions they held in other physical
3391  products as well as CFTC jurisdictional financial products.

3392       Now, in both the Amaranth and the Energy Transfer
3393  Partners cases, FERC began an investigation.  We shared our
3394  information fully with the CFTC, and the CFTC began its own
3395  investigations of both matters soon thereafter.  The two
3396  agencies cooperated closely throughout these investigations.
3397  I think that is a credit to the memorandum of understanding
3398  that the two agencies entered into in October 2005, as

3399    directed by Congress.

3400        I think the MOU has worked very successfully over the

3401    past two years.  Now, the MOU has worked very well and

3402    particularly during these investigations, during the 14

3403    months of the Amaranth investigation as well as the 21 months

3404    of the Energy Transfer Partners investigations, and it

3405    continues to operate successfully.  The two agencies

3406    conducted parallel investigations that were very closely

3407    coordinated.

3408        Now, this cooperation was significant.  Market

3409    manipulation can cross jurisdictional lines.  It can cross

3410    product lines, as shown by both the Amaranth and the Energy

3411    Transfer Partners investigations.  In a sense, one of these

3412    investigations examined manipulation that may have occurred

3413    within CFTC jurisdiction but affected FERC jurisdictional

3414    sales.  The other involved manipulation that may have

3415    occurred within FERC jurisdictional markets that affected

3416    other CFTC jurisdictional transactions.

3417        Both investigations involved possible manipulation that

3418    may have crossed the jurisdictional lines between the two

3419    agencies, and cooperation between FERC and CFTC is essential

3420    in order to police this kind of manipulation.

3421        Now the enforcement actions, as I indicated, were

3422    coordinated, very closely coordinated as were the

156

3423   investigations themselves, and both agencies publicly praised

3424   the investigations conducted by the other agencies when we

3425   took coordinated enforcement action in July.

3426        Now, since then Amaranth has raised arguments about

3427   whether FERC has jurisdiction over manipulation of the

3428   monthly futures price.  Even before we issued our order to

3429   show cause in July, Amaranth's lead trader, Brian Hunter,

3430   filed in the U.S. District Court for the District of

3431   Columbia, seeking to enjoin issuance of our Order, claiming

3432   that FERC lacked jurisdiction.  Judge Richard Leon denied

3433   their request for a temporary restraining order, and just on

3434   Monday of this week, he also denied the injunction.

3435        Now, within weeks of the order to show cause, Amaranth

3436   also filed a motion to stay FERC's action and civil action

3437   filed by the CFTC against Amaranth in the U.S. District Court

3438   for the Southern District of New York.  Amaranth argued,

3439   among other things, that we lacked jurisdiction, and CFTC has

3440   sole jurisdiction over the conduct prescribed in our order to

3441   show cause.  Although CFTC opposed Amaranth's motion to stay

3442   our order, CFTC maintained that it had exclusive jurisdiction

3443   over all trading and natural gas futures.

3444        This position would have the effect of preempting FERC's

3445   ongoing enforcement proceeding against Amaranth, and I

3446   consider this to have been a significant change in the CFTC

3447  position.

3448      Now, at this point, the two agencies, we have a

3449  difference of opinion about the proper interpretation of the

3450  anti-manipulation provisions of the Energy Policy Act and how

3451  those provisions should be interpreted in concert with the

3452  Commodity Exchange Act, and this agreement will likely be

3453  resolved by the Courts.  And I think that is appropriate.

3454      But I just want to emphasize that there is a great deal

3455  at stake in this legal dispute.  The key issue, the central

3456  issue, is the reach of FERC's anti-manipulation authority,

3457  the extent of our ability to protect consumers.  If the

3458  attack on our jurisdiction is successful, our ability to

3459  guard the consumers from exploitation would be significantly

3460  reduced.

3461      FERC and CFTC are different agencies with different

3462  duties.  We are a consumer protection agency.  The CFTC has a

3463  different mission.  We have greater penalty authority than

3464  the CFTC and are more likely to order disclosure of profits

3465  in a market manipulation case, which holds out the promise to

3466  consumers that they might be made whole.

3467      It is also much harder for the CFTC to prove

3468  manipulation that FERC since they operate under a high

3469  statutory standard.  And I think consumers see a difference

3470  between the agencies.  I think that is why the National

3471    Association of State Utility Regulators and a host of

3472    individual state commissions have declared support for FERC's

3473    position.  They have even gone so far as to enter the

3474    litigation, filing briefs in the New York District Court

3475    supporting FERC.

3476          But perhaps the best judge is the consumers themselves.

3477    Various consumers groups have filed briefs in support of FERC

3478    position, including one of the organizations represented on

3479    the first panel, American Public Gas Association.

3480          Now, at FERC, we recognize that CFTC has exclusive

3481    jurisdiction to regulate aspects of future trading.  FERC

3482    respects the CFTC's exclusive jurisdiction in these areas,

3483    and we do not seek to regulate futures or regulate NYMEX.

3484    And I do not believe that our enforcement actions that we

3485    proposed against Amaranth constitute regulation.

3486          Now, FERC stands by our position that Amaranth's

3487    activities fall within our jurisdiction insofar as they

3488    affect physical sales of natural gas.  We believe that the

3489    anti-manipulation and the anti-manipulation provisions in the

3490    Energy Policy Act 2005 give FERC broad authority to sanction

3491    manipulative conduct when it significantly affects

3492    jurisdictional sales.

3493          Comments in floor debate on the Energy Policy Act

3494    clearly indicate Congress's intent that FERC implement the

3495    broadest possible prescriptions necessary to protect energy
3496    consumers.
3497        I believe that the words in the statute mean something,
3498    both the words that Congress chooses and the words it does
3499    not choose.  Here, the choices are significant.  The FERC
3500    anti-manipulation authority applies to ``any entity'' rather
3501    than ``a natural gas company'', a defined term set in Law 7
3502    years ago, meaning a company that engages in jurisdictional
3503    sales.  We are authorized by the statute the sanction
3504    manipulation that directly or indirectly affects
3505    jurisdictional sales.  And we can sanction fraud and deceit
3506    in connection with jurisdictional sales.
3507        In addition, it is noteworthy that Congress included no
3508    saving clause in the anti-manipulation provision of the
3509    Energy Policy Act related to CFTC authority.  I would be
3510    happy to discuss statutory interpretation at greater length
3511    if that is the will of the subcommittee.
3512        Now, the question has been posed whether FERC should
3513    have exercised its anti-manipulation authority.  I think one
3514    of the lessons of the California Western power crisis is that
3515    manipulation can hurt gas and power consumers.  That is why
3516    you gave us the anti-manipulation authority 2 years ago.  You
3517    gave us the tools, and we have been using them.
3518        I think FERC has a duty to guard the consumer from

3519    exploitation, and exercise of our anti-manipulation authority

3520    is necessary to discharge that duty.  And I respectfully

3521    suggest that if FERC had declined to use this anti-

3522    manipulation authority, the subcommittee should have held a

3523    hearing today to ask us why not.

3524        Now, I regret that this disagreement between FERC and

3525    CFTC has arisen in recent months, but I want to make it clear

3526    that this disagreement over jurisdiction has not impeded

3527    cooperation between the two agencies.  We have a respectful

3528    disagreement over interpretation of the anti-manipulation

3529    provisions of the Energy Policy Act, a disagreement that, in

3530    my view, is best resolved by the Courts.

3531        But I also want to make it clear that I do not question

3532    CFTC's commitment to prevent market manipulation.  They are

3533    as committed to preventing market manipulation as FERC.  They

3534    have demonstrated that by continuing to cooperate with FERC

3535    on matters of mutual interest, notwithstanding their legal

3536    opinion on the scope of our jurisdiction.

3537        So I just want to reassure the subcommittee that this

3538    disagreement has not impeded cooperation between the two

3539    agencies on ongoing investigations in areas of mutual

3540    interest.  The MOU continues in place, and we continue to

3541    coordinate our information gathering, and we continue to

3542    coordinate our investigations.

3543      Staff members from the two agencies continue to meet

3544   periodically to discuss more general ides of common interest,

3545   and the two agencies are discussing other ideas on how to

3546   improve cooperation investigations going forward.

3547      Now, in conclusion, the Energy Policy Act gave FERC the

3548   tools that we need to oversee physical natural gas and

3549   electric power markets.  Over the last 2 years, we have moved

3550   both carefully and quickly to implement the relevant

3551   provisions of the Energy Policy Act, especially the anti-

3552   manipulation civil penalty and the transparency authorities.

3553      Our experience so far is that the new authorities gave

3554   us the tools we needed to penalize and deter price

3555   manipulation, and our track record shows how effective those

3556   authorities can be.  But I do not anticipate that we would

3557   need further authorities.  However, I do note that there is

3558   legislation being considered earlier today that would amend

3559   the Commodity Exchange Act.  I think it is important, though,

3560   to make sure that FERC authority to look into ICE markets is

3561   not diminished by changes to the Commodity Exchange Act.  And

3562   I ask the committee for your assistance in that.

3563      However, a legal question has arisen.  Yes, sir.

3564      Mr. {Stupak.}  I am going to need you to wrap up.

3565      Mr. {Kelliher.}  Yes, sir.

3566      Mr. {Stupak.}  We are 7 minutes over, and we got votes

3567  now.  I want to get Mr. Lukken in yet before we go.

3568      Mr. {Kelliher.}  Can I have 10 seconds?

3569      Mr. {Stupak.}  Yeah, quickly.

3570      Mr. {Kelliher.}  A legal question has arisen regarding

3571  one of our most important new authorities.  We think it is

3572  important to clarify the extent of FERC authority in this

3573  area.  We think there is a great deal at stake, and we think

3574  the Court is the right place to settle it.  Thank you.

3575      [The prepared statement of Joseph T. Kelliher appears at

3576  the conclusion of the hearing:]


3577  ***************  INSERT 6  ***************

|

3704    Mr. {Stupak.}  Thank you, and thank both of you for

3705    appearing here today.  Unfortunately, we have four votes on

3706    the floor right now.  So I think we are going to recess until

3707    approximately 1:30, 1:35.  We should be back by then, and

3708    hopefully we will have a chance to take questions, and more

3709    members will be back then.

3710        [Recess.]

3711    Mr. {Stupak.}  We have had the opening statements.  We

3712    are going to go on with questions.  Mr. Kelliher, if I may

3713    start with you, sir.  Your testimony says, ``legislative

3714    proposals intended to enclose the Enron loophole and give the

3715    CFTC jurisdiction over ICE and other electronic trading

3716    venues could affect FERC's ability to oversee natural gas and

3717    electric power markets.  Many of the same venues trade

3718    physical as well as financial contracts, and any limitations

3719    on FERC's access to that information could reduce its ability

3720    to oversee jurisdictional market.''  What specific

3721    legislative proposals are you referring to, and what

3722    authorities are at risk in terms of FERC jurisdiction over

3723    trading in exempt commercial markets?

3724    Mr. {Kelliher.}  Well, we do currently have ability to

3725    get information from ICE.  First of all, we get information

3726    as a client.  We buy information.  That was discussed in the

3727  first panel.  We actually think that information is very

3728  important to us, but we also occasionally issue a friendly

3729  subpoena to ICE.  And we get additional information that is

3730  non-public from them, and that information is very important

3731  to us to monitor markets and look for possible market

3732  manipulation.  If we were not able to get that non-public

3733  information, it would impair our ability to understand the

3734  market.

3735      Mr. {Stupak.}  Well, if it a friendly subpoena, is the

3736  contents of the subpoena negotiated out before it is issued

3737  then?

3738      Mr. {Kelliher.}  The subpoena, I won't say they invite,

3739  but they--the information we get from them is very detailed

3740  market information.  But the companies that are engaged in

3741  transactions, they are blind.  They are Company X, Company Y.

3742      Mr. {Stupak.}  Okay.

3743      Mr. {Kelliher.}  We sometimes want to know who Company X

3744  is, and so that--and it is necessary to issue a subpoena.

3745  And then they will identify the company.  The information

3746  remains nonpublic, but that is what we can do currently.  We

3747  don't want to lose that ability.

3748      Mr. {Stupak.}  Well, is there any language you would

3749  suggest to us to ensure that there is no limitation on your

3750  ability to access information and bring enforcement actions?

3751    Mr. {Kelliher.}  We can provide that information to you,

3752    sir.

3753    Mr. {Stupak.}  Okay, in the Energy Transfer Partners

3754    case brought by FERC, FERC alleged that the company used its

3755    market power in the Houston Ship Channel to drive down the

3756    physical price of natural gas and at the same time took a

3757    series of short positions on ICE which bet that the price of

3758    natural gas at that location would go down.  FERC estimated

3759    $67 million in unjust profits in just nine trading periods.

3760    What is noteworthy is that FERC was alerted by a call to the

3761    enforcement hotline.

3762    So would this case of alleged market manipulation have

3763    been detected without your call to the hotline, without a

3764    call from the hotline?

3765    Mr. {Kelliher.}  It might have, and FERC investigations,

3766    and probably similar with CFTC, begin a number of different

3767    ways.  In the case of Amaranth, that investigation began by

3768    FERC staff monitoring transactions at NYMEX, and NYMEX is a

3769    very transparent market and just seeing some price movements

3770    that didn't seem to make sense based on our understanding of

3771    market fundamentals.

3772    But hotline calls also are a source of--can begin an

3773    investigation.  Sometimes it is a FERC audit.  Sometimes it

3774    is a referral from another federal agency.  There really are

3775  about 10 different ways an investigation might begin, but in

3776  that case, it was a hotline call from--

3777      Mr. {Stupak.}  Let me ask this.  Has FERC initiated any

3778  manipulation cases where prices were manipulated upward?

3779      Mr. {Kelliher.}  We have a number of nonpublic

3780  investigations that I am not at liberty to discuss.  I am

3781  actually--

3782      Mr. {Stupak.}  Do you have a number of investigations

3783  going now on the upward--

3784      Mr. {Kelliher.}  We have a good number of current

3785  investigations.  Some of them may involve upward

3786  manipulation.  Some of them may involve downward

3787  manipulation, but I actually legally cannot discuss them

3788  without authorization--

3789      Mr. {Stupak.}  Sure.

3790      Mr. {Kelliher.}  --from the Commission.  But I can offer

3791  a private briefing.  I would be happy to provide a private

3792  briefing to you after getting that authorization.

3793      Mr. {Stupak.}  I am sure some members would be

3794  interested.  Mr. Kelliher, in the Amaranth case involving

3795  manipulation of futures and derivatives markets during the

3796  months of February, March, and April of 2006, which then

3797  drove down the prices paid in FERC jurisdiction markets, has

3798  FERC investigated price increases for '06 and '07 winter

3799  season that impacted prices in the spring and summer of '06,

3800  which was connected to Amaranth trading standard strategies?

3801      Mr. {Kelliher.}  We did look at Amaranth trading

3802  activity in other months, not just in those months.

3803      Mr. {Stupak.}  Okay.

3804      Mr. {Kelliher.}  But we are not looking at manipulation

3805  of futures.  We are looking at manipulation of futures

3806  products that affect physical gas consumers.  It is entirely

3807  possible Amaranth might have--it is hypothetically possible a

3808  company--I want to be careful.  A company could engage in

3809  manipulation of futures that actually has no effect on

3810  physical gas consumers, and we would have no interest in that

3811  manipulation.

3812      Mr. {Stupak.}  Okay, has FERC given thought to expanding

3813  its jurisdiction to cover enforcement of market manipulation

3814  outside its current jurisdictional markets involving pipes

3815  and wires such as heating oil, crude oil, propane, ethanol,

3816  or other?

3817      Mr. {Kelliher.}  We have not requested that authority.

3818      Mr. {Stupak.}  Have you given thought to it?  Have you

3819  discussed it?

3820      Mr. {Kelliher.}  I think the question has been raised

3821  about propane, and I think we have respectfully declined the

3822  request.  We have not sought that authority over propane and

3823  other petroleum products in part because of the nature of our

3824  agency.  Our authority, with respect to oil, is we set rates

3825  for oil pipelines.  That is it, and so we have a fairly--

3826      Mr. {Stupak.}  Sure.

3827      Mr. {Kelliher.}  --modest role in oil pipelines that

3828  goes back 100 years actually.  And the idea of a dramatic

3829  expansion is--

3830      Mr. {Stupak.}  Well, that is why I asked involving pipes

3831  and wires so the, you know, heating oil goes through pipes,

3832  crude oil, propane, ethanol.  It is all going to be going

3833  through pipes.  So I mean and if you are the agency that is

3834  there to protect the consumer, think the consumer would

3835  expect that protection to be extended.

3836      Mr. {Kelliher.}  We do comprehensively regulate natural

3837  gas pipelines, and we do look for undo discrimination

3838  preference by natural gas pipelines as they provide

3839  transportation service.

3840      Mr. {Stupak.}  Well, I am going to stop questions here.

3841  I will have questions for Mr. Lukken.  We will probably go a

3842  second round, so I will turn to Mr. Barton for questions,

3843  please.

3844      Mr. {Barton.}  Thank you.  Mr. Lukken, do you know who

3845  the Chairman of the Energy and Commerce Committee was in the

3846  last Congress?

3847   Mr. {Lukken.}  I believe it was you, sir.

3848   Mr. {Barton.}  Okay, do you know who the Chairman of the

3849 Energy Conference was that passed the Energy Policy Act of

3850 2005 in the last Congress?

3851   Mr. {Lukken.}  The same.

3852   Mr. {Barton.}  Okay, do you know who put in Section 315

3853 of the Energy Policy Act?  What member specifically wanted

3854 that language included in the Law?

3855   Mr. {Lukken.}  I don't know.

3856   Mr. {Barton.}  Well, it was the Chairman of the

3857 Committee and the Chairman of the Conference.  Do you think

3858 that when it says, ``shall be unlawful for any entity,

3859 directly or indirectly, to use or employ in connection with

3860 the purchase or sale of natural gas or the purchase or sale

3861 of transportation services, subject to the jurisdiction of

3862 the Commission, which is the FERC, any manipulative deceptive

3863 device or contrivance, as those terms are used in Section 10B

3864 of the Security Exchange Act of 1934, 15 U.S. Code, 78J/B in

3865 contravision of such rules and regulations as the Commission

3866 may prescribe as necessary in the public interest or for the

3867 protection of natural gas rate payers'', do you think that

3868 any entity doesn't mean any entity?

3869   Mr. {Lukken.}  We certainly support the broad grant of

3870 jurisdictional authority given to FERC in the EPAC of 2005.

3871  However, our mandate is to uphold the Commodity Exchange Act,

3872  which also has an exclusive jurisdiction provision enacted by

3873  Congress in 1974 to protect against duplicative regulation

3874  and differing legal standards in those markets.

3875      So we have to read those two statutes in context.

3876      Mr. {Barton.}  Now, you are basically, if I understand

3877  your agency's position, is that the Congress didn't know what

3878  it was talking about here.  I mean, you have no reason to

3879  know this, but this was put in specifically because of my

3880  concerns about this new exchange, the ICE exchange, and what

3881  they were doing.  I mean, I wanted to go a lot further, but

3882  because of concerns from other committees and some of the

3883  stakeholders, we agreed in a bipartisan, bicameral basis on

3884  this language.

3885      So we have the FERC who gets this authority.  They go

3886  out and try to use it, and your agency says they can't do it.

3887  I mean, do you think that Amaranth was--don't you believe

3888  that Amaranth was trying to manipulate markets?

3889      Mr. {Lukken.}  Absolutely.  That is why we have brought

3890  an action against Amaranth for manipulating the futures

3891  markets, and we have worked cooperatively with FERC to bring

3892  those actions.  And indeed, in our Court order, where the

3893  Judge has asked our opinion, exclusive jurisdiction, we

3894  supported FERC's ability to go forward with the proceeding,

3895  but we felt compelled--it was the opinion of our general

3896  counsel and the Commission that we have exclusive

3897  jurisdiction over these contracts.

3898       Mr. {Barton.}  Well, then, there is no way you can have

3899  exclusive jurisdiction with this statutory authority on the

3900  books, and what I want to inform you of, as the acting

3901  Chairman, is that this wasn't something serendipitous or

3902  inadvertent.  It was put in directly because of what since

3903  has transpired, and Mr. Kelliher and his compadres at the

3904  FERC are doing exactly or at least attempting to do exactly

3905  what we hoped they would do, which is work with your agency

3906  but use their own authorities to ferret out the bad actors

3907  and try to make our markets more open and transparent and

3908  accessible in a non-biased way to any willing participant.

3909       So I don't see how your Agency or the Courts can rule,

3910  unless they assume that the members of Congress who passed

3911  this didn't know what we were talking about and didn't

3912  understand the English language.  But I want to put on the

3913  record at this oversight hearing that this particular section

3914  was done at my express request, because of concerns I had at

3915  the time about speculation in the oil and gas markets, so

3916  that we could give the FERC some authority, which was

3917  ambiguous at that time.

3918       This is not ambiguous, and it is my understanding that

3919    the lower Court has ruled that because it is a federal

3920    statute, it has to be decided at the Appellate Court.  But I

3921    can't imagine the Appellate Court reading this language and

3922    saying that FERC can't do what they have been attempting to

3923    do.  So I would encourage you to work with the FERC, and you

3924    all decide how to cooperate together instead of arguing on

3925    who should be doing it in the first place.

3926         There is more than enough work to go around.  This is

3927    not an area that we have too many regulators and too many

3928    overseers.  Once could argue, given the budget problems that

3929    both of your agencies have had and the cutbacks, that you

3930    should be working much more closely together if the Law

3931    allows it to share resources.

3932         With that, Mr. Chairman, I am going to yield back.  But

3933    thank you again for holding this hearing.  And thank both of

3934    you gentlemen for participating.

3935         Mr. {Stupak.}  Thank you.  Mr. Whitfield, questions,

3936    please.

3937         Mr. {Whitfield.}  Thank you, Mr. Chairman.  Mr. Lukken,

3938    one question I would like to ask you.  The American Public

3939    Gas Association has called for legislation that would require

3940    broad market transparency for larger trading positions

3941    throughout the exempt markets, including all over-the-counter

3942    and bilateral trading.  And your recent legislative proposal

3943   does not really quite go that far, I believe.

3944        Do you think that the CFTC should implement a broad

3945   market transparency requirement throughout these exempt

3946   markets and bilateral trading and over-the-counter as well?

3947        Mr. {Lukken.}  Well, what our proposal suggested to

3948   Congress was that in these exempt commercial markets, when a

3949   contract becomes a price discovery contract, a benchmark that

3950   others are utilizing in interstate commerce, that additional

3951   regulatory authority should occur in those areas.  And we

3952   have recommended four things.

3953        One, large trader reporting system reports from that

3954   exchange regarding those contracts so that we, as a

3955   surveillance agency, can monitor the markets, make sure the

3956   positions can't be manipulated by certain positions of

3957   traders.

3958        Two, accountability and position limits, meaning that

3959   NYMEX, which is a regulated market, now has position limits

3960   on trading going into the closing of a contract.  ICE will

3961   also have to put position limits on those products.  They

3962   will also have to self-regular themselves.  They have to

3963   become their own watchdog with responsibilities to the

3964   commission as well as give us emergency authority of those

3965   markets.

3966        Now, you talk about in addition the bilateral markets

3967  outside.  It is our intention that our Section 1805 rule,

3968  1805 authority, gives us the ability to go into those

3969  bilateral markets on a need-to-know basis to ask for that

3970  information.  Anything that is traded on a ECM or a DCM are

3971  regulated markets that we are recommending would have to--

3972  those markets would also have to keep records on any things

3973  related to those transactions.  So if you are holding a

3974  bilateral swap that may affect the futures position, you have

3975  to keep those records for 5 years, and we would have the

3976  ability to go in and ask for them if we see an anomaly in

3977  pricing on the marketplace.

3978       Mr. {Whitfield.}  Right, I came in as Joe Barton was

3979  asking some questions, and I think he touched on this a

3980  little bit.  But on this Amaranth case, my impression is that

3981  FERC and your agency have worked closely on that case.  Is

3982  that correct?

3983       Mr. {Lukken.}  Correct.

3984       Mr. {Whitfield.}  You have shared information, but it is

3985  still your agency's position that FERC really does not have

3986  legal jurisdiction.  Is that true?  Is that your--

3987       Mr. {Lukken.}  That is correct.

3988       Mr. {Whitfield.}  Okay, and now my understanding, Mr.

3989  Kelliher, that there has been some initial Court rulings on

3990  that very point.  Is that correct?

3991        Mr. {Kelliher.}  Yes, we have had at least three or

3992    perhaps four Decisions by the Courts.  There have been

3993    attempts to impose temporary restraining orders, stays, and

3994    injunctions on our enforcement action.  All of which have

3995    been rejected, one as recently as Monday of this week.

3996        Mr. {Whitfield.}  Right.

3997        Mr. {Kelliher.}  And the Decision Monday was

3998    interesting, because it actually did discuss the statutory

3999    interpretation of the anti-manipulation provision.

4000        Mr. {Whitfield.}  But the Decision on Monday--give me a

4001    synopsis of that Decision.

4002        Mr. {Kelliher.}  It was rejecting a request for an

4003    injunction, and it was arguing that, I think in this case, I

4004    think it was Amaranth or Mr. Hunter.  Was this Amaranth?

4005    Hunter was the lead trader--

4006        Mr. {Whitfield.}  Right.

4007        Mr. {Kelliher.}  --at Amaranth, and he was seeking an

4008    injunction, and it rejected his petition because it argued

4009    that he had failed by quite a lot to demonstrate that there

4010    be any kind of irreparable harm.

4011        Mr. {Whitfield.}  Right.

4012        Mr. {Kelliher.}  But they also went a little bit

4013    further, and for them to grant an injunction, he would have

4014    to prove the likelihood of success on the merits.  The Court

4015   actually discussed that to some extent and said, that would

4016   mean he would have to prove that FERC has no authority--

4017        Mr. {Whitfield.}  Right.

4018        Mr. {Kelliher.}  --under the anti-manipulation provision

4019   of the Energy Policy Act.  Now, the Court had a brief

4020   discussion of that, suggesting that they thought that he had

4021   no basis for that argument.

4022        Mr. {Whitfield.}  Well, I mean, I certainly agree with

4023   the Court, and I think it has been very clear that this

4024   committee feels like FERC does have jurisdiction.  And

4025   certainly want to commend FERC for the aggressive action they

4026   took in this case and with that, Mr. Chairman, I will yield

4027   back the balance of my time.

4028        Mr. {Stupak.}  Well, thank you.  Mr. Lukken, let me

4029   follow up with something Mr. Whitfield asked you.  You were

4030   talking about the bilaterals in Rule 1805.  That is sort of

4031   after the fact though, isn't it?  I mean, you can't look at

4032   it while these things are going on.  You get the information

4033   after the fact, correct?

4034        Mr. {Lukken.}  Well, we would be able to find out--in

4035   order for a manipulation to occur, you need the means to

4036   manipulate but also the profit motive.

4037        Mr. {Stupak.}  Right.

4038        Mr. {Lukken.}  So you need the means being the

4039    benchmark, the pricing benchmark that we are looking at, and
4040    the profit center being maybe these bilateral trades that are
4041    occurring.  And so what we have said is if you are involved
4042    in the benchmark markets, if you are looking at significant
4043    price discovery markets and there is a pricing concern of
4044    ours, we have the ability to go ask for that information in
4045    the bilateral marketplace.

4046        Mr. {Stupak.}  Well, let me ask you this, do bilateral
4047    markets, using standardized contracts, have an impact on the
4048    discovery or the price discovery process for energy
4049    commodities?

4050        Mr. {Lukken.}  We did not find a strong correlation in
4051    the bilateral market as far as becoming a price discovery
4052    mechanism in the exempt commercial markets.  I would say,
4053    though, that it is in our rule or the proposal we sent up to
4054    Congress, it does not limit these potential price discovery
4055    contracts to only clear trades.  These could potentially go
4056    into bilateral contracts as well that are traded on ECM.

4057        Mr. {Stupak.}  Yeah, but our last panel--I mean, Mr.
4058    Cota, Professor Greenberger, and Ms. Campbell of the American
4059    Gas, they all thought that they do, in fact, have an impact,
4060    and they do have an impact on the price discovery process.

4061        Mr. {Lukken.}  I believe they were referring to the ECM
4062    product, bilateral products being traded on the ECMs.  I was

4063  not here for their entire testimony, but there are certainly

4064  bilateral contracts trading on an exempt commercial market

4065  that we will begin to see if those contracts become

4066  significant price discovery contracts.

4067     Mr. {Stupak.}  In the book right there, go to tab number

4068  18, if you would, please.  Let me ask you a question.  Tab 18

4069  in the binder.  Tab 18 should be the NYMEX large trader

4070  disclosure form.  ``A NYMEX rule requires traders who want to

4071  hold more than 1,000 contracts in a final day of a trading of

4072  the prompt month to disclose all over-the-counter and forward

4073  contract positions including those executed through bilateral

4074  trades.''  Since disclosure is required in this instance, is

4075  there a reason that large positions executed in bilateral

4076  markets cannot be routinely reported to the CFTC?

4077     Mr. {Lukken.}  So this is them opening up their books?

4078  Well, I think--

4079     Mr. {Stupak.}  Right, couldn't they do the same thing to

4080  you so you could really look at it?  Do you have real-time

4081  numbers or at least a prompt month?

4082     Mr. {Lukken.}  I think the focus of our report was to

4083  really look at where price discovery was occurring, which is

4084  on the electronic marketplace.  You know, this would be a lot

4085  of information coming into our markets.  Our surveillance

4086  economists, you know, the marginal beneficial nature of these

4087  bilateral contracts, we would be overwhelmed as far as an

4088  agency in trying to monitor and put them into systems that

4089  would be relevant for us.  So I think, you know, for us the

4090  tailored focus concern was going to be the ECMs and making

4091  sure we got that information on an ad hoc basis to go into

4092  the bilateral markets and ask for that information.  But

4093  certainly we would be overwhelmed if we were asked to receive

4094  information from the entire bilateral market.

4095      Mr. {Stupak.}  Well, what is the size of the bilateral

4096  market?

4097      Mr. {Lukken.}  It dwarfs the exchange rated market.  It

4098  is very large.

4099      Mr. {Stupak.}  Well, isn't that room for more

4100  speculation and more profit taking in the larger market as

4101  opposed to a small one, which you are looking at?

4102      Mr. {Lukken.}  Well, again, if it--

4103      Mr. {Stupak.}  I would think this information would be

4104  helpful

4105      Mr. {Lukken.}  --starts to bleed into the price

4106  discovery contracts, that is when the public interests arise

4107  in our concerns and regulations.

4108      Mr. {Stupak.}  But you wouldn't know that until after

4109  the fact.  Wouldn't you have more current information if they

4110  were required to disclose this form as they do at NYMEX?

4111    Mr. {Lukken.}  Well, they would be on our market's

4112  trading that we would see.  It wouldn't be after the fact.

4113  We would see pricing anomalies on our marketplace.

4114    Mr. {Stupak.}  Let me ask you this question.  Has the

4115  CFTC assessed the risk of whether traders will move from ICE

4116  to bilateral trading on overseas markets once a discovery

4117  regime is imposed on trading of price discovery contracts?

4118  Do you think they will move to foreign bilaterals?

4119    Mr. {Lukken.}  Well, in our testimony at our hearing in

4120  September, this was one of the listed points we asked

4121  witnesses to address, the U.S. competitiveness issue, where

4122  the markets would move.  It seemed to be the consensus that

4123  this tailored approach to regulation would be a way to get at

4124  the information, make sure that manipulation was not

4125  occurring on these ECM markets, but also ensure that markets

4126  didn't move overseas.  So that was the balance that we tried

4127  to strike.

4128    Mr. {Stupak.}  We heard concerns from the previous panel

4129  about foreign boards of trade.  Do you consider the UK

4130  Financial Service Authority to have equivalent market rules

4131  as those imposed by the CFTC in its designated contract

4132  markets?

4133    Mr. {Lukken.}  Equivalent may be too strong of a word,

4134  but comparable.  Certainly they in the international

4135    regulatory community are one of the strongest regulators

4136    around, the Financial Services Authority.  In fact, they are

4137    quoted by many in our government and in the private sector as

4138    the model we should be going towards.

4139        Mr. {Stupak.}  Well, but does FSA, the Financial

4140    Services Authority in the UK, do they require position limits

4141    on financially settled contracts to prevent excessive

4142    speculation?

4143        Mr. {Lukken.}  They do not, but they also have different

4144    requirements that our agency does not require.  So again,

4145    this is how these regulatory authorities have grown up and

4146    the history of all with that.

4147        Mr. {Stupak.}  Well, but then why would the CFTC then

4148    approve no-action letters allowing foreign boards of trade to

4149    operate in the U.S.?  You said they are not equivalent.  They

4150    are comparable.  I guess that is sort of a subjective

4151    standard.  If they don't require position limits on

4152    financially settled contracts, then why would we give them

4153    these no-action letters, as you call it?

4154        Mr. {Lukken.}  The no-action letter, this is something

4155    we debated at length at the Commission last year, held

4156    hearings on this.  We looked into this, and no action, you

4157    must understand, is almost the registration of these

4158    exchanges.  They have to come in, show us how these rules are

4159  comparable in the UK to our rule books here at the exchanges.

4160  We go through a broad analysis of the regulatory system in

4161  the United Kingdom in making our--

4162       Mr. {Stupak.}  But isn't it sort of like, hold us to

4163  what we say, not what we do?

4164       Mr. {Lukken.}  Pardon?

4165       Mr. {Stupak.}  Isn't it sort of like, here is what we

4166  are going to do, but how do you enforce if they are doing it?

4167       Mr. {Lukken.}  No, we condition the no-action

4168  arrangement with receiving large trader information from

4169  these markets.  So it is not that these are outside of our

4170  view.  In fact, one could argue they have two regulators

4171  looking at these markets, both the United Kingdom and our

4172  surveillance staff because we are getting large trader

4173  reporting on a weekly basis, leading up to the final week of

4174  expiration, and then on a daily basis.

4175       Mr. {Stupak.}  Well, you have a memorandum of agreement,

4176  don't you, with the financial services in England?

4177       Mr. {Lukken.}  Yes.

4178       Mr. {Stupak.}  Okay, so what information is specifically

4179  shared between you and the CFTC and FSA?

4180       Mr. {Lukken.}  It is large trader reporting information,

4181  similar to what we get from market participants and exchanges

4182  here in the United States.  We also hold quarterly meetings

4183  with them to discuss enforcement cases.  Our surveillance

4184  columnists talk to them all the time on these issues.

4185      Mr. {Stupak.}  Let me ask you this, because Professor

4186  Greenberger brought up--has the CFTC assessed whether trading

4187  on ICE futures for financial energy commodities, such as the

4188  New York Harbor Reformulated Gasoline, New York Harbor

4189  Heating Oil, or West Texas Intermediate Crude Oil, has an

4190  impact on the price discovery on the NYMEX?

4191      Mr. {Lukken.}  ICE futures in Atlanta or ICE futures--

4192      Mr. {Stupak.}  In Atlanta.

4193      Mr. {Lukken.}  In Atlanta.  What we looked at, and this

4194  is what our rulemaking will go to and what the House

4195  Agriculture Committee today marked up, that if any of these

4196  products become a significant price discovery contract traded

4197  on ICE on the exempt market, we would be able to get this

4198  information from them, once that occurs.  So certainly we

4199  understand that there can be an influence from these exempt

4200  markets on regulated markets.  And once that price discovery

4201  threshold is met, regulation would occur.

4202      Mr. {Stupak.}  Would that same answer hold true if it

4203  was the futures in the UK, ICE futures in UK, being closed

4204  out in UK?

4205      Mr. {Lukken.}  Well, they are a fully regulated

4206  exchange, so they are being regulated by the United Kingdom.

4207        Mr. {Stupak.}  Can trading on ICE futures be used as

4208    part of a strategy to manipulate energy prices?

4209        Mr. {Lukken.}  Sure, and we have brought cases on that.

4210        Mr. {Stupak.}  And why is the CFTC's approving no-action

4211    letters, which allow U.S. traders to trade financial energy

4212    commodities such as New York Harbor Gasoline, Heating Oil, or

4213    West Texas Intermediate Crude Oil without requiring the

4214    trading platform to become a designated contract market and

4215    subject to your jurisdiction, the CFTC's jurisdiction?

4216        Mr. {Lukken.}  Well, it is a very good question, but,

4217    you know, these are global commodities.  Even though West

4218    Texas is in the name, the oil is traded as a global

4219    commodity.  It is relied on around the world, and so we want

4220    to make sure that, as a world product, that other nations

4221    around the world are also being open to our markets.  So by

4222    allowing access to the UK of our traders, with conditions and

4223    full review by our staff, we also ensure that our markets

4224    have access to other overseas so that our markets here in the

4225    United States can grow.

4226        Mr. {Stupak.}  And without requiring the trading

4227    platform to become a designated contract market, aren't you

4228    sort of only hurting the integrity of the market?

4229        Mr. {Lukken.}  Well, this is the mutual recognition

4230    concept that is currently being debated on the security side

4231    right now.  In fact, the Securities Exchange Commission is

4232    looking into whether to adopt a similar comparable but not

4233    identical type of mutual recognition system that would most

4234    likely recognize the UK FSA.  So this is something that is

4235    the global standard of how regulators talk to each other

4236    around the world and interact.  And we are certainly a leader

4237    in this area.

4238         Mr. {Stupak.}  My time has expired.  Mr. Walden, for

4239    questions, please.

4240         Mr. {Walden.}  Thank you, Mr. Chairman.  Appreciate

4241    that.  I wanted to follow up with Mr. Lukken, with you.  You

4242    heard me ask Professor Greenberger about your report, and he

4243    said that your report really was done before the collapse of

4244    Amaranth.  Is that accurate, and do you still stand by the

4245    conclusions of your report that this speculative market isn't

4246    substantively driving up the price of oil gas?

4247         Mr. {Lukken.}  Our report was done on crude oil.  It was

4248    not done on natural gas, which is the--

4249         Mr. {Walden.}  Okay.

4250         Mr. {Lukken.}  --subject matter of the Amaranth

4251    investigation.  But it was dealing with a similar commodity

4252    and how hedge funds and other speculative interests behave in

4253    those markets.  And it was the conclusion of our chief

4254    economist and his staff that publish the paper that these

4255   were really price followers more than price makers in those

4256   markets.  It has been updated.  We have updated it up until

4257   most recently, I think, through November I believe.  Is that

4258   correct?  So it is updated to even account for the recent

4259   run-up in oil prices as well.

4260       Mr. {Walden.}  And the conclusion remains the same?

4261       Mr. {Lukken.}  I think the conclusions have remained

4262   exactly the same.  Is that correct?

4263       Mr. {Walden.}  All right, Mr. Kelliher.

4264       Mr. {Lukken.}  Having said that, we do have controls in

4265   place on speculation.  We recognize it can be excessive, and

4266   we do have certain things that we put into place to control

4267   against that excessive speculation.

4268       Mr. {Walden.}  So I just want to clarify.  You don't

4269   think it is a $20 to $30 a barrel part of the margin in oil

4270   right now then, speculation?

4271       Mr. {Lukken.}  I could only speculate.  Sorry.

4272       Mr. {Walden.}  Have you had experience, or that is what

4273   I want to know.  And is there somebody making money through a

4274   derivative through the--never mind.  Go ahead.

4275       Mr. {Lukken.}  But we have looked into that claim that

4276   there is a $30 premium.  We don't know any economic basis on

4277   what that--we are trying to figure out who said that.  I

4278   think some of this might be sort of gut feels of traders

4279  involved and analysts.  And those are real feelings that

4280  should be brought to light, but we have based our findings on

4281  economic data that we have through the positions of traders.

4282  And we feel more comfortable talking about those positions.

4283       Mr. {Walden.}  All right.  Yeah, it is Professor

4284  Greenberger who said in his testimony $20 to $30 a barrel.

4285  Mr. Kelliher, do you have any comment on that?

4286       Mr. {Kelliher.}  No, I am not familiar with the CFTC

4287  analysis, but I don't have any reason to dispute Chairman

4288  Lukken.

4289       Mr. {Walden.}  But from your own agency's perspective?

4290       Mr. {Kelliher.}  No, our authority in oil is just

4291  limited to oil pipeline rates.

4292       Mr. {Walden.}  What about natural gas?

4293       Mr. {Kelliher.}  Natural gas, we have jurisdiction over

4294  wholesale gas markets, pipelines, LNG projects.

4295       Mr. {Walden.}  But do you see speculation in that market

4296  as described by some of the other witnesses today?

4297       Mr. {Kelliher.}  There is speculation, and there is risk

4298  management.  And I think similar to CFTC we view use

4299  speculation by itself as harmful.

4300       Mr. {Walden.}  Right.

4301       Mr. {Kelliher.}  It is a necessary part of markets.

4302       Mr. {Walden.}  And so you don't see evidence of harmful

4303  speculation then?  Is that what you are saying?

4304      Mr. {Kelliher.}  We look for manipulation.  Manipulation

4305  is what we look for.  We look for undo discrimination and

4306  preference.  Those are the evils that we are focused on.  So

4307  we don't look for--we are not looking for excessive

4308  speculation per se.  We look for--

4309      Mr. {Walden.}  Okay, so let me get the term right then.

4310  Let us use manipulation of the market.  You do see some of

4311  that happening, has happened?

4312      Mr. {Kelliher.}  Yes.

4313      Mr. {Walden.}  And that more regulation is needed over

4314  ICE?

4315      Mr. {Kelliher.}  I will defer to CFTC on regulation of

4316  futures.  We think we have the authority we need at FERC to

4317  regulate in our jurisdiction.  We think you gave us the right

4318  tools 2 years ago, and I defer to CFTC on what authority they

4319  need.

4320      Mr. {Walden.}  And you think, Mr. Lukken, that the

4321  legislation that came out of the Ag Committee today while we

4322  were holding this hearing, just coincidentally, gave you the

4323  authority you need?

4324      Mr. {Lukken.}  We believe, yes.

4325      Mr. {Walden.}  Okay, I don't think I have any other

4326  questions, Mr. Chairman.  I again want to thank you for

4327 holding this hearing.  It is a very important issue.  Thank

4328 you.

4329     Mr. {Stupak.}  Thank you.  Mr. Green, for questions.

4330     Mr. {Green.}  Thank you, Mr. Chairman.  Mr. Kelliher,

4331 the CFTC has said it is exclusive regulator over futures

4332 markets.  Frankly, this is for both of you because our

4333 interest on the committee is to see--we want the regulation,

4334 and we just happen to have jurisdiction over FERC and

4335 obviously Ag Committee, I guess, has it over CFTC.

4336     But the exclusive regulator of the futures market, do

4337 you believe FERC's exercise of the anti-manipulation

4338 authority weakens the CFTC's role?  And adding into that, I

4339 have a question about the memorandum of understanding.  Is

4340 there some way that--because energy is easier understood in

4341 FERC whereas CFTC has so many other commodities they deal

4342 with other than energy?  And just appreciate an answer from

4343 both of you.

4344     Mr. {Kelliher.}  Go ahead.

4345     Mr. {Lukken.}  Okay.

4346     Mr. {Green.}  Has it weakened CFTC's role if FERC

4347 exercises the anti-manipulation authority under EVAC '05?

4348     Mr. {Lukken.}  You know, one of our mandates is to make

4349 sure that the markets are open, competitive, and transparent

4350 to ensure the integrity of the market.  And any time there is

4351    confusion on differing legal standards, duplicative

4352    regulators in the space, I think there is cause for concern

4353    that these markets may choose other alternatives that they

4354    may have to trade.  So that is what we try to minimize.

4355         I completely agree with Joe.  We share the goal of

4356    preventing manipulation no matter where it occurs.  We hope

4357    that there is no gaps, try to minimize duplication when we

4358    can.  But we think that these markets deserve legal

4359    certainty, and certainly the exclusive jurisdiction provides

4360    that for these markets.

4361         Mr. {Kelliher.}  And we don't think that our enforcement

4362    action interferes with CFTC regulation.  We don't think there

4363    is a dual regulation here because there is one regulator.  It

4364    is the CFTC.  There are two investigations that really have

4365    been announced in recent months that are--they are not joint

4366    investigations strictly speaking, but they are coordinated

4367    and parallel investigations.

4368         The other one, as I mentioned in my testimony, was the

4369    Energy Transfer Partners investigation.  In that case, that

4370    involved, we believe, involved manipulation in FERC

4371    jurisdictional markets, physical gas sales that affected

4372    other physical gas products as well as financial products.

4373    So manipulation occurred in our space, if you will, we think

4374    and then extended to CFTC space.

4375       Now they are conducting enforcement action of their own

4376    that involves an area where FERC has exclusive jurisdiction.

4377    We don't view that their enforcement action undermines or

4378    threatens or impairs FERC's exclusive jurisdiction over

4379    physical natural gas because they are not regulating in the

4380    sense that we regulate that market.  They are not setting a

4381    rate.  They are not revoking a blanket certificate.  They are

4382    not doing the things that are regulation under the Natural

4383    Gas Act.  So we don't see that their enforcement action

4384    undermines our authority, and we similarly don't see why our

4385    enforcement action undermines their authority.  But it is an

4386    honest disagreement.

4387       Mr. {Green.}  Well, how does MOU working if we can, you

4388    know, we ought to have the two agencies who complement each

4389    other really in the energy markets that there can be--can

4390    there be a joint effort?  I mean I have never heard of

4391    agencies, federal agencies doing that.  But it would seem

4392    like it would be needed in this, particularly the sensitivity

4393    of the price fluctuations for my industrial consumers but

4394    also for my constituents.

4395       Mr. {Lukken.}  Well, I think the original intent of the

4396    MOU was on information sharing, making sure each of us could

4397    uphold the mandate of their act.  We have different legal

4398    interpretations of what our acts require of us, so it is

4399    difficult for an MOU to try to change what we believe the Law

4400    to be, each of us respectively.  So, you know, it is

4401    something, I think, we are looking at.  Our staff have talked

4402    about ideas of trying to approach this to coordinate better,

4403    going forward to try to avoid, as best we can, these

4404    situations in the future.  But again this is an honest legal

4405    dispute between the two agencies that the Courts are

4406    currently and actively considering.

4407        Mr. {Green.}  Well, and that is my next question.

4408    Energy Transfer Partners, CFTC is prosecuting alleged

4409    manipulation of physical markets which was under FERC's

4410    jurisdiction because of their effect on the futures market,

4411    which are under CFTC's.  How is that going to balance out?

4412    Because I guess I have an interest because, you know, Energy

4413    Transfer Partners is doing things in my area.  I mean sure,

4414    nationwide, but at home.

4415        Mr. {Lukken.}  Our statutory mandate on manipulation

4416    covers both the futures markets, but Congress granted us also

4417    cash market authority.  And up until 2005, we were the only

4418    people in that space, so we brought lots of cash market

4419    authorities in light of the western energy crisis and Enron

4420    debacle.  So, you know, this is something we are still trying

4421    to work out, how to best divide the authority between the two

4422    agencies.  But you raise a good point, that maybe, you know,

4423   we should think about where the expertise of each regulator

4424   lies and how that might help us to guide where we divide

4425   jurisdiction.

4426       Mr. {Kelliher.}  And I would just like to comment.  I

4427   really don't think it is unusual that more than one federal

4428   agency might prosecute the same underlying offense.  I mean

4429   it happened a few years ago where CFTC was prosecuting false

4430   reporting with respect to natural gas sales, and the Justice

4431   Department also was taking fraud actions against the same

4432   companies and individuals.  So I don't think it is unusual

4433   that the same activity might violate two different Laws that

4434   are administered by two different agencies.

4435       And we are not, for example, charging anyone with

4436   violating the Commodity Exchange Act.  CFTC is not charging

4437   anyone with violating the Natural Gas Act.  We both are given

4438   these different duties by Congress, different

4439   responsibilities.  Sometimes the same behavior violates more

4440   than one federal Law.

4441       Mr. {Green.}  Mr. Chairman, I know my time is up, but I

4442   don't know what the bill is doing that has come out.  It was

4443   just was reported out today in Ag Committee, but I would hope

4444   it would foster that relationship so, again, the beneficiary

4445   are the citizens and whether it be corporate citizens or

4446   individuals ones.  And I know we don't have jurisdiction over

4447    that, but we definitely have it on the floor and to be able

4448    to have an interest in it, particularly when you come from

4449    energy-producing areas or chemical-producing areas.  So thank

4450    you, Mr. Chairman.

4451        Mr. {Stupak.}  Thank you.  Mr. Lukken, you indicate

4452    that, besides Professor Greenberger, you don't know of anyone

4453    else who agreed with the idea it is $20 to $30 more per

4454    barrel of oil in the price that we are paying right now.  Do

4455    you know a Mr. Gatt of Oppenheimer and Company?  Are you

4456    familiar with him?

4457        Mr. {Lukken.}  I understood he testified yesterday

4458    before the Senate.

4459        Mr. {Stupak.}  Okay, he has indicated in a couple of

4460    articles, LA Times, New York Times, it is $20 to $30 excess

4461    speculation brings to the price of a barrel of oil.  Are you

4462    familiar with Ms. Foss, the chief energy economist at the

4463    Center for Energy Economics at the University of Texas?

4464        Mr. {Lukken.}  I am not.  I am sorry.

4465        Mr. {Stupak.}  Okay, in the ENE News, Energy Environment

4466    News, she also indicates $20 to $30.  So there is a lot of

4467    support out there.  Kyle Cooper from the IAAF advisor out of

4468    Houston, Texas, and Miami Herald they report the same things.

4469    So there is a lot of authority besides Professor Greenberger.

4470    But let me ask you this.  Do you agree with Professor

4471 Greenberger's testimony that the CFTC proposal will lead to

4472 further regulatory arbitrage because once subject to CFTC

4473 regulation traders will simply move their trading to other

4474 contracts which are exempt from regulation?

4475     Mr. {Lukken.}  I don't agree with that.  I think, you

4476 know, our proposal, trying to get at the electronic exchange

4477 like facility, which is the exempt markets.  Now, people go

4478 to those markets because of the benefits that these type of

4479 multilateral trading facilities provide.  Clearing,

4480 creditworthiness that those markets provide, transparency of

4481 what the pricing might be.

4482     Mr. {Stupak.}  Well, what--

4483     Mr. {Lukken.}  --provided in the bilateral marketplace.

4484     Mr. {Stupak.}  Yeah, but didn't NYMEX provide the same

4485 thing?

4486     Mr. {Lukken.}  Correct.

4487     Mr. {Stupak.}  So why did people move to ICE?

4488     Mr. {Lukken.}  Well, I am talking once our proposal is

4489 put into place.  Then we will have the ability to see these

4490 markets to get the information--

4491     Mr. {Stupak.}  So you don't think they will move to

4492 bilaterals either through the phone or electronics?

4493     Mr. {Lukken.}  It is a different trading environment in

4494 the multilateral space.  I think those markets are

4495  beneficial, and people come to them for a reason not purely

4496  regulation.

4497       Mr. {Stupak.}  Well, they go there to avoid regulation.

4498       Mr. {Lukken.}  Again, this is something we discussed as

4499  part of our hearing in September, and these are the

4500  recommendations we made.

4501       Mr. {Stupak.}  Mr. Kelliher, let me ask you this.  In

4502  your testimony, and we are talking about the exclusive

4503  jurisdiction on future markets and your testimony, CFTC

4504  contends that FERC lacks legal authority to prosecute

4505  Amaranth, you know, been all through that.  But in your

4506  testimony, you state, and I am quoting now, ``it is much

4507  harder for CFTC to prove manipulation than FERC.''  Why is

4508  this the case?  Could you explain that a little bit further?

4509  The way I look at it, why would the futures industry rather

4510  have CFTC prosecuting their case as opposed to FERC other

4511  than fines?

4512       Mr. {Kelliher.}  Well, there is a difference in penalty

4513  authority, which you--

4514       Mr. {Stupak.}  Right.

4515       Mr. {Kelliher.}  I think our penalty authority is

4516  something like eight times larger than CFTC.  The one

4517  proposed change in the Commodity Exchange Act, I will express

4518  an opinion, is in the penalty provisions, and CFTC has

4519  proposed to have the same kind of penalty authority we have,

4520  and I think that is completely appropriate.

4521      Mr. {Lukken.}  And that was passed this morning.

4522      Mr. {Stupak.}  Congratulations.

4523      Mr. {Kelliher.}  So I think that is one reason why some

4524  participants in the futures industry might prefer that FERC

4525  not have any authority to pursue manipulation, the difference

4526  in penalty authority, which may soon be eliminated.  But we

4527  each have an intent standard on manipulation.  They have a

4528  specific intent standard, which is my understanding.  We have

4529  a lower intent standard, and reckless disregard can

4530  constitute intent for purposes of a FERC manipulation.

4531      Mr. {Stupak.}  So you have a broader standard?

4532      Mr. {Kelliher.}  Excuse me?

4533      Mr. {Stupak.}  A broader standard?

4534      Mr. {Kelliher.}  We have, I think it is fair to say, a

4535  lower standard, where reckless disregard is sufficient to

4536  constitute intent for a FERC manipulation case.  That is

4537  because Congress 2 years ago gave us securities Laws to

4538  model, not commodities Law.

4539      Mr. {Stupak.}  Okay.  Mr. Walden, anything further?

4540      Mr. {Walden.}  I do, Mr. Chairman.  I think we are all

4541  trying to figure out how much speculators may or may not--

4542  manipulation.  I will get the term correct here.  How much

4543   manipulation may or may add to the price of natural gas or

4544   oil.  And, you know, these Energy Information Administration

4545   testified recently, I guess it was yesterday, and said they

4546   believe supply and demand fundamentals, including strong

4547   world economic growth driving and increasing consumption,

4548   moderate non-organization of petroleum-exporting countries,

4549   OPEC supply growth, OPEC members' production decisions, low

4550   OPEC spare production capacity, tightness in global

4551   commercial inventories, worldwide refining bottlenecks, and

4552   ongoing geopolitical risk, and concerns about supply

4553   availability have been the main drivers of oil price

4554   movements over the past several years.  Do you concur with

4555   that statement?

4556       Mr. {Lukken.}  Well, our staff that look at these

4557   markets agree that fundamentals are very tight right now in

4558   these markets.  You look at supply, storage, geopolitical

4559   risk where those production facilities are, demand from India

4560   and China.  There are lots of reasons fundamentally why those

4561   markets are tight and why prices are high.  Having said that,

4562   we still make sure that controls are in place to look for

4563   excessive speculation by any individual that tries to take

4564   advantage of this tightness and move the markets, try to

4565   manipulate them.

4566       That is why we have position limits.  That is why we get

4567   position trader data on a daily, real-time basis from these

4568   folks, to see if this is occurring.  So, yeah, the

4569   fundamentals are tight.  We follow speculation closely, and

4570   we have controls in place to make sure manipulation does not

4571   occur.

4572        Mr. {Walden.}  Let me ask you this, because I believe it

4573   was Mr. Cota, is that right, who testified earlier, said that

4574   we were at 5-year highs in supply.  Is that accurate, and is

4575   it that demand is also still exceeding even that 5-year

4576   estimate?  I may have gotten the data wrong.  Maybe it is 5-

4577   year supply in storage.

4578        Mr. {Lukken.}  I have just been informed by our chief

4579   surveillance economist that crude oil storage is actually

4580   going down.  I think Mr.--was it Kato?

4581        Mr. {Walden.}  Cota.

4582        Mr. {Lukken.}  Cota, I am sorry.

4583        Mr. {Walden.}  I am sorry.  My apologies.

4584        Mr. {Lukken.}  I should know that.  I think he was

4585   talking about heating oil.  But as far as crude oil, storage

4586   have been going down.

4587        Mr. {Walden.}  And natural gas?  Where are we in terms

4588   of the supply/demand curve on that?

4589        Mr. {Lukken.}  We actually have lots of natural gas

4590   right now.  We are at record highs, predictions of a warmer

4591   winter, you know, no hurricanes activity coming into last

4592   year has allowed supplies to increase.  So much more

4593   comfortable situation on the natural gas.

4594        Mr. {Walden.}  So is the price going down then?

4595        Mr. {Lukken.}  Prices are at a lower level than

4596   historically for natural gas.

4597        Mr. {Walden.}  Do you know what they are at right now in

4598   the U.S.?

4599        Mr. {Kelliher.}  Seven-dollar range.

4600        Mr. {Walden.}  That is still a lot higher than it used

4601   to be, right?  I mean it seemed to me we ran a $2 to $3

4602   natural gas for a long time.  I mean, I am glad it is down,

4603   but I hate to think we are cheering at $7.

4604        Mr. {Kelliher.}  It is lower than what it was before the

4605   hurricanes.  Before Hurricanes Katrina and Rita, natural gas

4606   prices had climbed significantly, and then they went very

4607   high after the hurricanes.  But they haven't quite retreated

4608   to where they were a number of months before the hurricanes.

4609        Mr. {Walden.}  And when do we think that might happen,

4610   if even?

4611        Mr. {Kelliher.}  It may not happen.

4612        Mr. {Walden.}  And the reason for that?

4613        Mr. {Kelliher.}  North American natural gas supply is no

4614   longer sufficient to meet North American gas demand.

4615       Mr. {Walden.}  And what happens if Congress enacts some

4616  sort of cap and trade system on especially coal?  Do you see

4617  a shift then to natural gas as a replacement source of power

4618  for coal?  I read a story recently that the number of coal

4619  plants that have been put on hold that were planned to be

4620  constructed.  Are you seeing that trend?

4621       Mr. {Kelliher.}  We are seeing that as well.  Some coal

4622  plants are still being considered.  Some are being approved,

4623  but there has been very wide scale cancellation of coal

4624  plants.  And the commission looked at this actually fairly

4625  recently, and we have looked at under any scenario, any

4626  climate change scenario.  Well, under any climate change

4627  scenario, natural gas use will go up in the United States.

4628  And it--

4629       Mr. {Walden.}  And that is because the pressure will be

4630  to reduce coal as a fuel source for electricity?

4631       Mr. {Kelliher.}  For a number of reasons.  First of all,

4632  if you look at nuclear plants, they have a long lead time,

4633  for example.  Coal plants, some of the technology is not yet

4634  available.  Some of, you know, the sequestration.

4635       Mr. {Walden.}  Compression.

4636       Mr. {Kelliher.}  Some of the technologies are not

4637  available now.

4638       Mr. {Walden.}  Right.

4639        Mr. {Kelliher.}  Wind, a lot of the wind potential is

4640    tied to transmission expansions.

4641        Mr. {Walden.}  Right.

4642        Mr. {Kelliher.}  If you want to see wind expansion in

4643    this country, we need to build a lot more transmission.

4644        Mr. {Walden.}  Thank you.

4645        Mr. {Kelliher.}  And transmission has a long lead time.

4646    So if you add it all up, it really means we are placing a

4647    very big bet on natural gas prices for the next 10 years, the

4648    availability of supply as well as the price of supply, and

4649    that is something that is important to understand as

4650    Congress--

4651        Mr. {Walden.}  And have your economists projected, given

4652    us some models about what we can anticipate natural gas

4653    prices to be based on different scenarios of--

4654        Mr. {Kelliher.}  We have not.

4655        Mr. {Walden.}  --cap and trade?

4656        Mr. {Kelliher.}  I think there probably are other

4657    estimates, but we have not estimated that.

4658        Mr. {Walden.}  Okay, I think that is something

4659    eventually we are going to need, especially if Congress is

4660    going to mark up some sort of cap and trade climate change

4661    legislation, whether it is the straight carbon tax like Mr.

4662    Dingell, our Chairman, proposed at 50 cents per gallon of

4663    gasoline, or whether it is some other shift.

4664        And then I think we have to remember--I understand that

4665    electricity produced from natural gas still emits about two

4666    thirds the amount of carbon that coal-produced electricity

4667    emits.  So I mean you are reducing a third, but you are

4668    really shifting the market to a commodity that is in great

4669    demand now.  And its resource is far more limited than coal,

4670    correct?

4671        Mr. {Kelliher.}  Yes, sir, I think that is true.

4672        Mr. {Walden.}  All right, are you starting to see in the

4673    market any speculation, the good speculation--I won't go to

4674    manipulation--but using your terms, to begin to hedge for

4675    what may happen either globally or nationally when it comes

4676    to carbon and carbon emissions and some sort of restrictions

4677    on them?

4678        Mr. {Kelliher.}  Well, I think part of the carbon gets

4679    to the energy question, which is what you are referring to.

4680    And we are seeing greater liquidity in out months of

4681    exchanges so that people are now trading further into the

4682    future to hedge that risk, which is beneficial for the

4683    marketplace.  They can lock down prices in order to manage

4684    their risk.

4685        We also regulate an exempt market in this space, the

4686    Chicago Climate Exchange, which is a voluntary exchange

4687    organization.  It gets participants who produce carbon to

4688    sign up and to trade that carbon on a volunteer contractual

4689    basis.  And, you know, certainly that is a working example

4690    going forward that Congress should study when they are

4691    looking at these type of cap-and-trade systems.

4692        Mr. {Walden.}  All right.  Thank you, Mr. Chairman.  You

4693    have been most generous with the excess time.

4694        Mr. {Stupak.}  One more, if I may.  Mr. Lukken, CFTC's

4695    principles include position limits for look-alike contracts

4696    on ICE, such as natural gas swaps.  And that is what was

4697    marked up today, you said, in the Ag Committee?

4698        Mr. {Lukken.}  It is product neutral, so whatever the

4699    contract might be.

4700        Mr. {Stupak.}  Okay, explain the economic rationale for

4701    including position limits then on financially settled

4702    contracts.  Is that so you don't have excess speculation?

4703        Mr. {Lukken.}  Well, because they can influence the

4704    physical contract, they are based on the somewhat price of

4705    the physical contract, that is why we require accountability

4706    limits, I think, on the financials actually and position

4707    limits on the physical contracts in New York.  So this would

4708    treat these contracts comparable to how they are treated on a

4709    regulated exchange currently.

4710        Mr. {Stupak.}  Okay.  Go to tab 16 there in the book

4711  there.  So we talked about ICE, and it is basically a UK

4712  trading there.  It is foreign boards of trade receiving staff

4713  no-action letters permitting direct access from the U.S.  And

4714  there is a number of them.  Like the first one, Montreal.  Do

4715  they have position limits?

4716      Mr. {Lukken.}  I might have the wrong tab here.

4717      Mr. {Stupak.}  16.

4718      Mr. {Lukken.}  I have the--

4719      Mr. {Stupak.}  You got the wrong one.

4720      Mr. {Lukken.}  Report on enforcement.  I will double

4721  check here.

4722      Mr. {Stupak.}  Hang on.  We may have the wrong one for

4723  you.  We will have someone bring it down to you.  We will

4724  have Kyle bring it down to you, Mr. Lukken.

4725      Mr. {Lukken.}  Okay.

4726      Mr. {Stupak.}  I am not sure you have the right one.  We

4727  have two binders up here, investigative binder and exhibit

4728  binder.  So all these have no-action letters.  So I think we

4729  pretty much established that ICE, probably about the eighth

4730  one down, ICE Futures Europe, they have--that is UK--they

4731  have similar as us.

4732      But what about the other ones, like Montreal here,

4733  Dubai, Frankfort, Zurich, Amsterdam, Paris, Leipzig, Hong

4734  Kong.  You go to the next page.  You go Sydney, Australia,

4735  Singapore, Tokyo, Alberta, Mexico City, Barcelona.  Do they

4736  have, you know, position limits?

4737      Mr. {Lukken.}  I think some do, some don't.  This is

4738  again, we--these have been issued over a series of over 10

4739  years since 1996, I think was the first one.  Again, we go

4740  through a full-blown analysis by our staff looking at the

4741  regulatory regime that is requesting this as well as the

4742  exchange itself, whether it has rules in place to prevent

4743  manipulation and look for this type of activity.  Many of

4744  these are conditioned on certain authorities that we receive,

4745  most recently the FSA document.  We require them to give us

4746  large trader information.

4747      So we can tailor these to make sure that they are based

4748  on risk that we are getting the information we need to

4749  conduct our mandate.

4750      Mr. {Stupak.}  Well, I started to say that if they are

4751  large traders and there is no position limits, it opens it up

4752  for possibly more speculation, correct?

4753      Mr. {Lukken.}  Well, even though there is no position

4754  limits, we still see the positions.  So we have the ability,

4755  if we see a large position that concerns us--it may not be a

4756  per se violation, you know, more than 500 contracts, but if

4757  it is above a level that may draw concern by our economists,

4758  we are willing to call these people up, talk to the UK

4759  authorities about it.  We are looking at this.  It is just
4760  that the position limits, the hard limits that some of our
4761  exchanges have in place aren't in place in the UK.
4762      Mr. {Stupak.}  Well, how do you set that?  How do you
4763  determine under Section 6A that we talked about earlier in
4764  the first panel, speculation if you don't have the
4765  jurisdiction over them?  You see what I am trying to say?  If
4766  they have the letters, then you really don't have a lot of
4767  jurisdiction over it.  Then how do you know if you get to
4768  that excessive speculation?
4769      Mr. {Lukken.}  We do have jurisdiction over these
4770  entities.  We are able to go in and take enforcement action
4771  against a U.S. trader, you know, performing a manipulation on
4772  a different market that may affect our markets.  That is
4773  within the reach of our jurisdiction.
4774      Mr. {Stupak.}  Even on the foreign boards of trade?
4775      Mr. {Lukken.}  Yeah.
4776      Mr. {Stupak.}  But they have to have some kind of action
4777  in the U.S., do they not?
4778      Mr. {Lukken.}  Well, normally that is when our interests
4779  arise, yeah.  If there is a U.S. customer trader--
4780      Mr. {Stupak.}  Or use a computer terminal in U.S.?
4781      Mr. {Lukken.}  Well, the computer terminal in this case,
4782  I mean it is mostly U.S. access so it is U.S. participants.

4783  We have not been given a situation where it is only a U.S.

4784  computer terminal.

4785      Mr. {Stupak.}  So the access of the U.S. would be if it

4786  was intended to reach the U.S. shores, the product?

4787      Mr. {Lukken.}  If it had an impact on our markets, we

4788  work closely with the United Kingdom to try to go after that

4789  activity.

4790      Mr. {Stupak.}  Well, I know UK, but I am talking about

4791  the other ones like Dubai or Singapore.

4792      Mr. {Lukken.}  We just sent a couple of employees from

4793  our enforcement staff to Dubai to investigate some dealings

4794  there.  So it certainly is something that we closely

4795  correlate with all these jurisdictions.

4796      Mr. {Stupak.}  So any trade, future trade, as long as it

4797  has some nexus to the United States would be subject to your

4798  jurisdiction and enforcement?

4799      Mr. {Lukken.}  I am not sure legally if we have tested

4800  how far we have tested this.  But certainly if we have a

4801  nexus to our markets or U.S. customers, we will try to pursue

4802  that.  And if not, we will work closely with our foreign

4803  regulatory counterparts to go after that activity.

4804      Mr. {Stupak.}  I was thinking more if this committee

4805  wrote something that gave you very, very broad nexus,

4806  computer terminal and intended shipment started for U.S., to

4807  give as much jurisdiction as we can to have enforcement

4808  action to take the excessive speculation out of these prices.

4809      Mr. {Lukken.}  I would be cautious.  I mean, you have to

4810  understand that many of the products traded here in the

4811  United States, the largest product traded in the United

4812  States is the Chicago Mercantile Exchange Euro Dollar

4813  contract, a product that is based on the London, the Libor

4814  rate of interest rate.  Certainly any action that we try to

4815  impose jurisdictional authorities over things traded

4816  elsewhere, there may be the possibility of reciprocal action

4817  by foreign authorities limiting access to those products.

4818      Mr. {Stupak.}  Understood.  Mr. Walden, anything

4819  further?

4820      Mr. {Walden.}  No.

4821      Mr. {Stupak.}  With that, let me thank both of you for

4822  your time and your patience today with us.  And thank you for

4823  your testimony.

4824      Mr. {Lukken.}  Thank you.

4825  [Whereupon, at 2:38 p.m., the Subcommittee was adjourned.]

**Statement of Chairman Bart Stupak**
**Subcommittee on Oversight and Investigations**
**"Energy Speculation:  Is Greater Regulation Necessary to Stop Price Manipulation?"**
**December 12, 2007**

Of the 19 hearings this subcommittee has held this year, today's hearing is perhaps the most technical and complex.  Americans don't sit around the dinner table and discuss futures markets, swaps, position limits, look-alike contracts and exempt commercial markets.  What families do talk about is the cost of gas, oil, home heating oil, and propane.  They talk about how the high energy prices are literally taking food off their table to pay for basic needs such as transportation and warmth.  In one day we saw a 45 cent hike of gasoline prices in my district.  In another energy spike example, one senior high rise in my district saw their natural gas bill jump from just over $5,000 in November 2005 to an astonishing $13,000 in December!

Futures contracts for energy are traded on the New York Mercantile Exchange (NYMEX), which is regulated by the Commodity Futures Trading Commission (CFTC).  The unregulated ICE market was created by the "Enron Loophole" as part of the Commodity Futures Modernization Act of 2000.

Unregulated markets are known as "dark markets" because there is very little oversight of the trades.  By trading on the dark ICE market, traders can avoid CFTC's rules which are in place to prevent price distortions or supply squeezes. This makes it difficult for regulators to detect excessively large positions which could lead to price manipulation.

Trading volumes on this dark market have skyrocketed in the past three years and are now as large or even larger in some months, than the volumes traded on the regulated futures market.

**Chart 3** shows that the quantity of natural gas futures contracts on NYMEX and ICE are almost equal in 2006:  239 trillion cubic feet on NYMEX vs 237 trillion cubic feet on ICE.  To put this trading volume in perspective, the total U.S. consumption of natural gas in 2006 (represented by the yellow horizontal line near the bottom) was only 21.6 trillion cubic feet.  So why is trading on each market 10 times more than necessary to supply America?

**Chart 4** shows that only 600,000 natural gas contracts were traded on the dark ICE market in January 2005, **but increased by 433%** to 3.2 million contracts by October 2007.  Why?

The spiraling growth in commodity trading in "dark markets" has left regulators with a large blind spot and the public without information to track how noncommercial traders could be affecting energy prices. The CFTC has no control over the dark markets and they lack enough staff to police the regulated markets, let alone the unregulated dark markets.  This lack of oversight means that traders who exceed limits or who shun openness of the futures markets will merely take their business to the dark markets.

Less than 1 percent of futures contracts ever result in physical delivery; thus, most futures trades are not interested in delivery of a product, they are interested in profit.

The Energy Information Administration recently observed that, "Oil markets have been drawing increased interest and participation from investors and financial entities without direct commercial involvement in physical oil markets."

A recent report from Lehman Brothers, *Frenzied Oil Futures Frustrate Fundamentals*, states, "The surge in oil markets to $90 – the mirror image of last winter's price fall – seems underpinned more by financial flows and political risk than by fundamental factors." Oil-and-gas trader Stephen Schork who publishes the Schork Report on energy markets wrote, "Factors other than supply and demand are now impacting the price. We now have to factor in how the speculators are going to affect the market, because they have different priorities in managing their portfolios."

Rather than a market that is serving a price discovery function, we have a market that is more and more driven by profits and excessive prices. Often it is speculation based on fear which leads to greed.

Because of the Enron loophole, several major energy companies and hedge funds have been charged with price manipulation.

In February of 2004, British Petroleum (BP) acquired 90% of all U.S. "TET propane" supplies. Once in control of the market, BP intentionally withheld propane from the market and charged buyers artificially inflated prices in a classic supply squeeze. In a recent court settlement, BP agreed to pay $303 million in penalties and restitution.

In July of this year, FERC and CFTC brought anti-manipulation cases against Amaranth - a Connecticut-based hedge fund - which dominated natural gas financial markets for most of 2006, until its ultimate collapse in September 2006. FERC charged that Amaranth manipulated prices paid in the **physical** natural gas markets by driving down natural gas **futures** contracts through massive selling during the last 30 minutes of trading for the March, April and May 2006 contracts. This then allowed the companies to profit from much larger short positions traded on the dark ICE market that bet on this price decline. FERC has proposed $291 million in penalties and disgorgement of unjust profits.

A June 2007 staff report by the Senate Permanent Subcommittee on Investigations, entitled *Excess Speculation in the Natural Gas Market*, found Amaranth's trading increased price volatility to the point that traders deemed the price "out of whack" with regard to supply and demand fundamentals. These "out of whack" prices may have cost industrial, commercial and homeowners as much as $9 billion.

When the regulated market NYMEX directed Amaranth to reduce its excessive positions in the natural gas contracts, Amaranth shifted 80% of its gas contracts over to the dark ICE market, allowing them to maintain - and even increase – their overall speculative position. **Chart 6** shows that on August 28, 2006 Amaranth held nearly 100,000 contracts for September on ICE. To put this in perspective, by holding 100,000 contracts, a mere 1 penny increase in price would result in profit to Amaranth of $10 million.

Amaranth's traders knew this move would be invisible to regulators.  In an August 29 Instant Message about a large price move, Amaranth's lead trader wrote:  "classic pump and dump…boy I bet you see some CFTC inquiries of the last two days… "

But another trader reminded him that most of the trades had taken place on the dark ICE market using swaps. He replied: **"until they monitor swaps, no big deal".**

No big deal?  Tell that to the home owners across America who are paying record heating costs to heat their homes.  Tell that to the domestic manufacturers who are paying exponentially higher energy prices to manufacture their goods.  Tell that to the people who have been laid off because the manufacturing plant they worked in closed down and moved their operations off shore where energy and labor costs are lower. And tell that to the Municipal Gas Authority of Georgia, which buys natural gas for public utilities in 4 states, and took $18 million in losses which they contend was due to Amaranth's trading scheme.

In another case of market manipulation in July, 2007, FERC and CFTC charged that Energy Transfer Partners (ETP) manipulated natural gas prices by using its dominant market position in the Houston Ship Channel to force the price of natural gas down in order to profit from much larger short positions –many of which were held on the dark ICE market.  This strategy earned ETP nearly $70 million in unjust profits, according to FERC.   Driving down prices might seem to help consumers in the short term; however, in the long run distorting price signals will drive up costs to consumers.

I would now like to play voice recordings of individuals from the British Petroleum and Energy Transfer Partners cases.  Here they are in their own words: (play power point)

So what are possible solutions to these problems of manipulation?

CFTC recently proposed legislation to regulate the dark markets.  Witnesses today will explore whether this proposal goes far enough to restore integrity in energy markets, or will increased oversight of the dark markets drive energy commodity trading overseas to less rigorous regulatory jurisdictions?  ICE Futures already trades oil, gasoline and heating oil swaps for U.S. delivery in London under the U.K.'s Financial Services Authority, which has weaker market rules.

Another tool in addressing manipulation is ensuring  FERC's authority to police price manipulation trades that impact delivery of energy.  Legislative intent on the part of this Committee is clear.  We fully expect that the authority granted to FERC through the Energy Policy Act of 2005 will be upheld.  We question whether CFTC, in trying to block FERC from enforcing its anti-manipulation authority, is circumventing Congressional intent. Consumers could pay dearly if CFTC prevails, and this Committee is unlikely to be a bystander should that unlikely event occur.

A third possible solution, which has been proposed by Professor Michael Greenberger who will testify before us today, is for the CFTC to close the loophole that allows US traders to avoid CFTC regulation by using less regulated foreign markets to trade energy commodities.

There are also several pending legislative proposals intended to address this problem: HR 3009, The Market Trust Act of 2007 sponsored by Representatives Barrow and Graves; HR 4066, Close the Enron Loophole Act, introduced by Rep Welch of Vermont; and HR 594, the Preventing Unfair Manipulation of Prices Act, which I introduced with Chairman Dingell.

In the end, what we need is less of the greed we just heard from traders own voices on the power point a few moments ago, and more honesty.  We need to close the Enron loophole, to close the foreign market loophole, and we need additional enforcement by the CFTC and FERC to clamp down on the fear and speculation that lead to greed and market manipulation.

#

The House Committee on Energy and Commerce :: The Public Record :: Subc... Speculation: Is Greater Regulation Needed to Stop Price Manipulation?"

Case 1:07-cv-01307-RJL     Document 50-9     Filed 01/22/2008     Page 1 of 3

[Home Page](#) > [The Public Record > Statement](#)

Outline of the
top of the U.S.
Capitol Dome

**Statement of Congressman John D. Dingell, *Chairman***
**Committee on Energy and Commerce**

.

# SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS HEARING ENTITLED, "ENERGY SPECULATION: IS GREATER REGULATION NEEDED TO STOP PRICE MANIPULATION?"

## December 12, 2007

Mr. Chairman, thank you for holding this important hearing. The cost of energy is becoming an ever-larger component of the average citizen's household budget—for electricity, gasoline, and heating. Energy costs are rising rapidly for industrial users, as well. This, in turn, raises the price of products and services in virtually every sector of our economy.

The collapse of Enron in late 2001 confirmed what many had suspected: not all increases in energy prices are the result of supply and demand. Much of Enron's business consisted of speculative trading in an electronic "over-the-counter" market, exempt from regulation. It was virtually impossible for anyone, including government regulators, to know what Enron was doing or how it was affecting the broader market.

The House Committee on Energy and Commerce :: The Public Record :: Subc... Speculation: Is Greater Regulation Needed to Stop Price Manipulation?"

Case 1:07-cv-01307-RJL    Document 50-9    Filed 01/22/2008    Page 2 of 3

We now know that Enron engaged in fraud on a massive scale and manipulated California electric power markets, to the tune of millions of dollars out of consumers' pockets.

Unfortunately, Enron was not alone. Over the past six years, the rise in energy prices has been outpaced only by the rise in speculation. In short, energy speculation is a growth industry, and it has gone global.

A case in point is Amaranth. Over several months in 2006, Amaranth, a $9 billion hedge fund, dominated trading in U.S. natural gas contracts and intentionally drove down the price of natural gas futures on NYMEX so that it could make tens of millions of dollars on its undisclosed holdings in the so-called "dark markets"— the unregulated over-the-counter markets.

This was not a victimless crime. In summer 2006, Amaranth took enormous positions, which appear to have inflated the price of natural gas for delivery the following winter. Businesses, utilities, schools, and hospitals, as well as individual consumers, wound up paying abnormally high rates as a result.

According to a recent Senate report, speculation of this nature may have added $20 to $25 per barrel to the price of crude oil in 2006. The Industrial Energy Consumers of America estimates that Amaranth's speculation alone cost consumers of natural gas as much as $9 billion from April to August of last year.

At a time when people everywhere in this country are paying record prices for gasoline and record prices to heat their homes, government has a responsibility to put an end to this speculative excess.

This raises the interesting question of what the Federal Energy Regulatory Commission (FERC) and the Commodity Futures Trading Commission (CFTC) — two agencies that share jurisdiction over these matters—have done to address this problem.

I understand that the FERC has made considerable progress over the past two years in improving its market surveillance capabilities and exercising its enforcement authorities. On the other hand, there are indications that the CFTC may have been more enthusiastic in granting exemptions from regulation, than it has been in rooting out possible energy market manipulation. I look forward to exploring this matter further with the CFTC.

I am also disappointed to see that the CFTC has challenged FERC's authority to investigate and pursue energy market manipulators, despite the explicit grant of such authority to FERC by Congress in the Energy Policy Act of 2005. I would hope that by the time we conclude this hearing, CFTC will have rethought its views on this issue.

Mr. Chairman, speculative excess in the energy markets has cost consumers billions of dollars in unnecessary energy costs. It is time to close the loopholes that have allowed this unscrupulous consumer exploitation.

The House Committee on Energy and Commerce :: The Public Record :: Subc... Speculation: Is Greater Regulation Needed to Stop Price Manipulation?"

Case 1:07-cv-01307-RJL     Document 50-9     Filed 01/22/2008     Page 3 of 3

Prepared by the Committee on Energy and Commerce
2125 Rayburn House Office Building, Washington, DC 20515